# EXHIBIT A

1     IN THE UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF GEORGIA
2              ATLANTA DIVISION

3

4  NICOLE JENNINGS WADE,            )
   JONATHAN D. GRUNBERG, G.         )
5  TAYLOR WILSON,                   )
                                    )
6              Plaintiffs,          )
          v.                        )   CIVIL ACTION
7                                   )   FILE NO. 1:22-CV-01073-MLB
                                    )
8  L. LIN WOOD,                     )
                                    )
9              Defendant.           )
   _____ )

10

11

   ----------------------------------------------------------
12
          BEFORE THE HONORABLE MICHAEL L. BROWN
13            TRANSCRIPT OF PROCEEDINGS
                  AUGUST 17, 2022
14
   ----------------------------------------------------------
15

16  APPEARANCES:

17  For the Plaintiff:        ANDREW BEAL
                              Attorney at Law
18
    For the Defendant:        R. CHRIS HARRISON
19                            Attorney at Law

20

         Proceedings recorded by mechanical stenography
21         and computer-aided transcript produced by

22

         JANA B. COLTER, FAPR, RDR, CRR, CRC
23              Official Court Reporter
               1949 U.S. Courthouse
24            75 Ted Turner Drive, SW
              Atlanta, Georgia  30303
25                (404) 215-1456

1       (Atlanta, Fulton County, Georgia, August, 17, 2022, in

2   open court.)

3                               —  —  —

4                       P R O C E E D I N G S

5                               —  —  —

6           THE COURT:  All right.  Good morning.

7           We are here for a hearing in *Wade v. Wood.*

8           May I have appearances starting with counsel for the

9   plaintiff?

10          MR. BEAL:  Drew Beal for plaintiffs, Wade, Grunberg &

11  Wilson, Your Honor.  Good morning.

12          THE COURT:  Good morning.

13          And for the defendant?

14          MR. HARRISON:  Good morning, Your Honor.

15          Chris Harrison for the defendant, Lin Wood.

16          THE COURT:  All right.  Mr. Beal, I think it's the

17  first time we've been together.

18          MR. BEAL:  That's correct, Your Honor.

19          THE COURT:  I have had a couple of things with your

20  partner, but I don't think I have had anything with you since

21  I've been here.  Mr. Beal was my older brother's English

22  teacher.

23          MR. HARRISON:  Okay.

24          THE COURT:  At Marist; isn't that right?

25          MR. BEAL:  That's right.  For four years before I

1  went to law school.

2          THE COURT:  Yes.  I think you maybe left before I got

3  to the grade you taught.

4          MR. BEAL:  Yeah, I started with sophomores, so yeah.

5          THE COURT:  I think you taught David, but I think you

6  left before I became a sophomore.

7          MR. BEAL:  Yeah, because I left in '83.

8          THE COURT:  Yeah, that sounds about right.  Well, at

9  any rate, good.  It's nice to see you.

10          MR. BEAL:  So if we have any semicolon questions, I

11  want everybody to defer to me.

12          Can we agree on that?

13          THE COURT:  All right.  So I have looked at the

14  planning report that you-all filed.  It looks like that is the

15  basis for your dispute.

16          Does anybody want to talk me through it?  I mean, is

17  it really just as simple as how much time you-all need to do

18  discovery?

19          MR. BEAL:  Your Honor, we contend that there is no

20  dispute about anything but time for discovery, and I'm

21  prepared to address that.  We didn't say there was a dispute

22  on anything, the defendant did.

23          THE COURT:  Right.

24          MR. BEAL:  And I thought it was mainly about the way

25  they would be required to produce electronic communications,

specifically Telegram posts.  That's what I thought we were

here to argue about.  But also, perhaps, timing, so I'll let

counsel go and then I'll respond.

THE COURT:  Sure.  I'd like to get as many things

cleared out as we can and get you-all moving forward.

MR. BEAL:  Thank you, Your Honor.

THE COURT:  Has discovery started?  I know you

thought it started on the 2nd of July, I think, and I believe

they thought it started late July.  But are you-all into

discovery now?

MR. HARRISON:  We are, written discovery has been

propounded to us and we've actually got some depositions that

I think are on the books.

THE COURT:  Good.

MR. HARRISON:  So we are moving, Your Honor.

And just so the Court know, Mr. Beal and I have

worked together before --

THE COURT:  Great.

MR. HARRISON:  -- one particularly crazy case that we

got resolved, so I don't anticipate any problems between

counsel.

THE COURT:  Okay.

MR. HARRISON:  But we did have it run from July 27th,

which was 30 days from our answer.  I don't know that that's a

major issue for the parties, but we probably want the Court to

1   set a start date at some point, if that's all right.

2              THE COURT:  Okay.

3              MR. BEAL:  Well, we've agreed that we're going to

4   adopt his timetable for the response time, for the written

5   discovery, so that's coming up in about a week or two.  And so

6   that -- that issue will be resolved and we have set the

7   depositions of two of the three plaintiffs, the other is on

8   vacation, so we'll do that tomorrow.

