## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| NICOLE JENNINGS WADE, | ) | |
| JONATHAN D. GRUNBERG, and | ) | |
| G. TAYLOR WILSON | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION |
| v. | ) | |
| | ) | |
| L. LIN WOOD, | ) | FILE NO. 1:22-CV-01073 |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF SECOND MOTION FOR SUMMARY JUDGMENT

COMES NOW, Defendant L. LIN WOOD, appearing specially and without submitting to the jurisdiction and venue of this Court, and files this his Memorandum of Law in Support of Second Motion for Summary Judgment, and respectfully shows this Honorable Court as follows:

## INTRODUCTION

The present matter was initiated on March 17, 2022 by Plaintiffs NICOLE WADE, JONATHAN GRUNBERG, and TAYLOR WILSON (hereinafter, the "Plaintiffs") against Defendant L. LIN WOOD (hereinafter, the "Defendant"), for damages purportedly associated with online statements made by the Defendant following the conclusion of a business relationship between the Defendant and the

- 1 -

Plaintiffs. *See* Plaintiffs' *Verified Complaint for Defamation*. Specifically, the Plaintiffs allege that, through messages delivered virtually to various "channels" contained within the instant-message application, Telegram, the Defendant purportedly published defamatory statements entitling them to an award of damages.

Notwithstanding these allegations, the claims pending against the Defendant in this case are barred as a matter of law and should be dismissed with prejudice. The Plaintiffs have not, and cannot, set forth evidence sufficient to survive a motion for summary judgment, and particularly have failed to refute that the Defendant's statements consisted of mere opinions, hyperbole, and statements that were wholly protected by the Defendant's right to free speech. *See* Ga. Const. art. I, § 1, ¶ V.

Specifically, the Plaintiffs cannot refute that they are limited-purpose public figures for the purposes of this action. Yet, they do not offer sufficient evidence of actual malice on the part of the Defendant. The Plaintiffs also cannot produce evidence sufficient to support any recovery for defamation *per se*. Yet, they offer no sufficient evidence of actual damages. Finally, the Plaintiffs also cannot prove that the remarks made by the Defendant (hereinafter, the "Statements at Issue") are defamatory, regardless of how the Plaintiffs would be classified, because they are merely present-sense impressions and subjective opinions made by the Defendant with regard to the conduct exhibited by the Plaintiffs. *See* Plaintiffs' *Verified Complaint for Defamation*. Because the Plaintiffs have failed to offer evidence of actual malice, have failed to

show the Statements at Issue constitute defamation *per se*, have failed to offer evidence of actual damages, and cannot refute that the Statements at Issue constitute nothing other than protected, subjective opinions that cannot be proven false, the evidence does not support any recovery by the Plaintiffs in this case. Their claims are barred as a matter of law, and the Defendant is entitled to Summary judgment. *See* Fed. R. Civ. P. 56(a).

## STATEMENT OF FACTS

The Plaintiffs allege in their Complaint that the period of time relevant to the instant case essentially began on February 14, 2020. *See* Plaintiffs' *Verified Complaint for Defamation*. Prior to that date, the Plaintiffs, through their own professional corporations, were involved in a business relationship with the Defendant and his firm, L. Lin Wood, P.C. *See Id; see also* Defendant Lin Wood's *Deposition Testimony* (attached hereto as "**Exhibit A**"), p. 10-12, l. 6-19.

The business relationship then ended on or about February 14, 2020, when the Plaintiffs severed their working relationship with the Defendant and L. Lin Wood, P.C. *See* Plaintiffs' *Verified Complaint for Defamation; See also Id* at p. 17-18, l. 24-8. The Plaintiffs then formed a new, separate law firm, shortly after leaving L. Lin Wood, P.C., and continued their practice as partners of Wade, Grunberg & Wilson, LLC. *See* Plaintiffs' *Verified Complaint for Defamation*.

At the time of the conclusion of the Parties' former working relationship, there were a number of civil lawsuits that had been handled by the Parties during their working relationship at L. Lin Wood, P.C. which had resolved by way of settlement, but had not yet been paid out to the Parties pursuant to their understanding as to how the fees would be dispersed. *Id.*

Then, a misunderstanding ensued between the Parties in February of 2020, regarding documents that the Defendant believed had gone missing from his office computer system. The Defendant, believing that these documents may have been removed from the system by the Plaintiffs, made hyperbolic, opinionated statements toward the Plaintiffs. *See* Plaintiffs' *Verified Complaint for Defamation; see also* **Exhibit A**, p. 124-26, l. 1-16. He then *retracted* these statements via email on February 18, 2020. *See Id*, p. 125-26, l. 25-2.

Additionally, in February of 2020, the Parties began discussing how the fees, which had been earned by L. Lin Wood, P.C. in connection with a number of lawsuits it had recently handled, would be dispersed. *See* Plaintiffs' *Verified Complaint for Defamation.* During these discussions, various emails were exchanged, and the Defendant actually offered a higher percentage of these fees to the Plaintiffs than was originally proposed. *See id*; *see also* **Exhibit A**, p. 22-24, l. 21-1.

It then became clear, however, that the conclusion of the former working relationship between the Parties comprised of other issues aside from those associated

with the previously-earned-but-still-to-be-collected attorney's fees. *See* **Exhibit A**, p. 24-25, l. 17-6. Namely, what to do about the lease obligations for the office location of L. Lin Wood, P.C., became an item of controversy. *Id.*

The Parties then each hired separate counsel, with the Defendant hiring attorneys from Alston & Bird to represent him in connection with the conclusion of the former working relationship between the Parties. *See* **Exhibit A**, p. 25, l. 19-22.

The Parties, through counsel, began negotiating the issues that could not be resolved previously, and entered into an agreement on March 17, 2020 (hereinafter referred to as the "Agreement"). *See* Plaintiffs' *Verified Complaint for Defamation.* In the Agreement, the Parties agreed to the same fee-split proposed in February of 2020. *See Id; See also* March 17, 2020 Agreement (attached hereto as "**Exhibit B**"). The Plaintiffs also agreed to contribute an amount to satisfy their obligations under the lease for L. Lin Wood, P.C. *See Id; See* Plaintiffs' *Verified Complaint for Defamation.*

Ultimately, the Defendant entered into the Agreement in an effort to resolve the outstanding issues between the Parties and put the conclusion of their former working relationship behind him. *See* **Exhibit A**, p. 59, l. 9-17; p. 135, l. 9-17. Nevertheless, he then realized, upon reflecting on the creation of the Agreement, that he in fact was coerced into agreeing to its terms. *See* **Exhibit A**, p. 48-49, l. 13-4. Particularly, because of representations made by the Plaintiffs regarding the negative impact a lawsuit could have on various relationships of the Defendant which were very

important to him, statements associated with the Defendant's mental health, and because of statements associated with the Defendant's ongoing effort to try and have a former client of his awarded the Presidential Medal of Freedom, the Defendant felt he had no choice but to enter into the Agreement at the time it was executed. *See Id.* The Defendant was afraid that he would be "smear[ed]," and did not want to further damage any relationships in his life. *Id.*

A number of months later, in July of 2020, the Plaintiffs were made aware of the Defendant's inability to tender a portion of the fees associated with one of the settled lawsuits contemplated by the Agreement, through a letter from then-counsel for the Defendant (attached hereto as "**Exhibit C**"). This letter, dated July 24, 2020, advised that one of the Parties' clients had elected not to consent to the fee-split agreement set forth in the Agreement, and that therefore, that portion of the Agreement was void. *See* **Exhibit C.**

The Plaintiffs then, roughly one month after receiving the July 24, 2020 letter, drafted a *Complaint* (hereinafter referred to as the "Draft Complaint"), and delivered the same to the Defendant, allegedly because such an act is "common practice" ahead of pursuing litigation in Georgia. *See* Plaintiffs' *Verified Complaint for Defamation.* A few days after serving the Draft Complaint, on August 26, 2020, the Plaintiffs served the Defendant with a time-limited demand (hereinafter referred to as the "August 26, 2020 Demand"), purportedly in an effort to resolve the present case, pre-suit. *See Id*;

*see also* Plaintiffs' *August 26, 2020 Demand* (attached hereto as "**Exhibit D**")*.* The August 26, 2020 Demand required that *within less than 20 hours*, the Defendant was to tender a check for the arbitrary amount of $1,250,000.00, or else the Draft Complaint would be filed by the Plaintiffs. *See Id; see also* **Exhibit A**, p. 115, l. 6-20.

The Defendant was therefore faced with yet another impossible decision: he could either (A) immediately tender the amount demanded, *without* first having the opportunity to investigate whether such an amount was warranted, or could (B) refuse the demand, and have the Draft Complaint filed against him, even though he found the same to be overly threatening and intentionally intrusive.

Confronted with this ultimatum, the Defendant began to believe that he in fact was being extorted by the Plaintiffs, by and through their delivery of the August 26, 2020 Demand and associated Draft Complaint. *See Id*, p. 114-16, l. 7-21. He also began to see that the conduct of the Plaintiffs, which he saw as extortion, in fact began during negotiations over the formation of the Agreement. *Id.*

The Defendant, concerned by the situation, *chose* to express his opinions regarding the conduct of the Plaintiffs to those he believed would listen, those being his connections and followers on the instant-messaging application, Telegram. *See* Plaintiffs' *Verified Complaint for Defamation; see also* **Exhibit A**, p. 52, l. 8-20. The Defendant did not, however, go beyond expressing mere opinions, or specifically allege that the Plaintiffs actions satisfied the elements of the legal definition of

extortion. *Id.* He also did not make any statements with the deliberate intent to cause harm. *See* **Exhibit A**, p. 47, l. 4-17; p. 52, l. 8-20; p. 110-11, l. 16-25.

As such, there is no evidence in this case establishing either (A) that the Defendant ever knowingly made any false and unprivileged, factual statements about the Plaintiffs, or (B) that he ever made any factual statements with knowledge of their falsity or with disregard of their veracity. Thus, the Plaintiffs' claims asserted under theories of defamation and defamation *per se*, as well as their claims for punitive damages, fail as a matter of law and should be dismissed with prejudice.

## ARGUMENT AND CITATION TO AUTHORITY

The Defendant is entitled to judgment as a matter of law. The claims asserted by the Plaintiffs are not substantiated by the record evidence and the Plaintiffs are unable to identify a genuine dispute as to material facts that exist in this case. Specifically, there is no evidence refuting that the Statements at Issue constitute anything other than opinions or subjective appraisals of the Plaintiffs' conduct. There is also no evidence showing that the Statements at Issue were made with knowledge of falsity, or with reckless disregard for the truth. As such, there are elements of the Plaintiffs' claims for which no evidence has been presented, entitling the Defendant to summary judgment.

## I.  Standard For Granting A Motion For Summary Judgment

Summary judgment is appropriate where the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56. Specifically, a defendant who is "seeking summary judgment bears the initial burden of identifying for the district court those portions of the record 'which it believes demonstrate the absence of a genuine issue of material fact.'" *Cohen v. United Am. Bank of Cent. Florida*, 83 F.3d 1347, 1349 (11th Cir. 1996); *quoting Cox v. Administrator United States Steel & Carnegie,* 17 F.3d 1386, 1396 (11th Cir. 1994). Once this burden is satisfied, "[t]here is no genuine issue for trial unless the non-moving party establishes . . . that it is able to prove evidence sufficient for a jury to return a verdict in its favor." *Cohen*, 83 F.3d at 1349; *citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986); *see also Cox,* 17 F.3d at 1396: ("[T]he moving party need not support its motion with evidence 'negating the opponent's claim[,]'" and need only point to the absence of evidence supporting at least one essential element of the non-moving party's claim.).

## II.    <u>The Defendant Is Entitled To Summary Judgment Because The Plaintiffs, As Limited-Purpose Public Figures, Have Not Shown That The Defendant Made Unprivileged Statements Concerning The Plaintiffs With "Actual Malice."</u>

Fortunately, the Court's consideration of the instant Motion is well-guided by settled principles of law, which began with the United States Supreme Court's consideration of *New York Times Co. v. Sullivan.* 376 U.S. 254 (1964). Therein, the Supreme Court considered a defamation action that originated in Alabama. The Supreme Court clarified, importantly, that "the Constitution delimits a State's power to award damages for libel in actions brought by public officials against critics of their

official conduct. [In] such an action, the rule requiring proof of actual malice is applicable." *Id* at 283. *Sullivan* ultimately established the *actual malice* standard, which applies when a public official asserts a claim for defamation. *Id* at 279-80: ("The constitutional guarantees require, we think, a federal rule that prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not.") (emphasis supplied). *Sullivan* also ruled that defamation is *not* a strict liability tort. *See Id; see also Mathis v. Cannon*, 276 Ga. 16, 20 (2002).

The Supreme Court revisited the issue in *Curtis Pub. Co. v. Butts*. 388 U.S. 130 (1967). In *Butts*, the Supreme Court further clarified the *actual malice* standard, by setting forth what constituted a public *person* for the purposes of determining what constitutional safeguards are needed. *See Mathis*, 276 Ga. at 21-22; *see accord Butts*, 388 U.S. 130. Specifically, the *Butts* Court ruled that the requirement of showing actual malice should be extended not only to public *officials* (i.e., those who hold an elected position or public office), but also to public *figures*, since such figures are "intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large." *Id* at 164.

Moreover, the Supreme Court examined the actual malice standard again in *Gertz v. Robert Welch, Inc.*, although this time was charged with determining whether

the *actual malice* standard should be extended not only to those who qualify as public figures all the time, but also to those who are public figures for a *limited purpose*, or within a limited community, those being "*limited-purpose public figures*." *See Mathis*, 276 Ga. at 22-23; *see accord Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974). The Georgia Court of Appeals then examined this standard further in a Georgia defamation action, that was in fact argued by the Defendant. Therein, the Court of Appeals established a three-part analysis for determining whether one qualifies as a *limited-purpose public figure* and held that a "court must [(1)] isolate the public controversy, [(2)] examine the plaintiff's involvement in the controversy, and [(3)] determine whether the alleged defamation was germane to the plaintiff's participation in the controversy." *See Mathis*, 276 Ga. at 22-23; *see also Atlanta Journal-Constitution v. Jewell*, 251 Ga. App. 808, 817 (2001). If the allegedly-defamed party "became a central figure in the specific public controversy with respect to which he[/she] was allegedly defamed," they will be a *limited-purpose public figure* for the purposes of determining what standard of fault should be applied. *Jewell*, 251 Ga. App. at 819. Thus, pursuant to the constitutional safeguards that protect the freedom of speech and freedom of press, as guaranteed by the First and Fourteenth Amendments, where allegedly-defamed plaintiffs are determined to be public officials, public figures, or limited-purpose public figures, *actual malice* must be shown in order for them to recover. *See Id*; *see Mathis*, 276 Ga. at 21.

Here, it is clear that the Plaintiffs are limited-purpose public figures, given *both* (A) their prominence within the community of defamation lawyers practicing in Georgia, and (B) their involvement in the controversy that arose from the conclusion of the business relationship between the Parties.

Specifically, the Plaintiffs do not dispute that prior to the conclusion of the business relationship between the Parties, they worked with the Defendant as attorneys at his law firm, L. Lin Wood, P.C. *See* Plaintiffs' *Verified Complaint for Defamation.* The Plaintiffs also do not dispute they voluntarily ended their business relationship with the Defendant and formed their own firm, shortly thereafter. *Id.* Finally, the Plaintiffs also admit and explain, as the Defendant did in his deposition, that the conclusion of the business relationship between the Parties resulted in much disagreement, multiple lawsuits, and a significant number of newspaper articles, online articles, and online posts referencing the end of the relationship. *Id.*

The specific controversy with respect to which the Plaintiffs purport they were defamed resulted in *all Parties* to this action becoming limited-purpose public figures, because all Parties were involved in the specific event (i.e., the end of the Parties' former business relationship) that the controversy arose out of. The Plaintiffs, through their actions in 2020 (including but not limited to serving the August 26, 2020 Demand with a response due *less than 20 hours afterward*), played an active role in creating the controversy that generated the Statements at Issue. Thus, all Parties to this action

- 12 -

should be considered limited-purpose public figures, and a showing of actual malice by the Plaintiffs should accordingly be required.

Furthermore, the actual malice standard also applies to the Plaintiffs' claims for punitive damages. *See Diamond v. Am. Family Corp.*, 186 Ga. App. 681, 685 (1988): ("[T]he evidence must still meet the more demanding standard of 'actual malice,' as set forth in *New York Times Co. v. Sullivan,* in order to support a recovery of punitive damages."). This rule was originally set forth by the United States Supreme Court but has been extended by the Georgia Court of Appeals. *See Gertz*, 418 U.S. at 349: ("we hold that the States may not permit recovery of presumed or punitive damages . . . [unless] liability [is] based on a showing of knowledge of falsity or reckless disregard for the truth," i.e., a showing of *actual malice*). Undoubtably, the actual malice standard applies to the Plaintiffs' claims for punitive damages.

With the above framework in mind, it must be determined whether the Plaintiffs have successfully made a showing of actual malice, to determine if they are able to recover. It is well settled that in order to show actual malice, a plaintiff must show that a defendant made statements either "with knowledge that it was false[,] or with reckless disregard of whether it was false or not." *Sullivan*, 376 U.S. at 279–80.

No such showing has been made by the Plaintiffs. In fact, there is no evidence sufficiently refuting the fact that the Defendant, when he made the Statements at Issue, did and in fact still does believe that he was extorted by the Plaintiffs during

negotiations over the Agreement and in connection with the August 26, 2020 Demand.

Specifically, when asked to explain his reasoning for, and mindset behind, authoring

the Statements at Issue, the Defendant explained,

> I felt like as a lawyer when I was getting blasted up there in South Carolina, in large part based on their lawsuit, that I had not only a right, but under the law I had a duty as my own lawyer to defend myself in the Court of public opinion and that is when I posted on Telegram. And that is when I described what they had done as extortion. **That is my opinion. It was then. It is now and it hasn't changed.** *See* **Exhibit A**, p. 52, l. 12-20.

He then explained, when asked again about his reasons for the Statements at issue:

> I made my statements I believe in May of 2021, when at a time that I had been taken on being Counsel to myself I was coming under fierce attack in South Carolina with their Complaint, which is exactly why I think they filed it for. So[,] I made a decision to speak out as a lawyer for myself for myself in the Court of public opinion, and **I did believe at the beginning, I believed in the middle, and I believed at the end** that what was done in reference to the filing of this Superior Court lawsuit in September of 2020 was pure extortion. **My opinion has never changed.**
>
> Now I said what I said on Telegram and after I said it[,] I don't think I have gone back and said it again. I said enough. **I had to defend myself from what was a very, very salacious, inappropriate, irrelevant, immaterial, personal attack on me** that had no relationship to the claims for breach of contract and a fraud and inducement claim that they had waived and agreed not to file. *See Id at* p. 110-111, l. 16-13.

Furthermore, in describing how his mindset and reaction to the Agreement and August

26, 2020 Demand specifically, the Defendant stated,

> People feel extorted in different ways. I have told you why I felt extorted in the two instances, one that showed the pattern; and two, that I thought was extortion. And nobody complained when I put extortion in my public statement that I issued right after the lawsuit was filed.· They put in the public record that I had said extortion to Dexter King and another lawyer.· They spread the

accusation or my opinion of extortion around the world, and they complained that I made a comment about it on Telegram, where you don't really know how many people see it. *See Id at* p. 148, l. 2-14.

Also, related to the August 26, 2020 Demand, the Defendant described, "you [were] making a demand [requiring] within less than literally 24 hours that I pay 1.25 million, plus the lease, another 285, to buy out what was in litigation that was liquidated at 648,000. It made no sense. It was extortion in my opinion." *Id at* p. 202-03, l. 21-1. And finally, the Defendant also advised: "I felt strongly then that it was extortion[, and] I feel that way now[.] [T]hat is my opinion." *Id at* p. 137, l. 1-3.

The Defendant also, with the assistance of counsel from Alston & Bird, authored and published the attached press release (attached hereto as "**Exhibit E**"). The press release provides further clarity as to the reasoning behind the Defendant's authoring of the Statements at Issue. *See* **Exhibit E**. The press release also, as shown by the attached affidavit from then-counsel for the Defendant, Christopher Marquardt (attached hereto as "**Exhibit F**"), shows that the Defendant consulted with counsel, sought advice from counsel, and received suggestions from counsel with regard to the press release before it was ever published. *See* **Exhibits E** & **F**.

The above considered, it is evident that the Plaintiffs contributed to the end of business relationship between the Parties, and therefore indeed injected themselves into the controversy with respect to which they were purportedly defamed. Thus, in order to recover, they would need to show actual malice on the part of the Defendant.

However, *even if* a showing of actual malice were to have been made, the Statements at Issue, in addition to being mere opinions, are privileged under Georgia Law and therefore are not actionable. Specifically, O.C.G.A. § 51-5-7 provides that,

> The following communications are deemed privileged: . . . .
>
> > (9) Comments upon the acts of public men or public women in their public capacity and with reference thereto. O.C.G.A. § 51-5-7.

Here, it has already been established that the Plaintiffs are limited-purpose public figures. Moreover, the Statements at issue clearly relate to actions the Plaintiffs took in their official capacity as lawyers, and in connection with the conclusion of the business relationship that existed between the Parties. As such, the Statements at Issue cannot be reasonably categorized as anything *other* than "Comments upon the acts of public men or public women in their public capacity." *Id.* The Statements at Issue are therefore privileged opinions and are therefore not actionable here.

While there is a mountain of evidence showing the Defendant simply expressed his opinions, and in essence merely offered a *present-sense impression* of the situation created by the August 26, 2020 Demand, there is no contrary evidence showing that the Defendant had knowledge of the alleged falsity of the Statements at Issue. There is also no evidence proving reckless disregard for whether the Statements at Issue were false. As such, there is no evidence of actual malice.

III. **The Plaintiffs Cannot Recover Upon Their Claims Of Defamation *Per Se* Because They Cannot Identify Evidence Showing That Specific Statements Warranting Recovery Exist.**

In addition to the above standard, which provides that the Plaintiffs, as limited-purpose public figures, cannot recover because they have failed to show actual malice on the part of the Defendant, it is also worth discussing the effects that asserting a claim for defamation *per se* has on the type of evidence that must be presented. Where defamation *per se* occurs, "damage is inferred." O.C.G.A. § 51-5-4. Thus, where one asserts a claim for defamation *per se*, proof of damages need not be shown in order to recover, generally. *Id.* A claimant must show, however, that the conduct of the alleged defamer constitutes one of the specific categories of statements that have been recognized as defamation *per se*. *Id.* Namely, statements:

> (1) Imputing to another a crime punishable by law;
> (2) Charging a person with having some contagious disorder or with being guilty of some debasing act which may exclude him from society;
> (3) Making charges against another in reference to his trade, office, or profession, calculated to injure him therein[,]

have been determined to be defamation *per se*, and do not require a further showing of damages before recovery will be allowed generally as a matter of law. *Id.*

Here, a discussion of the difference between an allegation that one committed a crime and fulfilled the elements of the same, versus a separate accusation that one simply acted in a way that was similar to the description of a crime, even if all elements of the actual offense may not been carried out, is necessary. For example, assume one

is walking along a sidewalk and is unexpectedly passed by a motor vehicle traveling at what appears to be a high rate of speed. The pedestrian might, utter something along the lines of, "Wow, that vehicle is really speeding along!" Would such a statement constitute defamation *per se* though, solely because "speeding," i.e., breaking the posted speed limit, is also a statutory violation? Certainly, it cannot be said that the pedestrian has defamed the driver, as the pedestrian is simply using a word that is also often used in common vernacular. The pedestrian is not, however, actually asserting that the driver committed a crime.

This simple example illustrates exactly why the *thoughts behind one's words* and the *totality of the wording used throughout the course of a particular statement or set of statements* are important to determining what was actually alleged. *See 800 Mktg. Sols., Inc. v. GMAC Ins. Mgmt. Corp.*, 2008 WL 2777140, at *7 (M.D. Ga. July 14, 2008); *citing Gast v. Brittain*, 277 Ga. 340, 340 (2003); *Jaillett v. Georgia Television Co.*, 238 Ga. App. 885, 888-89 (1999): (holding that 'the context of [an] entire writing' should be considered in to determine its meaning and implications).

Here, the Plaintiffs *allege* that they committed no act that amounted to the *crime* of extortion, but that the Defendant, by communicating to others that he felt he was being extorted, is liable for defamation *per se*. *See* Plaintiffs' *Verified Complaint for Defamation.* Yet, the Plaintiffs confuse the difference between alleging that one has engaged in the *act* of extortion generally and alleging that one *fulfilled the elements* of

the legal definition of extortion as contemplated by the Georgia Code. *See* O.C.G.A. §

16-8-16. Fortunately, the reasoning for, and mindset behind, the Defendant's

authoring of the Statements at Issue is made significantly clearer by the Defendant's

deposition testimony, some of which has already been introduced.

Specifically, the Defendant was asked a number of times whether he believed

that the Plaintiffs actually committed a *crime*. When first asked, the Defendant

responded, "I believe that they extorted me into the March 17th agreement[,] and I gave

into it." *See* **Exhibit A**, p. 49-50, l. 25-2. He then went on to explain, "[s]o I believe

that was extortion. I don't know that I -- you would have to show me what I said, but

extortion is extortion. If it is a crime, it is a crime." *See Id* at p. 50, l. 21-24.

Further, the Defendant was also asked, if he believed he was extorted, why he

did not try to have the Plaintiffs prosecuted. In response, the Defendant stated,

> I believed that they extorted me and I made finally a decision in I believe May
> of 2021 when I was then representing myself in this case, when I had joined as
> Co-Counsel when Burby had left, I felt like as a lawyer when I was getting
> blasted up there in South Carolina, in large part based on their lawsuit, that I had
> not only a right, but under the law I had a duty as my own lawyer to defend
> myself in the Court of public opinion and that is when I posted on Telegram.
> And that is when I described what they had done as extortion.  That is my
> opinion. It was then. It is now[,] and it hasn't changed. *Id* at p. 52, l. 8-20; *see
> also Id* at p. 139-40, l. 17-7.

The Defendant was also asked, improperly, "What was your understanding of

the elements of the crime of extortion?" *Id* at p. 140, l. 12-13. The Defendant first

answered,

I am not sitting here with a law book in front of me, but I think when you take acts that are beyond what you are entitled to, to try to get someone else coerced into doing what they are not obligated to do for you, that is extortion.· It is in the dictionary.· People use the term all the time. A lot of people say the lawyer is extorting you.· It is a commonly used term, especially when you are talking about lawyers making demands on you. And this one was not just a demand to pay.· If you had said here is the breach of contract claim, we demand you pay the 600-what-odd-thousand-dollars, that would not be extortion.· But when you add all that other stuff in there, and you made a $1.5 million demand; and you actually attacked my faith by putting in your Complaint that I thought I was all mighty [sic] God, what in the world were you thinking? *See Id* at p. 140-41, l. 16-14.

He was then asked the same question, again, and stated,

You have asked me that before, I have told you . . . It is as simple as what is extortion.  You can look that up.  You know what extortion is. I have given you my best explanation. And I don't know that there are elements of such.  It is just an overall effort of someone to coerce someone wrongfully into paying something or doing something that they are not obligated to pay or do. And if you look at this, I didn't mention their names.  I gave a hypothetical and said does that sound like criminal extortion to you? *Id* at p. 199, l. 12-25.

And finally, the Defendant explained, when asked about *his* definition of extortion:

Extortion comes in many forms. But it is when somebody inappropriately tries to exert leverage or pressure on you for their own game, that they are not entitled to. So[,] the extortion could be in the form of the money demand, [if] it was outrageous. It can't be justified.

It can be part of the fact that you are only gave me 24 hours initially to respond. What was the rush? That you would refuse a reasonable request that we arbitrated privately with lawyers, binding arbitration.

And you added in so much stuff that was intended clearly in my mind to smear me and attack me for purposes that had nothing to do with the dispute on whether there was client consent required. And other things that were done, if you say "Lin, make this agreement or we are going to continue to drive a wedge between you and your children," that is extortion. "Lin, make this agreement or we are going to continue to talk about your mental health that might hurt you in

your Sandmann litigation or hurt you in your efforts with Richard Jewell with President Trump," **in my view that is extortion. That is my opinion.** *Id* at p. 141-43, 20-1.

Considering these excerpts, which are essential in determining the meaning behind the Statements at Issue, it is clear the Defendant never alleged that the Plaintiffs acted in manner that *fulfilled the statutory definition of the crime, extortion*, and *never* discussed the specific elements of extortion, nor identified specific acts of the Plaintiffs that he believed constituted the elements of the crime of extortion.

Rather, the Defendant, when faced with the August 26, 2020 Demand due *less than 20 hours after* it was served, the threat of an intrusive and salaciously-worded Draft Complaint, and a monetary figure he felt was arbitrary and unfounded, indeed felt extorted. When the Defendant authored the Statements at Issue, he was not offering a legal opinion as to whether the Plaintiffs actions constituted a crime but was simply expressing a subjective opinion that he felt he was extorted by the Plaintiffs.

Considering the Defendant's testimony as to his state of mind at the time the Statements at Issue were made, it is evident he did not accuse anyone of committing a crime. Rather, he merely communicated to others his belief and opinion that because of the nature of formation of the Agreement and the 20-hour, August 26, 2020 Demand, he did in fact believe he was being extorted by the Plaintiffs. Because the evidence indicates that the Statements at Issue were merely the subjective, present-sense impressions of the Defendant as to the acts carried out by the Plaintiffs, and not

accusations of specific criminal conduct, no evidence of defamation *per se* has been offered here, entitling the Defendant to judgment as a matter of law.

## IV.  The Claims Asserted By The Plaintiffs Should Be Dismissed With Prejudice Because The Defendant's Statements Constituted Protected, Subjective Opinions And Are Incapable Of Being Proven False.

The Plaintiffs contributed to the tumultuous end of a business relationship that existed between the Parties prior to February of 2020 and injected themselves into the controversy at issue. Yet, they have failed to show any actual malice on the part of the Defendant. In addition, it has also been shown that because the Defendant merely authored an opinionated, present-sense impression as to the Plaintiffs' actions, and not a legal opinion as to whether any criminal statute was violated, there is no evidence of defamation *per se* here. Crucially, even *if* the Plaintiffs are considered private figures, they *still* could not recover because (A) the Defendant's statements were mere opinions, and (B) no actual damages have been asserted.

It is evident that the Statements at Issue were mere opinions, rather than statements of fact or allegations of specific, criminal conduct. While the Plaintiffs may disagree with the opinions, they cannot establish their falsity. *See Gertz*, 418 U.S. at 339–40: ("Under the First Amendment[,] there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries[,] but on the competition of other ideas."). Moreover, under Georgia Law, "[S]tatements of pure opinion are not capable of being proven

false and cannot form the basis of a defamation claim." *Bryant v. Cox Enterprises, Inc.*, 311 Ga. App. 230, 234 (2011); *see also Koly v. Enney*, 269 Fed. Appx. 861, 864 (11th Cir. 2008): ("[A]n opinion . . . is not actionable under Georgia law."). And specifically,

> Under Georgia Law, it is well-settled that[:]
>
> 'the expression of opinion on matters with respect to which reasonable men might entertain differing opinions is not libelous . . . . A writer cannot be sued for simply expressing his opinion[,] . . . however unreasonable the opinion or vituperous the expressing of it might be.' *800 Mktg. Sols., Inc.*, 2008 WL 2777140, at *6; *citing Gast*, 277 Ga. at 341; *see also Bergen v. Martindale-Hubbell*, 176 Ga. App. 745, 746 (1985).

Furthermore, the United States District Court for the Middle District of Georgia held that "Georgia law 'unquestionably excludes from defamation liability[,]' any statements that may be characterized as 'rhetorical hyperbole' or are 'clearly recognizable as pure opinion *because their factual premises are revealed*." *800 Mktg. Sols., Inc.*, 2008 WL 2777140, at *6; *citing Jaillett*, 238 Ga. App. at 890 (emphasis supplied). This indicates that where one provides a factual background in connection with their statement, in an effort to clarify *why* that statement is being made, their facts should be considered. In addition, the Middle District of Georgia also advised, in *800 Mktg. Sols., Inc.*, that if the parties to an action appear able to "entertain differing opinions," as is clearly the case in the present matter, such a statement is then more likely to be considered a pure opinion. *See Id.* And further, as referenced above, "the context of [an] *entire* writing' should also be considered by the Court, in order to

determine its actual meaning and implications. *See 800 Mktg. Sols., Inc.*, 2008 WL 2777140, at *7; *citing Gast*, 277 Ga. at 340; *Jaillett*, 238 Ga. App. at 888-89.

In the present case, it is clear that Statements at Issue consisted of multiple statements that were made by the Defendant, many of which contained a factual background explaining the reasoning for said statements. *See* **Exhibit A**, generally; *see also* **Exhibit E**. It is also plainly evident that the Parties clearly had differing opinions as to what the Plaintiffs' pre-suit actions amounted to, and whether the Plaintiffs' August 26, 2020 Demand constituted any type of extorting act. It is therefore clear that the Parties also "entertain[ed] differing opinions" with regard to the Statements at Issue. *See 800 Mktg. Sols., Inc.*, 2008 WL 2777140, at *6.

On this basis, when considering the Statements at Issue not in a vacuum, but rather in conjunction with the entirety of the statements, the background sets of facts communicated therewith, and in light of the fact that the Parties vehemently disagree as to whether the veracity of the Statements at Issue can even been established, it is clear that the Defendant did not utter defamatory remarks, but instead merely communicated subjective, protected opinions to others regarding the conduct exhibited by the Plaintiffs, and his impressions of that conduct.

Finally, it is also worth noting that because the Defendant has shown he was not offering a legal opinion as to whether the Plaintiffs actions constituted the actual crime of extortion when he made the Statements at Issue, but instead was opining to others

that he felt he had been extorted by the Plaintiffs, there is no evidence of defamation *per se* in this case. Therefore, in order to recover, the Plaintiffs would need to show evidence of actual damages. However, no such assertions have been made, and no such evidence has been offered. *See* Plaintiffs' *Verified Complaint for Defamation.* As such, there is nothing for the Plaintiffs to recover, their claims are barred as a matter of law, and the Defendant should be dismissed with Prejudice.

## CONCLUSION

The Plaintiffs are limited-purpose public figures given the role each played in the controversy with respect to which they were allegedly defamed. Yet, no sufficient evidence of actual malice has been offered. The Defendant has also shown that the evidence does not support any recovery for defamation *per se*. Yet, no sufficient evidence of damages has been submitted. Finally, the Statements at Issue also cannot be classified as defamatory, regardless of how the Plaintiffs would be classified, because there is no evidence refuting that the Statements at Issue are anything *other than* what they actually are: present-sense impressions and subjective opinions made by the Defendant with regard to the conduct of the Plaintiffs. As such, there is no evidence of actual falsity in this case. Considering the totality of the evidence, the Plaintiffs cannot recover in this case, and that the Defendant is entitled to judgment as a matter of law.

[*Signatures on next page*]

- 25 -

Respectfully submitted,

**DOWNEY & CLEVELAND, LLP**


By: /s/ R. CHRISTOPHER HARRISON
    **R. CHRISTOPHER HARRISON**
    Georgia State Bar No. 333199
    **JACKSON A. GRINER**
    Georgia State Bar No. 495020
    harrison@downeycleveland.com
    *Attorneys for Defendant*

Downey & Cleveland, LLP
288 Washington Avenue
Marietta, GA 30060-1979
T: 770-422-3233
F: 770-423-4199


**L. LIN WOOD, P.C.**


By: /s/ L. LIN WOOD
    L. Lin Wood
    Georgia State Bar No. 774588
    lwood@linwoodlaw.com

L. Lin Wood, P.C.
P.O. Box 52584
Atlanta, GA 30355
T: 404-891-1402
F: 404-506-9111


[*Signatures continue onto next page*]

**REYES LAWYERS, P.A.**


By:/s/ IBRAHIM REYES
       Ibrahim Reyes
       Florida State Bar No. 581798
       ireyes@reyeslawyers.com

Reyes Lawyers, P.A.
236 Valencia Avenue
Coral Gables, FL 33134
T: 305-445-0011
F: 305-445-1181

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(D) of the Northern District of Georgia, I hereby certify that this submission has been prepared in compliance with Local Rule 5.1(C), using 14-point Times New Roman Font.

Respectfully submitted,

**DOWNEY & CLEVELAND, LLP**

By: <u>/s/ R. CHRISTOPHER HARRISON</u>
      **R. CHRISTOPHER HARRISON**
      Georgia State Bar No. 333199
      **JACKSON A. GRINER**
      Georgia State Bar No. 495020
      harrison@downeycleveland.com
      *Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served the following counsel of record with a true and correct copy of the foregoing pleading via electronic service and/or by depositing said copy in the United States Mail, with sufficient postage affixed thereon, and properly addressed to the following:

Andrew M. Beal, Esq.
Milinda Brown, Esq.
Buckley Beal, LLP
600 Peachtree Street, NE
Suite 3900
Atlanta, GA 30308

This 17th day of April, 2023.

**DOWNEY & CLEVELAND, LLP**

By: <u>/s/ R. CHRISTOPHER HARRISON</u>
       **R. CHRISTOPHER HARRISON**
       Georgia State Bar No. 333199
       **JACKSON A. GRINER**
       Georgia State Bar No. 495020

- 29 -

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD

1              UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF GEORGIA
2                 ATLANTA DIVISION

3
   NICOLE JENNINGS WADE,
4  JONATHAN D. GRUNBERG, and
   G. TAYLOR WILSON,
5
        Plaintiff,
6

7

8                                    CASE NUMBER
   vs.                               1:22-CV-01073
9

10

11

12
   L. LIN WOOD,
13
        Defendant.
14
   --------------------------/
15

16          The videotaped deposition of L. LIN

17  WOOD, a defendant, in the above-entitled cause,

18  taken pursuant to Notice and agreement, before

19  Ceil Weser, Certified Court Reporter and Notary

20  Public, Charles T. Nussbaum, Jr.,

21  Video-Technician, at the Meeting Room in

22  SpringHill Suites by Marriott, 2227 Boundary

23  Street, Beaufort, South Carolina, on the 13th

24  day of March, 2023, commencing at or about the

25  hour of 10:06 a.m.


**COASTAL COURT REPORTING & VIDEO SERVICES**
www.coastalcourt.com

EXHIBIT

A

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                    2

```
 1    APPEARANCES OF COUNSEL:

 2       FOR THE PLAINTIFF(s):

 3              ANDREW M. BEAL, ESQUIRE
                MILINDA L. BROWN, ESQUIRE
 4              Beal, Sutherland, Berlin & Brown, LLC
                945 East Paces Ferry Road, NE
 5              Suite 2000
                Atlanta, Georgia 30326
 6              678.439.0330
                drew@beal.law
 7              milinda@beal.law

 8
         FOR THE DEFENDANT:
 9
                R. CHRISTOPHER HARRISON, ESQUIRE
10              Downey &Cleveland, LLP
                288 Washington Avenue
11              Marietta, Georgia 30060
                770.422.3233
12              harrison@downeycleveland.com

13


14
         ALSO PRESENT:
15
                John Exum, Paralegal,
16              L. Lin Wood, Esquire
                        &
17              Nicole Jennings Wade, Plaintiff
                Jonathan D. Grunberg, Plaintiff
18

19

20
                        -   -   -
21

22

23

24

25
```



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                    3

1                          I N D E X

2

3

4                                                      PAGE

5
    EXHIBIT INDEX ---------------------------- 4-5
6

7   OPENING REMARKS AND STIPULATIONS ----------- 6

8

9

10

11

12

13

14

15  DIRECT-EXAMINATION:
       By Mr. Beal  ---------------------------- 6
16

17

18

19

20

21

22

23

24  CERTIFICATE ------------------------------ 230
    ERRATA ------------------------------ 231-233
25

 **COASTAL COURT REPORTING & VIDEO SERVICES**
                          **800-791-1100**      **www.coastalcourt.com**

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                                4

1              D O C U M E N T A R Y   E V I D E N C E

2     NUMBER                  DESCRIPTION                 PAGE

3
      PX-1      Second Amended Notice of          6
4               deposition of Defendant, L. Lin
                Wood (4 pages)
5
      PX-2      Copy of E-mail, Bates Stamped     13
6               WGW 001883 (1 page)

7     PX-3      Copy of E-mail, Bates Stamped     14
                WGW 001881 through WGW 001882
8               through (2 pages)

9     PX-4      Copy of E-mail, Bates Stamped     16
                WGW 001891 (1 page)
10
      PX-5      Copy of Settlement Statement      17
11              Re: Carbone v. Cable News
                Network Inc., (2 pages)
12
      PX-6      Copy of E-mail string, Bates      21
13              Stamped WGW - 000231 - Federal
                Matter through WGW - 000235
14              ( 5 pages)

15    PX-7      Copy of forwarded E-mail,         53
                Bates Stamped WGW 002072
16              through WGW 002073 (2 pages)

17    PX-8      Copy of forwarded E-mail,         76
                Bates Stamped WGW 002080
18              through WGW 002083 (4 pages)

19    PX-9      Copy of forwarded E-mail,         78
                Bates Stamped WGW 002089
20              through WGW 002090 (2 pages)

21    PX-10     Copy of forwarded E-mail,         84
                Bates Stamped WGW 002074
22              through WGW 002076 (3 pages)

23    PX-11     Copy of E-mail string, Bates      98
                Stamped WGW 002135 through
24              WGW 002137 ( 5 pages)

25



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                          5

```
1   (continued)
            D O C U M E N T A R Y   E V I D E N C E
2
    NUMBER              DESCRIPTION                PAGE
3
    PX-12    Copy of Settlement and Agreement    104
4            Release Stamped WGW 002296
             through WGW 002302 (7 pages)
5
    PX-13    Copy of letter, dated               107
6            July 24, 2020 to
             Andrew M. Beal, Esquire,
7            (2 pages)

8   PX-14    Copy of Verified Complaint for      109
             Defamation Demand for Jury Trial
9            In Re: Wade et al., vs.
             L. Lin Wood (56 pages)
10
    PX-15    Copy Plaintiff's Complain           145
11           with Jury Demand, Re:
             Sandmann vs. Cable New
12           Network, Inc., (3 pages)

13  PX-16    Copy Plaintiff's Complaint          146
             with Jury Demand, Re:
14           Sandmann vs. WP Company, LLC
             (3 pages)
15
    PX-17    Copy of Defense and Answer,         164
16           In Re: Wade et al., vs. L.
             Lin Wood (29 pages)
17
    PX-18    Copy of Plaintiff's First           190
18           Continuing Interrogatories to
             Defendant, In Re: Wade et al.,
19           vs. L. Lin Wood (10 pages)

20  PX-19    Copy of Defendant's Amended         190
             Responses to Plaintiffs'
21           First continuing Interrogatories,
             In Re: Wade et al., vs. L. Lin
22           Wood (9 pages)

23  PX-20    Copy of Invoice, Carmichael         192
             Consulting Solutions, LLC,
24           Invoice Number 6861, Bates
             Stamped Wood0145 through
25           Wood0147 (3 pages)
```



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100          www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                    6

1              MR. BEAL:  This will be the
2       deposition of Defendant Lin Wood taken
3       pursuant to Notice and agreement of
4       Counsel.  I would propose that all
5       objections save to the form of the
6       question or responsiveness of the
7       answer be reserved until first use of
8       the deposition, is that agreeable?
9              MR. HARRISON:  Agreed.
10                (Whereupon, Plaintiff's Exhibit
11                Number 1 was marked for
12                identification.)
13                   DIRECT EXAMINATION
14     BY MR. BEAL:
15        Q    Mr. Wood, we met before.  My name is
16     Drew Beal, and I believe you are well versed in
17     the world of depositions, so I won't give you
18     any preamble.  Instead I will give you what has
19     been marked as Exhibit 1 to this deposition and
20     ask you if you have seen that before?
21        A    I did receive it in advance of it, yes.
22        Q    What did you do in preparation for this
23     deposition?
24        A    Nothing.  I prayed.
25        Q    Did you have any review of documents?



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                    7

1        A     No, I did not review any documents.

2        Q     Did you discuss any part of this matter

3    or the claims brought by the Plaintiffs with any

4    parties or potential witnesses?

5        A     I spoke briefly with Chris but I didn't

6    speak to anybody else.

7        Q     With Counsel?

8        A     Yes.

9              Just a brief call last week.

10       Q     Mr. Wood, for years you maintained L.

11   Lin Wood, PC, is that correct?

12       A     Yes.

13       Q     And about how many years did you have

14   that firm?  More than 20?

15       A     Well, let me think.

16             So I formed L. Lin Wood, P.C. in

17   September of 1997, and I maintained it as a

18   viable PC to this day.  Even though I had a

19   brief period of time where I was working as a

20   partner at Powell Goldstein, later Bryan Cave;

21   but I kept L. Lin Wood, P.C. during that time

22   period because I had some matters that predated

23   Powell Goldstein that were still in a status

24   that required me to maintain my own professional

25   corporation.



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                        8

```
1      Q     So after you left Powell Goldstein,
2   later Bryan Cave you practiced law under the
3   name L. Lin Wood, P.C., is that correct?
4      A     I did, the same corporation.
5      Q     And you specialized primarily in
6   defamation claims and lawsuits, is that correct?
7      A     Well, I started -- not actually.
8      Q     Okay.
9      A     I started off my law career with a
10  focus on medical malpractice for the Plaintiff;
11  and I did some other types of Plaintiff's work.
12  In 1996 when I took on the representation of
13  Richard Jewell that kind of led to a shift in my
14  practice into the area of First Amendment
15  defamation.
16          When I joined Powell Goldstein and
17  later Bryan Cave I was actually doing very
18  little defamation.  I was doing what -- the
19  first case I started off handling with Nicole it
20  was the case of I believe it was Alec Hipp
21  versus Suntrust Bank.
22          When I left Bryan Cave I did that based
23  on being engaged to represent two whistle
24  blowers in a Medicare fraud case, and that was
25  the focus at least for the first years until
```



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                    9

1    2015 when it settled; and I took on another

2    Medicare fraud case against Halifax Hospital

3    during that time period.

4             So I was doing more fraud work in those

5    years, and then shifted back to areas of

6    defamation toward the last part of 19 -- 2015,

7    '16 on I then began to do more back in the area

8    of First Amendment defamation.

9        Q    Most of that work that you have just

10   described, the whistle blower work and the

11   defamation work from 2015 on, was on behalf of

12   the Plaintiff, is that correct?

13       A    Yes.

14       Q    And it was all a contingency based fee

15   to you for the most part?

16       A    On the Medicare fraud cases?

17       Q    Yes, and the defamation cases?

18       A    Defamation cases were generally

19   contingency fee, although I did work for Steve

20   Wynn and that was done in areas of defamation,

21   but it was hourly.

22             The whistle blower cases were

23   contingency with a recovery of attorneys' fees

24   to the prevailing party.

25       Q    And at different times you brought on



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              10

1    various lawyers to work with you and the three

2    lawyers who are Plaintiffs in this case, Nicole

3    Wade, Johnathan Grunberg, and Taylor Wilson,

4    joined you and were on-board by 2016, is that

5    correct?

6         A    By 2016 I believe that is correct.  I

7    can't remember the exact time when Taylor came;

8    but yes, they came in in an office sharing

9    arrangement first as my Associates.  Johnathan

10   was an Associate.  Taylor was an Associate.

11             And you know this, I am sure, that

12   there is a certain I will say stigma to be

13   referred to as an Associate versus being

14   referred to as a partner, especially when you

15   are trying to get business; and I wanted them to

16   get business.

17             So we had an office sharing

18   arrangement, and then I would engage with them

19   after Johnathan and Taylor were no longer

20   Associates.  I would then engage with them to

21   help me in cases on a case-by-case basis with an

22   agreement of how we would do the fee.

23             Some of that was contingency and I know

24   some of it was hourly divisions, particularly

25   with the Wynn cases.



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              11

1        Q     Let us unpack what you just said.

2              If they were no longer Associate's did

3    you refer to them in the Bar and the courts and

4    the clients as your partner?

5        A     I did and they were my partners.  They

6    were partners in a business relationship.

7        Q     And did they sign Pleadings as partners

8    of L. Lin Wood, P.C.?

9        A     I don't know if they had the word

10   partners, but they certainly signed Pleadings as

11   under the name L. Lin Wood, P.C.

12       Q     All right, thank you.

13             And when you would pay them a fee, a

14   portion of the fee recovered, did you pay that

15   to them individually or to one of their PC's or

16   LLC's?

17       A     I did not pay them individually.  So

18   the arrangement was Nicole had -- when she was

19   leaving Bryan Cave and I offered her a place to

20   work, instead of her going out and starting up

21   her own physical law firm, I thought it would be

22   helpful to her and helpful to me, because Nicole

23   is a very smart lawyer; and I envisioned that I

24   would be able to engage her to help me in

25   matters, and so all of the fees that were paid



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                    12

1    to Nicole were always paid to Wade Law, I

2    believe was her firm's name, PC or LLC.

3         Q    Okay.  And similarly for the other two?

4         A    Well, somewhat different in that, and I

5    don't know specifically if there were some

6    breakdowns, where I paid Taylor Wilson's PC

7    versus -- or Johnathan Grunberg's PC, but most

8    of the cases where I paid to Johnathan and

9    Taylor were done to Grunberg and Wilson, LLC or

10   PC; but I always paid their individual PC's

11   because they had their own separate firms.

12        Q    And then those PC's oftentimes paid

13   certain shares of overhead or operating expenses

14   back to the L. Lin Wood, P.C., is that right?

15        A    Yes.  L. Lin Wood, P.C. would

16   receive -- we would send to Johnathan and Taylor

17   and Nicole each month a breakdown of the shared

18   overhead, and then they would pay their

19   respective 25 percent.

20        Q    Okay.

21        A    And there may be sometimes where there

22   was overhead that was higher for one than the

23   other, parking or something along those lines;

24   but no, it was generally done on a 25 percent

25   basis of all of the shared overhead paid by



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                    13

1    their PC's.

2        Q    Thank you.

3                 (Whereupon, Plaintiff's Exhibit

4                 Number 2 was marked for

5                 identification.)

6    BY MR. BEAL:

7        Q    Let me hand you what has been marked as

8    Exhibit 2, and is this an Email from you to the

9    three of them talking about a share of the

10   Ramsey case?

11       A    Yes.

12       Q    So that would be a typical kind of

13   discussion you would have on a larger

14   contingency fee case discussing the fee

15   allocation with the three of them and their PC's

16   or LLC's?

17       A    I don't know that I would say this is

18   typical.

19                 Usually when I got them involved and

20   gave them the opportunity to work with me and to

21   make money from the cases that I had -- I was

22   the -- I wouldn't say all, but it was my law

23   practice and they had the benefit of working

24   with me and being able to generate in some

25   instances a very significant income by being



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          14

1    engaged with me in a case.

2             Usually it was much simpler I think.

3    We just simply agreed to what the division would

4    be, and it varied; and then I would send an

5    Email and confirm.  It was always confirmed in

6    writing.

7                  (Whereupon, Plaintiff's Exhibit

8                  Number 3 was marked for

9                  identification.)

10   BY MR. BEAL:

11       Q    And here is one such Email confirming

12   in writing Exhibit 3, is that correct, where you

13   talk about your final decisions on the fee

14   sharing in Ramsey?

15       A    Yes, it is; and you can see that I have

16   a sense of humor; and I made clear that the

17   executive committee, which was me, by unanimous

18   vote of 1 to 0, which is me, my firm, was

19   confirming the agreement that I made with them

20   in the Ramsey case.  That was the Burr Ramsey

21   case versus CVS.

22             I had been representing off and on Burr

23   and John and Patsy Ramsey since 1999.  So I had

24   the benefit of literally the mass of knowledge

25   that was underlying the Burke Ramsey versus CVS



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          15

1    case; but I nonetheless -- candidly for them to
2    have the opportunity to make potentially a
3    significant fee for themselves, I gave them I
4    thought a very fair division of the fee in the
5    Ramsey case, and they made a lot of money.
6         Q    And were the fees disbursed pursuant to
7    that agreement as best you can remember?
8         A    As best I can remember, yeah, we
9    settled it and then L. Lin Wood, P.C. disbursed
10   to Nicole and Johnathan and Taylor, their PC's
11   respective portions; and I think they made --
12   don't hold me to it, but I think they each made
13   around 800 or $850,000.  It was a generous fee
14   for them, but I appreciated their efforts and
15   was glad to be able to put them in good shape
16   financially.
17        Q    Was the Email that you sent marked
18   Exhibit 3 essentially the only necessary step in
19   your mind for division of fees?
20        A    We would reach an agreement, and then
21   it would be confirmed in writing.
22        Q    And then you would divide them?
23        A    Until a case came where we didn't have
24   an agreement and it moved quickly.
25                  (Whereupon, Plaintiff's Exhibit



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                16

1                    Number 4 was marked for
2                    identification.)
3     BY MR. BEAL:
4          Q     Let me hand you Exhibit 4 where there
5     is a similar agreement that you entered into for
6     the Unsworth versus Musk case.
7          A     Yeah, again, you can see the
8     light-hearted in the way I dealt with it,
9     because it was my decision, my law firm, my
10    client; and I gave them I can't remember what
11    the division was in the Unsworth versus Musk
12    case, but I know that I gave them a very
13    generous portion.  Again.  It was a case where
14    they had an opportunity to be involved in trial
15    of a high profile case in Los Angeles with a
16    potential for a significant recovery, although
17    as I got more and more into the case I realized
18    I am not sure if Elon Musk was ever going to pay
19    them anything no matter what the jury did.
20              But I entered into that agreement with
21    them.  They worked on the case with me, and we
22    had a division in writing.
23         Q     Okay.  And the fee disbursement
24    schedule or the chart that you would present to
25    the client, this is the gross recovery per the



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              17

```
1    expenses, here are the attorneys' fees, it
2    wouldn't necessarily discuss these percentages?
3    It would discuss the percentage that L. Lin
4    Wood, P.C. was taking of the total fee, is that
5    correct?
6         A    I would have to go back and look at the
7    settlement statements, but usually they were
8    broken down; and it showed who was receiving
9    what.
10        Q    Really?
11        A    I am pretty sure I am right about that.
12   If I had L. Lin Wood, P.C. with the percentage,
13   there might be a breakdown as to who received
14   what.
15             (Whereupon, Plaintiff's Exhibit
16             Number 5 was marked for
17             identification.)
18   BY MR. BEAL:
19        Q    Let me hand you what has been marked as
20   Exhibit 5, does this look like the Settlement
21   Statement or what I call fee disbursement
22   schedule in the David Carbone case?
23        A    Yes.  This was dated February the 25th
24   of 2020, which would have been -- well, they
25   left -- the fee -- they left the arrangement
```



1    with L. Lin Wood, P.C. effective on

2    February 14th of 2020.  So they ended that

3    arrangement on their own decision; and the

4    Carbone case was a case where there had been --

5    it was one of those cases where I am not sure if

6    we had an agreement going in.  I think it was

7    part of the efforts to resolve the case at the

8    time.

9         At the time this was done I am not sure

10   that there had been an agreement reached on the

11   Carbone fees division, but I could be wrong

12   about that.

13     Q    And this Settlement Statement reflects

14   a breakout for the fees earned by L. Lin Wood,

15   P.C., and the fees earned by Wargo and French,

16   LLP and SG Evans Law?

17     A    Yes.  I had associated Stacey Evans,

18   who formerly had been a partner with me at Wood

19   Hernacki and Evans, the firm I established when

20   I left Bryan Cave; and that firm was made up of

21   their three PC's.  It was basically the same

22   thing.  It was an office sharing arrangement

23   where we would divide up cases by agreement,

24   where they would help me.

25         This refreshes my recollection a little



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                19

1    bit.  The Carbone case I do not think I

2    initially envisioned getting Johnathan or Taylor

3    or Nicole involved in it.  I don't think Nicole

4    ever did any work on it, because Stacey Evans

5    was going to be the person who was really

6    engaged to help me; and she was at Wargo &

7    French and I had a division of fees with her.

8            And so I broke down how the fees were

9    split.  And that is why you see Wargo & French,

10   and then she had SG Evans Law had independent of

11   Wargo & French expended expense money.

12       Q    And Wargo & French and SG Evans Law did

13   not maintain a practice in the same lease space

14   as L. Lin Wood, P.C., did they?

15       A    No.  Wargo & French never had a sharing

16   arrangement with me.  Stacey had earlier had an

17   office sharing arrangement with me, but when

18   she -- she ran for Governor.

19       Q    But she was long since done when this

20   was entered?

21       A    She was out of the office sharing

22   arrangement with me.

23       Q    Right.

24       A    When she --

25       Q    And does this refresh your recollection



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              20

1    that there was no breakdown below L. Lin Wood,
2    P.C. to the PC's or LLC's of the Plaintiffs
3    here?
4        A    No, it was just a breakdown between L.
5    Lin Wood, P.C. and Wargo & French, LLP; and I
6    don't believe at the time -- I am subject to
7    being refreshed, but they didn't do a lot --
8    Johnathan got involved in it at some point and
9    did some work; but I don't think Nicole ever did
10   any work on Carbone, and I don't think Taylor
11   Wilson did.
12       Q    So in the Lindsey case is it your
13   recollection that the fee disbursement schedule
14   in the Lindsey case would reflect fees going to
15   L. Lin Wood, P.C. and separately show fees going
16   to one of the Plaintiff's PC's or LLC's?
17       A    You would have to show me the
18   agreement.
19       Q    Okay.  Is it your recollection that the
20   Ramsey fee contracts showed a distinction
21   between the fees going to L. Lin Wood, P.C. and
22   the fees going to one of the, LLC's or PC's of
23   the Plaintiffs?
24       A    You said the contract, that is the
25   contract of engagement.



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                        21

```
 1        Q     No, I mean the Settlement Statement?
 2        A     I would have to see it.  I think it
 3   showed how the breakdown of money.   In other
 4   words, my recollection is that it listed how
 5   much each of them got.
 6        Q     Okay.
 7                    (Whereupon, Plaintiff's Exhibit
 8                    Number 6 was marked for
 9                    identification.)
10   BY MR. BEAL:
11        Q     Let me hand you what has been marked
12   Exhibit 6.
13                And we are going to be talking about
14   the first long Email from Taylor Wilson to you
15   dated February 17, 2020.
16        A     Okay, we are going to be talking about
17   the first part of it?  Not February 18th?
18        Q     Correct.  I don't know.  We just left
19   it on there for context, because it was part of
20   the chain.
21                Do you remember entering into an
22   agreement with the Plaintiffs here regarding the
23   fee splits that are reflected here on Taylor's
24   Email to you of February 17, 2020?
25        A     I do remember speaking with them on the
```



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          22

```
 1    phone, and we reached an agreement as to how the
 2    fee -- the fees themselves would be divided.  We
 3    did not reach at that time an agreement on the
 4    overall issues that were between us.
 5         Q    Okay.
 6         A    In fact, I remember it well because I
 7    had to ask --
 8              MR. BEAL:  Hold on for one second.
 9              (Whereupon, an off-the-record
10              discussion was held.)
11    BY MR. BEAL:
12         Q    I am handing you back Exhibit 5.  We
13    needed to black out a total in the recovery in
14    Sandmann.
15         A    It might be a good idea to block off
16    Carbone and CNN on the second page, because that
17    agreement may have been confidential at CNN's
18    request.
19         Q    We can do that at the end of the
20    deposition.
21              So this agreement by -- this Email by
22    Taylor sets forth in writing the agreement you
23    had reached certainly by February 17th on
24    regarding fee splits in a variety of cases, is
25    that correct?
```



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                               23

1       A     I think it reflects how we agreed to
2   divide the fee, not the final agreement on how
3   we were going to sever the relationship, because
4   there were other issues.
5       Q     Right.
6       A     But it does, because I remember the
7   phone call was on the 17th three days after they
8   had left the office sharing agreement with
9   myself and my PC; and I remember having a
10  conversation.  I was trying to be -- I was
11  trying to calm the waters at that time.
12      Q     I understand.
13      A     We were going through a very difficult
14  time period dealing with Johnathan and Taylor --
15  not so much Nicole -- starting in October of
16  2019, and there were a lot of things that were
17  done that created problems --
18      Q     But this Email --
19      A     Let me finish, and I was trying to calm
20  the waters.  And I remember that I said what do
21  you all think is fair?  And they said
22  35 percent.  I said I will give you 50, is that
23  fair?  Yeah, yeah, we will take 50.
24            And that that was a discussion that
25  occurred on February 17th and Taylor sent an



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              24

1    Email confirming it.

2         Q    Thank you.

3              And so if you turn over to the second

4    page of Exhibit 6 (b) is Carbone versus CNN, the

5    proposed -- you proposed to split the fee

6    40 percent to L. Lin Wood, P.C. and 60 percent

7    to us.

8              Did I read that correctly?

9         A    Yes, that is what it says.

10        Q    And the date of this is February 17th,

11   is that correct?

12        A    Yes.

13        Q    And then if we refer back to Exhibit 5,

14   the date of that fee disbursement is about a

15   week after?  It is February 25th, is that

16   correct?

17        A    It is because, and I tell you, I think

18   I am right I think, after I had had the

19   conversation with Johnathan Taylor and Nicole on

20   the 17th, things occurred that placed doubt in

21   my mind as to whether I was going to actually do

22   what I had said on the 17th in terms of the fee

23   division.

24        Q    Whether you were going to honor that

25   promise?



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              25

1       A    Well, it wasn't a done deal; and issues
2    arose about the lease, and I was not happy with
3    them.
4            And so at the time that I did the
5    Carbone Settlement Statement in my mind it was
6    unclear what was going to happen with Carbone.
7       Q    And so you didn't list them on
8    Exhibit 5 on the Carbone Settlement Statement
9    because you planned to keep all the fees
10   yourself?
11      A    That is not true.
12           MR. HARRISON:  Object to the form.
13   BY MR. BEAL:
14      Q    Well, you said --
15           THE WITNESS:  Hold on, that is not
16      true at all.
17   BY MR. BEAL:
18      Q    Okay.
19      A    In fact, I got to remember the date;
20   but somewhere after -- or shortly after or
21   before maybe, February 20th, I engaged Alston &
22   Byrd to represent me.
23      Q    Did you in fact share any of the
24   Carbone fees with the Plaintiffs in this case?
25      A    It would have been done pursuant to the



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100       www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              26

1    March 17th agreement that was negotiated between
2    you and Alston & Byrd; and it has been handled
3    pursuant to that agreement.
4              And there was a division where they
5    would receive some of the fee.  But the way it
6    was set up is it wasn't going to be paid until
7    the Sandmann case resolved.  But even then as I
8    recall without looking at the agreement, it
9    wasn't going to be paid as a practical matter
10   because they owed me 200 and -- they owed
11   $285,000 on their share of the lease.  They owed
12   that directly to the landlord.
13             And so the agreement was set up so that
14   I would not pay any of the fees in the other
15   matters, except for Sandmann, except for when it
16   came in because those fees were --
17             MR. BEAL:  I don't want to be
18        rude, but I don't know what he is
19        talking about.
20             THE WITNESS:  Well, I am trying to
21        tell you --
22             MR. HARRISON:  Let him finish.
23             MR. BEAL:  It is a very simple
24        question.
25             THE WITNESS:  I am trying to give



1        you an answer.  Let me finish.  I am
2        sorry.
3             So for example if I owed him
4        hypothetically $50,000 on Carbone, even
5        though it closed, I didn't pay him the
6        50 because the agreement allowed me to
7        keep any of their fees that they had
8        agreed to pay them until they had
9        satisfied the $285,000 that they had to
10       pay to the landlord, which I agreed to
11       let them pay to me.  Then I would pay
12       to the landlord on their behalf to make
13       sure that their fees were actually
14       paid, because they owed 75 percent of
15       the lease.
16            So the amount of Carbone and how
17       that worked out, that ultimately was
18       tied more to the final agreement of
19       March 17th, than it was the preliminary
20       on the 17th of February.
21   BY MR. BEAL:
22       Q    Let me ask this question, on
23   February 17th Taylor wrote this Email
24   summarizing your agreement, which included fee
25   divisions on a variety of cases, including



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                    28

1     Carbone, is that correct?

2          A    It is correct, to the point that we

3     agreed at that time on a fee division in certain

4     cases.

5          Q    And then?

6          A    But it was not put in writing after I

7     had to get Joey Burby involved.  Then it was put

8     in writing.

9          Q    Six days later you received the fees in

10    Carbone and --

11         A    It looks like I got them on the 25th,

12    which would have been more than six days.

13              MR. HARRISON:  Eight days.

14    BY MR. BEAL:

15         Q    So eight days later, but payment was

16    not made because you planned on entering into a

17    separate agreement, which would deal with other

18    issues; and these payments would not be due, is

19    that correct?

20         A    I don't think that is accurate.

21         Q    Okay.

22         A    I mean it is ultimately accurate on

23    March 17th that the payment of that fee in

24    Carbone was not due and payable until they had

25    paid their share of the $285,000 that they owed



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              29

1    on the lease.

2         Q    So when you entered into --

3         A    Hold on a second.  I believe it was

4    during the time period of the 17th prior to the

5    25th that I learned that my computer had been

6    hacked, and my Email's had been hacked; and I

7    had reason at that time to believe that

8    Johnathan and Taylor and perhaps Nicole were

9    involved in it.  I still think that.

10        Q    Okay.  Were you --

11        A    I think it related to Dr. Phil, but we

12   will see.  I thought at the time that it related

13   to Rick Miller, so there was a problem.  However

14   we define it, there was a serious problem that

15   came up between the 17th and the 25th of

16   February that ultimately led me to get Joey

17   Burby and his firm Alston & Byrd involved to

18   negotiate a final deal with you.

19        Q    If you had been planning on paying the

20   fee to my clients out of Carbone, would you have

21   had to have listed them on that Settlement

22   Statement?

23        A    You know, I don't believe that I

24   realized at the time that I had to do that.

25        Q    Okay.  So you didn't think you had to



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                    30

1    do it?

2         A    I learned from Joey Burby and Chris

3    Marquardt when the Sandmann issue came up, that

4    when you divide a fee with an outside firm that

5    you have to get the client consent either --

6    preferably in the initial engagement agreement,

7    but if not at that time I was told that you have

8    to get it at the time of consummation of the

9    settlement, or before the consummation, or at

10   the consummation.

11             I was not intimately familiar with the

12   Georgia ethical rules on fee splits with third

13   parties.

14        Q    And so that was not something you had

15   been doing in your career with the Plaintiffs up

16   to that point, is that correct?

17        A    It is correct in that I did not do it,

18   because I thought there was an ethical

19   obligation to do it; but I think my history

20   showed that I generally would reflect to the

21   clients how the fees were disbursed or the

22   moneys were disbursed, and how the settlement

23   proceeds were disbursed.

24             That was a matter of disclosure that I

25   always engaged in, but I did not know that it



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          31

1   was a requirement under the Georgia ethical

2   rules until I was informed of that by Alston &

3   Byrd.  And that came up in discussion about

4   the --

5        Q    And the matters --

6             MR. BEAL:  We are wasting just a

7        ton of time.  We don't have -- we don't

8        need to be here until 8:00 o'clock at

9        night.

10            MR. HARRISON:  I understand.

11            MR. BEAL:  I know, but I mean a

12       lot of this hang on.

13            THE WITNESS:  Well, let me --

14            MR. HARRISON:  Hang on.

15            MR. BEAL:  The question got

16       answered and then it got re-answered a

17       second time, and now we are onto a

18       whole different subject.

19            MR. HARRISON:  So two things, let

20       him finish his answers, please.

21            Lin, answer the question and stop.

22            MR. BEAL:  Because he can get to

23       all this stuff --

24            MR. HARRISON:  I don't need it.

25            MR. BEAL:  I am not trying to cut



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              32

1        you off.  I just want to save some
2        time.
3             THE WITNESS:  Let me finish now.
4             MR. HARRISON:  Please don't cut
5        him off.
6             Lin, please just answer the
7        question.
8             THE WITNESS:  I believe what I was
9        saying when you jumped in was in a
10       discussion about the fee division with
11       Cherie Fuzzell, that is when Alston &
12       Byrd says this applies to Sandmann too.
13       That is when I learned about the
14       ethical rule.
15            So my disclosures in any of the
16       agreements that I had, it was really a
17       matter of transparency to tell the
18       client how the proceeds were disbursed.
19            I didn't do it because I thought
20       there was an ethical rule to do it.
21  BY MR. BEAL:
22       Q    And did Alston & Byrd tell you how --
23  did Alston & Byrd describe to you that these
24  ethical regulations they were talking about were
25  different for firms inside your office, versus



```
 1    firms outside, practicing law somewhere else?
 2             MR. HARRISON:  Let me make sure
 3        before he answers.
 4             He is asking you potentially about
 5        attorney-client communications.
 6             THE WITNESS:  Well, I relied on
 7        Counsel so I think he is entitled to
 8        ask it.
 9             MR. HARRISON:  I think he is
10        entitled to ask it, but I just wanted
11        to make you aware of it.
12             THE WITNESS:  I gave Joey Burby
13        and Chris Marquardt the entire history
14        of the fee splits, et cetera with the
15        three PC's.  Yeah, Wade, Grunberg --
16        however many PC's they had.
17             I gave them the entire history.  I
18        gave them the history of the office
19        sharing division.  They were aware that
20        these lawyers had left the fee sharing
21        arrangement on February 14th.  So when
22        I was told that consent was required
23        from Nicholas Sandmann pursuant to the
24        Georgia ethical rules, and as I recall
25        Todd McMurtry said it was required
```



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

1           pursuant to Kentucky's ethical rules, I
2           relied on the fact that they knew the
3           history and they knew whether or not
4           the fee should be divided or should
5           require client consent.
6                And however they resolved that in
7           terms of what you are suggesting or
8           that they were in the office or out of
9           the office, the fact is we know without
10          any doubt that the fee agreement was
11          signed, the division agreement was
12          signed on March 17th.  Over a month
13          earlier they had terminated their lease
14          office sharing arrangement with me.  So
15          they were a third party firm at the
16          time the agreement was entered into in
17          March, and for whatever their legal
18          reasoning was, Alston & Byrd said
19          client consent is required.
20     BY MR. BEAL:
21          Q    And what legal research did you do to
22     confirm that that was indeed accurate?
23          A    I didn't do any.  I read the rule, and
24     they brought it to my attention; but they were
25     my lawyers, and I figured they had done the



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                           35

1    research to come to the right --
2        Q    Did they prepare a research memo --
3             MR. HARRISON:  Hang on.  You got
4        to let him finish his answer.  I
5        understand that you think maybe it is
6        not relevant; but you are continuing to
7        talk over him.  It is just not going to
8        get anywhere.
9             THE WITNESS:  Let me just finish.
10            So I didn't prepare any -- I do
11       didn't do any legal research.  I was
12       paying Alston & Byrd to resolve the
13       issue for me.  And they gave me a hard
14       statement that consent was required,
15       and I can't remember exactly the date
16       of when that advice was given to me;
17       but that was their counsel.  I didn't
18       go back and second-guess it.  I didn't
19       do my own research.
20            I was familiar with the rule when
21       it was brought to my attention, and the
22       issue of whether it applied based on
23       the arrangement we had predating the
24       March 17 or not, I relied on Alston &
25       Byrd to tell me the answer.



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                36

1    BY MR. BEAL:

2        Q     When do you think they gave you that

3    advice?

4        A     I would have to go back and look.  I

5    really don't remember, and my recollection is

6    that it was sometime after March the 17th,

7    because it was in a discussion about a division

8    with Cherie Fuzzell; and they said we have

9    looked and you got to get client consent.

10             And I asked the question, well, does

11   that also apply to Sandmann?  And they said

12   yeah.  So that is when it happened.  I don't

13   have a specific date.

14       Q     And who was Miss Fuzzell?

15       A     Cherie Fuzzell is Rick Miller's wife.

16       Q     And she is associated with what law

17   firm?

18       A     I don't think she has an association

19   with a law firm.  I don't think she ever

20   practiced law actually, but she got a law

21   degree.  She may have practiced at one time.

22       Q     She never practiced in any capacity

23   with L. Lin Wood, P.C. or in your office?

24       A     She did not.

25       Q     Okay.



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              37

1          Did Alston & Byrd ever indicate to you
2    that there was a difference between the
3    Plaintiffs here who practiced law as your
4    partners in your business, versus someone who
5    practiced law at a completely different firm in
6    a different location?  Did they ever draw that
7    distinction?
8       A    They didn't draw the distinction with
9    me.  I gave them all the information, all the
10   factual background of the history of the
11   relationship between the various PC's; and they
12   came to their own conclusion on their own time
13   that client consent in the Sandmann case was
14   required.  And I tried to get it.
15      Q    So would it be fair to say that all of
16   these cases here, Sandmann -- well, leave
17   Sandmann aside -- Carbone, Lindsey, Grogan and
18   Cardoba all had settlement statements that would
19   have reflected the Plaintiffs and the percentage
20   that they were receiving?
21      A    Well, Cordoba I was not involved in
22   however that was done.
23          Grogan versus Aarons, I was not
24   involved in how that was done, if it has been
25   done.


**COASTAL COURT REPORTING & VIDEO SERVICES**
           800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                    38

1           Lindsey, I am sure that I did prepare a

2    client statement.

3           And Carbone, you have got.

4           And then we obviously know what has

5    happened with Sandmann.

6       Q    And would Lindsey -- I may have asked

7    you this question before -- but let me go over

8    it again, in Lindsey was there a separate line

9    item for the Plaintiffs in the percentage their

10   PC's or LLC's would receive?

11      A    I would have to see the agreement, but

12   I suspect it might be more in line with the

13   Carbone Settlement Statement; but I don't know

14   that.

15          Because this was all in flux pending

16   the final agreement that was reached on

17   March 17th.

18      Q    And so is there anything in Exhibit 6

19   which indicates that these agreements are in

20   flux or will be changed, or are pending a final

21   agreement?  Any reference to that?

22      A    Taylor didn't put anything in there,

23   but we had other agreements -- we had other

24   issues that had to be resolved.

25      Q    And then under number 2 he says:  We



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                    39

1   agreed to speak to Kimmy and use our best

2   efforts to influence her as to the benefits of

3   returning to work with you, including without

4   limitation by describing to her how much we

5   appreciate your willingness to work with us and

6   how well we were able to work with you on

7   resolving the issues tonight, et cetera.

8           And is this Kimmy Hart Bennett?

9      A    Yes.

10     Q    And why was it so important to you that

11  the Plaintiffs go and talk to Kimmy and persuade

12  her to come to work for you?

13     A    Because they had put her job at risk

14  and to get her terminated.  On February 14th I

15  believe that was the day that we were supposed

16  to meet in the offices of L. Lin Wood, P.C.

17     Q    Okay --

18     A    Hold on.  We had come to an agreement

19  to continue to work in an office sharing

20  arrangement under the name of Wood Wilson

21  Grunberg and Wade; and we were going to be

22  meeting on February 14th after some very, very

23  difficult days starting in October until that

24  time period, to try to sit down and go over how

25  we are going to agree on how that office sharing



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          40

1    agreement was going to work.

2           I sensed that it was a setup, and that

3    they weren't going to be at the meeting; so I

4    didn't go.  Because I sensed they were going to

5    try to leave and stick me with the lease.  I

6    thought the lease was in L. Lin Wood, P.C.'s

7    name, and I had the keys removed, the card's

8    access removed.

9           And then I found out that they had a

10   meeting I think at Nicole's house where they

11   were going to read me the riot act, and they

12   changed the time to 2:30 and Johnathan got on

13   the phone and just ripped me for 20 minutes; and

14   I finally said, can I say something, Jonathan?

15   Hold on.  This is important and I am going

16   answer it --

17   BY MR. BEAL:

18       Q    Is this going to tie back to Kimmy?

19       A    It is.  So I finally said to Jonathan

20   can I get a word in?  He said you got five

21   minutes.  I said I don't need five minutes.  You

22   got until 5:00 o'clock to get in the office and

23   get your stuff out.  I am told that when they

24   all went to the meeting, and Kimmy went with

25   him, she was my executive assistant, she never



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              41

1   worked for any of their PC's, she was paid
2   strictly by me.  She worked for me, although
3   they benefited because she was at my request
4   keeping up with the overhead and paying it, and
5   then getting their share paid.
6           They took Kimmy to that meeting, and
7   Johnathan I am told looked over and say you know
8   you are going to lose your job now.  And Kimmy
9   said yes.  And that would have hurt me badly,
10  because I had to have Kimmy to be able to
11  maintain my law practice at that time.
12          And so when we had this discussion on
13  the 20th, I raised with them that I would like
14  for them to tell Kimmy, to urge her to stay.
15      Q    Okay.
16      A    And they were willing to do it then,
17  because I guess they saw the benefit to them by
18  making sure that I could still function with my
19  own self and have an executive assistant that
20  was skilled and knowledgeable.
21      Q    So Kimmy ultimately did stay with you,
22  is that right?
23      A    She did.  In fact I learned that Taylor
24  had called her and said you ought to stay --
25      Q    Just yes or no, I mean?


**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          42

1        A     I am answering.  I have the right to
2    answer fully.  I learned that Taylor had called
3    her and said you ought to stay with Lin.  They
4    were trying to make peace at that time because I
5    guess they thought they were going to get what
6    they wanted out of these other cases.
7              So she did ultimately stay with me.
8    She still works for me.
9        Q     Does she live with you up here?
10       A     No, she lives with her husband outside
11   of Atlanta.
12       Q     But it was very important for you to
13   get Kimmy and this salary was what you offered
14   her was 120,000 a year, is that correct?
15       A     I believe that is correct.  I was
16   paying her 100 or 120 at that time.  Kimmy is a
17   very valuable person in terms of her skill and
18   her knowledge.  She runs my law practice.  Since
19   I have lost my law practice due to this lawsuit
20   and the State Bar, she runs my other efforts to
21   try to find a way to make a living.  So she is a
22   very critical employee.  She was then.  She is
23   now.
24       Q     And she works out of Atlanta and you
25   live up here in South Carolina most of the time,



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                    43

1    is that correct?
2         A    My residence was moved to South
3    Carolina in February of 2021.  I still have a
4    home in Atlanta on Green View and I have to -- I
5    am trying to maintain it, because when I go down
6    to deal with this litigation and the State Bar,
7    I don't want to go down and stay in a hotel
8    because I take my dog with me.
9              So the answer is Kimmy works remotely,
10   and then I will see her in person when I go to
11   Atlanta; and then she has made a couple of trips
12   to South Carolina.  Tat is right after when I
13   first bought the property here.
14        Q    And you have invested with Kimmy's
15   husband in another business, is that correct?
16        A    No.
17        Q    No?
18        A    No, I have no investments with Paul.
19        Q    Okay.  So for the most part your PC is
20   located in Atlanta, Georgia; but your permanent
21   residence and where you spend the majority of
22   your time is here in South Carolina, is that
23   correct?
24        A    I spend the majority of my time here.
25   The PC still has an address in Atlanta.  I have



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          44

1    left the corporation viable, although it is not

2    a viable entity any more financially; and I

3    don't have any cases that I am working on,

4    except my efforts to combat as Co-Counsel the

5    warfare that has been waged against me,

6    including this lawsuit.

7        Q    And when we look at the lawsuits listed

8    on Exhibit 6, Sandmann, Carbone, Lindsey,

9    Grogan -- let us leave Cordoba out for now -- in

10   each one there is an estimated fee recovery, and

11   is that because the majority of the work had

12   already been performed on those files?

13       A    No.  No.

14            Cordoba was as I recall the case that

15   Taylor Wilson brought in --

16       Q    I don't want to talk about Cordoba

17   right now.  I am asking A through E?

18       A    You asked me about D and E.

19       Q    No, I am asking you A through D.

20   Sandmann --

21       A    Grogan -- I don't know -- no, I don't

22   believe Grogan had all the work done on it at

23   all.  I thought it was relatively a new case.

24       Q    But we know that Carbone was done

25   because the payment came eight days later.

 **COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          45

1       A    I would have to look and see when
2   Carbone actually was done.
3            I remember being at Reynolds when I
4   spoke with David and also David Vigilante; so I
5   don't remember the exact date that it was done.
6   It may have been --
7       Q    But all of the work was substantially
8   performed, because you had a check eight days
9   later, right?
10      A    Well, I don't -- the work is not done
11  on a contingency fee case until you get a
12  settlement.
13           And so I was still negotiating with
14  David Vigilante and the Carbone's.  They were
15  tough clients, and they had a certain view of
16  the case and I had a different view.  And so I
17  had to spend time with them and spend time with
18  David Vigilante to get it settled.  I don't know
19  when those conversations occurred.
20      Q    But it was most of the actual legal
21  work had already been performed, and there was
22  an estimated fee so --
23      A    Yeah.
24      Q    So there must have been a tentative
25  agreement as to even settlement amount at that



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              46

1    point?

2        A    I think that is accurate.

3        Q    Okay.  And then the same is true of

4    Sandmann, all the heavy lifting, the legal work

5    must have been done because we have got a fee

6    share estimate, which is remarkably accurate;

7    and it is down to the dollar.  So that amount,

8    the majority of the work had been done on

9    Sandmann, and you were finalizing the settlement

10   documents at that time in February 17th, right?

11       A    What is the question?  There is a lot

12   said there.

13       Q    Is that correct that the majority of

14   the legal work had been completed in Sandmann

15   and a settlement amount had been agreed to?

16       A    No.  What would be accurate is is that

17   work had been done -- Sandmann was involved in I

18   believe seven different cases.  So a lot of the

19   work that was done would have been for the

20   benefit of all of those cases.

21            There was concentration on CNN and then

22   the Washington Post.  So enough work had been

23   done on the CNN case that the parties settled

24   it.

25            At the time that it settled there was



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              47

```
 1   no agreement on a fee division with any other
 2   lawyers in how we would deal with the fees.
 3       Q    All right.
 4       A    Until we had the discussion and I
 5   entered into what I felt was -- I felt like --
 6   hold on -- these people were extorting me.  But
 7   I entered into an agreement to get them in my
 8   rear-view mirror and then that blew up.
 9            But then I went back and said look, I
10   just want to move on with my life.  I had this
11   disruption with my children and Richard Jewell
12   and the threats that it posed to my ongoing
13   representation of Sandmann, and that is when
14   Joey and them got the matter settled.  I thought
15   we were in the rear-view mirror and would have
16   an amicable relationship going forward.  That
17   was my intent.
18       Q    So when we are talking with Sandmann
19   here on Exhibit 6, we are talking about Sandmann
20   versus CNN?
21       A    On Exhibit 6 we are talking about
22   Sandmann versus CNN.
23       Q    Yes, and the settlement agreement had
24   been reached?
25       A    Yes, it had to have been.  It wasn't
```



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              48

1    consummated.

2        Q    Correct.

3        A    I don't know if it had been documented,

4    because Todd McMurtry handled that part of the

5    case.  It had been envisioned at one point that

6    I was going to ask Taylor to work with Todd on

7    it and I don't think that worked out.  Either I

8    just changed my mind or things got to a point

9    where it didn't matter because we got it

10   settled.

11       Q    A minute ago you said these people were

12   extorting me.

13            Do you believe that there was in fact

14   extortion committed by the Plaintiffs?

15       A    I believe they extorted me into the

16   agreement of March 17th, because they were

17   interfering with my relationship with my

18   children.  That is documented.  You don't do

19   that to me.

20            They were threatening me with their

21   accusations, false about my mental health.  They

22   were threatening my efforts for Richard Jewell

23   to have President Trump award him posthumously

24   the Presidential Medal of Freedom.

25            And their baseless allegations also



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100          www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          49

1    threatened what I was doing in an ongoing effort

2    for Nicholas Sandmann and they knew it.

3            And I think they used that leverage and

4    it worked.  I gave in, but I felt extorted.

5    Then I believe clearly without any doubt in my

6    mind it is my opinion they extorted me or tried

7    to extort me with respect to the demand that you

8    made when you sent over that incredibly

9    scandalous, irrelevant, impertinent Complaint

10   that they were determined to file, so they could

11   smear my name and they did it.

12           They knew I would never agree to the

13   extortion terms that were presented to me when

14   you sent that over to Joey Burby.  They wanted

15   to smear me.  I think that why they involved

16   David Hancock.

17     Q    So it is your belief that the first act

18   of criminal extortion or the crime of extortion

19   occurred by the Plaintiffs in the March 17th

20   agreement, Settlement Agreement, is that

21   correct?

22           MR. HARRISON:  Objection to the

23       form.

24           You can answer.

25           THE WITNESS:  I believe that they



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          50

```
 1        extorted me into the March 17th
 2        agreement and I gave into it.
 3   BY MR. BEAL:
 4        Q    And then --
 5        A    Let me finish.
 6        Q    I want you to list them all out for me.
 7        A    I am trying to.
 8        Q    Good.
 9        A    I believe they extorted me in
10   connection with the March 17th agreement, and I
11   gave into it.
12             If I had not given into it they would
13   have had to sue me for quantum meruit, and it is
14   a lot less than what I had agreed to pay.
15             And then I believe that they attempted
16   to extort me, and you were involved in it, Drew,
17   with the obscene Complaint that was filed, where
18   the only issue to be resolved was whether or not
19   client consent was required in the Sandmann
20   case.
21             So I believe that was extortion.  I
22   don't know that I -- you would have to show me
23   what I said, but extortion is extortion.  If it
24   is a crime, it is a crime.  Theirs was knowing,
25   and it was my firm opinion and validated by
```



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              51

1   Alston & Byrd, because they prepared with me the

2   press release that was issued after the lawsuit

3   was filed; and they assisted me in editing it,

4   and it contained the fact that I said that they

5   were trying to extort me through litigation.  I

6   wasn't going to get extorted.

7            So the first accusation or description

8   or my opinion I would say about extortion was in

9   the press release that I issued back in

10  September of 2020.  They didn't say anything

11  about it.

12           And then they filed their lawsuit and

13  published to the world that I had said to Dexter

14  Cain that they were extorting.  That I had said

15  to one of the Co-Counsel in the class action

16  case that they were extorting me.  They put that

17  out for the world to read.  They published it

18  themselves.  I didn't.  But that is the way I

19  felt, because I think I am right.  I think my

20  opinion is solid.

21       Q    To whom -- to what Law Enforcement

22  agencies did you report this extortion or

23  attempted extortion?

24       A    I didn't -- I didn't -- I didn't have

25  the opinion it was extortion to have these



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          52

```
 1   people put in jail for it.  But I described what
 2   they had done, because I believed then, I
 3   believe now that it was extortion; but I wasn't
 4   here to put anybody in jail.
 5        Q    But you believe it was the crime of
 6   extortion, but you did not want to put them in
 7   jail for it?
 8        A    I believed that they extorted me and I
 9   made finally a decision in I believe May of 2021
10   when I was then representing myself in this
11   case, when I had joined as Co-Counsel when Burby
12   had left, I felt like as a lawyer when I was
13   getting blasted up there in South Carolina, in
14   large part based on their lawsuit, that I had
15   not only a right, but under the law I had a duty
16   as my own lawyer to defend myself in the Court
17   of public opinion and that is when I posted on
18   Telegram.  And that is when I described what
19   they had done as extortion.  That is my opinion.
20   It was then.  It is now and it hasn't changed.
21        Q    Did you believe that you had a duty to
22   report the crime of extortion to any Bar
23   Association?
24        A    Well, it was on Telegram; and I think I
25   made some reference to it.  The Bar had
```



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                    53

1    apparently changed their policies sometime in
2    2020 where you could file a Complaint against
3    any lawyer even if he never represented you or
4    she never represented you.  It changed
5    completely in the rules, where usually a
6    Complaint ethically had to be filed by a client.
7              And so having been subjected to an
8    ethics investigation by people I didn't even
9    know who they were, I figured the Bar wants to
10   hear from the people.
11             And I think I put on Telegram -- I
12   don't have it with me -- but I recall putting on
13   Telegram if you feel this is extortion, you can
14   always report it to the Georgia Bar; and I think
15   I did report them to the Georgia Bar.
16                  (Whereupon, Plaintiff's Exhibit
17                  Number 7 was marked for
18                  identification.)
19   BY MR. BEAL:
20       Q    Let me hand you this.
21       A    But I didn't contact Law Enforcement,
22   just like I note they didn't contact Law
23   Enforcement despite having what they claim was
24   serious threats of bodily harm they claim were
25   made by people who followed me on Telegram.



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          54

1    That is not true.
2        Q    I am handing you what has been marked
3    as Exhibit 7, and ask you if this is an Email
4    that you wrote to Todd McMurtry on February 27th
5    of 2020?
6        A    Let me take a look at it.
7        Q    Yeah, it is kind of long.  It will take
8    a second.
9        A    It looks like it will be all right.
10             He called you a flaming liberal.  I
11   think that is right.
12       Q    No, Ed was the flaming liberal?
13       A    I am just kidding, Ed was the flaming
14   liberal.  I am sorry.  Oh yes, it says Ed is a
15   flaming liberal.  I like Ed.  I think he is a
16   flaming liberal.  But that is all right.  He
17   thinks I am a flaming conservative.
18             Okay, that is an Email I sent to Todd.
19       Q    The Plaintiffs are not copied on this
20   separately?
21       A    Nor would there be a reason to copy
22   them.
23       Q    So in the first paragraph you talk
24   about a dispute you had with my then law partner
25   Ed Buckley regarding claims from his client



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                    55

1    against Herman Cain, is that correct?

2         A     I didn't have a dispute with it.

3         Q     Okay.

4         A     I represented Herman Cain.  Ed

5    represented Ginger White and Ed started making a

6    media tour with Ginger White to attack Herman

7    Cain.

8              That is my dealings with Ed Buckley.

9         Q     All right.

10             Did you accuse him of extortion?

11             MR. HARRISON:  Object to the form.

12             THE WITNESS:  He wasn't extorting

13        me.  I didn't make any accusations

14        against Ed Buckley.  I was only

15        involved, and it was peripheral.  I

16        think we talked on the phone a few

17        times, because he was on a media tour

18        with Ginger White attacking Herman Cain

19        who I represented.

20   BY MR. BEAL:

21        Q     In the next paragraph you say and I

22   will just read it and tell me if I read it

23   correctly and we can break it down:  I can

24   explain more to you tomorrow by phone, but I

25   would like to ask you to consider preparing a



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                    56

1    letter from you to Beal and a letter signed by
2    Ted and Julie to you or Beal, making clear that
3    there is express directive that no fees be paid
4    to Taylor, Johnathan and Nicole that exceed a
5    quantum meruit basis regardless of any agreement
6    I made or attempted to make to get rid of their
7    foolishness to prevent it from harming my future
8    efforts for Nicholas and others.
9            Did I read that correctly?
10   A    You did.
11   Q    Would it be fair to say that you are
12   asking Todd to go to Mr. and Mrs. Sandmann and
13   instruct them to insist on a quantum meruit fee
14   for the Plaintiffs in this case?
15   A    I said what I said.
16   Q    All right.
17   A    But let me say this, you had made some
18   demand on Todd that he maintain the Sandmann fee
19   in his escrow account, in terms of the share
20   that Nicole and Johnathan and Taylor were trying
21   to get.  And I remember that he said -- I called
22   him on it -- and he said I can't do that under
23   Kentucky law, and I will inform them.  And then
24   he said would you want to see the draft of the
25   letter before I send it to them.  And I said no,



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          57

```
 1    you write whatever you want to write.

 2            And in that letter I noted when it was

 3    received that the last paragraph of that letter

 4    said that the Sandmann parents were only going

 5    to agree to a quantum meruit recovery.  I didn't

 6    know he was going to put that in the letter.  So

 7    you knew and they knew that that was the

 8    Sandmann position, not Lin Wood's.

 9            Although when this blew up I wanted to

10    make it clear to them so there was no

11    misunderstanding that that was their position,

12    and then in an effort to put this behind I

13    changed my mind and I said let us just get it

14    done and I got Joey and Chris to negotiate an

15    agreement with you.

16        Q    Okay.

17        A    And I wanted to go forward.  I wanted

18    these people to prosper.  That is why I sent

19    them business, offered them a line of credit;

20    and this idea that I was trying to destroy them

21    is --

22            MR. BEAL:  I will have to object.

23            THE WITNESS:  It is a brutal,

24        vicious, intentional lie.

25    BY MR. BEAL:
```



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          58

1       Q    Okay.  In Exhibit 7 you wrote this on
2   February 22, 2020, is that correct?
3       A    2:40 a.m., yes.  It looks like I wrote
4   it that morning.
5       Q    So that is five days after you entered
6   into the February 17th agreement with Taylor
7   about fee splits, is that correct?
8       A    It was after I had -- we had come to --
9   extorted agreement -- you didn't hear what I
10  said, so let me make sure you understand.
11      Q    You are under cross-examination, so I
12  need a --
13      A    I am going to answer it.  If I am not
14  allowed to --
15      Q    Yes or no and then you can explain
16  whatever you would like to.  This Email was
17  written five days?
18      A    That is clearly yes, you can do the
19  math.
20      Q    Okay, good.
21      A    The answer is yes, but go back and
22  understand I was extorted when I gave them that
23  agreement on the 17th.
24           And I was kind of playing with them.
25  When I said well, tell me what you think is



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100       www.coastalcourt.com

1   fair.  35 percent, the same thing we got with

2   Ramsey.  I said I will tell you what, I will

3   give you 50 percent, do you think that is fair?

4          I was not actually of the mind to give

5   them a dime at that time.  I was playing with

6   them a little bit to see what they would do.

7   And they went oh, yeah, yeah, we will take the

8   50 because they are greedy.

9          And then when I got back and dealt with

10  Joey Burby and Chris Marquardt, I said just go

11  ahead and let us divide it the way I said on

12  February 17th, because I did say it even though

13  it was not done with the mind set that they

14  deserved it and I wanted to give it to them, I

15  would live up to my word and give them

16  50 percent; and that is what got into the final

17  agreement.

18     Q    Okay.  And so when you entered into the

19  agreement with Taylor on February 17th you were,

20  to use your words, sort of playing with them.

21  You didn't plan on giving those percentages.

22  You were thinking more in line of what you said

23  here five days later to Todd McMurtry on

24  February 22nd, Exhibit 7?

25     A    No.



```
 1            MR. HARRISON:  Object to the form.
 2        Misstates --
 3            THE WITNESS:  No, you just made
 4        that up.
 5   BY MR. BEAL:
 6        Q    Okay.  When you said you were playing
 7     with them, you didn't want to give them
 8     anything?
 9            MR. HARRISON:  The same objection.
10            THE WITNESS:  I was not -- the
11        record that I have with these lawyers I
12        was abundantly and generously fair
13        above and beyond with them.  I was good
14        as gold to every one of them.
15            We didn't have an agreement on
16        Sandmann like we had in other cases;
17        and by the time it came time to make an
18        agreement they had left the -- they had
19        gone over into yah yah land in terms of
20        what they were doing with me.
21            When I said I am playing with
22        them, let me tell you what I meant, I
23        wanted to find out whether I was right
24        and if these people were really dealing
25        in good faith with me.  So when I had
```

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          61

1        that phone call with Taylor and then I
2        said how about what do you want in
3        Sandmann?  35 percent.  The same thing
4        we had with Ramsey, which was way
5        generous.  I said I will give you
6        50 percent.  So I was actually more
7        serious about confirming what these
8        people were up to, and that is why we
9        had to come back in March and make the
10       final agreement.
11   BY MR. BEAL:
12        Q    Okay.
13        A    I wasn't playing with them to play with
14   them.  None of this was fun t me.  What they
15   were saying about my mental health to my
16   children and others, that was not fun for me.
17   But they admitted that was a lie when they got
18   the Settlement Agreement in March 17th and
19   admitted that I was mentally competent at all
20   times and had been for a long time.
21   BY MR. BEAL:
22        Q    Let's look at page 2 of Exhibit 7.
23        A    Okay.
24        Q    And if you start in the second line,
25   the middle of the sentence it says:  I would



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          62

```
1     like for you to consider doing for me and what I
2     would like for Ted and Julie to consider doing
3     for me, which I believe will bring this
4     foolishness to an abrupt and unhappy ending for
5     Taylor, Johnathan, and Nicole, if they realize
6     they are not going to receive a sum certain for
7     the CNN case.  They will have NO ability to
8     finance their frivolous claims regarding the
9     fees in CNN and the remaining office lease
10    liability.  The worst-case scenario would be
11    that I would be authorized by the client to hold
12    my PC's portion of the CNN fee in my escrow
13    account pending final resolution of the disputes
14    between me and WGW.  That alone will cut off
15    their ability to finance and publicize their BS
16    claims against me.
17              MR. HARRISON:  What is the
18        question?
19    BY MR. BEAL:
20        Q    So did I read that correctly?
21        A    (Nods) I didn't follow it, but I don't
22    believe you intentionally misread it.
23        Q    Okay.
24             Did that accurately summarize your
25    feelings and intentions at the time you read it?
```



**COASTAL COURT REPORTING & VIDEO SERVICES**

1       A      It is incomplete.  If you look at what

2    I am trying to do, I realized that the plan they

3    had was to leave on February the 14th.  They

4    already had made that plan at a time when they

5    had a fiduciary duty to me as part of the office

6    sharing agreement, and in violation of that they

7    were out plotting against me to move out of the

8    office, to go somewhere else, and stick me with

9    the entire amount of the lease.

10      Q      All right.

11      A      And I was trying to tell Todd, and I

12   would have to look back at the letter that he

13   sent them where he makes some reference to the

14   Sandmann's not -- it was before -- I am sure it

15   was before this because I was surprised when I

16   saw it.

17             I was essentially saying make it clear

18   to these people that is all they are going to

19   get, and maybe that will bring them to the

20   reality that they need to stop the foolishness,

21   stop the accusations, stop the threats, and not

22   be able to follow up with their plan, which was

23   going to be to leave me stuck with the full

24   amount of the office lease.  That is my better

25   description of what I was saying.



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          64

1        Q      Let me unpack something that you have

2    just said.

3              You believe that the three Plaintiffs

4    owed you a fiduciary duty, is that correct, at

5    that time in February of 2020?

6        A      I thought they owed me a fiduciary

7    duty, as I owed them in terms of being partners

8    an office sharing arrangement.  We were in

9    business together.

10       Q      Partners in a business?

11       A      Partners in an office sharing

12   arrangement.

13       Q      But that office sharing arrangement was

14   for the conducting of the business, is that

15   right?

16       A      It was an office sharing arrangement

17   where they were able to practice law up there,

18   and I was able to practice law up there, and it

19   made it affordable for them and me to have it

20   done under an office sharing arrangement;

21   because I did not then and had never had any

22   type of a law partner with L. Lin Wood, P.C. It

23   has always been exclusively my partnership and

24   my PC.

25       Q      But you characterized them as partners



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          65

1    in an office sharing arrangement that owed a

2    fiduciary duty to you, and you perhaps owed one

3    to them, is that correct?

4        A    Anybody that is in an agreement --

5        Q    Yes or no?

6        A    Well, you said perhaps.  A fiduciary

7    duty is a fiduciary duty.  So everybody in the

8    agreement as it related to the lease owed each

9    other a fiduciary duty of good faith and honest

10   dealings, and not to be doing things behind the

11   back of another partner as it relates to the

12   lease.

13       Q    So would it be fair to say in this

14   February 22nd letter, Exhibit 7 -- excuse me,

15   Email, you were urging Todd to go to Mr. and

16   Mrs. Sandmann to persuade them to insist on a

17   quantum meruit fee only for the Plaintiffs?

18           MR. HARRISON:  Object to the form.

19   BY MR. BEAL:

20       Q    Is that correct?

21       A    No.  They had already said they were

22   going to pay quantum meruit.  I was saying make

23   it clear and maybe that will help bring these

24   people to their senses and we can get this all

25   resolved and the nonsense and foolishness on



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                        66

1    their part will stop.

2        Q    So when you said:  And what I would

3    like for Ted and Julie to consider doing for

4    me -- what you really meant is to formalize an

5    agreement they had already said before?

6        A    No.

7        Q    I mean doesn't this indicate that you

8    are asking Todd to bring this subject up to Ted

9    and Julie?

10       A    To consider it, yeah.  It says what it

11   says, but there was no agreement before.  They

12   had made their statement about their position

13   clear to you in Todd's letter that I had nothing

14   to do with.

15       Q    And the reason as you say here, one of

16   the main reasons you wanted them to only get

17   quantum meruit, so they would not have funds to

18   fuel litigation against you?

19       A    No, that is not what I said at all.  I

20   wanted their foolishness to stop, and I felt

21   like knowing what they were doing that if it

22   became abundantly clear to them that that is all

23   they are going to get, then they would stop

24   their foolishness and we could get this thing

25   resolved and move on.



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                    67

1        Q      When you say their foolishness, would
2    that be what you are describing here on
3    paragraph 2 on page 2 of Exhibit 7:  That alone
4    would cut off their ability to finance and
5    publicize their BS claims against me.
6        A      No.  That was a part of it.
7               The foolishness that I was being faced
8    with were their efforts in dealing with my
9    children claiming that I needed to agree to
10   undergo regular mental healthcare treatment.
11   They were interfering with my relationship with
12   my children and their discussions, whether they
13   were by text or Email or by phone were subject
14   to being discovered by the media, there is no
15   privacy.  And that threatened my efforts with
16   respect to the ongoing representation of
17   Nicholas Sandmann.  It threatened my efforts,
18   which they were well aware of that I had been
19   making to try to have President Trump to give
20   Richard Jewell the Presidential Medal of
21   freedom.  I am not sure when he asked me to meet
22   with him, but I met with him on March 11th, so
23   it may have been that I already had the meeting
24   date at the time when I was writing this.
25               I wanted this to stop.



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                             68

1        Q     All right.

2        A     And I wanted it to stop because it was

3   hurting my relationship with my children.  It

4   was threatening my efforts for Richard.  It was

5   threatening my potential efforts going forward

6   for Nicholas Sandmann.

7              And so having seen they are only going

8   to pay quantum meruit, I said make it clear to

9   them and I thought that might bring them to

10  their senses; and also prevent them from

11  thinking they were going to stick me with

12  $285,000 of their lease, their liability on the

13  lease.

14       Q     So when you say cut off their ability

15  to finance and publicize their claims against

16  you, that was only one of the desires you had,

17  and the others were to have them stop

18  interfering or having some relationship with

19  your children and making statements about your

20  mental health, is that right?

21       A     No, those are your words.  I told you

22  my words.

23       Q     All right --

24       A     Hold on a second.  I documented that I

25  was right when I saw the text messages between



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          69

1    my son Matt and Taylor Wilson with respect to

2    Dr. Phil McGraw.  I know what happened with

3    Dr. Phil McGraw.  I know how the jury got

4    rigged, and I know who was involved in it.

5         Q    So how would a lack of money prevent

6    the Plaintiffs from talking to your children?

7         A    That we come to an agreement.  If they

8    realized they weren't going to have their big

9    payday, which they did not earn.  I bet their

10   quantum meruit effort in the case was probably

11   not 150,000.  If they were not going to get the

12   847 or whatever the deal was where they could

13   pay what they owed on the lease, and then have a

14   bonanza from the fee they didn't earn based on

15   quantum meruit.  I thought it was something that

16   would make them realize the foolishness of their

17   ways.

18        Q    And that would make them not contact

19   your children or question your mental health?

20        A    Listen, I cannot -- my mental health

21   was fine then, and they knew it; and that is why

22   they admitted it in March.

23             I couldn't stop somebody from

24   contacting my children, but let me say this to

25   you, Drew, I am a nice guy.  I am not an angry



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                        70

1    man; but if you mess with my children and my
2    relationship I am hot blooded.
3            If you mess with Richard Jewell, I am
4    hot blooded, just like I am if you mess with my
5    puppies I am hot blooded.
6            These people were engaged in subverting
7    my relationship with my children.  Read the
8    bible --
9            MR. BEAL:  Real quickly --
10           THE WITNESS:  Wait a minute.  This
11       was the threat they were making.  God's
12       commandment, honor thy father and thy
13       mother is the only commandment that
14       comes with a promise.  Honor thy father
15       and thy mother so that thy days can be
16       long on this earth.
17   BY MR. BEAL:
18       Q    All right --
19       A    God could take them out for not
20   honoring their mother and father.  If you know
21   God and you read the bible.  They were not only
22   threatening my relationship with my children,
23   but other God's commandment they were putting my
24   children at risk; so I was not happy with them.
25   I am not happy with them now for doing it; but I



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          71

1    forgive them.  I love them.  I want to move on
2    from all the nonsense with them even today.
3        Q    So while we are talking about the
4    commandments this also would have allowed you to
5    pocket their $843,000 too?
6        A    It wasn't theirs until there was an
7    agreement.
8              MR. HARRISON:  Object to the form.
9    BY MR. BEAL:
10       Q    So you would get all the money?
11       A    If we had not -- if I had not made the
12   deal in March -- if I had not made the deal in
13   March, they would have had to sue me for quantum
14   meruit, me, seeking their recovery because there
15   was no written division.
16             So they would have had to sue me for
17   quantum meruit.  My guess is is at best they
18   could have maybe come up with $150,000 in time;
19   and then they would have gotten the $150,000.
20       Q    So in this second paragraph you talk
21   about that the money might be put in an escrow
22   account pending final resolution of the disputes
23   between you and WGW.
24             That never happened, did it?
25       A    It didn't happen because that is not



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          72

1    what happened.

2        Q    Because you took it all?

3        A    I certainly -- I didn't -- I certainly

4    was thinking that that might be a way to satisfy

5    getting it resolved if it was done where I said

6    I am going to leave your share in escrow.

7        Q    Did Jesus tell you to take all the

8    money?

9        A    That is blasphemy.

10            MR. HARRISON:  All right.  We are

11       taking a break.

12            THE WITNESS:  That is blasphemy.

13       You need to get into the bible my

14       friend, or you are going to spend a

15       long time in hell and eternity.  How

16       dare you make that comment about our

17       Lord and our Savior.

18            MR. HARRISON:  Lin, let's take a

19       break.

20            THE WITNESS:  Shame on you.  I

21       rebuke you.

22            MR. HARRISON:  So just for the

23       record.  You are smirking and smiling

24       there.  You did it intentionally to

25       inflame him.  We are not going to sit



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              73

```
 1          here all day and let you do that.

 2                  MR. BEAL:  Lin --

 3                  MR. HARRISON:  No, no, stay on the

 4          record.  This is not going to happen if

 5          you keep doing that, Drew.

 6     BY MR. BEAL:

 7          Q    When we talk about intentional --

 8                  MR. HARRISON:  We are not off the

 9          video.

10                  It is not going to happen.

11                  Come here, let me talk to you.

12                     (Whereupon, an off-the-record

13                     discussion was held.)

14     BY MR. BEAL:

15          Q    Mr. Wood, when did you hire Alston &

16     Byrd?

17          A    I don't have the exact date, but it is

18     documented.

19          Q    Would the date March 3rd refresh your

20     recollection?

21                  MR. HARRISON:  2020?

22                  MR. BEAL:  Yes.

23                  THE WITNESS:  Yes, that is

24          consistent, but I don't have the exact

25          date.
```

 **COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          74

1              Yes, it is 2020.  They got
2       involved and you knew when they got
3       involved because they dealt with you.
4       I did not.
5    BY MR. BEAL:
6       Q    Right, so would it be within a day or
7    so of having them reach to me saying that we
8    have just been retained to represent Lin Wood?
9       A    I didn't keep up with when they reached
10   out to you, but when they reached out you they
11   had been retained by me.
12      Q    Right, and that was on --
13      A    To try to bring the matter to an
14   agreement.
15      Q    And that was on March 4th?
16           MR. HARRISON:  What was on
17      March 4th?
18           MR. BEAL:  When they reached out
19      to me.  So I am trying to refresh his
20      recollection.
21           THE WITNESS:  It is what it is.
22      It is documented when I hired them.
23      You know when they reached out to you.
24      You know that they dealt with you.  You
25      all negotiated the agreement, but ended



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          75

1        up being the March 17th agreement; and
2        that is I can tell you.
3   BY MR. BEAL:
4        Q    And earlier I believe you said that
5   Alston & Byrd told you that you needed client
6   consent in the Lindsey settlement because of
7   Cherie Fuzzell's involvement, is that correct?
8        A    I had some issues with Rick Miller and
9   Cherie Fuzzell, in terms of what I thought was
10  wrongdoing out of the DaVita case, and I was
11  exploring that.
12            Obviously I think she had referred --
13  the Lindsey case came to me based on the --
14  based on Rick Miller's administrative assistant,
15  who I think was the sister of the gentleman that
16  died.  And then Rick wanted me to pay Cherie a
17  referral fee or a split of the fee.  And I was
18  discussing that with Joey and Chris; and they
19  said there has got to be client consent because
20  she is a third party.
21            And I said does that apply -- I
22  remember saying does that rule also apply to
23  Sandmann; and they said yeah, yeah, it does.  So
24  the idea of client consent for the ethical rule
25  was first raised with me in that context.



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          76

1        Q     And would it be fair to say that you

2    entered into the Settlement Statement on the

3    Lindsey case before hiring Alston & Byrd?

4        A     I think that is right.  I think that

5    Lindsey had settled before I hired them in terms

6    of the agreement of the amount, yeah.

7                    (Whereupon, Plaintiff's Exhibit

8                    Number 8 was marked for

9                    identification.)

10   BY MR. BEAL:

11       Q     Let me hand you what has been marked as

12   Exhibit 8.  You don't need to read the whole

13   thing.  I am only going to look at this very top

14   part up here.

15            Does this top part appear to be an

16   Email from you to Nikki Baker dated

17   February 22nd at 9:20 p.m.?

18       A     Yeah.  It looks like I was sending

19   Nikki the Email that I had sent to you on

20   February 22nd.

21       Q     Okay.

22       A     Wait, hold on a second.  I had

23   contemplated --

24            MR. BEAL:  Wait a second.  Let me

25       object.


**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

1                THE WITNESS:  I sent it to Nikki
2        Baker because she was at the time
3        thought to be who I would use to help
4        me with the Sandmann cases going
5        forward, giving Nicole and Johnathan
6        and Taylor no involvement.
7                So yes, this is the Email I sent
8        to Nikki.  I don't know what letter of
9        Todd's I was referring to.
10   BY MR. BEAL:
11        Q    But you do say:  Todd's letter to
12   follow?
13        A    Yes, I said it.  I don't know what
14   letter I was talking about.  It may have been
15   the letter confirming that she was going to be
16   involved, I don't know.
17        Q    If we look back at Exhibit 7 it
18   wouldn't be the letter that you were urging Todd
19   to write to me saying that the Sandmann's would
20   only consent to quantum meruit?
21        A    I do not believe that is the letter I
22   was referring to.
23        Q    You just thought that it could be a
24   random letter from Todd?
25        A    No, I didn't ask -- no.  I had asked



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                    78

1     Todd for them to consider it.  I don't think
2     they did it.  So there was no letter for me to
3     send to Nikki along those lines.
4              I imagine it was Todd's letter -- I am
5     guessing.  I don't want to guess.
6         Q    So it wasn't --
7         A    He would have to -- he would have had
8     to acknowledge the engagement of Nikki.
9         Q    So Todd's letter to follow in Exhibit 8
10    doesn't refer to the letter you asked him to
11    write the same day in Exhibit 7?
12        A    No, because I only said in Exhibit 7 I
13    would like to ask you to consider preparing a
14    letter.
15        Q    Okay.
16        A    And so no, I don't believe that would
17    have been the letter, because there is no such
18    letter existed.
19                   (Whereupon, Plaintiff's Exhibit
20                    Number 9 was marked for
21                    identification.)
22    BY MR. BEAL:
23        Q    Let me hand you Exhibit 9 and ask you
24    if this is an Email from Todd McMurtry to me
25    dated essentially of the same day, just later



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          79

1    that day?

2        A    Yes, I mean it is an Email that Todd

3    sent you and copied me.  I did not review it.  I

4    didn't have any approval of what he said.  He

5    said what he said to you.

6            And I wrote back and said Todd's Email

7    to Beal is perfect because I think he was

8    correct in what he was saying.

9        Q    And in this Email to me from

10   Mr. McMurtry on Exhibit 9, he is stating that

11   only quantum meruit would be paid, which is

12   exactly what you asked him to say in Exhibit 7,

13   is that correct?

14       A    Apparently he and his clients discussed

15   it.  They apparently told him that they would

16   pay quantum meruit.  That was consistent at the

17   time with what I wanted them to do.  You have to

18   remember --

19       Q    So let's --

20       A    Hold on a second now.  I am going to

21   finish my answer.

22           You have to remember that this was

23   settled at a time when the settlement would have

24   been subject to a probate judge approving it on

25   behalf of Nicholas.  That may have obviated the



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          80

1    need for consent by Nicholas because the probate
2    judge could give approval to whatever he wanted
3    to do.
4           So that is the client's position.  It
5    was consistent with what I wanted them to say,
6    because that is what I at that point wanted
7    Nicole and Johnathan to get is quantum meruit.
8    That is all they were ever really entitled to.
9       Q    So the answer to my question was yes or
10   no.
11          The Email that he sends on Exhibit 9 to
12   me about quantum meruit is exactly the Email
13   that you requested that he write in Exhibit 7,
14   is that correct?
15      A    No.
16      Q    Okay.
17      A    I asked them to consider.  I had no
18   authority to direct them to do anything.  That
19   was between Todd McMurtry and the Sandmann's.
20   But remember this all predated.  These were
21   negotiations and positions being taken prior to
22   March the 17th, and those by the agreement of
23   March the 17th were not even admissible.
24          The prior discussions were integrated
25   into the written agreement of March the 17th.



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              81

1    So you are going through stuff that your clients
2    agree all would have been integrated into the
3    March 17th agreement.  There were different
4    positions taken before March the 17th.  The
5    final agreement was made on March the 17th.
6         Q    And nowhere in Exhibit 9 does
7    Mr. McMurtry refer to the decision of the
8    Sandmann's, is that correct?
9         A    Listen, it says what it says.
10        Q    Okay, on page 2 --
11        A    Hold on a second, let me look.
12             It says:  I advised the Sandmann's that
13   there may be a dispute between Lin and his
14   former colleagues.  They have authorized me to
15   take actions necessary to protect their son's
16   interest.  To that end I wish to advise you that
17   upon the Court's approval of the minor's
18   settlement I will deposit the CNN settlement
19   moneys into my firm's escrow account, distribute
20   moneys to Nicholas Sandmann, distribute fees to
21   my firm and pay L. Lin Wood, PC its costs and
22   expenses.  I however will not distribute moneys
23   to your client or Lin Wood for fees absent
24   agreement by the parties or an Order by an
25   Kentucky Court directing me to disburse the



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              82

1    moneys in a particular manner.  Further it is my

2    opinion that the Sandmann's control the fees to

3    be paid from CNN, and at best are obligated to

4    pay your clients in quantum meruit for their

5    services.

6              Absent an agreement we do not and shall

7    not agree that any fees due to L. Lin Wood, PC

8    be divided with any other lawyers except on a

9    quantum meruit basis.  We believe this position

10   is consistent with our agreement with L. Lin

11   Wood, P.C. and the law in general.

12             That is documenting discussions and

13   decisions that Todd made with his clients.  Todd

14   I don't believe would have been directed by me

15   to make decisions with his clients.  I wouldn't

16   have had that authority, and I don't believe he

17   would have ceded it to me.

18             So he is telling you about what his

19   discussions were; and it is clear that as of

20   this date there is at least a position taken by

21   the Sandmann's, whether you want to blame me for

22   it or whether you want to blame Todd for it,

23   that he gave them that advice and that is what

24   they intended to do.

25             So that is why I didn't understand when



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                           83

```
 1   it all came up why you did not in the agreement
 2   put in a warranty of consent by me.  Then I
 3   would have had to pay it whether he consented or
 4   not.  But you didn't put it in there.  Now you
 5   are complaining about it.
 6             MR. BEAL:  Chris, we have to call
 7        the Court.  I mean this is crazy.  We
 8        are getting a 20-minute speech on
 9        unrelated matters.
10             THE WITNESS:  It is not a
11        20-minute speech.
12             MR. BEAL:  I can't.
13             MR. HARRISON:  Keep going.  Ask
14        the questions.
15             MR. BEAL:  If it doesn't get
16        better we will have to Court, because
17        it is just a filibuster.
18             (Whereupon cross-talk occurs.)
19             MR. HARRISON:  Lin, just answer
20        his questions.
21             MR. BEAL:  We have either got to
22        get answers to questions or we have got
23        to get a little mini speech and that is
24        not fair.
25             MR. HARRISON:  Let us keep going
```



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              84

1          and see what we can do here.

2                  I understand.

3     BY MR. BEAL:

4          Q    The statement at the top of page 2 of

5     Exhibit 9 where Todd McMurtry promises to put

6     the money in escrow absent an agreement, that

7     didn't happen, did it?

8          A    That was Todd's decision, not mine.

9          Q    So what is the answer to my question?

10    To the best of your knowledge?

11         A    To the best of my knowledge he did not

12    do that.

13         Q    And in fact you got paid, is that

14    correct?

15         A    I received the L. Lin Wood, P.C. share

16    of the fees and the expenses.

17                  (Whereupon, Plaintiff's Exhibit

18                  Number 10 was marked for

19                  identification.)

20    BY MR. BEAL:

21         Q    Let me hand you Exhibit 10.

22         A    Okay.

23         Q    Okay.  So does Exhibit 10 reflect

24    another February 22nd Email from you to Todd

25    McMurtry regarding division of fees in the



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              85

1    Sandmann versus CNN case?

2         A    It is a true and correct copy of the

3    Email that I sent to Mr. McMurtry, and I think

4    it speaks for itself.

5         Q    So then in the fourth paragraph here

6    you state:  There was no oral or written

7    agreement between me and any of those lawyers

8    concerning my share of my firm's fee in the CNN

9    case.

10        A    That is true.

11        Q    Did you consider that to be a truthful

12   statement in light of your February 17th

13   agreement and Email confirming that agreement

14   with Taylor Wilson?

15        A    I believe it was absolutely consistent.

16   There was no oral or written agreement between

17   me and any of those lawyers concerning any share

18   of my firm's fee in the CNN case before the case

19   settled.

20             And then the issue arose after they had

21   themselves left any relationship with me on the

22   14th of February; and I told you that I did have

23   that conversation as it related to what I was

24   willing to say at the time on dividing the fees.

25   But there were other issues that connected into



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                    86

 1    payment of the fees, the main one being the
 2    issue of their responsibility under the lease.
 3        Q    All right.
 4        A    So then I put it in the hands -- I
 5    decided it is a mistake dealing with this
 6    myself -- and then I put it in the hands of Joey
 7    Burby and Chris Marquardt at Alston & Byrd.
 8             At from that point on they dealt with
 9    you.  You all negotiated the agreement.  I
10    intended to pay that money per the agreement,
11    and I even asked when the issue came up, Joey
12    Burby I believe is the one that drafted the -- I
13    don't know if Todd drafted it or not, because I
14    was told -- because I stayed out of it at that
15    point.  I was told --
16             MR. BEAL:  Let me object.
17             MR. HARRISON:  Why?  He is
18        answering the question.
19             MR. BEAL:  We are going into
20        completely unrelated --
21             THE WITNESS:  You asked about this
22        agreement.
23             MR. BEAL:  I said is it consistent
24        with what you said in February 17th.
25        He said yes.



1        THE WITNESS:  No, I did not say

2   that.

3        MR. HARRISON:  Hang on.

4        THE WITNESS:  That is the problem.

5   You are coming up with the answers.  I

6   am trying to give you my answer, and

7   you won't let me give it to you.

8        MR. BEAL:  He answered the

9   question.  He explained why he thought

10  it was consistent and not a

11  contradiction of the February 17th, and

12  why that had changed.

13       MR. HARRISON:  Right.

14       MR. BEAL:  And we are done.  But

15  now we are going on to another speech.

16       THE WITNESS:  It is not a speech.

17  I am sorry, I will try to be more

18  concise.  But I want to be thorough.  I

19  don't want my answers to be

20  misrepresented like they are being

21  misrepresented even here today.

22       The point I am making is, is that

23  I gave this to Alston & Byrd; and then

24  they negotiated the agreement, which

25  integrated every prior discussion or



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              88

```
 1        agreement into the agreement, March the
 2        17th, 2020.
 3   BY MR. BEAL:
 4        Q    So on February 22nd before you had
 5   hired Alston & Byrd, five days after receiving
 6   the Email from Lin, you stated that there had
 7   never been an agreement -- excuse me -- with
 8   Taylor Wilson, you stated there had never been
 9   an agreement with any of those lawyers
10   concerning any share of my firm's fee in the CNN
11   case?
12             MR. HARRISON:  Object to the form.
13             Asked and answered.
14             Hang on.
15             You are complaining about the
16        length of his answers and you are
17        asking the question again.
18             So you have answered it.
19             THE WITNESS:  Let me try to make
20        it clear.
21             MR. BEAL:  I will move on.
22             THE WITNESS:  I have the right to
23        answer the question.
24             MR. HARRISON:  But you have
25        answered it.
```



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          89

1           THE WITNESS:  But he just made a

2      statement that is inaccurate.

3           The statement that I made, there

4      was no written or oral agreement

5      between me and any of those lawyers

6      concerning any share --

7           MR. BEAL:  I withdrew the

8      question.

9           THE WITNESS:  All right, the

10      question is withdrawn.

11  BY MR. BEAL:

12      Q    Let us look on page 2:  I have tried to

13   negotiate with Taylor, Johnathan and Nicole

14   about a fair percentage or payment for their

15   efforts in relation to the CNN case.  Those

16   efforts on my part have varied between offering

17   an hourly quantum meruit payment, to a demand by

18   them for 35 percent of my fee, to which I

19   confirmed to them I would pay them 50 percent of

20   my fee.  I agreed to the outrageous payment of

21   50 percent only in a last ditch effort to

22   peacefully resolve the differences between us

23   and maintain a semblance of dignity and order

24   with respect to the separation of my law

25   practice from their law practices, which would



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                    90

1    minimize damage to me, my family, and my
2    clients.  I should not now be coerced into
3    paying that ransom.  These people should not
4    receive a dime above quantum meruit.
5             Did I read that right correctly?
6       A    Are you talking about wasting time?
7    You read it correctly.
8             Now may I explain?
9       Q    No, I am not asking --
10      A    So I don't have the right to explain my
11   answer?  You just get to make a statement.
12            I am going to explain it.  It is going
13   to be simple.  There were varying discussions
14   prior to March the 17th, all of which were
15   integrated into the March 17th agreement, where
16   I said in that agreement that I was going to pay
17   them 50 percent of the Sandmann case.  I don't
18   understand the problem.
19      Q    Let us look at the fourth paragraph.
20   The last sentence of the fourth paragraph in
21   which you stated --
22      A    Which?
23            MR. HARRISON:  On page 2?
24            MR. BEAL:  I am on page 2 and
25      right there, the fourth paragraph.



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                   91

1            THE WITNESS:  I have sent you the
2       lease?
3   BY MR. BEAL:
4       Q    Yes, it is that paragraph, the third
5    line down.
6            MR. HARRISON:  Okay.
7   BY MR. BEAL:
8       Q    "I am not concerned about money.  I am
9    only concerned about clearing my slate in order
10   to pursue the Sandmann litigation and the
11   opportunities possibly presented by my scheduled
12   meeting in D.C."
13      A    Okay.
14      Q    My question to you is, if you are not
15   concerned about the money, but only clearing
16   your slate in order to pursue other litigation
17   and opportunities, why did you contest paying
18   the amount that you had agreed to in the
19   preceding paragraph?
20      A    Okay.  Number 1, I didn't contest it.
21   I entered into the agreement on March the 17th,
22   and it said 50 percent would go to Wade Grunberg
23   and Wilson's PC's.  So I didn't contest it.  I
24   lived up to ti.
25            When I say I am not concerned about



1   money, what I mean by that is that I don't love

2   money.  The love of money is the root of all

3   evil.  I need money, but God will provide me

4   what I need.  So I don't fight over money.

5           But I wanted to get their foolishness

6   out of the way because it was jeopardizing not

7   only my family's relationship with me, but what

8   I had to do going forward in the Sandmann

9   litigation and the other cases; and the

10  opportunities that might possibly be presented

11  by meeting in Washington, D.C. at the Oval

12  Office requested by President Trump.  That is

13  what I was referring to.  I had a meeting on

14  March 11 in the Oval Office at his request.

15    Q    Would it be fair to say that the money

16  was important to you because you took all of the

17  funds?

18          MR. HARRISON:  Object to the form.

19          THE WITNESS:  No, I took the funds

20     subject to the payment pursuant to the

21     March 17th agreement.  If the issue of

22     consent had never come up, if it had

23     proceeded to the probate judge; and he

24     said here is where you are going to pay

25     and who you are going to pay, I was



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                             93

1        going to pay it.  I even asked Nicholas

2        to agree to it.  I was actually

3        surprised, Drew, that he did not.

4    BY MR. BEAL:

5        Q    Okay.

6        A    I was surprised that Todd didn't say to

7    him if this is satisfactory to Lin, and he feels

8    like it is commensurate with what they did, go

9    ahead and agree to it.  It is not your money to

10   fight, but he didn't consent to it.  It was news

11   to me after they had the day where they were

12   going to settle it.

13            I thought he was going to consent.  I

14   was going to be paid the money.  I wanted to

15   make sure I was covered of what they owed on the

16   lease, and life goes on.  That is why some 40,

17   45 cases off of a line of credit.  I wanted

18   peace.

19            MR. BEAL:  Object.  We can't have

20       a speech on everyone of these.  Can we

21       just answer the question?

22            MR. HARRISON:  Just ask your

23       question.

24   BY MR. BEAL:

25       Q    Look at the next paragraph, on the



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          94

1    second sentence says:  While the lease -- I am

2    not sure that "wow" isn't a typo?

3         A    I think it meant to be "while".

4         Q    "While the lease is in the name of my

5    PC, all four of us agreed as the lease, as the

6    tenants, as partners with my PC, we are in fact

7    partners in an office sharing arrangement.

8              Do you believe both of those statements

9    to be true?

10        A    I think they are absolutely true.

11        Q    Okay.

12        A    But let me say this.  I did not -- when

13   I asked the building to take their keys, I did

14   not look at the lease.  I assumed that the lease

15   was in the name of L. Lin Wood, P.C., and I was

16   the one responsible.

17             MR. BEAL:  Let me object.  I don't

18        care about --

19             THE WITNESS:  You don't hear about

20        hearing the truth, that is fine.

21   BY MR. BEAL:

22        Q    The next paragraph says:  Because the

23   lease is in the name of my PC, the building

24   management followed my directions.  That action

25   was not justified under the actual execution of



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              95

1    the lease bar all four lawyers.

2            So of these pair of sentences here what

3    you were getting to when you barred them from

4    the lease, you barred them from the space, you

5    hadn't read the lease?

6        A    I think "bar" is a typo.  It should

7    have been "buy".

8            When I got the building to pull their

9    access cards and change the locks on the door,

10   as I thought here I thought that it was in my

11   name, under my control.  I did not go back and

12   look at the lease.  Then I did.  And I saw where

13   they were signers on the lease and responsible

14   themselves under the lease.  I called the

15   building.  I said let them back in.

16           I didn't have the right to bar them or

17   take their keys, nor did the building; and they

18   were in trouble because they should have known

19   what their lease said.  I tried to get them back

20   in right away.

21       Q    Let us look at the next paragraph:  I

22   need for you and Ted and Julie to state in

23   writing that Ted and Julie do not and shall not

24   agree that any fees due to my PC be divided with

25   any other lawyers except on a quantum meryl --



1    and I assume you mean quantum meruit basis?

2        A    That is fair.

3        Q    "I am confident they have the right to

4    control the fees.  I am confident that their

5    right to do so exceeds my right, if any, to be

6    coerced into paying these greedy lawyers

7    50 percent of my fee."

8        A    I think I am right.  I think what I

9    said to them is exactly right.  The client

10   controls it.

11       Q    So --

12       A    But the point is, please, this changed;

13   and we made a final agreement on March 17th.

14   And you are fussing about things that went back

15   and forth prior in time that are integrated into

16   the March 17th lease.  You wrote the March 17th

17   agreement to which you helped draft.

18            Why are you talking about this when the

19   issue is March 17th?

20            MR. BEAL:  Chris, can I get some

21       help here?

22            THE WITNESS:  I am not doing

23       anything that requires help.

24            Go ahead and ask your next

25       question.



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              97

1           MR. HARRISON:  Come on.
2    BY MR. BEAL:
3       Q    So by February 22, 2020 you believed
4    that client consent was essential, and you had
5    asked Todd to intercede on your behalf to insist
6    to have the clients insist on quantum meruit?
7       A    I said exactly what I said in this
8    letter.
9       Q    Okay.
10      A    And then the agreement was negotiated,
11   and it was finalized on March 17th.
12      Q    Okay.  And then the last paragraph, the
13   first sentence:  Will you help me?
14           And by that sentence you meant go to
15   the Sandmann's and persuade them?
16      A    I didn't mean that at all.
17           MR. HARRISON:  Object to the form.
18           THE WITNESS:  What I meant by it
19   was that I wanted them to consider
20   informing Jonathan, Taylor, and Nicole
21   of their positions, but it was up to
22   Todd to make that decision with his
23   clients.  I couldn't insist that they
24   do anything.  Todd was the lead lawyer
25   for them.

 **COASTAL COURT REPORTING & VIDEO SERVICES**
                         **800-791-1100      www.coastalcourt.com**

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                    98

1           But nonetheless, whatever I was
2      trying to get done at that time was
3      integrated into the March 17th
4      agreement.
5           It was not on February 17th
6      agreement.
7           It was a March 17th agreement.
8               (Whereupon, Plaintiff's Exhibit
9               Number 11 was marked for
10              identification.)
11   BY MR. BEAL:
12      Q    Let me hand you what has been marked as
13   Exhibit 11.
14           And ask you if this is your March 3rd
15   Email to Todd McMurtry?
16      A    It is.  I was asking him to give me
17   your evaluation.
18      Q    So in the very first paragraph you
19   state:  I am prepared to offer WGWB's on a
20   quantum meruit basis only for Carbone and
21   Lindsey.  Their problem on those cases is that
22   they did not keep up with their hours and can
23   only reconstruct them after the fact of
24   settlement.
25      A    I said that and I later changed my mind



**COASTAL COURT REPORTING & VIDEO SERVICES**
          800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                99

```
1    in the final agreement.  And you told everybody
2    they had plenty of documentation of their time
3    on Sandmann.  We just hadn't seen it yet.
4        Q    And then the very last sentence of this
5    Exhibit 11 you state:  A legitimate argument
6    could be made that a fair and respectful amount
7    I should offer these people who have been
8    practicing law for fame and fortune and
9    conniving against their office sharing agreement
10   partner since 2018 is quantum meruit only as to
11   all three cases, Carbone versus CNN, Lindsey,
12   and Sandmann versus CNN, which under the law and
13   agreed to by my clients will be worth zero,
14   since that cannot legitimately reconstruct their
15   hours in any of those cases.
16       A    So what is your question?
17       Q    My question is, you were aware
18   obviously at the time March 3, 2020 when you
19   wrote this that the Plaintiffs did not regularly
20   record their hours as a function of performing
21   services for clients, is that correct?
22       A    No.  They did record the time.  They
23   know they recorded to the minute in the Steve
24   Wynn cases where they were getting paid
25   80 percent of what they billed.  Do I believe
```



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                    100

1    that they were doing it?  I had my doubts.  But

2    I didn't know.  They had their own PC's.  They

3    could do whatever they wanted to do.

4         Q    So when you say they did not keep up

5    with their hours and can only reconstruct them

6    after the fact of settlement, you didn't believe

7    that to be true when you wrote it?

8              MR. HARRISON:  Object to the form.

9              THE WITNESS:  As to Carbone and

10        Lindsey, their problem on those cases,

11        Carbone and Lindsey is that they did

12        not keep up with their hours and can

13        only reconstruct them after the fact of

14        the settlement.  That is what I

15        believed to be true.

16   BY MR. BEAL:

17        Q    And then in the last sentence you

18   reference:  Carbone, Lindsey, and Sandmann vs.

19   CNN which under the law and agreed to by my

20   clients will be worth zero since they cannot

21   legitimately reconstruct their hours in any of

22   those cases.

23              You said that --

24        A    I said that.

25        Q    -- Because you believed that they did



1    not regularly record their time?

2        A    I didn't believe that they did, but

3    they did keep it up in certain cases.

4            So I don't know for a fact whether they

5    did in those cases or not.  You have indicated

6    that they did reconstruct it in Sandmann, so I

7    was wrong on that.

8            But that was my belief at the time.

9    All of this predates my engagement -- this is

10   March the 3rd, and this is when I realized I

11   needed to get somebody to represent me.

12       Q    I am only asking about recording time?

13       A    And I have told you that I believed

14   they did not, but I knew that in other instances

15   they did.  So my belief is either right or

16   wrong.

17       Q    And you were saying here that they

18   didn't?

19       A    I didn't believe that they did.

20       Q    Okay.

21       A    But I didn't know it, and I found out

22   later that they did keep up with their time in

23   Sandmann when you said they had a wealth of

24   documentation of their time.

25       Q    Would it be fair to say that the three



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              102

1    Plaintiffs performed the majority of work on

2    creating Pleadings and correspondence and

3    responding to correspondence and Pleadings in

4    the CNN versus Sandmann case?

5        A    I don't know that I can quantitate it

6    that way.

7             Did they do what they had always done

8    for me in terms of drafting Pleadings, doing

9    legal research, preparing motions, they had also

10   looked into all of the body of what was said

11   about Nicholas, not just related to CNN; and

12   then Todd cut that off because he got a firm to

13   do it.

14            So they did what they did.  I

15   appreciated their efforts.  I acknowledged what

16   they did; and then we got into this dispute

17   which I settled with them on March 17th of 2020.

18       Q    Can you name any Pleadings that you

19   drafted completely on your own?

20       A    I wouldn't do that.  I didn't -- I have

21   been practicing law for how long.  I don't go

22   out and have not since they worked with me, I do

23   not generate the first iteration of a Brief or a

24   Pleading.  That is what they are getting paid to

25   do.

 **COASTAL COURT REPORTING & VIDEO SERVICES**
                    800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              103

1            So they would bring it to me.  I would

2    give them input, advice.  I might as we say --

3    Nicole will tell you I would Wood-ize it.  I did

4    the preparation of it initially as an Associate

5    and a young lawyer.  I didn't do it after

6    40 years of practicing law.

7       Q    So then all of the Pleadings that were

8    created in the Sandmann versus CNN case were

9    initially drafted by the Plaintiffs in this

10   case?

11      A    I don't know that, because I don't know

12   if Todd did some of it.  But everything that was

13   drafted would have been under my direction and

14   my input, because I was the one that shaped the

15   issues for the case in how it was going to be

16   proceeding.  I had the expertise in defamation.

17   They did not.

18      Q    So all of the Pleadings that came out

19   of your office would have been drafted by them

20   at your direction and with your input, is that

21   correct?

22      A    No, I know one time we had a problem

23   that came up, and I had to basically to rewrite

24   the Brief.  So I can't say all of it.

25            But I am not trying to tell you they



1    did not do it.  They did.  That is why I had

2    them engaged.  If I wanted to do that, I

3    wouldn't have needed them.

4        Q    And was a large volume of work in CNN

5    versus Sandmann --

6        A    CNN and Sandmann settled quickly.  So

7    on the scale of things they could have been --

8    that litigation could have gone on for five

9    years.  So whether it is a large volume or not

10   is not really capable of saying it.  It is what

11   it is.  They did what they did.

12       Q    The --

13       A    And I was going to pay them for it.

14            (Whereupon, Plaintiff's Exhibit

15            Number 12 was marked for

16            identification.)

17   BY MR. BEAL:

18       Q    And is Exhibit 12 the March 17th

19   Settlement Agreement that you have referenced

20   earlier?

21       A    Yes.

22       Q    And does it refer to the same cases as

23   in the February 17th agreement, Carbone,

24   Lindsey, Sandmann, Grogan Cordoba and then add

25   in La Liberte?



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                        105

1      A      The answer is no as you point out

2   because it also dealt with La Liberte versus

3   Reid.  We had not settled all of the issues in

4   the February 17th discussion.

5           But we did settle all the issues in the

6   March 17th final agreement that says this is the

7   agreement and prior discussions or agreements

8   are integrated into this agreement.

9      Q      So let us look back at Exhibit 6 and

10  ask you to look at page 2, and see if there

11  isn't in the middle of the page:  Additionally

12  as we discussed earlier with respect to La

13  Liberte and Reid we agreed to split 20 percent

14  to Lin Wood, PC and 80 percent to us.

15     A      I do see that now.

16     Q      So that was in the February

17  agreement --

18     A      Yes.

19     Q      -- As well?

20     A      Yes, because we had to agree that

21  Taylor was going to continue to be lead Counsel

22  because it was his case that he took in, and he

23  wanted to take the case.  I was not the lawyer

24  that said let's take the La Liberte case.  He

25  liked it.  He wanted to take it.  That is why I



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                    106

1    was getting 20 percent to give input in overall

2    strategy.

3           But all that worked out when it worked

4    out after we made the agreement.  So I stand

5    corrected, there had been a discussion.  But it

6    doesn't change the reality that the agreement

7    was March 17th.  And all prior discussions,

8    agreements, et cetera were integrated into the

9    March 17th agreement that you helped draft and

10   they signed, and now you want to go back and

11   litigate pre-March 17th.

12          MR. BEAL:  Can I respond to his

13      speech, and tell him why I am doing it?

14      Or would that be another --

15          THE WITNESS:  I am here to answer

16      questions.  I don't need to listen to

17      his --

18          MR. HARRISON:  Just ask your

19      questions, please.

20          We had a conversation and I told

21      you what would happen if we had another

22      outburst.  We will walk out the door.

23          MR. BEAL:  Well, they are not

24      outbursts.

25          MR. HARRISON:  We will walk out



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                        107

1        the door.
2              MR. BEAL:  Okay.  You can any time
3        you want to.
4              MR. HARRISON:  Yeah.
5                 (Whereupon, Plaintiff's Exhibit
6                 Number 13 was marked for
7                 identification.)
8    BY MR. BEAL:
9        Q    I hand you what has been marked as
10   Exhibit 13.  Does this appear to be the
11   July 24th letter from Alston & Byrd to me
12   refusing to make payment under the March 17th
13   Settlement Agreement that we marked Exhibit 12?
14       A    I believe it is, yes.
15       Q    Okay.
16       A    I am sure I got a copy at the time.
17   That was the letter he wrote on his own to you.
18       Q    And in this letter Chris Marquardt is
19   stating that only quantum meruit will be paid
20   exactly as you had asked Todd McMurtry to assist
21   in reaching that agreement in Exhibits 7, 8 and
22   9, is that correct?
23             MR. HARRISON:  Object to the form.
24             THE WITNESS:  No.
25             MR. HARRISON:  But you can answer.



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              108

```
1              THE WITNESS:  No, because this was
2         his opinion, independent legal opinion
3         on what could be paid given the fact
4         that Nicholas did not consent, even
5         though I had asked him to do so.  So he
6         is telling you he didn't consent.
7              And now, this is what the law
8         says.  Chris Marquardt and Alston &
9         Byrd are not going to tell you what I
10        think the law says.  They are going to
11        tell you what Alston & Byrd has
12        determined the law says.
13             So I relied on them from the time
14        I engaged them.  I relied on them in
15        terms of the positions to be taken.  I
16        wanted to make sure that I complied
17        with the agreement and that I complied
18        with the Georgia ethical rule.
19   BY MR. BEAL:
20        Q    When you said earlier you urged
21   Nicholas Sandmann to agree to a percentage
22   distribution, that would be the exact opposite
23   of what you said in Exhibits 7, 8 and 9 in your
24   Email's to Todd McMurtry, right?
25        A    Yes, those predated the final
```



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                         109

1    agreement.  And so Todd prepared -- and I don't
2    know if Todd prepared it or Joey Burby did, I
3    don't know, I didn't prepare it -- but when the
4    money could be distributed on his 18th birthday
5    they gave him a statement from me recommending
6    and asking him to agree to it.
7               I couldn't put it into his head and
8    tell him to do it.  I was surprised that he
9    didn't.
10               (Whereupon, Plaintiff's Exhibit
11               Number 14 was marked for
12               identification.)
13   BY MR. BEAL:
14       Q    Let me hand you Exhibit 14.
15               Does this appear to be the Complaint
16   that was filed?
17       A    If you don't mind, I know your time is
18   important to you, and it is to me too I guess;
19   but I will sit here as long as I need to.
20               But you want me to go through and tell
21   you what it is.  I would have to read the whole
22   thing.  What I can tell you quickly you have
23   represented it to me as such and it shows a case
24   filing number of March 17th of 2022, so I won't
25   quibble with it.  It is what it is.



1        Q    And this next group of exhibits are

2    going to be a little messy, because they are

3    Telegram messages that are many pages, but the

4    only relevant part is on a particular page, so

5    we are all just going to have to turn the pages.

6             MR. HARRISON:  No worries.

7             THE WITNESS:  Okay.

8    BY MR. BEAL:

9        Q    While we are waiting, it would be fair

10   to say that on Telegram you repeatedly stated

11   that the Plaintiffs were extortionists or had

12   extorted you?

13       A    I wouldn't agree with that at all.

14            The way you characterize it, it sounds

15   like all I did on Telegram was talk about them.

16            I made my statements I believe in May

17   of 2021, when at a time that I had been taken on

18   being Counsel to myself I was coming under

19   fierce attack in South Carolina with their

20   Complaint, which is exactly why I think they

21   filed it for.

22            So I made a decision to speak out as a

23   lawyer for myself for myself in the Court of

24   public opinion, and I did believe at the

25   beginning, I believed in the middle, and I



1    believed at the end that what was done in

2    reference to the filing of this Superior Court

3    lawsuit in September of 2020 was pure extortion.

4    My opinion has never changed.

5              Now I said what I said on Telegram and

6    after I said it I don't think I have gone back

7    and said it again.  I said enough.  I had to

8    defend myself from what was a very, very

9    salacious, inappropriate, irrelevant,

10   immaterial, personal attack on me that had no

11   relationship to the claims for breach of

12   contract and a fraud and inducement claim that

13   they had waived and agreed not to file.  They

14   waived all of it.  They released all their

15   claims.  There was a covenant not to sue.

16             And the next thing I know I get hit

17   with a breach of contract in a fraud case that

18   goes on ad nauseam to personally attack and

19   demean me.  I didn't say anything about it first

20   in a press release that Joey and Chris helped me

21   write.  The next time I said something about it

22   representing myself I had to speak out in the

23   Court of public opinion in May because I was

24   being brutally attacked for the false statements

25   contained in their Complaint.



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          112

1       Q     Can you identify every act that you

2    contend constituted extortion or attempts at

3    extortion?

4       A     Honestly, I can take the time to

5    catalog every act, but the acts are pretty

6    simple.

7       Q     What are they?

8       A     Number one, remember the back drop.   I

9    believe there was a pattern of extortion with

10   respect to the March 17th agreement.   So they

11   had a pattern of extorting and making claims

12   that threatened me unrelated to the litigation

13   with my children, Richard Jewell, the

14   Sandmann's; and my efforts for Richard were very

15   important to me.

16          So I felt extorted into that agreement.

17   Candidly I wished I had never made it; but I did

18   what I did.   I was going to live up to it.

19          Then in September out of the blue,

20   nobody sued me when I said extortion in the

21   press release.   When they put in their own

22   Complaint in September and they said that I

23   told -- it is Dexter King that they were

24   extorting me, they put that in their Complaint.

25          Then they put in their Complaint that I



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

1    told a co-Counsel of mine on one of the class

2    action cases they were extorting me.  They

3    published my statements themselves in their

4    Complaint.

5          So then they come up with this new

6    lawsuit.  They sue me for breach of contract.  I

7    didn't breach the contract.  I asked the boy to

8    consent.  Then they sued me for fraud in the

9    inducement -- hang on, you want to know -- now

10   you don't want me to answer --

11         MR. BEAL:  Hang on.  I know, but I

12      am getting confused.  Can you list out

13      what acts constituted your sort of --

14         THE WITNESS:  I am.

15         MR. HARRISON:  We have been over

16      this.  You said that you don't want him

17      to give long answers, but you asked him

18      the specific acts that he said

19      constituted extortion in the context,

20      and he has answered those --

21         MR. BEAL:  I just got confused

22      about some of the last one's because he

23      was speaking about other people's

24      actions.  So let's go to the first

25      one --



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          114

1            THE WITNESS:  I haven't answered
2        the question.  This is not fair.  You
3        want to know what I believe to be the
4        extortion, I am telling you.
5    BY MR. BEAL:
6        Q    Yeah.
7        A    I believe part of what proves the
8    extortion in September of 2020 is the pattern of
9    extortion related to the March 17th agreement.
10           Then I am trying to tell you, and let
11   me go back and start again, I get a lawsuit
12   draft from you through Joey Burby that contains
13   pages of personal attacks, salacious,
14   irrelevant, immaterial, redundant that had
15   nothing to do with whether there was a breach of
16   contract based on consent.  That had nothing to
17   do with even your fraud in the inducement claim,
18   because in the agreement all of the other claims
19   were released.
20           And there was an agreement in the
21   March 17th agreement that they would not sue, a
22   covenant not to sue, except for breach of the
23   agreement.
24           So you got them filing this salacious
25   Complaint that personally smears me.  You got



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

1    them suing me for something they had released.

2    Suing me in direct derogation of the agreement

3    of March 17th covenant not to sue, and yet they

4    are sitting there relying on the agreement.  And

5    then they make a demand -- I am not done.

6         Then you make a demand that I pay in

7    effect $1.5 million, 1.25 plus another in effect

8    280, because now you want me to pay for their

9    share of the lease they already agreed they

10   owed.  And the claim for $1.5 million is part of

11   the extortion.  It was totally unjustified.  It

12   cannot be documented, and you made it in a way

13   that said agree to this and pay this, or we are

14   going to file this lawsuit in 24 hours.

15        And then thankfully Joey was able to

16   get you to agree to give us two or three days to

17   figure out what to do until a Monday.  Why would

18   you put that out there and say pay me in

19   24 hours or I am going to smear you like crazy

20   when I file this lawsuit.  That is extortion.

21        I sat there with Jonathan Burby and

22   them, and I said look, the only real dispute is

23   over consent.  Let us take it to an arbitrator

24   and get a ruling in final arbitration on the

25   issue is consent required or not.



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              116

1           No, we are not going to do that.  We
2     are going to file it.  You didn't want to
3     discuss a settlement by arbitration.  You wanted
4     to litigate it and file it publicly in my
5     opinion and I think the facts bear it out.
6           And then you file it, and I don't
7     have -- I make a response and the next thing I
8     know is I can't even respond.  My response is
9     under seal.  The craziest thing I ever heard.
10    There was no legal basis to seal the records.
11    The legal basis that the judge used to seal the
12    records were striking those types of allegations
13    from the Complaint.
14           So I believe that if you go back and
15    look at the correspondence between you and Joey
16    Burby and Chris Marquardt and the efforts you
17    have made to try to explain the unexplainable in
18    terms of how you came up with $1.5 million, pay
19    it in 24 hours or I am going to sue you, I think
20    that is extortion.  I thought so then, I feel so
21    now.
22           If I have left out a fact or two
23    because of documents I haven't reviewed recently
24    I will make it up at a later time, but I believe
25    it was extortion; and I haven't heard a real



1    explanation of how anybody says it is not.

2              MR. BEAL:  Can you look through

3        there and find me Exhibit 12?

4              MR. HARRISON:   Uh-huh.

5              MR. BEAL:  Thanks.

6    BY MR. BEAL:

7        Q    So going back to your statements, the

8    first act of extortion you believe was a pattern

9    of extortion surrounding the March 17th

10   Settlement Agreement which is marked as

11   Exhibit 12?

12       A    I wouldn't call that the first act of

13   extortion.  What I called it is what I called

14   it.

15            I thought that what they did leading up

16   to the March 17th agreement established a

17   pattern of extortion, because they were trying

18   to get money that they had not earned.  They

19   were trying to coerce me into giving them more

20   than they deserved under the threat of a

21   continued attack in my relationship with my

22   children, my efforts ongoing for Nicholas

23   Sandmann, and to jeopardize my efforts to try to

24   ask the President to give Richard Jewell the

25   presidential Medal of Freedom.

 **COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100       www.coastalcourt.com

1         And just generally the idea of saying
2    these false things about my mental health, which
3    they documented were false in the March 17th
4    agreement, I thought that showed extortion; but
5    I paid it, I paid it.  I agreed to it.  I wish I
6    hadn't.  I should have stood on my principles
7    instead of my preference, I wanted peace.  I
8    should have stood on my principles.
9         And then all of a sudden I am hit with
10    your lawsuit to pay within a day 1.5 million or
11    we are going to file this thing and smear --
12    Q    I want to talk about March.  Let's
13    not --
14    A    Okay, well, I have covered March.
15    Q    Would it be fair to say that a
16    culmination of this pattern of extortion you
17    have identified, it culminated in the March 17th
18    Settlement Agreement?
19         MR. HARRISON:  Object to the form.
20         You can answer.
21         THE WITNESS:  What I said was that
22    when I looked at what you did in
23    September of 2020, I recognized then as
24    I had recognized earlier that they had
25    extorted me into the March 17th



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          119

1          agreement, but I went ahead and made it

2          and I felt extorted.  That was my

3          opinion then.  And then all of a sudden

4          I get extorted again.

5     BY MR. BEAL:

6          Q    So you were represented when you signed

7     the March 17th Settlement Agreement, right?

8          A    Absolutely, Joey Burby and you

9     negotiated it.

10         Q    And do you have a single writing that

11    you can point to where any of the Plaintiffs

12    threatened to take any action with regard to

13    your children or your mental health condition?

14         A    I have already pointed you to the

15    confirmatory text -- there is more, where it was

16    clear that Taylor Wilson was conspiring with my

17    son Matt Wood to have Dr. Phil McGraw conduct a

18    mental health intervention on me, but I caught

19    it.  I caught it in time because I knew what

20    they were up to, and I told Phil McGraw don't

21    come out to Atlanta, Georgia and mess with my

22    relationship with my children, because it won't

23    end well for you; and he did not.

24              He Emailed my son and said your father

25    is a genius, he is the finest lawyer I have ever



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              120

1    met.  He can get all the facts wrong and still
2    come up with the perfect resolution.  That Email
3    is now missing out of my system.
4            But nevertheless put yourself in my
5    position, I know it is hard for you to do, but
6    try I am trying my best to get Richard Jewell a
7    recognition that Richard Jewell deserved.  I am
8    trying my best to represent the Sandmann family.
9    I want to do the Sandmann cases and then retire;
10   and I am always trying to do my best to maintain
11   a good, healthy relationship with my children;
12   and these people are threatening all of that.
13   If I don't give them money that they really
14   under the law did not deserve, but I ended up
15   making the agreement in March 17th; and then I
16   lived up to it.  Did you see how many cases I
17   sent them?  You still haven't told me how much
18   money they made on it.
19       Q    Can I ask you if there was a
20   specific -- if you can point to any act or
21   threat by any of the Plaintiffs with regard to
22   Nicholas Sandmann or Nicholas Sandmann's claims
23   or cases?
24       A    I don't know how many Email's there
25   were at the time.  I haven't gone back and



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                    121

1    looked, but the discussions leading up to
2    ultimately the March 17th agreement would be
3    part of what I believed to be acts of extortion
4    until I finally agreed to it.
5              The only thing that came up after that
6    in terms of extortion is when you tried to
7    extort me by telling me to pay them $1.5 million
8    or you are going to file this frivolous, heinous
9    complaint against me within 24 hours.  There is
10   your document.
11       Q    Was there any threat by any of the
12   Plaintiffs to interfere with your relationship
13   with Richard Jewell?
14       A    They knew that I was doing my best,
15   publicly advocate for Richard Jewell to receive
16   the Presidential Medal of Freedom, that was
17   well-known to them.
18             The idea that they were out talking to
19   people, and you don't know where it stops,
20   suggesting that Richard Jewell's lawyer was in
21   need of mental healthcare treatment, well I
22   don't think President Trump would have been so
23   fond of thinking about meeting with me to talk
24   about Richard; but yet despite the accusations
25   he met with me.



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              122

1       Q     But you don't have any evidence of any

2    conversations by the Plaintiffs with any parties

3    regarding mental health besides what you just

4    identified as a conversation with your son Matt

5    and --

6       A     Dr. Phil.

7       Q     -- And possibly a conversation with

8    Dr. Phil?

9       A     I think it is more than a conversation

10   with Dr. Phil.

11      Q     And Dr. Phil was -- had previously been

12   your client, is that correct?

13      A     He was.

14      Q     Okay.

15      A     He is not now.

16      Q     And --

17      A     Are you going to break for lunch?

18      Q     I kind of want to power through and be

19   done.

20      A     That is not fair to anybody.  I need at

21   least 15, 20 minutes to get a sandwich.

22            MR. HARRISON:  How long do you

23       think you have?

24            And let me offer this while you

25       are thinking about it.  Are you going



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          123

```
1          to go through each Telegram statement,
2          because you do it how you want it, but
3          they are in the Complaint, and they are
4          also a subject of a Request to Admit
5          them; and he said he already sent them.
6              MR. BEAL:  I am thinking of a way
7          to cut those out altogether.
8              MR. HARRISON:  I appreciate that.
9              MR. BEAL:  And these copies are
10         hard to follow, so I want to do that.
11             But we will take a break and we
12         will talk.
13             Just let me finish up with these
14         series of questions and take a break
15         and see exactly how long we have and
16         what we want to do.
17             MR. HARRISON:  Yeah, here is my
18         request, get to a good stopping point,
19         let's see how long it will be.
20             MR. BEAL:  Yes.
21             MR. HARRISON:  At least get
22         something really quick, if that is what
23         the witness wants to do.
24             Right.  So keep going.
25    BY MR. BEAL:
```



1      Q     So you have referenced in prior

2   testimony computer hacking.

3            Do you believe that the Plaintiffs have

4   hacked into your computers or your Email's?

5      A     I believed at the time that I learned

6   that my computer was hacked, and it was hacked.

7   The whole file system was out of whack.  I had

8   it investigated.  It was hacked.

9            I also believed that my phone system

10  had been hacked.  I think that was done through

11  my Wi-Fi system in my house, so I documented the

12  hacking.

13           I felt like that there might have been

14  an effort by Johnathan Taylor and/or Nicole,

15  because she is close with Rick Miller to go in

16  and perhaps remove certain documents that were

17  related to Rick Miller.

18           When I first went in I couldn't find

19  the documents to confirm the hack.  I filed a

20  complaint with the FBI.

21           Then we went back and I found the

22  documents that I thought might have been hacked

23  out, and I wrote them and apologized.

24           But the problem is I still think now

25  that I was wrong about what was being looked



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          125

1    for, but I was right about what was done; and I

2    think it related to Dr. Phil McGraw.

3        Q    So here is my question real

4    specifically, do you believe the Plaintiffs

5    hacked your computers or participated in the

6    hacking of your computers?

7        A    I have no way to know who hacked it,

8    but I thought that they had a motivation to hack

9    it, I still do, or to have someone hack it.

10            I know there was a day where I came in

11   and turned on my Email, I thought it was a

12   Sunday; and there was an Email being forwarded

13   to Taylor, not a complete Email address, and I

14   stopped it.  And then for that day it kept

15   trying to send it bouncing back, because when I

16   stopped it it hadn't gotten to a full Email

17   address.  That led me to believe that may be

18   effort for someone to mess with the Microsoft

19   360, Johnathan is familiar with it.

20            I don't know, but I know that my

21   computer was hacked.  I know my phone was

22   hacked, and I believe they had motivation to at

23   least know it or be involved in it.

24       Q    Did you believe --

25       A    But when I found out it was not Rick



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          126

1   Miller documents, I wrote them and said I am
2   sorry.  I jumped the gun.
3          But then I found out about confirmatory
4   evidence on Dr. Phil; and I am convinced beyond
5   any doubt in my mind that these lawyers to some
6   extent were involved in the Elon Musk case to
7   sabotage and rig the jury.
8      Q    Okay, I want to ask that before we take
9   a break.
10     A    Sure.
11     Q    So summing up on hacking, do you
12  believe the Plaintiffs were involved or not
13  involved as you sit here today?
14     A    My belief is just what I said.  They
15  had motivation to be involved.  The whole
16  Dr. Phil thing stinks.
17     Q    Do you believe that Dr. Phil was
18  involved in computer hacking?
19     A    I don't think Dr. Phil --- I don't know
20  if he knows how to hack a computer.  But I think
21  I know enough about Dr. Phil and what happened
22  with Tara Trask and Chris Chatham, that I have
23  serious concerns.  I know the jury was rigged
24  and I started to investigate it --
25     Q    Now --



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                    127

1        A     And my son Matt went ballistic, because

2     he didn't want to give me any information.

3               MR. HARRISON:   Okay.

4     BY MR. BEAL:

5        Q     So we have transitioned from hacking to

6     jury tampering?

7        A     No.

8        Q     Or is this part of hacking?

9        A     I will tell you.

10       Q     All right.

11       A     You are asking me if I know who hacked

12    me, I do not; but I have certain suspicions.

13       Q     All right.  So --

14       A     When I said that about jury rigging, I

15    don't know who did what, when and where; but I

16    have certain suspicions based on facts that I am

17    aware of.

18    BY MR. BEAL:

19       Q     All right.  So and the jury tampering

20    issue, do you believe the Plaintiffs were

21    involved somehow in tampering with the jury or

22    hurting your efforts in the representation of

23    Unsworth versus Elon Musk?

24       A     You asked me two questions, let me

25    answer it this way.  There was a noticeable



1   change in Johnathan Grunberg and Taylor Wilson's

2   treatment of me starting with the incident in

3   October, and by November if I hadn't had them to

4   help me, I would have thrown them out of my

5   office on the 21st floor.  I had never seen

6   lawyers more rude, more abrasive, more

7   condescending, telling me I didn't know what I

8   was doing.  They like changed day and night.

9        Q    Okay.

10       A    And so do I have concerns that that

11   relates to perhaps them having gotten

12   compromised to participate in sabotaging some

13   part of the Elon Musk case?  I believe it does,

14   but I haven't taken any action yet.

15       Q    Do you believe that the Plaintiffs were

16   involved in somehow sabotaging or working

17   against your efforts in the Unsworth versus Elon

18   Musk case?

19       A    I know they were.  I know they were

20   because they were trying to direct me to take an

21   issue in the case that was minuscule compared to

22   the main allegation of pedophilia that I now

23   know that issue was interjected by the

24   Mockingbird Media, so that we would spend time

25   on that and not time on what the main case was



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

1    about; and they were adamant that I needed to go

2    there, and it very much affected my ability to

3    prepare the case in an orderly fashion in the

4    manner that I thought it should be done, being

5    the most experienced, being the lawyer in

6    charge.  And I have never let such opposition

7    and mistreatment from every one of them, not as

8    much Nicole.  In fact, I told Nicole one day

9    when Johnathan and Taylor were in my office and

10   I looked at them and said I ought to sue every

11   damn one of you about what you said about mental

12   health.

13          And Nicole said I never said it, and I

14   said you are too smart to say it.  And she sent

15   me a note later when she found out about my

16   children.  And she knew how much that would hurt

17   me.  And she said I love you no matter what

18   happens to our law firm.  I will always be there

19   for you, and I appreciate that and I believe she

20   meant it.

21      Q    So you believe the Plaintiffs were

22   deliberately taking steps to sabotage or hurt

23   your client in the Elon Musk litigation?

24      A    I said what I said.  I don't know it,

25   but I saw it --



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          130

1       Q     But you believe it?
2       A     Do you want me to answer or are you
3    going to answer it for me?
4       Q     No, I am just trying to --
5       A     Why don't you let me answer it.
6       Q     All right.
7       A     Because you don't know what you are
8    talking about.  Only I can answer that question
9    with all due respect.
10       Q     Okay.  Go ahead.
11       A     I have serious concerns based on the
12    totality of the circumstances that occurred and
13    the timing of those, I have serious concerns
14    that somehow my son, perhaps Johnathan and
15    Taylor perhaps were compromised and perhaps had
16    to do things that were not in the best interest
17    of Vernon Unsworth, although I have a lot of
18    thoughts on the Vernon Unworth's case, which we
19    don't need to go into today.  I don't know what
20    this has to do with extortion, but I am happy to
21    talk to you about it.
22       Q     Okay.
23       A     Because I don't know what happened in
24    the Thai cave rescue.  I know a lot more now
25    about child sex trafficking than I knew then.  I



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                    131

1    know a lot more now about how caves are used in
2    Thailand.  I know a lot more now about
3    psychological operations.
4              MR. HARRISON:  What I will ask
5         both of you to do is stick to the
6         allegations of the Complaint.  This is
7         a defamation lawsuit, right, Drew?
8              MR. BEAL:  Right.
9    BY MR. BEAL:
10        Q    So when you said that you were lead
11   Counsel in the Vernon Unworth's case?
12        A    I was.
13        Q    Was there a time when you asked Taylor
14   to take over the lead Counsel role prior to
15   trial?
16        A    I don't remember it.  If I was going to
17   ask Taylor to take on lead Counsel, I wouldn't
18   have gone.  I was always lead Counsel.  We had a
19   meeting the weekend before Thanksgiving, where
20   we had, I guess you would call it a come to
21   Jesus meeting, because the acrimony between
22   those lawyers and me and their disrespect and
23   their acting like they knew everything, and I
24   was some sort of a dummy in my case, with my
25   experience.  I couldn't understand it.



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                           132

1              We all got together at Lake Oconee at
2      my house in Reynolds that I owned then and we
3      had a sit down and I heard them all out; and
4      then I made the decision here is what is going
5      to be done.  If you don't want to do it my way,
6      then you will not need to go to Los Angeles.
7              They all said we will do it your way,
8      so I don't think there was ever any time where I
9      would have told Taylor Wilson to take on the
10     role of lead trial Counsel.  He hadn't had that
11     much experience, my goodness.
12             MR. BEAL:  All right.  Let us make
13        it a short break and talk about timing,
14        and then you and I get together and
15        make a decision.
16             MR. HARRISON:  Very good.
17             (Whereupon, a short break was
18             taken.)
19     BY MR. BEAL:
20        Q   Mr. Wood, real briefly, we talked about
21     the Carbone and Lindsey settlement, and we saw
22     that the Carbone settlement did not have a
23     separate breakout for the Plaintiffs' legal
24     fees.
25             Did you have an oral agreement with



1    David Carbone or Lindsey about the percentage of

2    the fee that would be received by the

3    Plaintiffs?

4         A    I did not have an agreement at that

5    time with either one of those.

6         Q    Did you ever have -- you stated

7    previously that you were surprised that there

8    was no warranty in the March 17th Settlement

9    Agreement about the Sandmann's consenting to a

10   fee.

11             Do you remember that testimony?

12        A    Yes.

13        Q    Were you surprised by that absence, if

14   you will, on March 17th when you signed the

15   document?

16        A    No, it was not an issue at that time.

17   From my perspective that agreement was

18   negotiated by you and Alston & Byrd, so I wasn't

19   questioning it.  I trusted my lawyers.

20             And when the consent issue came to the

21   forefront, given that you were aware from the

22   prior statements of Todd McMurtry there was

23   potentially a client out there saying quantum

24   meruit, I am surprised that you did not put in a

25   warranty of consent on my part; so that if he



1  did not consent I would still be liable for it.

2  So I was really surprised that you did not put

3  it in, given your knowledge that they had taken

4  positions apparently as you pointed out that

5  they only wanted to pay quantum meruit.

6      Q    So it is your understanding if they

7  hadn't consented, you would be responsible for

8  it from the PC?

9      A    If you had included a warranty on my

10 part to his consent, meaning if he doesn't

11 consent I have warranted his consent; and they

12 could sue and recover from my PC.

13     Q    I believe earlier you testified that

14 Alston & Byrd told you about client consent with

15 regard to the Lindsey settlement?

16     A    That is my best recollection.  It came

17 up when I was talking to them about Cherie

18 Fuzzell.

19     Q    Okay.  And --

20     A    And they told me to apply it to

21 Sandmann too.

22     Q    Okay.  And --

23     A    And I am surprised both of you all

24 didn't address the issue of consent more

25 clearly.



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          135

1      Q     And the Lindsey settlement occurred in
2   February of 2020.
3            So would it be fair to say that Alston
4   & Byrd brought that to your attention sometime
5   early on in their representation?
6      A     They brought to my attention they were
7   hired to help negotiate and reach an agreement
8   with Nicole, Johnathan, and Taylor.
9            I decided not to go back and
10  re-litigate the issue of the amounts that I had
11  said on the 17th I would pay.
12           As I recall in the first part of their
13  representation I had not reached that
14  conclusion.  But I did when it was finalized.  I
15  thought, you know, I said it, I will live up to
16  it.  Just give them the money, give them
17  percentages.
18     Q     So did they tell you about their
19  understanding of the requirements of client
20  consent around the time of the Lindsey
21  settlement?
22     A     They didn't represent me at that time,
23  I don't believe.
24     Q     Did Alston & Byrd ever tell you that
25  you did not owe the funds under the March 17th



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                         136

1      Settlement Agreement for Sandmann versus CNN
2      because of client consent?
3                  MR. HARRISON:   Object to the form.
4                  Answer.
5                  THE WITNESS:   They told you what
6          their position was.   I wasn't an expert
7          on the ethics rules; they were in terms
8          of fee splits.   So I assumed that they
9          knew what they were talking about, and
10         I think they dd.
11                 And so I relied on what they told
12         me, which is exactly what they told you
13         I think in the letter of July 24th, if
14         I am right, that you introduced
15         earlier.
16     BY MR. BEAL:
17         Q     Did Alston & Byrd ever tell you that
18     the Plaintiffs or their Counsel had committed
19     extortion?
20         A     I didn't ask that question to them, but
21     I had in my press statement the fact that I was
22     not going to allow them to extort me by
23     litigation.   That press statement was edited and
24     reviewed by Alston & Byrd.
25                 If there was a red flag, I would have



1    expected them to tell me; but I felt strongly

2    then that it was extortion.  And I feel that way

3    now, that is my opinion.

4         Q    In earlier posts you have stated that

5    you felt Alston & Byrd committed malpractice in

6    their representation of you?

7         A    What post?

8         Q    Do you remember that?

9         A    Tell me what you are talking about.

10        Q    Have you ever made a statement that

11   Alston & Byrd committed malpractice in their

12   representation of you?

13        A    Where?  Are you talking about on

14   Telegram?

15        Q    I am saying in any public forum?

16        A    That is so broad I don't know.

17             I mean I have concerns that having been

18   hired to negotiate a settlement on a fee split

19   with an outside firm, that I was not informed

20   and that it was not -- the issue of consent was

21   not addressed at the time of agreement.

22             And I was concerned subsequently they

23   did not file a counter-claim, but the issue is

24   before the Court, so it is okay, that Johnathan,

25   Nicole, Taylor breached the contract themselves



1     when they sued me for fraud and inducement,

2     which is in breach of the agreement.

3          Q    Do you believe that as you sit here

4     today that Alston & Byrd committed

5     malpractice --

6               MR. HARRISON:  Objection.

7     BY MR. BEAL:

8          Q    -- In their representation of you?

9          A    I don't know what that has to do with

10    this liable case.  I have concerns in the two

11    areas that I have mentioned; I may have more.

12    But I have not acted on those.

13              But I do know that if it turns out that

14    L. Lin Wood, P.C., which is the only party that

15    is responsible for the fee, if L. Lin Wood, P.C.

16    is found liable, then I would look to Alston &

17    Byrd to indemnify me, because I relied on their

18    advice, which they told you themselves in the

19    July or the July 24th letter.

20              I don't want any more litigation.  I

21    have more than I can afford now, and you are all

22    going to be litigating for nothing pretty soon,

23    because I am having to pay attorneys' fees; and

24    I know they are not.

25          Q    And I believe you testified -- earlier



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                    139

1    you testified that one act of extortion was the
2    demand that was made upon you in September of
3    2020 immediately prior to the filing of suit?
4        A    That was I thought consistent with
5    extortion, yes.
6        Q    And --
7        A    It made no sense.  Why would you not --
8        Q    I just need you to --
9        A    I am going to answer the question
10   fully.
11            That was an act of extortion, part of
12   the extortion because the position that you all
13   took made no sense.  You weren't looking to
14   resolve the matter.  You were looking to sue it.
15       Q    And it was the crime of extortion?
16            MR. HARRISON:  Object to the form.
17            THE WITNESS:  I call it extortion.
18       Whether you refer to it as a crime, it
19       is knowing.  So I guess it would fall
20       within the category of knowing,
21       criminal extortion.  I didn't act on it
22       in the sense of taking it to the
23       police.  Just like --
24   BY MR. BEAL:
25       Q    Okay.

 **COASTAL COURT REPORTING & VIDEO SERVICES**
                    800-791-1100      www.coastalcourt.com

1          A     I didn't -- I knew what had happened to
2     me.  I was going to move forward.  And then when
3     I got brutally attacked in South Carolina, I
4     made a decision as a lawyer for myself that I
5     needed to speak out publicly about it and so I
6     did.  And I told the truth.  I gave my honest
7     opinion.
8                 MR. BEAL:  I have to object.
9                 THE WITNESS:  I gave the truth and
10        gave my honest opinion.  I don't lie.
11    BY MR. BEAL:
12         Q     What is your understanding of the
13    elements of extortion?
14                MR. HARRISON:  Object to the form.
15                You can answer.
16                THE WITNESS:  I am not sitting
17           here with a law book in front of me,
18           but I think when you take acts that are
19           beyond what you are entitled to, to try
20           to get someone else coerced into doing
21           what they are not obligated to do for
22           you, that is extortion.  It is in the
23           dictionary.  People use the term all
24           the time.
25                A lot of people say the lawyer is



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                        141

```
1        extorting you.  It is a commonly used
2        term, especially when you are talking
3        about lawyers making demands on you.
4             And this one was not just a demand
5        to pay.  If you had said here is the
6        breach of contract claim, we demand you
7        pay the 600-what-odd-thousand-dollars,
8        that would not be extortion.  But when
9        you add all that other stuff in there,
10       and you made a $1.5 million demand; and
11       you actually attacked my faith by
12       putting in your Complaint that I
13       thought I was all mighty God, what in
14       the world were you thinking?
15  BY MR. BEAL:
16       Q    So your definition of extortion is
17   urging someone to make a payment to you that you
18   are not required to make?
19            MR. HARRISON:  Object to the form.
20            THE WITNESS:  Extortion comes in
21       many forms.  But it is when somebody
22       inappropriately tries to exert leverage
23       or pressure on you for their own game,
24       that they are not entitled to.
25            So the extortion could be in the
```



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          142

1    form of the money demand, it was

2    outrageous.  It can't be justified.  It

3    can be part of the fact that you are

4    only gave me 24 hours initially to

5    respond.  What was the rush?

6         That you would refuse a reasonable

7    request that we arbitrated privately

8    with lawyers, binding arbitration.

9         And you added in so much stuff

10   that was intended clearly in my mind to

11   smear me and attack me for purposes

12   that had nothing to do with the dispute

13   on whether there was client consent

14   required.

15        And other things that were done,

16   if you say Lin, make this agreement or

17   we are going to continue to drive a

18   wedge between you and your children,

19   that is extortion.

20        Lin, make this agreement or we are

21   going to continue to talk about your

22   mental health that might hurt you in

23   your Sandmann litigation or hurt you in

24   your efforts with Richard Jewell with

25   President Trump, in my view that is



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                143

1        extortion.  That is my opinion.
2   BY MR. BEAL:
3        Q    So the September demand included
4   payment of fees on various cases?
5        A    It included a lot more than that.  In
6   fact, nobody -- you have to explain how they
7   came up with the fees.  But on top of that --
8        Q    Can you just answer the question yes or
9   no.  Did it include that or not?
10       A    I don't know.  Show it to me and I will
11  tell you what it included.
12       Q    What was the Washington Post
13  settlement?
14            MR. HARRISON:  You are asking him
15       the amount?
16            MR. BEAL:  Yes.
17            MR. HARRISON:  Is it confidential?
18            THE WITNESS:  It is confidential.
19  BY MR. BEAL:
20       Q    Well, everything else is sealed in this
21  proceeding.
22       A    Not in this case.
23       Q    But it is part of our demand so.
24       A    There is no seal order in this case.
25            MR. HARRISON:  Yeah, I am not



1    aware of anything under seal in this

2    case.

3         We have also asked for some

4    financial information and information

5    on referrals and fees earned so -- but

6    beside that I don't know if it is

7    confidential or not.

8         And you say it is then --

9         THE WITNESS:  Oh yeah, it is

10   confidential but I don't mind telling

11   you at some point, but I want to make

12   sure I don't violate the agreement.

13        MR. BEAL:  Why don't we go off the

14   record.

15        THE WITNESS:  That would require

16   that I get in touch with Todd McMurtry

17   to make sure he is okay with me telling

18   it.  I mean it is not -- I don't mind

19   you knowing, but it is not something I

20   am allowed to say without some

21   protection in terms of ensuring that I

22   don't breach the agreement with

23   Nicholas and Todd may.

24        MR. HARRISON:  I am happy to

25   discuss it with you to see if we find a



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              145

1        way to get it to you somehow; but I
2        don't know the answer other than what
3        he said.
4                    (Whereupon, Plaintiff's Exhibit
5                    Number 15 was marked for
6                    identification.)
7    BY MR. BEAL:
8        Q    Let me hand you what has been marked as
9    Exhibit 15.
10            Does this look like the first page, and
11   then it skips to the Ad Damnum clause of the
12   Sandmann lawsuit filed in the Eastern District
13   of Kentucky?
14            MR. HARRISON:  Just for the
15       record, it is page 1 of the Complaint,
16       and then it goes to page 57.
17            MR. BEAL:  Correct, and 58.
18            MR. HARRISON:  And 58, okay.
19            THE WITNESS:  What do you want me
20       to tell you?  It looks like it.  It is
21       marked filed.
22   BY MR. BEAL:
23       Q    Let us look over at page 57.
24       A    Okay.
25       Q    And in paragraph (a) and (b) of the



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                    146

1      Sandmann Ad Damnum clause, did you make a demand
2      for $275 million?
3          A    That is what it says right here.
4          Q    Did you consider that to be extortion?
5               MR. HARRISON:  Object to the form.
6               THE WITNESS:  That is the way
7          lawyers file lawsuits.  The Ad Damnum
8          can be related to what you want to
9          recover.  It can be made to make a
10         point to the person that is looking at
11         the Complaint.
12              There is no connection between the
13         Ad Damnum and a legitimate lawsuit and
14         extortion.  Now, I can tell you CNN
15         might have looked at it and said that
16         is extortion.  Sandmann is trying to
17         extort me.  That would be their
18         opinion.  They may view it that way.  I
19         didn't view it as extortion, but CNN
20         very well could have.
21              (Whereupon, Plaintiff's Exhibit
22              Number 16 was marked for
23              identification.)
24     BY MR. BEAL:
25         Q    Let me hand you the same three-page



1    Exhibit for the Washington Post Complaint

2    against Sandmann and direct your attention to

3    page 37 of that Complaint, and that is paragraph

4    (a) and paragraph (b) on page 38; and in that

5    Complaint did you assert a claim for $250

6    million?

7         A    I did not.  Nicholas Sandmann did.

8         Q    But you didn't consider that to be

9    extortion?

10        A    No.

11        Q    For the same reason?

12        A    Well, let me answer.  Once again, Ad

13   Damnum's in Complaints are done by lawyers in

14   connection with a case that is pending, to be

15   pending.

16             I did not put in something -- I have

17   never filed a lawsuit to extort someone.  I

18   filed a lawsuit when I thought it was

19   meritorious.  Then I make a decision on what I

20   believe is the proper Ad Damnum.  Again, the

21   Washington Post may think it is extortion.  Just

22   like President Trump recently said that he

23   settled the horse face Daniels case, but it was

24   extortion, extortion litigation; but he settled

25   it for a nominal amount on his advice of



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                             148

1     Counsel.

2              People feel extorted in different ways.

3     I have told you why I felt extorted in the two

4     instances, one that showed the pattern; and two,

5     that I thought was extortion.

6              And nobody complained when I put

7     extortion in my public statement that I issued

8     right after the lawsuit was filed.  They put in

9     the public record that I had said extortion to

10    Dexter King and another lawyer.  They spread the

11    accusation or my opinion of extortion around the

12    world, and they complained that I made a comment

13    about it on Telegram, where you don't really

14    know how many people see it.

15             MR. BEAL:  Let me object.  I mean

16        it is a simple question of it wasn't

17        extortion for the same reason as what

18        he just described.

19             MR. HARRISON:  Okay.  Keep moving.

20    BY MR. BEAL:

21        Q    And it would be fair to say that when

22    making demands in cases that involve punitive

23    damages or presumed damages or exemplary damages

24    that demands are difficult to quantify, because

25    they are not tied to actual, specific damage



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                           149

```
1    computation?
2              MR. HARRISON:  Object to the form.
3              THE WITNESS:  There is no way I
4         can agree with that.  That is not what
5         you did here.  You are trying to say
6         that you were making a demand for a
7         lawsuit you intended to file.  That is
8         just one small part of what you did
9         with them.
10             MR. BEAL:  Let me object as
11        nonresponsive.
12             THE WITNESS:  If you don't want to
13        find out what I am going to say.  This
14        is the time to find out.
15   BY MR. BEAL:
16        Q    I am asking you about demands made in a
17   lawsuit.
18        A    I don't agree with you.  The way you
19   phrase that you are trying to say that any
20   demand in a lawsuit cannot be extortion.  That
21   is not true, because there was more to this than
22   just the demand.  You were asking for something
23   in the demand that you had already agreed that
24   you owed in the breach of contract portion; and
25   you were asking for undefined amounts for some
```



1    cases.  You were claiming you wanted to be paid
2    for defamation, which I guess was --
3              MR. BEAL:  What does this got to
4         do with this?
5              THE WITNESS:  I am trying to tell
6         you why --
7              MR. HARRISON:  He is trying to
8         answer the question.
9              MR. BEAL:  He is not answering the
10        question.
11             THE WITNESS:  I am not going to
12        sit here and be insulted by this man.
13                  (Whereupon, a discussion was
14                   held off the record.)
15             MR. BEAL:  The ruler is coming out
16        for both of us.
17             MR. HARRISON:  Yeah.
18             MR. BEAL:  And I simply asked
19        about computation of damages in other
20        lawsuits, and I got a right to get an
21        answer.  He has practiced law for a
22        long time.  He has made a lot of
23        demands.  I don't want to get into
24        this.  We will get into this on the
25        next set of questions.



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                    151

1              But I am talking about demands
2        made in general on cases that involve
3        exemplary or punitive damages, and now
4        we are going into a bunch of specifics.
5              THE WITNESS:  Let me --
6              MR. HARRISON:  Hang on.
7              THE WITNESS:  That doesn't -- what
8        you are asking about does not describe
9        the facts of this case.  So I don't
10       agree with you, that the demand was a
11       part of extortion.
12             MR. HARRISON:  That is the answer
13       that he gave, and he is giving it
14       again.
15             Next question.
16   BY MR. BEAL:
17       Q    So in other cases when you made these
18     demands in Exhibits 15 and 16 they weren't
19     extortion, because the amount of damages is
20     based on punitive damages and injury to feelings
21     and they are difficult to quantify?
22       A    Who said that?
23       Q    Is that a fair statement?
24       A    No.
25       Q    Okay.  So you can --



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                152

1       A      I didn't extort anybody when I filed
2    this lawsuit.
3       Q      Because you can exactly compute the
4    $275 million?
5       A      That is not at all accurate.  Where are
6    you getting that from?  You are making up
7    something that is not part of what I am doing
8    here in terms of what happened to me.
9       Q      Why did you make the demand of
10   $275 million?
11      A      In what case?
12      Q      In the Sandmann case, Exhibit 15?
13             MR. HARRISON:   CNN.
14             THE WITNESS:   Because it was the
15      consensus of the clients and Todd
16      McMurtry and me that that was an
17      appropriate Ad Damnum.  It wasn't a
18      demand to pay us $275 million or we are
19      going to sue you.  And in the process
20      of making that demand for $275 million,
21      we are also going to slander you and
22      put in false allegations about you and
23      file claims that have already been
24      agreed to.
25             I mean it is a whole different set



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          153

1        of factors that go in.  But again, CNN
2        may look at it and go this is
3        extortion.  People say it all the time
4        when a lawyer sues them.  So you are
5        trying to compare apples and oranges,
6        Drew.
7    BY MR. BEAL:
8        Q    So the answer to my question is 15 and
9    16 were fair demands to go in the Complaint?
10       A    They were.
11       Q    They were fair demands for Nicholas'
12   case in these Complaints?
13       A    They were in the Ad Damnum clause.
14   They weren't demands pay us this or we are going
15   to smear you and do all --
16           MR. BEAL:  I am going to object.
17       It is completely nonresponsive.
18           MR. HARRISON:  It is not at all
19       true.  I disagree.
20           MR. BEAL:  I want an answer to the
21       question I asked.
22           MR. HARRISON:  He is trying to
23       answer your question.
24           MR. BEAL:  The demands made in
25       Exhibits 15 and 16 were in his



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

1    opinion -- in your opinion fair demands

2    to make in those lawsuits and that is

3    why you made them?

4         THE WITNESS:  One more time.  Todd

5    McMurtry and the clients, and I made

6    the decision on the amount of the Ad

7    Damnum clause in a Complaint.  That

8    wasn't a settlement demand.  And

9    then -- but even then CNN -- we thought

10   it was a reasonable amount to put in

11   the Ad Damnum clause.

12        MR. BEAL:  Okay.

13        THE WITNESS:  And then CNN could

14   turn around and go out public and say

15   we think that is extortion by the

16   Sandmann's.  They had the right to have

17   that opinion.  Whether they had it or

18   not, I don't know.  But a lot of people

19   feel extorted by lawsuits.

20        But my case is not a -- my

21   comments about Taylor, Jonathan, and

22   Nicole were much more than the actual

23   lawsuit that it was.  It came with the

24   timing of things you did, the things

25   you put in there.  There was a whole



1       host of things given the background of
2       the March 17th agreement that in my
3       opinion I believed was extortion.  I am
4       entitled to have that opinion.  It is
5       an honest opinion.  I haven't changed
6       it.  I am not going to change it.
7              MR. BEAL:  Object and move to
8       strike.
9              That is nonresponsive.
10             MR. HARRISON:  I don't agree with
11      you.  You have done this all day long
12      where you try to talk over him and stop
13      him.  He gave his answer.  He is
14      entitled to it.  You have asked the
15      same question over and over a couple of
16      times today.
17   BY MR. BEAL:
18      Q    Let me ask you this --
19             MR. HARRISON:  I am not finished.
20             MR. BEAL:  Please, this whole
21      thing has been a filibuster.
22             MR. HARRISON:  Now you are
23      interrupting me.  Ask you question, get
24      your answer and ask your next question.
25             MR. BEAL:  Please don't --



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                        156

1              MR. HARRISON:  Quit interrupting
2         him and quit trying to lecture me.
3              MR. BEAL:  Please, there is no
4         answer to any of these questions.
5              MR. HARRISON:  Not true.
6              Ask a question.
7    BY MR. BEAL:
8         Q    If the Washington Post had not answered
9    this Complaint on time, they would have
10   hypothetically gone into default.  Assume that.
11   They went into default.                What
12   amount would they be responsible for if they
13   went into default in light of this Complaint?
14        A    They would have been responsible -- if
15   you default on the Complaint, then there has to
16   be a hearing for the Court to determine based on
17   evidence the amount to be paid.  It does not
18   default to the Ad Damnum.  If that were true I
19   would sue for $10 million and hope that the
20   person didn't answer and you get award for $10
21   million.
22              The point I am trying to make, which
23   you won't let me make, what you are trying to
24   say about an Ad Damnum in a Complaint is apples
25   and orange from what the facts are in this case



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              157

1    and what you and your clients attempted to do.
2        Q    Let us direct your attention back to
3    March 17th on what you contend was a pattern of
4    extortion; and I am just going to ask you to
5    identify specifically the facts that you
6    contend; and I believe you referenced in general
7    terms communications with your children and some
8    complaints about mental health.
9            But I am asking you to identify
10   specifically what actions the Plaintiffs took
11   leading up to the March 17th Settlement
12   Agreement, the specific acts which constituted
13   extortion?
14           MR. HARRISON:  So to be clear we
15       have covered this, but you are asking
16       him to answer it again?
17           MR. BEAL:  Yes, I am asking for
18       the specific acts.  I just need a list
19       of them.
20           MR. HARRISON:  And you are going
21       to let him give an answer?
22           MR. BEAL:  I am all set.
23           MR. HARRISON:  Okay.
24           THE WITNESS:  Well, number 1, I
25       have answered this question.



1     BY MR. BEAL:

2          Q     Right.

3          A     So I refer you and I would incorporate

4     the answer I previously gave you into what I say

5     now.

6          Q     Okay.

7          A     Which will be in addition potentially.

8                It is not a matter of acts.  It is not

9     you act to extort.  You can say something.  You

10    can take a position.  I know here that Johnathan

11    I believe was involved with Dr. Phil; certainly

12    Taylor Wilson was in trying to have Dr. Phil

13    come in and do a mental health intervention.

14               I remember Matt wrote him and said we

15    have got too much to lose without Dr. Phil, what

16    did they have to lose?  They never even dealt

17    with Dr. Phil.  I know what Dr. Phil was doing,

18    and they were involved in it, at least Taylor

19    was.  And Johnathan was going around telling me

20    and my children confirming that somehow I needed

21    to go into regular mental healthcare, monthly

22    treatment.  Johnathan even said you need to be

23    on Lithium.  I ain't getting on Lithium.  There

24    are people who need it.

25               And my son said the same thing a month



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                        159

1   before, Lithium.  It was a concerted effort to
2   try to attack me on my mental health.  It is a
3   classic psychological operation.  The State Bar
4   was part of it later.  I am sorry my children
5   were involved.  I think I know how they got
6   involved.  Time will tell.
7           But that was one part of it.  You got a
8   guy that is in your law office, I don't know who
9   else he is saying it to; but he is questioning
10  my mental health, where I have got clients, I
11  have got Richard Jewell and I have got my family
12  involved.  What is he doing that for?
13          It was I said a pattern of extortion,
14  because I am sitting there going well, am I
15  going to shut this guy up by just getting rid of
16  him and paying him, or I am not going to let him
17  go our and continue doing this, have it get
18  worse, and have it impact my family more than it
19  already has, and my clients more than it already
20  has.  I got five by Nicholas Sandmann, and then
21  obviously hopefully down the road when things
22  get right in this country, and I believe they
23  will in due time.  Then I will be able to renew
24  my efforts with President Trump to get Richard
25  Jewell the Presidential Medal of Freedom.



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                           160

1     Q     So the first category of actions that
2  you referred to efforts is Johnathan and Taylor
3  contacting Dr. Phil seeking an intervention or
4  discussion about your mental health?
5     A     I didn't say they contacted Dr. Phil
6  for that purpose.  I know now that it is
7  documented that they were talking to Dr. Phil.
8     Q     But at the time you didn't know --
9     A     It was enough that just running around
10  saying it, period.  They had no right to say it.
11  They had no medical training.  They had no
12  psychological training.  They were just making
13  it up and accusing me of something that was not
14  true, which they admitted in March 17th was not
15  true when they said I was mentally competent in
16  all respects.
17     Q     Who were they saying it to that you are
18  aware of?
19     A     I don't know.  I know they were saying
20  it to my children.  I know they were saying it
21  to each other.  I know they were saying it to
22  me.  I know that probably other people heard it.
23           I don't know who else they said it to.
24     Q     How did you know they were saying it to
25  your kids?



**COASTAL COURT REPORTING & VIDEO SERVICES**

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          161

1       A     Because they told me.  Johnathan and
2    Taylor told me they talked to them.  There was
3    this big powwow where they were all concerned
4    about me.  It was nonsense.  They were making it
5    up out of whole cloth.
6             It is a typical psychological operation
7    to attack the target by attacking their mental
8    health.  Study psychological operations.
9             It just didn't work because my mental
10   health is fine.
11      Q     Okay.
12            Next, action, words, or series of
13   actions that constituted extortion by the
14   Plaintiffs leading up to this March 17th
15   agreement besides that whole category, is there
16   anything else?
17      A     I have told you everything in my first
18   time I answered it.  I think I have added some
19   more specifics in.
20            It is just this simple, they were
21   threatening my family with their comments.  They
22   were threatening my clients with their comments.
23   They were threatening Richard Jewell with their
24   comments; and their comments were fake.  It was
25   false.  They have admitted that themselves in



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          162

1    the March 17th Settlement Agreement.

2            And I think they were doing it to try

3    to pressure me into paying them more than they

4    deserved in a situation where they had made the

5    mistake of not getting an agreement on the fee

6    division before the Sandmann case settled.

7    Historically we always did.  So I think they

8    were doing it to extort me, to force me to pay

9    them more than they deserve.

10           I gave in.  I agreed to it in March

11   17th.

12       Q    Okay, all right.

13       A    And then Nicholas doesn't consent and

14   you saw the letter from --

15       Q    Okay.

16       A    From Chris Marquardt.  And then the

17   next thing I know you send me this Complaint.

18       Q    Now, we are getting onto something

19   else.

20       A    You send me this Complaint.  Shame on

21   you.

22       Q    We are talking about March 17.

23       A    Questioning my faith in my children.

24   It is extortion.

25       Q    And how do you know that the Plaintiffs



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                            163

1    were speaking to your clients about mental
2    health issues?
3              MR. HARRISON:  Object to the form.
4       I don't think he said that.
5              MR. BEAL:  I thought you said
6       saying it to me, saying it to my
7       clients.
8              THE WITNESS:  They were saying it
9       to me.
10   BY MR. BEAL:
11       Q    Okay.
12       A    They were saying it to my children.
13       Q    Okay.
14       A    I don't know who else they were saying
15   it to.
16       Q    Okay.
17       A    But I have got concerns they may be
18   saying to it other people, or what they were
19   saying to the people they did say it to.  It
20   could be leaked out into the public discussion.
21   I mean there is no privacy.  Everything you say
22   on your phone, your Email's, and your texts is
23   captured in the air.  So you don't know who is
24   going to get it, and what they are going to do
25   with it.



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          164

1          So you don't make baseless accusations
2     about somebody, because you don't know who is
3     going to get it and how they may try to use it
4     to hurt you.  Study about cell phones and
5     Email's and texts, and how they are in the air
6     and they capture it, Palentir.
7               They shouldn't have been doing it, that
8     is my point.
9                    (Whereupon, Plaintiff's Exhibit
10                   Number 17 was marked for
11                   identification.)
12    BY MR. BEAL:
13        Q     Let me hand you what I will purport to
14    you was the Answer that you filed in this case,
15    which is Exhibit 17.
16        A     I will accept your representation.  It
17    is marked.
18        Q     And can you grab the Complaint?
19              MR. HARRISON:  14?
20              MR. BEAL:  Which is 14.
21    BY MR. BEAL:
22        Q     And if you turn over to your Answer
23    number 36.
24              MR. HARRISON:  The Answer is 17,
25        is that right?

 **COASTAL COURT REPORTING & VIDEO SERVICES**
                    800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              165

1              MR. BEAL:  Yes.

2              THE WITNESS:  So you want me to

3        look at paragraph 36.

4     BY MR. BEAL:

5        Q    Can you explain the basis for your

6     denial in paragraph 36.  And I will read to you

7     the averment in paragraph 36.

8        A    Hold on.  Let me have a chance to make

9     sure I understand it.

10             MR. HARRISON:  While he is reading

11        it to the extent that any decisions

12        about responses or denials were made by

13        Counsel.

14             THE WITNESS:  Well, I can tell you

15        they hadn't offered any concession on

16        the amounts previously agreed on

17        February 17th.  They had no agreement.

18        They had no leverage.  They didn't get

19        a written agreement.  They were

20        literally at my mercy.  I could have

21        said you are only going to get quantum

22        meruit, good luck.

23             But I made the deal in terms of

24        coming to an agreement as to the

25        amounts for all other things to be



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                166

1          resolved, which ultimately was done by
2          Birdie and Mark Watt and you, and that
3          was the March 17th agreement.
4    BY MR. BEAL:
5          Q    So the basis of the denial in paragraph
6    36 was you didn't believe that there had been an
7    agreement reached on February 17th regarding
8    splitting the fees?
9          A    That is not what I said at all.  You
10   are not listening.
11         Q    Okay.
12         A    I said that it looks like here that
13   during the conversation Plaintiffs offered
14   concessions on the amounts previously agreed.
15   Where was the previous agreement?  And what
16   concessions did they offer?  I know of none.
17   They had nothing to offer me.  They could either
18   get me to agree, and I think they extorted me
19   into it to pay them what they had not gotten an
20   agreement on, after the fact; or they could get
21   quantum meruit.  They had nothing to concede.
22              It is like they are claiming they had a
23   right to a fee that they did not have a right
24   to.  They had a right to quantum meruit, because
25   they did not get a written agreement on how to

1    split up a contingency; and then they wanted

2    35 percent.  35 percent.

3           Well, if I know what the case is

4    settled for, it is nice to be able to settle, I

5    will take 35 percent of that.  It might not have

6    been that much if we had reached it before.  It

7    was not their fault any more than it was mine

8    that the Sandmann case for some reason was an

9    exception to the rule that had always been in

10   place.  We always confirmed at the time they got

11   involved what their respective corporations

12   would receive on a contingency fee split.  That

13   didn't happen in Sandmann.

14          And then their demand came after the

15   case had settled, and it came after two or three

16   very trying months where these people treated me

17   horribly.

18       Q    Okay.

19       A    I was not happy with them.  But I would

20   have paid them quantum meruit.

21          MR. BEAL:  I am going to object.

22          THE WITNESS:  They just kept

23     trying to get more money.

24   BY MR. BEAL:

25       Q    Paragraph 37, can you explain the basis



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          168

1    for your denial there?
2         A     Well, I am telling you what I do.   I
3    can't speak for my lawyer.
4              MR. HARRISON:   The same statement
5         as before, Drew.   I don't know if you
6         want me to keep repeating it.
7              MR. BEAL:   You don't have to.
8              THE WITNESS:   You want me to read
9         38?
10   BY MR. BEAL:
11        Q     37.
12        A     To the extent that we had that
13   conversation, Taylor sent me an Email to
14   document it.   And I told you that I was also
15   trying to ferret out what these people were
16   really up to.   Were they really looking for
17   fairness, or were they looking to take advantage
18   of my largesse.   That is why I said what do you
19   think is fair?   35 percent.   I said I will give
20   you 50, is that fair?   Yeah, that is fair; which
21   shows that is what was fair to them was as much
22   as they could get.
23        Q     Okay.
24        A     So I said that I documented the
25   discussions we had, Taylor did it.   But the



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                         169

1   agreement was not complete until March the 17th.
2   Yeah, March the 17th.  We had other issues to be
3   resolved; but I lived up to the percentages that
4   we discussed on the 17th in the March 17th
5   agreement.
6       Q    So let me direct your attention back to
7   paragraph 35 of the Complaint.
8       A    Okay.
9       Q    And so paragraph 35 says:  On
10  February 17th shortly following these threats
11  the parties reached an agreement for the
12  allocation of all fees earned, but not yet
13  collected by LLW, PC on those cases which had
14  already resolved.
15      A    Yes, they had resolved.
16      Q    And then on paragraph 36 says that the
17  parties reached an agreement, which you denied?
18      A    I did not.
19      Q    Paragraph 37 says:  The parties
20  subsequently documented their agreement via
21  Email.
22           And my question to you is why did you
23  deny that paragraph?  Didn't we --
24      A    Which one is it you want me to --
25      Q    37.



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              170

1       A     First it was 35.  Which one do you want
2    me to look at?  37?  The parties subsequently
3    documented their agreement via Email, the
4    February 17th agreement.  And that was denied.
5            Because that was not the agreement, and
6    if we just simply admit that then you will be
7    going the agreement was February 17th.  That is
8    not the agreement.  There were other issues that
9    had to be resolved, including the very
10   significant issue of their liability for 3/4th's
11   of the office space.
12           So you are trying to make that the
13   agreement.  The agreement was March 17th, and
14   the March 17th agreement had an integration
15   clause, that all prior agreements, all prior
16   discussions merged into the March 17th
17   agreement, which was the governing agreement,
18   which you don't want to be governed by.
19      Q     On paragraph 35 it defines what we are
20   talking about, which is an agreement for the
21   allocation of all fees earned, but not yet
22   collected by L. Lin Wood, P.C. on those cases,
23   which had already resolved --
24      A     I --
25      Q     Can I finish my question?



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                               171

1      A     Yeah, but you are just beating the same
2  horse.  I thought you are in a hurry to get the
3  testimony.
4      Q     That paragraph does not refer to any
5  other agreements about rent or anything.  It
6  only talks about allocation of fees on a series
7  of cases; and you have denied that subsequently
8  saying no, that is not true.
9      A     I didn't say that.
10          Listen, I think you have been
11  practicing law long enough to know that your
12  lawyer makes a decision in admitting and denying
13  very carefully, because you don't want to over
14  admit; and if there is some concern about it,
15  you will deny and hold you to the proof.  Chris
16  prepared the Answer.  I went through it with
17  him.
18          The decision was his to make ultimately
19  on how to respond.  I have not denied that there
20  was an allocation agreement, although I was
21  getting really to let them litigate it with me;
22  but then I decided not to and put those amounts
23  in the agreement.  So the allocation that we
24  discussed, and Taylor confirmed in his Email of
25  February 17th, all of which was done after they



1   had left the office.  They were no longer my

2   office sharing partner.  It was in the

3   March 17th agreement.  What is the problem?

4        Q    Okay, look over at paragraph 41.

5        A    I see you want to go through the

6   Complaint.  Okay, paragraph 41.

7        Q    Paragraph 41 and explain --

8        A    It says just what I said.

9        Q    And March 17, 2020 after negotiations

10  by lawyers for each side the parties executed a

11  formal written Settlement Agreement, the

12  March 17th agreement, in which they agreed to

13  the exact same fee split set forth in the

14  February 17th agreement; but Plaintiffs agreed

15  to contribute $285,000 from the fees owed to

16  them to buy out a portion of LLW, PC's lease,

17  among other things.

18       A    I deny it.

19       Q    Right.  And --

20       A    They were not buying out a portion of

21  my lease.  They were paying their share of their

22  lease.  And you talked to the lawyer.  You know

23  the lawyer for the landlord, he said they owe

24  75 percent.

25       Q    And so that was the basis for your



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          173

1    denial?

2        A    The way you worded this, it was not --

3    and I am assuming Chris made the decision, but I

4    am sure I would have looked over and my reaction

5    to it looking here is it does not correctly

6    address the $285,000.

7        Q    Okay.  Can you --

8        A    They weren't buying out a portion of my

9    lease.  They were paying their share of the

10   lease.

11       Q    Can you look at paragraph 44.

12            Take a look at that paragraph and

13   explain your denial on that one.

14       A    I am not really sure I understand what

15   44 is saying.  In late July 2020 the initial

16   payments -- no, they weren't due then.  The

17   initial payments under the other cases, those

18   payments were due.  But they weren't due in

19   terms of actually paying them until I was able

20   to get the $285,000.

21            Their share of the Carbone case and the

22   Lindsey case did not -- did not total at -- it

23   was not the 285,000.  So they weren't going to

24   be due any payment until -- they were due the

25   payments from those people, but I was holding it



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              174

1    to pay their share of the lease.  So maybe that

2    is why it is denied.  I mean it is hard to come

3    back here today and tell you what is admitted or

4    denied, but it seems to be an exercise of waste

5    of time.

6              MR. HARRISON:  I can tell you why

7         it is denied, if you want me to, or I

8         won't.

9    BY MR. BEAL:

10       Q    Did you have an opportunity --

11             THE WITNESS:  Do you mind telling

12        him so I can hear it?  You prepared the

13        Answer.

14   BY MR. BEAL:

15       Q    Did you have a chance to look over this

16   document before you filed it?

17       A    Let's take a break.  I want to find out

18   what my lawyer wants to tell you that you don't

19   want to hear and then I will tell you.

20       Q    No, no, no.  There is a question on the

21   table.  You have to answer the question.

22             MR. HARRISON:  One question, did

23        you get a chance to review this before

24        we filed it?

25             THE WITNESS:  Absolutely.  I



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                    175

1        looked at it with you, Chris.  He is a
2        good lawyer.
3   BY MR. BEAL:
4        Q    Good, so let's look at paragraph 46.
5        A    Now I want to take a break and confer
6    with my Counsel, so he can tell me what you
7    don't want to hear and I will tell it to myself.
8             MR. BEAL:  I will object to you
9        leaving the room under the
10       circumstances.
11            THE WITNESS:  You are not the
12       Judge.
13            MR. HARRISON:  Well, I am offering
14       to clarify the reason for the denial if
15       you want to in the Answer --
16            MR. BEAL:  Okay, well, you can
17       clarify it.  Go for it, please.
18            MR. HARRISON:  It says Defendant
19       Wood and LLW, PC, I don't think that is
20       correct.
21            THE WITNESS:  Thank you, that
22       refreshes me.
23            So if you don't mind, Chris.
24            MR. HARRISON:  Hang on a second.
25               (Whereupon, an off-the-record



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          176

1                    discussion was held.)
2              MR. HARRISON:  Do you want to ask
3         a question or do you want to make a
4         statement?
5              MR. BEAL:  You can make your
6         statement.
7              MR. HARRISON:  I believe it was
8         denied because it says came due from
9         Defendant Wood and LLW, PC.  I don't
10        think that is correct as to who it was
11        coming due from --
12             MR. BEAL:  Only from the PC?
13             MR. HARRISON:  Yes.
14             MR. BEAL:  Got it.
15             MR. HARRISON:  Yes.
16             MR. BEAL:  Okay, thank you.
17             THE WITNESS:  Lin Wood
18        individually does not owe them a dime
19        on the fee.
20             MR. HARRISON:  Right, we got it.
21             THE WITNESS:  It is PC only.
22   BY MR. BEAL:
23        Q    Let us look at paragraph 46.  Let us
24    take a second to read that.
25        A    Okay, I have read it.



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                    177

1      Q    And is it true that the statement there
2   in paragraph 46 that you have not disclosed the
3   amount of the recovery in the Sandmann versus
4   Washington Post?
5      A    I never received a demand or a request
6   for that amount.  And that would have been an
7   event that occurred after Joey Burby and Chris
8   Marquardt were involved and you were involved;
9   and I don't know whether Joey and Chris got a
10  demand or a request from you about that or not.
11  I don't think they did.
12     Q    Can we refer over to paragraph 49; and
13  there is a text embedded there in paragraph 49.
14          Can you tell us who that text was being
15  sent to?
16     A    It was not sent to -- it was not
17  intended to be sent to Johnathan.  And sitting
18  here today -- I mean what is the date of the
19  text?
20          I don't see a date.  So I don't know
21  who that I am intending to send it to.  It would
22  probably be better if I knew the time that I
23  sent it.  I was dealing with issues about my
24  computer being hacked.
25          MR. HARRISON:  Lin, I believe it



1        is supposed to be July 26, 2020, if you

2        look at 48.

3                THE WITNESS:  July the 26th, 2020?

4                MR. HARRISON:  Is that correct,

5        Drew?

6                MR. BEAL:  I think so.

7                THE WITNESS:  July the 6th?

8                MR. HARRISON:  26.

9                THE WITNESS:  July the 26th of

10       2020?

11               Well, it wouldn't have been

12       intended to be sent to Johnathan

13       because he had a lawyer.

14               So I could have been sending it to

15       my lawyer.  I could have been sending

16       it to somebody who I was working with.

17               I have no idea who I intended to

18       send it to.

19  BY MR. BEAL:

20       Q    Okay.  Let us look at paragraph 58 over

21  on page 16.

22               And can you explain your denial of

23  paragraph 58?

24       A    Yeah.  I didn't agree to pay him

25  anything.  The fee splits were L. Lin Wood, P.C.



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                      179

```
 1    That was a very important distinction and Joey
 2    and Chris knew it, you knew it.  The fee split
 3    payments were from L. Lin Wood, P.C. only.  So
 4    Wood individually didn't agree to pay him a dime
 5    on the fee splits.
 6         Q    Okay.  Can you refer over to paragraphs
 7    79 and 80, and they are related so I am just
 8    lumping them together.
 9              If you can tell me the basis for your
10    denial there?
11         A    79 and 80?
12         Q    Yes.
13         A    I don't know.  I can't as I sit here
14    why the denial was done.  I know I did it in
15    discussions with Chris.
16         Q    Okay.
17         A    What I can tell you is that I don't
18    believe the numbers of subscribers on Telegram.
19    I think they are manufactured.  I don't think
20    you can trust it, just like you can't trust
21    receiving something from someone on Telegram
22    because you don't know whether it is artificial
23    intelligence or a bot or a shield or a
24    propagandist.
25              So I do know that I had the channel
```



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              180

1    "Lin Wood Speaks Truth".  I don't remember it
2    having the Number 660,000.  But at some point it
3    did.  I know it started off at 980.  And down
4    substantially from the number of subscribers he
5    had previously while defaming Plaintiffs, I
6    don't know if that is true or not; so I think we
7    took the safe option of denying it.
8         Q    Okay.
9         A    And then the second channel, that
10   channel was not mine.  The reply channel was in
11   the name of another individual who was going to
12   look at the replies to be able to edit them,
13   because people put pornography and obscene
14   things on there.  And if you don't have someone
15   monitoring it and get them off quickly, they
16   will use it as an excuse to close your channel.
17   I don't remember if she was doing the channel in
18   March of '22 or not.  I haven't gone back to
19   look.
20        But again I do know that the channel
21   says it is for Lin Wood followers to be able to
22   reply to him with words of support, love and
23   encouragement.  I can't tell you why.  It may
24   just be because of the numbers.  I can't tell
25   you why it was denied.  It wasn't denied in bad



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                           181

1    faith.

2         Q     Who was the person who monitored this

3    response channel?

4         A     I should have known you would ask me

5    that.  The first name is Margaret, and I can't

6    remember her last name.

7         Q     And who does she work for?

8         A     I don't think at the time that I knew

9    Margaret.  I don't know that she worked for

10   anybody.  She did -- she did voiceovers for ads,

11   and I met her at the church that I was

12   previously attending.

13        Q     Here in South Carolina?

14        A     Yes.

15        Q     And do you know what kind of computer

16   background or anything she had?

17        A     No.

18        Q     Did you ask her to monitor the channel,

19   or did she volunteer?  Or how did that come

20   about?

21        A     One of the two.  I think she

22   volunteered.  She was very kind at the time and

23   seemed to want to be helpful.  Ultimately I

24   found out it was not a good idea to have her do

25   it, and we switched to somebody else.  Now we



1   got some other people doing it.  It is not

2   rocket science.  You just go in and try to

3   delete spam, profanity, pornography, clear

4   propaganda.  What appears to be an artificial

5   intelligence bot.

6              So it doesn't take a computer

7   background to be able to monitor the Telegram

8   channel.  But it takes time, and the people give

9   it to me willingly; and I am incredibly thankful

10  for what they do.

11      Q    So the response channel posts come from

12  people -- from outsiders or from you?

13      A    So I post on my main channel.

14      Q    Right.

15      A    Elizabeth set up the reply channel.

16      Q    You mean Margaret?

17      A    Margaret -- no, Elizabeth.

18           MR. HARRISON:  The name you gave

19      earlier was Margaret.

20           THE WITNESS:  I messed that up.

21      It was Elizabeth.

22           MR. HARRISON:  No problem.

23           THE WITNESS:  When I put something

24      on my main channel, she would send it

25      to the reply channel that she had set



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                  183

1         up.  When I stopped using her I just

2         started posting it and sending it to

3         the reply channel myself; and then the

4         monitors monitor what is posted on

5         there by the third parties or

6         artificial intelligence or bots or

7         whoever, a lot of spam.

8    BY MR. BEAL:

9         Q    Hold on one second.

10             Is there a reason why you didn't just

11    have the responses posted to the main channel?

12        A    Because then it would -- when I first

13    set up the main channel it was set up for

14    responses to be made there; and then I quickly

15    realized that Telegram, because they sent things

16    in, you have got pornography or something on

17    your channel, and either monitor it or get it

18    off or you are going to lose your channel.

19        Q    I got you.

20        A    I didn't buy into -- some people just

21    post and don't allow replies.

22        Q    I see.  That is what you were

23    explaining before?

24        A    I haven't done that.  And there are so

25    many people, legitimate people that follow me, a



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              184

1    lot of people all over the world, because I talk
2    about God a lot.
3           And so I wanted to keep their ability
4    to reply and to have a chat channel which I
5    added, so they could have conversations with
6    each other, and that is monitored now by a group
7    of very nice people.
8    Q    On paragraphs 103 and 4?
9    A    Okay.
10   Q    There were denials for both of those
11   paragraphs.
12          What was the basis of those denials?
13   A    I will do the best I can; but I think
14   it is unfair to continually ask me the basis
15   when the Answer was prepared in conjunction with
16   my lawyer who prepared the Answer.  So he may
17   have made a decision for reasons I don't really
18   know about.
19          So what were the numbers again.
20   Q    103 and 104?
21   A    I imagine in 103 would be denied
22   because I did not -- I stated my opinion.  I
23   really don't know.
24          I could confer with Counsel and try to
25   answer it, but then you will be getting my



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                    185

1    attorney's advice.  I didn't prepare the Answer.
2    I did it in conjunction with Chris.
3         But I do know that I did make the
4    statement repeatedly and not that many times,
5    but I made it enough to put my position in a
6    Court of public opinion that in my belief they
7    had extorted me and attempted to extort me and
8    that I believed 100 percent that I am right.
9        Q    Thank you.
10       A    There is not a doubt in my mind.
11       Q    In paragraph 104 you did say that you
12   were considering whether to pursue criminal
13   action against the Plaintiffs?
14       A    I would have to look at the posts where
15   that came from.
16       Q    We can do that in just a minute.
17       A    I mean I thought about it, but I just
18   thought wait a minute, this foolishness has got
19   to end at some point in time.  So I just didn't
20   want to take another step further.  I would like
21   to get this -- I would like to have this
22   resolved in some way with these people, so they
23   can go about their lives, I can go about mine;
24   the same thing I tried to do in March 17 of
25   2020.



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              186

1     Q     But you believed that you have the
2    right to pursue criminal action against the
3    Plaintiffs?
4     A     I could go -- yeah, I believe under the
5    facts that I could go out and sign a warrant for
6    having them try to criminally extort me, but
7    what is that going to do?
8     Q     So in paragraph 105 on the next page
9    you refer to the filing a grievance against the
10   Plaintiffs with the State Bar of Georgia.
11          Did you in fact file a grievance or
12   complaint with the State Bar of Georgia against
13   any of the Plaintiffs regarding your belief --
14   regarding extortion?
15    A     I believe so.
16    Q     What was Nicole Wade doing during all
17   of this dispute where you believe leading up to
18   March 17th on Taylor and Johnathan were
19   contacting your children improperly --
20    A     I said they were talking with them.  I
21   don't know who initiated the contacts.
22    Q     But was Nicole a part of any of that in
23   your belief?
24    A     My recollection, and I have a very
25   vivid recollection of having Johnathan and



1    Taylor in my office standing; and Nicole was

2    sitting in the chair and this was after all this

3    bizarre change of treatment of me that started

4    late October and was full blown in November.

5    And I remember looking at them at some point and

6    I said I ought to sue every damn one of you for

7    defamation for running around and running your

8    mouth and making an accusation about my mental

9    health.  And Nicole quickly said I have never

10   said that.  And I said to her right, you are too

11   smart to have done that.  These two people are

12   not.

13        Q    So --

14        A    I also remember, and I think I sent

15   it -- Nicole sent me and -- I think it -- I have

16   to go back and look, but I believe that it was

17   right around -- well, it was January for sure

18   and it could have been very early February, and

19   she said I just found out about the problems you

20   are having with your family.  I know -- because

21   she knows how much I love my children and they

22   love me -- I said I know that tears you apart.

23   It did.  It still does.

24             And then she said words to the effect,

25   that I still love you or I will always love you



1    no matter what happens in terms of how we

2    practice law in the future; and I believed her.

3    And I said today I believe her now.  I think

4    Nicole Wade does love me.  Her love for me over

5    the years is legitimate as is mine for her.  I

6    think Johnathan loves me.  I think Taylor loves

7    me.  I love them.

8            But she was not in the middle of what

9    was going on in December.  I don't remember if

10   it was because she wasn't there.  I don't

11   recall.

12           But she was not one of the people who

13   was being so abusive to me and contradicting me

14   and acting like I did not know what I was doing

15   in preparation for the Musk trial.  So her

16   involvement in that was much different than

17   Johnathan and Taylor's.

18       Q    Okay.  So my question to you is about

19   Nicole Wade in this time period leading up to

20   the March 17th Settlement Agreement, do you

21   believe that she extorted you as well?  Or was

22   it just Johnathan and Taylor?

23       A    I think they all three did.  You were

24   asking me about the children.

25       Q    Yes.



1      A      They all three were trying to get money

2   they did not have the right to.  They did not

3   get an agreement.  That is as much their fault

4   as it would have been mine.

5           And then after the case settled and

6   they knew the amount, then they wanted to go

7   back and get the same amount that I had agreed

8   to give them in the Ramsey case, and after the

9   way they had treated me and looking at the work

10   done related to the result and how it came

11   about, the case didn't settle because of them,

12   it settled because of the argument that I made

13   to the Judge when he reversed himself and

14   reinstated part of the case.  I didn't feel like

15   looking at that that was at all fair for them to

16   get that much money, but I agreed to it.  I

17   wanted to move on.  March the 17th.

18           MR. BEAL:  Is this is a good place

19       for a break for five minutes?

20           MR. HARRISON:  Sure.

21           (Whereupon, a short break was

22           taken.)

23           MR. BEAL:  Did you have a

24       statement your client wanted to make?

25           THE WITNESS:  You asked me, Drew,



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              190

```
1        about paragraph 79 and 80 of the
2        Complaint and why I denied them.
3               MR. BEAL:  Okay.
4               THE WITNESS:  I was struggling to
5        figure out looking at it.  Now I know.
6        79 says that I had a certain amount of
7        followers while defaming Plaintiffs.  I
8        did not defame them.
9    BY MR. BEAL:
10       Q    Okay.
11       A    80 has the same problem, but it dropped
12   in number connected to 79, which suggested that
13   I was defaming them; and I don't believe I
14   defamed them.  I believe my statements were
15   protected and substantially true.
16               Thank you.
17               MR. HARRISON:  Thank you, Drew.
18               MR. BEAL:  Thank you.
19                   (Whereupon, Plaintiff's Exhibit
20                   Number 18 was marked for
21                   identification.)
22                   (Whereupon, Plaintiff's Exhibit
23                   Number 19 was marked for
24                   identification.)
25   BY MR. BEAL:
```

 **COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100       www.coastalcourt.com

1        Q     Let me hand you what has been marked as

2   Exhibits 18 and 19, and unfortunately I only

3   have a copy of the 19.  18 is our

4   Interrogatories, First Set of Interrogatories,

5   and 19 is the Response.

6             And I direct your attention, and I will

7   read it into the record so you don't need it,

8   Chris.  Question number 9 on page 7,

9   Interrogatory Number 9 says:  Please identify

10  each and every act done by you or on your behalf

11  to investigate whether the Plaintiffs or any of

12  them had committed the crime of extortion,

13  attempted extortion or blackmail.

14            Now, directing your attention to 19 on

15  page 3, paragraph 9, you responded.

16            MR. HARRISON:  These are Amended

17     Responses, right?

18            MR. BEAL:  Yes.

19            MR. HARRISON:  Okay.

20            THE WITNESS:  Okay.

21  BY MR. BEAL:

22        Q     And you state that you had your

23  computer inspected by Tyler Jones in February of

24  2020, is that correct?

25        A     Yes.



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          192

1        Q     And does he work for Carmichael?
2        A     Yes.
3               (Whereupon, Plaintiff's Exhibit
4               Number 20 was marked for
5               identification.)
6    BY MR. BEAL:
7        Q     And let me hand you Exhibit 20, and is
8    that an invoice that he generated for his
9    computer search of your computer?  That didn't
10   come out right, but you know what I meant.
11              MR. HARRISON:  Is it three pages?
12              MR. BEAL:  Yes.
13              MR. HARRISON:  Let me look through
14       that.
15              THE WITNESS:  Okay.
16   BY MR. BEAL:
17       Q     And did Tyler Jones ever tell you that
18   he found on -- some Malware or some evidence of
19   computer hacking?
20       A     He didn't tell me Malware.  But he told
21   me that I had been hacked.  And the way the
22   question was asked me was whether I had done
23   anything to investigate whether they, the
24   Plaintiffs might have been involved.  And
25   because I was looking at who if I could find had



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

1   my computer been hacked, the answer was yes.  So

2   I was doing an investigation.  But I wanted to

3   make sure that that was part of it; and that

4   investigation may have revealed that they had

5   involvement.

6        Q    Well, did it in fact reveal that the

7   Plaintiffs were somehow involved in tampering

8   with your computer or computer systems?

9        A    I didn't reach that.  I didn't take

10  that next step.  Once I had documented that it

11  had been hacked, that is what I wanted to

12  document.

13       Q    So you never asked Mr. Jones to try to

14  determine where the hack came from?

15       A    I only asked him to determine whether

16  it had been hacked.  In the process of

17  determining that he was able to find out how and

18  who hacked it, great.  My goal was at that time

19  was to take what I had happen on the computer,

20  let him do his examination and he determined

21  that the computer had been hacked; and that was

22  on or around the time frame of February 17th.

23       Q    And it is your testimony that you hired

24  this Carmichael Company, Tyler Jones, to

25  investigate your computer network; and he



1    determined that you had in fact been hacked?

2         A    Yes.  And Tyler was our computer

3    expert, or he was doing our IT work for L. Lin

4    Wood, P.C.  He had done some things in terms of

5    Johnathan's computer earlier.

6         Q    I apologize if we are re-plowing some

7    ground we have been over, but this will save us

8    a lot of time rather than use any exhibits.

9              I believe you testified to this, but

10   let us just make it abundantly clear, in the

11   case of Carbone versus Lindsey you had no

12   agreement with them at any time that you can

13   remember about client consent to fee sharing

14   with all the Plaintiffs here?

15        A    I can't remember exactly what I told

16   you in response to what question; but I do

17   believe that there was no agreement that

18   referenced these, Nicole, Johnathan, and Taylor.

19        Q    Okay.

20        A    There may have been in those agreements

21   a statement that I could divide -- that they

22   agreed that I had the authority to divide the

23   fee any way I wanted to, and they would agree to

24   it.

25        Q    When you received the Sandmann --



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

1      A      But I would have to look at the
2  agreement, but I think that may have been it.  I
3  think it was in both of those.
4      Q      When you received the --
5      A      Sandmann?
6      Q      Well, we saw the Carbone agreement, and
7  there was no reference to them.
8      A      I don't have it.
9             You are talking about the Settlement
10 Statement.
11     Q      Yes.
12     A      I am talking about the engagement
13 agreement.
14     Q      Oh, okay, thank you.
15            When you received the Sandmann versus
16 CNN fees from Mr. McMurtry's escrow account, and
17 I assume that is how it got to you, was because
18 it went through his escrow account first and
19 came to you, is that correct?
20     A      Oh yeah, he closed it.
21     Q      Yes.
22     A      Once the probate judge's hearing was
23 postponed, I did not have any contact with Todd
24 until after the money was received and he
25 disbursed it, except for him to tell me that



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                    196

1    they had, he and CNN had agreed to wait until
2    Nicholas turned 18.  So that Nicholas could then
3    sign without having to go through a probate, and
4    which would also have had to have been approved
5    by the federal judge I take it from what Todd
6    told me that CNN was willing to wait, so it
7    would lessen the chance of there being any
8    breach of the confidentiality.  But Todd handled
9    all of that.  I did not do anything at all.
10        Q    And when you received your portion of
11    those fees, where did you deposit that check?
12        A    I would have to go look.  Either in my
13    personal account or --
14                (Whereupon, a short pause was
15                taken.)
16   BY MR. BEAL:
17        Q    So my question was where did that money
18    from Todd McMurtry get deposited and you said?
19        A    I haven't looked at that, but it would
20    either have been into my escrow account or into
21    my operating account, PC's account; or the only
22    other option would be for it to be deposited
23    directly to my account personally.
24        Q    To your personal account.  So one of
25    those three accounts?



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                    197

1        A    (Nods.)

2        Q    Would it be fair to say that there is

3   no money remaining in your escrow account from

4   this Sandmann versus CNN fees?

5        A    There is no money in either of my

6   accounts.  The law firm is defunct due to this

7   litigation and the State Bar.

8        Q    So all fees --

9        A    In other words, we are broke, I thought

10  about filing bankruptcy, but I hope I can avoid

11  it.

12       Q    So all fees in the CNN versus Sandmann

13  have been taken or paid to you individually

14  ultimately?

15       A    I have to go back and look and see how

16  it was paid out.

17       Q    Okay.

18       A    It may have been paid out of my PC for

19  other things that the PC -- I don't know.

20       Q    Okay.

21       A    So you got to keep in mind there is a

22  difference between my PC and me.  That is why it

23  is only my PC that agreed to split the fee, not

24  me.

25       Q    So some amount may have been paid over



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100       www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          198

1    to the PC to reimburse it for cost advances?

2         A     You are asking me to guess and I don't

3    know.

4         Q     But I believe you testified that you

5    know that no money remains in your escrow

6    account on these fees and that that account is

7    empty?

8         A     I think that is -- if there may be some

9    amount in there to keep it open, but I don't

10   think so.  I don't know.

11        Q     Okay.

12        A     There is no Sandmann money.  That

13   Sandmann money, whatever my share was that has

14   long been spent on attorneys' fees, litigating

15   all of these things that came out of this

16   lawsuit.

17              So I didn't make any money on the deal.

18        Q     Let us go back to the Complaint, which

19   I believe is Exhibit 14.

20        A     Okay.

21        Q     Exhibit 14, let us turn over to page

22   25, which is paragraph 88.

23        A     Okay.  Is there a page number?

24        Q     Yes.  Page 45, paragraph 88, the first

25   post.

 **COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                      199

1        A     Okay.

2        Q     And it is if you look at the sort of

3    faint markings on the bottom, it is May 19,

4    2021.

5        A     Correct.

6        Q     As of May 19, 2021, what was your

7    understanding of the elements of the crime of

8    extortion?

9        A     You have asked me that before, I have

10   told you.

11            MR. HARRISON:  Object to the form.

12            THE WITNESS:  It is as simple as

13       what is extortion.  You can look that

14       up.  You know what extortion is.  I

15       have given you my best explanation.

16       And I don't know that there are

17       elements of such.  It is just an

18       overall effort of someone to coerce

19       someone wrongfully into paying

20       something or doing something that they

21       are not obligated to pay or do.

22            And if you look at this, I didn't

23       mention their names.  I gave a

24       hypothetical and said does that sound

25       like criminal extortion to you?



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                           200

1        Soliciting opinions.

2    BY MR. BEAL:

3        Q    Did you really think --

4        A    No, no --

5        Q    I am on my best behavior.

6        A    Listen, I was talking about Johnathan,

7    Taylor, and Nicole because I wanted to make sure

8    that the facts upon which my opinion was based

9    were stated.  That gives it complete protection

10   under Milkevich vs. Lorraine Jones.

11       Q    Let us turn over to page 27, sorry --

12   27, there is an insert of my Email to Chris

13   Marquardt and Joey Burby of Alston & Byrd; and I

14   am going to have my Melinda who has the best

15   eyes to read it into the record because it is --

16       A    Hold on.  I was just looking for the

17   date of the Email.

18            Okay, I see it, the 28th.

19            MS. BROWN:  I think it is the 26th

20       at 9:10 p.m.

21            THE WITNESS:  I think it is

22       legible to save you the time of reading

23       it.

24            MR. BEAL:  Okay.

25   BY MR. BEAL:



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              201

1        Q    So this is Plaintiff's Demand sent by
2   Email by me to Chris and Joey that you contend
3   is another act of extortion, is that correct?
4        A    Well, it is part of a scheme to extort.
5        Q    Okay.  And in that demand I have set
6   forth a demand of $1.25 million, is that
7   correct?
8        A    That was part of it.  In that
9   particular, yes, you also demanded I pay their
10  share of the office lease, which would have
11  taken the demand in excess of $1.5 million.
12       Q    And that involved a buyout of all of
13  the cases that are referenced in the March 17th
14  Settlement Agreement, is that correct?
15       A    No.  Those cases had been decided in
16  the March 17th agreement.  The amounts were set
17  forth.  This was sent to me on the 26th of
18  August.  And I was told here is our proposal.
19  And I was told on the 26th at 9:10 p.m. that if
20  I didn't agree with this that the offer only
21  remained open until the next afternoon at
22  5:00 o'clock p.m.
23       Q    Okay.  So my question is --
24       A    9:10 p.m., do it by 5:00 o'clock the
25  next day or we are going to sue you.  It is



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                    202

1    extortion.

2        Q    The question is about the cases that

3    are included in the 1.25 million.  It is all

4    those cases that are referenced in the

5    March 17th Settlement Agreement, right?

6        A    I don't think so because as I recall

7    there is other documents where there was some 2

8    or $300,000, I don't remember the amount, to pay

9    for other cases.  There were no other cases.

10       Q    Well, I am going to get to that.

11       A    There was an NBC case, but I got fired.

12   So I didn't have anything to do with that.

13       Q    But it did include the payout of their

14   share of CNN -- Sandmann versus CNN, is that

15   correct?

16       A    Well, with all due respect, it is hard

17   to understand what you are asking for.

18            There was litigation pending on the

19   March 17th agreement.

20       Q    Yes.

21       A    And now you are making a demand within

22   less than literally 24 hours that I pay

23   1.25 million, plus the lease, another 285, to

24   buy out what was in litigation that was

25   liquidated at 648,000.  It made no sense.  It



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              203

1     was extortion in my opinion.

2         Q    So first of all, the litigation got

3     filed after this was sent, right?  So there

4     wasn't pending litigation?  There was a threat

5     of litigation?

6         A    There was pending litigation that --

7     there was not pending litigation.  There was the

8     March 17th agreement.

9         Q    Okay.

10        A    And what came along with this was this

11    obscene Complaint that was doing nothing but

12    talking about me personally on irrelevant issues

13    to smear me, to say I thought I was God, to say

14    that I had problems with my children.

15             MR. BEAL:  I will object.

16             THE WITNESS:  The whole thing was

17        extortion in my opinion.

18    BY MR. BEAL:

19        Q    My question to you is what cases are

20    covered in this Demand?  It references all the

21    cases in the March 17th agreement, as well as

22    other things.

23        A    I don't see that.

24             MR. BEAL:  Can you read that?

25             MS. BROWN:  Sure.  It says:  Your



1        client pays my clients 1.25 million

2        immediately in satisfaction of the

3        existing claims my clients intend to

4        file, in which you have reviewed, to

5        buy them out of the existing Settlement

6        Agreement, attorneys' fees for this

7        matter and claims for defamation and

8        breach of the non-disparagement based

9        upon today's events.

10               MR. BEAL:  That is good enough.

11               THE WITNESS:  I don't know what

12        cases.  I mean this was between you and

13        Chris and Joey.

14   BY MR. BEAL:

15        Q    Right, so --

16        A    I just saw the amount, plus the 285,

17   plus the inexplicable rush to say at

18   9:00 o'clock at night, agree to this by

19   5:00 o'clock tomorrow afternoon, or we are going

20   to file this slanderous, salacious, irrelevant,

21   redundant Complaint to smear you, Mr. Wood.

22   That was trying to force me to avoid the

23   smears --

24               MR. BEAL:  I object to this.

25               THE WITNESS:  You can object if



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                    205

1        you want to.
2                MR. BEAL:  This answer has nothing
3        to do with the question.  The question
4        is --
5                THE WITNESS:  I can't understand
6        the question candidly.
7    BY MR. BEAL:
8        Q    Can we identify the cases that are
9    referenced in the Settlement Agreement in
10   Exhibit 12?
11       A    Here is the problem.  Whatever they are
12   you knew.  This is your Email.  I can't get into
13   your mind.  Don't want to.  So you decide what
14   cases you were talking about.
15               MR. BEAL:  Show him Exhibit 12.
16               THE WITNESS:  I don't know how the
17       cases go from $648,000, which I think
18       you admit --
19   BY MR. BEAL:
20       Q    I am going to tell you.
21       A    You are going to testify?
22               MR. BEAL:  So there won't be much
23       question.
24               THE WITNESS:  Are you going to
25       testify or ask me questions?



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              206

1   BY MR. BEAL:

2       Q    So the cases that are referenced under

3   number 1, fee split for legal work involved

4   Carbone versus CNN, Lindsey versus Clear Zone,

5   Sandmann versus CNN, Grogan versus Aarons,

6   Cordoba et al. versus Direct TV La Liberte

7   versus Reid, is that correct?

8       A    Those were the cases that were the

9   subject matter of the March 17th Settlement

10  Agreement.

11      Q    Okay.  Then we look at paragraph B,

12  because those were the one's that had resolved

13  or were in the process of resolving -- whoops,

14  sorry -- paragraph D with respect to the pending

15  Sandmann versus Washington Post and Sandmann

16  versus CNN --

17      A    No, NBC.

18           MR. HARRISON:  NBCUniversal.

19           MR. BEAL:  Sorry.

20           THE WITNESS:  There is no real

21      difference.

22  BY MR. BEAL:

23      Q    Versus NBCUniversal.  L. Lin Wood, PC

24  shall pay to WGW and its members 10 percent of

25  L. Lin Wood, P.C. contractual portion of any



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          207

```
 1   contingency fee received by L. Lin Wood, PC in
 2   connection with those cases.
 3            So the demand related to all of these
 4   cases, plus the Sandmann versus Washington Post
 5   case?
 6       A    How did you come up with the figure?
 7   You didn't ask anybody what the Washington Post
 8   settled for.
 9       Q    Don't ask me questions.
10            It is a simple question?
11       A    Let me answer, and I have been patient
12   with you, Drew, this makes no sense to me, I
13   have told you that I don't know what you are
14   talking about.
15       Q    Okay.
16       A    Claims for defamation August of 2020.
17       Q    Okay.
18       A    That would have been I guess referring
19   to what I said to Dexter King and to co-Counsel
20   in the class action case, those were not viable
21   claims of defamation because they were made with
22   privilege.  And you published them in your own
23   lawsuit.
24            MR. BEAL:  I am going to object.
25       Now this is the same speech we have
```



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100       www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                        208

```
 1        heard.  It is a simple question.
 2             THE WITNESS:  I have been patient
 3        with you and I don't understand you
 4        getting to try to get me to figure out
 5        what your Email means.
 6   BY MR. BEAL:
 7        Q    I am trying to get you to identify what
 8   cases are referred to in the Settlement
 9   Agreement?
10        A    I have told you that.  It is right here
11   in writing.  Why are we taking time to tell you
12   what is right in front of you.
13        Q    Okay.  So it is all of those fees.  It
14   does refer to claims as set forth in the
15   attached Complaint?
16        A    And I don't have that here, but there
17   claims -- there were no claims for defamation
18   made in that Complaint.
19        Q    That is correct.  Was there a claim for
20   fraud in that Complaint?
21        A    In that Complaint?
22        Q    Yes.
23        A    There was a claim for fraud in the
24   inducement which has been released.  It was a
25   frivolous claim.
```



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          209

1        Q     And then there was a claim for breach
2   of contract, is that right?
3        A     Absolutely because you didn't get the
4   client to consent.
5        Q     And then there was a claim for a breach
6   of the non-disparagement agreement, is that
7   correct?
8        A     I don't recall that being in there.
9              I am not saying it is not.
10       Q     I am not trying to trick you.  It was
11  the third count?
12       A     Was it based on the press release?  The
13  press release was done after the lawsuit was
14  filed.  I don't know what you are referring to
15  about breach of non-disparagement based upon
16  today's events.  I don't know what you are
17  talking about.  But I guess you are talking
18  about disparagement that occurred sometime
19  before August 26th of 2020 at 9:10 p.m.  I don't
20  know what you are talking about.
21             MR. BEAL:  Excuse me.
22             (Whereupon, an off-the-record
23             discussion was held.)
24             MR. BEAL:  Let us take five and
25   see if we can wrap up the rest of this.



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          210

```
 1              MR. HARRISON:  Okay.
 2              MR. BEAL:  And we may be able to
 3     do that.
 4                   (Whereupon, a short break was
 5                   taken.)
 6   BY MR. BEAL:
 7        Q    Mr. Wood, a few follow-up questions and
 8   we will be all done.
 9        A    Is that a promise or a threat?
10        Q    That is a promise.  So looking at the
11   August 26th Demand there was no Ad Damnum in the
12   Fulton County lawsuit, is that correct?
13        A    I don't have the lawsuit.
14        Q    So you don't remember one way or the
15   other?
16        A    I don't remember what the Ad Damnum
17   was.  I am not even sure how closely I read it
18   when I got it, because when I saw it it was for
19   fraud inducement.
20        Q    Since this demand settled all claims
21   under the March 17th Settlement Agreement --
22        A    Which Demand?
23        Q    This Demand that we are looking at here
24   on page 28 of the Complaint sent on August 26th.
25        A    I am not sure I understand you.  All
```



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100       www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                             211

1    the claim were settled on March 17th.

2         Q    So the Demand that was sent to you on

3    August 26th states that it will be a settlement

4    or a buyout of -- buy them out of the existing

5    Settlement Agreement.

6              So this Demand on August 26th settled

7    all the fee split of cases referenced in the

8    Settlement Agreement?

9         A    Did you ask me is that my

10   understanding?

11        Q    Yes, is that the what the first two

12   sentences state?

13        A    It makes no sense.  We settled

14   everything on March 17th, and now you are coming

15   back and giving me less than 24 hours to --

16              MR. BEAL:  I am going to object.

17        I need a yes or no answer.

18              THE WITNESS:  It is not capable of

19        a yes or no answer.

20              MR. HARRISON:  Drew, I --

21   BY MR. BEAL:

22        Q    Let me phrase it again.  This

23   Settlement Demand of August 26th references a

24   settlement of all of the fee splits that are

25   contained in the Settlement Agreement, as well

 **COASTAL COURT REPORTING & VIDEO SERVICES**
                        800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              212

```
 1    as other issues?
 2         A    You said for the breach of the
 3    Settlement Agreement --
 4              MR. HARRISON:  Hang on.  It is not
 5         a question.  You are making a
 6         statement.
 7    BY MR. BEAL:
 8         Q    Is that true or false?
 9              MR. HARRISON:  There you go.
10              THE WITNESS:  What is the
11         question?
12    BY MR. BEAL:
13         Q    The Demand sent from my office on
14    August 26, 2020 to your attorneys at Alston &
15    Byrd is among other things a settlement of all
16    of the fee splits contained in the March 17th
17    Settlement Agreement.
18         A    Are you telling me that?  Because I
19    don't know that.
20              Here is what I know, this Demand is
21    extortion.  You want me to pay you this money
22    and then you are suing me for breach of
23    contract.  And then you are suing me for breach
24    of contract.
25         Q    So can you can you say yes or no to the
```



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          213

1    question?
2        A    I am telling you it is not capable of a
3    yes or no answer.  But the bottom line is --
4            MR. BEAL:  Object to the form as
5        nonresponsive.
6            THE WITNESS:  Let me put it to you
7        quickly.
8            MR. BEAL:  Do you understand my
9        question?
10           THE WITNESS:  This letter was
11       extortion.  That is what I will tell
12       you.
13           MR. HARRISON:  Can I respond?
14           MR. BEAL:  Yeah.
15           MR. HARRISON:  You are not asking
16       a question.  You made a statement a
17       couple of times, and also you are still
18       not allowing him to finish.
19           I understand your position, but if
20       you are going to go object to the
21       responsiveness or you are going to move
22       to strike, the proper way to handle
23       that is to let the witness finish and
24       then to make your objection.  You
25       haven't done it all day long.  You have



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                    214

1          done it over him.
2                  So Lin, if you can answer it with
3          a yes or no, do so.
4                  THE WITNESS:  I think I have the
5          right to explain it.
6                  MR. HARRISON:  If you can answer
7          yes and no and then explain it, do so.
8                  THE WITNESS:  That is fine to do.
9     BY MR. BEAL:
10         Q    As of August 28, 2020 in Nicholas
11    Sandmann versus Washington Post case had not
12    settled, is that correct?
13         A    Are you talking about the 26th or the
14    28th?
15                 MR. BEAL:  Jus read back the
16         question, will you, please?
17                     (Whereupon, the record
18                      was read back as requested.)
19                 MR. HARRISON:  Sorry, did you mean
20         August 26th because that is the date of
21         the Demand?
22                 MR. BEAL:  (Nods).
23                 MR. HARRISON:  Okay.
24                 Lin, do you understand?
25                 THE WITNESS:  I believe that it



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          215

1       had settled because I was always
2       mystified why you and Drew had never
3       asked anybody what it settled for.
4       Because your clients were entitled
5       under the March 17th agreement to
6       10 percent.
7             So how are you making a demand on
8       Washington Post without knowing what
9       your clients had agreed to and were
10      entitled to in the March 17th
11      agreement?  It makes no sense to me.
12      That is why I think this is just
13      another element of extortion.
14   BY MR. BEAL:
15      Q    And had you ever told your clients that
16    the Sandmann versus Washington Post case was as
17    good as or better than the Sandmann versus CNN
18    case?
19            MR. HARRISON:  Object to the form.
20            THE WITNESS:  You are talking
21      about the Sandmann's?  You want me to
22      tell you what I told the Sandmann's?
23            MR. BEAL:  Can you read the
24      question back.
25                 (Whereupon, the record



1          was read back as requested.)

2          THE WITNESS:  Number 1, I am not

3    going to tell you what I told my

4    clients, because that is

5    attorney-client privileged information.

6          But I will try to help you by

7    giving you my own analysis that was in

8    my mind at the time.  I viewed the

9    Nicholas Sandmann cases, seven cases I

10   believe, I viewed them as in effect one

11   whole.  So that I was looking more

12   towards what potentially he might get

13   from each case in terms of how that

14   total amount would compensate him for

15   the damage done, because it was

16   essentially the same defamation against

17   him in each case.

18         So it is not a new defamation, it

19   is just another pocket, when one of

20   them does the same thing another one

21   did.  So clearly the Washington Post

22   case had some serious problems, because

23   the Judge dismissed it, and that was

24   after CNN had settled.  He dismissed

25   the case and then I was able to



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              217

1          convince him to reverse himself and to
2          leave in for litigation one aspect of
3          the claim of defamation.
4               So I can only tell you that I was
5          looking at it as an entirety.  Not one
6          case is better than the other.  So I am
7          not going to tell you what I told my
8          clients, what I am going to tell you,
9          and I don't know what Todd told them,
10         and I could be wrong about when the
11         Washington Post case settled; but I
12         think it was before the 26th because I
13         remember that I was surprised as we got
14         to -- when I found out he didn't
15         consent that no one had ever asked
16         between March the 17th and that date
17         what happened to the Washington Post
18         case.  I don't know if you asked Joey
19         and them or not, because they were
20         representing them.
21    BY MR. BEAL:
22         Q    And did you ever tell the Plaintiffs
23    that you felt that the Washington Post case had
24    significant value, approximately equal to the
25    Sandmann versus CNN case?



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          218

1       A    I can't remember the specific statement
2    to that effect, but it wouldn't surprise me that
3    somewhere along the way when they were working
4    with me that I could have said we ought to maybe
5    do as well in Washington Post as we did in CNN;
6    but that is just an opinion and that changed.
7    It changed based on what the offer was and what
8    the clients were willing to take, and what Todd
9    wanted to do it with it.  I am not going to tell
10   you the amount, but I am going to tell you that
11   it was significantly less than CNN.
12   BY MR. BEAL:
13      Q    So the Plaintiffs' 10 percent of that
14   amount based on what you had told them earlier
15   in the case, that one fee amount could have
16   equaled over a million dollars?
17      A    No.
18      Q    Unlikely?
19      A    Unlikely.
20      Q    Okay.
21      A    I mean what you did was you pulled a
22   number out of the air, without asking what it
23   had settled for; and then you wanted to come
24   back and re-settle what had already been settled
25   and have me make demands to pay things that had



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          219

1  already been settled that were the obligation of
2  Johnathan and Nicole; or you were going to file
3  a heinously, slanderous smear Complaint against
4  me.  I look at that in the totality.  That in my
5  opinion is extortion.
6       Q    Let us turn over to page 29, and in the
7  post there on -- you said:  Yesterday I posted
8  the Email below and suggested that in my opinion
9  this Demand by Atlanta lawyer Andy Beal of
10 Buckley Beal and Atlanta lawyers Nicole Wade,
11 Johnathan Grunberg and Taylor Wilson of Wade,
12 Grunberg & Wilson, LLC constituted an attempt to
13 extort me.  I know some other lawyers who agree
14 with my opinion.
15           Who are those other lawyers?
16      A    I don't know who I talked to about it.
17 I know that the statement that I issued after
18 you all went out and filed this thing, couldn't
19 wait to file, and it went international.  You
20 took the statements I had made in private about
21 extortion and you blew it up around the world.
22 You created your own damage if you got damaged
23 at all; but I know that I had discussed it with
24 some lawyers.
25      Q    And do you remember who any of them

 **COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

1    were?

2         A    You know, I don't.  It is kind of like

3    when we were taking Elon Musk's deposition, and

4    he called me a shake down lawyer.  That is a

5    phrase people use.  You are extorting me.  That

6    lawyer is trying to extort me.

7              So I know that I included in this press

8    release, which Alston & Byrd assisted in the

9    preparation of and edited, I specifically

10   included a statement that I was not going to be

11   extorted by this litigation.  Nobody sued me for

12   extortion.  In fact, I had every reason to

13   believe that you all had the good sense not to,

14   because it was protected opinion.  And then you

15   only did it whenever you filed the liable case

16   at the same time law 65 came out.

17             MR. BEAL:  Let me object.

18   BY MR. BEAL:

19        Q    The question was quite simply who were

20   the other lawyers?

21        A    65 Project, excuse me.  You know all

22   about it.

23        Q    The question was who are the other

24   lawyers, and you are saying you don't remember?

25        A    I would be trying to reconstruct who I



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              221

1     talked with at the time.

2           Q     Okay.

3           A     And I know that others, whether it was

4     one or two, I know I talked with them, but not

5     to retain them, the people I knew had law

6     degrees; and I told them what was happening to

7     me and there was a consensus yes, that is

8     extortion.

9                 Extortion in the sense that if you go

10    to anybody and start talking about these kinds

11    of demands, it is always somebody saying I have

12    had lawyers that are trying to extort you.

13                MR. BEAL:  I am going to object as

14          nonresponsive.

15                THE WITNESS:  So the answer to

16          your the question I know what I did

17          with Chris and Joey, that is two

18          lawyers who helped me do that

19          statement.

20                I don't remember the names of any

21          others.  I didn't go out and seek an

22          official opinion, if that helps.

23    BY MR. BEAL:

24          Q     Okay, thank you.

25                And Chris and Joey never told you that



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                      222

1    any of these acts constituted extortion, but
2    they reviewed a press release that you
3    published, that you drafted, which used the word
4    extortion and they did not edit it out, is that
5    a fair summary of your testimony?
6         A    You said I prepared it.  They helped
7    prepare it.
8         Q    Okay.
9         A    They edited it and reviewed it and made
10   suggestions.
11        Q    Did they come up with the word
12   "extortion" or did you?
13        A    I believe it was in mine, but I know
14   there are several red lines back and forth, and
15   if it was mine I felt like if they thought it
16   was a red flag they would have told me nobody
17   thought it was a red flag they would have told
18   me.  Nobody thought it was a red flag.
19             You didn't even think it was a red flag
20   until you decided to sue me a second time.
21        Q    Did Chris or Joey ever give you a
22   summary of the law of extortion?
23        A    No.
24        Q    Okay.  On --
25        A    Extortion is extortion.  You don't need



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          223

1    summaries of law.  If you have the opinion you
2    are being extorted and somebody trying to get
3    you to give you money or get you to do something
4    or you are threatening to hurt them with their
5    family or hurt them with their clients, or hurt
6    them in their dealings with the President of
7    United States, you don't need a memo about
8    extortion if you have any common sense.
9        Q    Okay.  So a memo summarizing the law in
10   this area wouldn't have helped you?
11            MR. HARRISON:  Object to the form.
12            THE WITNESS:  It wouldn't have
13       changed my bona fide, good-faith
14       opinion; and I have told you why a
15       zillion times today.  You know, I don't
16       want to distort it.
17            I have told you plenty of times
18       why I believed it was extortion, and I
19       think I am right.
20            MR. BEAL:  Off the record for one
21       minute.
22                (Whereupon, an off-the-record
23                discussion was held.)
24   BY MR. BEAL:
25       Q    A couple of follow-up questions, you


**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              224

1   were terminated in the Sandmann versus CNN -- in

2   the Sandmann representation months after you

3   entered into the Settlement Agreement, is that

4   correct?

5        A    Of March 17th?

6        Q    Yes.

7        A    Yes, I believe that it was in February

8   of 2021 when I was told that I was fired.

9        Q    Okay.

10       A    And I still at that time had five

11   pending cases; and I made clear it was an honor

12   and a privilege to represent him.

13            I said that I am sure Todd would do a

14   great job representing him.

15       Q    Okay.

16       A    And I wished him good luck.

17       Q    Thank you.

18            Did Alston & Byrd ever tell you that

19   client consent may not be required in the

20   Sandmann versus CNN fee sharing?

21       A    No.  They told me exactly what they

22   told you in their letter to you of July 24th, I

23   believe, 2020.

24       Q    Did they ever --

25       A    I didn't have anything to do with it.



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          225

1   Did Todd handle the settlement?  I asked the boy
2   to consent to it, and he didn't.  He asked for
3   documentation and then they wrote you the
4   letter.
5        Q    Okay.  Did Alston & Byrd, this is a
6   very similar question, just yes or no, did
7   Alston & Byrd ever tell you that there were some
8   limitations on the application of Rule 1.5 E
9   regarding division of fees between firms?
10       A    They never told me -- they never sent
11  me any information, other than they gave me
12  their opinion based on all the information that
13  I provided them about the history of the law
14  firm and what had happened.  They told me that
15  client consent was necessary; and if I did pay
16  it without client consent I would be in
17  violation of the ethical rules and I have never
18  violated an ethical rule in my life.
19       Q    Have you ever made a claim against
20  Alston & Byrd for legal malpractice related to
21  their representation of you in this matter?
22       A    I don't know whether there was a formal
23  letter on it.  I don't think so.  But it has
24  been, and I am sure they are aware of it, and if
25  they gave me the wrong advice and I am liable



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                    226

1    for this money, I acted on their advice and I
2    certainly would expect them to be responsible to
3    indemnify me.
4         Q    Did you ever have any of your attorneys
5    or you yourself write to anyone at Alston & Byrd
6    and set out those concerns or claims?
7         A    I don't recall that occurring.
8              Ibrahim Reyes has been involved, and I
9    know we brought to the attention of Judge Brown,
10   and I think that is the judge in this case --
11             MR. HARRISON:   Uh-huh.
12             THE WITNESS:   -- the potential for
13        there to be a lawsuit against Alston &
14        Byrd with Chris and Julie also being
15        witnesses in this case, and I think he
16        said something that you might even be a
17        witness.  I wasn't there, so I am just
18        hearing it secondhand.
19             So it is not a secret.  But my
20        view right now I don't have the money,
21        I don't have the time.  I don't want to
22        waste my energy any more on litigation
23        than I have to.  I have got more
24        important things to do related to my
25        eternity.



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                    227

1    BY MR. BEAL:

2         Q    Okay.

3         A    So if it turns out that somebody says

4    that they were wrong and that client consent was

5    not necessary, then I would certainly expect

6    them to indemnify me, because I acted in

7    reliance on their advice; and they told you what

8    their advice was.  It was never Lin Wood.  It

9    was the lawyers telling Lin Wood if you pay it

10   without consent, you will violate the ethical

11   rules.

12             And I think you said send the

13   information, and I don't know whatever happened

14   to that.  I know there was some discussion and

15   Todd said he wasn't going to send it.  I don't

16   know why Todd would say that.  I haven't talked

17   to him in ages, except to wish him good luck.

18   BY MR. BEAL:

19        Q    So any claims that you made to Alston &

20   Byrd were made orally either by you or your

21   Counsel?

22        A    I don't think they were technically a

23   claim made on them.

24        Q    Okay.

25        A    But I think there were discussions, and



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                      228

1      I think there was a discussion with Judge Brown.
2        Q     And do you believe that any claims you
3      might have against Alston & Byrd would be
4      controlled by a statute of limitations?
5        A     Indemnification, the statute starts --
6      if they end up being wrong, and I am stuck with
7      some type of a judgment, then I believe the
8      statute runs on indemnification.
9        Q     So the statute of limitations on legal
10     malpractice would be tolled until such time as
11     you were damaged?
12             MR. HARRISON:  Object to the form.
13             You can answer.
14             THE WITNESS:  You are asking me a
15         question, I didn't do legal
16         malpractice.  I think I did a couple
17         things peripherally.
18             I think the legal malpractice
19         statute is four years.  Four years from
20         2021 would be 2024.  Now whether that
21         is tolled when you are seeking
22         indemnification, I don't know.
23         Hopefully we will have this all
24         resolved before then.
25     BY MR. BEAL:



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                        229

1      Q     That is all I have got.  Thank you very
2    much.  I appreciate it.
3      A     God bless you.
4            MR. HARRISON:  Okay.
5            THE WITNESS:  I will read and
6    sign.
7            MS. BROWN:  We just need an
8    electronic copy.
9            MR. HARRISON:  I will get it
10   expedited.  I need it by Friday.
11           I will get a copy of the video.
12               (RESERVED SIGNATURE.)
13               (Whereupon, the videotaped
14               deposition of L. Lin Wood
15               was concluded at
16               approximately 4:23 p.m.)
17
18
19
20
21
22
23
24
25

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                    230

```
 1              C E R T I F I C A T E

 2

 3   STATE OF SOUTH CAROLINA:

 4   BEAUFORT COUNTY:

 5

 6            I, Ceil Weser, CSR and Notary

 7   Public in and for the above county and state, do

 8   hereby certify that the foregoing testimony was

 9   taken before me at the time and place

10   herein before set forth; that the witness was by

11   me first duly sworn to testify to the truth, the

12   whole truth, and nothing but the truth, that

13   thereupon the foregoing testimony was later

14   reduced by computer transcription; and I certify

15   that this is a true and correct transcript of my

16   stenographic notes so taken.

17            I further certify that I am not of

18   counsel to either party, nor interested in the

19   event of this cause.

20

21              Ceil Weser

22              ------------------------

23              Ceil Weser, CCR

24              Notary Public

25              Beaufort, South Carolina
```

**CCR** **COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                    231

```
1                        ERRATA SHEET

2

3       CAPTION:   NICOLE JENNINGS WADE, et al.
                        vs. L. LIN WOOD
4

5

6          DECLARATION UNDER PENALTY OF PERJURY

7              I declare under penalty of perjury
           that I have read the entire transcript
8          of my Deposition taken in the
           above-captioned matter or the same
9          has been read to me and the same is
           true and accurate, save and except for
10         changes and/or corrections, if any, as
           indicated by me on the COASTAL COURT
11         REPORTING DEPOSITION ERRATA SHEET
           hereof, with the understanding that I
12         offer these changes as if still under
           oath. Signed on the _____ day of
13

14         _____, 2023.

15

16

17

18            _____
                   L. LIN WOOD (Deponent)

19

20      SWORN TO and subscribed before me
        THIS _____ day of _____, 2023
21

22

23      NOTARY PUBLIC: _____

24
        My commission Expires: _____
25
```

 **COASTAL COURT REPORTING & VIDEO SERVICES**
                       800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                    232

```
 1                     DEPOSITION ERRATA SHEET
         Reason for
 2       change:_____
         Page No._____Line No._____Change to:_____
 3       _____
         Reason for
 4       change:_____
         Page No._____Line No._____Change to:_____
 5       _____
         Reason for
 6       change:_____
         Page No._____Line No._____Change to:_____
 7       _____
         Reason for
 8       change:_____
         Page No._____Line No._____Change to:_____
 9       _____
         Reason for
10       change:_____
         Page No._____Line No._____Change to:_____
11       _____
         Reason for
12       change:_____
         Page No._____Line No._____Change to:_____
13       _____
         Reason for
14       change:_____
         Page No._____Line No._____Change to:_____
15       _____
         Reason for
16       change:_____
         Page No._____Line No._____Change to:_____
17       _____
         Reason for
18       change:_____
         Page No._____Line No._____Change to:_____
19       _____
         Reason for
20       change:_____
         Page No._____Line No._____Change to:_____
21       _____
         Reason for
22       change:_____
         Page No._____Line No._____Change to:_____
23       _____

24
         SIGNATURE:_____DATE:_____
25                 L. LIN WOOD
```



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          233

1                    DEPOSITION ERRATA SHEET
     Reason for
2    change:_____
     Page No._____Line No._____Change to:_____
3    _____
     Reason for
4    change:_____
     Page No._____Line No._____Change to:_____
5    _____
     Reason for
6    change:_____
     Page No._____Line No._____Change to:_____
7    _____
     Reason for
8    change:_____
     Page No._____Line No._____Change to:_____
9    _____
     Reason for
10   change:_____
     Page No._____Line No._____Change to:_____
11   _____
     Reason for
12   change:_____
     Page No._____Line No._____Change to:_____
13   _____
     Reason for
14   change:_____
     Page No._____Line No._____Change to:_____
15   _____
     Reason for
16   change:_____
     Page No._____Line No._____Change to:_____
17   _____
     Reason for
18   change:_____
     Page No._____Line No._____Change to:_____
19   _____
     Reason for
20   change:_____
     Page No._____Line No._____Change to:_____
21   _____
     Reason for
22   change:_____
     Page No._____Line No._____Change to:_____
23   _____

24
     SIGNATURE:_____DATE:_____
25                  L. LIN WOOD

 **COASTAL COURT REPORTING & VIDEO SERVICES**
                    800-791-1100      www.coastalcourt.com

**Exhibits**

**PX-1**  4:3 6:10,11,19

**PX-2**  4:5 13:3,4,8

**PX-3**  4:7 14:7,8,12 15:18

**PX-4**  4:9 15:25 16:1,4

**PX-5**  4:10 17:15,16,20 22:12 24:13 25:8

**PX-6**  4:12 21:7,8,12 24:4 38:18 44:8 47:19, 21 105:9

**PX-7**  4:15 53:16,17 54:3 58:1 59:24 61:22 65:14 67:3 77:17 78:11,12 79:12 80:13

**PX-8**  4:17 76:7,8,12 78:9

**PX-9**  4:19 78:19,20,23 79:10 80:11 81:6 84:5

**PX-10**  4:21 84:17,18, 21,23

**PX-11**  4:23 98:8,9,13 99:5

**PX-12**  5:3 104:14,15,18 107:13 117:3,11 205:10,15

**PX-13**  5:5 107:5,6,10

**PX-14**  5:8 109:10,11,14 198:19,21

**PX-15**  5:10 145:4,5,9 152:12

**PX-16**  5:13 146:21,22

**PX-17**  5:15 164:9,10,15

**PX-18**  5:17 190:19,20

**PX-19**  5:20 190:22,23

**PX-20**  5:23 192:3,4,7

**$**

**$1.25**  201:6

**$1.5**  115:7,10 116:18 121:7 141:10 201:11

**$10**  156:19,20

**$150,000**  71:18,19

**$250**  147:5

**$275**  146:2 152:4,10,18, 20

**$285,000**  26:11 27:9 28:25 68:12 172:15 173:6,20

**$300,000**  202:8

**$50,000**  27:4

**$648,000**  205:17

**$843,000**  71:5

**$850,000**  15:13

**(**

**(a)**  145:25 147:4

**(b)**  24:4 145:25 147:4

**0**

**0**  14:18

**1**

**1**  6:11,19 14:18 91:20 145:15 157:24 206:3 216:2

**1.25**  115:7 202:3,23 204:1

**1.5**  118:10 225:8

**10**  84:18,21,23 206:24 215:6 218:13

**100**  42:16 185:8

**103**  184:8,20,21

**104**  184:20 185:11

**105**  186:8

**11**  92:14 98:9,13 99:5

**11th**  67:22

**12**  104:15,18 107:13 117:3,11 205:10,15

**120**  42:16

**120,000**  42:14

**13**  107:6,10

**14**  109:11,14 164:19,20 198:19,21

**14th**  18:2 33:21 39:14, 22 63:3 85:22

**15**  122:21 145:5,9 151:18 152:12 153:8,25

**150,000**  69:11

**16**  9:7 146:22 151:18 153:9,25 178:21

**17**  21:15,24 35:24 162:22 164:10,15,24 172:9 185:24

**17th**  22:23 23:7,25 24:10,20,22 26:1 27:19, 20,23 28:23 29:4,15 34:12 36:6 38:17 46:10 48:16 49:19 50:1,10 58:6,23 59:12,19 61:18 75:1 80:22,23,25 81:3, 4,5 85:12 86:24 87:11 88:2 90:14,15 91:21 92:21 96:13,16,19 97:11 98:3,5,7 102:17 104:18,23 105:4,6 106:7,9,11 107:12 109:24 112:10 114:9,21 115:3 117:9,16 118:3, 17,25 119:7 120:15 121:2 133:8,14 135:11, 25 155:2 157:3,11 160:14 161:14 162:1,11 165:17 166:3,7 169:1,2, 4,10 170:4,7,13,14,16 171:25 172:3,12,14 186:18 188:20 189:17 193:22 201:13,16 202:5,19 203:8,21 206:9 210:21 211:1,14 212:16 215:5,10 217:16 224:5

**18**  190:20 191:2,3 196:2

**18th**  21:17 109:4

**19**  9:6 190:23 191:2,3,5, 14 199:3,6

**1996**  8:12

**1997**  7:17

**1999**  14:23

**2**

**2**  13:4,8 38:25 61:22 67:3 81:10 84:4 89:12 90:23,24 105:10 202:7

**20**  7:14 40:13 105:13 106:1 122:21 192:4,7

**20-minute**  83:8,11

**200**  26:10

**2015**  9:1,6,11

**2016**  10:4,6

**2018**  99:10

**2019**  23:16

**2020**  17:24 18:2 21:15, 24 51:10 53:2 54:5 58:2 64:5 73:21 74:1 88:2 97:3 99:18 102:17 111:3 114:8 118:23 135:2 139:3 172:9 173:15 178:1,3,10 185:25 191:24 207:16 209:19 212:14 214:10 224:23

**2021**  43:3 52:9 110:17 199:4,6 224:8 228:20

**2022**  109:24

**2024**  228:20

**20th**  25:21 41:13

**21st**  128:5

**22**  58:2 97:3 180:18

**22nd**  59:24 65:14 76:17,20 84:24 88:4

**24**  115:14,19 116:19 121:9 142:4 202:22 211:15

**24th**  107:11 136:13 138:19 224:22



**25** 12:19,24 198:22

**25th** 17:23 24:15 28:11 29:5,15

**26** 178:1,8 212:14

**26th** 178:3,9 200:19 201:17,19 209:19 210:11,24 211:3,6,23 214:13,20 217:12

**27** 200:11,12

**27th** 54:4

**28** 210:24 214:10

**280** 115:8

**285** 202:23 204:16

**285,000** 173:23

**28th** 200:18 214:14

**29** 219:6

**2:30** 40:12

**2:40** 58:3

---

**3**

**3** 14:8,12 15:18 99:18 191:15

**3/4th's** 170:10

**35** 23:22 59:1 61:3 89:18 167:2,5 168:19 169:7,9 170:1,19

**36** 164:23 165:3,6,7 166:6 169:16

**360** 125:19

**37** 147:3 167:25 168:11 169:19,25 170:2

**38** 147:4 168:9

**3rd** 73:19 98:14 101:10

---

**4**

**4** 16:1,4 184:8

**40** 24:6 93:16 103:6

**41** 172:4,6,7

**44** 173:11,15

**45** 93:17 198:24

**46** 175:4 176:23 177:2

**48** 178:2

**49** 177:12,13

**4:23** 229:16

**4th** 74:15,17

---

**5**

**5** 17:16,20 22:12 24:13 25:8

**50** 23:22,23 27:6 59:3,8, 16 61:6 89:19,21 90:17 91:22 96:7 168:20

**57** 145:16,23

**58** 145:17,18 178:20,23

**5:00** 40:22 201:22,24 204:19

---

**6**

**6** 21:8,12 24:4 38:18 44:8 47:19,21 105:9

**60** 24:6

**600-what-odd-thousand-dollars** 141:7

**648,000** 202:25

**65** 220:16,21

**660,000** 180:2

**6th** 178:7

---

**7**

**7** 53:17 54:3 58:1 59:24 61:22 65:14 67:3 77:17 78:11,12 79:12 80:13 107:21 108:23 191:8

**75** 27:14 172:24

**79** 179:7,11 190:1,6,12

---

**8**

**8** 76:8,12 78:9 107:21 108:23

**80** 99:25 105:14 179:7, 11 190:1,11

**800** 15:13

**847** 69:12

**88** 198:22,24

**8:00** 31:8

---

**9**

**9** 78:20,23 79:10 80:11 81:6 84:5 107:22 108:23 191:8,9,15

**980** 180:3

**9:00** 204:18

**9:10** 200:20 201:19,24 209:19

**9:20** 76:17

---

**A**

**a.m.** 58:3

**Aarons** 37:23 206:5

**ability** 62:7,15 67:4 68:14 129:2 184:3

**abrasive** 128:6

**abrupt** 62:4

**absence** 133:13

**absent** 81:23 82:6 84:6

**absolutely** 85:15 94:10 119:8 174:25 209:3

**abundantly** 60:12 66:22 194:10

**abusive** 188:13

**accept** 164:16

**access** 40:8 95:9

**account** 56:19 62:13 71:22 81:19 195:16,18 196:13,20,21,23,24 197:3 198:6

**accounts** 196:25 197:6

**accurate** 28:20,22 34:22 46:2,6,16 152:5

**accurately** 62:24

**accusation** 51:7 148:11 187:8

**accusations** 48:21 55:13 63:21 121:24 164:1

**accuse** 55:10

**accusing** 160:13

**acknowledge** 78:8

**acknowledged** 102:15

**acrimony** 131:21

**act** 40:11 49:17 112:1,5 117:8,12 120:20 139:1, 11,21 158:9 191:10 201:3

**acted** 138:12 226:1 227:6

**acting** 131:23 188:14

**action** 51:15 94:24 113:2 119:12 128:14 161:12 185:13 186:2 207:20

**actions** 81:15 113:24 157:10 160:1 161:13

**acts** 112:5 113:13,18 121:3 140:18 157:12,18 158:8 222:1

**actual** 45:20 94:25 148:25 154:22

**ad** 111:18 145:11 146:1, 7,13 147:12,20 152:17 153:13 154:6,11 156:18,24 210:11,16

**adamant** 129:1

**add** 104:24 141:9

**added** 142:9 161:18 184:5



**addition** 158:7

**Additionally** 105:11

**address** 43:25 125:13, 17 134:24 173:6

**addressed** 137:21

**administrative** 75:14

**admissible** 80:23

**admit** 123:4 170:6 171:14 205:18

**admitted** 61:17,19 69:22 160:14 161:25 174:3

**admitting** 171:12

**ads** 181:10

**advance** 6:21

**advances** 198:1

**advantage** 168:17

**advice** 35:16 36:3 82:23 103:2 138:18 147:25 185:1 225:25 226:1 227:7,8

**advise** 81:16

**advised** 81:12

**advocate** 121:15

**affected** 129:2

**afford** 138:21

**affordable** 64:19

**afternoon** 201:21 204:19

**agencies** 51:22

**ages** 227:17

**agree** 39:25 49:12 57:5 67:9 81:2 82:7 93:2,9 95:24 105:20 108:21 109:6 110:13 115:13,16 149:4,18 151:10 155:10 166:18 178:24 179:4 194:23 201:20 204:18 219:13

**agreeable** 6:8

**agreed** 6:9 14:3 23:1

27:8,10 28:3 39:1 46:15 50:14 89:20 91:18 94:5 99:13 100:19 105:13 111:13 115:9 118:5 121:4 149:23 152:24 162:10 165:16 166:14 172:12,14 189:7,16 194:22 196:1 197:23 215:9

**agreement** 6:3 10:22 14:19 15:7,20,24 16:5, 20 18:6,10,23 20:18 21:22 22:1,3,17,21,22 23:2,8 26:1,3,8,13 27:6, 18,24 28:17 30:6 34:10, 11,16 38:11,16,21 39:18 40:1 45:25 47:1, 7,23 48:16 49:20 50:2, 10 56:5 57:15 58:6,9,23 59:17,19 60:15,18 61:10,18 63:6 65:4,8 66:5,11 69:7 71:7 74:14,25 75:1 76:6 80:22,25 81:3,5,24 82:6,10 83:1 84:6 85:7, 13,16 86:9,10,22 87:24 88:1,7,9 89:4 90:15,16 91:21 92:21 96:13,17 97:10 98:4,6,7 99:1,9 104:19,23 105:6,7,8,17 106:4,6,9 107:13,21 108:17 109:1 112:10,16 114:9,18,20,21,23 115:2,4 117:10,16 118:4,18 119:1,7 120:15 121:2 132:25 133:4,9,17 135:7 136:1 137:21 138:2 142:16,20 144:12,22 155:2 157:12 161:15 162:1,5 165:17, 19,24 166:3,7,15,20,25 169:1,5,11,17,20 170:3, 4,5,7,8,13,14,17,20 171:20,23 172:3,11,12, 14 188:20 189:3 194:12,17 195:2,6,13 201:14,16 202:5,19 203:8,21 204:6 205:9 206:10 208:9 209:6 210:21 211:5,8,25 212:3,17 215:5,11 224:3

**agreements** 32:16

38:19,23 105:7 106:8 170:15 171:5 194:20

**ahead** 59:11 93:9 96:24 119:1 130:10

**air** 163:23 164:5 218:22

**Alec** 8:20

**allegation** 128:22

**allegations** 48:25 116:12 131:6 152:22

**allocation** 13:15 169:12 170:21 171:6, 20,23

**allowed** 27:6 58:14 71:4 144:20

**allowing** 213:18

**Alston** 25:21 26:2 29:17 31:2 32:11,22,23 34:18 35:12,24 37:1 51:1 73:15 75:5 76:3 86:7 87:23 88:5 107:11 108:8,11 133:18 134:14 135:3,24 136:17,24 137:5,11 138:4,16 200:13 212:14 220:8 224:18 225:5,7,20 226:5,13 227:19 228:3

**altogether** 123:7

**Amended** 191:16

**Amendment** 8:14 9:8

**amicable** 47:16

**amount** 27:16 45:25 46:7,15 63:9,24 76:6 91:18 99:6 143:15 147:25 151:19 154:6,10 156:12,17 177:3,6 189:6,7 190:6 197:25 198:9 202:8 204:16 216:14 218:10,14,15

**amounts** 135:10 149:25 165:16,25 166:14 171:22 201:16

**analysis** 216:7

**and/or** 124:14

**Andy** 219:9

**Angeles** 16:15 132:6

**angry** 69:25

**answering** 42:1 86:18 150:9

**answers** 31:20 33:3 83:22 87:5,19 88:16 113:17

**apologize** 194:6

**apologized** 124:23

**apparently** 53:1 79:14, 15 134:4

**appears** 182:4

**apples** 153:5 156:24

**application** 225:8

**applied** 35:22

**applies** 32:12

**apply** 36:11 75:21,22 134:20

**appreciated** 15:14 102:15

**approval** 79:4 80:2 81:17

**approved** 196:4

**approving** 79:24

**approximately** 217:24 229:16

**arbitrated** 142:7

**arbitration** 115:24 116:3 142:8

**arbitrator** 115:23

**area** 8:14 9:7 223:10

**areas** 9:5,20 138:11

**argument** 99:5 189:12

**arose** 25:2 85:20

**arrangement** 10:9,18 11:18 17:25 18:3,22 19:16,17,22 33:21 34:14 35:23 39:20 64:8, 12,13,16,20 65:1 94:7

**artificial** 179:22 182:4 183:6



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD
237Index: aspect–blackmail

**aspect** 217:2

**assert** 147:5

**assist** 107:20

**assistant** 40:25 41:19
75:14

**assisted** 51:3 220:8

**Associate** 10:10,13
103:4

**Associate's** 11:2

**Associates** 10:9,20

**association** 36:18
52:23

**assume** 96:1 156:10
195:17

**assumed** 94:14 136:8

**assuming** 173:3

**Atlanta** 42:11,24 43:4,
11,20,25 119:21 219:9,
10

**attached** 208:15

**attack** 55:6 110:19
111:10,18 117:21
142:11 159:2 161:7

**attacked** 111:24 140:3
141:11

**attacking** 55:18 161:7

**attacks** 114:13

**attempt** 219:12

**attempted** 50:15 51:23
56:6 157:1 185:7
191:13

**attempts** 112:2

**attending** 181:12

**attention** 34:24 35:21
135:4,6 147:2 157:2
169:6 191:6,14 226:9

**attorney's** 185:1

**attorney-client** 33:5
216:5

**attorneys** 212:14
226:4

**attorneys'** 9:23 17:1
138:23 198:14 204:6

**August** 201:18 207:16
209:19 210:11,24
211:3,6,23 212:14
214:10,20

**authority** 80:18 82:16
194:22

**authorized** 62:11
81:14

**averment** 165:7

**avoid** 197:10 204:22

**award** 48:23 156:20

**aware** 33:11,19 67:18
99:17 127:17 133:21
144:1 160:18 225:24

**B**

**back** 9:5,7 12:14 17:6
22:12 24:13 35:18 36:4
40:18 47:9 51:9 58:21
59:9 61:9 63:12 65:11
77:17 79:6 95:11,15,19
96:14 105:9 106:10
111:6 112:8 114:11
116:14 117:7 120:25
124:21 125:15 135:9
157:2 169:6 174:3
180:18 187:16 189:7
197:15 198:18 211:15
214:15,18 215:24 216:1
218:24 222:14

**background** 37:10
155:1 181:16 182:7

**bad** 180:25

**badly** 41:9

**Baker** 76:16 77:2

**ballistic** 127:1

**Bank** 8:21

**bankruptcy** 197:10

**bar** 11:3 42:20 43:6
52:22,25 53:9,14,15
95:1,6,16 159:3 186:10,
12 197:7

**barred** 95:3,4

**based** 8:22 9:14 35:22
52:14 69:14 75:13,14
114:16 127:16 130:11
151:20 156:16 200:8
204:8 209:12,15 218:7,
14 225:12

**baseless** 48:25 164:1

**basically** 18:21 103:23

**basis** 10:21 12:25 56:5
82:9 96:1 98:20 116:10,
11 165:5 166:5 167:25
172:25 179:9 184:12,14

**Beal** 6:1,14,16 13:6
14:10 16:3 17:18 21:10
22:8,11 25:13,17 26:17,
23 27:21 28:14 31:6,11,
15,22,25 32:21 34:20
36:1 40:17 50:3 53:19
55:20 56:1,2 57:22,25
60:5 61:11,21 62:19
65:19 70:9,17 71:9
73:2,6,14,22 74:5,18
75:3 76:10,24 77:10
78:22 79:7 83:6,12,15,
21 84:3,20 86:16,19,23
87:8,14 88:3,21 89:7,11
90:24 91:3,7 93:4,19,24
94:17,21 96:20 97:2
98:11 100:16 104:17
106:12,23 107:2,8
108:19 109:13 110:8
113:11,21 114:5 117:2,
5,6 119:5 123:6,9,20,25
127:4,18 131:8,9
132:12,19 136:16 138:7
139:24 140:8,11 141:15
143:2,16,19 144:13
145:7,17,22 146:24
148:15,20 149:10,15
150:3,9,15,18 151:16
153:7,16,20,24 154:12
155:7,17,20,25 156:3,7
157:17,22 158:1 163:5,
10 164:12,20,21 165:1,
4 166:4 167:21,24
168:7,10 174:9,14
175:3,8,16 176:5,12,14,
16,22 178:6,19 183:8
189:18,23 190:3,9,18,
25 191:18,21 192:6,12,
16 196:16 200:2,24,25
203:15,18,24 204:10,
14,24 205:2,7,15,19,22
206:1,19,22 207:24
208:6 209:21,24 210:2,
6 211:16,21 212:7,12
213:4,8,14 214:9,15,22
215:14,23 217:21
218:12 219:9,10
220:17,18 221:13,23
223:20,24 227:1,18
228:25

**bear** 116:5

**beating** 171:1

**began** 9:7

**beginning** 110:25

**behalf** 9:11 27:12 79:25
97:5 191:10

**behavior** 200:5

**belief** 49:17 101:8,15
126:14 185:6 186:13,23

**believed** 52:2,8 97:3
100:15,25 101:13
110:25 111:1 121:3
124:5,9 155:3 185:8
186:1 188:2 223:18

**benefit** 13:23 14:24
41:17 46:20

**benefited** 41:3

**benefits** 39:2

**Bennett** 39:8

**bet** 69:9

**bible** 70:8,21 72:13

**big** 69:8 161:3

**billed** 99:25

**binding** 142:8

**Birdie** 166:2

**birthday** 109:4

**bit** 19:1 59:6

**bizarre** 187:3

**black** 22:13

**blackmail** 191:13



**blame** 82:21,22

**blasphemy** 72:9,12

**blasted** 52:13

**bless** 229:3

**blew** 47:8 57:9 219:21

**block** 22:15

**blooded** 70:2,4,5

**blower** 9:10,22

**blowers** 8:24

**blown** 187:4

**blue** 112:19

**bodily** 53:24

**body** 102:10

**bona** 223:13

**bonanza** 69:14

**book** 140:17

**bot** 179:23 182:5

**bots** 183:6

**bottom** 199:3 213:3

**bought** 43:13

**bouncing** 125:15

**boy** 113:7 225:1

**breach** 111:11,17 113:6,7 114:15,22 138:2 141:6 144:22 149:24 196:8 204:8 209:1,5,15 212:2,22,23

**breached** 137:25

**break** 55:23 72:11,19 122:17 123:11,14 126:9 132:13,17 174:17 175:5 189:19,21 210:4

**breakdown** 12:17 17:13 20:1,4 21:3

**breakdowns** 12:6

**breakout** 18:14 132:23

**briefly** 7:5 132:20

**bring** 62:3 63:19 65:23 66:8 68:9 74:13 103:1

**broad** 137:16

**broke** 19:8 197:9

**broken** 17:8

**brought** 7:3 9:25 34:24 35:21 44:15 135:4,6 226:9

**Brown** 200:19 203:25 226:9 228:1 229:7

**brutal** 57:23

**brutally** 111:24 140:3

**Bryan** 7:20 8:2,17,22 11:19 18:20

**BS** 62:15 67:5

**Buckley** 54:25 55:8,14 219:10

**building** 94:13,23 95:8, 15,17

**bunch** 151:4

**Burby** 28:7 29:17 30:2 33:12 49:14 52:11 59:10 86:7,12 109:2 114:12 115:21 116:16 119:8 177:7 200:13

**Burke** 14:25

**Burr** 14:20,22

**business** 10:15,16 11:6 37:4 43:15 57:19 64:9,10,14

**buy** 95:7 172:16 183:20 202:24 204:5 211:4

**buying** 172:20 173:8

**buyout** 201:12 211:4

**Byrd** 25:22 26:2 29:17 31:3 32:12,22,23 34:18 35:12,25 37:1 51:1 73:16 75:5 76:3 86:7 87:23 88:5 107:11 108:9,11 133:18 134:14 135:4,24 136:17,24 137:5,11 138:4,17 200:13 212:15 220:8 224:18 225:5,7,20 226:5,14 227:20 228:3

**C**

**Cain** 51:14 55:1,4,7,18

**call** 7:9 17:21 23:7 61:1 83:6 117:12 131:20 139:17

**called** 41:24 42:2 54:10 56:21 95:14 117:13 220:4

**calm** 23:11,19

**candidly** 15:1 112:17 205:6

**capable** 104:10 211:18 213:2

**capacity** 36:22

**capture** 164:6

**captured** 163:23

**Carbone** 17:22 18:4,11 19:1 20:10 22:16 24:4 25:5,6,8,24 27:4,16 28:1,10,24 29:20 37:17 38:3,13 44:8,24 45:2 98:20 99:11 100:9,11, 18 104:23 132:21,22 133:1 173:21 194:11 195:6 206:4

**Carbone's** 45:14

**card's** 40:7

**Cardoba** 37:18

**cards** 95:9

**care** 94:18

**career** 8:9 30:15

**carefully** 171:13

**Carmichael** 192:1 193:24

**Carolina** 42:25 43:3, 12,22 52:13 110:19 140:3 181:13

**case** 8:19,20,24 9:2 10:2 13:10,14 14:1,20, 21 15:1,5,23 16:6,12, 13,15,17,21 17:22 18:4, 7 19:1 20:12,14 25:24

26:7 37:13 44:14,23 45:11,16 46:23 48:5 50:20 51:16 52:11 56:14 62:7 69:10 75:10, 13 76:3 85:1,9,18 88:11 89:15 90:17 102:4 103:8,10,15 105:22,23, 24 109:23 111:17 126:6 128:13,18,21,25 129:3 130:18 131:11,24 138:10 143:22,24 144:2 147:14,23 151:9 152:11,12 153:12 154:20 156:25 162:6 164:14 167:3,8,15 173:21,22 189:5,8,11, 14 194:11 202:11 207:5,20 214:11 215:16,18 216:13,17, 22,25 217:6,11,18,23, 25 218:15 220:15 226:10,15

**case-by-case** 10:21

**cases** 9:16,17,18,22 10:21,25 12:8 13:21 18:5,23 22:24 27:25 28:4 37:16 42:6 44:3 46:18,20 60:16 77:4 92:9 93:17 98:21 99:11, 15,24 100:10,22 101:3, 5 104:22 113:2 120:9, 16,23 143:4 148:22 150:1 151:2,17 169:13 170:22 171:7 173:17 201:13,15 202:2,4,9 203:19,21 204:12 205:8,14,17 206:2,8 207:2,4 208:8 211:7 216:9 224:11

**catalog** 112:5

**category** 139:20 160:1 161:15

**caught** 119:18,19

**cave** 7:20 8:2,17,22 11:19 18:20 130:24

**caves** 131:1

**ceded** 82:17

**cell** 164:4

**cetera** 33:14 39:7 106:8



**chain** 21:20

**chair** 187:2

**chance** 165:8 174:15, 23 196:7

**change** 95:9 106:6 128:1 155:6 187:3

**changed** 38:20 40:12 48:8 52:20 53:1,4 57:13 87:12 96:12 98:25 111:4 128:8 155:5 218:6,7 223:13

**channel** 179:25 180:9, 10,16,17,20 181:3,18 182:8,11,13,15,24,25 183:3,11,13,17,18 184:4

**characterize** 110:14

**characterized** 64:25

**charge** 129:6

**chart** 16:24

**chat** 184:4

**Chatham** 126:22

**check** 45:8 196:11

**Cherie** 32:11 36:8,15 75:7,9,16 134:17

**child** 130:25

**children** 47:11 48:18 61:16 67:9,12 68:3,19 69:6,19,24 70:1,7,22,24 112:13 117:22 119:13, 22 120:11 129:16 142:18 157:7 158:20 159:4 160:20 162:23 163:12 186:19 187:21 188:24 203:14

**Chris** 7:5 30:2 33:13 57:14 59:10 75:18 83:6 86:7 96:20 107:18 108:8 111:20 116:16 126:22 162:16 171:15 173:3 175:1,23 177:7,9 179:2,15 185:2 191:8 200:12 201:2 204:13 221:17,25 222:21 226:14

**church** 181:11

**circumstances** 130:12 175:10

**claim** 53:23,24 111:12 114:17 115:10 141:6 147:5 208:19,23,25 209:1,5 211:1 217:3 225:19 227:23

**claiming** 67:9 150:1 166:22

**claims** 7:3 8:6 54:25 62:8,16 67:5 68:15 111:11,15 112:11 114:18 120:22 152:23 204:3,7 207:16,21 208:14,17 210:20 226:6 227:19 228:2

**clarify** 175:14,17

**class** 51:15 113:1 207:20

**classic** 159:3

**clause** 145:11 146:1 153:13 154:7,11 170:15

**clear** 14:16 56:2 57:10 63:17 65:23 66:13,22 68:8 82:19 88:20 119:16 157:14 182:3 194:10 206:4 224:11

**clearing** 91:9,15

**client** 16:10,25 30:5 32:18 34:5,19 36:9 37:13 38:2 50:19 53:6 54:25 62:11 75:5,19,24 81:23 96:9 97:4 122:12 129:23 133:23 134:14 135:19 136:2 142:13 189:24 194:13 204:1 209:4 224:19 225:15,16 227:4

**client's** 80:4

**clients** 11:4 29:20 30:21 45:15 79:14 81:1 82:4,13,15 90:2 97:6,23 99:13,21 100:20 152:15 154:5 157:1 159:10,19 161:22 163:1,7 204:1,3 215:4,9,15 216:4 217:8 218:8 223:5

**close** 124:15 180:16

**closed** 27:5 195:20

**closely** 210:17

**cloth** 161:5

**CNN** 22:16 24:4 46:21, 23 47:20,22 62:7,9,12 81:18 82:3 85:1,8,18 88:10 89:15 99:11,12 100:19 102:4,11 103:8 104:4,6 136:1 146:14, 19 152:13 153:1 154:9, 13 195:16 196:1,6 197:4,12 202:14 206:4, 5,16 215:17 216:24 217:25 218:5,11 224:1, 20

**CNN's** 22:17

**co-counsel** 44:4 51:15 52:11 113:1 207:19

**coerce** 117:19 199:18

**coerced** 90:2 96:6 140:20

**colleagues** 81:14

**collected** 169:13 170:22

**combat** 44:4

**commandment** 70:12, 13,23

**commandments** 71:4

**commensurate** 93:8

**comment** 72:16 148:12

**comments** 154:21 161:21,22,24

**committed** 48:14 136:18 137:5,11 138:4 191:12

**committee** 14:17

**common** 223:8

**commonly** 141:1

**communications** 33:5 157:7

**Company** 193:24

**compare** 153:5

**compared** 128:21

**compensate** 216:14

**competent** 61:19 160:15

**complained** 148:6,12

**complaining** 83:5 88:15

**complaint** 49:9 50:17 53:2,6 109:15 110:20 111:25 112:22,24,25 113:4 114:25 116:13 121:9 123:3 124:20 131:6 141:12 145:15 146:11 147:1,3,5 153:9 154:7 156:9,13,15,24 162:17,20 164:18 169:7 172:6 186:12 190:2 198:18 203:11 204:21 208:15,18,20,21 210:24 219:3

**complaints** 147:13 153:12 157:8

**complete** 125:13 169:1 200:9

**completed** 46:14

**completely** 37:5 53:5 86:20 102:19 153:17

**complied** 108:16,17

**compromised** 128:12 130:15

**computation** 149:1 150:19

**compute** 152:3

**computer** 29:5 124:2,6 125:21 126:18,20 177:24 181:15 182:6 191:23 192:9,19 193:1, 8,19,21,25 194:2,5

**computers** 124:4 125:5,6

**concede** 166:21

**concentration** 46:21

**concern** 171:14



**concerned** 91:8,9,15, 25 137:22 161:3

**concerns** 126:23 128:10 130:11,13 137:17 138:10 163:17 226:6

**concerted** 159:1

**concession** 165:15

**concessions** 166:14, 16

**concise** 87:18

**concluded** 229:15

**conclusion** 37:12 135:14

**condescending** 128:7

**condition** 119:13

**conduct** 119:17

**conducting** 64:14

**confer** 175:5 184:24

**confident** 96:3,4

**confidential** 22:17 143:17,18 144:7,10

**confidentiality** 196:8

**confirm** 14:5 34:22 124:19

**confirmatory** 119:15 126:3

**confirmed** 14:5 15:21 89:19 167:10 171:24

**confirming** 14:11,19 24:1 61:7 77:15 85:13 158:20

**confused** 113:12,21

**conjunction** 184:15 185:2

**connected** 85:25 190:12

**connection** 50:10 146:12 147:14 207:2

**conniving** 99:9

**consensus** 152:15

221:7

**consent** 30:5 33:22 34:5,19 35:14 36:9 37:13 50:19 75:6,19,24 77:20 80:1 83:2 92:22 93:10,13 97:4 108:4,6 113:8 114:16 115:23,25 133:20,25 134:1,10,11, 14,24 135:20 136:2 137:20 142:13 162:13 194:13 209:4 217:15 224:19 225:2,15,16 227:4,10

**consented** 83:3 134:7

**consenting** 133:9

**conservative** 54:17

**consistent** 73:24 79:16 80:5 82:10 85:15 86:23 87:10 139:4

**conspiring** 119:16

**constituted** 112:2 113:13,19 157:12 161:13 219:12 222:1

**consummated** 48:1

**consummation** 30:8, 9,10

**contact** 53:21,22 69:18 195:23

**contacted** 160:5

**contacting** 69:24 160:3 186:19

**contacts** 186:21

**contained** 51:4 111:25 211:25 212:16

**contemplated** 76:23

**contend** 112:2 157:3,6 201:2

**contest** 91:17,20,23

**context** 21:19 75:25 113:19

**contingency** 9:14,19, 23 10:23 13:14 45:11 167:1,12 207:1

**continually** 184:14

**continue** 39:19 105:21 142:17,21 159:17

**continued** 117:21

**continuing** 35:6

**contract** 20:24,25 111:12,17 113:6,7 114:16 137:25 141:6 149:24 209:2 212:23,24

**contracts** 20:20

**contractual** 206:25

**contradicting** 188:13

**contradiction** 87:11

**contribute** 172:15

**control** 82:2 95:11 96:4

**controlled** 228:4

**controls** 96:10

**conversation** 23:10 24:19 85:23 106:20 122:4,7,9 166:13 168:13

**conversations** 45:19 122:2 184:5

**convince** 217:1

**convinced** 126:4

**copied** 54:19 79:3

**copies** 123:9

**copy** 54:21 85:2 107:16 191:3 229:8,11

**Cordoba** 37:21 44:9, 14,16 104:24 206:6

**corporation** 7:25 8:4 44:1

**corporations** 167:11

**correct** 7:11 8:3,6 9:12 10:5,6 14:12 17:5 21:18 22:25 24:11,16 28:1,2, 19 30:16,17 42:14,15 43:1,15,23 46:13 48:2 49:21 55:1 58:2,7 64:4 65:3,20 75:7 79:8,13 80:14 81:8 84:14 85:2

99:21 103:21 107:22 122:12 145:17 175:20 176:10 178:4 191:24 195:19 199:5 201:3,7, 14 202:15 206:7 208:19 209:7 210:12 214:12 224:4

**corrected** 106:5

**correctly** 24:8 55:23 56:9 62:20 90:5,7 173:5

**correspondence** 102:2,3 116:15

**cost** 198:1

**costs** 81:21

**counsel** 6:4 7:7 33:7 35:17 105:21 110:18 131:11,14,17,18 132:10 136:18 148:1 165:13 175:6 184:24 227:21

**count** 209:11

**counter-claim** 137:23

**country** 159:22

**County** 210:12

**couple** 43:11 155:15 213:17 223:25 228:16

**Court** 52:16 81:25 83:7, 16 110:23 111:2,23 137:24 156:16 185:6

**Court's** 81:17

**courts** 11:3

**covenant** 111:15 114:22 115:3

**covered** 93:15 118:14 157:15 203:20

**craziest** 116:9

**crazy** 83:7 115:19

**created** 23:17 103:8 219:22

**creating** 102:2

**credit** 57:19 93:17

**crime** 49:18 50:24 52:5, 22 139:15,18 191:12 199:7



**criminal** 49:18 139:21 185:12 186:2 199:25

**criminally** 186:6

**critical** 42:22

**cross-examination** 58:11

**cross-talk** 83:18

**culminated** 118:17

**culmination** 118:16

**cut** 31:25 32:4 62:14 67:4 68:14 102:12 123:7

**CVS** 14:21,25

---

**D**

**D.C.** 91:12 92:11

**damage** 90:1 148:25 216:15 219:22

**damaged** 219:22 228:11

**damages** 148:23 150:19 151:3,19,20

**damn** 129:11 187:6

**Damnum** 145:11 146:1,7,13 147:20 152:17 153:13 154:7,11 156:18,24 210:11,16

**Damnum's** 147:13

**Daniels** 147:23

**dare** 72:16

**date** 24:10,14 25:19 35:15 36:13 45:5 67:24 73:17,19,25 82:20 177:18,20 200:17 214:20 217:16

**dated** 17:23 21:15 76:16 78:25

**David** 17:22 45:4,14,18 49:16 133:1

**Davita** 75:10

**day** 7:18 39:15 73:1 74:6 78:11,25 79:1

**93**:11 118:10 125:10,14 128:8 129:8 155:11 201:25 213:25

**days** 23:7 28:9,12,13, 15 39:23 44:25 45:8 58:5,17 59:23 70:15 88:5 115:16

**dd** 136:10

**deal** 25:1 28:17 29:18 43:6 47:2 69:12 71:12 165:23 198:17

**dealing** 23:14 60:24 67:8 86:5 177:23

**dealings** 55:8 65:10 223:6

**dealt** 16:8 59:9 74:3,24 86:8 105:2 158:16

**December** 188:9

**decide** 205:13

**decided** 86:5 135:9 171:22 201:15 222:20

**decision** 16:9 18:3 52:9 81:7 84:8 97:22 110:22 132:4,15 140:4 147:19 154:6 171:12,18 173:3 184:17

**decisions** 14:13 82:13, 15 165:11

**defamation** 8:6,15,18 9:6,8,11,17,18,20 103:16 131:7 150:2 187:7 204:7 207:16,21 208:17 216:16,18 217:3

**defame** 190:8

**defamed** 190:14

**defaming** 180:5 190:7, 13

**default** 156:10,11,13, 15,18

**defend** 52:16 111:8

**Defendant** 6:2 175:18 176:9

**define** 29:14

**defines** 170:19

**definition** 141:16

**defunct** 197:6

**degree** 36:21

**degrees** 221:6

**delete** 182:3

**deliberately** 129:22

**demand** 49:7 56:18 89:17 115:5,6 139:2 141:4,6,10 142:1 143:3, 23 146:1 149:6,20,22, 23 151:10 152:9,18,20 154:8 167:14 177:5,10 201:1,5,6,11 202:21 203:20 207:3 210:11, 20,22,23 211:2,6,23 212:13,20 214:21 215:7 219:9

**demanded** 201:9

**demands** 141:3 148:22,24 149:16 150:23 151:1,18 153:9, 11,14,24 154:1 218:25 221:11

**demean** 111:19

**denial** 165:6 166:5 168:1 173:1,13 175:14 178:22 179:10,14

**denials** 165:12 184:10, 12

**denied** 169:17 170:4 171:7,19 174:2,4,7 176:8 180:25 184:21 190:2

**deny** 169:23 171:15 172:18

**denying** 171:12 180:7

**deposit** 81:18 196:11

**deposited** 196:18,22

**deposition** 6:2,8,19,23 22:20 220:3 229:14

**depositions** 6:17

**derogation** 115:2

**describe** 32:23 151:8

**describing** 39:4 67:2

**description** 51:7 63:25

**deserve** 120:14 162:9

**deserved** 59:14 117:20 120:7 162:4

**desires** 68:16

**destroy** 57:20

**determine** 156:16 193:14,15

**determined** 49:10 108:12 193:20 194:1

**determining** 193:17

**Dexter** 51:13 112:23 148:10 207:19

**dictionary** 140:23

**died** 75:16

**difference** 37:2 197:22 206:21

**differences** 89:22

**difficult** 23:13 39:23 148:24 151:21

**dignity** 89:23

**dime** 59:5 90:4 176:18 179:4

**direct** 6:13 80:18 115:2 128:20 147:2 157:2 169:6 191:6 206:6

**directed** 82:14

**directing** 81:25 191:14

**direction** 103:13,20

**directions** 94:24

**directive** 56:3

**directly** 26:12 196:23

**disagree** 153:19

**disburse** 81:25

**disbursed** 15:6,9 30:21,22,23 32:18 195:25



**disbursement** 16:23 17:21 20:13 24:14

**disclosed** 177:2

**disclosure** 30:24

**disclosures** 32:15

**discovered** 67:14

**discuss** 7:2 17:2,3 116:3 144:25

**discussed** 79:14 105:12 169:4 171:24 219:23

**discussing** 13:14 75:18

**discussion** 13:13 22:10 23:24 31:3 32:10 36:7 41:12 47:4 73:13 87:25 105:4 106:5 150:13 160:4 163:20 176:1 209:23 223:23 227:14 228:1

**discussions** 67:12 80:24 82:12,19 90:13 105:7 106:7 121:1 168:25 170:16 179:15 227:25

**dismissed** 216:23,24

**disparagement** 209:18

**dispute** 54:24 55:2 81:13 102:16 115:22 142:12 186:17

**disputes** 62:13 71:22

**disrespect** 131:22

**disruption** 47:11

**distinction** 20:20 37:7, 8 179:1

**distort** 223:16

**distribute** 81:19,20,22

**distributed** 109:4

**distribution** 108:22

**District** 145:12

**ditch** 89:21

**divide** 15:22 18:23 23:2 30:4 59:11 194:21,22

**divided** 22:2 34:4 82:8 95:24

**dividing** 85:24

**division** 14:3 15:4,19 16:11,22 18:11 19:7 24:23 26:4 28:3 32:10 33:19 34:11 36:7 47:1 71:15 84:25 162:6 225:9

**divisions** 10:24 27:25

**document** 121:10 133:15 168:14 174:16 193:12

**documentation** 99:2 101:24 225:3

**documented** 48:3,18 68:24 73:18 74:22 115:12 118:3 124:11 160:7 168:24 169:20 170:3 193:10

**documenting** 82:12

**documents** 6:25 7:1 46:10 116:23 124:16, 19,22 126:1 202:7

**dog** 43:8

**dollar** 46:7

**dollars** 218:16

**door** 95:9 106:22 107:1

**doubt** 24:20 34:10 49:5 126:5 185:10

**doubts** 100:1

**draft** 56:24 96:17 106:9 114:12

**drafted** 86:12,13 102:19 103:9,13,19 222:3

**drafting** 102:8

**draw** 37:6,8

**Drew** 6:16 50:16 69:25 73:5 93:3 131:7 153:6 168:5 178:5 189:25 190:17 207:12 211:20

215:2

**drive** 142:17

**drop** 112:8

**dropped** 190:11

**due** 28:18,24 42:19 82:7 95:24 130:9 159:23 173:16,18,24 176:8,11 197:6 202:16

**dummy** 131:24

**duty** 52:15,21 63:5 64:4,7 65:2,7,9

**E**

**earlier** 19:16 34:13 75:4 104:20 105:12 108:20 118:24 134:13 136:15 137:4 138:25 182:19 194:5 218:14

**early** 135:5 187:18

**earn** 69:9,14

**earned** 18:14,15 117:18 144:5 169:12 170:21

**earth** 70:16

**Eastern** 145:12

**Ed** 54:12,13,14,15,25 55:4,5,8,14

**edit** 180:12 222:4

**edited** 136:23 220:9 222:9

**editing** 51:3

**effect** 115:7 187:24 216:10 218:2

**effective** 18:1

**effort** 49:1 57:12 69:10 89:21 124:14 125:18 159:1 199:18

**efforts** 15:14 18:7 39:2 42:20 44:4 48:22 56:8 67:8,15,17 68:4,5 89:15,16 102:15 112:14 116:16 117:22,23 127:22 128:17 142:24

159:24 160:2

**electronic** 229:8

**element** 215:13

**elements** 140:13 199:7,17

**Elizabeth** 182:15,17,21

**Elon** 16:18 126:6 127:23 128:13,17 129:23 220:3

**Email** 13:8 14:5,11 15:17 21:14,24 22:21 23:18 24:1 27:23 54:3, 18 58:16 65:15 67:13 76:16,19 77:7 78:24 79:2,6,9 80:11,12 84:24 85:3,13 88:6 98:15 120:2 125:11,12,13,16 168:13 169:21 170:3 171:24 200:12,17 201:2 205:12 208:5 219:8

**Email's** 29:6 108:24 120:24 124:4 163:22 164:5

**Emailed** 119:24

**embedded** 177:13

**employee** 42:22

**empty** 198:7

**encouragement** 180:23

**end** 22:19 81:16 111:1 119:23 185:19 228:6

**ended** 18:2 74:25 120:14

**ending** 62:4

**energy** 226:22

**Enforcement** 51:21 53:21,23

**engage** 10:18,20 11:24

**engaged** 8:23 14:1 19:6 25:21 30:25 70:6 104:2 108:14

**engagement** 20:25 30:6 78:8 101:9 195:12



**ensuring** 144:21

**entered** 16:5,20 19:20 29:2 34:16 47:5,7 58:5 59:18 76:2 91:21 224:3

**entering** 21:21 28:16

**entire** 33:13,17 63:9

**entirety** 217:5

**entitled** 33:7,10 80:8 140:19 141:24 155:4,14 215:4,10

**entity** 44:2

**envisioned** 11:23 19:2 48:5

**equal** 217:24

**equaled** 218:16

**escrow** 56:19 62:12 71:21 72:6 81:19 84:6 195:16,18 196:20 197:3 198:5

**essential** 97:4

**essentially** 15:18 63:17 78:25 216:16

**established** 18:19 117:16

**estimate** 46:6

**estimated** 44:10 45:22

**et al** 206:6

**eternity** 72:15 226:25

**ethical** 30:12,18 31:1 32:14,20,24 33:24 34:1 75:24 108:18 225:17,18 227:10

**ethically** 53:6

**ethics** 53:8 136:7

**evaluation** 98:17

**Evans** 18:16,17,19 19:4,10,12

**event** 177:7

**events** 204:9 209:16

**evidence** 122:1 126:4 156:17 192:18

**evil** 92:3

**exact** 10:7 45:5 73:17, 24 108:22 172:13

**examination** 6:13 193:20

**exceed** 56:4

**exceeds** 96:5

**exception** 167:9

**excess** 201:11

**exclusively** 64:23

**excuse** 65:14 88:7 180:16 209:21 220:21

**executed** 172:10

**execution** 94:25

**executive** 14:17 40:25 41:19

**exemplary** 148:23 151:3

**exercise** 174:4

**exert** 141:22

**Exhibit** 6:10,19 13:3,8 14:7,12 15:18,25 16:4 17:15,20 21:7,12 22:12 24:4,13 25:8 38:18 44:8 47:19,21 53:16 54:3 58:1 59:24 61:22 65:14 67:3 76:7,12 77:17 78:9,11,12,19,23 79:10, 12 80:11,13 81:6 84:5, 17,21,23 98:8,13 99:5 104:14,18 105:9 107:5, 10,13 109:10,14 117:3, 11 145:4,9 146:21 147:1 152:12 164:9,15 190:19,22 192:3,7 198:19,21 205:10,15

**exhibits** 107:21 108:23 110:1 151:18 153:25 191:2 194:8

**existed** 78:18

**existing** 204:3,5 211:4

**expect** 226:2 227:5

**expected** 137:1

**expedited** 229:10

**expended** 19:11

**expense** 19:11

**expenses** 12:13 17:1 81:22 84:16

**experience** 131:25 132:11

**experienced** 129:5

**expert** 136:6 194:3

**expertise** 103:16

**explain** 55:24 58:15 90:8,10,12 116:17 143:6 165:5 167:25 172:7 173:13 178:22 214:5,7

**explained** 87:9

**explaining** 183:23

**explanation** 117:1 199:15

**exploring** 75:11

**express** 56:3

**extent** 126:6 165:11 168:12

**extort** 49:7 50:16 51:5 121:7 136:22 146:17 147:17 152:1 158:9 162:8 185:7 186:6 201:4 219:13 220:6 221:12

**extorted** 48:15 49:4,6 50:1,9 51:6 52:8 58:9, 22 110:12 112:16 118:25 119:2,4 148:2,3 154:19 166:18 185:7 188:21 220:11 223:2

**extorting** 47:6 48:12 51:14,16 55:12 112:11, 24 113:2 141:1 220:5

**extortion** 48:14 49:13, 18 50:21,23 51:8,22,23, 25 52:3,6,19,22 53:13 55:10 111:3 112:2,3,9, 20 113:19 114:4,8,9 115:11,20 116:20,25 117:8,9,13,17 118:4,16

**expedited** 229:10

**121**:3,6 130:20 136:19 137:2 139:1,5,11,12,15, 17,21 140:13,22 141:8, 16,20,25 142:19 143:1 146:4,14,16,19 147:9, 21,24 148:5,7,9,11,17 149:20 151:11,19 153:3 154:15 155:3 157:4,13 159:13 161:13 162:24 186:14 191:12,13 199:8,13,14,25 201:3 202:1 203:1,17 212:21 213:11 215:13 219:5,21 220:12 221:8,9 222:1,4, 12,22,25 223:8,18

**extortionists** 110:11

**eyes** 200:15

**F**

**face** 147:23

**faced** 67:7

**fact** 22:6 25:19,23 34:2, 9 41:23 48:13 51:4 84:13 94:6 98:23 100:6, 13 101:4 108:3 116:22 129:8 136:21 142:3 143:6 166:20 186:11 193:6 194:1 220:12

**factors** 153:1

**facts** 116:5 120:1 127:16 151:9 156:25 157:5 186:5 200:8

**factual** 37:10

**faint** 199:3

**fair** 15:4 23:21,23 37:15 56:11 59:1,3 60:12 65:13 76:1 83:24 89:14 92:15 96:2 99:6 101:25 110:9 114:2 118:15 122:20 135:3 148:21 151:23 153:9,11 154:1 168:19,20,21 189:15 197:2 222:5

**fairness** 168:17

**faith** 60:25 65:9 141:11 162:23 181:1



**fake** 161:24

**fall** 139:19

**false** 48:21 111:24 118:2,3 152:22 161:25 212:8

**fame** 99:8

**familiar** 30:11 35:20 125:19

**family** 90:1 120:8 159:11,18 161:21 187:20 223:5

**family's** 92:7

**fashion** 129:3

**father** 70:12,14,20 119:24

**fault** 167:7 189:3

**FBI** 124:20

**February** 17:23 18:2 21:15,17,24 22:23 23:25 24:10,15 25:21 27:20,23 29:16 33:21 39:14,22 43:3 46:10 54:4 58:2,6 59:12,19,24 63:3 64:5 65:14 76:17, 20 84:24 85:12,22 86:24 87:11 88:4 97:3 98:5 104:23 105:4,16 135:2 165:17 166:7 169:10 170:4,7 171:25 172:14 187:18 191:23 193:22 224:7

**federal** 196:5

**fee** 9:14,19 10:22 11:13, 14 13:14 14:13 15:3,4, 13 16:23 17:4,21,25 20:13,20 21:23 22:2,24 23:2 24:5,14,22 26:5 27:24 28:3,23 29:20 30:4,12 32:10 33:14,20 34:4,10 44:10 45:11,22 46:5 47:1 56:13,18 58:7 62:12 65:17 69:14 75:17 85:8,18 88:10 89:18,20 96:7 133:2,10 136:8 137:18 138:15 162:5 166:23 167:12 172:13 176:19 178:25 179:2,5 194:13,23

197:23 206:3 207:1 211:7,24 212:16 218:15 224:20

**feel** 53:13 116:20 137:2 148:2 154:19 189:14

**feelings** 62:25 151:20

**feels** 93:7

**fees** 9:23 11:25 15:6,19 17:1 18:11,14,15 19:7,8 20:14,15,21,22 22:2 25:9,24 26:14,16 27:7, 13 28:9 30:21 47:2 56:3 62:9 81:20,23 82:2,7 84:16,25 85:24 86:1 95:24 96:4 132:24 138:23 143:4,7 144:5 166:8 169:12 170:21 171:6 172:15 195:16 196:11 197:4,8,12 198:6,14 204:6 208:13 225:9

**felt** 47:5 49:4 51:19 52:12 66:20 112:16 119:2 124:13 137:1,5 148:3 217:23 222:15

**ferret** 168:15

**fide** 223:13

**fiduciary** 63:5 64:4,6 65:2,6,7,9

**fierce** 110:19

**fight** 92:4 93:10

**figure** 115:17 190:5 207:6 208:4

**figured** 34:25 53:9

**file** 49:10 53:2 111:13 115:14,20 116:2,4,6 118:11 121:8 124:7 137:23 146:7 149:7 152:23 186:11 204:4,20 219:2,19

**filed** 50:17 51:3,12 53:6 109:16 110:21 124:19 145:12,21 147:17,18 148:8 152:1 164:14 174:16,24 203:3 209:14 219:18 220:15

**files** 44:12

**filibuster** 83:17 155:21

**filing** 109:24 111:2 114:24 139:3 186:9 197:10

**final** 14:13 23:2 27:18 29:18 38:16,20 59:16 61:10 62:13 71:22 81:5 96:13 99:1 105:6 108:25 115:24

**finalized** 97:11 135:14

**finalizing** 46:9

**finally** 40:14,19 52:9 121:4

**finance** 62:8,15 67:4 68:15

**financial** 144:4

**financially** 15:16 44:2

**find** 42:21 60:23 117:3 124:18 144:25 149:13, 14 174:17 192:25 193:17

**fine** 69:21 94:20 161:10 214:8

**finest** 119:25

**finish** 23:19 26:22 27:1 31:20 32:3 35:4,9 50:5 79:21 123:13 170:25 213:18,23

**finished** 155:19

**fired** 202:11 224:8

**firm** 7:14 11:21 14:18 16:9 18:19,20 29:17 30:4 34:15 36:17,19 37:5 50:25 81:21 102:12 129:18 137:19 197:6 225:14

**firm's** 12:2 81:19 85:8, 18 88:10

**firms** 12:11 32:25 33:1 225:9

**flag** 136:25 222:16,17, 18,19

**flaming** 54:10,12,13, 15,16,17

**floor** 128:5

**flux** 38:15,20

**focus** 8:10,25

**follow** 62:21 63:22 77:12 78:9 123:10 183:25

**follow-up** 210:7 223:25

**followers** 180:21 190:7

**fond** 121:23

**foolishness** 56:7 62:4 63:20 65:25 66:20,24 67:1,7 69:16 92:5 185:18

**force** 162:8 204:22

**forefront** 133:21

**forgive** 71:1

**form** 6:5 25:12 49:23 55:11 60:1 65:18 71:8 88:12 92:18 97:17 100:8 107:23 118:19 136:3 139:16 140:14 141:19 142:1 146:5 149:2 163:3 199:11 213:4 215:19 223:11 228:12

**formal** 172:11 225:22

**formalize** 66:4

**formed** 7:16

**forms** 141:21

**fortune** 99:8

**forum** 137:15

**forward** 47:16 57:17 68:5 77:5 92:8 140:2

**forwarded** 125:12

**found** 40:9 101:21 124:21 125:25 126:3 129:15 138:16 181:24 187:19 192:18 217:14

**fourth** 85:5 90:19,20,25

**frame** 193:22



**fraud** 8:24 9:2,4,16 111:12,17 113:8 114:17 138:1 208:20,23 210:19

**freedom** 48:24 67:21 117:25 121:16 159:25

**French** 18:15 19:7,9, 11,12,15 20:5

**Friday** 229:10

**friend** 72:14

**frivolous** 62:8 121:8 208:25

**front** 140:17 208:12

**fuel** 66:18

**full** 63:23 125:16 187:4

**fully** 42:2 139:10

**Fulton** 210:12

**fun** 61:14,16

**function** 41:18 99:20

**funds** 66:17 92:17,19 135:25

**fussing** 96:14

**future** 56:7 188:2

**Fuzzell** 32:11 36:8,14, 15 75:9 134:18

**Fuzzell's** 75:7

---

**G**

**game** 141:23

**gave** 13:20 15:3 16:10, 12 33:12,17,18 35:13 36:2 37:9 49:4 50:2,11 58:22 82:23 87:23 109:5 140:6,9,10 142:4 151:13 155:13 158:4 162:10 182:18 199:23 225:11,25

**general** 82:11 151:2 157:6

**generally** 9:18 12:24 30:20 118:1

**generate** 13:24 102:23

**generated** 192:8

**generous** 15:13 16:13 61:5

**generously** 60:12

**genius** 119:25

**gentleman** 75:15

**Georgia** 30:12 31:1 33:24 43:20 53:14,15 108:18 119:21 186:10, 12

**get all** 71:10 120:1

**Ginger** 55:5,6,18

**give** 6:17,18 23:22 26:25 59:3,4,14,15 60:7 61:5 67:19 80:2 87:6,7 98:16 103:2 106:1 113:17 115:16 117:24 120:13 127:2 135:16 157:21 168:19 182:8 189:8 222:21 223:3

**giving** 59:21 77:5 117:19 151:13 211:15 216:7

**glad** 15:15

**goal** 193:18

**God** 70:19,21 92:3 141:13 184:2 203:13 229:3

**God's** 70:11,23

**gold** 60:14

**Goldstein** 7:20,23 8:1, 16

**good** 15:15 22:15 50:8 58:20 60:13,25 65:9 120:11 123:18 132:16 165:22 175:2,4 181:24 189:18 204:10 215:17 220:13 224:16 227:17

**good-faith** 223:13

**goodness** 132:11

**governed** 170:18

**governing** 170:17

**Governor** 19:18

**grab** 164:18

**great** 193:18 224:14

**greedy** 59:8 96:6

**Green** 43:4

**grievance** 186:9,11

**Grogan** 37:17,23 44:9, 21,22 104:24 206:5

**gross** 16:25

**ground** 194:7

**group** 110:1 184:6

**Grunberg** 10:3 12:9 33:15 39:21 91:22 128:1 219:11,12

**Grunberg's** 12:7

**guess** 41:17 42:5 71:17 78:5 109:18 131:20 139:19 150:2 198:2 207:18 209:17

**guessing** 78:5

**gun** 126:2

**guy** 69:25 159:8,15

---

**H**

**hack** 124:19 125:8,9 126:20 193:14

**hacked** 29:6 124:4,6,8, 10,22 125:5,7,21,22 127:11 177:24 192:21 193:1,11,16,18,21 194:1

**hacking** 124:2,12 125:6 126:11,18 127:5, 8 192:19

**Halifax** 9:2

**Hancock** 49:16

**hand** 13:7 16:4 17:19 21:11 53:20 76:11 78:23 84:21 98:12 107:9 109:14 145:8 146:25 164:13 191:1 192:7

**handing** 22:12 54:2

**handle** 213:22 225:1

**handled** 26:2 48:4 196:8

**handling** 8:19

**hands** 86:4,6

**hang** 31:12,14 35:3 87:3 88:14 113:9,11 151:6 175:24 212:4

**happen** 25:6 71:25 73:4,10 84:7 106:21 167:13 193:19

**happened** 36:12 38:5 69:2 71:24 72:1 126:21 130:23 140:1 152:8 217:17 225:14 227:13

**happening** 221:6

**happy** 25:2 70:24,25 130:20 144:24 167:19

**hard** 35:13 120:5 123:10 174:2 202:16

**harm** 53:24

**harming** 56:7

**HARRISON** 6:9 25:12 26:22 28:13 31:10,14, 19,24 32:4 33:2,9 35:3 49:22 55:11 60:1,9 62:17 65:18 71:8 72:10, 18,22 73:3,8,21 74:16 83:13,19,25 86:17 87:3, 13 88:12,24 90:23 91:6 92:18 93:22 97:1,17 100:8 106:18,25 107:4, 23,25 110:6 113:15 117:4 118:19 122:22 123:8,17,21 127:3 131:4 132:16 136:3 138:6 139:16 140:14 141:19 143:14,17,25 144:24 145:14,18 146:5 148:19 149:2 150:7,17 151:6,12 152:13 153:18,22 155:10,19,22 156:1,5 157:14,20,23 163:3 164:19,24 165:10 168:4 174:6,22 175:13, 18,24 176:2,7,13,15,20 177:25 178:4,8 182:18, 22 189:20 190:17



191:16,19 192:11,13
199:11 206:18 210:1
211:20 212:4,9 213:13,
15 214:6,19,23 215:19
223:11 226:11 228:12
229:4,9

**Hart** 39:8

**head** 109:7

**health** 48:21 61:15
68:20 69:19,20 118:2
119:13,18 122:3 129:12
142:22 157:8 158:13
159:2,10 160:4 161:8,
10 163:2 187:9

**healthcare** 67:10
121:21 158:21

**healthy** 120:11

**hear** 53:10 58:9 94:19
174:12,19 175:7

**heard** 116:9,25 132:3
160:22 208:1

**hearing** 94:20 156:16
195:22 226:18

**heavy** 46:4

**heinous** 121:8

**heinously** 219:3

**held** 22:10 73:13
150:14 176:1 209:23
223:23

**hell** 72:15

**helped** 96:17 106:9
111:20 221:18 222:6
223:10

**helpful** 11:22 181:23

**helps** 221:22

**Herman** 55:1,4,6,18

**Hernacki** 18:19

**high** 16:15

**higher** 12:22

**Hipp** 8:20

**hire** 73:15

**hired** 74:22 76:5 88:5

135:7 137:18 193:23

**hiring** 76:3

**Historically** 162:7

**history** 30:19 33:13,17,
18 34:3 37:10 225:13

**hit** 111:16 118:9

**hold** 15:12 22:8 25:15
29:3 39:18 40:15 47:6
62:11 68:24 76:22
79:20 81:11 165:8
171:15 183:9 200:16

**holding** 173:25

**home** 43:4

**honest** 65:9 140:6,10
155:5

**Honestly** 112:4

**honor** 24:24 70:12,14
224:11

**honoring** 70:20

**hope** 156:19 197:10

**horribly** 167:17

**horse** 147:23 171:2

**Hospital** 9:2

**host** 155:1

**hot** 70:2,4,5

**hotel** 43:7

**hourly** 9:21 10:24
89:17

**hours** 98:22 99:15,20
100:5,12,21 115:14,19
116:19 121:9 142:4
202:22 211:15

**house** 40:10 124:11
132:2

**humor** 14:16

**hurry** 171:2

**hurt** 41:9 129:16,22
142:22,23 164:4 223:4,
5

**hurting** 68:3 127:22

**husband** 42:10 43:15

**hypothetical** 199:24

**hypothetically** 27:4
156:10

---

**I**

**Ibrahim** 226:8

**idea** 22:15 57:20 75:24
118:1 121:18 178:17
181:24

**identification** 6:12
13:5 14:9 16:2 17:17
21:9 53:18 76:9 78:21
84:19 98:10 104:16
107:7 109:12 145:6
146:23 164:11 190:21,
24 192:5

**identified** 118:17 122:4

**identify** 112:1 157:5,9
191:9 205:8 208:7

**imagine** 78:4 184:21

**immaterial** 111:10
114:14

**immediately** 139:3
204:2

**impact** 159:18

**impertinent** 49:9

**important** 39:10 40:15
42:12 92:16 109:18
112:15 179:1 226:24

**improperly** 186:19

**inaccurate** 89:2

**inappropriate** 111:9

**inappropriately**
141:22

**incident** 128:2

**include** 143:9 202:13

**included** 27:24 134:9
143:3,5,11 202:3 220:7,
10

**including** 27:25 39:3
44:6 170:9

**income** 13:25

**incomplete** 63:1

**incorporate** 158:3

**incredibly** 49:8 182:9

**indemnification**
228:5,8,22

**indemnify** 138:17
226:3 227:6

**independent** 19:10
108:2

**individual** 12:10
180:11

**individually** 11:15,17
176:18 179:4 197:13

**inducement** 111:12
113:9 114:17 138:1
208:24 210:19

**inexplicable** 204:17

**inflame** 72:25

**influence** 39:2

**inform** 56:23

**information** 37:9
127:2 144:4 216:5
225:11,12 227:13

**informed** 31:2 137:19

**informing** 97:20

**initial** 30:6 173:15,17

**initially** 19:2 103:4,9
142:4

**initiated** 186:21

**injury** 151:20

**input** 103:2,14,20 106:1

**insert** 200:12

**inside** 32:25

**insist** 56:13 65:16 97:5,
6,23

**inspected** 191:23

**instances** 13:25
101:14 148:4

**instruct** 56:13



**insulted** 150:12

**integrated** 80:24 81:2 87:25 90:15 96:15 98:3 105:8 106:8

**integration** 170:14

**intelligence** 179:23 182:5 183:6

**intend** 204:3

**intended** 82:24 86:10 142:10 149:7 177:17 178:12,17

**intending** 177:21

**intent** 47:17

**intentional** 57:24 73:7

**intentionally** 62:22 72:24

**intentions** 62:25

**intercede** 97:5

**interest** 81:16 130:16

**interfere** 121:12

**interfering** 48:17 67:11 68:18

**interjected** 128:23

**international** 219:19

**Interrogatories** 191:4

**Interrogatory** 191:9

**interrupting** 155:23 156:1

**intervention** 119:18 158:13 160:3

**intimately** 30:11

**introduced** 136:14

**invested** 43:14

**investigate** 126:24 191:11 192:23 193:25

**investigated** 124:8

**investigation** 53:8 193:2,4

**investments** 43:18

**invoice** 192:8

**involve** 148:22 151:2

**involved** 13:19 16:14 19:3 20:8 28:7 29:9,17 37:21,24 46:17 49:15 50:16 55:15 69:4 74:2,3 77:16 125:23 126:6,12, 13,15,18 127:21 128:16 158:11,18 159:5,6,12 167:11 177:8 192:24 193:7 201:12 206:3 226:8

**involvement** 75:7 77:6 188:16 193:5

**irrelevant** 49:9 111:9 114:14 203:12 204:20

**issue** 30:3 35:13,22 50:18 85:20 86:2,11 92:21 96:19 115:25 127:20 128:21,23 133:16,20 134:24 135:10 137:20,23 170:10

**issued** 51:2,9 148:7 219:17

**issues** 22:4 23:4 25:1 28:18 38:24 39:7 75:8 85:25 103:15 105:3,5 163:2 169:2 170:8 177:23 203:12 212:1

**item** 38:9

**iteration** 102:23

---

**J**

**jail** 52:1,4,7

**January** 187:17

**jeopardize** 117:23

**jeopardizing** 92:6

**Jesus** 72:7 131:21

**Jewell** 8:13 47:11 48:22 67:20 70:3 112:13 117:24 120:6,7 121:13,15 142:24 159:11,25 161:23

**Jewell's** 121:20

**job** 39:13 41:8 224:14

**Joey** 28:7 29:16 30:2 33:12 47:14 49:14 57:14 59:10 75:18 86:6, 11 109:2 111:20 114:12 115:15 116:15 119:8 177:7,9 179:1 200:13 201:2 204:13 217:18 221:17,25 222:21

**John** 14:23

**Johnathan** 10:3,9,19 12:7,8,16 15:10 19:2 20:8 23:14 24:19 29:8 40:12 41:7 56:4,20 62:5 77:5 80:7 89:13 124:14 125:19 128:1 129:9 130:14 135:8 137:24 158:10,19,22 160:2 161:1 177:17 178:12 186:18,25 188:6,17,22 194:18 200:6 219:2,11

**Johnathan's** 194:5

**joined** 8:16 10:4 52:11

**Jonathan** 40:14,19 97:20 115:21 154:21

**Jones** 191:23 192:17 193:13,24 200:10

**judge** 79:24 80:2 92:23 116:11 175:12 189:13 196:5 216:23 226:9,10 228:1

**judge's** 195:22

**judgment** 228:7

**Julie** 56:2 62:2 66:3,9 95:22,23 226:14

**July** 107:11 136:13 138:19 173:15 178:1,3, 7,9 224:22

**jumped** 32:9 126:2

**jury** 16:19 69:3 126:7, 23 127:6,14,19,21

**Jus** 214:15

**justified** 94:25 142:2

**Jewell's** 121:20

---

**K**

**keeping** 41:4

**Kentucky** 56:23 81:25 145:13

**Kentucky's** 34:1

**keys** 40:7 94:13 95:17

**kidding** 54:13

**kids** 160:25

**Kimmy** 39:1,8,11 40:18,24 41:6,8,10,14, 21 42:13,16 43:9

**Kimmy's** 43:14

**kind** 8:13 13:12 54:7 58:24 122:18 181:15,22 220:2

**kinds** 221:10

**King** 112:23 148:10 207:19

**knew** 34:2,3 49:2,12 57:7 69:21 74:2 101:14 119:19 121:14 129:16 130:25 131:23 136:9 140:1 177:22 179:2 181:8 189:6 205:12 221:5

**knowing** 50:24 66:21 139:19,20 144:19 215:8

**knowledge** 14:24 42:18 84:10,11 134:3

**knowledgeable** 41:20

---

**L**

**La** 104:25 105:2,12,24 206:6

**lack** 69:5

**Lake** 132:1

**land** 60:19

**landlord** 26:12 27:10, 12 172:23

**large** 52:14 104:4,9



Case 1:22-cv-01073-MLB   Document 69-1   Filed 04/17/23   Page 277 of 313

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD
248Index: larger–lose

**larger** 13:13

**largesse** 168:18

**late** 173:15 187:4

**law** 8:2,9 11:21 12:1
13:22 16:9 18:16 19:10,
12 33:1 36:16,19,20
37:3,5 41:11 42:18,19
51:21 52:15 53:21,22
54:24 56:23 64:17,18,
22 82:11 89:24,25 99:8,
12 100:19 102:21 103:6
108:7,10,12 120:14
129:18 140:17 150:21
159:8 171:11 188:2
197:6 220:16 221:5
222:22 223:1,9 225:13

**lawsuit** 42:19 44:6
51:2,12 52:14 111:3
113:6 114:11 115:14,20
118:10 131:7 145:12
146:13 147:17,18 148:8
149:7,17,20 152:2
154:23 198:16 207:23
209:13 210:12,13
226:13

**lawsuits** 8:6 44:7 146:7
150:20 154:2,19

**lawyer** 11:23 52:12,16
53:3 97:24 103:5
105:23 110:23 119:25
121:20 129:5 140:4,25
148:10 153:4 168:3
171:12 172:22,23
174:18 175:2 178:13,15
184:16 219:9 220:4,6

**lawyers** 10:1,2 33:20
34:25 47:2 60:11 82:8
85:7,17 88:9 89:5 95:1,
25 96:6 126:5 128:6
131:22 133:19 141:3
142:8 146:7 147:13
172:10 219:10,13,15,24
220:20,24 221:12,18
227:9

**lead** 97:24 105:21
131:10,14,17,18 132:10

**leading** 117:15 121:1
157:11 161:14 186:17
188:19

**leaked** 163:20

**learned** 29:5 30:2
32:13 41:23 42:2 124:5

**lease** 19:13 25:2 26:11
27:15 29:1 34:13 40:5,6
62:9 63:9,24 65:8,12
68:12,13 69:13 86:2
91:2 93:16 94:1,4,5,14,
23 95:1,4,5,12,13,14,19
96:16 115:9 172:16,21,
22 173:9,10 174:1
201:10 202:23

**leave** 37:16 40:5 44:9
63:3,23 72:6 217:2

**leaving** 11:19 175:9

**lecture** 156:2

**led** 8:13 29:16 125:17

**left** 8:1,22 17:25 18:20
21:18 23:8 33:20 44:1
52:12 60:18 85:21
116:22 172:1

**legal** 34:17,21 35:11
45:20 46:4,14 102:9
108:2 116:10,11 132:23
206:3 225:20 228:9,15,
18

**legible** 200:22

**legitimate** 99:5 146:13
183:25 188:5

**legitimately** 99:14
100:21

**length** 88:16

**lessen** 196:7

**letter** 56:1,25 57:2,3,6
63:12 65:14 66:13 77:8,
11,14,15,18,21,24 78:2,
4,9,10,14,17,18 97:8
107:11,17,18 136:13
138:19 162:14 213:10
224:22 225:4,23

**leverage** 49:3 141:22
165:18

**liability** 62:10 68:12
170:10

**liable** 134:1 138:10,16

220:15 225:25

**liberal** 54:10,12,14,15,
16

**Liberte** 104:25 105:2,
13,24 206:6

**lie** 57:24 61:17 140:10

**life** 47:10 93:16 225:18

**lifting** 46:4

**light** 85:12 156:13

**light-hearted** 16:8

**limitation** 39:4

**limitations** 225:8
228:4,9

**Lin** 6:2 7:11,16,21 8:3
11:8,11 12:14,15 15:9
17:3,12 18:1,14 19:14
20:1,5,15,21 24:6 31:21
32:6 36:23 39:16 40:6
42:3 57:8 64:22 72:18
73:2 74:8 81:13,21,23
82:7,10 83:19 84:15
88:6 93:7 94:15 105:14
138:14,15 142:16,20
170:22 176:17 177:25
178:25 179:3 180:1,21
194:3 206:23,25 207:1
214:2,24 227:8,9
229:14

**Lindsey** 20:12,14
37:17 38:1,6,8 44:8
75:6,13 76:3,5 98:21
99:11 100:10,11,18
104:24 132:21 133:1
134:15 135:1,20 173:22
194:11 206:4

**lines** 12:23 78:3 222:14

**liquidated** 202:25

**list** 25:7 50:6 113:12
157:18

**listed** 21:4 29:21 44:7

**listen** 69:20 81:9
106:16 171:10 200:6

**listening** 166:10

**literally** 14:24 165:20
202:22

**Lithium** 158:23 159:1

**litigate** 106:11 116:4
171:21

**litigating** 138:22
198:14

**litigation** 43:6 51:5
66:18 91:10,16 92:9
104:8 112:12 129:23
136:23 138:20 142:23
147:24 197:7 202:18,24
203:2,4,5,6,7 217:2
220:11 226:22

**live** 42:9,25 59:15
112:18 135:15

**lived** 91:24 120:16
169:3

**lives** 42:10 185:23

**living** 42:21

**LLC** 12:2,9 219:12

**LLC's** 11:16 13:16
20:2,16,22 38:10

**LLP** 18:16 20:5

**LLW** 169:13 172:16
175:19 176:9

**located** 43:20

**location** 37:6

**locks** 95:9

**long** 19:19 21:14 54:7
61:20 70:16 72:15
102:21 109:19 113:17
122:22 123:15,19
150:22 155:11 171:11
198:14 213:25

**longer** 10:19 11:2
172:1

**looked** 36:9 41:7
102:10 118:22 121:1
124:25 129:10 146:15
173:4 175:1 196:19

**Lord** 72:17

**Lorraine** 200:10

**Los** 16:15 132:6

**lose** 41:8 158:15,16



183:18

**lost** 42:19

**lot** 15:5 20:7 23:16 31:12 46:11,18 50:14 130:17,24 131:1,2 140:25 143:5 150:22 154:18 183:7 184:1,2 194:8

**love** 71:1 92:1,2 129:17 180:22 187:21,22,25 188:4,7

**loves** 188:6

**luck** 165:22 224:16 227:17

**lumping** 179:8

**lunch** 122:17

**M**

**made** 14:16,19 15:5,11, 12 18:20 28:16 43:11 49:2 52:9,25 53:25 56:6,17 60:3 63:4 64:19 66:12 71:11,12 81:5 82:13 89:1,3 96:13 99:6 106:4 110:16,22 112:17 115:12 116:17 119:1 120:18 132:4 137:10 139:2,7,13 140:4 141:10 146:9 148:12 149:16 150:22 151:2,17 153:24 154:3,5 162:4 165:12,23 173:3 183:14 184:17 185:5 189:12 202:25 207:21 208:18 213:16 219:20 222:9 224:11 225:19 227:19, 20,23

**main** 66:16 86:1 128:22,25 182:13,24 183:11,13

**maintain** 7:24 19:13 41:11 43:5 56:18 89:23 120:10

**maintained** 7:10,17

**majority** 43:21,24 44:11 46:8,13 102:1

**make** 13:21 15:2 27:12 33:2,11 42:4,21 55:13 56:6 57:10 58:10 60:17 61:9 63:17 65:22 68:8 69:16,18 72:16 82:15 88:19 90:11 93:15 97:22 107:12 108:16 115:5,6 116:7,24 132:12,15 141:17,18 142:16,20 144:11,17 146:1,9 147:19 152:9 154:2 156:22,23 164:1 165:8 170:12 171:18 176:3,5 185:3 189:24 193:3 194:10 198:17 200:7 213:24 218:25

**makes** 63:13 171:12 207:12 211:13 215:11

**making** 41:18 55:5 56:2 67:19 68:19 70:11 87:22 112:11 120:15 141:3 148:22 149:6 152:6,20 160:12 161:4 187:8 202:21 212:5 215:7

**malpractice** 8:10 137:5,11 138:5 225:20 228:10,16,18

**Malware** 192:18,20

**man** 70:1 150:12

**management** 94:24

**manner** 82:1 129:4

**manufactured** 179:19

**March** 26:1 27:19 28:23 34:12,17 35:24 36:6 38:17 48:16 49:19 50:1, 10 61:9,18 67:22 69:22 71:12,13 73:19 74:15, 17 75:1 80:22,23,25 81:3,4,5 88:1 90:14,15 91:21 92:14,21 96:13, 16,19 97:11 98:3,7,14 99:18 101:10 102:17 104:18 105:6 106:7,9 107:12 109:24 112:10 114:9,21 115:3 117:9, 16 118:3,12,14,17,25 119:7 120:15 121:2 133:8,14 135:25 155:2 157:3,11 160:14 161:14

162:1,10,22 166:3 169:1,2,4 170:13,14,16 172:3,9,12 180:18 185:24 186:18 188:20 189:17 201:13,16 202:5,19 203:8,21 206:9 210:21 211:1,14 212:16 215:5,10 217:16 224:5

**Margaret** 181:5,9 182:16,17,19

**Mark** 166:2

**marked** 6:11,19 13:4,7 14:8 15:17 16:1 17:16, 19 21:8,11 53:17 54:2 76:8,11 78:20 84:18 98:9,12 104:15 107:6,9, 13 109:11 117:10 145:5,8,21 146:22 164:10,17 190:20,23 191:1 192:4

**markings** 199:3

**Marquardt** 30:3 33:13 59:10 86:7 107:18 108:8 116:16 162:16 177:8 200:13

**mass** 14:24

**math** 58:19

**Matt** 69:1 119:17 122:4 127:1 158:14

**matter** 7:2 16:19 26:9 30:24 32:17 47:14 48:9 74:13 129:17 139:14 158:8 188:1 204:7 206:9 225:21

**matters** 7:22 11:25 26:15 31:5 83:9

**Mcgraw** 69:2,3 119:17, 20 125:2

**Mcmurtry** 33:25 48:4 54:4 59:23 78:24 79:10 80:19 81:7 84:5,25 85:3 98:15 107:20 108:24 133:22 144:16 152:16 154:5 196:18

**Mcmurtry's** 195:16

**meaning** 134:10

**means** 208:5

**meant** 60:22 66:4 94:3 97:14,18 129:20 192:10

**Medal** 48:24 67:20 117:25 121:16 159:25

**media** 55:6,17 67:14 128:24

**medical** 8:10 160:11

**Medicare** 8:24 9:2,16

**meet** 39:16 67:21

**meeting** 39:22 40:3,10, 24 41:6 67:23 91:12 92:11,13 121:23 131:19,21

**Melinda** 200:14

**members** 206:24

**memo** 35:2 223:7,9

**mental** 48:21 61:15 67:10 68:20 69:19,20 118:2 119:13,18 121:21 122:3 129:11 142:22 157:8 158:13,21 159:2, 10 160:4 161:7,9 163:1 187:8

**mentally** 61:19 160:15

**mention** 199:23

**mentioned** 138:11

**mercy** 165:20

**merged** 170:16

**meritorious** 147:19

**meruit** 50:13 56:5,13 57:5 65:17,22 66:17 68:8 69:10,15 71:14,17 77:20 79:11,16 80:7,12 82:4,9 89:17 90:4 96:1 97:6 98:20 99:10 107:19 133:24 134:5 165:22 166:21,24 167:20

**meryl** 95:25

**mess** 70:1,3,4 119:21 125:18



**messages** 68:25 110:3

**messed** 182:20

**messy** 110:2

**met** 6:15 67:22 120:1
121:25 181:11

**Microsoft** 125:18

**middle** 61:25 105:11
110:25 188:8

**mighty** 141:13

**Milkevich** 200:10

**Miller** 29:13 75:8
124:15,17 126:1

**Miller's** 36:15 75:14

**million** 115:7,10 116:18
118:10 121:7 141:10
146:2 147:6 152:4,10,
18,20 156:19,21 201:6,
11 202:3,23 204:1
218:16

**mind** 15:19 24:21 25:5
48:8 49:6 57:13 59:4,13
98:25 109:17 126:5
142:10 144:10,18
174:11 175:23 185:10
197:21 205:13 216:8

**mine** 84:8 113:1 167:7
180:10 185:23 188:5
189:4 222:13,15

**mini** 83:23

**minimize** 90:1

**minor's** 81:17

**minuscule** 128:21

**minute** 48:11 70:10
99:23 185:16,18 223:21

**minutes** 40:13,21
122:21 189:19

**mirror** 47:8,15

**misread** 62:22

**misrepresented**
87:20,21

**missing** 120:3

**Misstates** 60:2

**mistake** 86:5 162:5

**mistreatment** 129:7

**misunderstanding**
57:11

**Mockingbird** 128:24

**Monday** 115:17

**money** 13:21 15:5
19:11 21:3 69:5 71:10,
21 72:8 84:6 86:10
91:8,15 92:1,2,3,4,15
93:9,14 109:4 117:18
120:13,18 135:16 142:1
167:23 189:1,16 195:24
196:17 197:3,5 198:5,
12,13,17 212:21 223:3
226:1,20

**moneys** 30:22 81:19,
20,22 82:1

**monitor** 181:18 182:7
183:4,17

**monitored** 181:2 184:6

**monitoring** 180:15

**monitors** 183:4

**month** 12:17 34:12
158:25

**monthly** 158:21

**months** 167:16 224:2

**morning** 58:4

**mother** 70:13,15,20

**motions** 102:9

**motivation** 125:8,22
126:15

**mouth** 187:8

**move** 47:10 63:7 66:25
71:1 88:21 140:2 155:7
189:17 213:21

**moved** 15:24 43:2

**moving** 148:19

**Musk** 16:6,11,18 126:6
127:23 128:13,18
129:23 188:15

**Musk's** 220:3

**mystified** 215:2

---

**N**

**names** 199:23 221:20

**nauseam** 111:18

**NBC** 202:11 206:17

**NBCUNIVERSAL**
206:18,23

**necessarily** 17:2

**needed** 22:13 67:9
75:5 101:11 104:3
129:1 140:5 158:20

**negotiate** 29:18 57:14
89:13 135:7 137:18

**negotiated** 26:1 74:25
86:9 87:24 97:10 119:9
133:18

**negotiating** 45:13

**negotiations** 80:21
172:9

**network** 193:25

**news** 93:10

**nice** 69:25 167:4 184:7

**Nicholas** 33:23 49:2
56:8 67:17 68:6 79:25
80:1 81:20 93:1 102:11
108:4,21 117:22 120:22
144:23 147:7 159:20
162:13 196:2 214:10
216:9

**Nicholas'** 153:11

**Nicole** 8:19 10:2 11:18,
22 12:1,17 15:10 19:3
20:9 23:15 24:19 29:8
56:4,20 62:5 77:5 80:7
89:13 97:20 103:3
124:14 129:8,13 135:8
137:25 154:22 186:16,
22 187:1,9,15 188:4,19
194:18 200:7 219:2,10

**Nicole's** 40:10

**night** 31:9 128:8 204:18

**Nikki** 76:16,19 77:1,8

**mystified** 215:2

78:3,8

**Nods** 62:21 197:1
214:22

**nominal** 147:25

**non-disparagement**
204:8 209:6,15

**nonetheless** 15:1 98:1

**nonresponsive**
149:11 153:17 155:9
213:5 221:14

**nonsense** 65:25 71:2
161:4

**note** 53:22 129:15

**noted** 57:2

**Notice** 6:3

**noticeable** 127:25

**November** 128:3 187:4

**number** 6:11 13:4 14:8
16:1 17:16 21:8 38:25
53:17 76:8 78:20 84:18
91:20 98:9 104:15
107:6 109:11,24 112:8
145:5 146:22 157:24
164:10,23 180:2,4
190:12,20,23 191:8,9
192:4 198:23 206:3
216:2 218:22

**numbers** 179:18
180:24 184:19

---

**O**

**object** 25:12 55:11
57:22 60:1 65:18 71:8
76:25 86:16 88:12
92:18 93:19 94:17
97:17 100:8 107:23
118:19 136:3 139:16
140:8,14 141:19 146:5
148:15 149:2,10 153:16
155:7 163:3 167:21
175:8 199:11 203:15
204:24,25 207:24
211:16 213:4,20 215:19
220:17 221:13 223:11
228:12



**objection** 49:22 60:9
138:6 213:24

**objections** 6:5

**obligated** 82:3 140:21
199:21

**obligation** 30:19 219:1

**obscene** 50:17 180:13
203:11

**obviated** 79:25

**occurred** 23:25 24:20
45:19 49:19 130:12
135:1 177:7 209:18

**occurring** 226:7

**occurs** 83:18

**Oconee** 132:1

**October** 23:15 39:23
128:3 187:4

**off-the-record** 22:9
73:12 175:25 209:22
223:22

**offer** 98:19 99:7 122:24
166:16,17 201:20 218:7

**offered** 11:19 42:13
57:19 165:15 166:13

**offering** 89:16 175:13

**office** 10:8,17 18:22
19:17,21 23:8 32:25
33:18 34:8,9,14 36:23
39:19,25 40:22 62:9
63:5,8,24 64:8,11,13,
16,20 65:1 92:12,14
94:7 99:9 103:19 128:5
129:9 159:8 170:11
172:1,2 187:1 201:10
212:13

**offices** 39:16

**official** 221:22

**oftentimes** 12:12

**on-board** 10:4

**one's** 113:22 206:12

**ongoing** 47:12 49:1
67:16 117:22

**open** 198:9 201:21

**operating** 12:13
196:21

**operation** 159:3 161:6

**operations** 131:3
161:8

**opinion** 49:6 50:25
51:8,20,25 52:17,19
82:2 108:2 110:24
111:4,23 116:5 119:3
137:3 140:7,10 143:1
146:18 148:11 154:1,17
155:3,4,5 184:22 185:6
200:8 203:1,17 218:6
219:5,8,14 220:14
221:22 223:1,14 225:12

**opinions** 200:1

**opportunities** 91:11,
17 92:10

**opportunity** 13:20
15:2 16:14 174:10

**opposite** 108:22

**opposition** 129:6

**option** 180:7 196:22

**oral** 85:6,16 89:4
132:25

**orally** 227:20

**orange** 156:25

**oranges** 153:5

**order** 81:24 89:23 91:9,
16 143:24

**orderly** 129:3

**outburst** 106:22

**outbursts** 106:24

**outrageous** 89:20
142:2

**outsiders** 182:12

**Oval** 92:11,14

**overhead** 12:13,18,22,
25 41:4

**owe** 135:25 172:23
176:18

**owed** 26:10,11 27:3,14
28:25 64:4,6,7 65:1,2,8
69:13 93:15 115:10
149:24 172:15

**owned** 132:2

---

**P**

---

**P.C.** 7:16,21 8:3 11:8,11
12:14,15 15:9 17:4,12
18:1,15 19:14 20:2,5,
15,21 24:6 36:23 39:16
64:22 82:11 84:15
94:15 138:14,15 170:22
178:25 179:3 194:4
206:25

**P.c.'s** 40:6

**p.m.** 76:17 200:20
201:19,22,24 209:19
229:16

**pages** 110:3,5 114:13
192:11

**paid** 11:25 12:1,6,8,10,
12,25 26:6,9 27:14
28:25 41:1,5 56:3 79:11
82:3 84:13 93:14 99:24
102:24 107:19 108:3
118:5 150:1 156:17
167:20 197:13,16,18,25

**pair** 95:2

**Palentir** 164:6

**paragraph** 54:23 55:21
57:3 67:3 71:20 85:5
90:19,20,25 91:4,19
93:25 94:22 95:21
97:12 98:18 145:25
147:3,4 165:3,6,7 166:5
167:25 169:7,9,16,19,
23 170:19 171:4 172:4,
6,7 173:11,12 175:4
176:23 177:2,12,13
178:20,23 185:11 186:8
190:1 191:15 198:22,24
206:11,14

**paragraphs** 179:6
184:8,11

**parents** 57:4

**parking** 12:23

**part** 7:2 9:6,15 18:7
21:17,19 43:19 48:4
52:14 63:5 66:1 67:6
76:14,15 89:16 110:4
114:7 115:10 121:3
127:8 128:13 133:25
134:10 135:12 139:11
142:3 143:23 149:8
151:11 152:7 159:4,7
186:22 189:14 193:3
201:4,8

**participate** 128:12

**participated** 125:5

**parties** 7:4 30:13 46:23
81:24 122:2 169:11,17,
19 170:2 172:10 183:5

**partner** 7:20 10:14 11:4
18:18 54:24 64:22
65:11 99:10 172:2

**partners** 11:5,6,7,10
37:4 64:7,10,11,25
94:6,7

**partnership** 64:23

**party** 9:24 34:15 75:20
138:14

**patient** 207:11 208:2

**Patsy** 14:23

**pattern** 112:9,11 114:8
117:8,17 118:16 148:4
157:3 159:13

**Paul** 43:18

**pause** 196:14

**pay** 11:13,14,17 12:18
16:18 26:14 27:5,8,10,
11 50:14 65:22 68:8
69:13 75:16 79:16
81:21 82:4 83:3 86:10
89:19 90:16 92:24,25
93:1 104:13 115:6,8,13,
18 116:18 118:10 121:7
134:5 135:11 138:23
141:5,7 152:18 153:14
162:8 166:19 174:1
178:24 179:4 199:21
201:9 202:8,22 206:24
212:21 218:25 225:15



227:9

payable 28:24

payday 69:9

paying 29:19 35:12
41:4 42:16 90:3 91:17
96:6 159:16 162:3
172:21 173:9,19 199:19

payment 28:15,23
44:25 86:1 89:14,17,20
92:20 107:12 141:17
143:4 173:24

payments 28:18
173:16,17,18,25 179:3

payout 202:13

pays 204:1

PC 7:11,18 12:2,6,7,10
23:9 43:19,25 64:24
81:21 82:7 94:5,6,23
95:24 105:14 134:8,12
169:13 175:19 176:9,
12,21 197:18,19,22,23
198:1 206:23 207:1

PC's 11:15 12:10,12
13:1,15 15:10 18:21
20:2,16,22 33:15,16
37:11 38:10 41:1 62:12
91:23 100:2 172:16
196:21

peace 42:4 93:18 118:7

peacefully 89:22

pedophilia 128:22

pending 38:15,20
62:13 71:22 147:14,15
202:18 203:4,6,7
206:14 224:11

people 47:6 48:11 52:1
53:8,10,25 57:18 60:24
61:8 63:18 65:24 70:6
90:3 99:7 120:12
121:19 140:23,25
148:2,14 153:3 154:18
158:24 160:22 163:18,
19 167:16 168:15
173:25 180:13 182:1,8,
12 183:20,25 184:1,7
185:22 187:11 188:12
220:5 221:5

people's 113:23

percent 12:19,24 23:22
24:6 27:14 59:1,3,16
61:3,6 89:18,19,21
90:17 91:22 96:7 99:25
105:13,14 106:1 167:2,
5 168:19 172:24 185:8
206:24 215:6 218:13

percentage 17:3,12
37:19 38:9 89:14
108:21 133:1

percentages 17:2
59:21 135:17 169:3

perfect 79:7 120:2

performed 44:12 45:8,
21 102:1

performing 99:20

period 7:19,22 9:3
23:14 29:4 39:24
160:10 188:19

peripheral 55:15

peripherally 228:17

permanent 43:20

person 19:5 42:17
43:10 146:10 156:20
181:2

personal 111:10
114:13 196:13,24

personally 111:18
114:25 196:23 203:12

perspective 133:17

persuade 39:11 65:16
97:15

Phil 29:11 69:2,3
119:17,20 122:6,8,10,
11 125:2 126:4,16,17,
19,21 158:11,12,15,17
160:3,5,7

phone 22:1 23:7 40:13
55:16,24 61:1 67:13
124:9 125:21 163:22

phones 164:4

phrase 149:19 211:22
220:5

physical 11:21

place 11:19 167:10
189:18

Plaintiff 8:10 9:12

Plaintiff's 6:10 8:11
13:3 14:7 15:25 17:15
20:16 21:7 53:16 76:7
78:19 84:17 98:8
104:14 107:5 109:10
145:4 146:21 164:9
190:19,22 192:3 201:1

Plaintiffs 7:3 10:2 20:2,
23 21:22 25:24 30:15
37:3,19 38:9 39:11
48:14 49:19 54:19
56:14 64:3 65:17 69:6
99:19 102:1 103:9
110:11 119:11 120:21
121:12 122:2 124:3
125:4 126:12 127:20
128:15 129:21 133:3
136:18 157:10 161:14
162:25 166:13 172:14
180:5 185:13 186:3,10,
13 190:7 191:11 192:24
193:7 194:14 217:22

Plaintiffs' 132:23
218:13

plan 59:21 63:2,4,22

planned 25:9 28:16

planning 29:19

play 61:13

playing 58:24 59:5,20
60:6,21 61:13

Pleading 102:24

Pleadings 11:7,10
102:2,3,8,18 103:7,18

plenty 99:2 223:17

plotting 63:7

pocket 71:5 216:19

point 20:8 28:2 30:16
46:1 48:5,8 80:6 86:8,
15 87:22 96:12 105:1
119:11 120:20 123:18
144:11 146:10 156:22
164:8 180:2 185:19

187:5

pointed 119:14 134:4

police 139:23

policies 53:1

pornography 180:13
182:3 183:16

portion 11:14 16:13
62:12 149:24 172:16,20
173:8 196:10 206:25

portions 15:11

posed 47:12

position 57:8,11 66:12
80:4 82:9,20 120:5
136:6 139:12 158:10
185:5 213:19

positions 80:21 81:4
97:21 108:15 134:4

possibly 91:11 92:10
122:7

post 46:22 137:7
143:12 147:1,21 156:8
177:4 182:13 183:21
198:25 206:15 207:4,7
214:11 215:8,16 216:21
217:11,17,23 218:5
219:7

posted 52:17 183:4,11
219:7

posthumously 48:23

posting 183:2

postponed 195:23

posts 137:4 182:11
185:14

potential 7:4 16:16
68:5 226:12

potentially 15:2 33:4
133:23 158:7 216:12

Powell 7:20,23 8:1,16

power 122:18

powwow 161:3

practical 26:9

practice 8:14 13:23



19:13 41:11 42:18,19
64:17,18 89:25 188:2

**practiced** 8:2 36:20,21,
22 37:3,5 150:21

**practices** 89:25

**practicing** 33:1 99:8
102:21 103:6 171:11

**prayed** 6:24

**pre-march** 106:11

**preamble** 6:18

**preceding** 91:19

**predated** 7:22 80:20
108:25

**predates** 101:9

**predating** 35:23

**preferably** 30:6

**preference** 118:7

**preliminary** 27:19

**preparation** 6:22
103:4 188:15 220:9

**prepare** 35:2,10 38:1
109:3 129:3 185:1
222:7

**prepared** 51:1 98:19
109:1,2 171:16 174:12
184:15,16 222:6

**preparing** 55:25 78:13
102:9

**present** 16:24

**presented** 49:13 91:11
92:10

**President** 48:23 67:19
92:12 117:24 121:22
142:25 147:22 159:24
223:6

**presidential** 48:24
67:20 117:25 121:16
159:25

**press** 51:2,9 111:20
112:21 136:21,23
209:12,13 220:7 222:2

**pressure** 141:23 162:3

**presumed** 148:23

**pretty** 17:11 112:5
138:22

**prevailing** 9:24

**prevent** 56:7 68:10
69:5

**previous** 166:15

**previously** 122:11
133:7 158:4 165:16
166:14 180:5 181:12

**primarily** 8:5

**principles** 118:6,8

**prior** 29:4 80:21,24
87:25 90:14 96:15
105:7 106:7 124:1
131:14 133:22 139:3
170:15

**privacy** 67:15 163:21

**private** 219:20

**privately** 142:7

**privilege** 207:22
224:12

**privileged** 216:5

**probate** 79:24 80:1
92:23 195:22 196:3

**problem** 29:13,14 87:4
90:18 98:21 100:10
103:22 124:24 172:3
182:22 190:11 205:11

**problems** 23:17
187:19 203:14 216:22

**proceeded** 92:23

**proceeding** 103:16
143:21

**proceeds** 30:23 32:18

**process** 152:19 193:16
206:13

**profanity** 182:3

**professional** 7:24

**profile** 16:15

**Project** 220:21

**promise** 24:25 70:14
210:9,10

**promises** 84:5

**proof** 171:15

**propaganda** 182:4

**propagandist** 179:24

**proper** 147:20 213:22

**property** 43:13

**proposal** 201:18

**propose** 6:4

**proposed** 24:5

**prosper** 57:18

**protect** 81:15

**protected** 190:15
220:14

**protection** 144:21
200:9

**proves** 114:7

**provide** 92:3

**provided** 225:13

**psychological** 131:3
159:3 160:12 161:6,8

**public** 52:17 110:24
111:23 137:15 148:7,9
154:14 163:20 185:6

**publicize** 62:15 67:5
68:15

**publicly** 116:4 121:15
140:5

**published** 51:13,17
113:3 207:22 222:3

**pull** 95:8

**pulled** 218:21

**punitive** 148:22 151:3,
20

**puppies** 70:5

**pure** 111:3

**purport** 164:13

**purpose** 160:6

**purposes** 142:11

**pursuant** 6:3 15:6
25:25 26:3 33:23 34:1
92:20

**pursue** 91:10,16
185:12 186:2

**put** 15:15 28:6,7 38:22
39:13 51:16 52:1,4,6
53:11 57:6,12 71:21
83:2,4 84:5 86:4,6
109:7 112:21,24,25
115:18 120:4 133:24
134:2 147:16 148:6,8
152:22 154:10,25
171:22 180:13 182:23
185:5 213:6

**putting** 53:12 70:23
141:12

**Q**

**quantify** 148:24 151:21

**quantitate** 102:5

**quantum** 50:13 56:5,13
57:5 65:17,22 66:17
68:8 69:10,15 71:13,17
77:20 79:11,16 80:7,12
82:4,9 89:17 90:4 95:25
96:1 97:6 98:20 99:10
107:19 133:23 134:5
165:21 166:21,24
167:20

**question** 6:6 26:24
27:22 31:15,21 32:7
36:10 38:7 46:11 62:18
69:19 80:9 84:9 86:18
87:9 88:17,23 89:8,10
91:14 93:21,23 96:25
99:16,17 114:2 125:3
130:8 136:20 139:9
143:8 148:16 150:8,10
151:15 153:8,21,23
155:15,23,24 156:6
157:25 169:22 170:25
174:20,21,22 176:3
188:18 191:8 192:22
194:16 196:17 201:23
202:2 203:19 205:3,6,
23 207:10 208:1 212:5,
11 213:1,9,16 214:16



215:24 220:19,23
221:16 225:6 228:15

**questioning** 133:19
159:9 162:23

**questions** 83:14,20,22
106:16,19 123:14
127:24 150:25 156:4
205:25 207:9 210:7
223:25

**quibble** 109:25

**quick** 123:22

**quickly** 15:24 70:9
104:6 109:22 180:15
183:14 187:9 213:7

**quit** 156:1,2

---

**R**

**raised** 41:13 75:25

**Ramsey** 13:10 14:14,
20,23,25 15:5 20:20
59:2 61:4 189:8

**ran** 19:18

**random** 77:24

**ransom** 90:3

**re-answered** 31:16

**re-litigate** 135:10

**re-plowing** 194:6

**re-settle** 218:24

**reach** 15:20 22:3 74:7
135:7 193:9

**reached** 18:10 22:1,23
38:16 47:24 74:9,10,18,
23 135:13 166:7 167:6
169:11,17

**reaching** 107:21

**reaction** 173:4

**read** 24:8 34:23 40:11
51:17 55:22 56:9 62:20,
25 70:7,21 76:12 90:5,7
95:5 109:21 165:6
168:8 176:24,25 191:7
200:15 203:24 210:17
214:15,18 215:23 216:1

229:5

**reading** 165:10 200:22

**real** 70:9 115:22 116:25
125:3 132:20 206:20

**reality** 63:20 106:6

**realize** 62:5 69:16

**realized** 16:17 29:24
63:2 69:8 101:10
183:15

**rear-view** 47:8,15

**reason** 29:7 54:21
66:15 147:11 148:17
167:8 175:14 183:10
220:12

**reasonable** 142:6
154:10

**reasoning** 34:18

**reasons** 66:16 184:17

**rebuke** 72:21

**recall** 26:8 33:24 44:14
53:12 135:12 188:11
202:6 209:8 226:7

**receive** 6:21 12:16 26:5
38:10 62:6 90:4 121:15
167:12

**received** 17:13 28:9
57:3 84:15 133:2 177:5
194:25 195:4,15,24
196:10 207:1

**receiving** 17:8 37:20
88:5 179:21

**recently** 116:23 147:22

**recognition** 120:7

**recognized** 118:23,24

**recollection** 18:25
19:25 20:13,19 21:4
36:5 73:20 74:20
134:16 186:24,25

**recommending** 109:5

**reconstruct** 98:23
99:14 100:5,13,21
101:6 220:25

**record** 60:11 72:23
73:4 99:20,22 101:1
144:14 145:15 148:9
150:14 191:7 200:15
214:17 215:25 223:20

**recorded** 99:23

**recording** 101:12

**records** 116:10,12

**recover** 134:12 146:9

**recovered** 11:14

**recovery** 9:23 16:16,25
22:13 44:10 57:5 71:14
177:3

**red** 136:25 222:14,16,
17,18,19

**redundant** 114:14
204:21

**refer** 11:3 24:13 78:10
81:7 104:22 139:18
158:3 171:4 177:12
179:6 186:9 208:14

**reference** 38:21 52:25
63:13 100:18 111:2
195:7

**referenced** 104:19
124:1 157:6 194:18
201:13 202:4 205:9
206:2 211:7

**references** 203:20
211:23

**referral** 75:17

**referrals** 144:5

**referred** 10:13,14
75:12 160:2 208:8

**referring** 77:9,22 92:13
207:18 209:14

**reflect** 20:14 30:20
84:23

**reflected** 21:23 37:19

**reflects** 18:13 23:1

**refresh** 19:25 73:19
74:19

**refreshed** 20:7

**refreshes** 18:25
175:22

**refuse** 142:6

**refusing** 107:12

**regard** 119:12 120:21
134:15

**regular** 67:10 158:21

**regularly** 99:19 101:1

**regulations** 32:24

**Reid** 105:3,13 206:7

**reimburse** 198:1

**reinstated** 189:14

**related** 29:11,12 65:8
85:23 102:11 114:9
124:17 125:2 146:8
179:7 189:10 207:3
225:20 226:24

**relates** 65:11 128:11

**relation** 89:15

**relationship** 11:6 23:3
37:11 47:16 48:17
67:11 68:3,18 70:2,7,22
85:21 92:7 111:11
117:21 119:22 120:11
121:12

**release** 51:2,9 111:20
112:21 209:12,13 220:8
222:2

**released** 111:14
114:19 115:1 208:24

**relevant** 35:6 110:4

**reliance** 227:7

**relied** 33:6 34:2 35:24
108:13,14 136:11
138:17

**relying** 115:4

**remained** 201:21

**remaining** 62:9 197:3

**remains** 198:5

**remarkably** 46:6

**remember** 10:7 15:7,8
16:10 21:21,25 22:6



23:6,9,20 25:19 35:15
36:5 45:3,5 56:21 75:22
79:18,22 80:20 112:8
131:16 133:11 137:8
158:14 180:1,17 181:6
187:5,14 188:9 194:13,
15 202:8 210:14,16
217:13 218:1 219:25
220:24 221:20

**remotely** 43:9

**remove** 124:16

**removed** 40:7,8

**renew** 159:23

**rent** 171:5

**repeatedly** 110:10
185:4

**repeating** 168:6

**replies** 180:12 183:21

**reply** 180:10,22 182:15,
25 183:3 184:4

**report** 51:22 52:22
53:14,15

**represent** 8:23 25:22
74:8 101:11 120:8
135:22 224:12

**representation** 8:12
47:13 67:16 127:22
135:5,13 137:6,12
138:8 164:16 224:2
225:21

**represented** 53:3,4
55:4,5,19 109:23 119:6

**representing** 14:22
52:10 111:22 217:20
224:14

**request** 22:18 41:3
92:14 123:4,18 142:7
177:5,10

**requested** 80:13 92:12
214:18 216:1

**require** 34:5 144:15

**required** 7:24 33:22,25
34:19 35:14 37:14
50:19 115:25 141:18
142:14 224:19

**requirement** 31:1

**requirements** 135:19

**requires** 96:23

**rescue** 130:24

**research** 34:21 35:1,2,
11,19 102:9

**reserved** 6:7 229:12

**residence** 43:2,21

**resolution** 62:13 71:22
120:2

**resolve** 18:7 35:12
89:22 139:14

**resolved** 26:7 34:6
38:24 50:18 65:25
66:25 72:5 166:1 169:3,
14,15 170:9,23 185:22
206:12 228:24

**resolving** 39:7 206:13

**respect** 49:7 67:16
69:1 89:24 105:12
112:10 130:9 202:16
206:14

**respectful** 99:6

**respective** 12:19 15:11
167:11

**respects** 160:16

**respond** 106:12 116:8
142:5 171:19 213:13

**responded** 191:15

**responding** 102:3

**response** 116:7,8
181:3 182:11 191:5
194:16

**responses** 165:12
183:11,14 191:17

**responsibility** 86:2

**responsible** 94:16
95:13 134:7 138:15
156:12,14 226:2

**responsiveness** 6:6
213:21

**rest** 209:25

**result** 189:10

**retain** 221:5

**retained** 74:8,11

**retire** 120:9

**returning** 39:3

**reveal** 193:6

**revealed** 193:4

**reverse** 217:1

**reversed** 189:13

**review** 6:25 7:1 79:3
174:23

**reviewed** 116:23
136:24 204:4 222:2,9

**rewrite** 103:23

**Reyes** 226:8

**Reynolds** 45:3 132:2

**Richard** 8:13 47:11
48:22 67:20 68:4 70:3
112:13,14 117:24
120:6,7 121:13,15,20,
24 142:24 159:11,24
161:23

**Rick** 29:13 36:15 75:8,
14,16 124:15,17 125:25

**rid** 56:6 159:15

**rig** 126:7

**rigged** 69:4 126:23

**rigging** 127:14

**riot** 40:11

**ripped** 40:13

**risk** 39:13 70:24

**road** 159:21

**rocket** 182:2

**role** 131:14 132:10

**room** 175:9

**root** 92:2

**rude** 26:18 128:6

**rule** 32:14,20 34:23
35:20 75:22,24 108:18

167:9 225:8,18

**ruler** 150:15

**rules** 30:12 31:2 33:24
34:1 53:5 136:7 225:17
227:11

**ruling** 115:24

**running** 160:9 187:7

**runs** 42:18,20 228:8

**rush** 142:5 204:17

---

**S**

**sabotage** 126:7 129:22

**sabotaging** 128:12,16

**safe** 180:7

**salacious** 111:9
114:13,24 204:20

**salary** 42:13

**Sandmann** 22:14 26:7,
15 30:3 32:12 33:23
36:11 37:13,16,17 38:5
44:8,20 46:4,9,14,17
47:13,18,19,22 49:2
50:19 56:12,18 57:4,8
60:16 61:3 65:16 67:17
68:6 75:23 77:4 81:20
85:1 90:17 91:10 92:8
99:3,12 100:18 101:6,
23 102:4 103:8 104:5,6,
24 108:21 117:23
120:8,9,22 134:21
136:1 142:23 145:12
146:1,16 147:2,7
152:12 159:20 162:6
167:8,13 177:3 194:25
195:5,15 197:4,12
198:12,13 202:14
206:5,15 207:4 214:11
215:16,17 216:9 217:25
224:1,2,20

**Sandmann's** 63:14
77:19 80:19 81:8,12
82:2,21 97:15 112:14
120:22 133:9 154:16
215:21,22

**sandwich** 122:21



**sat** 115:21

**satisfaction** 204:2

**satisfactory** 93:7

**satisfied** 27:9

**satisfy** 72:4

**save** 6:5 32:1 194:7 200:22

**Savior** 72:17

**scale** 104:7

**scandalous** 49:9

**scenario** 62:10

**schedule** 16:24 17:22 20:13

**scheduled** 91:11

**scheme** 201:4

**science** 182:2

**seal** 116:9,10,11 143:24 144:1

**sealed** 143:20

**search** 192:9

**second-guess** 35:18

**secondhand** 226:18

**secret** 226:19

**seek** 221:21

**seeking** 71:14 160:3 228:21

**semblance** 89:23

**send** 12:16 14:4 56:25 78:3 125:15 162:17,20 177:21 178:18 182:24 227:12,15

**sending** 76:18 178:14, 15 183:2

**sends** 80:11

**sense** 14:16 139:7,13, 22 202:25 207:12 211:13 215:11 220:13 221:9 223:8

**sensed** 40:2,4

**senses** 65:24 68:10

**sentence** 61:25 90:20 94:1 97:13,14 99:4 100:17

**sentences** 95:2 211:12

**separate** 12:11 28:17 38:8 132:23

**separately** 20:15 54:20

**separation** 89:24

**September** 7:17 51:10 111:3 112:19,22 114:8 118:23 139:2 143:3

**series** 123:14 161:12 171:6

**services** 82:5 99:21

**set** 26:6,13 59:13 150:25 152:25 157:22 172:13 182:15,25 183:13 191:4 201:5,16 208:14 226:6

**sets** 22:22

**settle** 93:12 105:5 167:4 189:11

**settled** 9:1 15:9 45:18 46:23,25 47:14 48:10 76:5 79:23 85:19 102:17 104:6 105:3 147:23,24 162:6 167:4, 15 189:5,12 207:8 210:20 211:1,6,13 214:12 215:1,3 216:24 217:11 218:23,24 219:1

**settlement** 17:7,20 18:13 21:1 25:5,8 29:21 30:9,22 37:18 38:13 45:12,25 46:9,15 47:23 49:20 61:18 75:6 76:2 79:23 81:18 98:24 100:6,14 104:19 107:13 116:3 117:10 118:18 119:7 132:21,22 133:8 134:15 135:1,21 136:1 137:18 143:13 154:8 157:11 162:1 172:11 188:20 195:9 201:14 202:5 204:5 205:9 206:9 208:8 210:21 211:3,5,8,23,24,25

212:3,15,17 224:3 225:1

**setup** 40:2

**sever** 23:3

**sex** 130:25

**SG** 18:16 19:10,12

**shake** 220:4

**Shame** 72:20 162:20

**shape** 15:15

**shaped** 103:14

**share** 13:9 25:23 26:11 28:25 41:5 46:6 56:19 72:6 84:15 85:8,17 88:10 89:6 115:9 172:21 173:9,21 174:1 198:13 201:10 202:14

**shared** 12:17,25

**shares** 12:13

**sharing** 10:8,17 14:14 18:22 19:15,17,21 23:8 33:19,20 34:14 39:19, 25 63:6 64:8,11,13,16, 20 65:1 94:7 99:9 172:2 194:13 224:20

**shield** 179:23

**shift** 8:13

**shifted** 9:5

**short** 132:13,17 189:21 196:14 210:4

**shortly** 25:20 169:10

**show** 20:15,17 50:22 143:10 205:15

**showed** 17:8 20:20 21:3 30:20 118:4 148:4

**shows** 109:23 168:21

**shut** 159:15

**side** 172:10

**sign** 11:7 186:5 196:3 229:6

**SIGNATURE** 229:12

**signed** 11:10 34:11,12

56:1 106:10 119:6 133:14

**signers** 95:13

**significant** 13:25 15:3 16:16 170:10 217:24

**significantly** 218:11

**similar** 16:5 225:6

**similarly** 12:3

**simple** 26:23 90:13 112:6 148:16 161:20 199:12 207:10 208:1

**simpler** 14:2

**simply** 14:3 150:18 170:6 220:19

**single** 119:10

**sister** 75:15

**sit** 39:24 72:25 109:19 126:13 132:3 138:3 150:12 179:13

**sitting** 115:4 140:16 159:14 177:17 187:2

**situation** 162:4

**skill** 42:17

**skilled** 41:20

**skips** 145:11

**slander** 152:21

**slanderous** 204:20 219:3

**slate** 91:9,16

**small** 149:8

**smart** 11:23 129:14 187:11

**smear** 49:11,15 115:19 118:11 142:11 153:15 203:13 204:21 219:3

**smears** 114:25 204:23

**smiling** 72:23

**smirking** 72:23

**Soliciting** 200:1

**solid** 51:20



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD
257Index: son–takes

**son** 69:1 119:17,24 122:4 127:1 130:14 158:25

**son's** 81:15

**sort** 59:20 113:13 131:24 199:2

**sound** 199:24

**sounds** 110:14

**South** 42:25 43:2,12,22 52:13 110:19 140:3 181:13

**space** 19:13 95:4 170:11

**spam** 182:3 183:7

**speak** 7:6 39:1 110:22 111:22 140:5 168:3

**speaking** 21:25 113:23 163:1

**speaks** 85:4 180:1

**specialized** 8:5

**specific** 36:13 113:18 120:20 148:25 157:12, 18 218:1

**specifically** 12:5 125:4 157:5,10 220:9

**specifics** 151:4 161:19

**speech** 83:8,11,23 87:15,16 93:20 106:13 207:25

**spend** 43:21,24 45:17 72:14 128:24

**spent** 198:14

**split** 19:9 24:5 75:17 105:13 137:18 167:1,12 172:13 179:2 197:23 206:3 211:7

**splits** 21:23 22:24 30:12 33:14 58:7 136:8 178:25 179:5 211:24 212:16

**splitting** 166:8

**spoke** 7:5 45:4

**spread** 148:10

**Stacey** 18:17 19:4,16

**stand** 106:4

**standing** 187:1

**start** 61:24 114:11 221:10

**started** 8:7,9,19 55:5 126:24 180:3 183:2 187:3

**starting** 11:20 23:15 39:23 128:2

**starts** 228:5

**state** 42:20 43:6 85:6 95:22 98:19 99:5 159:3 186:10,12 191:22 197:7 211:12

**stated** 88:6,8 90:21 110:10 133:6 137:4 184:22 200:9

**statement** 17:21 18:13 21:1 25:5,8 29:22 35:14 38:2,13 66:12 76:2 84:4 85:12 89:2,3 90:11 109:5 123:1 136:21,23 137:10 148:7 151:23 168:4 176:4,6 177:1 185:4 189:24 194:21 195:10 212:6 213:16 218:1 219:17 220:10 221:19

**statements** 17:7 37:18 68:19 94:8 110:16 111:24 113:3 117:7 133:22 190:14 219:20

**states** 211:3 223:7

**stating** 79:10 107:19

**status** 7:23

**statute** 228:4,5,8,9,19

**stay** 41:14,21,24 42:3,7 43:7 73:3

**stayed** 86:14

**step** 15:18 185:20 193:10

**steps** 129:22

**Steve** 9:19 99:23

**stick** 40:5 63:8 68:11 131:5

**stigma** 10:12

**stinks** 126:16

**stood** 118:6,8

**stop** 31:21 63:20,21 66:1,20,23 67:25 68:2, 17 69:23 155:12

**stopped** 125:14,16 183:1

**stopping** 123:18

**stops** 121:19

**strategy** 106:2

**strictly** 41:2

**strike** 155:8 213:22

**striking** 116:12

**strongly** 137:1

**struggling** 190:4

**stuck** 63:23 228:6

**Study** 161:8 164:4

**stuff** 31:23 40:23 81:1 141:9 142:9

**subject** 20:6 31:18 66:8 67:13 79:24 92:20 123:4 206:9

**subjected** 53:7

**subscribers** 179:18 180:4

**subsequently** 137:22 169:20 170:2 171:7

**substantially** 45:7 180:4 190:15

**subverting** 70:6

**sudden** 118:9 119:3

**sue** 50:13 71:13,16 111:15 113:6 114:21,22 115:3 116:19 129:10 134:12 139:14 152:19 156:19 187:6 201:25 222:20

**sued** 112:20 113:8 138:1 220:11

**sues** 153:4

**suggested** 190:12 219:8

**suggesting** 34:7 121:20

**suggestions** 222:10

**suing** 115:1,2 212:22, 23

**suit** 139:3

**sum** 62:6

**summaries** 223:1

**summarize** 62:24

**summarizing** 27:24 223:9

**summary** 222:5,22

**summing** 126:11

**Sunday** 125:12

**Suntrust** 8:21

**Superior** 111:2

**support** 180:22

**supposed** 39:15 178:1

**surprise** 218:2

**surprised** 63:15 93:3,6 109:8 133:7,13,24 134:2,23 217:13

**surrounding** 117:9

**suspect** 38:12

**suspicions** 127:12,16

**switched** 181:25

**system** 120:3 124:7,9, 11

**systems** 193:8

---

**T**

**table** 174:21

**takes** 182:8



**taking** 17:4 72:11 129:22 139:22 208:11 220:3

**talk** 14:13 35:7 39:11 44:16 54:23 71:20 73:7, 11 110:15 118:12 121:23 123:12 130:21 132:13 142:21 155:12 184:1

**talked** 55:16 132:20 161:2 172:22 219:16 221:1,4 227:16

**talking** 13:9 21:13,16 26:19 32:24 47:18,19, 21 69:6 71:3 77:14 90:6 96:18 121:18 130:8 134:17 136:9 137:9,13 141:2 151:1 160:7 162:22 170:20 186:20 195:9,12 200:6 203:12 205:14 207:14 209:17, 20 214:13 215:20 221:10

**talks** 171:6

**tampering** 127:6,19,21 193:7

**Tara** 126:22

**target** 161:7

**Tat** 43:12

**Taylor** 10:3,7,10,19 12:6,9,16 15:10 19:2 20:10 21:14 22:22 23:14,25 24:19 27:23 29:8 38:22 41:23 42:2 44:15 48:6 56:4,20 58:6 59:19 61:1 62:5 69:1 77:6 85:14 88:8 89:13 97:20 105:21 119:16 124:14 125:13 128:1 129:9 130:15 131:13,17 132:9 135:8 137:25 154:21 158:12,18 160:2 161:2 168:13,25 171:24 186:18 187:1 188:6,22 194:18 200:7 219:11

**Taylor's** 21:23 188:17

**tears** 187:22

**technically** 227:22

**Ted** 56:2 62:2 66:3,8 95:22,23

**Telegram** 52:18,24 53:11,13,25 110:3,10, 15 111:5 123:1 137:14 148:13 179:18,21 182:7 183:15

**telling** 82:18 108:6 114:4 121:7 128:7 144:10,17 158:19 168:2 174:11 212:18 213:2 227:9

**tenants** 94:6

**tentative** 45:24

**term** 140:23 141:2

**terminated** 34:13 39:14 224:1

**terms** 24:22 34:7 42:17 49:13 56:19 60:19 64:7 75:9 76:5 102:8 108:15 116:18 121:6 136:7 144:21 152:8 157:7 165:23 173:19 188:1 194:4 216:13

**testified** 134:13 138:25 139:1 194:9 198:4

**testify** 205:21,25

**testimony** 124:2 133:11 171:3 193:23 222:5

**text** 67:13 68:25 119:15 177:13,14,19

**texts** 163:22 164:5

**Thai** 130:24

**Thailand** 131:2

**thankful** 182:9

**thankfully** 115:15

**Thanksgiving** 131:19

**thing** 18:22 59:1 61:3 66:24 76:13 109:22 111:16 116:7,9 118:11 121:5 126:16 155:21 158:25 162:17 185:24 203:16 216:20 219:18

**things** 23:16 24:20 31:19 48:8 65:10 96:14 104:7 118:2 130:16 142:15 154:24 155:1 159:21 165:25 172:17 180:14 183:15 194:4 197:19 198:15 203:22 212:15 218:25 226:24 228:17

**thinking** 59:22 68:11 72:4 121:23 122:25 123:6 141:14

**thinks** 54:17

**thought** 11:21 15:4 29:12 30:18 32:19 40:6 42:5 44:23 47:14 64:6 68:9 69:15 75:9 77:3,23 87:9 93:13 95:10 116:20 117:15 118:4 124:22 125:8,11 129:4 135:15 139:4 141:13 147:18 148:5 154:9 163:5 171:2 185:17,18 197:9 203:13 222:15, 17,18

**thoughts** 130:18

**threat** 70:11 117:20 120:21 121:11 203:4 210:9

**threatened** 49:1 67:15, 17 112:12 119:12

**threatening** 48:20,22 68:4,5 70:22 120:12 161:21,22,23 223:4

**threats** 47:12 53:24 63:21 169:10

**three-page** 146:25

**thrown** 128:4

**thy** 70:12,14,15

**ti** 91:24

**tie** 40:18

**tied** 27:18 148:25

**time** 7:19,21 9:3 10:7 18:8,9 20:6 22:3 23:11, 14 25:4 28:3 29:4,7,12, 24 30:7,8 31:7,17 32:2

34:16 36:21 37:12 39:24 40:12 41:11 42:4, 16,25 43:22,24 45:17 46:10,25 59:5 60:17 61:20 62:25 63:4 64:5 67:24 71:18 72:15 77:2 79:17,23 85:24 90:6 96:15 98:2 99:2,18,22 101:1,8,12,22,24 103:22 107:2,16 108:13 109:17 110:17 111:21 112:4 116:24 119:19 120:25 124:5 128:24,25 131:13 132:8 133:5,16 135:20,22 137:21 140:24 149:14 150:22 153:3 154:4 156:9 159:6,23 160:8 161:18 167:10 174:5 177:22 181:8,22 182:8 185:19 188:19 193:18,22 194:8,12 200:22 208:11 216:8 220:16 221:1 222:20 224:10 226:21 228:10

**times** 9:25 55:17 61:20 155:16 185:4 213:17 223:15,17

**timing** 130:13 132:13 154:24

**today** 71:2 87:21 126:13 130:19 138:4 155:16 174:3 177:18 188:3 223:15

**today's** 204:9 209:16

**Todd** 33:25 48:4,6 54:4, 18 56:12,18 59:23 63:11 65:15 66:8 77:18, 24 78:1,24 79:2 80:19 82:13,22 84:5,24 86:13 93:6 97:5,22,24 98:15 102:12 103:12 107:20 108:24 109:1,2 133:22 144:16,23 152:15 154:4 195:23 196:5,8,18 217:9 218:8 224:13 225:1 227:15,16

**Todd's** 66:13 77:9,11 78:4,9 79:6 84:8

**told** 30:7 33:22 40:23 41:7 68:21 75:5 79:15



85:22 86:14,15 99:1
101:13 106:20 112:23
113:1 119:20 120:17
129:8 132:9 134:14,20
136:5,11,12 138:18
140:6 148:3 161:1,2,17
168:14 192:20 194:15
196:6 199:10 201:18,19
207:13 208:10 215:15,
22 216:3 217:7,9
218:14 221:6,25
222:16,17 223:14,17
224:8,21,22 225:10,14
227:7

**tolled** 228:10,21

**tomorrow** 55:24
204:19

**ton** 31:7

**tonight** 39:7

**top** 76:13,15 84:4 143:7

**total** 17:4 22:13 173:22
216:14

**totality** 130:12 219:4

**totally** 115:11

**touch** 144:16

**tough** 45:15

**tour** 55:6,17

**trafficking** 130:25

**training** 160:11,12

**transitioned** 127:5

**transparency** 32:17

**Trask** 126:22

**treated** 167:16 189:9

**treatment** 67:10
121:21 128:2 158:22
187:3

**trial** 16:14 131:15
132:10 188:15

**trick** 209:10

**trips** 43:11

**trouble** 95:18

**true** 25:11,16 46:3 54:1

85:2,10 94:9,10 100:7,
15 149:21 153:19
156:5,18 160:14,15
171:8 177:1 180:6
190:15 212:8

**Trump** 48:23 67:19
92:12 121:22 142:25
147:22 159:24

**trust** 179:20

**trusted** 133:19

**truth** 94:20 140:6,9
180:1

**truthful** 85:11

**turn** 24:3 110:5 154:14
164:22 198:21 200:11
219:6

**turned** 125:11 196:2

**turns** 138:13 227:3

**TV** 206:6

**Tyler** 191:23 192:17
193:24 194:2

**type** 64:22 228:7

**types** 8:11 116:12

**typical** 13:12,18 161:6

**typo** 94:2 95:6

### U

**Uh-huh** 117:4 226:11

**ultimately** 27:17 28:22
29:16 41:21 42:7 121:2
166:1 171:18 181:23
197:14

**unanimous** 14:17

**unclear** 25:6

**undefined** 149:25

**undergo** 67:10

**underlying** 14:25

**understand** 23:12
31:10 35:5 58:10,22
82:25 84:2 90:18
131:25 165:9 173:14
202:17 205:5 208:3

210:25 213:8,19 214:24

**understanding** 134:6
135:19 140:12 199:7
211:10

**unexplainable** 116:17

**unfair** 184:14

**unhappy** 62:4

**United** 223:7

**unjustified** 115:11

**unpack** 11:1 64:1

**unrelated** 83:9 86:20
112:12

**Unsworth** 16:6,11
127:23 128:17 130:17

**Unworth's** 130:18
131:11

**urge** 41:14

**urged** 108:20

**urging** 65:15 77:18
141:17

### V

**validated** 50:25

**valuable** 42:17

**varied** 14:4 89:16

**variety** 22:24 27:25

**varying** 90:13

**Vernon** 130:17,18
131:11

**versed** 6:16

**versus** 8:21 10:13 12:7
14:21,25 16:6,11 24:4
32:25 37:4,23 47:20,22
85:1 99:11,12 102:4
103:8 104:5 105:2
127:23 128:17 136:1
177:3 194:11 195:15
197:4,12 202:14 206:4,
5,6,7,15,16,23 207:4
214:11 215:16,17
217:25 224:1,20

**viable** 7:18 44:1,2
207:20

**vicious** 57:24

**video** 73:9 229:11

**view** 43:4 45:15,16
142:25 146:18,19
226:20

**viewed** 216:8,10

**Vigilante** 45:4,14,18

**violate** 144:12 227:10

**violated** 225:18

**violation** 63:6 225:17

**vivid** 186:25

**voiceovers** 181:10

**volume** 104:4,9

**volunteer** 181:19

**volunteered** 181:22

**vote** 14:18

### W

**Wade** 10:3 12:1 33:15
39:21 91:22 186:16
188:4,19 219:10,11

**waged** 44:5

**wait** 70:10 76:22,24
185:18 196:1,6 219:19

**waiting** 110:9

**waived** 111:13,14

**walk** 106:22,25

**wanted** 10:15 33:10
42:6 49:14 57:9,17
59:14 60:23 66:16,20
67:25 68:2 75:16 79:17
80:2,5,6 92:5 93:14,17
97:19 100:3 104:2
105:23,25 108:16 116:3
118:7 134:5 150:1
167:1 184:3 189:6,17,
24 193:2,11 194:23
200:7 218:9,23

**warfare** 44:5



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                    260Index: Wargo–Zone

**Wargo** 18:15 19:6,9,11, 12,15 20:5

**warrant** 186:5

**warranted** 134:11

**warranty** 83:2 133:8,25 134:9

**Washington** 46:22 92:11 143:12 147:1,21 156:8 177:4 206:15 207:4,7 214:11 215:8, 16 216:21 217:11,17,23 218:5

**waste** 174:4 226:22

**wasting** 31:6 90:6

**waters** 23:11,20

**Watt** 166:2

**ways** 69:17 148:2

**wealth** 101:23

**wedge** 142:18

**week** 7:9 24:15

**weekend** 131:19

**well-known** 121:17

**WGW** 62:14 71:23 206:24

**WGWB's** 98:19

**whack** 124:7

**whistle** 8:23 9:10,22

**White** 55:5,6,18

**whoops** 206:13

**Wi-fi** 124:11

**wife** 36:15

**willingly** 182:9

**willingness** 39:5

**Wilson** 10:3 12:9 20:11 21:14 39:20 44:15 69:1 85:14 88:8 119:16 132:9 158:12 219:11,12

**Wilson's** 12:6 91:23 128:1

**wished** 112:17 224:16

**withdrawn** 89:10

**withdrew** 89:7

**witnesses** 7:4 226:15

**Wood** 6:2,15 7:10,11, 16,21 8:3 11:8,11 12:14,15 15:9 17:4,12 18:1,14,18 19:14 20:1, 5,15,21 24:6 36:23 39:16,20 40:6 64:22 73:15 74:8 81:21,23 82:7,11 84:15 94:15 105:14 119:17 132:20 138:14,15 170:22 175:19 176:9,17 178:25 179:3,4 180:1,21 194:4 204:21 206:23,25 207:1 210:7 227:8,9 229:14

**Wood's** 57:8

**Wood-ize** 103:3

**word** 11:9 40:20 59:15 222:3,11

**worded** 173:2

**words** 21:4 59:20 68:21,22 161:12 180:22 187:24 197:9

**work** 8:11 9:4,9,10,11, 19 10:1 11:20 13:20 19:4 20:9,10 39:3,5,6, 12,19 40:1 44:11,22 45:7,10,21 46:4,8,14, 17,19,22 48:6 102:1 104:4 161:9 181:7 189:9 192:1 194:3 206:3

**worked** 16:21 27:17 41:1,2 48:7 49:4 102:22 106:3 181:9

**working** 7:19 13:23 44:3 128:16 178:16 218:3

**works** 42:8,24 43:9

**world** 6:17 51:13,17 141:14 148:12 184:1 219:21

**worries** 110:6

**worse** 159:18

**worst-case** 62:10

**worth** 99:13 100:20

**wow** 94:2

**wrap** 209:25

**write** 57:1 77:19 78:11 80:13 111:21 226:5

**writing** 14:6,12 15:21 16:22 22:22 28:6,8 67:24 95:23 119:10 208:11

**written** 58:17 71:15 80:25 85:6,16 89:4 165:19 166:25 172:11

**wrong** 18:11 101:7,16 120:1 124:25 217:10 225:25 227:4 228:6

**wrongdoing** 75:10

**wrongfully** 199:19

**wrote** 27:23 54:4 58:1,3 79:6 96:16 99:19 100:7 107:17 124:23 126:1 158:14 225:3

**Wynn** 9:20 10:25 99:24

---

**Y**

**yah** 60:19

**year** 42:14

**years** 7:10,13 8:25 9:5 103:6 104:9 188:5 228:19

**Yesterday** 219:7

**young** 103:5

---

**Z**

**zillion** 223:15

**Zone** 206:4



## SETTLEMENT AGREEMENT AND GENERAL RELEASE

This **SETTLEMENT AGREEMENT AND GENERAL RELEASE** (this "Agreement") is made and entered into this 17th day of March 2020, by and between L. Lin Wood, P.C. and L. Lin Wood (collectively, "Wood"), on the one hand, and Wade, Grunberg & Wilson, LLC, Nicole Wade, Wade Law, LLC, Jonathan Grunberg, J.D. Grunberg, LLC, Taylor Wilson, G. Taylor Wilson, LLC, and Grunberg & Wilson, LLC (collectively "WGW"), on the other (each party hereto a "Party" and all collectively, the "Parties").

### RECITALS

WHEREAS, Nicole Wade, Jonathan Grunberg, and Taylor Wilson and Wood are lawyers who practiced law and shared office space together for several years.

WHEREAS, WGW never held any ownership interest in L. Lin Wood, P.C. (hereinafter "LLW PC") but have worked as lawyers of L. Lin Wood, P.C. on cases since 2018.

WHEREAS, the Parties have determined that it is in their mutual interest to amicably resolve disputes regarding their business affiliation, define with certainty the parties' obligations and rights regarding cases on which they have been or are presently working together on a case-by-case basis, and to terminate their shared office space arrangement.

WHEREAS, the Parties have agreed to compromise and resolve all claims and controversies now existing between them, and each of the Parties enters into this Agreement to memorialize its understanding and agreement with respect to such compromise and resolution.

NOW, THEREFORE, in consideration of the foregoing, and the respective agreements, warranties and covenants contained herein, the Parties hereto agree, covenant and warrant as follows:

1. Fee Split for Legal Work.

    A.    LLW PC shall pay to WGW a portion of its fees for the following cases as set forth herein (or, as applicable, WGW will pay a portion of fees to LLW PC), subject to the offset for lease expenses described in Section 2 below:

        i.    *Carbone v. CNN:* $54,999.99 from the LLW PC fee, and the parties acknowledge that Carbone was and is the client of LLW PC.

        ii.    *Lindsey v. Clear Zone:* $34,200.00 from the LLW PC fee, and the parties acknowledge that Lindsey was and is the client of LLW PC.

        iii.    *Sandmann v. CNN:* $843,750.00 of the LLW PC court-approved fee, and the parties acknowledge that The Sandmann Family (including Ted, Julie and Nicholas Sandmann) was and is the client of LLW PC.

**EXHIBIT**

tabbies

B

Wood Initials: _MWW)_

WGW Initials: _____

iv.   *Grogan v. Aaron's*: 20% of the court-approved fee will be paid to LLW PC (80% of the court-approved fee will be paid to WGW), and the parties acknowledge Grogan was and is the client of WGW.

v.   *Cordoba, et al v. DirectTV*: 20% of the court-approved fee will be paid to LLW PC (80% of the court-approved fee will be paid to WGW), LLW PC will timely reimburse WGW for 20% of reasonable expenses incurred, and the parties acknowledge Cordoba was and is the client of WGW.

vi.   *La Liberte v. Reid*: 20% of the court-approved fee will be paid to LLW PC (80% of the court-approved fee will be paid to WGW), LLW PC will timely reimburse WGW for 50% of reasonable expenses incurred, and the parties acknowledge La Liberte was and is the client of WGW.

B.   LLW PC shall pay the stated portion of said fees for the three settled cases -- i.e., the ones described in (i), (ii), and (iii) above – to WGW, minus the lease amount referenced in Section 2 below, within 72 hours of LLW PC's receipt of its portion of the fees from the *Sandmann v. CNN* settlement, said payment to be made via wire transfer to WGW at Iberiabank. 200 West Congress Street, Lafayette, LA, 70501, Routing #265270413, Account #2000212841. In the highly unlikely event that the Court approves the settlement but lowers the fee amount paid to LLW PC for that *Sandmann v. CNN* case, the parties will make a corresponding adjustment to the amount set forth in subpart (iii) above.

C.   WGW shall pay the stated portion of said fees for the three cases that have not yet settled – i.e., the ones described in (iv), (v), and (vi) above – to LLW PC within 72 hours of WGW's receipt of its portion of any fees from such cases. With respect to those three cases, each Party will be reimbursed for expenses he or it had incurred as of the date of this Agreement on a dollar-for-dollar basis if and when a recovery is had.

D.   With respect to the pending *Sandmann v. Washington Post* and *Sandmann v. NBCUniversal* cases, LLW PC shall pay to WGW and its members 10% of LLW PC's contractual portion of any contingent fee received by LLW PC in connection with those cases. Any such payments shall be made within 72 hours of LLW PC's receipt of its portion of the fees from those cases. With respect to those two cases, the Parties acknowledge that The Sandmann Family (including Ted, Julie and Nicholas Sandmann) was and is the client of LLW PC. Except as expressly described in this Agreement, WGW and its members shall make no claim for any case in which LLW PC was and is the attorney for its client, The Sandmann Family (including Ted, Julie and Nicholas Sandmann). The Parties acknowledge and agree that WGW and its members have no claim, and make no claim, of entitlement to fees for any other matter, pending or otherwise, in which The Sandmann Family (including Ted, Julie and Nicholas Sandmann) is the client of LLW PC.

E.   With respect to the hourly fee client, the Estate of Martin Luther King, Jr., Inc. ("EMLK"), the Parties recognize that EMLK was and is the client of WGW. EMLK

2

Wood Initials:

WGW Initials:

currently owes approximately $188,503 in overdue bills to LLW PC. The Parties agree to cooperate in attempting to recover these fees, and in the event of any such recovery, payments will be allocated first to expenses owed to LLW PC, if any, and the remainder split 80% to WGW and 20% to LLW PC.

F.      With respect to other hourly fee clients, the Parties agree that those hourly billable matters brought to LLW PC by Nicole Wade, Jonathan Grunberg, or Taylor Wilson were and are clients of WGW, and that LLW PC will cooperate in providing any information or documents for those clients to WGW. The Parties agree that those hourly billable matters brought to LLW PC by Wood were and are clients of LLW PC. The Parties agree that, except as set forth herein and in Section 1(E), no further amounts will be due to either side with respect to any hourly fee billable matters.

2.  Office Lease.

A.      WGW shall pay to LLW PC the amount of $285,000.00 in full satisfaction of any obligations WGW may have, or be alleged to have, under the lease agreement with PR II Regions Plaza, LLC for Suite 2040 at Regions Plaza (the "Lease"). This amount shall be deducted from the payment by LLW PC to WGW referenced in Section 1(B) above. Thus, the total payment required by Section 1(B) shall be in the total amount of $647,949.99.

B.      WGW (which, as noted above, includes its members in their individual capacities and their respective LLCs) shall have no further obligation or liability under the Lease. LLW PC will take all necessary steps to remove the names of WGW members from the Lease and/or to ensure that they have no obligation for further Lease payments, including if possible obtaining a release from PR II Regions Plaza, LLC of WGW or, if such release cannot be obtained, LLW PC and L. Lin Wood, individually, shall agree to indemnify WGW against any claims by PR II Regions Plaza, LLC, or any affiliate, subsidiary, related party, or assignee, relating to the Lease.

3.  Non-Disparagement.  LLW PC and L. Lin Wood, individually, agree not to disparage WGW. This agreement is not to be construed to imply or suggest that LLW PC and/or L. Lin Wood has disparaged WGW or its members prior to the date of this Agreement. Nothing in this provision prevents the Parties from providing truthful information about each other and its members in response to a court order or subpoena, or during any federal, state, or local governmental body investigation or proceeding. LLW PC and L. Lin Wood, individually, do not seek in this Agreement any legal protection regarding any future disparagement of LLW PC and L. Lin Wood, individually, but shall address any future false and defamatory statements by WGW and its members about LLW PC and L. Lin Wood, individually, on a case-by-case basis as provided by law.

4.  Mutual General Release.

A.  *Release by Wood.*  LLW PC and L. Lin Wood, individually, hereby irrevocably and unconditionally forever release and discharge WGW (as defined above), and their heirs, executors, administrators and assigns, and their attorneys and representatives, and

3

Wood Initials: _____

WGW Initials: _____

waive any and all rights with respect to, all manner of actual or potential claims, actions, causes of action, suits, judgments, rights, demands, debts, damages or accountings of whatever nature, legal, equitable or administrative, whether the same are now known or unknown, which LLW PC and L. Lin Wood, individually, ever had, now have or may claim to have, upon or by reason of any acts or omissions of WGW or it members up to the effective date of this Agreement, including but not limited to all claims and liabilities arising from any acts, omissions, cases, or business relationships that have occurred or commenced, or allegedly have occurred or commenced, prior to the date that this Agreement is signed. This is a general release of all such claims.

B.  *Release by WGW.* Nicole Wade, Jonathan Grunberg, and Taylor Wilson, and Wade, Grunberg & Wilson, LLC, for themselves and itself, hereby irrevocably and unconditionally forever release and discharge LLW PC and L. Lin Wood, individually, and their heirs, executors, administrators and assigns, and their attorneys and representatives, and waive any and all rights with respect to, all manner of actual or potential claims, actions, causes of action, suits, judgments, rights, demands, debts, damages or accountings of whatever nature, legal, equitable or administrative, whether the same are now known or unknown, which WGW and its members ever had, now have or may claim to have, upon or by reason of any acts or omissions of LLW PC and L. Lin Wood, individually, up to the effective date of this Agreement, including but not limited to all claims and liabilities arising from any acts, omissions, cases, or business relationships that have occurred or commenced, or allegedly have occurred or commenced, prior to the date that this Agreement is signed. This is a general release of all such claims.

C.  The Parties hereby absolutely, unconditionally and irrevocably, covenant and agree with and in favor of each other Party that they shall not sue (at law, in equity, in any regulatory proceeding or otherwise), or maintain any suit against, any Party released above on the basis of any claim released, remised and discharged above.

D.  The Parties understand, acknowledge and agree that the releases set forth above may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such releases.

E.  The Parties agree that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final, absolute and unconditional nature of the release set forth above.

F.  Notwithstanding anything to the contrary in this Section 4 and in this Agreement, the Parties acknowledge and agree that any actions necessary to enforce the terms of this Agreement are not released or barred. Further, the Parties acknowledge and agree that any claims or actions necessary to invoke any defenses and/or insurance protections against any claims for malpractice are not released or barred.

4

Wood Initials: _____

WGW Initials: _____

5. <u>No Further Money Owed</u>.  The Parties acknowledge and agree that, except as set forth expressly in Section 1 of this Agreement, there is no further money owed by LLW PC and/or L. Lin Wood, individually, to WGW and/or its members, or by WGW and/or its members to LLW PC and L. Lin Wood, individually.

6. <u>Miscellaneous Provisions</u>.

A. <u>Applicable Law</u>.  This Agreement shall be construed and governed by the laws of the State of Georgia, irrespective of its choice of law rules.  The Parties consent to jurisdiction and venue in Georgia in any action brought to enforce the terms of this Agreement.

B. <u>Jointly Drafted</u>.  The Parties and their respective counsel mutually contributed to the preparation of, and have had the opportunity to review and revise, this Agreement.  Accordingly, no provision of this Agreement shall be construed against any Party because that Party, or its counsel, drafted the provision.  This Agreement and all of its terms shall be construed equally as to each Party.

C. <u>Entire Agreement</u>.  This Agreement contains the entire agreement between the Parties relating to the subject matter hereof, integrates all the terms and conditions mentioned or incidental to this Agreement, and supersedes all prior negotiations or writings.  No modification or waiver of any provisions of this Agreement shall be valid unless in writing and signed by all parties hereto.

D. <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which may be enforceable as an original, but all of which taken together shall constitute but one agreement.  Electronic execution and delivery of this Agreement by a Party shall constitute legal, valid and binding execution and delivery of this Agreement.

E. <u>Fees and Costs</u>.  Each Party shall bear his, her, or its own costs and attorneys' fees.

F. <u>Acknowledgments and Competency.</u>  The Parties represent that they have read and understand the provisions of this Agreement; that they are entering into this Agreement knowingly and voluntarily; and that they sought the advice of counsel prior to executing this Agreement. The Parties further agree that, upon information and belief, each Party to this Agreement is mentally and physically competent in all respects, including their ability to enter into this Agreement and any and all prior agreements which formed the basis in whole or in part for certain disputes between the parties which have been resolved by this Agreement.

**IN WITNESS WHEREOF,** the Parties have executed this Settlement Agreement and Release as of the day and year written above.

**L. Lin Wood, P.C.**

5

Wood Initials:

WGW Initials:

By: _____ L. LIN WOOD _____

Name: _____ L. LIN WOOD _____

Title: _____ PRESIDENT _____


_____
**L. Lin Wood**

6

Wood Initials: _____

WGW Initials: _____

WADE, GRUNBERG & WILSON, LLC

By: _____

Name: _____

Title: _____


_____

Nicole Wade, Individually and on behalf of
Wade Law, LLC


_____

Jonathan Grunberg, Individually and on behalf
of J.D. Grunberg, LLC and Grunberg &
Wilson, LLC


_____

Taylor Wilson, Individually and on behalf of G.
Taylor Wilson, LLC and Grunberg & Wilson,
LLC

7

Wood Initials: _____

WGW Initials: _____



# ALSTON & BIRD

One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424
404-881-7000 | Fax: 404-881-7777

Christopher C. Marquardt

Direct Dial: 404-881-7827

Email: chris.marquardt@alston.com

July 24, 2020

*VIA EMAIL*

Andrew M. Beal, Esq.
Buckley Beal
600 Peachtree Street, N.E.
Suite 3900,
Atlanta, GA 30308

Dear Drew:

I hope you and your family remain safe and well in these pandemic days.

The settlement agreement between our respective clients provides that LLW PC shall pay to WGW a portion of its fees earned in three settled cases (*Carbone v. CNN, Lindsey v. Clear Zone* and *Sandmann v. CNN*) and two other pending cases (*Sandmann v. Washington Post* and *Sandmann v. NBCUniversal*).

The fee splits for these cases require client consent in order to comply with Georgia Rule of Professional Conduct 1.5(e). LLW PC has therefore requested that each of the clients in question provide their consent to the fee splits. The clients in the *Carbone* and *Lindsey* cases have consented, but we have just learned that the client in the *Sandmann* cases (Nicholas Sandmann, who is now 18 years old) has declined to consent and indicated he will only approve payment of a quantum meruit fee to WGW. Accordingly, please provide LLW PC with documentation of the services rendered by WGW in the three *Sandmann* cases (including contemporaneous time records) and a proposed fee based on the total hours worked so that it may be presented to Nicholas Sandmann for his review and approval. Or if you prefer, you may send the information to Todd McMurtry, who also represents Nicholas Sandmann and has been the primary point of contact on this issue.

Without client consent, the fee splits pertaining to the *Sandmann* cases in the settlement agreement are void. The other provisions of the agreement remain valid, however, and LLW PC intends to honor them and expects for WGW to do the same. Accordingly, LLW PC plans to pay WGW the agreed-upon portion of its fees for the *Carbone* and *Lindsey* cases, which together total $89,199.99. WGW agreed in the settlement agreement to pay LLW PC $285,000.00 in full satisfaction of their obligations under the lease agreement

Alston & Bird LLP                                                                                    www.alston.com

Atlanta | Beijing | Brussels | Charlotte | Dallas | London | Los Angeles | New York | Raleigh | San Francisco | Silicon Valley | Washington, D.C.

Andrew M. Beal, Esq.

Page 2

with PR II Regions Plaza, LLC.  When the $89,199.99 owed by LLW PC for the *Carbone* and *Lindsey* cases is deducted from the $285,000.00 owed by WGW for the lease, there remains a balance due to LLW PC of $195,800.01. Once Nicholas Sandmann approves a quantum meruit fee to WGW for all three *Sandmann* cases, LLW PC will pay that amount to WGW after first deducting the $195,800.01 that WGW owes to LLW PC.

If you have questions, please feel free to contact me.

Sincerely yours,

*/s/ Christopher C. Marquardt*

Christopher C. Marquardt

CCM:jh

cc: Joey Burby

LEGAL02/39930786v1

**From:** Andrew Beal <ABeal@buckleybeal.com> **Sent:** Wednesday, August 26 2020 9:10 PM **To:** Marquardt, Chris <Chris.Marquardt@alston.com>; Burby, Joey <Joey.Burby@alston.com> **Subject:** Settlement Demand

**EXTERNAL SENDER – Proceed with caution**

_____

Chris and Joey

As we discussed this afternoon, the parties are engaging in settlement discussions by exchanging written offers of terms. This offer will remain open until 5:00 pm Eastern tomorrow, Thursday August 27.

Here is our proposal. Your client pays my clients $1,250,000.00 immediately in satisfaction of the existing claims my clients intend to file and which you have reviewed, to buy them out of the existing settlement agreement, attorneys fees for this matter, and claims for defamation and breach of non-disparagement based upon today's events. Further, your client will withdraw from the ▮▮▮▮▮▮▮▮▮▮▮ cases and the ▮▮▮▮ ▮▮▮▮ matters ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ provided each client consents and will issue a retraction for his libel and slander in the form below to all persons he contacted today. My clients will remit no fees to your client, and your client will have no further responsibilities to make any payments to my clients. Your client will acknowledge responsibility for the Lease and the parties will execute mutual releases. Nothing further is required.

Retraction: "I wanted to take this opportunity to contact you and personally retract the statements I made about my former partners: Nicole Wade, Jonathan Grunberg and Taylor Wilson. I was angry, and those statements are not true."

Drew

**ANDREW M. BEAL**

Buckley Beal, LLP

Bank of America Plaza, Suite 3900



**STATEMENT OF L. LIN WOOD REGARDING
LAWSUIT FILED AGAINST HIM AND L. LIN WOOD, P.C.
BY WADE, GRUNBERG & WILSON, LLC**

I am deeply disappointed and saddened that three young lawyers I mentored and involved in some of my cases in recent years have chosen to file a frivolous and unnecessary lawsuit against me and my law firm. Adding insult to injury, these young lawyers have chosen to willingly engage in a disgraceful and unprofessional effort to publicly attack me by including irrelevant, out-of-context private messages I sent to them in the midst of a difficult time in my personal life arising primarily from my family's reaction to my faith in Jesus Christ. In an effort to help them professionally and personally, I sought the assistance of these lawyers, who had their own professional corporations, in high profile cases which their firms would never have been hired to handle on their own – cases which out of my generosity, made them very wealthy. Now in a shakedown effort to coerce me to do what I believe the ethical rules of my profession prohibit, they manipulate and ignore truth to try to force me, without my client's consent, to pay their separate law firms an unreasonable portion of my earned fee while repeatedly refusing to provide to the client any proof of the work they claim to have performed on the case.

I strongly believe that when disagreements over fees arise, lawyers owe it to themselves, their clients, the legal profession, and the public to attempt to resolve them privately and in good faith. This duty is heightened at a time when our nation and the judicial system is burdened with problems related to the Covid-19 virus and civil unrest. For those reasons, I offered to have an in-person settlement meeting with these young lawyers, to mediate the dispute, or to submit the dispute to binding arbitration. They quickly rejected all of those proposals, opting instead to make this fee dispute public and to falsely sensationalize a straightforward business disagreement. They have done so with an intent to damage my professional reputation under the guise of the litigation privilege. I am ashamed of them.

For over 43 years, I have never placed my personal interests over the interests of my clients and I am not willing to do so now just to prevent their false innuendo and slanderous claims from being asserted in a court filing. I will not succumb to litigation intended to extort money from me. I have worked hard in many difficult cases over the course of my career to establish and maintain an unassailable record of integrity, honesty, and professionalism. My many clients, members of the judiciary, law school faculty members, friends, and the multitude of ethical lawyers who have known me and worked with me over the years will understand why under these circumstances, I have no choice except to fight these frivolous claims and false accusations to the end.



## AFFIDAVIT OF CHRISTOPHER C. MARQUARDT

1.

My name is Christopher C. Marquardt.

2.

I am over the age of 18, suffering from no legal disabilities, and am competent to make this Affidavit.

3.

I am currently an attorney at Alston & Bird LLP and was an attorney at Alston & Bird LLP at all times relevant to this Affidavit.

4.

In March 2020, L. Lin Wood (hereinafter referred to as "Mr. Wood") and L. Lin Wood, P.C. (hereinafter referred to as "LLW PC") hired Alston & Bird LLP.

5.

LLW PC and Mr. Wood hired our law firm to represent them with respect to a dispute that had arisen with the following individuals and entities: Wade, Grunberg & Wilson LLC; Nicole Wade; Wade Law LLC; Jonathan Grunberg; J.D. Grunberg LLC; Taylor Wilson; G. Taylor Wilson LLC; and Grunberg & Wilson, LLC (hereinafter collectively referred to as "WGW").

6.

On behalf of Mr. Wood and LLW PC, my law partner Joey Burby and I participated in discussions and negotiations with Andrew Beal, counsel for WGW, and our respective clients entered into a Settlement Agreement and General Release (See Exhibit "A").


EXHIBIT
E

7.

On behalf of Mr. Wood and LLW PC, we participated in drafting and reviewing the Settlement Agreement.

8.

The Settlement Agreement provided, among other things, that LLW PC would pay to WGW a portion of its fees earned in three settled cases and other pending cases. (See Exhibit "A" and Exhibit "B", 7/24/20 correspondence from Christopher C. Marquardt to Andrew Beal).

11.

I wrote to Andrew Beal on July 24, 2020 to inform Mr. Beal and his clients that the fee splits for the cases in question required client consent to comply with Georgia Rule of Professional Conduct 1.5(e), and that LLW PC asked the clients in question to provide consent. (See Exhibit "B").

12.

My letter of July 24, 2020 further advised Mr. Beal that one particular client, Nicholas Sandmann, "has declined to consent and indicated he will only approve payment of a quantum merit fee to WGW." (See Exhibit "B").

13.

My letter of July 24, 2020 requested WGW to "provide LLW PC with written documentation of the services rendered by WGW in the three *Sandmann* cases (including contemporaneous time records) and a proposed fee based on the total hours worked so that it may be presented to Nicholas Sandmann for his review and approval." (See Exhibit "B").

14.

Separately, a portion of the settlement agreement memorialized that WGW agreed to pay LLW PC $285,000.00 in full satisfaction of their obligations under the lease agreement with PR II Regions Plaza, LLC. (See Exhibit "A" and Exhibit "B").

15.

I am aware of a written statement (hereinafter referred to as the "press release") issued by Mr. Wood in September 2020. (See Exhibit "C").

16.

Mr. Burby and I reviewed a draft of the press release, advised Mr. Wood about it, and suggested edits.

CHRISTOPHER C. MARQUARDT

Sworn to and Subscribed before me on this 10th day of march, 2023.

Notary Public



## SETTLEMENT AGREEMENT AND GENERAL RELEASE

This **SETTLEMENT AGREEMENT AND GENERAL RELEASE** (this "Agreement") is made and entered into this 17th day of March 2020, by and between L. Lin Wood, P.C. and L. Lin Wood (collectively, "Wood"), on the one hand, and Wade, Grunberg & Wilson, LLC, Nicole Wade, Wade Law, LLC, Jonathan Grunberg, J.D. Grunberg, LLC, Taylor Wilson, G. Taylor Wilson, LLC, and Grunberg & Wilson, LLC (collectively "WGW"), on the other (each party hereto a "Party" and all collectively, the "Parties").

### RECITALS

WHEREAS, Nicole Wade, Jonathan Grunberg, and Taylor Wilson and Wood are lawyers who practiced law and shared office space together for several years.

WHEREAS, WGW never held any ownership interest in L. Lin Wood, P.C. (hereinafter "LLW PC") but have worked as lawyers of L. Lin Wood, P.C. on cases since 2018.

WHEREAS, the Parties have determined that it is in their mutual interest to amicably resolve disputes regarding their business affiliation, define with certainty the parties' obligations and rights regarding cases on which they have been or are presently working together on a case-by-case basis, and to terminate their shared office space arrangement.

WHEREAS, the Parties have agreed to compromise and resolve all claims and controversies now existing between them, and each of the Parties enters into this Agreement to memorialize its understanding and agreement with respect to such compromise and resolution.

NOW, THEREFORE, in consideration of the foregoing, and the respective agreements, warranties and covenants contained herein, the Parties hereto agree, covenant and warrant as follows:

1. Fee Split for Legal Work.

   A.   LLW PC shall pay to WGW a portion of its fees for the following cases as set forth herein (or, as applicable, WGW will pay a portion of fees to LLW PC), subject to the offset for lease expenses described in Section 2 below:

      i.   *Carbone v. CNN:* $54,999.99 from the LLW PC fee, and the parties acknowledge that Carbone was and is the client of LLW PC.

      ii.   *Lindsey v. Clear Zone:* $34,200.00 from the LLW PC fee, and the parties acknowledge that Lindsey was and is the client of LLW PC.

      iii.   *Sandmann v. CNN:* $843,750.00 of the LLW PC court-approved fee, and the parties acknowledge that The Sandmann Family (including Ted, Julie and Nicholas Sandmann) was and is the client of LLW PC.



**EXHIBIT**

A

Wood Initials: _____

WGW Initials: _____

iv.  *Grogan v. Aaron's*: 20% of the court-approved fee will be paid to LLW PC (80% of the court-approved fee will be paid to WGW), and the parties acknowledge Grogan was and is the client of WGW.

v.   *Cordoba, et al v. DirectTV*: 20% of the court-approved fee will be paid to LLW PC (80% of the court-approved fee will be paid to WGW), LLW PC will timely reimburse WGW for 20% of reasonable expenses incurred, and the parties acknowledge Cordoba was and is the client of WGW.

vi.  *La Liberte v. Reid*: 20% of the court-approved fee will be paid to LLW PC (80% of the court-approved fee will be paid to WGW), LLW PC will timely reimburse WGW for 50% of reasonable expenses incurred, and the parties acknowledge La Liberte was and is the client of WGW.

B.   LLW PC shall pay the stated portion of said fees for the three settled cases – i.e., the ones described in (i), (ii), and (iii) above – to WGW, minus the lease amount referenced in Section 2 below, within 72 hours of LLW PC's receipt of its portion of the fees from the *Sandmann v. CNN* settlement, said payment to be made via wire transfer to WGW at Iberiabank, 200 West Congress Street, Lafayette, LA, 70501, Routing #265270413, Account #2000212841. In the highly unlikely event that the Court approves the settlement but lowers the fee amount paid to LLW PC for that *Sandmann v. CNN* case, the parties will make a corresponding adjustment to the amount set forth in subpart (iii) above.

C.   WGW shall pay the stated portion of said fees for the three cases that have not yet settled – i.e., the ones described in (iv), (v), and (vi) above – to LLW PC within 72 hours of WGW's receipt of its portion of any fees from such cases. With respect to those three cases, each Party will be reimbursed for expenses he or it had incurred as of the date of this Agreement on a dollar-for-dollar basis if and when a recovery is had.

D.   With respect to the pending *Sandmann v. Washington Post* and *Sandmann v. NBCUniversal* cases, LLW PC shall pay to WGW and its members 10% of LLW PC's contractual portion of any contingent fee received by LLW PC in connection with those cases. Any such payments shall be made within 72 hours of LLW PC's receipt of its portion of the fees from those cases. With respect to those two cases, the Parties acknowledge that The Sandmann Family (including Ted, Julie and Nicholas Sandmann) was and is the client of LLW PC. Except as expressly described in this Agreement, WGW and its members shall make no claim for any case in which LLW PC was and is the attorney for its client, The Sandmann Family (including Ted, Julie and Nicholas Sandmann). The Parties acknowledge and agree that WGW and its members have no claim, and make no claim, of entitlement to fees for any other matter, pending or otherwise, in which The Sandmann Family (including Ted, Julie and Nicholas Sandmann) is the client of LLW PC.

E.   With respect to the hourly fee client, the Estate of Martin Luther King, Jr., Inc. ("EMLK"), the Parties recognize that EMLK was and is the client of WGW. EMLK

2

Wood Initials:

WGW Initials:

currently owes approximately $188,503 in overdue bills to LLW PC. The Parties agree to cooperate in attempting to recover these fees, and in the event of any such recovery, payments will be allocated first to expenses owed to LLW PC, if any, and the remainder split 80% to WGW and 20% to LLW PC.

F.     With respect to other hourly fee clients, the Parties agree that those hourly billable matters brought to LLW PC by Nicole Wade, Jonathan Grunberg, or Taylor Wilson were and are clients of WGW, and that LLW PC will cooperate in providing any information or documents for those clients to WGW.  The Parties agree that those hourly billable matters brought to LLW PC by Wood were and are clients of LLW PC. The Parties agree that, except as set forth herein and in Section 1(E), no further amounts will be due to either side with respect to any hourly fee billable matters.

2.  Office Lease.

A.     WGW shall pay to LLW PC the amount of $285,000.00 in full satisfaction of any obligations WGW may have, or be alleged to have, under the lease agreement with PR II Regions Plaza, LLC for Suite 2040 at Regions Plaza (the "Lease").  This amount shall be deducted from the payment by LLW PC to WGW referenced in Section 1(B) above. Thus, the total payment required by Section 1(B) shall be in the total amount of $647,949.99.

B.     WGW (which, as noted above, includes its members in their individual capacities and their respective LLCs) shall have no further obligation or liability under the Lease. LLW PC will take all necessary steps to remove the names of WGW members from the Lease and/or to ensure that they have no obligation for further Lease payments, including if possible obtaining a release from PR II Regions Plaza, LLC of WGW or, if such release cannot be obtained, LLW PC and L. Lin Wood, individually, shall agree to indemnify WGW against any claims by PR II Regions Plaza, LLC, or any affiliate, subsidiary, related party, or assignee, relating to the Lease.

3.  Non-Disparagement.  LLW PC and L. Lin Wood, individually, agree not to disparage WGW. This agreement is not to be construed to imply or suggest that LLW PC and/or L. Lin Wood has disparaged WGW or its members prior to the date of this Agreement. Nothing in this provision prevents the Parties from providing truthful information about each other and its members in response to a court order or subpoena, or during any federal, state, or local governmental body investigation or proceeding. LLW PC and L. Lin Wood, individually, do not seek in this Agreement any legal protection regarding any future disparagement of LLW PC and L. Lin Wood, individually, but shall address any future false and defamatory statements by WGW and its members about LLW PC and L. Lin Wood, individually, on a case-by-case basis as provided by law.

4.  Mutual General Release.

A. *Release by Wood.*  LLW PC and L. Lin Wood, individually, hereby irrevocably and unconditionally forever release and discharge WGW (as defined above), and their heirs, executors, administrators and assigns, and their attorneys and representatives, and

3

Wood Initials: 

WGW Initials:

waive any and all rights with respect to, all manner of actual or potential claims, actions, causes of action, suits, judgments, rights, demands, debts, damages or accountings of whatever nature, legal, equitable or administrative, whether the same are now known or unknown, which LLW PC and L. Lin Wood, individually, ever had, now have or may claim to have, upon or by reason of any acts or omissions of WGW or it members up to the effective date of this Agreement, including but not limited to all claims and liabilities arising from any acts, omissions, cases, or business relationships that have occurred or commenced, or allegedly have occurred or commenced, prior to the date that this Agreement is signed. This is a general release of all such claims.

B. *Release by WGW.* Nicole Wade, Jonathan Grunberg, and Taylor Wilson, and Wade, Grunberg & Wilson, LLC, for themselves and itself, hereby irrevocably and unconditionally forever release and discharge LLW PC and L. Lin Wood, individually, and their heirs, executors, administrators and assigns, and their attorneys or representatives, and waive any and all rights with respect to, all manner of actual or potential claims, actions, causes of action, suits, judgments, rights, demands, debts, damages or accountings of whatever nature, legal, equitable or administrative, whether the same are now known or unknown, which WGW and its members ever had, now have or may claim to have, upon or by reason of any acts or omissions of LLW PC and L. Lin Wood, individually, up to the effective date of this Agreement, including but not limited to all claims and liabilities arising from any acts, omissions, cases, or business relationships that have occurred or commenced, or allegedly have occurred or commenced, prior to the date that this Agreement is signed. This is a general release of all such claims.

C. The Parties hereby absolutely, unconditionally and irrevocably, covenant and agree with and in favor of each other Party that they shall not sue (at law, in equity, in any regulatory proceeding or otherwise), or maintain any suit against, any Party released above on the basis of any claim released, remised and discharged above.

D. The Parties understand, acknowledge and agree that the releases set forth above may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such releases.

E. The Parties agree that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final, absolute and unconditional nature of the release set forth above.

F. Notwithstanding anything to the contrary in this Section 4 and in this Agreement, the Parties acknowledge and agree that any actions necessary to enforce the terms of this Agreement are not released or barred. Further, the Parties acknowledge and agree that any claims or actions necessary to invoke any defenses and/or insurance protections against any claims for malpractice are not released or barred.

4

Wood Initials: _____

WGW Initials: _____

5. <u>No Further Money Owed</u>.  The Parties acknowledge and agree that, except as set forth expressly in Section 1 of this Agreement, there is no further money owed by LLW PC and/or L. Lin Wood, individually, to WGW and/or its members, or by WGW and/or its members to LLW PC and L. Lin Wood, individually.

6. <u>Miscellaneous Provisions</u>.

    A. <u>Applicable Law</u>.  This Agreement shall be construed and governed by the laws of the State of Georgia, irrespective of its choice of law rules.  The Parties consent to jurisdiction and venue in Georgia in any action brought to enforce the terms of this Agreement.

    B. <u>Jointly Drafted</u>.  The Parties and their respective counsel mutually contributed to the preparation of, and have had the opportunity to review and revise, this Agreement.  Accordingly, no provision of this Agreement shall be construed against any Party because that Party, or its counsel, drafted the provision.  This Agreement and all of its terms shall be construed equally as to each Party.

    C. <u>Entire Agreement</u>.  This Agreement contains the entire agreement between the Parties relating to the subject matter hereof, integrates all the terms and conditions mentioned or incidental to this Agreement, and supersedes all prior negotiations or writings.  No modification or waiver of any provisions of this Agreement shall be valid unless in writing and signed by all parties hereto.

    D. <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which may be enforceable as an original, but all of which taken together shall constitute but one agreement.  Electronic execution and delivery of this Agreement by a Party shall constitute legal, valid and binding execution and delivery of this Agreement.

    E. <u>Fees and Costs</u>.  Each Party shall bear his, her, or its own costs and attorneys' fees.

    F. <u>Acknowledgments and Competency</u>.  The Parties represent that they have read and understand the provisions of this Agreement; that they are entering into this Agreement knowingly and voluntarily; and that they sought the advice of counsel prior to executing this Agreement. The Parties further agree that, upon information and belief, each Party to this Agreement is mentally and physically competent in all respects, including their ability to enter into this Agreement and any and all prior agreements which formed the basis in whole or in part for certain disputes between the parties which have been resolved by this Agreement.

    **IN WITNESS WHEREOF**, the Parties have executed this Settlement Agreement and Release as of the day and year written above.

**L. Lin Wood, P.C.**

5

Wood Initials: _____

WGW Initials: _____

By: _____ L. LIN WOOD _____

Name: _____ L. Lin Wood _____

Title: _____ PRESIDENT _____


_____

L. Lin Wood

6

Wood Initials: _____

WGW Initials: _____

WADE, GRUNBERG & WILSON, LLC

By: _____

Name: _____

Title: _____


_____
Nicole Wade, Individually and on behalf of
Wade Law, LLC


_____
Jonathan Grunberg, Individually and on behalf
of J.D. Grunberg, LLC and Grunberg &
Wilson, LLC


_____
Taylor Wilson, Individually and on behalf of G.
Taylor Wilson, LLC and Grunberg & Wilson,
LLC

7

Wood Initials: _____

WGW Initials: _____



# ALSTON & BIRD

One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424
404-881-7000 | Fax: 404-881-7777

Christopher C. Marquardt                Direct Dial: 404-881-7827                Email: chris.marquardt@alston.com

July 24, 2020

*VIA EMAIL*

Andrew M. Beal, Esq.
Buckley Beal
600 Peachtree Street, N.E.
Suite 3900,
Atlanta, GA 30308

Dear Drew:

I hope you and your family remain safe and well in these pandemic days.

The settlement agreement between our respective clients provides that LLW PC shall pay to WGW a portion of its fees earned in three settled cases (*Carbone v. CNN*, *Lindsey v. Clear Zone* and *Sandmann v. CNN*) and two other pending cases (*Sandmann v. Washington Post* and *Sandmann v. NBCUniversal*).

The fee splits for these cases require client consent in order to comply with Georgia Rule of Professional Conduct 1.5(e). LLW PC has therefore requested that each of the clients in question provide their consent to the fee splits. The clients in the *Carbone* and *Lindsey* cases have consented, but we have just learned that the client in the *Sandmann* cases (Nicholas Sandmann, who is now 18 years old) has declined to consent and indicated he will only approve payment of a quantum meruit fee to WGW. Accordingly, please provide LLW PC with documentation of the services rendered by WGW in the three *Sandmann* cases (including contemporaneous time records) and a proposed fee based on the total hours worked so that it may be presented to Nicholas Sandmann for his review and approval. Or if you prefer, you may send the information to Todd McMurtry, who also represents Nicholas Sandmann and has been the primary point of contact on this issue.

Without client consent, the fee splits pertaining to the *Sandmann* cases in the settlement agreement are void. The other provisions of the agreement remain valid, however, and LLW PC intends to honor them and expects for WGW to do the same. Accordingly, LLW PC plans to pay WGW the agreed-upon portion of its fees for the *Carbone* and *Lindsey* cases, which together total $89,199.99. WGW agreed in the settlement agreement to pay LLW PC $285,000.00 in full satisfaction of their obligations under the lease agreement

Alston & Bird LLP                                                                                                              www.alston.com

Atlanta | Beijing | Brussels | Charlotte | Dallas | London | Los Angeles | New York | Raleigh | San Francisco | Silicon Valley | Washington, D.C.

Andrew M. Beal, Esq.

Page 2

with PR II Regions Plaza, LLC.  When the $89,199.99 owed by LLW PC for the *Carbone* and *Lindsey* cases is deducted from the $285,000.00 owed by WGW for the lease, there remains a balance due to LLW PC of $195,800.01. Once Nicholas Sandmann approves a quantum meruit fee to WGW for all three *Sandmann* cases, LLW PC will pay that amount to WGW after first deducting the $195,800.01 that WGW owes to LLW PC.

If you have questions, please feel free to contact me.

Sincerely yours,

*/s/ Christopher C. Marquardt*

Christopher C. Marquardt

CCM:jh

cc: Joey Burby

LEGAL02/39930786v1



## STATEMENT OF L. LIN WOOD REGARDING
## LAWSUIT FILED AGAINST HIM AND L. LIN WOOD, P.C.
## BY WADE, GRUNBERG & WILSON, LLC

I am deeply disappointed and saddened that three young lawyers I mentored and involved in some of my cases in recent years have chosen to file a frivolous and unnecessary lawsuit against me and my law firm. Adding insult to injury, these young lawyers have chosen to willingly engage in a disgraceful and unprofessional effort to publicly attack me by including irrelevant, out-of-context private messages I sent to them in the midst of a difficult time in my personal life arising primarily from my family's reaction to my faith in Jesus Christ. In an effort to help them professionally and personally, I sought the assistance of these lawyers, who had their own professional corporations, in high profile cases which their firms would never have been hired to handle on their own – cases which out of my generosity, made them very wealthy. Now in a shakedown effort to coerce me to do what I believe the ethical rules of my profession prohibit, they manipulate and ignore truth to try to force me, without my client's consent, to pay their separate law firms an unreasonable portion of my earned fee while repeatedly refusing to provide to the client any proof of the work they claim to have performed on the case.

I strongly believe that when disagreements over fees arise, lawyers owe it to themselves, their clients, the legal profession, and the public to attempt to resolve them privately and in good faith. This duty is heightened at a time when our nation and the judicial system is burdened with problems related to the Covid-19 virus and civil unrest. For those reasons, I offered to have an in-person settlement meeting with these young lawyers, to mediate the dispute, or to submit the dispute to binding arbitration. They quickly rejected all of those proposals, opting instead to make this fee dispute public and to falsely sensationalize a straightforward business disagreement. They have done so with an intent to damage my professional reputation under the guise of the litigation privilege. I am ashamed of them.

For over 43 years, I have never placed my personal interests over the interests of my clients and I am not willing to do so now just to prevent their false innuendo and slanderous claims from being asserted in a court filing. I will not succumb to litigation intended to extort money from me. I have worked hard in many difficult cases over the course of my career to establish and maintain an unassailable record of integrity, honesty, and professionalism. My many clients, members of the judiciary, law school faculty members, friends, and the multitude of ethical lawyers who have known me and worked with me over the years will understand why under these circumstances, I have no choice except to fight these frivolous claims and false accusations to the end.