1    2015 when it settled; and I took on another

2    Medicare fraud case against ████████████

3    during that time period.

4           So I was doing more fraud work in those

5    years, and then shifted back to areas of

6    defamation toward the last part of 19 -- 2015,

7    '16 on I then began to do more back in the area

8    of First Amendment defamation.

9       Q    Most of that work that you have just

10   described, the whistle blower work and the

11   defamation work from 2015 on, was on behalf of

12   the Plaintiff, is that correct?

13      A    Yes.

14      Q    And it was all a contingency based fee

15   to you for the most part?

16      A    On the Medicare fraud cases?

17      Q    Yes, and the defamation cases?

18      A    Defamation cases were generally

19   contingency fee, although I did work for ████

20   ████ and that was done in areas of defamation,

21   but it was hourly.

22           The whistle blower cases were

23   contingency with a recovery of attorneys' fees

24   to the prevailing party.

25      Q    And at different times you brought on



1   various lawyers to work with you and the three

2   lawyers who are Plaintiffs in this case, Nicole

3   Wade, Johnathan Grunberg, and Taylor Wilson,

4   joined you and were on-board by 2016, is that

5   correct?

6       A    By 2016 I believe that is correct.  I

7   can't remember the exact time when Taylor came;

8   but yes, they came in in an office sharing

9   arrangement first as my Associates.  Johnathan

10  was an Associate.  Taylor was an Associate.

11          And you know this, I am sure, that

12  there is a certain I will say stigma to be

13  referred to as an Associate versus being

14  referred to as a partner, especially when you

15  are trying to get business; and I wanted them to

16  get business.

17          So we had an office sharing

18  arrangement, and then I would engage with them

19  after Johnathan and Taylor were no longer

20  Associates.  I would then engage with them to

21  help me in cases on a case-by-case basis with an

22  agreement of how we would do the fee.

23          Some of that was contingency and I know

24  some of it was hourly divisions, particularly

25  with the ███ cases.



1      Q    Let us unpack what you just said.

2           If they were no longer Associate's did

3  you refer to them in the Bar and the courts and

4  the clients as your partner?

5      A    I did and they were my partners.  They

6  were partners in a business relationship.

7      Q    And did they sign Pleadings as partners

8  of L. Lin Wood, P.C.?

9      A    I don't know if they had the word

10  partners, but they certainly signed Pleadings as

11  under the name L. Lin Wood, P.C.

12     Q    All right, thank you.

13          And when you would pay them a fee, a

14  portion of the fee recovered, did you pay that

15  to them individually or to one of their PC's or

16  LLC's?

17     A    I did not pay them individually.  So

18  the arrangement was Nicole had -- when she was

19  leaving Bryan Cave and I offered her a place to

20  work, instead of her going out and starting up

21  her own physical law firm, I thought it would be

22  helpful to her and helpful to me, because Nicole

23  is a very smart lawyer; and I envisioned that I

24  would be able to engage her to help me in

25  matters, and so all of the fees that were paid



1    expenses, here are the attorneys' fees, it
2    wouldn't necessarily discuss these percentages?
3    It would discuss the percentage that L. Lin
4    Wood, P.C. was taking of the total fee, is that
5    correct?
6        A    I would have to go back and look at the
7    settlement statements, but usually they were
8    broken down; and it showed who was receiving
9    what.
10       Q    Really?
11       A    I am pretty sure I am right about that.
12   If I had L. Lin Wood, P.C. with the percentage,
13   there might be a breakdown as to who received
14   what.
15               (Whereupon, Plaintiff's Exhibit
16               Number 5 was marked for
17               identification.)
18   BY MR. BEAL:
19       Q    Let me hand you what has been marked as
20   Exhibit 5, does this look like the Settlement
21   Statement or what I call fee disbursement
22   schedule in the ███████████ case?
23       A    Yes.  This was dated February the 25th
24   of 2020, which would have been -- well, they
25   left -- the fee -- they left the arrangement



1    with L. Lin Wood, P.C. effective on

2    February 14th of 2020.  So they ended that

3    arrangement on their own decision; and the

4    ████████ case was a case where there had been --

5    it was one of those cases where I am not sure if

6    we had an agreement going in.  I think it was

7    part of the efforts to resolve the case at the

8    time.

9            At the time this was done I am not sure

10   that there had been an agreement reached on the

11   ████████ fees division, but I could be wrong

12   about that.

13       Q    And this Settlement Statement reflects

14   a breakout for the fees earned by L. Lin Wood,

15   P.C., and the fees earned by Wargo and French,

16   LLP and SG Evans Law?

17       A    Yes.  I had associated Stacey Evans,

18   who formerly had been a partner with me at Wood

19   Hernacki and Evans, the firm I established when

20   I left Bryan Cave; and that firm was made up of

21   their three PC's.  It was basically the same

22   thing.  It was an office sharing arrangement

23   where we would divide up cases by agreement,

24   where they would help me.

25            This refreshes my recollection a little



1        Q    No, I mean the Settlement Statement?

2        A    I would have to see it.  I think it

3    showed how the breakdown of money.  In other

4    words, my recollection is that it listed how

5    much each of them got.

6        Q    Okay.

7                 (Whereupon, Plaintiff's Exhibit

8                 Number 6 was marked for

9                 identification.)

10   BY MR. BEAL:

11       Q    Let me hand you what has been marked

12   Exhibit 6.

13                And we are going to be talking about

14   the first long Email from Taylor Wilson to you

15   dated February 17, 2020.

16       A    Okay, we are going to be talking about

17   the first part of it?  Not February 18th?

18       Q    Correct.  I don't know.  We just left

19   it on there for context, because it was part of

20   the chain.

21                Do you remember entering into an

22   agreement with the Plaintiffs here regarding the

23   fee splits that are reflected here on Taylor's

24   Email to you of February 17, 2020?

25       A    I do remember speaking with them on the



```
 1    phone, and we reached an agreement as to how the
 2    fee -- the fees themselves would be divided.  We
 3    did not reach at that time an agreement on the
 4    overall issues that were between us.
 5        Q    Okay.
 6        A    In fact, I remember it well because I
 7    had to ask --
 8             MR. BEAL:  Hold on for one second.
 9                  (Whereupon, an off-the-record
10                  discussion was held.)
11    BY MR. BEAL:
12        Q    I am handing you back Exhibit 5.  We
13    needed to black out a total in the recovery in
14    ████.
15        A    It might be a good idea to block off
16    ████ and CNN on the second page, because that
17    agreement may have been confidential at CNN's
18    request.
19        Q    We can do that at the end of the
20    deposition.
21             So this agreement by -- this Email by
22    Taylor sets forth in writing the agreement you
23    had reached certainly by February 17th on
24    regarding fee splits in a variety of cases, is
25    that correct?
```



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD

1      A     I think it reflects how we agreed to
2   divide the fee, not the final agreement on how
3   we were going to sever the relationship, because
4   there were other issues.
5      Q     Right.
6      A     But it does, because I remember the
7   phone call was on the 17th three days after they
8   had left the office sharing agreement with
9   myself and my PC; and I remember having a
10  conversation.  I was trying to be -- I was
11  trying to calm the waters at that time.
12     Q     I understand.
13     A     We were going through a very difficult
14  time period dealing with Johnathan and Taylor --
15  not so much Nicole -- starting in October of
16  2019, and there were a lot of things that were
17  done that created problems --
18     Q     But this Email --
19     A     Let me finish, and I was trying to calm
20  the waters.  And I remember that I said what do
21  you all think is fair?  And they said
22  35 percent.  I said I will give you 50, is that
23  fair?  Yeah, yeah, we will take 50.
24           And that that was a discussion that
25  occurred on February 17th and Taylor sent an



1    Email confirming it.

2         Q    Thank you.

3              And so if you turn over to the second

4    page of Exhibit 6 (b) is ██████ versus CNN, the

5    proposed -- you proposed to split the fee

6    40 percent to L. Lin Wood, P.C. and 60 percent

7    to us.

8              Did I read that correctly?

9         A    Yes, that is what it says.

10        Q    And the date of this is February 17th,

11   is that correct?

12        A    Yes.

13        Q    And then if we refer back to Exhibit 5,

14   the date of that fee disbursement is about a

15   week after?  It is February 25th, is that

16   correct?