9              THE COURT:  Okay.  All right.  So what is it you-all

10  wanted to talk about?

11             MR. HARRISON:  So I think maybe working from the back

12  end on the ESI issue, Your Honor.

13             THE COURT:  Sure.

14             MR. HARRISON:  I think there probably is not much of

15  a dispute or a dispute.  I think Drew is probably right.

16             I will advise the Court that I certainly have not

17  looked at all of the documents and I'm coming into this

18  suit -- there's a separate pending suit in the Superior Court

19  of Fulton County, Judge Glanville, that's part of our ask for

20  additional time.

21             But in regard to specifically Telegram posts that may

22  need to be produced from my client to the plaintiffs, I talked

23  with Mr. Beal's associate, I just want to make sure that --

24  and this may be overkill, Your Honor, but that we don't have

25  the capability, as I understand it, Mr. Wood does not have, to

1  produce those posts in native format, or near native, he

2  certainly has the ability to make a copy of it and produce it,

3  so...

4          THE COURT:  Essentially a screenshot?

5          MR. HARRISON:  Yes, Your Honor, I think so.  Now, I

6  think there were -- and I'll let Mr. Beal speak to it -- some

7  issues with the production in the Fulton County suit, but I

8  think we can work through that.  I just wanted to make sure

9  that we got that out in the open that in terms of Telegram

10 administrators and those sorts of people, I don't have any

11 contact or ability to handle that, but whatever is posted, if

12 he can pull it up, we'll produce it.

13         THE COURT:  Right.  But isn't that all that you can

14 do?  I mean, you can only give what you can get.

15         MR. HARRISON:  That's our position, Your Honor.

16         THE COURT:  Is there an issue there that I'm missing?

17         MR. BEAL:  Your Honor, with the Court's permission, I

18 wanted to give the Court a couple of printouts from Telegram.

19         THE COURT:  Sure.

20         MR. BEAL:  Telegram what's called a bot, which

21 your Honor knows what that is.  It is basically an app and you

22 go on and you click on it and it is a two-step process, and it

23 will download all of your posts and responses in that medium

24 and put it in a separate download on your computer.

25         THE COURT:  Do you know about this process?

1    MR. HARRISON:  I do not.  And, Your Honor, if that is

2  correct, I'm sure it is, and we have that capability, we'll do

3  it.

4    THE COURT:  Okay.

5    MR. HARRISON:  Yeah.

6    MR. BEAL:  And so I've got printouts.  And I thought

7  I had three, but of course I only have two, so that's a bit of

8  a problem.

9    THE COURT:  Is Telegram where he allegedly made the

10  defamatory statements?

11    MR. BEAL:  Yes, Your Honor, Telegram, yes.  It is a

12  totally encrypted end-to-end encryption.  They brag on this

13  handout that I'll give, Your Honor, that they have never

14  produced any confidential -- any data in response to a

15  subpoena worldwide.

16    THE COURT:  Why?  How?  Because they don't have any

17  because it passes through them encrypted?

18    MR. BEAL:  Correct, Your Honor.  And so if I set up a

19  Telegram channel, I can give it subject to a subpoena, but

20  Telegram can't come in and give you Beal's data --

21    THE COURT:  Right.  Okay.

22    MR. BEAL:  -- because of the encryption and it says

23  what can administrators do.

24    Can I approach, Your Honor?

25    THE COURT:  Yes, of course.

So when you set up an account, you are your own administrator?

MR. BEAL:  That's correct.

And we'll just have to read this one together.
Sorry.

MR. HARRISON:  No.  No worries.

MR. BEAL:  What can an administrator do?  The owner of a channel can broadcast messages, delete any messages, add subscribers, remove subscribers, change the channel's name, profile, image and link as well as delete the channel completely.  The owner can also add and remove administrators to help manage the channel.

What happens if I delete a message?

If a message is deleted in a channel, it will disappear for all subscribers.

And then the second document we have is the process by which they download all of the -- and this is why, you know, we kind of made a big deal out of it.  And you'll see the highlighted portion there.

It says, Do you process data requests?

Secret chats use end-to-end encryption, thanks to which we don't have any data to disclose.  To protect the data that is not covered by end-to-end encryption, Telegram uses a distributed infrastructure.  File chat data is stored in multiple data centers around the globe that are controlled by

1 different legal entities spread across different

2 jurisdictions.  The relevant decryption keys are split into

3 parts and are never kept in the same place as the data they

4 protect.

5        As a result, several court orders from different

6 jurisdictions are required to force us to give up any data.

7 Thanks to this structure, we can ensure that no single

8 government or block of like-minded countries can intrude on

9 people's privacy and freedom of expression.  Telegram can be

10 forced to give up data only if an issue is grave and universal

11 enough to pass the scrutiny of several different legal systems

12 around the world.  To this day, we have disclosed zero bytes

13 of user data to third parties, including governments.