17        A    It is because, and I tell you, I think

18   I am right I think, after I had had the

19   conversation with Johnathan Taylor and Nicole on

20   the 17th, things occurred that placed doubt in

21   my mind as to whether I was going to actually do

22   what I had said on the 17th in terms of the fee

23   division.

24        Q    Whether you were going to honor that

25   promise?



```
 1      A     Well, it wasn't a done deal; and issues
 2   arose about the lease, and I was not happy with
 3   them.
 4           And so at the time that I did the
 5   ▉▉▉▉▉ Settlement Statement in my mind it was
 6   unclear what was going to happen with ▉▉▉▉▉.
 7      Q     And so you didn't list them on
 8   Exhibit 5 on the ▉▉▉▉▉ Settlement Statement
 9   because you planned to keep all the fees
10   yourself?
11      A     That is not true.
12           MR. HARRISON:  Object to the form.
13   BY MR. BEAL:
14      Q     Well, you said --
15           THE WITNESS:  Hold on, that is not
16      true at all.
17   BY MR. BEAL:
18      Q     Okay.
19      A     In fact, I got to remember the date;
20   but somewhere after -- or shortly after or
21   before maybe, February 20th, I engaged Alston &
22   Byrd to represent me.
23      Q     Did you in fact share any of the
24   ▉▉▉▉▉ fees with the Plaintiffs in this case?
25      A     It would have been done pursuant to the
```



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                    58

1        Q        Okay.  In Exhibit 7 you wrote this on
2    February 22, 2020, is that correct?
3        A        2:40 a.m., yes.  It looks like I wrote
4    it that morning.
5        Q        So that is five days after you entered
6    into the February 17th agreement with Taylor
7    about fee splits, is that correct?
8        A        It was after I had -- we had come to --
9    extorted agreement -- you didn't hear what I
10   said, so let me make sure you understand.
11       Q        You are under cross-examination, so I
12   need a --
13       A        I am going to answer it.  If I am not
14   allowed to --
15       Q        Yes or no and then you can explain
16   whatever you would like to.  This Email was
17   written five days?
18       A        That is clearly yes, you can do the
19   math.
20       Q        Okay, good.
21       A        The answer is yes, but go back and
22   understand I was extorted when I gave them that
23   agreement on the 17th.
24                And I was kind of playing with them.
25   When I said well, tell me what you think is



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                    59

1   fair.  35 percent, the same thing we got with
2   Ramsey.  I said I will tell you what, I will
3   give you 50 percent, do you think that is fair?
4            I was not actually of the mind to give
5   them a dime at that time.  I was playing with
6   them a little bit to see what they would do.
7   And they went oh, yeah, yeah, we will take the
8   50 because they are greedy.
9            And then when I got back and dealt with
10  Joey Burby and Chris Marquardt, I said just go
11  ahead and let us divide it the way I said on
12  February 17th, because I did say it even though
13  it was not done with the mind set that they
14  deserved it and I wanted to give it to them, I
15  would live up to my word and give them
16  50 percent; and that is what got into the final
17  agreement.
18       Q    Okay.  And so when you entered into the
19  agreement with Taylor on February 17th you were,
20  to use your words, sort of playing with them.
21  You didn't plan on giving those percentages.
22  You were thinking more in line of what you said
23  here five days later to Todd McMurtry on
24  February 22nd, Exhibit 7?
25       A    No.



1   the lease bar all four lawyers.

2         So of these pair of sentences here what

3   you were getting to when you barred them from

4   the lease, you barred them from the space, you

5   hadn't read the lease?

6     A     I think "bar" is a typo.  It should

7   have been "buy".

8         When I got the building to pull their

9   access cards and change the locks on the door,

10  as I thought here I thought that it was in my

11  name, under my control.  I did not go back and

12  look at the lease.  Then I did.  And I saw where

13  they were signers on the lease and responsible

14  themselves under the lease.  I called the

15  building.  I said let them back in.

16        I didn't have the right to bar them or

17  take their keys, nor did the building; and they

18  were in trouble because they should have known

19  what their lease said.  I tried to get them back

20  in right away.

21    Q     Let us look at the next paragraph:  I

22  need for you and ███ and ██████ to state in

23  writing that ███ and █████ do not and shall not

24  agree that any fees due to my PC be divided with

25  any other lawyers except on a quantum meryl --



1   did not do it.  They did.  That is why I had

2   them engaged.  If I wanted to do that, I

3   wouldn't have needed them.

4        Q    And was a large volume of work in CNN

5   versus █████████ --

6        A    CNN and █████████ settled quickly.  So

7   on the scale of things they could have been --

8   that litigation could have gone on for five

9   years.  So whether it is a large volume or not

10  is not really capable of saying it.  It is what

11  it is.  They did what they did.

12       Q    The --

13       A    And I was going to pay them for it.

14            (Whereupon, Plaintiff's Exhibit

15            Number 12 was marked for

16            identification.)

17  BY MR. BEAL:

18       Q    And is Exhibit 12 the March 17th

19  Settlement Agreement that you have referenced

20  earlier?

21       A    Yes.

22       Q    And does it refer to the same cases as

23  in the February 17th agreement, █████████,

24  █████████, █████████, █████████████ and then add

25  in █████████?



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                           107

```
 1       the door.
 2              MR. BEAL:  Okay.  You can any time
 3       you want to.
 4              MR. HARRISON:  Yeah.
 5              (Whereupon, Plaintiff's Exhibit
 6              Number 13 was marked for
 7              identification.)
 8   BY MR. BEAL:
 9       Q    I hand you what has been marked as
10   Exhibit 13.  Does this appear to be the
11   July 24th letter from Alston & Byrd to me
12   refusing to make payment under the March 17th
13   Settlement Agreement that we marked Exhibit 12?
14       A    I believe it is, yes.
15       Q    Okay.
16       A    I am sure I got a copy at the time.
17   That was the letter he wrote on his own to you.
18       Q    And in this letter Chris Marquardt is
19   stating that only quantum meruit will be paid
20   exactly as you had asked Todd McMurtry to assist
21   in reaching that agreement in Exhibits 7, 8 and
22   9, is that correct?
23              MR. HARRISON:  Object to the form.
24              THE WITNESS:  No.
25              MR. HARRISON:  But you can answer.
```



```
1      Q     Can you identify every act that you
2    contend constituted extortion or attempts at
3    extortion?
4      A     Honestly, I can take the time to
5    catalog every act, but the acts are pretty
6    simple.
7      Q     What are they?
8      A     Number one, remember the back drop.  I
9    believe there was a pattern of extortion with
10   respect to the March 17th agreement.  So they
11   had a pattern of extorting and making claims
12   that threatened me unrelated to the litigation
13   with my children,              , the
14              ; and my efforts for         were very
15   important to me.
16           So I felt extorted into that agreement.
17   Candidly I wished I had never made it; but I did
18   what I did.  I was going to live up to it.
19           Then in September out of the blue,
20   nobody sued me when I said extortion in the
21   press release.  When they put in their own
22   Complaint in September and they said that I
23   told -- it is            that they were
24   extorting me, they put that in their Complaint.
25           Then they put in their Complaint that I
```



1    explanation of how anybody says it is not.

2              MR. BEAL:  Can you look through

3         there and find me Exhibit 12?

4              MR. HARRISON:  Uh-huh.

5              MR. BEAL:  Thanks.

6    BY MR. BEAL:

7         Q    So going back to your statements, the

8    first act of extortion you believe was a pattern

9    of extortion surrounding the March 17th

10   Settlement Agreement which is marked as

11   Exhibit 12?

12        A    I wouldn't call that the first act of

13   extortion.  What I called it is what I called

14   it.

15              I thought that what they did leading up

16   to the March 17th agreement established a

17   pattern of extortion, because they were trying

18   to get money that they had not earned.  They

19   were trying to coerce me into giving them more

20   than they deserved under the threat of a

21   continued attack in my relationship with my

22   children, my efforts ongoing for ██████████

23   ██████████, and to jeopardize my efforts to try to

24   ask the President to give ████████████████ the

25   presidential Medal of Freedom.



1              And just generally the idea of saying

2    these false things about my mental health, which

3    they documented were false in the March 17th

4    agreement, I thought that showed extortion; but

5    I paid it, I paid it.  I agreed to it.  I wish I

6    hadn't.  I should have stood on my principles

7    instead of my preference, I wanted peace.  I

8    should have stood on my principles.