14        Then the last --

15        THE COURT:  If I were a prosecutor, I would like that

16 challenge.  But I have no will and I think there is some

17 saying about courts have no will in this regard, so I accept

18 that that could not be done.

19        MR. HARRISON:  Your Honor, whatever my client has the

20 capability of producing, we will.  I don't know if he's an

21 owner and administrator, if that's separate, but we

22 understand.

23        THE COURT:  It sounds like you both agree that the

24 defendant has to give whatever he can get, but it sounds like

25 Mr. Beal has reason to believe that there is more that he can

1   get than just screenshots.

2           MR. BEAL:  Yes, Your Honor.

3           THE COURT:  And I think you ought to go and

4   investigate that.

5           MR. HARRISON:  We will, Your Honor, absolutely.

6           MR. BEAL:  And these all just came from the Telegram

7   website, so we just kind of did these Google-type searches.

8   And this is the GEPR bot, and as it says here, what can this

9   bot do?  This bot can help you get a copy of your data that is

10  stored by Telegram and contact us about privacy.

11          Welcome to Telegram's official GDPR bot.  Please use

12  one of the following commands.  Leave a request for your

13  Telegram data and account information.

14          And then it says on the next page, to download your

15  data, at the bottom of the second page, please make sure that

16  you have a Telegram desktop installed on your computer.  Log

17  in to the desktop and go to settings, advanced, export

18  Telegram data, choose which kinds of data you would like to

19  export, and press export.  And so I opened up a Telegram

20  account.

21          THE COURT:  I was about to ask if anybody did that.

22          MR. BEAL:  And did it.  And even I was able to do it.

23  Unfortunately, Linda Brown, my associate is not here today, so

24  if I do it, I'll probably screw it up, but I have it on my

25  iPad if Your Honor would like to see it.  You just go to your

1  Telegram account, press a button, the bot shows up, says what

2  do you want to do with this?  You can contact us and talk to

3  us or you can download your data.

4         And you say download the data, and it says do you

5  have a place to store it?  And the answer is yes.  And then it

6  takes everything from that channel and puts it in there.

7         So we ran a bunch of messages that just said test,

8  test, test, and we downloaded them and so, you know, it took

9  just a couple seconds.  Now, obviously we didn't have much

10 data in there, we just had a bunch of test things.

11        And interestingly, we got a request when we opened it

12 to join various groups, two militia groups, so we haven't

13 really activated the account beyond that initial time, and I

14 think maybe it's a good idea if we don't do that.

15        But anyway, so we contend it's real simple and I'm

16 sure Chris and I can work it out.  But the idea that emails

17 are not going to be in native format or these are not going to

18 be in native format is going to be a problem, because all of

19 the defamatory statements were made in electronic form.

20        There is a possibility we will discover at various

21 press conferences that similar things were said, we believe

22 that happened, but it's -- as you know, it's not a part of our

23 complaint right now.  That's why the electronic data has got

24 to be downloaded.

25        THE COURT:  Explain to me why the native format is

1   going to be a problem.

2          MR. BEAL:  It's not.

3          THE COURT:  Oh, okay.

4          MR. BEAL:  But they have said it could be.  And I

5   realize that he's -- you know, that Chris wants to, you know,

6   be circumspect, but at the same time, that is -- that is

7   essential.  And we know that at some point, the defense is

8   going to be, oh, I didn't post this or somebody else posted

9   it, so, you know, we need it to come right out of his channel.

10          THE COURT:  Okay.

11          MR. BEAL:  And I'm prepared to address the other

12  issues, but --

13          THE COURT:  Mr. Harrison, what do you say about this?

14  I mean, it sounds like you agree, you ought to have to give

15  it, if it's available.

16          MR. HARRISON:  We agree, Your Honor, sure.

17          THE COURT:  Okay.  So I think you ought to, because

18  this could become a problem, why don't you-all in the next

19  week get together and see if this is available.  Okay?

20          And let me know whether it is something that,

21  Mr. Harrison, you believe is available.  I'll give you seven

22  days to let me know that what you-all believe could be done

23  today can, in fact, be done or cannot be done, and if so, why

24  it can't be done.

25          MR. HARRISON:  Your Honor, just to clarify, meaning

1  if this GDPR bot works --

2            THE COURT:  Yes.

3            MR. HARRISON:  -- as advertised here --

4            THE COURT:  Yes.

5            MR. HARRISON:  -- with this account?

6            THE COURT:  Yes.  So I'd like you to just file

7  something by this time -- or by the end of Wednesday next week

8  letting me know that it was possible to do so.  Okay?

9            MR. HARRISON:  Yes, sir.

10            THE COURT:  They've been requested by the plaintiff

11  already?

12            MR. BEAL:  Yes, Your Honor.

13            THE COURT:  When is that discovery request subject to

14  being responded to?