9              And then all of a sudden I am hit with

10   your lawsuit to pay within a day 1.5 million or

11   we are going to file this thing and smear --

12       Q    I want to talk about March.  Let's

13   not --

14       A    Okay, well, I have covered March.

15       Q    Would it be fair to say that a

16   culmination of this pattern of extortion you

17   have identified, it culminated in the March 17th

18   Settlement Agreement?

19              MR. HARRISON:  Object to the form.

20              You can answer.

21              THE WITNESS:  What I said was that

22        when I looked at what you did in

23        September of 2020, I recognized then as

24        I had recognized earlier that they had

25        extorted me into the March 17th



1   met.  He can get all the facts wrong and still

2   come up with the perfect resolution.  That Email

3   is now missing out of my system.

4           But nevertheless put yourself in my

5   position, I know it is hard for you to do, but

6   try I am trying my best to get ▆▆▆▆▆▆▆▆ a

7   recognition that ▆▆▆▆▆▆▆▆ deserved.  I am

8   trying my best to represent the ▆▆▆▆▆ family.

9   I want to do the ▆▆▆▆▆ cases and then retire;

10  and I am always trying to do my best to maintain

11  a good, healthy relationship with my children;

12  and these people are threatening all of that.

13  If I don't give them money that they really

14  under the law did not deserve, but I ended up

15  making the agreement in March 17th; and then I

16  lived up to it.  Did you see how many cases I

17  sent them?  You still haven't told me how much

18  money they made on it.

19      Q    Can I ask you if there was a

20  specific -- if you can point to any act or

21  threat by any of the Plaintiffs with regard to

22  ▆▆▆▆▆▆▆▆▆▆ or ▆▆▆▆▆▆▆▆▆▆▆ claims

23  or cases?

24      A    I don't know how many Email's there

25  were at the time.  I haven't gone back and



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                               124

1       Q       So you have referenced in prior
2    testimony computer hacking.
3               Do you believe that the Plaintiffs have
4    hacked into your computers or your Email's?
5       A       I believed at the time that I learned
6    that my computer was hacked, and it was hacked.
7    The whole file system was out of whack.  I had
8    it investigated.  It was hacked.
9               I also believed that my phone system
10   had been hacked.  I think that was done through
11   my Wi-Fi system in my house, so I documented the
12   hacking.
13              I felt like that there might have been
14   an effort by Johnathan Taylor and/or Nicole,
15   because she is close with Rick Miller to go in
16   and perhaps remove certain documents that were
17   related to Rick Miller.
18              When I first went in I couldn't find
19   the documents to confirm the hack.  I filed a
20   complaint with the FBI.
21              Then we went back and I found the
22   documents that I thought might have been hacked
23   out, and I wrote them and apologized.
24              But the problem is I still think now
25   that I was wrong about what was being looked



1    Miller documents, I wrote them and said I am

2    sorry.  I jumped the gun.

3            But then I found out about confirmatory

4    evidence on Dr. Phil; and I am convinced beyond

5    any doubt in my mind that these lawyers to some

6    extent were involved in the ████████ case to

7    sabotage and rig the jury.

8        Q    Okay, I want to ask that before we take

9    a break.

10       A    Sure.

11       Q    So summing up on hacking, do you

12   believe the Plaintiffs were involved or not

13   involved as you sit here today?

14       A    My belief is just what I said.  They

15   had motivation to be involved.  The whole

16   Dr. Phil thing stinks.

17       Q    Do you believe that Dr. Phil was

18   involved in computer hacking?

19       A    I don't think Dr. Phil --- I don't know

20   if he knows how to hack a computer.  But I think

21   I know enough about Dr. Phil and what happened

22   with Tara Trask and Chris Chatham, that I have

23   serious concerns.  I know the jury was rigged

24   and I started to investigate it --

25       Q    Now --



1        A    And my son Matt went ballistic, because

2    he didn't want to give me any information.

3             MR. HARRISON:  Okay.

4    BY MR. BEAL:

5        Q    So we have transitioned from hacking to

6    jury tampering?

7        A    No.

8        Q    Or is this part of hacking?

9        A    I will tell you.

10       Q    All right.

11       A    You are asking me if I know who hacked

12   me, I do not; but I have certain suspicions.

13       Q    All right.  So --

14       A    When I said that about jury rigging, I

15   don't know who did what, when and where; but I

16   have certain suspicions based on facts that I am

17   aware of.

18   BY MR. BEAL:

19       Q    All right.  So and the jury tampering

20   issue, do you believe the Plaintiffs were

21   involved somehow in tampering with the jury or

22   hurting your efforts in the representation of

23   ██████████  versus  ███████████?

24       A    You asked me two questions, let me

25   answer it this way.  There was a noticeable



```
 1    change in Johnathan Grunberg and Taylor Wilson's
 2    treatment of me starting with the incident in
 3    October, and by November if I hadn't had them to
 4    help me, I would have thrown them out of my
 5    office on the 21st floor.  I had never seen
 6    lawyers more rude, more abrasive, more
 7    condescending, telling me I didn't know what I
 8    was doing.  They like changed day and night.
 9         Q    Okay.
10         A    And so do I have concerns that that
11    relates to perhaps them having gotten
12    compromised to participate in sabotaging some
13    part of the ████████ case?  I believe it does,
14    but I haven't taken any action yet.
15         Q    Do you believe that the Plaintiffs were
16    involved in somehow sabotaging or working
17    against your efforts in the ████████ versus ████
18    ████ case?
19         A    I know they were.  I know they were
20    because they were trying to direct me to take an
21    issue in the case that was minuscule compared to
22    the main allegation of pedophilia that I now
23    know that issue was interjected by the
24    Mockingbird Media, so that we would spend time
25    on that and not time on what the main case was
```



1    about; and they were adamant that I needed to go

2    there, and it very much affected my ability to

3    prepare the case in an orderly fashion in the

4    manner that I thought it should be done, being

5    the most experienced, being the lawyer in

6    charge.  And I have never let such opposition

7    and mistreatment from every one of them, not as

8    much Nicole.  In fact, I told Nicole one day

9    when Johnathan and Taylor were in my office and

10   I looked at them and said I ought to sue every

11   damn one of you about what you said about mental

12   health.

13          And Nicole said I never said it, and I

14   said you are too smart to say it.  And she sent

15   me a note later when she found out about my

16   children.  And she knew how much that would hurt

17   me.  And she said I love you no matter what

18   happens to our law firm.  I will always be there

19   for you, and I appreciate that and I believe she

20   meant it.

21      Q    So you believe the Plaintiffs were

22   deliberately taking steps to sabotage or hurt

23   your client in the ▮▮▮▮▮▮ litigation?

24      A    I said what I said.  I don't know it,

25   but I saw it --



1      Q     But you believe it?

2      A     Do you want me to answer or are you

3   going to answer it for me?

4      Q     No, I am just trying to --

5      A     Why don't you let me answer it.

6      Q     All right.

7      A     Because you don't know what you are

8   talking about.  Only I can answer that question

9   with all due respect.

10     Q     Okay.  Go ahead.

11     A     I have serious concerns based on the

12  totality of the circumstances that occurred and

13  the timing of those, I have serious concerns

14  that somehow my son, perhaps Johnathan and

15  Taylor perhaps were compromised and perhaps had

16  to do things that were not in the best interest

17  of ████████████, although I have a lot of

18  thoughts on the ██████████████ case, which we

19  don't need to go into today.  I don't know what

20  this has to do with extortion, but I am happy to

21  talk to you about it.

22     Q     Okay.

23     A     Because I don't know what happened in

24  the Thai cave rescue.  I know a lot more now

25  about child sex trafficking than I knew then.  I



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                  139

1    you testified that one act of extortion was the

2    demand that was made upon you in September of

3    2020 immediately prior to the filing of suit?

4        A    That was I thought consistent with

5    extortion, yes.

6        Q    And --

7        A    It made no sense.  Why would you not --

8        Q    I just need you to --

9        A    I am going to answer the question

10   fully.

11            That was an act of extortion, part of

12   the extortion because the position that you all

13   took made no sense.  You weren't looking to

14   resolve the matter.  You were looking to sue it.