15            MR. HARRISON:  We have it at the, I think, 27th of

16  this month.

17            THE COURT:  Okay.

18            MR. BEAL:  That seems right.

19            THE COURT:  So just let me know if there is some

20  problem with doing the process and then you-all can continue

21  with the discovery response in the ordinary course.  But if

22  there's some problem with the process, let's get together

23  again and talk about what it is.

24            MR. HARRISON:  Yes, Your Honor.

25            MR. BEAL:  Thank you, Your Honor.  I don't foresee a

1  problem, but...

2  MR. HARRISON:  The only other thing I think,

3  Your Honor, is the bigger issue of the discovery track, is

4  primarily why we were here.

5  THE COURT:  Okay.

6  MR. HARRISON:  I think it's laid out in the joint

7  report and the disclosures.  I don't want to take too much of

8  the Court's time.  Of course I'll answer any questions that

9  the Court has.  But we do have a separate pending, and we

10  contend related, suit in Superior Court Fulton County,

11  Judge Glanville.

12  THE COURT:  That's really just a contract claim,

13  right?

14  MR. HARRISON:  It is.  It's a breach of contract

15  fraud claim arising out of the party's prior business

16  relationship.  We -- our position, though, Your Honor, is that

17  that's the genesis of the dispute and the alleged defamatory

18  statements.

19  And, in fact, in the complaint here, I think the

20  first 60 or 70 paragraphs reference that history, so we do not

21  agree about the scope of this suit relative to that one, and

22  so I think we're really just talking about what can be

23  discovered and, in particular, some witnesses and those

24  witnesses are listed in our disclosures.

25  THE COURT:  So you-all want a four-month discovery

1  track; is that right?

2          MR. BEAL:  Right.  Yes, Your Honor.

3          THE COURT:  And they want eight months?

4          MR. BEAL:  And I don't see any reason beyond that.

5  This is a straightforward defamation over a handful of posts

6  that when we made a demand upon them, in writing to Alston &

7  Bird, Mr. Wood's lawyers, not sent to anybody else, that that

8  was somehow extortion.  The law in Georgia is clear.  It can't

9  be extortion.

10          First of all, he didn't threaten anything else, it

11  didn't say we're going to expose you, we're going to do

12  anything else.  It said we've been unable to resolve this,

13  here's a copy of the complaint we're going to file.  Look it

14  over.  If any part of this complaint's wrong, tell us about

15  it, but this is what we contend happened and this is what you

16  owe, and here's why there's additional damages, because of

17  this additional contact -- conduct and additional expenses.

18          So the demand was for $1.2 million, the underlying

19  claim was between 800 and $900,000 for damages under the

20  contract.

21          And so Mr. Wood contended that that was extortion,

22  said that my clients were extortionists.  Then he went further

23  and said they should be disbarred and lawyers who are

24  committing criminal acts should not be allowed to practice.

25  Then he encouraged his viewers all around the country to

1 somehow make bar complaints against them because they were

2 lawyers engaging in criminal activity. That's what this case

3 is about.

4       The underlying case, one or two sentences about

5 background, Your Honor, Mr. Wood's behavior became

6 increasingly -- and this is the line from the complaint --

7 increasingly abusive and erratic, but that erratic behavior is

8 used in the underlying case and in this case for one purpose

9 only, to show malice, but it is not a cause of action in the

10 underlying case. It is not part -- it does not give rise to a

11 cause of action in this case. It shows malice, both

12 constitutional and common law.

13       What we don't want to do is Judge Glanville has, for

14 whatever reason, suspended hearings and we have about 30

15 pending motions, there has been no activity in Fulton County,

16 no rulings, even though we've had about six meetings. He has

17 said I'm going to let everything be done in the Court of

18 Appeals in the Georgia Supreme Court before I do anything.

19       And that relates to an additional claim we had that

20 was enforcement of the nondisparagement clause. This all

21 comes about out of a settlement agreement. And like so many

22 settlement agreements, it said nondisparagement, and when he

23 breached it, he started to disparage them, so we moved for an

24 injunction in addition to the breach of contract, fraud, we

25 moved for an injunction to stop the disparaging speech. Judge

1 Constance Russell granted that in November before she left the

2 bench in December.

3       Mr. Wood took it up on appeal to the Georgia Court of

4 Appeals.  The Georgia Court of Appeals shifted it to the

5 Supreme Court, because it was a constitutional question.  The

6 Supreme Court said this is not a constitutional question and

7 we deny this referral, sent it back to the Court of Appeals.

8       The Court of Appeals issued a 20-page order saying

9 this is just a nondisparagement clause.  This doesn't have

10 anything to do with the U.S. Constitution or the Georgia

11 Constitution, forget about it.  It's enforceable like the

12 millions of others out there.