15       Q    And it was the crime of extortion?

16            MR. HARRISON:  Object to the form.

17            THE WITNESS:  I call it extortion.

18       Whether you refer to it as a crime, it

19       is knowing.  So I guess it would fall

20       within the category of knowing,

21       criminal extortion.  I didn't act on it

22       in the sense of taking it to the

23       police.  Just like --

24   BY MR. BEAL:

25       Q    Okay.



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                    143

1       extortion.  That is my opinion.
2    BY MR. BEAL:
3       Q    So the September demand included
4    payment of fees on various cases?
5       A    It included a lot more than that.  In
6    fact, nobody -- you have to explain how they
7    came up with the fees.  But on top of that --
8       Q    Can you just answer the question yes or
9    no.  Did it include that or not?
10      A    I don't know.  Show it to me and I will
11   tell you what it included.
12      Q    What was the Washington Post
13   settlement?
14           MR. HARRISON:  You are asking him
15      the amount?
16           MR. BEAL:  Yes.
17           MR. HARRISON:  Is it confidential?
18           THE WITNESS:  It is confidential.
19   BY MR. BEAL:
20      Q    Well, everything else is sealed in this
21   proceeding.
22      A    Not in this case.
23      Q    But it is part of our demand so.
24      A    There is no seal order in this case.
25           MR. HARRISON:  Yeah, I am not



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

```
 1      A     Because they told me.  Johnathan and

 2   Taylor told me they talked to them.  There was

 3   this big powwow where they were all concerned

 4   about me.  It was nonsense.  They were making it

 5   up out of whole cloth.

 6            It is a typical psychological operation

 7   to attack the target by attacking their mental

 8   health.  Study psychological operations.

 9            It just didn't work because my mental

10   health is fine.

11      Q     Okay.

12            Next, action, words, or series of

13   actions that constituted extortion by the

14   Plaintiffs leading up to this March 17th

15   agreement besides that whole category, is there

16   anything else?

17      A     I have told you everything in my first

18   time I answered it.  I think I have added some

19   more specifics in.

20            It is just this simple, they were

21   threatening my family with their comments.  They

22   were threatening my clients with their comments.

23   They were threatening ███████████ with their

24   comments; and their comments were fake.  It was

25   false.  They have admitted that themselves in
```



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                    165

1           MR. BEAL:  Yes.
2           THE WITNESS:  So you want me to
3     look at paragraph 36.
4   BY MR. BEAL:
5      Q    Can you explain the basis for your
6   denial in paragraph 36.  And I will read to you
7   the averment in paragraph 36.
8      A    Hold on.  Let me have a chance to make
9   sure I understand it.
10          MR. HARRISON:  While he is reading
11     it to the extent that any decisions
12     about responses or denials were made by
13     Counsel.
14          THE WITNESS:  Well, I can tell you
15     they hadn't offered any concession on
16     the amounts previously agreed on
17     February 17th.  They had no agreement.
18     They had no leverage.  They didn't get
19     a written agreement.  They were
20     literally at my mercy.  I could have
21     said you are only going to get quantum
22     meruit, good luck.
23          But I made the deal in terms of
24     coming to an agreement as to the
25     amounts for all other things to be



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                    179

1    That was a very important distinction and Joey

2    and Chris knew it, you knew it.  The fee split

3    payments were from L. Lin Wood, P.C. only.  So

4    Wood individually didn't agree to pay him a dime

5    on the fee splits.

6         Q    Okay.  Can you refer over to paragraphs

7    79 and 80, and they are related so I am just

8    lumping them together.

9              If you can tell me the basis for your

10   denial there?

11        A    79 and 80?

12        Q    Yes.

13        A    I don't know.  I can't as I sit here

14   why the denial was done.  I know I did it in

15   discussions with Chris.

16        Q    Okay.

17        A    What I can tell you is that I don't

18   believe the numbers of subscribers on Telegram.

19   I think they are manufactured.  I don't think

20   you can trust it, just like you can't trust

21   receiving something from someone on Telegram

22   because you don't know whether it is artificial

23   intelligence or a bot or a shield or a

24   propagandist.

25              So I do know that I had the channel



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          180

1    "Lin Wood Speaks Truth".  I don't remember it
2    having the Number 660,000.  But at some point it
3    did.  I know it started off at 980.  And down
4    substantially from the number of subscribers he
5    had previously while defaming Plaintiffs, I
6    don't know if that is true or not; so I think we
7    took the safe option of denying it.
8        Q     Okay.
9        A     And then the second channel, that
10   channel was not mine.  The reply channel was in
11   the name of another individual who was going to
12   look at the replies to be able to edit them,
13   because people put pornography and obscene
14   things on there.  And if you don't have someone
15   monitoring it and get them off quickly, they
16   will use it as an excuse to close your channel.
17   I don't remember if she was doing the channel in
18   March of '22 or not.  I haven't gone back to
19   look.
20           But again I do know that the channel
21   says it is for Lin Wood followers to be able to
22   reply to him with words of support, love and
23   encouragement.  I can't tell you why.  It may
24   just be because of the numbers.  I can't tell
25   you why it was denied.  It wasn't denied in bad


**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100          www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                    185

1    attorney's advice.  I didn't prepare the Answer.
2    I did it in conjunction with Chris.
3              But I do know that I did make the
4    statement repeatedly and not that many times,
5    but I made it enough to put my position in a
6    Court of public opinion that in my belief they
7    had extorted me and attempted to extort me and
8    that I believed 100 percent that I am right.
9        Q    Thank you.
10       A    There is not a doubt in my mind.
11       Q    In paragraph 104 you did say that you
12   were considering whether to pursue criminal
13   action against the Plaintiffs?
14       A    I would have to look at the posts where
15   that came from.
16       Q    We can do that in just a minute.
17       A    I mean I thought about it, but I just
18   thought wait a minute, this foolishness has got
19   to end at some point in time.  So I just didn't
20   want to take another step further.  I would like
21   to get this -- I would like to have this
22   resolved in some way with these people, so they
23   can go about their lives, I can go about mine;
24   the same thing I tried to do in March 17 of
25   2020.



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                    186

1      Q     But you believed that you have the
2   right to pursue criminal action against the
3   Plaintiffs?
4      A     I could go -- yeah, I believe under the
5   facts that I could go out and sign a warrant for
6   having them try to criminally extort me, but
7   what is that going to do?
8      Q     So in paragraph 105 on the next page
9   you refer to the filing a grievance against the
10  Plaintiffs with the State Bar of Georgia.
11           Did you in fact file a grievance or
12  complaint with the State Bar of Georgia against
13  any of the Plaintiffs regarding your belief --
14  regarding extortion?
15     A     I believe so.
16     Q     What was Nicole Wade doing during all
17  of this dispute where you believe leading up to
18  March 17th on Taylor and Johnathan were
19  contacting your children improperly --
20     A     I said they were talking with them.  I
21  don't know who initiated the contacts.
22     Q     But was Nicole a part of any of that in
23  your belief?
24     A     My recollection, and I have a very
25  vivid recollection of having Johnathan and



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                    200

1        Soliciting opinions.
2    BY MR. BEAL:
3        Q     Did you really think --
4        A     No, no --
5        Q     I am on my best behavior.
6        A     Listen, I was talking about Johnathan,
7    Taylor, and Nicole because I wanted to make sure
8    that the facts upon which my opinion was based
9    were stated.  That gives it complete protection
10   under Milkevich vs. Lorraine Jones.
11       Q     Let us turn over to page 27, sorry --
12   27, there is an insert of my Email to Chris
13   Marquardt and Joey Burby of Alston & Byrd; and I
14   am going to have my Melinda who has the best
15   eyes to read it into the record because it is --
16       A     Hold on.  I was just looking for the
17   date of the Email.
18             Okay, I see it, the 28th.
19             MS. BROWN:  I think it is the 26th
20       at 9:10 p.m.
21             THE WITNESS:  I think it is
22       legible to save you the time of reading
23       it.
24             MR. BEAL:  Okay.
25   BY MR. BEAL:



1    contingency fee received by L. Lin Wood, PC in

2    connection with those cases.

3            So the demand related to all of these

4    cases, plus the ███████   versus Washington Post

5    case?

6        A    How did you come up with the figure?

7    You didn't ask anybody what the Washington Post

8    settled for.

9        Q    Don't ask me questions.

10           It is a simple question?

11       A    Let me answer, and I have been patient

12   with you, Drew, this makes no sense to me, I

13   have told you that I don't know what you are

14   talking about.