13       He then took that up to the Georgia Supreme Court and

14 we assume that a ruling will come down at the end of this

15 month.  He has then said I'm going to take it to the

16 U.S. Supreme Court, because, you know, it creates further

17 delay.

18       So Judge Glanville hasn't done anything with the

19 fraud or breach of contract case, it's just -- there was no

20 answer to discovery, there were no answers to requests to

21 admit, there was no answer to any of this, there was crazy

22 behavior and so we filed motions, and the Judge hasn't ruled

23 on any of that.  So I bring all of that up to say I don't know

24 that we should use this case to conduct discovery in that

25 case.

1     The prior statements by Mr. Wood saying I'm going to

2  kill you or I'm going to destroy you or you should be

3  destroyed or you should be disbarred proved malice and they

4  have a right to inquire about that.  I understand.

5     But my clients did not initiate a bar complaint

6  against him.  My clients didn't have anything to do with his

7  bar problems.  And so all throughout this, he said, well, I

8  want to get into the bar.  I don't want to get into the bar.

9  That's a government or quasi-governmental agency, it has

10 nothing to do with us.  We didn't initiate it and we don't

11 prosecute it.  And I don't know anything about it.

12    He has counsel, the bar has counsel, and they're

13 involved in two really complex pieces of litigation that we

14 aren't competent to testify about and shouldn't have to.

15    And I don't want to get into years of discovery of

16 all kinds of people.  And when Mr. Harrison says witnesses,

17 the witness is -- one of the witnesses is me, because I signed

18 the letter.  The letter speaks for itself.  I'm never going to

19 testify about what my clients told me or any of that.

20    And nothing that Chris Marquardt at Alston & Bird

21 told me is going to be relevant.  They said the letter I sent

22 was extortion.  The letter speaks for itself.  And Your Honor

23 and I already went over this when we had our initial phone

24 conversation, I don't think Chris Marquardt can be compelled

25 or Joey Burby can be compelled to say anything because they

1 | were representing their client.

2 |        THE COURT:  Well, he could waive it and let them

3 | testify.

4 |        MR. HARRISON:  Exactly.

5 |        THE COURT:  Right?

6 |        MR. BEAL:  Well, that's up to him, but --

7 |        THE COURT:  Yes.

8 |        MR. BEAL:  -- everything that I said was in my

9 | letter.  I'm holding this up like it is my letter, it is not.

10 | But, you know --

11 |        THE COURT:  I guess, though, the lawyers could say

12 | that you said something additive to your letter.

13 |        MR. BEAL:  But he never did in any of the posts, he

14 | never referenced that.

15 |        THE COURT:  Mr. Wood never did?

16 |        MR. BEAL:  So it wouldn't be relevant now because he

17 | said the letter constitutes this and that's what we need to

18 | analyze.

19 |        And throughout the other litigation, Mr. Wood has

20 | constantly found ways to delay things.  You know, I'm going to

21 | take this breach of -- this breach of the nondisparagement

22 | clause to the U.S. Supreme Court, and he's just building a

23 | couple of years of delay.  He's done some outrageous things

24 | and he doesn't want to pay the piper, he doesn't want to go to

25 | trial.

1          And so by creating these huge expansive discovery

2   requests and appeals, he's wasting time and buying time for

3   himself, he gets a couple of years and he thinks everybody's

4   going to be out of time and out of money and out of patience.

5          The reason I feel that way is that's specifically

6   what he said on Telegram over and over and over again, these

7   people will run out of money and time.  And he insulted all of

8   the judges.  He insulted -- in the Fulton County case, he

9   insulted and said that they were somehow criminals or part of

10  some larger deep-state conspiracy in the Court of Appeals.

11         And so it is important -- I even have videos that he

12  has recently posted about me saying that I'm actually a

13  transgender lawyer misrepresenting myself as a male and I'm

14  actually a female, and so the personal attacks continue and it

15  has been probably good for --

16         THE COURT:  None of that is really a basis for me to

17  do anything.

18         MR. BEAL:  Nothing.  I'm just sort of giving you the

19  color.

20         MR. HARRISON:  May I respond?

21         THE COURT:  You're just making your point as to why

22  you want to move expeditiously and maybe drawing or maybe in

23  some way raising a credibility issue as to their claim that

24  they really need more time in order to do discovery.

25         MR. BEAL:  Exactly, Your Honor.

1    THE COURT:  Did you want to say anything about any of

2  that?

3    MR. HARRISON:  I did, Your Honor, briefly.

4    And I didn't realize we were giving closing

5  arguments, or I would have prepared one.

6    But there are two things, Your Honor.  Mr. Beal said

7  the underlying actions and statements by Mr. Wood show malice.

8  That is exactly what he's argued in this complaint, that's the

9  subject of the Fulton County suit, and that's the reason why

10  it's discoverable here.  They want the Court to believe that

11  this is just a very discrete lawsuit about 15 or 20 statements

12  made in 2021.  That was the reason we filed our 12(b)(6)

13  motion.