15       Q    Okay.

16       A    Claims for defamation August of 2020.

17       Q    Okay.

18       A    That would have been I guess referring

19   to what I said to ███████   and to co-Counsel

20   in the class action case, those were not viable

21   claims of defamation because they were made with

22   privilege.  And you published them in your own

23   lawsuit.

24           MR. BEAL:  I am going to object.

25       Now this is the same speech we have



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                        212

1    as other issues?

2         A    You said for the breach of the

3    Settlement Agreement --

4              MR. HARRISON:  Hang on.  It is not

5         a question.  You are making a

6         statement.

7    BY MR. BEAL:

8         Q    Is that true or false?

9              MR. HARRISON:  There you go.

10             THE WITNESS:  What is the

11        question?

12   BY MR. BEAL:

13        Q    The Demand sent from my office on

14   August 26, 2020 to your attorneys at Alston &

15   Byrd is among other things a settlement of all

16   of the fee splits contained in the March 17th

17   Settlement Agreement.

18        A    Are you telling me that?  Because I

19   don't know that.

20             Here is what I know, this Demand is

21   extortion.  You want me to pay you this money

22   and then you are suing me for breach of

23   contract.  And then you are suing me for breach

24   of contract.

25        Q    So can you can you say yes or no to the



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

1    had settled because I was always

2    mystified why you and Drew had never

3    asked anybody what it settled for.

4    Because your clients were entitled

5    under the March 17th agreement to

6    10 percent.

7         So how are you making a demand on

8    Washington Post without knowing what

9    your clients had agreed to and were

10    entitled to in the March 17th

11    agreement?  It makes no sense to me.

12    That is why I think this is just

13    another element of extortion.

14  BY MR. BEAL:

15    Q   And had you ever told your clients that

16  the Sandmann versus Washington Post case was as

17  good as or better than the ▇▇▇▇▇ versus CNN

18  case?

19        MR. HARRISON:  Object to the form.

20        THE WITNESS:  You are talking

21    about the ▇▇▇▇▇?  You want me to

22    tell you what I told the ▇▇▇▇▇?

23        MR. BEAL:  Can you read the

24    question back.

25         (Whereupon, the record



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              218

1        A     I can't remember the specific statement
2    to that effect, but it wouldn't surprise me that
3    somewhere along the way when they were working
4    with me that I could have said we ought to maybe
5    do as well in Washington Post as we did in CNN;
6    but that is just an opinion and that changed.
7    It changed based on what the offer was and what
8    the clients were willing to take, and what Todd
9    wanted to do it with it.  I am not going to tell
10   you the amount, but I am going to tell you that
11   it was significantly less than CNN.
12   BY MR. BEAL:
13       Q    So the Plaintiffs' 10 percent of that
14   amount based on what you had told them earlier
15   in the case, that one fee amount could have
16   equaled over a million dollars?
17       A    No.
18       Q    Unlikely?
19       A    Unlikely.
20       Q    Okay.
21       A     I mean what you did was you pulled a
22   number out of the air, without asking what it
23   had settled for; and then you wanted to come
24   back and re-settle what had already been settled
25   and have me make demands to pay things that had



1    were?

2        A    You know, I don't.  It is kind of like

3    when we were taking ████████ deposition, and

4    he called me a shake down lawyer.  That is a

5    phrase people use.  You are extorting me.  That

6    lawyer is trying to extort me.

7            So I know that I included in this press

8    release, which Alston & Byrd assisted in the

9    preparation of and edited, I specifically

10   included a statement that I was not going to be

11   extorted by this litigation.  Nobody sued me for

12   extortion.  In fact, I had every reason to

13   believe that you all had the good sense not to,

14   because it was protected opinion.  And then you

15   only did it whenever you filed the liable case

16   at the same time law 65 came out.

17           MR. BEAL:  Let me object.

18   BY MR. BEAL:

19       Q    The question was quite simply who were

20   the other lawyers?

21       A    65 Project, excuse me.  You know all

22   about it.

23       Q    The question was who are the other

24   lawyers, and you are saying you don't remember?

25       A    I would be trying to reconstruct who I



1    talked with at the time.

2        Q    Okay.

3        A    And I know that others, whether it was

4    one or two, I know I talked with them, but not

5    to retain them, the people I knew had law

6    degrees; and I told them what was happening to

7    me and there was a consensus yes, that is

8    extortion.

9            Extortion in the sense that if you go

10   to anybody and start talking about these kinds

11   of demands, it is always somebody saying I have

12   had lawyers that are trying to extort you.

13           MR. BEAL:  I am going to object as

14       nonresponsive.

15           THE WITNESS:  So the answer to

16       your the question I know what I did

17       with Chris and Joey, that is two

18       lawyers who helped me do that

19       statement.

20           I don't remember the names of any

21       others.  I didn't go out and seek an

22       official opinion, if that helps.

23   BY MR. BEAL:

24       Q    Okay, thank you.

25           And Chris and Joey never told you that



Lin 💜

L. Lin Wood
L. LIN WOOD, P.C.
1180 West Peachtree Street
Suite 2040
Atlanta, GA 30309
Telephone: (404) 891-1402
Direct Dial: (404) 891-1406
Facsimile: (404) 506-9111
E-Mail: lwood@linwoodlaw.com

Sent from my iPhone

> On Feb 17, 2020, at 10:13 PM, Lin Wood <lwood@linwoodlaw.com> wrote:
>
> Agreed.
>
> "What seems to us bitter trials are often blessings in disguise." - Oscar Wilde
>
> L. Lin Wood
> L. LIN WOOD, P.C.
> 1180 West Peachtree Street
> Suite 2040
> Atlanta, GA 30309
> Telephone: (404) 891-1402
> Direct Dial: (404) 891-1406
> Facsimile: (404) 506-9111
> E-Mail: lwood@linwoodlaw.com
>
> Sent from my iPhone
>
>> On Feb 17, 2020, at 9:10 PM, Taylor Wilson <georgetaylorwilson@gmail.com> wrote:
>>
>> Lin,
>>
>> Thank you for the conversation we had tonight. This email will confirm our
>> discussion and agreement regarding the following, giving us all an
>> opportunity to forge ahead.
>>
>> 1) Case fees:
>>
>>    (a) Sandmann v. CNN: L. Lin Wood, P.C.'s ("LLW PC") share of the
>> fee is an estimated $1,687,500. You proposed to split the fee 50/50%
>> between your firm and us ("us" referring to Nicole, Jonathan, and I as a


EXHIBIT
6

group), which is particularly generous given your commitment of
$100,000 from your portion of the fee to Todd McMurtry and his firm to
help resolve his dispute with his partner.

(b) ████ v. CNN: LLW PC's share of the fee is an estimated
█91,000. You proposed to split the fee 40% to LLW PC and 60% and us.

(c) ████: LLW PC's share of the fee is an estimated $42,750. You
proposed to split the fee 20% to LLW PC and 80% to us.

(d) ████ Our best belief is that LLW PC's fee will be
approximately $65,000, subject to court approval. You proposed to split
the fee 20% to LLW PC and 80% to us.

(e) ████ v. DIRECTV: It is unknown at this time what the ultimate
fee may be, if any. You proposed to split the fee 20% to LLW PC and
80% to us.

We accepted all of your proposals, as they were extremely fair and more
generous than our proposals. Additionally, as we discussed earlier with
respect to ████, we agreed to split the fee 20% to LLW PC
and 80% to us.

Also as discussed, Nicole, Jonathan, and I have agreed to work out the
"us" fee divisions amongst ourselves. We anticipate re-activating Wade,
Grunberg & Wilson LLC.

2) Additional issues:

We agreed to speak with Kimmy and use our best efforts to influence her
as to the benefits of returning to work with you, including without limitation
by describing to her how much we appreciate your willingness to work
with us and how well we were able to work with you on resolving issues
tonight, the positive influence you have had on her and our lives these
last many years, and that you will pay her $120,000/year if she comes
back to work for LLW PC. We have arranged to speak with her as a
group first thing in the morning, and I will reach out to her tonight
individually.

Taylor agreed to close out the ████ v. CNN settlement and has
emailed Todd McMurtry per your later request.

Jonathan agreed to handle the ███████ meeting on February 19 to conclude our obligations with respect to that agreement and representation.

We will get back to you tomorrow updating you on our new contact information.  Again, we very much appreciate your fairness and generosity in these discussions with us, and we appreciate more than you know all that you have taught us and the opportunities you have provided for us over the years.