14    THE COURT:  I'm sorry.  What are the underlying

15  statements that show malice?  Are they part of what's in the

16  Telegraph -- is it Telegraph postings?

17    MR. BEAL:  Telegram, Your Honor.

18    MR. HARRISON:  Your Honor, they came out of the 2020

19  fee disputes between these parties.  The Telegram statements

20  at issue here are 2021 only, correct?

21    MR. BEAL:  Correct, that's 100 percent right.

22    MR. HARRISON:  But, but he said a minute ago that

23  they want to show these prior statements --

24    THE COURT:  I see.

25    MR. HARRISON:  -- to use as malice, so if that's the

1  case, then we believe those issues are discoverable, those two

2  lawyers from A&B, perhaps this Kentucky lawyer who was

3  involved in the fee dispute involving that client.  We

4  understand the Court wants to move expeditiously, and we're

5  trying to already have depositions booked.

6          THE COURT:  I didn't say that.

7          MR. HARRISON:  Well --

8          THE COURT:  I just want to move at the right pace.

9          MR. HARRISON:  The other thing I would add,

10 Your Honor, is -- and I don't want to get into the Fulton

11 County suit.  I'm not involved in that.  Drew knows it much

12 better than I do.

13         But the reason this action was filed is because that

14 court won't do anything.  It's been sitting.  And so this was

15 filed for the purpose of trying to get something moving, so if

16 they're going to use prior statements that are not the subject

17 of the 2021 Telegram statements to show malice in this action,

18 we believe that an extended discovery period is necessary and

19 the exclusion of those witnesses.

20         THE COURT:  How many witnesses are there in that

21 regard?  Right now what I've heard is there are, what, three

22 plaintiffs.

23         MR. HARRISON:  Correct, Your Honor.

24         THE COURT:  There's Mr. Wood.

25         MR. HARRISON:  Yes, Your Honor.

1          THE COURT:  There is let's say potentially the two

2    lawyers -- you've identified three lawyers so far.

3          MR. HARRISON:  Correct, Your Honor.

4          THE COURT:  And whether or not they could actually

5    provide any information, we don't know.  Then who are the

6    other witnesses?

7          MR. HARRISON:  And I guess it would actually be four

8    attorneys, you have Mr. Marquardt, Mr. Burby, Mr. Beal, and I

9    know he's given his position on that and we won't be able to

10   resolve that today.

11         THE COURT:  Right.  I didn't include Mr. Beal.

12         MR. HARRISON:  And then Todd McMurtry, who is a

13   Kentucky lawyer, who was involved in that fee dispute over the

14   client in the 2020 action.

15         THE COURT:  All right.  And if we got into a lot of

16   discovery about the prior statements in regards to malice, who

17   are those witnesses?

18         MR. BEAL:  It's just the same ones.  Wood said it to

19   my clients and my clients recorded it on their cell phone and

20   he sent it by email, so we've got that.

21         And so, you know, he keeps saying he wanted to get

22   into the state bar and talk to people at the state bar and

23   I -- you know, I don't want to be involved in any part of

24   that.  I don't know what the state bar is doing or accusing

25   him of or what the law is on it.

1           THE COURT:  Even if he wanted to get into that, even

2   if he wanted to -- do you want to bring the state bar issue

3   this does?  Your client want to?

4           MR. HARRISON:  I don't intend to Your Honor.  I don't

5   intend to.

6           THE COURT:  And so right now I've got nine witnesses.

7           MR. BEAL:  And that's a stretch, Your Honor.

8           THE COURT:  Why is there more than that?

9           MR. HARRISON:  Why is there more than that?

10          THE COURT:  Yes.

11          MR. HARRISON:  There's several other folks listed,

12  Your Honor.  Three of them are Mr. Wood's children.  My

13  preference, if we're going to talk about that, my preference

14  would be to do that with Your Honor in chambers.  I don't

15  think we necessarily need to for the purposes of today, but

16  that would be my preference.  They're listed on our list as

17  folks my client believes are relevant to this action.

18          MR. BEAL:  Your Honor, real briefly, Mr. Wood has

19  continually felt when he entered his period of erratic

20  behavior that somehow my clients were interfering with his

21  relationship with his children, and nothing could be further

22  from the truth.

23          We don't have anything to say about his kids or with

24  his kids.  One of his sons, his oldest son is a partner, I

25  believe, with a large Texas firm and he litigated with

1 Mr. Wood in the famous Elon Musk trial, he was somehow -- had

2 some part of that.

3          THE COURT:  What's the famous Elon Musk trial, if it

4 matters?

5          MR. HARRISON:  It's a recent defamation trial.

6          MR. BEAL:  The pedo boy trial, when he got into a

7 fight with the --

8          THE COURT:  The young men that were trapped in the

9 cave?