Love,
Taylor
Jonathan &
Nicole

Taylor Wilson
678-787-0216

WGW - 000235 - Federal Matter

 Gmail

Nicole Jennings Wade <nicolejenningswade@gmail.com>

## Re: Moving Forward
1 message

**Lin Wood** <lwood@linwoodlaw.com>                          Tue, Feb 18, 2020 at 11:26 AM
To: Taylor Wilson <georgetaylorwilson@gmail.com>, Jonathan Grunberg <jgrunberg@gmail.com>, Nicole
Jennings Wade <nicolejenningswade@gmail.com>
Cc: Taylor Wilson <twilson@linwoodlaw.com>, Jonathan Grunberg <jgrunberg@linwoodlaw.com>, Nicole Wade
<nwade@linwoodlaw.com>, Kimmy Hart Bennett <khart@linwoodlaw.com>, Chelsea Gray
<cgray@linwoodlaw.com>

All,

God does work in mysterious ways!

The offer regarding you returning to the physical office at Suite 2040 is withdrawn.

If there is anything I can do to help you in your search for office space, let me know. I remember my first office
at 620 Carnegie Building in Atlanta. Wood & Moore. It was fun.

Please let me have your personal email addresses and the correct phone numbers if I need to reach out to
you for any reason or on any matter.

You can reach out to me when you are ready to arrange with me the pick up of your personal office furniture.

Remember, have fun doing what your are doing!

Love you!

Lin

L. Lin Wood
L. LIN WOOD, P.C.
1180 West Peachtree Street
Suite 2040
Atlanta, GA 30309
Telephone: (404) 891-1402
Direct Dial: (404) 891-1406
Facsimile: (404) 506-9111
E-Mail: lwood@linwoodlaw.com

Sent from my iPhone

> On Feb 18, 2020, at 3:00 AM, Lin Wood <lwood@linwoodlaw.com> wrote:
>
>
> All,
>
> I just left Taylor a voice mail message. I know it is late but God woke me from a hard sleep to write these

words to you:

"God only hears our love for him through the words of our lips. God only believes our love for him through our acts and deeds toward others."

By my free will I choose to believe these words mean that you should return to work tomorrow at Wood, Wilson, Grunberg & Wade. Existence and address already announced to many. Internal battles that have now been resolved are known only to a chosen few. "Many will come, few will be chosen."

Under this proposal made known to me this early morning, we could act as follows and return immediately to serving our clients:

1. Kimmy could come by my house this morning and pick up the new key to the office door to open the office door for you.

2. As an act of faith in you, I have called Tyler and returned access to emails and Dropbox. I will discuss passwords for email so that you can establish your own password. Dropbox access will remain the same as before.

3. I could call and reinstate directory to WWGW. The door sign is already in place. I could call and have name WWGW completed for inside wall.

4. We could ALL easily return to work to promptly continue working to serve ALL of our clients. We would ALL be in close proximity to each other in the event of the foreseeable need to rely on each other.

5. We could have Patrick Norris prepare a written operating agreement that clearly defines our firm's rights, obligations, and protections under my lease and for our individual agreements on a case by case basis as well as shared office overhead (including Chelsea).

6. Each firm would then be free and able to exercise its own free will without interference from the other.

7. We would fulfill our previously announced intention to the many members of the public and clients with respect to our new arrangement. Only a few would know of the turmoil we suffered to forge our new clearly defined physical union.

Abraham LINCOLN said "United we stand, divided we fall." We ALL know that a broken heart once restored is stronger than before. We ALL can chose to believe that the process suggested to me tonight by my God will be easier for ALL of us regardless of our respective choice of faiths.

All means All. Always has. Always shall.

Let me know this morning after you speak with Kimmy whether you agree with me that it is time to get back to healing under a clear and legally binding agreement to physically work together as we put our clients interests ahead of our own. Our furniture is already in place and can remain so. It is located where we voluntarily choose to locate our hearts.

Let me know what you voluntarily choose to decide. I only urge you to choose wisely. Then we can ALL exercise our choices with discernment.

Your linwoodlaw.com e-mail accounts have been re-activated. Dropbox access too. Building access cards can be re-activated easily by Kimmy this morning. Parking passes have remained intact. 

I love you. 

WGW - 000232 - Federal Matter

CONFIDENTIAL

## Nikki Baker

| | |
|---|---|
| **From:** | Lin Wood <lwood@linwoodlaw.com> |
| **Sent:** | Saturday, February 22, 2020 9:15 PM |
| **To:** | Nikki Baker |
| **Subject:** | Fwd: Taylor, Jonathan, and Nicole |

| | |
|---|---|
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

FYI to Todd.

L. Lin Wood
L. LIN WOOD, P.C.
1180 West Peachtree Street
Suite 2040
Atlanta, GA 30309
Telephone: (404) 891-1402
Direct Dial: (404) 891-1406
Facsimile: (404) 506-9111
E-Mail: lwood@linwoodlaw.com

Sent from my iPhone

Begin forwarded message:

> **From:** Lin Wood <lwood@linwoodlaw.com>
> **Date:** February 22, 2020 at 2:42:00 AM EST
> **To:** "Todd V. McMurtry (tmcmurtry@hemmerlaw.com)" <tmcmurtry@hemmerlaw.com>
> **Subject: Taylor, Jonathan, and Nicole**

Todd,

As you can easily see from the late hour of this email, I am spending entirely too much time dealing with the foolishness of Taylor, Jonathan, and Nicole. Time I should be spending resting or dealing with important matters like D.C. and the pending and future cases for Nicholas. By separate emails, I have sent you exchanges between me and their attorney, Andy Beal which occurred earlier tonight. I know Andy Beal's law partner, Ed Buckley. Ed represented ▮▮▮▮▮ and her claims against my client, ▮▮▮▮▮. Ed is a flaming liberal who would do anything to damage President Trump and the President's conservative agenda.

I can explain more to you tomorrow by phone but I would like to ask you to consider preparing a letter from you to Beal and a letter signed by ▮ and ▮ to you or Beal making clear that it is there express directive that no fees be paid to Taylor, Jonathan, and Nicole that exceed a quantum meruit basis regardless of any agreement I made or attempted to make to get rid of their foolishness to prevent it from harming my future efforts for ▮▮▮▮ and others. That is, they and you should demand that on a fair and reasonable attorney hourly fee for documented fair and reasonable hours spent on the CNN


WGW 002072

NLB000▮▮▮


EXHIBIT
7

CONFIDENTIAL

settlement.  In short, Taylor, Jonathan, and Nicole are trying to claim 50% of my fee while attempting to stick me with 75% of the outstanding liability owed on the office lease.  Their greed will not be honored by any court.  But their efforts to be greedy could damage me, my family, my legacy, and my clients-which include your clients, the ████████ if the disputes become public. This needs to nipped on the bud and quickly so.

Would you please be willing to call me in the morning and let me give you the basic details of what is going on and exactly what I would like for you to consider doing for me and what I would like for Ted and Julie to consider doing for me which I believe will bring this foolishness to an abrupt and unhappy ending for Taylor, Jonathan, and Nicole. If they the realize that they are not going to receive ███████████ for the CNN case, they will have NO ability to finance their frivolous claims regarding the fees in CNN and the remaining office lease liability. Worse case scenario will be that I will be authorized by the clients to hold my PC's portion of the CNN fee in my escrow account pending final resolution of the disputes between me and WGW. That alone will cut off their ability to finance and publicize their BS claims against me.

I will look forward to hearing from you and I am very much looking forward to seeing you, Kyle, and will in Greensboro on Sunday morning.  I am confident we will have a meaningful and important discussion on the future handling of the salmon matters.  A future which is very, very bright, but is being dimmed to a potentially large extent by the foolishness or threatened foolishness of Taylor, Jonathan, and Nicole.

I had earlier attempted to send you a more detailed email on my cell phone. It froze so I am sending this email. If I can get my phone unfrozen, I will also send you that email which will make my requests more clear to you. We mat be able to nip this in the bud by an email letter from you tomorrow (Saturday) to Beal. It would be nice to have this off the deck on or before Sunday byt Monday will still work.

Thank you, Todd.