10         MR. BEAL:  Yes.

11         MR. HARRISON:  Yes, sir.

12         MR. BEAL:  And there was another scientist who had a

13 different way to try to rescue children, and Mr. Wood insulted

14 that guy on Twitter and said that he was a pedophile because

15 he married his wife when she was under age or started dating

16 her, and that wasn't true, and so there was a defamation case

17 that came about.

18         And ultimately, at the end, the jury sided with

19 Mr. Musk and said it was hyperbole and it was, you know --

20 all's fair in love and war or something, and Mr. Wood did not

21 recover in that case.

22         But that was sort of the beginning of the end, that

23 was a very stressful trial, a lot of stuff was said on

24 Telegram.  Mr. Wood's son attended that trial.  There were

25 numerous heated physical exchanges between Mr. Wood and his

1  son.  And apparently, at some point, Mr. Wood's son said I

2  don't want you to come anywhere near my children, this is the

3  end.  Lin Wood's fight with his kids, I hope he works it out,

4  but it's between him and his kids.  It has nothing to do with

5  us and I don't want to get into that because --

6           THE COURT:  I can't imagine how that is relevant.

7           MR. BEAL:  -- we don't have anything to do with that,

8  we didn't -- Mr. Wood sent me emails, confidential emails he

9  had with Dr. Phil, you know the guy from television who

10  offered to mediate a dispute between Mr. Wood and his

11  children, and this is before any of these problems came up.

12           And Mr. Wood got very angry at him and basically said

13  butt out, get out of my life, so he's got some issues with his

14  kids, and I'm sorry, but I don't want to litigate that.

15           MR. HARRISON:  Your Honor, I think the focus should

16  be --

17           THE COURT:  I'm not even sure how we got to this

18  issue.

19           MR. HARRISON:  I'm not, either.  I think we're way

20  off track.  I think the focus should be on the allegations of

21  the complaint, a number of paragraphs, again, reference

22  alleged statements made in 2020 that show malice and that they

23  believe will show malice here.  That's why those Alston & Bird

24  lawyers are relevant and the attorney in Kentucky.

25           And so I just think it's going to take some time to

1  work through that and to get those depositions scheduled.  I

2  don't know that there is a tremendous amount of written

3  discovery, necessarily, but getting these folks deposed or

4  determining if they are willing to be deposed or not may take

5  a little bit of time.

6          THE COURT:  Okay.  This does not seem to me to be a

7  case with extensive discovery.  You've identified a couple of

8  maybe collateral, maybe relevant issues, prior statements,

9  what's going on with the state bar, you say you don't --

10  Mr. Harrison says he doesn't want to get into that, even,

11  whatever the relevance of the children might be, some of all

12  of that stuff, those three things might be relevant, some

13  might not.  But even if they are, they're pretty finite, it

14  seems.  None of those seem to be something that would take a

15  long and drawn-out amount of discovery.

16          I'm going to put this on a four-month discovery

17  track.  I'm going to run it from today.  That really is more

18  than four months.  If you go back to July 2nd, when I think

19  the plaintiff believes it started to run, then it's more like

20  five-plus months.

21          And if not, if you go to the other, it's just a

22  little bit over four months, the date that I think the

23  defendant was proposing to begin discovery, but I'm going to

24  put it on a four-month discovery track because nothing that

25  I've heard today makes me think this is going to be long or

drawn out in any way.  During that four-month -- and also, I

can always extend discovery if needed.

You will have, Mr. Harrison, the opportunity to do

whatever discovery is necessary, but in looking at a discovery

extension, I will then be able to determine whether it really

is necessary, either because deposing the people you've

identified or potentially identified as necessary or

potentially necessary, we'll know whether there is any

difficulty getting those depositions scheduled, we'll know

whether there's any other problems with discovery at that

point, and we can adjust then.

But in my experience so far, is that discovery works

better when extensions are requested than when more time is

given.  If we do eight months, and then you need more time,

that could happen as well.  I'm not saying that right.

I suspect that everything could be done in eight

months.  I think everything can be done in four months, or I

wouldn't have put it on a four-month track, but might we get

to four months and add another four months, yes, we might, but

then we'll know that it's necessary.

The discovery problems, in other words, typically in

my experience seem to arise in the last quarter of the

discovery period, no matter how long the discovery period is.

And so to just pick eight months when there doesn't seem to be

a basis for it now would be just to put off that serious

analysis.  So I'm going to put this on a four-month track,

starting today.

Which day would that make it end?  That would make it

end December 17th?

MR. HARRISON:  Yes, Your Honor.

THE COURT:  What day of the week is that?

COURTROOM DEPUTY:  Saturday.

THE COURT:  Saturday, so we'll make it the day

before, December 16th of this year.  If more time is needed,

or is anticipated to be needed, any discovery extension needs

to be requested 30 days before the end of discovery.  That

gives me time and you-all time to talk about what's actually

needed and dial it in more precisely.  It also gives me

convenient time, which is otherwise you-all may file something

three days before the end of discovery and then all of a

sudden it's an emergency for me, whereas if you do it 30 days

ahead of time, we can all get together and be thoughtful about

extending it.