Lin

L. Lin Wood
L. LIN WOOD, P.C.
1180 West Peachtree Street
Suite 2040
Atlanta, GA 30309
Telephone: (404) 891-1402
Direct Dial: (404) 891-1406
Facsimile: (404) 506-9111
E-Mail: lwood@linwoodlaw.com
Website: www.linwoodlaw.com

CONFIDENTIAL

## SETTLEMENT AGREEMENT AND GENERAL RELEASE

This **SETTLEMENT AGREEMENT AND GENERAL RELEASE** (this "Agreement") is made and entered into this 17th day of March 2020, by and between L. Lin Wood, P.C. and L. Lin Wood (collectively, "Wood"), on the one hand, and Wade, Grunberg & Wilson, LLC, Nicole Wade, Wade Law, LLC, Jonathan Grunberg, J.D. Grunberg, LLC, Taylor Wilson, G. Taylor Wilson, LLC, and Grunberg & Wilson, LLC (collectively "WGW"), on the other (each party hereto a "Party" and all collectively, the "Parties").

### RECITALS

WHEREAS, Nicole Wade, Jonathan Grunberg, and Taylor Wilson and Wood are lawyers who practiced law and shared office space together for several years.

WHEREAS, WGW never held any ownership interest in L. Lin Wood, P.C. (hereinafter "LLW PC") but have worked as lawyers of L. Lin Wood, P.C. on cases since 2018.

WHEREAS, the Parties have determined that it is in their mutual interest to amicably resolve disputes regarding their business affiliation, define with certainty the parties' obligations and rights regarding cases on which they have been or are presently working together on a case-by-case basis, and to terminate their shared office space arrangement.

WHEREAS, the Parties have agreed to compromise and resolve all claims and controversies now existing between them, and each of the Parties enters into this Agreement to memorialize its understanding and agreement with respect to such compromise and resolution.

NOW, THEREFORE, in consideration of the foregoing, and the respective agreements, warranties and covenants contained herein, the Parties hereto agree, covenant and warrant as follows:

1. Fee Split for Legal Work.

    A.  LLW PC shall pay to WGW a portion of its fees for the following cases as set forth herein (or, as applicable, WGW will pay a portion of fees to LLW PC), subject to the offset for lease expenses described in Section 2 below:

        i.  ▮▮▮ *v. CNN:* ▮4,999.99 from the LLW PC fee, and the parties acknowledge that ▮▮▮ was and is the client of LLW PC.

        ii.  ▮▮▮ ▮4,200.0▮ from the LLW PC fee, and the parties acknowledge that ▮▮▮ was and is the client of LLW PC.

        iii.  ▮▮▮ *v. CNN:* ▮43,750.0▮ of the LLW PC court-approved fee, and the parties acknowledge that The ▮▮▮ Family (including ▮▮▮ ▮▮ and ▮▮▮) was and is the client of LLW PC.

Wood Initials: _MMW_

EXHIBIT 12   PENGAD 800-631-6989

WGW Initials: _▮_

WGW 002296



iv.      ▮▮▮▮▮▮▮▮: 20% of the court-approved fee will be paid to LLW PC (80% of the court-approved fee will be paid to WGW), and the parties acknowledge ▮▮▮▮ was and is the client of WGW.

v.      ▮▮▮▮▮▮▮ *v. DirectTV*: 20% of the court-approved fee will be paid to LLW PC (80% of the court-approved fee will be paid to WGW), LLW PC will timely reimburse WGW for 20% of reasonable expenses incurred, and the parties acknowledge ▮▮▮▮ was and is the client of WGW.

vi.      ▮▮▮▮▮▮▮ 20% of the court-approved fee will be paid to LLW PC (80% of the court-approved fee will be paid to WGW), LLW PC will timely reimburse WGW for 50% of reasonable expenses incurred, and the parties acknowledge ▮▮▮▮ was and is the client of WGW.

B.    LLW PC shall pay the stated portion of said fees for the three settled cases – i.e., the ones described in (i), (ii), and (iii) above – to WGW, minus the lease amount referenced in Section 2 below, within 72 hours of LLW PC's receipt of its portion of the fees from the ▮▮▮▮ *v. CNN* settlement, said payment to be made via wire transfer to WGW at Iberiabank, 200 West Congress Street, Lafayette, LA, 70501, Routing ▮▮▮▮▮▮▮ Account #200021▮▮▮▮ In the highly unlikely event that the Court approves the settlement but lowers the fee amount paid to LLW PC for that ▮▮▮▮ *v. CNN* case, the parties will make a corresponding adjustment to the amount set forth in subpart (iii) above.

C.    WGW shall pay the stated portion of said fees for the three cases that have not yet settled – i.e., the ones described in (iv), (v), and (vi) above – to LLW PC within 72 hours of WGW's receipt of its portion of any fees from such cases. With respect to those three cases, each Party will be reimbursed for expenses he or it had incurred as of the date of this Agreement on a dollar-for-dollar basis if and when a recovery is had.

D.    With respect to the pending ▮▮▮▮ *v. Washington Post* and ▮▮▮▮ *v. NBCUniversal* cases, LLW PC shall pay to WGW and its members 10% of LLW PC's contractual portion of any contingent fee received by LLW PC in connection with those cases. Any such payments shall be made within 72 hours of LLW PC's receipt of its portion of the fees from those cases. With respect to those two cases, the Parties acknowledge that The ▮▮▮▮Family (including ▮▮▮▮) was and is the client of LLW PC. Except as expressly described in this Agreement, WGW and its members shall make no claim for any case in which LLW PC was and is the attorney for its client, The ▮▮▮▮ Family (including ▮▮▮▮). The Parties acknowledge and agree that WGW and its members have no claim, and make no claim, of entitlement to fees for any other matter, pending or otherwise, in which The ▮▮▮▮ Family (including ▮▮▮▮) is the client of LLW PC.

E.    With respect to the hourly fee client, the Estate of ▮▮▮▮, Inc. ("▮▮▮▮"), the Parties recognize that ▮▮▮▮ was and is the client of WGW.

2

Wood Initials: ▮▮▮

WGW Initials: ▮▮

**WGW 002297**

currently owes approximately $188,503 in overdue bills to LLW PC. The Parties agree to cooperate in attempting to recover these fees, and in the event of any such recovery, payments will be allocated first to expenses owed to LLW PC, if any, and the remainder split 80% to WGW and 20% to LLW PC.

F.     With respect to other hourly fee clients, the Parties agree that those hourly billable matters brought to LLW PC by Nicole Wade, Jonathan Grunberg, or Taylor Wilson were and are clients of WGW, and that LLW PC will cooperate in providing any information or documents for those clients to WGW. The Parties agree that those hourly billable matters brought to LLW PC by Wood were and are clients of LLW PC. The Parties agree that, except as set forth herein and in Section 1(E), no further amounts will be due to either side with respect to any hourly fee billable matters.

2.  Office Lease.

A.     WGW shall pay to LLW PC the amount of $285,000.00 in full satisfaction of any obligations WGW may have, or be alleged to have, under the lease agreement with PR II Regions Plaza, LLC for Suite 2040 at Regions Plaza (the "Lease"). This amount shall be deducted from the payment by LLW PC to WGW referenced in Section 1(B) above. Thus, the total payment required by Section 1(B) shall be in the total amount of $647,949.99.

B.     WGW (which, as noted above, includes its members in their individual capacities and their respective LLCs) shall have no further obligation or liability under the Lease. LLW PC will take all necessary steps to remove the names of WGW members from the Lease and/or to ensure that they have no obligation for further Lease payments, including if possible obtaining a release from PR II Regions Plaza, LLC of WGW or, if such release cannot be obtained, LLW PC and L. Lin Wood, individually, shall agree to indemnify WGW against any claims by PR II Regions Plaza, LLC, or any affiliate, subsidiary, related party, or assignee, relating to the Lease.

3.  Non-Disparagement.  LLW PC and L. Lin Wood, individually, agree not to disparage WGW. This agreement is not to be construed to imply or suggest that LLW PC and/or L. Lin Wood has disparaged WGW or its members prior to the date of this Agreement. Nothing in this provision prevents the Parties from providing truthful information about each other and its members in response to a court order or subpoena, or during any federal, state, or local governmental body investigation or proceeding. LLW PC and L. Lin Wood, individually, do not seek in this Agreement any legal protection regarding any future disparagement of LLW PC and L. Lin Wood, individually, but shall address any future false and defamatory statements by WGW and its members about LLW PC and L. Lin Wood, individually, on a case-by-case basis as provided by law.