But with the caveat that, Mr. Harrison, your client

will, of course, not be caught short and unable to do

necessary discovery provided that he's working diligently now.

But we will determine whether there is a need for more

discovery when we have more details in front of us.

Okay?

Does that make sense to you both?

1           MR. BEAL:  That's perfect, Your Honor.  Thank you.

2           MR. HARRISON:  Thank you, Your Honor.

3           THE COURT:  Okay.  And in the interim, you know we

4   have a policy or a program in place for resolving discovery

5   disputes.  It's in my standing order.  I don't remember all

6   the details of it, but it's roughly this, when you all-have a

7   discovery dispute, you get together and you send me a fairly

8   short letter that outlines what the dispute is and then we

9   will get together and we will resolve the dispute.  That does

10  it pretty quickly.  If you give it to us, we can usually get

11  back to you within a couple of days and tell you when we will

12  have a chance to get together and address it.  But that way we

13  can work pretty quickly in that regard.

14          Okay?

15          MR. BEAL:  Yes, Your Honor.

16          MR. HARRISON:  Yes, Your Honor.

17          THE COURT:  Anything else that you-all want to talk

18  about?  Any other adjustments you-all want to make or things

19  that you see down field that we ought to talk about?

20          MR. BEAL:  I don't think so, Your Honor.  I think we

21  addressed the -- I think Your Honor knows what our position is

22  going to be on discovery, if he wants to inquire about

23  statements that are referenced in the complaint, certainly, he

24  has a right to do that.  I just don't want to get into it, so

25  I'll just be objecting to things --

```
 1            THE COURT:  What is it that you're afraid of, like
 2   where do you see the goalposts to be or the sidelines to be?
 3            MR. BEAL:  Our never-ending discussion about his
 4   relationship with his children.  I mean, he left me --
 5            THE COURT:  Him discovering his own relationship or
 6   your client's understanding of that relationship?
 7            MR. BEAL:  Inquiring about my clients' understanding
 8   of his relationship in a way that there is no end to it.
 9   Issues that have nothing to do with the break-up of their
10   partnership, the signing of the settlement agreement and the
11   breach of the settlement agreement and his statements of
12   criminality.  That's really, to me -- and so since we don't
13   have a discovery dispute, I think -- I think we're in good
14   shape.
15            I don't ask Your Honor to give some kind of advanced
16   ruling, because that would be too difficult.  If there is a
17   problem, we'll bring it to Your Honor, and it will be in black
18   and white and Your Honor can then easily make a ruling, cut
19   and --
20            THE COURT:  Okay.
21            MR. BEAL:  -- clean it up for us.
22            THE COURT:  Okay.  I think that's right.
23            Anything you want to say about that, Mr. Harrison?
24            MR. HARRISON:  Nothing else.  Thank you to the Court
25   for hearing us.  We appreciate it.
```

1          THE COURT:  Okay.  All right.  Well, good luck to you

2     both.  And I will give these back to you, Mr. Beal.

3          MR. BEAL:  Okay.

4          THE COURT:  It's the Telegram information.

5          MR. BEAL:  Thank you.

6          THE COURT:  If you need them, because if it becomes

7     an issue next week, we can get back together.

8          MR. BEAL:  Thank you.

9          THE COURT:  But talk next week and I want you to file

10    something that lets me know this is something I need to worry

11    about or something I don't need to worry about.

12         MR. HARRISON:  Yes, Your Honor.

13         THE COURT:  Because otherwise, I will continue to

14    just sort of worry about it.  Okay?

15         MR. BEAL:  Right.

16         THE COURT:  Okay.  Thank you.

17         MR. BEAL:  Thank you, Your Honor.  I appreciate the

18    hearing.

19         MR. HARRISON:  Thank you, Your Honor.

20         THE COURT:  You bet.

21

22         (Whereupon, the proceedings were adjourned at 11:46

23    a.m.)

24

25

1                   REPORTERS CERTIFICATE

2

3

4          I, Jana B. Colter, Official Court Reporter for the

5   United States District Court for the Northern District of

6   Georgia, with offices at Atlanta, do hereby certify:

7          That I reported on the Stenograph machine the

8   proceedings held in open court on August 17, 2022, in the

9   matter of *Nicole Jennings Wade, Jonathan D. Grunberg, G.*

10  *Taylor Wilson v. L. Lin Wood,* Case Number 1:22-CV-01073-MLB;

11  that said proceedings in connection with the hearing were

12  reduced to typewritten form by me; and that the foregoing

13  transcript (32 Pages) is a true and accurate record of the

14  proceedings.

15         This the 26th day of October, 2022.

16

17

18

19                         _____
                           /s/ Jana B. Colter, FAPR, RDR, CRR, CRC
20                              Official Court Reporter

21

22

23

24

25