4.  Mutual General Release.

A.  Release by Wood.  LLW PC and L. Lin Wood, individually, hereby irrevocably and unconditionally forever release and discharge WGW (as defined above), and their heirs, executors, administrators and assigns, and their attorneys and representatives, and

3

Wood Initials: _____

WGW Initials: _____
WGW 002298

waive any and all rights with respect to, all manner of actual or potential claims, actions, causes of action, suits, judgments, rights, demands, debts, damages or accountings of whatever nature, legal, equitable or administrative, whether the same are now known or unknown, which LLW PC and L. Lin Wood, individually, ever had, now have or may claim to have, upon or by reason of any acts or omissions of WGW or it members up to the effective date of this Agreement, including but not limited to all claims and liabilities arising from any acts, omissions, cases, or business relationships that have occurred or commenced, or allegedly have occurred or commenced, prior to the date that this Agreement is signed. This is a general release of all such claims.

B. *Release by WGW.* Nicole Wade, Jonathan Grunberg, and Taylor Wilson, and Wade, Grunberg & Wilson, LLC, for themselves and itself, hereby irrevocably and unconditionally forever release and discharge LLW PC and L. Lin Wood, individually, and their heirs, executors, administrators and assigns, and their attorneys and representatives, and waive any and all rights with respect to, all manner of actual or potential claims, actions, causes of action, suits, judgments, rights, demands, debts, damages or accountings of whatever nature, legal, equitable or administrative, whether the same are now known or unknown, which WGW and its members ever had, now have or may claim to have, upon or by reason of any acts or omissions of LLW PC and L. Lin Wood, individually, up to the effective date of this Agreement, including but not limited to all claims and liabilities arising from any acts, omissions, cases, or business relationships that have occurred or commenced, or allegedly have occurred or commenced, prior to the date that this Agreement is signed. This is a general release of all such claims.

C. The Parties hereby absolutely, unconditionally and irrevocably, covenant and agree with and in favor of each other Party that they shall not sue (at law, in equity, in any regulatory proceeding or otherwise), or maintain any suit against, any Party released above on the basis of any claim released, remised and discharged above.

D. The Parties understand, acknowledge and agree that the releases set forth above may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such releases.

E. The Parties agree that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final, absolute and unconditional nature of the release set forth above.

F. Notwithstanding anything to the contrary in this Section 4 and in this Agreement, the Parties acknowledge and agree that any actions necessary to enforce the terms of this Agreement are not released or barred. Further, the Parties acknowledge and agree that any claims or actions necessary to invoke any defenses and/or insurance protections against any claims for malpractice are not released or barred.

4

Wood Initials: _____

WGW Initials: _____
WGW 002299

5. No Further Money Owed. The Parties acknowledge and agree that, except as set forth expressly in Section 1 of this Agreement, there is no further money owed by LLW PC and/or L. Lin Wood, individually, to WGW and/or its members, or by WGW and/or its members to LLW PC and L. Lin Wood, individually.

6. Miscellaneous Provisions.

    A. Applicable Law. This Agreement shall be construed and governed by the laws of the State of Georgia, irrespective of its choice of law rules. The Parties consent to jurisdiction and venue in Georgia in any action brought to enforce the terms of this Agreement.

    B. Jointly Drafted. The Parties and their respective counsel mutually contributed to the preparation of, and have had the opportunity to review and revise, this Agreement. Accordingly, no provision of this Agreement shall be construed against any Party because that Party, or its counsel, drafted the provision. This Agreement and all of its terms shall be construed equally as to each Party.

    C. Entire Agreement. This Agreement contains the entire agreement between the Parties relating to the subject matter hereof, integrates all the terms and conditions mentioned or incidental to this Agreement, and supersedes all prior negotiations or writings. No modification or waiver of any provisions of this Agreement shall be valid unless in writing and signed by all parties hereto.

    D. Counterparts. This Agreement may be executed in counterparts, each of which may be enforceable as an original, but all of which taken together shall constitute but one agreement. Electronic execution and delivery of this Agreement by a Party shall constitute legal, valid and binding execution and delivery of this Agreement.

    E. Fees and Costs. Each Party shall bear his, her, or its own costs and attorneys' fees.

    F. Acknowledgments and Competency. The Parties represent that they have read and understand the provisions of this Agreement; that they are entering into this Agreement knowingly and voluntarily; and that they sought the advice of counsel prior to executing this Agreement. The Parties further agree that, upon information and belief, each Party to this Agreement is mentally and physically competent in all respects, including their ability to enter into this Agreement and any and all prior agreements which formed the basis in whole or in part for certain disputes between the parties which have been resolved by this Agreement.

**IN WITNESS WHEREOF**, the Parties have executed this Settlement Agreement and Release as of the day and year written above.

**L. Lin Wood, P.C.**

5

Wood Initials: _____

WGW Initials: _____
WGW 002300

By: _____ L. LIN WOOD _____

Name: _____ L. LIN WOOD _____

Title: _____ PRESIDENT _____


_____

**L. Lin Wood**

6

**WADE, GRUNBERG & WILSON, LLC**

By: _____

Name: _____

Title: _____

_____
Nicole Wade, Individually and on behalf of
**Wade Law, LLC**

_____
Jonathan Grunberg, Individually and on behalf
of J.D. Grunberg, LLC and Grunberg &
Wilson, LLC

_____
Taylor Wilson, Individually and on behalf of G.
Taylor Wilson, LLC and Grunberg & Wilson,
LLC

7

Wood Initials: _____

WGW Initials: _____

# ALSTON & BIRD

One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424
404-881-7000 | Fax: 404-881-7777

Christopher C. Marquardt          Direct Dial: **404-881-7827**          Email: **chris.marquardt@alston.com**

July 24, 2020

*VIA EMAIL*

Andrew M. Beal, Esq.
Buckley Beal
600 Peachtree Street, N.E.
Suite 3900,
Atlanta, GA 30308

Dear Drew:

I hope you and your family remain safe and well in these pandemic days.

The settlement agreement between our respective clients provides that LLW PC shall pay to WGW a portion of its fees earned in three settled cases (████ *v. CNN*, ████ and ████ *v. CNN*) and two other pending cases (████ *v. Washington Post* and ████ *v. NBCUniversal*).

The fee splits for these cases require client consent in order to comply with Georgia Rule of Professional Conduct 1.5(e). LLW PC has therefore requested that each of the clients in question provide their consent to the fee splits. The clients in the ████ and ████ cases have consented, but we have just learned that the client in the ████ cases (████, who is now 18 years old) has declined to consent and indicated he will only approve payment of a quantum meruit fee to WGW. Accordingly, please provide LLW PC with documentation of the services rendered by WGW in the three ████ cases (including contemporaneous time records) and a proposed fee based on the total hours worked so that it may be presented to ████ for his review and approval. Or if you prefer, you may send the information to Todd McMurtry, who also represents ████ and has been the primary point of contact on this issue.

Without client consent, the fee splits pertaining to the ████ cases in the settlement agreement are void. The other provisions of the agreement remain valid, however, and LLW PC intends to honor them and expects for WGW to do the same. Accordingly, LLW PC plans to pay WGW the agreed-upon portion of its fees for the ████ and ████ cases, which together total $89,199.99. WGW agreed in the settlement agreement to pay LLW PC $285,000.00 in full satisfaction of their obligations under the lease agreement

Alston & Bird LLP                                                                                                    www.alston.com

Atlanta | Beijing | Brussels | Charlotte | Dallas | London | Los Angeles | New York | Raleigh | San Francisco | Silicon Valley | Washington,

**EXHIBIT**
**13**
PENGAD 800-631-6989

Andrew M. Beal, Esq.

Page 2

with PR II Regions Plaza, LLC.  When the $89,199.99 owed by LLW PC for the ▇▇▇▇ and ▇▇▇▇ cases is deducted from the $285,000.00 owed by WGW for the lease, there remains a balance due to LLW PC of $195,800.01. Once ▇▇▇▇▇▇▇ approves a quantum meruit fee to WGW for all three ▇▇▇▇ cases, LLW PC will pay that amount to WGW after first deducting the $195,800.01 that WGW owes to LLW PC.

If you have questions, please feel free to contact me.

Sincerely yours,

*/s/ Christopher C. Marquardt*

Christopher C. Marquardt

CCM:jh

cc: Joey Burby

LEGAL02/39930786v1