1          UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF GEORGIA
2              ATLANTA DIVISION

3
    NICOLE JENNINGS WADE,
4   JONATHAN D. GRUNBERG, and
    G. TAYLOR WILSON,
5
        Plaintiff,
6

7

8
    vs.                          CASE NUMBER
9                                1:22-CV-01073

10

11

12
    L. LIN WOOD,
13
        Defendant.
14
    --------------------------/
15

16          The videotaped deposition of L. LIN

17   WOOD, a defendant, in the above-entitled cause,

18   taken pursuant to Notice and agreement, before

19   Ceil Weser, Certified Court Reporter and Notary

20   Public, Charles T. Nussbaum, Jr.,

21   Video-Technician, at the Meeting Room in

22   SpringHill Suites by Marriott, 2227 Boundary

23   Street, Beaufort, South Carolina, on the 13th

24   day of March, 2023, commencing at or about the

25   hour of 10:06 a.m.


EXHIBIT
A

```
 1    APPEARANCES OF COUNSEL:

 2       FOR THE PLAINTIFF(s):

 3               ANDREW M. BEAL, ESQUIRE
                 MILINDA L. BROWN, ESQUIRE
 4               Beal, Sutherland, Berlin & Brown, LLC
                 945 East Paces Ferry Road, NE
 5               Suite 2000
                 Atlanta, Georgia 30326
 6               678.439.0330
                 drew@beal.law
 7               milinda@beal.law

 8
          FOR THE DEFENDANT:
 9
                 R. CHRISTOPHER HARRISON, ESQUIRE
10               Downey &Cleveland, LLP
                 288 Washington Avenue
11               Marietta, Georgia 30060
                 770.422.3233
12               harrison@downeycleveland.com

13

14
          ALSO PRESENT:
15
                 John Exum, Paralegal,
16               L. Lin Wood, Esquire
                             &
17               Nicole Jennings Wade, Plaintiff
                 Jonathan D. Grunberg, Plaintiff
18

19

20
                           -  -  -
21

22

23

24

25
```



1                           I N D E X

2

3

4                                                    PAGE

5
     EXHIBIT INDEX --------------------------- 4-5
6

7    OPENING REMARKS AND STIPULATIONS ----------- 6

8

9

10

11

12

13

14

15   DIRECT-EXAMINATION:
        By Mr. Beal  --------------------------- 6
16

17

18

19

20

21

22

23

24   CERTIFICATE ------------------------------- 230
     ERRATA ------------------------------- 231-233
25

 **COASTAL COURT REPORTING & VIDEO SERVICES**
                    800-791-1100      www.coastalcourt.com

1          D O C U M E N T A R Y    E V I D E N C E

2     NUMBER              DESCRIPTION                  PAGE

3
      PX-1      Second Amended Notice of         6
4               deposition of Defendant, L. Lin
                Wood (4 pages)
5
      PX-2      Copy of E-mail, Bates Stamped    13
6               WGW 001883 (1 page)

7     PX-3      Copy of E-mail, Bates Stamped    14
                WGW 001881 through WGW 001882
8               through (2 pages)

9     PX-4      Copy of E-mail, Bates Stamped    16
                WGW 001891 (1 page)
10
      PX-5      Copy of Settlement Statement     17
11              Re: Carbone v. Cable News
                Network Inc., (2 pages)
12
      PX-6      Copy of E-mail string, Bates     21
13              Stamped WGW - 000231 - Federal
                Matter through WGW - 000235
14              ( 5 pages)

15    PX-7      Copy of forwarded E-mail,        53
                Bates Stamped WGW 002072
16              through WGW 002073 (2 pages)

17    PX-8      Copy of forwarded E-mail,        76
                Bates Stamped WGW 002080
18              through WGW 002083 (4 pages)

19    PX-9      Copy of forwarded E-mail,        78
                Bates Stamped WGW 002089
20              through WGW 002090 (2 pages)

21    PX-10     Copy of forwarded E-mail,        84
                Bates Stamped WGW 002074
22              through WGW 002076 (3 pages)

23    PX-11     Copy of E-mail string, Bates     98
                Stamped WGW 002135 through
24              WGW 002137 ( 5 pages)

25

 **COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

1    (continued)
              D O C U M E N T A R Y   E V I D E N C E
2
     NUMBER              DESCRIPTION                    PAGE
3
     PX-12    Copy of Settlement and Agreement    104
4             Release Bates Stamped WGW 002296
              through WGW 002302 (7 pages)
5
     PX-13    Copy of letter, dated               107
6             July 24, 2020 to
              Andrew M. Beal, Esquire,
7             (2 pages)

8    PX-14    Copy of Verified Complaint for      109
              Defamation Demand for Jury Trial
9             In Re: Wade et al., vs.
              L. Lin Wood (56 pages)
10
     PX-15    Copy Plaintiff's Complain           145
11            with Jury Demand, Re:
              Sandmann vs. Cable New
12            Network, Inc., (3 pages)

13   PX-16    Copy Plaintiff's Complaint          146
              with Jury Demand, Re:
14            Sandmann vs. WP Company, LLC
              (3 pages)
15
     PX-17    Copy of Defense and Answer,         164
16            In Re: Wade et al., vs. L.
              Lin Wood (29 pages)
17
     PX-18    Copy of Plaintiff's First           190
18            Continuing Interrogatories to
              Defendant, In Re: Wade et al.,
19            vs. L. Lin Wood (10 pages)

20   PX-19    Copy of Defendant's Amended         190
              Responses to Plaintiffs'
21            First continuing Interrogatories,
              In Re: Wade et al., vs. L. Lin
22            Wood (9 pages)

23   PX-20    Copy of Invoice, Carmichael         192
              Consulting Solutions, LLC,
24            Invoice Number 6861, Bates
              Stamped Wood0145 through
25            Wood0147 (3 pages)


**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

```
 1              MR. BEAL:  This will be the
 2      deposition of Defendant Lin Wood taken
 3      pursuant to Notice and agreement of
 4      Counsel.  I would propose that all
 5      objections save to the form of the
 6      question or responsiveness of the
 7      answer be reserved until first use of
 8      the deposition, is that agreeable?
 9              MR. HARRISON:  Agreed.
10                  (Whereupon, Plaintiff's Exhibit
11                  Number 1 was marked for
12                  identification.)
13                  DIRECT EXAMINATION
14   BY MR. BEAL:
15      Q    Mr. Wood, we met before.  My name is
16   Drew Beal, and I believe you are well versed in
17   the world of depositions, so I won't give you
18   any preamble.  Instead I will give you what has
19   been marked as Exhibit 1 to this deposition and
20   ask you if you have seen that before?
21      A    I did receive it in advance of it, yes.
22      Q    What did you do in preparation for this
23   deposition?
24      A    Nothing.  I prayed.
25      Q    Did you have any review of documents?
```


**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

1      A     No, I did not review any documents.

2      Q     Did you discuss any part of this matter

3  or the claims brought by the Plaintiffs with any

4  parties or potential witnesses?

5      A     I spoke briefly with Chris but I didn't

6  speak to anybody else.

7      Q     With Counsel?

8      A     Yes.

9            Just a brief call last week.

10     Q     Mr. Wood, for years you maintained L.

11  Lin Wood, PC, is that correct?

12     A     Yes.

13     Q     And about how many years did you have

14  that firm?  More than 20?

15     A     Well, let me think.

16           So I formed L. Lin Wood, P.C. in

17  September of 1997, and I maintained it as a

18  viable PC to this day.  Even though I had a

19  brief period of time where I was working as a

20  partner at Powell Goldstein, later Bryan Cave;

21  but I kept L. Lin Wood, P.C. during that time

22  period because I had some matters that predated

23  Powell Goldstein that were still in a status

24  that required me to maintain my own professional

25  corporation.



1      Q     So after you left Powell Goldstein,
2   later Bryan Cave you practiced law under the
3   name L. Lin Wood, P.C., is that correct?
4      A     I did, the same corporation.
5      Q     And you specialized primarily in
6   defamation claims and lawsuits, is that correct?
7      A     Well, I started -- not actually.
8      Q     Okay.
9      A     I started off my law career with a
10  focus on medical malpractice for the Plaintiff;
11  and I did some other types of Plaintiff's work.
12  In 1996 when I took on the representation of
13  Richard Jewell that kind of led to a shift in my
14  practice into the area of First Amendment
15  defamation.
16           When I joined Powell Goldstein and
17  later Bryan Cave I was actually doing very
18  little defamation.  I was doing what -- the
19  first case I started off handling with Nicole it
20  was the case of I believe it was Alec Hipp
21  versus Suntrust Bank.
22           When I left Bryan Cave I did that based
23  on being engaged to represent two whistle
24  blowers in a Medicare fraud case, and that was
25  the focus at least for the first years until



1   2015 when it settled; and I took on another

2   Medicare fraud case against Halifax Hospital

3   during that time period.

4           So I was doing more fraud work in those

5   years, and then shifted back to areas of

6   defamation toward the last part of 19 -- 2015,

7   '16 on I then began to do more back in the area

8   of First Amendment defamation.

9       Q    Most of that work that you have just

10  described, the whistle blower work and the

11  defamation work from 2015 on, was on behalf of

12  the Plaintiff, is that correct?

13      A    Yes.

14      Q    And it was all a contingency based fee

15  to you for the most part?

16      A    On the Medicare fraud cases?

17      Q    Yes, and the defamation cases?

18      A    Defamation cases were generally

19  contingency fee, although I did work for Steve

20  Wynn and that was done in areas of defamation,

21  but it was hourly.

22          The whistle blower cases were

23  contingency with a recovery of attorneys' fees

24  to the prevailing party.

25      Q    And at different times you brought on



1    various lawyers to work with you and the three

2    lawyers who are Plaintiffs in this case, Nicole

3    Wade, Johnathan Grunberg, and Taylor Wilson,

4    joined you and were on-board by 2016, is that

5    correct?

6         A    By 2016 I believe that is correct.  I

7    can't remember the exact time when Taylor came;

8    but yes, they came in in an office sharing

9    arrangement first as my Associates.  Johnathan

10   was an Associate.  Taylor was an Associate.

11            And you know this, I am sure, that

12   there is a certain I will say stigma to be

13   referred to as an Associate versus being

14   referred to as a partner, especially when you

15   are trying to get business; and I wanted them to

16   get business.

17            So we had an office sharing

18   arrangement, and then I would engage with them

19   after Johnathan and Taylor were no longer

20   Associates.  I would then engage with them to

21   help me in cases on a case-by-case basis with an

22   agreement of how we would do the fee.

23            Some of that was contingency and I know

24   some of it was hourly divisions, particularly

25   with the Wynn cases.

 **COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

1       Q     Let us unpack what you just said.

2             If they were no longer Associate's did

3    you refer to them in the Bar and the courts and

4    the clients as your partner?

5       A     I did and they were my partners.  They

6    were partners in a business relationship.

7       Q     And did they sign Pleadings as partners

8    of L. Lin Wood, P.C.?

9       A     I don't know if they had the word

10   partners, but they certainly signed Pleadings as

11   under the name L. Lin Wood, P.C.

12      Q     All right, thank you.

13            And when you would pay them a fee, a

14   portion of the fee recovered, did you pay that

15   to them individually or to one of their PC's or

16   LLC's?

17      A     I did not pay them individually.  So

18   the arrangement was Nicole had -- when she was

19   leaving Bryan Cave and I offered her a place to

20   work, instead of her going out and starting up

21   her own physical law firm, I thought it would be

22   helpful to her and helpful to me, because Nicole

23   is a very smart lawyer; and I envisioned that I

24   would be able to engage her to help me in

25   matters, and so all of the fees that were paid


**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

1    to Nicole were always paid to Wade Law, I

2    believe was her firm's name, PC or LLC.

3          Q     Okay.  And similarly for the other two?

4          A     Well, somewhat different in that, and I

5    don't know specifically if there were some

6    breakdowns, where I paid Taylor Wilson's PC

7    versus -- or Johnathan Grunberg's PC, but most

8    of the cases where I paid to Johnathan and

9    Taylor were done to Grunberg and Wilson, LLC or

10   PC; but I always paid their individual PC's

11   because they had their own separate firms.

12         Q     And then those PC's oftentimes paid

13   certain shares of overhead or operating expenses

14   back to the L. Lin Wood, P.C., is that right?

15         A     Yes.  L. Lin Wood, P.C. would

16   receive -- we would send to Johnathan and Taylor

17   and Nicole each month a breakdown of the shared

18   overhead, and then they would pay their

19   respective 25 percent.

20         Q     Okay.

21         A     And there may be sometimes where there

22   was overhead that was higher for one than the

23   other, parking or something along those lines;

24   but no, it was generally done on a 25 percent

25   basis of all of the shared overhead paid by



1    their PC's.

2        Q    Thank you.

3             (Whereupon, Plaintiff's Exhibit

4             Number 2 was marked for

5             identification.)

6    BY MR. BEAL:

7        Q    Let me hand you what has been marked as

8    Exhibit 2, and is this an Email from you to the

9    three of them talking about a share of the

10   Ramsey case?

11       A    Yes.

12       Q    So that would be a typical kind of

13   discussion you would have on a larger

14   contingency fee case discussing the fee

15   allocation with the three of them and their PC's

16   or LLC's?

17       A    I don't know that I would say this is

18   typical.

19            Usually when I got them involved and

20   gave them the opportunity to work with me and to

21   make money from the cases that I had -- I was

22   the -- I wouldn't say all, but it was my law

23   practice and they had the benefit of working

24   with me and being able to generate in some

25   instances a very significant income by being



1   engaged with me in a case.

2            Usually it was much simpler I think.

3   We just simply agreed to what the division would

4   be, and it varied; and then I would send an

5   Email and confirm.  It was always confirmed in

6   writing.

7            (Whereupon, Plaintiff's Exhibit

8             Number 3 was marked for

9             identification.)

10  BY MR. BEAL:

11      Q    And here is one such Email confirming

12  in writing Exhibit 3, is that correct, where you

13  talk about your final decisions on the fee

14  sharing in Ramsey?

15      A    Yes, it is; and you can see that I have

16  a sense of humor; and I made clear that the

17  executive committee, which was me, by unanimous

18  vote of 1 to 0, which is me, my firm, was

19  confirming the agreement that I made with them

20  in the Ramsey case.  That was the Burr Ramsey

21  case versus CVS.

22            I had been representing off and on Burr

23  and John and Patsy Ramsey since 1999.  So I had

24  the benefit of literally the mass of knowledge

25  that was underlying the Burke Ramsey versus CVS



1   case; but I nonetheless -- candidly for them to

2   have the opportunity to make potentially a

3   significant fee for themselves, I gave them I

4   thought a very fair division of the fee in the

5   Ramsey case, and they made a lot of money.

6        Q    And were the fees disbursed pursuant to

7   that agreement as best you can remember?

8        A    As best I can remember, yeah, we

9   settled it and then L. Lin Wood, P.C. disbursed

10  to Nicole and Johnathan and Taylor, their PC's

11  respective portions; and I think they made --

12  don't hold me to it, but I think they each made

13  around 800 or $850,000.  It was a generous fee

14  for them, but I appreciated their efforts and

15  was glad to be able to put them in good shape

16  financially.

17       Q    Was the Email that you sent marked

18  Exhibit 3 essentially the only necessary step in

19  your mind for division of fees?

20       A    We would reach an agreement, and then

21  it would be confirmed in writing.

22       Q    And then you would divide them?

23       A    Until a case came where we didn't have

24  an agreement and it moved quickly.

25                 (Whereupon, Plaintiff's Exhibit



1                    Number 4 was marked for

2                    identification.)

3    BY MR. BEAL:

4        Q    Let me hand you Exhibit 4 where there

5    is a similar agreement that you entered into for

6    the Unsworth versus Musk case.

7        A    Yeah, again, you can see the

8    light-hearted in the way I dealt with it,

9    because it was my decision, my law firm, my

10   client; and I gave them I can't remember what

11   the division was in the Unsworth versus Musk

12   case, but I know that I gave them a very

13   generous portion.  Again.  It was a case where

14   they had an opportunity to be involved in trial

15   of a high profile case in Los Angeles with a

16   potential for a significant recovery, although

17   as I got more and more into the case I realized

18   I am not sure if Elon Musk was ever going to pay

19   them anything no matter what the jury did.

20           But I entered into that agreement with

21   them.  They worked on the case with me, and we

22   had a division in writing.

23       Q    Okay.  And the fee disbursement

24   schedule or the chart that you would present to

25   the client, this is the gross recovery per the

 **COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

1    expenses, here are the attorneys' fees, it
2    wouldn't necessarily discuss these percentages?
3    It would discuss the percentage that L. Lin
4    Wood, P.C. was taking of the total fee, is that
5    correct?
6         A    I would have to go back and look at the
7    settlement statements, but usually they were
8    broken down; and it showed who was receiving
9    what.
10        Q    Really?
11        A    I am pretty sure I am right about that.
12   If I had L. Lin Wood, P.C. with the percentage,
13   there might be a breakdown as to who received
14   what.
15             (Whereupon, Plaintiff's Exhibit
16             Number 5 was marked for
17             identification.)
18   BY MR. BEAL:
19        Q    Let me hand you what has been marked as
20   Exhibit 5, does this look like the Settlement
21   Statement or what I call fee disbursement
22   schedule in the David Carbone case?
23        A    Yes.  This was dated February the 25th
24   of 2020, which would have been -- well, they
25   left -- the fee -- they left the arrangement



1    with L. Lin Wood, P.C. effective on

2    February 14th of 2020.  So they ended that

3    arrangement on their own decision; and the

4    Carbone case was a case where there had been --

5    it was one of those cases where I am not sure if

6    we had an agreement going in.  I think it was

7    part of the efforts to resolve the case at the

8    time.

9          At the time this was done I am not sure

10   that there had been an agreement reached on the

11   Carbone fees division, but I could be wrong

12   about that.

13      Q    And this Settlement Statement reflects

14   a breakout for the fees earned by L. Lin Wood,

15   P.C., and the fees earned by Wargo and French,

16   LLP and SG Evans Law?

17      A    Yes.  I had associated Stacey Evans,

18   who formerly had been a partner with me at Wood

19   Hernacki and Evans, the firm I established when

20   I left Bryan Cave; and that firm was made up of

21   their three PC's.  It was basically the same

22   thing.  It was an office sharing arrangement

23   where we would divide up cases by agreement,

24   where they would help me.

25          This refreshes my recollection a little



1   bit.  The Carbone case I do not think I

2   initially envisioned getting Johnathan or Taylor

3   or Nicole involved in it.  I don't think Nicole

4   ever did any work on it, because Stacey Evans

5   was going to be the person who was really

6   engaged to help me; and she was at Wargo &

7   French and I had a division of fees with her.

8          And so I broke down how the fees were

9   split.  And that is why you see Wargo & French,

10  and then she had SG Evans Law had independent of

11  Wargo & French expended expense money.

12     Q    And Wargo & French and SG Evans Law did

13  not maintain a practice in the same lease space

14  as L. Lin Wood, P.C., did they?

15     A    No.  Wargo & French never had a sharing

16  arrangement with me.  Stacey had earlier had an

17  office sharing arrangement with me, but when

18  she -- she ran for Governor.

19     Q    But she was long since done when this

20  was entered?

21     A    She was out of the office sharing

22  arrangement with me.

23     Q    Right.

24     A    When she --

25     Q    And does this refresh your recollection


**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

1    that there was no breakdown below L. Lin Wood,

2    P.C. to the PC's or LLC's of the Plaintiffs

3    here?

4        A    No, it was just a breakdown between L.

5    Lin Wood, P.C. and Wargo & French, LLP; and I

6    don't believe at the time -- I am subject to

7    being refreshed, but they didn't do a lot --

8    Johnathan got involved in it at some point and

9    did some work; but I don't think Nicole ever did

10   any work on Carbone, and I don't think Taylor

11   Wilson did.

12       Q    So in the Lindsey case is it your

13   recollection that the fee disbursement schedule

14   in the Lindsey case would reflect fees going to

15   L. Lin Wood, P.C. and separately show fees going

16   to one of the Plaintiff's PC's or LLC's?

17       A    You would have to show me the

18   agreement.

19       Q    Okay.  Is it your recollection that the

20   Ramsey fee contracts showed a distinction

21   between the fees going to L. Lin Wood, P.C. and

22   the fees going to one of the, LLC's or PC's of

23   the Plaintiffs?

24       A    You said the contract, that is the

25   contract of engagement.



1      Q    No, I mean the Settlement Statement?

2      A    I would have to see it.  I think it

3   showed how the breakdown of money.  In other

4   words, my recollection is that it listed how

5   much each of them got.

6      Q    Okay.

7               (Whereupon, Plaintiff's Exhibit

8               Number 6 was marked for

9               identification.)

10  BY MR. BEAL:

11     Q    Let me hand you what has been marked

12  Exhibit 6.

13               And we are going to be talking about

14  the first long Email from Taylor Wilson to you

15  dated February 17, 2020.

16     A    Okay, we are going to be talking about

17  the first part of it?  Not February 18th?

18     Q    Correct.  I don't know.  We just left

19  it on there for context, because it was part of

20  the chain.

21               Do you remember entering into an

22  agreement with the Plaintiffs here regarding the

23  fee splits that are reflected here on Taylor's

24  Email to you of February 17, 2020?

25     A    I do remember speaking with them on the



1    phone, and we reached an agreement as to how the
2    fee -- the fees themselves would be divided.  We
3    did not reach at that time an agreement on the
4    overall issues that were between us.
5        Q    Okay.
6        A    In fact, I remember it well because I
7    had to ask --
8            MR. BEAL:  Hold on for one second.
9            (Whereupon, an off-the-record
10            discussion was held.)
11   BY MR. BEAL:
12       Q    I am handing you back Exhibit 5.  We
13   needed to black out a total in the recovery in
14   Sandmann.
15       A    It might be a good idea to block off
16   Carbone and CNN on the second page, because that
17   agreement may have been confidential at CNN's
18   request.
19       Q    We can do that at the end of the
20   deposition.
21            So this agreement by -- this Email by
22   Taylor sets forth in writing the agreement you
23   had reached certainly by February 17th on
24   regarding fee splits in a variety of cases, is
25   that correct?



1      A     I think it reflects how we agreed to

2    divide the fee, not the final agreement on how

3    we were going to sever the relationship, because

4    there were other issues.

5      Q     Right.

6      A     But it does, because I remember the

7    phone call was on the 17th three days after they

8    had left the office sharing agreement with

9    myself and my PC; and I remember having a

10   conversation.  I was trying to be -- I was

11   trying to calm the waters at that time.

12     Q     I understand.

13     A     We were going through a very difficult

14   time period dealing with Johnathan and Taylor --

15   not so much Nicole -- starting in October of

16   2019, and there were a lot of things that were

17   done that created problems --

18     Q     But this Email --

19     A     Let me finish, and I was trying to calm

20   the waters.  And I remember that I said what do

21   you all think is fair?  And they said

22   35 percent.  I said I will give you 50, is that

23   fair?  Yeah, yeah, we will take 50.

24           And that that was a discussion that

25   occurred on February 17th and Taylor sent an



1    Email confirming it.

2        Q      Thank you.

3               And so if you turn over to the second

4    page of Exhibit 6 (b) is Carbone versus CNN, the

5    proposed -- you proposed to split the fee

6    40 percent to L. Lin Wood, P.C. and 60 percent

7    to us.

8               Did I read that correctly?

9        A      Yes, that is what it says.

10       Q      And the date of this is February 17th,

11   is that correct?

12       A      Yes.

13       Q      And then if we refer back to Exhibit 5,

14   the date of that fee disbursement is about a

15   week after?  It is February 25th, is that

16   correct?

17       A      It is because, and I tell you, I think

18   I am right I think, after I had had the

19   conversation with Johnathan Taylor and Nicole on

20   the 17th, things occurred that placed doubt in

21   my mind as to whether I was going to actually do

22   what I had said on the 17th in terms of the fee

23   division.

24       Q      Whether you were going to honor that

25   promise?



1       A    Well, it wasn't a done deal; and issues

2    arose about the lease, and I was not happy with

3    them.

4            And so at the time that I did the

5    Carbone Settlement Statement in my mind it was

6    unclear what was going to happen with Carbone.

7       Q    And so you didn't list them on

8    Exhibit 5 on the Carbone Settlement Statement

9    because you planned to keep all the fees

10   yourself?

11      A    That is not true.

12           MR. HARRISON:  Object to the form.

13   BY MR. BEAL:

14      Q    Well, you said --

15           THE WITNESS:  Hold on, that is not

16     true at all.

17   BY MR. BEAL:

18      Q    Okay.

19      A    In fact, I got to remember the date;

20   but somewhere after -- or shortly after or

21   before maybe, February 20th, I engaged Alston &

22   Byrd to represent me.

23      Q    Did you in fact share any of the

24   Carbone fees with the Plaintiffs in this case?

25      A    It would have been done pursuant to the

 **COASTAL COURT REPORTING & VIDEO SERVICES**
                            800-791-1100        www.coastalcourt.com

1    March 17th agreement that was negotiated between

2    you and Alston & Byrd; and it has been handled

3    pursuant to that agreement.

4              And there was a division where they

5    would receive some of the fee.  But the way it

6    was set up is it wasn't going to be paid until

7    the Sandmann case resolved.  But even then as I

8    recall without looking at the agreement, it

9    wasn't going to be paid as a practical matter

10   because they owed me 200 and -- they owed

11   $285,000 on their share of the lease.  They owed

12   that directly to the landlord.

13             And so the agreement was set up so that

14   I would not pay any of the fees in the other

15   matters, except for Sandmann, except for when it

16   came in because those fees were --

17             MR. BEAL:  I don't want to be

18        rude, but I don't know what he is

19        talking about.

20             THE WITNESS:  Well, I am trying to

21        tell you --

22             MR. HARRISON:  Let him finish.

23             MR. BEAL:  It is a very simple

24        question.

25             THE WITNESS:  I am trying to give



1          you an answer.  Let me finish.  I am
2          sorry.
3                  So for example if I owed him
4          hypothetically $50,000 on Carbone, even
5          though it closed, I didn't pay him the
6          50 because the agreement allowed me to
7          keep any of their fees that they had
8          agreed to pay them until they had
9          satisfied the $285,000 that they had to
10         pay to the landlord, which I agreed to
11         let them pay to me.  Then I would pay
12         to the landlord on their behalf to make
13         sure that their fees were actually
14         paid, because they owed 75 percent of
15         the lease.
16                 So the amount of Carbone and how
17         that worked out, that ultimately was
18         tied more to the final agreement of
19         March 17th, than it was the preliminary
20         on the 17th of February.
21    BY MR. BEAL:
22         Q    Let me ask this question, on
23    February 17th Taylor wrote this Email
24    summarizing your agreement, which included fee
25    divisions on a variety of cases, including



1    Carbone, is that correct?

2        A    It is correct, to the point that we

3    agreed at that time on a fee division in certain

4    cases.

5        Q    And then?

6        A    But it was not put in writing after I

7    had to get Joey Burby involved.  Then it was put

8    in writing.

9        Q    Six days later you received the fees in

10   Carbone and --

11       A    It looks like I got them on the 25th,

12   which would have been more than six days.

13            MR. HARRISON:  Eight days.

14   BY MR. BEAL:

15       Q    So eight days later, but payment was

16   not made because you planned on entering into a

17   separate agreement, which would deal with other

18   issues; and these payments would not be due, is

19   that correct?

20       A    I don't think that is accurate.

21       Q    Okay.

22       A    I mean it is ultimately accurate on

23   March 17th that the payment of that fee in

24   Carbone was not due and payable until they had

25   paid their share of the $285,000 that they owed



1    on the lease.

2        Q    So when you entered into --

3        A    Hold on a second.  I believe it was

4    during the time period of the 17th prior to the

5    25th that I learned that my computer had been

6    hacked, and my Email's had been hacked; and I

7    had reason at that time to believe that

8    Johnathan and Taylor and perhaps Nicole were

9    involved in it.  I still think that.

10       Q    Okay.  Were you --

11       A    I think it related to Dr. Phil, but we

12   will see.  I thought at the time that it related

13   to Rick Miller, so there was a problem.  However

14   we define it, there was a serious problem that

15   came up between the 17th and the 25th of

16   February that ultimately led me to get Joey

17   Burby and his firm Alston & Byrd involved to

18   negotiate a final deal with you.

19       Q    If you had been planning on paying the

20   fee to my clients out of Carbone, would you have

21   had to have listed them on that Settlement

22   Statement?

23       A    You know, I don't believe that I

24   realized at the time that I had to do that.

25       Q    Okay.  So you didn't think you had to



1    do it?

2        A    I learned from Joey Burby and Chris

3    Marquardt when the Sandmann issue came up, that

4    when you divide a fee with an outside firm that

5    you have to get the client consent either --

6    preferably in the initial engagement agreement,

7    but if not at that time I was told that you have

8    to get it at the time of consummation of the

9    settlement, or before the consummation, or at

10   the consummation.

11            I was not intimately familiar with the

12   Georgia ethical rules on fee splits with third

13   parties.

14       Q    And so that was not something you had

15   been doing in your career with the Plaintiffs up

16   to that point, is that correct?

17       A    It is correct in that I did not do it,

18   because I thought there was an ethical

19   obligation to do it; but I think my history

20   showed that I generally would reflect to the

21   clients how the fees were disbursed or the

22   moneys were disbursed, and how the settlement

23   proceeds were disbursed.

24            That was a matter of disclosure that I

25   always engaged in, but I did not know that it



1    was a requirement under the Georgia ethical

2    rules until I was informed of that by Alston &

3    Byrd.  And that came up in discussion about

4    the --

5      Q    And the matters --

6           MR. BEAL:  We are wasting just a

7      ton of time.  We don't have -- we don't

8      need to be here until 8:00 o'clock at

9      night.

10          MR. HARRISON:  I understand.

11          MR. BEAL:  I know, but I mean a

12     lot of this hang on.

13          THE WITNESS:  Well, let me --

14          MR. HARRISON:  Hang on.

15          MR. BEAL:  The question got

16     answered and then it got re-answered a

17     second time, and now we are onto a

18     whole different subject.

19          MR. HARRISON:  So two things, let

20     him finish his answers, please.

21          Lin, answer the question and stop.

22          MR. BEAL:  Because he can get to

23     all this stuff --

24          MR. HARRISON:  I don't need it.

25          MR. BEAL:  I am not trying to cut



1      you off.  I just want to save some
2      time.
3              THE WITNESS:  Let me finish now.
4              MR. HARRISON:  Please don't cut
5      him off.
6              Lin, please just answer the
7      question.
8              THE WITNESS:  I believe what I was
9      saying when you jumped in was in a
10     discussion about the fee division with
11     Cherie Fuzzell, that is when Alston &
12     Byrd says this applies to Sandmann too.
13     That is when I learned about the
14     ethical rule.
15             So my disclosures in any of the
16     agreements that I had, it was really a
17     matter of transparency to tell the
18     client how the proceeds were disbursed.
19             I didn't do it because I thought
20     there was an ethical rule to do it.
21  BY MR. BEAL:
22     Q    And did Alston & Byrd tell you how --
23  did Alston & Byrd describe to you that these
24  ethical regulations they were talking about were
25  different for firms inside your office, versus



1    firms outside, practicing law somewhere else?

2              MR. HARRISON:  Let me make sure

3         before he answers.

4              He is asking you potentially about

5         attorney-client communications.

6              THE WITNESS:  Well, I relied on

7         Counsel so I think he is entitled to

8         ask it.

9              MR. HARRISON:  I think he is

10        entitled to ask it, but I just wanted

11        to make you aware of it.

12             THE WITNESS:  I gave Joey Burby

13        and Chris Marquardt the entire history

14        of the fee splits, et cetera with the

15        three PC's.  Yeah, Wade, Grunberg --

16        however many PC's they had.

17             I gave them the entire history.  I

18        gave them the history of the office

19        sharing division.  They were aware that

20        these lawyers had left the fee sharing

21        arrangement on February 14th.  So when

22        I was told that consent was required

23        from Nicholas Sandmann pursuant to the

24        Georgia ethical rules, and as I recall

25        Todd McMurtry said it was required



1          pursuant to Kentucky's ethical rules, I
2          relied on the fact that they knew the
3          history and they knew whether or not
4          the fee should be divided or should
5          require client consent.
6               And however they resolved that in
7          terms of what you are suggesting or
8          that they were in the office or out of
9          the office, the fact is we know without
10         any doubt that the fee agreement was
11         signed, the division agreement was
12         signed on March 17th.  Over a month
13         earlier they had terminated their lease
14         office sharing arrangement with me.  So
15         they were a third party firm at the
16         time the agreement was entered into in
17         March, and for whatever their legal
18         reasoning was, Alston & Byrd said
19         client consent is required.
20    BY MR. BEAL:
21         Q    And what legal research did you do to
22    confirm that that was indeed accurate?
23         A    I didn't do any.  I read the rule, and
24    they brought it to my attention; but they were
25    my lawyers, and I figured they had done the



**COASTAL COURT REPORTING & VIDEO SERVICES**
                    800-791-1100      www.coastalcourt.com

1    research to come to the right --

2         Q    Did they prepare a research memo --

3              MR. HARRISON:  Hang on.  You got

4         to let him finish his answer.  I

5         understand that you think maybe it is

6         not relevant; but you are continuing to

7         talk over him.  It is just not going to

8         get anywhere.

9              THE WITNESS:  Let me just finish.

10             So I didn't prepare any -- I do

11        didn't do any legal research.  I was

12        paying Alston & Byrd to resolve the

13        issue for me.  And they gave me a hard

14        statement that consent was required,

15        and I can't remember exactly the date

16        of when that advice was given to me;

17        but that was their counsel.  I didn't

18        go back and second-guess it.  I didn't

19        do my own research.

20             I was familiar with the rule when

21        it was brought to my attention, and the

22        issue of whether it applied based on

23        the arrangement we had predating the

24        March 17 or not, I relied on Alston &

25        Byrd to tell me the answer.



1    BY MR. BEAL:

2        Q    When do you think they gave you that

3    advice?

4        A    I would have to go back and look.  I

5    really don't remember, and my recollection is

6    that it was sometime after March the 17th,

7    because it was in a discussion about a division

8    with Cherie Fuzzell; and they said we have

9    looked and you got to get client consent.

10            And I asked the question, well, does

11   that also apply to Sandmann?  And they said

12   yeah.  So that is when it happened.  I don't

13   have a specific date.

14       Q    And who was Miss Fuzzell?

15       A    Cherie Fuzzell is Rick Miller's wife.

16       Q    And she is associated with what law

17   firm?

18       A    I don't think she has an association

19   with a law firm.  I don't think she ever

20   practiced law actually, but she got a law

21   degree.  She may have practiced at one time.

22       Q    She never practiced in any capacity

23   with L. Lin Wood, P.C. or in your office?

24       A    She did not.

25       Q    Okay.



1          Did Alston & Byrd ever indicate to you
2    that there was a difference between the
3    Plaintiffs here who practiced law as your
4    partners in your business, versus someone who
5    practiced law at a completely different firm in
6    a different location?  Did they ever draw that
7    distinction?
8       A    They didn't draw the distinction with
9    me.  I gave them all the information, all the
10   factual background of the history of the
11   relationship between the various PC's; and they
12   came to their own conclusion on their own time
13   that client consent in the Sandmann case was
14   required.  And I tried to get it.
15      Q    So would it be fair to say that all of
16   these cases here, Sandmann -- well, leave
17   Sandmann aside -- Carbone, Lindsey, Grogan and
18   Cardoba all had settlement statements that would
19   have reflected the Plaintiffs and the percentage
20   that they were receiving?
21      A    Well, Cordoba I was not involved in
22   however that was done.
23          Grogan versus Aarons, I was not
24   involved in how that was done, if it has been
25   done.



1           Lindsey, I am sure that I did prepare a

2     client statement.

3           And Carbone, you have got.

4           And then we obviously know what has

5     happened with Sandmann.

6     Q     And would Lindsey -- I may have asked

7     you this question before -- but let me go over

8     it again, in Lindsey was there a separate line

9     item for the Plaintiffs in the percentage their

10    PC's or LLC's would receive?

11    A     I would have to see the agreement, but

12    I suspect it might be more in line with the

13    Carbone Settlement Statement; but I don't know

14    that.

15          Because this was all in flux pending

16    the final agreement that was reached on

17    March 17th.

18    Q     And so is there anything in Exhibit 6

19    which indicates that these agreements are in

20    flux or will be changed, or are pending a final

21    agreement?  Any reference to that?

22    A     Taylor didn't put anything in there,

23    but we had other agreements -- we had other

24    issues that had to be resolved.

25    Q     And then under number 2 he says:  We



1    agreed to speak to Kimmy and use our best

2    efforts to influence her as to the benefits of

3    returning to work with you, including without

4    limitation by describing to her how much we

5    appreciate your willingness to work with us and

6    how well we were able to work with you on

7    resolving the issues tonight, et cetera.

8            And is this Kimmy Hart Bennett?

9        A    Yes.

10       Q    And why was it so important to you that

11   the Plaintiffs go and talk to Kimmy and persuade

12   her to come to work for you?

13       A    Because they had put her job at risk

14   and to get her terminated.  On February 14th I

15   believe that was the day that we were supposed

16   to meet in the offices of L. Lin Wood, P.C.

17       Q    Okay --

18       A    Hold on.  We had come to an agreement

19   to continue to work in an office sharing

20   arrangement under the name of Wood Wilson

21   Grunberg and Wade; and we were going to be

22   meeting on February 14th after some very, very

23   difficult days starting in October until that

24   time period, to try to sit down and go over how

25   we are going to agree on how that office sharing



1    agreement was going to work.

2            I sensed that it was a setup, and that

3    they weren't going to be at the meeting; so I

4    didn't go.  Because I sensed they were going to

5    try to leave and stick me with the lease.  I

6    thought the lease was in L. Lin Wood, P.C.'s

7    name, and I had the keys removed, the card's

8    access removed.

9            And then I found out that they had a

10   meeting I think at Nicole's house where they

11   were going to read me the riot act, and they

12   changed the time to 2:30 and Johnathan got on

13   the phone and just ripped me for 20 minutes; and

14   I finally said, can I say something, Jonathan?

15   Hold on.  This is important and I am going

16   answer it --

17   BY MR. BEAL:

18       Q    Is this going to tie back to Kimmy?

19       A    It is.  So I finally said to Jonathan

20   can I get a word in?  He said you got five

21   minutes.  I said I don't need five minutes.  You

22   got until 5:00 o'clock to get in the office and

23   get your stuff out.  I am told that when they

24   all went to the meeting, and Kimmy went with

25   him, she was my executive assistant, she never



1    worked for any of their PC's, she was paid
2    strictly by me.  She worked for me, although
3    they benefited because she was at my request
4    keeping up with the overhead and paying it, and
5    then getting their share paid.
6          They took Kimmy to that meeting, and
7    Johnathan I am told looked over and say you know
8    you are going to lose your job now.  And Kimmy
9    said yes.  And that would have hurt me badly,
10   because I had to have Kimmy to be able to
11   maintain my law practice at that time.
12         And so when we had this discussion on
13   the 20th, I raised with them that I would like
14   for them to tell Kimmy, to urge her to stay.
15   Q    Okay.
16   A    And they were willing to do it then,
17   because I guess they saw the benefit to them by
18   making sure that I could still function with my
19   own self and have an executive assistant that
20   was skilled and knowledgeable.
21   Q    So Kimmy ultimately did stay with you,
22   is that right?
23   A    She did.  In fact I learned that Taylor
24   had called her and said you ought to stay --
25   Q    Just yes or no, I mean?



1       A    I am answering.  I have the right to

2   answer fully.  I learned that Taylor had called

3   her and said you ought to stay with Lin.  They

4   were trying to make peace at that time because I

5   guess they thought they were going to get what

6   they wanted out of these other cases.

7            So she did ultimately stay with me.

8   She still works for me.

9       Q    Does she live with you up here?

10      A    No, she lives with her husband outside

11  of Atlanta.

12      Q    But it was very important for you to

13  get Kimmy and this salary was what you offered

14  her was 120,000 a year, is that correct?

15      A    I believe that is correct.  I was

16  paying her 100 or 120 at that time.  Kimmy is a

17  very valuable person in terms of her skill and

18  her knowledge.  She runs my law practice.  Since

19  I have lost my law practice due to this lawsuit

20  and the State Bar, she runs my other efforts to

21  try to find a way to make a living.  So she is a

22  very critical employee.  She was then.  She is

23  now.

24      Q    And she works out of Atlanta and you

25  live up here in South Carolina most of the time,



1   is that correct?

2      A    My residence was moved to South

3   Carolina in February of 2021.  I still have a

4   home in Atlanta on Green View and I have to -- I

5   am trying to maintain it, because when I go down

6   to deal with this litigation and the State Bar,

7   I don't want to go down and stay in a hotel

8   because I take my dog with me.

9           So the answer is Kimmy works remotely,

10  and then I will see her in person when I go to

11  Atlanta; and then she has made a couple of trips

12  to South Carolina.  Tat is right after when I

13  first bought the property here.

14     Q    And you have invested with Kimmy's

15  husband in another business, is that correct?

16     A    No.

17     Q    No?

18     A    No, I have no investments with Paul.

19     Q    Okay.  So for the most part your PC is

20  located in Atlanta, Georgia; but your permanent

21  residence and where you spend the majority of

22  your time is here in South Carolina, is that

23  correct?

24     A    I spend the majority of my time here.

25  The PC still has an address in Atlanta.  I have



1    left the corporation viable, although it is not
2    a viable entity any more financially; and I
3    don't have any cases that I am working on,
4    except my efforts to combat as Co-Counsel the
5    warfare that has been waged against me,
6    including this lawsuit.
7        Q    And when we look at the lawsuits listed
8    on Exhibit 6, Sandmann, Carbone, Lindsey,
9    Grogan -- let us leave Cordoba out for now -- in
10   each one there is an estimated fee recovery, and
11   is that because the majority of the work had
12   already been performed on those files?
13       A    No.  No.
14            Cordoba was as I recall the case that
15   Taylor Wilson brought in --
16       Q    I don't want to talk about Cordoba
17   right now.  I am asking A through E?
18       A    You asked me about D and E.
19       Q    No, I am asking you A through D.
20   Sandmann --
21       A    Grogan -- I don't know -- no, I don't
22   believe Grogan had all the work done on it at
23   all.  I thought it was relatively a new case.
24       Q    But we know that Carbone was done
25   because the payment came eight days later.



1      A      I would have to look and see when
2  Carbone actually was done.
3             I remember being at Reynolds when I
4  spoke with David and also David Vigilante; so I
5  don't remember the exact date that it was done.
6  It may have been --
7      Q      But all of the work was substantially
8  performed, because you had a check eight days
9  later, right?
10     A      Well, I don't -- the work is not done
11  on a contingency fee case until you get a
12  settlement.
13            And so I was still negotiating with
14  David Vigilante and the Carbone's.  They were
15  tough clients, and they had a certain view of
16  the case and I had a different view.  And so I
17  had to spend time with them and spend time with
18  David Vigilante to get it settled.  I don't know
19  when those conversations occurred.
20     Q      But it was most of the actual legal
21  work had already been performed, and there was
22  an estimated fee so --
23     A      Yeah.
24     Q      So there must have been a tentative
25  agreement as to even settlement amount at that



1    point?

2         A    I think that is accurate.

3         Q    Okay.  And then the same is true of

4    Sandmann, all the heavy lifting, the legal work

5    must have been done because we have got a fee

6    share estimate, which is remarkably accurate;

7    and it is down to the dollar.  So that amount,

8    the majority of the work had been done on

9    Sandmann, and you were finalizing the settlement

10   documents at that time in February 17th, right?

11        A    What is the question?  There is a lot

12   said there.

13        Q    Is that correct that the majority of

14   the legal work had been completed in Sandmann

15   and a settlement amount had been agreed to?

16        A    No.  What would be accurate is is that

17   work had been done -- Sandmann was involved in I

18   believe seven different cases.  So a lot of the

19   work that was done would have been for the

20   benefit of all of those cases.

21             There was concentration on CNN and then

22   the Washington Post.  So enough work had been

23   done on the CNN case that the parties settled

24   it.

25             At the time that it settled there was



1   no agreement on a fee division with any other
2   lawyers in how we would deal with the fees.
3        Q    All right.
4        A    Until we had the discussion and I
5   entered into what I felt was -- I felt like --
6   hold on -- these people were extorting me.  But
7   I entered into an agreement to get them in my
8   rear-view mirror and then that blew up.
9             But then I went back and said look, I
10  just want to move on with my life.  I had this
11  disruption with my children and Richard Jewell
12  and the threats that it posed to my ongoing
13  representation of Sandmann, and that is when
14  Joey and them got the matter settled.  I thought
15  we were in the rear-view mirror and would have
16  an amicable relationship going forward.  That
17  was my intent.
18       Q    So when we are talking with Sandmann
19  here on Exhibit 6, we are talking about Sandmann
20  versus CNN?
21       A    On Exhibit 6 we are talking about
22  Sandmann versus CNN.
23       Q    Yes, and the settlement agreement had
24  been reached?
25       A    Yes, it had to have been.  It wasn't



1    consummated.

2        Q    Correct.

3        A    I don't know if it had been documented,

4    because Todd McMurtry handled that part of the

5    case.  It had been envisioned at one point that

6    I was going to ask Taylor to work with Todd on

7    it and I don't think that worked out.  Either I

8    just changed my mind or things got to a point

9    where it didn't matter because we got it

10   settled.

11       Q    A minute ago you said these people were

12   extorting me.

13            Do you believe that there was in fact

14   extortion committed by the Plaintiffs?

15       A    I believe they extorted me into the

16   agreement of March 17th, because they were

17   interfering with my relationship with my

18   children.  That is documented.  You don't do

19   that to me.

20            They were threatening me with their

21   accusations, false about my mental health.  They

22   were threatening my efforts for Richard Jewell

23   to have President Trump award him posthumously

24   the Presidential Medal of Freedom.

25            And their baseless allegations also



1    threatened what I was doing in an ongoing effort

2    for Nicholas Sandmann and they knew it.

3            And I think they used that leverage and

4    it worked.  I gave in, but I felt extorted.

5    Then I believe clearly without any doubt in my

6    mind it is my opinion they extorted me or tried

7    to extort me with respect to the demand that you

8    made when you sent over that incredibly

9    scandalous, irrelevant, impertinent Complaint

10   that they were determined to file, so they could

11   smear my name and they did it.

12           They knew I would never agree to the

13   extortion terms that were presented to me when

14   you sent that over to Joey Burby.  They wanted

15   to smear me.  I think that why they involved

16   David Hancock.

17     Q    So it is your belief that the first act

18   of criminal extortion or the crime of extortion

19   occurred by the Plaintiffs in the March 17th

20   agreement, Settlement Agreement, is that

21   correct?

22           MR. HARRISON:  Objection to the

23       form.

24           You can answer.

25           THE WITNESS:  I believe that they



1       extorted me into the March 17th

2       agreement and I gave into it.

3  BY MR. BEAL:

4       Q      And then --

5       A      Let me finish.

6       Q      I want you to list them all out for me.

7       A      I am trying to.

8       Q      Good.

9       A      I believe they extorted me in

10  connection with the March 17th agreement, and I

11  gave into it.

12          If I had not given into it they would

13  have had to sue me for quantum meruit, and it is

14  a lot less than what I had agreed to pay.

15          And then I believe that they attempted

16  to extort me, and you were involved in it, Drew,

17  with the obscene Complaint that was filed, where

18  the only issue to be resolved was whether or not

19  client consent was required in the Sandmann

20  case.

21          So I believe that was extortion.  I

22  don't know that I -- you would have to show me

23  what I said, but extortion is extortion.  If it

24  is a crime, it is a crime.  Theirs was knowing,

25  and it was my firm opinion and validated by



1    Alston & Byrd, because they prepared with me the
2    press release that was issued after the lawsuit
3    was filed; and they assisted me in editing it,
4    and it contained the fact that I said that they
5    were trying to extort me through litigation.  I
6    wasn't going to get extorted.
7            So the first accusation or description
8    or my opinion I would say about extortion was in
9    the press release that I issued back in
10   September of 2020.  They didn't say anything
11   about it.
12           And then they filed their lawsuit and
13   published to the world that I had said to Dexter
14   Cain that they were extorting.  That I had said
15   to one of the Co-Counsel in the class action
16   case that they were extorting me.  They put that
17   out for the world to read.  They published it
18   themselves.  I didn't.  But that is the way I
19   felt, because I think I am right.  I think my
20   opinion is solid.
21   Q    To whom -- to what Law Enforcement
22   agencies did you report this extortion or
23   attempted extortion?
24   A    I didn't -- I didn't -- I didn't have
25   the opinion it was extortion to have these



1    people put in jail for it.  But I described what
2    they had done, because I believed then, I
3    believe now that it was extortion; but I wasn't
4    here to put anybody in jail.
5         Q    But you believe it was the crime of
6    extortion, but you did not want to put them in
7    jail for it?
8         A    I believed that they extorted me and I
9    made finally a decision in I believe May of 2021
10   when I was then representing myself in this
11   case, when I had joined as Co-Counsel when Burby
12   had left, I felt like as a lawyer when I was
13   getting blasted up there in South Carolina, in
14   large part based on their lawsuit, that I had
15   not only a right, but under the law I had a duty
16   as my own lawyer to defend myself in the Court
17   of public opinion and that is when I posted on
18   Telegram.  And that is when I described what
19   they had done as extortion.  That is my opinion.
20   It was then.  It is now and it hasn't changed.
21        Q    Did you believe that you had a duty to
22   report the crime of extortion to any Bar
23   Association?
24        A    Well, it was on Telegram; and I think I
25   made some reference to it.  The Bar had



1    apparently changed their policies sometime in

2    2020 where you could file a Complaint against

3    any lawyer even if he never represented you or

4    she never represented you.  It changed

5    completely in the rules, where usually a

6    Complaint ethically had to be filed by a client.

7           And so having been subjected to an

8    ethics investigation by people I didn't even

9    know who they were, I figured the Bar wants to

10   hear from the people.

11          And I think I put on Telegram -- I

12   don't have it with me -- but I recall putting on

13   Telegram if you feel this is extortion, you can

14   always report it to the Georgia Bar; and I think

15   I did report them to the Georgia Bar.

16              (Whereupon, Plaintiff's Exhibit

17              Number 7 was marked for

18              identification.)

19   BY MR. BEAL:

20      Q    Let me hand you this.

21      A    But I didn't contact Law Enforcement,

22   just like I note they didn't contact Law

23   Enforcement despite having what they claim was

24   serious threats of bodily harm they claim were

25   made by people who followed me on Telegram.



1    That is not true.

2        Q    I am handing you what has been marked

3    as Exhibit 7, and ask you if this is an Email

4    that you wrote to Todd McMurtry on February 27th

5    of 2020?

6        A    Let me take a look at it.

7        Q    Yeah, it is kind of long.  It will take

8    a second.

9        A    It looks like it will be all right.

10            He called you a flaming liberal.  I

11   think that is right.

12       Q    No, Ed was the flaming liberal?

13       A    I am just kidding, Ed was the flaming

14   liberal.  I am sorry.  Oh yes, it says Ed is a

15   flaming liberal.  I like Ed.  I think he is a

16   flaming liberal.  But that is all right.  He

17   thinks I am a flaming conservative.

18            Okay, that is an Email I sent to Todd.

19       Q    The Plaintiffs are not copied on this

20   separately?

21       A    Nor would there be a reason to copy

22   them.

23       Q    So in the first paragraph you talk

24   about a dispute you had with my then law partner

25   Ed Buckley regarding claims from his client



**COASTAL COURT REPORTING & VIDEO SERVICES**
                800-791-1100        www.coastalcourt.com

1      against Herman Cain, is that correct?

2          A    I didn't have a dispute with it.

3          Q    Okay.

4          A    I represented Herman Cain.  Ed

5      represented Ginger White and Ed started making a

6      media tour with Ginger White to attack Herman

7      Cain.

8               That is my dealings with Ed Buckley.

9          Q    All right.

10              Did you accuse him of extortion?

11              MR. HARRISON:  Object to the form.

12              THE WITNESS:  He wasn't extorting

13         me.  I didn't make any accusations

14         against Ed Buckley.  I was only

15         involved, and it was peripheral.  I

16         think we talked on the phone a few

17         times, because he was on a media tour

18         with Ginger White attacking Herman Cain

19         who I represented.

20     BY MR. BEAL:

21         Q    In the next paragraph you say and I

22     will just read it and tell me if I read it

23     correctly and we can break it down:  I can

24     explain more to you tomorrow by phone, but I

25     would like to ask you to consider preparing a



1    letter from you to Beal and a letter signed by

2    Ted and Julie to you or Beal, making clear that

3    there is express directive that no fees be paid

4    to Taylor, Johnathan and Nicole that exceed a

5    quantum meruit basis regardless of any agreement

6    I made or attempted to make to get rid of their

7    foolishness to prevent it from harming my future

8    efforts for Nicholas and others.

9              Did I read that correctly?

10       A    You did.

11       Q    Would it be fair to say that you are

12   asking Todd to go to Mr. and Mrs. Sandmann and

13   instruct them to insist on a quantum meruit fee

14   for the Plaintiffs in this case?

15       A    I said what I said.

16       Q    All right.

17       A    But let me say this, you had made some

18   demand on Todd that he maintain the Sandmann fee

19   in his escrow account, in terms of the share

20   that Nicole and Johnathan and Taylor were trying

21   to get.  And I remember that he said -- I called

22   him on it -- and he said I can't do that under

23   Kentucky law, and I will inform them.  And then

24   he said would you want to see the draft of the

25   letter before I send it to them.  And I said no,



1    you write whatever you want to write.

2            And in that letter I noted when it was

3    received that the last paragraph of that letter

4    said that the Sandmann parents were only going

5    to agree to a quantum meruit recovery.  I didn't

6    know he was going to put that in the letter.  So

7    you knew and they knew that that was the

8    Sandmann position, not Lin Wood's.

9            Although when this blew up I wanted to

10   make it clear to them so there was no

11   misunderstanding that that was their position,

12   and then in an effort to put this behind I

13   changed my mind and I said let us just get it

14   done and I got Joey and Chris to negotiate an

15   agreement with you.

16       Q    Okay.

17       A    And I wanted to go forward.  I wanted

18   these people to prosper.  That is why I sent

19   them business, offered them a line of credit;

20   and this idea that I was trying to destroy them

21   is --

22            MR. BEAL:  I will have to object.

23            THE WITNESS:  It is a brutal,

24      vicious, intentional lie.

25   BY MR. BEAL:



1      Q      Okay.  In Exhibit 7 you wrote this on
2    February 22, 2020, is that correct?
3      A      2:40 a.m., yes.  It looks like I wrote
4    it that morning.
5      Q      So that is five days after you entered
6    into the February 17th agreement with Taylor
7    about fee splits, is that correct?
8      A      It was after I had -- we had come to --
9    extorted agreement -- you didn't hear what I
10   said, so let me make sure you understand.
11     Q      You are under cross-examination, so I
12   need a --
13     A      I am going to answer it.  If I am not
14   allowed to --
15     Q      Yes or no and then you can explain
16   whatever you would like to.  This Email was
17   written five days?
18     A      That is clearly yes, you can do the
19   math.
20     Q      Okay, good.
21     A      The answer is yes, but go back and
22   understand I was extorted when I gave them that
23   agreement on the 17th.
24            And I was kind of playing with them.
25   When I said well, tell me what you think is



1    fair.  35 percent, the same thing we got with

2    Ramsey.  I said I will tell you what, I will

3    give you 50 percent, do you think that is fair?

4            I was not actually of the mind to give

5    them a dime at that time.  I was playing with

6    them a little bit to see what they would do.

7    And they went oh, yeah, yeah, we will take the

8    50 because they are greedy.

9            And then when I got back and dealt with

10   Joey Burby and Chris Marquardt, I said just go

11   ahead and let us divide it the way I said on

12   February 17th, because I did say it even though

13   it was not done with the mind set that they

14   deserved it and I wanted to give it to them, I

15   would live up to my word and give them

16   50 percent; and that is what got into the final

17   agreement.

18       Q    Okay.  And so when you entered into the

19   agreement with Taylor on February 17th you were,

20   to use your words, sort of playing with them.

21   You didn't plan on giving those percentages.

22   You were thinking more in line of what you said

23   here five days later to Todd McMurtry on

24   February 22nd, Exhibit 7?

25       A    No.



1          MR. HARRISON:  Object to the form.

2      Misstates --

3          THE WITNESS:  No, you just made

4      that up.

5  BY MR. BEAL:

6      Q    Okay.  When you said you were playing

7  with them, you didn't want to give them

8  anything?

9          MR. HARRISON:  The same objection.

10         THE WITNESS:  I was not -- the

11     record that I have with these lawyers I

12     was abundantly and generously fair

13     above and beyond with them.  I was good

14     as gold to every one of them.

15         We didn't have an agreement on

16     Sandmann like we had in other cases;

17     and by the time it came time to make an

18     agreement they had left the -- they had

19     gone over into yah yah land in terms of

20     what they were doing with me.

21         When I said I am playing with

22     them, let me tell you what I meant, I

23     wanted to find out whether I was right

24     and if these people were really dealing

25     in good faith with me.  So when I had



1          that phone call with Taylor and then I
2          said how about what do you want in
3          Sandmann?  35 percent.  The same thing
4          we had with Ramsey, which was way
5          generous.  I said I will give you
6          50 percent.  So I was actually more
7          serious about confirming what these
8          people were up to, and that is why we
9          had to come back in March and make the
10         final agreement.
11     BY MR. BEAL:
12         Q    Okay.
13         A    I wasn't playing with them to play with
14     them.  None of this was fun t me.  What they
15     were saying about my mental health to my
16     children and others, that was not fun for me.
17     But they admitted that was a lie when they got
18     the Settlement Agreement in March 17th and
19     admitted that I was mentally competent at all
20     times and had been for a long time.
21     BY MR. BEAL:
22         Q    Let's look at page 2 of Exhibit 7.
23         A    Okay.
24         Q    And if you start in the second line,
25     the middle of the sentence it says:  I would



1    like for you to consider doing for me and what I

2    would like for Ted and Julie to consider doing

3    for me, which I believe will bring this

4    foolishness to an abrupt and unhappy ending for

5    Taylor, Johnathan, and Nicole, if they realize

6    they are not going to receive a sum certain for

7    the CNN case.  They will have NO ability to

8    finance their frivolous claims regarding the

9    fees in CNN and the remaining office lease

10   liability.  The worst-case scenario would be

11   that I would be authorized by the client to hold

12   my PC's portion of the CNN fee in my escrow

13   account pending final resolution of the disputes

14   between me and WGW.  That alone will cut off

15   their ability to finance and publicize their BS

16   claims against me.

17            MR. HARRISON:  What is the

18       question?

19   BY MR. BEAL:

20       Q    So did I read that correctly?

21       A    (Nods) I didn't follow it, but I don't

22   believe you intentionally misread it.

23       Q    Okay.

24            Did that accurately summarize your

25   feelings and intentions at the time you read it?



1      A    It is incomplete.  If you look at what
2   I am trying to do, I realized that the plan they
3   had was to leave on February the 14th.  They
4   already had made that plan at a time when they
5   had a fiduciary duty to me as part of the office
6   sharing agreement, and in violation of that they
7   were out plotting against me to move out of the
8   office, to go somewhere else, and stick me with
9   the entire amount of the lease.

10      Q    All right.

11      A    And I was trying to tell Todd, and I
12   would have to look back at the letter that he
13   sent them where he makes some reference to the
14   Sandmann's not -- it was before -- I am sure it
15   was before this because I was surprised when I
16   saw it.

17           I was essentially saying make it clear
18   to these people that is all they are going to
19   get, and maybe that will bring them to the
20   reality that they need to stop the foolishness,
21   stop the accusations, stop the threats, and not
22   be able to follow up with their plan, which was
23   going to be to leave me stuck with the full
24   amount of the office lease.  That is my better
25   description of what I was saying.



1      Q     Let me unpack something that you have
2   just said.
3            You believe that the three Plaintiffs
4   owed you a fiduciary duty, is that correct, at
5   that time in February of 2020?
6      A     I thought they owed me a fiduciary
7   duty, as I owed them in terms of being partners
8   an office sharing arrangement.  We were in
9   business together.
10     Q     Partners in a business?
11     A     Partners in an office sharing
12  arrangement.
13     Q     But that office sharing arrangement was
14  for the conducting of the business, is that
15  right?
16     A     It was an office sharing arrangement
17  where they were able to practice law up there,
18  and I was able to practice law up there, and it
19  made it affordable for them and me to have it
20  done under an office sharing arrangement;
21  because I did not then and had never had any
22  type of a law partner with L. Lin Wood, P.C. It
23  has always been exclusively my partnership and
24  my PC.
25     Q     But you characterized them as partners



1    in an office sharing arrangement that owed a

2    fiduciary duty to you, and you perhaps owed one

3    to them, is that correct?

4         A    Anybody that is in an agreement --

5         Q    Yes or no?

6         A    Well, you said perhaps.  A fiduciary

7    duty is a fiduciary duty.  So everybody in the

8    agreement as it related to the lease owed each

9    other a fiduciary duty of good faith and honest

10   dealings, and not to be doing things behind the

11   back of another partner as it relates to the

12   lease.

13        Q    So would it be fair to say in this

14   February 22nd letter, Exhibit 7 -- excuse me,

15   Email, you were urging Todd to go to Mr. and

16   Mrs. Sandmann to persuade them to insist on a

17   quantum meruit fee only for the Plaintiffs?

18             MR. HARRISON:  Object to the form.

19   BY MR. BEAL:

20        Q    Is that correct?

21        A    No.  They had already said they were

22   going to pay quantum meruit.  I was saying make

23   it clear and maybe that will help bring these

24   people to their senses and we can get this all

25   resolved and the nonsense and foolishness on



1    their part will stop.

2        Q    So when you said:  And what I would

3    like for Ted and Julie to consider doing for

4    me -- what you really meant is to formalize an

5    agreement they had already said before?

6        A    No.

7        Q    I mean doesn't this indicate that you

8    are asking Todd to bring this subject up to Ted

9    and Julie?

10       A    To consider it, yeah.  It says what it

11   says, but there was no agreement before.  They

12   had made their statement about their position

13   clear to you in Todd's letter that I had nothing

14   to do with.

15       Q    And the reason as you say here, one of

16   the main reasons you wanted them to only get

17   quantum meruit, so they would not have funds to

18   fuel litigation against you?

19       A    No, that is not what I said at all.  I

20   wanted their foolishness to stop, and I felt

21   like knowing what they were doing that if it

22   became abundantly clear to them that that is all

23   they are going to get, then they would stop

24   their foolishness and we could get this thing

25   resolved and move on.



1      Q     When you say their foolishness, would

2   that be what you are describing here on

3   paragraph 2 on page 2 of Exhibit 7:  That alone

4   would cut off their ability to finance and

5   publicize their BS claims against me.

6      A     No.  That was a part of it.

7           The foolishness that I was being faced

8   with were their efforts in dealing with my

9   children claiming that I needed to agree to

10   undergo regular mental healthcare treatment.

11   They were interfering with my relationship with

12   my children and their discussions, whether they

13   were by text or Email or by phone were subject

14   to being discovered by the media, there is no

15   privacy.  And that threatened my efforts with

16   respect to the ongoing representation of

17   Nicholas Sandmann.  It threatened my efforts,

18   which they were well aware of that I had been

19   making to try to have President Trump to give

20   Richard Jewell the Presidential Medal of

21   freedom.  I am not sure when he asked me to meet

22   with him, but I met with him on March 11th, so

23   it may have been that I already had the meeting

24   date at the time when I was writing this.

25           I wanted this to stop.



1      Q    All right.

2      A    And I wanted it to stop because it was

3  hurting my relationship with my children.  It

4  was threatening my efforts for Richard.  It was

5  threatening my potential efforts going forward

6  for Nicholas Sandmann.

7           And so having seen they are only going

8  to pay quantum meruit, I said make it clear to

9  them and I thought that might bring them to

10 their senses; and also prevent them from

11 thinking they were going to stick me with

12 $285,000 of their lease, their liability on the

13 lease.

14     Q    So when you say cut off their ability

15 to finance and publicize their claims against

16 you, that was only one of the desires you had,

17 and the others were to have them stop

18 interfering or having some relationship with

19 your children and making statements about your

20 mental health, is that right?

21     A    No, those are your words.  I told you

22 my words.

23     Q    All right --

24     A    Hold on a second.  I documented that I

25 was right when I saw the text messages between



1    my son Matt and Taylor Wilson with respect to

2    Dr. Phil McGraw.  I know what happened with

3    Dr. Phil McGraw.  I know how the jury got

4    rigged, and I know who was involved in it.

5        Q    So how would a lack of money prevent

6    the Plaintiffs from talking to your children?

7        A    That we come to an agreement.  If they

8    realized they weren't going to have their big

9    payday, which they did not earn.  I bet their

10   quantum meruit effort in the case was probably

11   not 150,000.  If they were not going to get the

12   847 or whatever the deal was where they could

13   pay what they owed on the lease, and then have a

14   bonanza from the fee they didn't earn based on

15   quantum meruit.  I thought it was something that

16   would make them realize the foolishness of their

17   ways.

18       Q    And that would make them not contact

19   your children or question your mental health?

20       A    Listen, I cannot -- my mental health

21   was fine then, and they knew it; and that is why

22   they admitted it in March.

23            I couldn't stop somebody from

24   contacting my children, but let me say this to

25   you, Drew, I am a nice guy.  I am not an angry



1    man; but if you mess with my children and my

2    relationship I am hot blooded.

3            If you mess with Richard Jewell, I am

4    hot blooded, just like I am if you mess with my

5    puppies I am hot blooded.

6            These people were engaged in subverting

7    my relationship with my children.  Read the

8    bible --

9            MR. BEAL:  Real quickly --

10           THE WITNESS:  Wait a minute.  This

11        was the threat they were making.  God's

12        commandment, honor thy father and thy

13        mother is the only commandment that

14        comes with a promise.  Honor thy father

15        and thy mother so that thy days can be

16        long on this earth.

17   BY MR. BEAL:

18       Q    All right --

19       A    God could take them out for not

20   honoring their mother and father.  If you know

21   God and you read the bible.  They were not only

22   threatening my relationship with my children,

23   but other God's commandment they were putting my

24   children at risk; so I was not happy with them.

25   I am not happy with them now for doing it; but I



1    forgive them.  I love them.  I want to move on

2    from all the nonsense with them even today.

3        Q    So while we are talking about the

4    commandments this also would have allowed you to

5    pocket their $843,000 too?

6        A    It wasn't theirs until there was an

7    agreement.

8             MR. HARRISON:  Object to the form.

9    BY MR. BEAL:

10       Q    So you would get all the money?

11       A    If we had not -- if I had not made the

12   deal in March -- if I had not made the deal in

13   March, they would have had to sue me for quantum

14   meruit, me, seeking their recovery because there

15   was no written division.

16            So they would have had to sue me for

17   quantum meruit.  My guess is is at best they

18   could have maybe come up with $150,000 in time;

19   and then they would have gotten the $150,000.

20       Q    So in this second paragraph you talk

21   about that the money might be put in an escrow

22   account pending final resolution of the disputes

23   between you and WGW.

24            That never happened, did it?

25       A    It didn't happen because that is not



1    what happened.

2        Q    Because you took it all?

3        A    I certainly -- I didn't -- I certainly

4    was thinking that that might be a way to satisfy

5    getting it resolved if it was done where I said

6    I am going to leave your share in escrow.

7        Q    Did Jesus tell you to take all the

8    money?

9        A    That is blasphemy.

10            MR. HARRISON:  All right.  We are

11       taking a break.

12            THE WITNESS:  That is blasphemy.

13       You need to get into the bible my

14       friend, or you are going to spend a

15       long time in hell and eternity.  How

16       dare you make that comment about our

17       Lord and our Savior.

18            MR. HARRISON:  Lin, let's take a

19       break.

20            THE WITNESS:  Shame on you.  I

21       rebuke you.

22            MR. HARRISON:  So just for the

23       record.  You are smirking and smiling

24       there.  You did it intentionally to

25       inflame him.  We are not going to sit



```
1          here all day and let you do that.
2                 MR. BEAL:  Lin --
3                 MR. HARRISON:  No, no, stay on the
4          record.  This is not going to happen if
5          you keep doing that, Drew.
6     BY MR. BEAL:
7          Q    When we talk about intentional --
8                 MR. HARRISON:  We are not off the
9          video.
10                It is not going to happen.
11                Come here, let me talk to you.
12                (Whereupon, an off-the-record
13                 discussion was held.)
14    BY MR. BEAL:
15         Q    Mr. Wood, when did you hire Alston &
16    Byrd?
17         A    I don't have the exact date, but it is
18    documented.
19         Q    Would the date March 3rd refresh your
20    recollection?
21                MR. HARRISON:  2020?
22                MR. BEAL:  Yes.
23                THE WITNESS:  Yes, that is
24         consistent, but I don't have the exact
25         date.
```

 **COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

1              Yes, it is 2020.  They got

2      involved and you knew when they got

3      involved because they dealt with you.

4      I did not.

5    BY MR. BEAL:

6        Q    Right, so would it be within a day or

7    so of having them reach to me saying that we

8    have just been retained to represent Lin Wood?

9        A    I didn't keep up with when they reached

10    out to you, but when they reached out you they

11    had been retained by me.

12        Q    Right, and that was on --

13        A    To try to bring the matter to an

14    agreement.

15        Q    And that was on March 4th?

16             MR. HARRISON:  What was on

17      March 4th?

18             MR. BEAL:  When they reached out

19      to me.  So I am trying to refresh his

20      recollection.

21             THE WITNESS:  It is what it is.

22      It is documented when I hired them.

23      You know when they reached out to you.

24      You know that they dealt with you.  You

25      all negotiated the agreement, but ended



1       up being the March 17th agreement; and

2       that is I can tell you.

3    BY MR. BEAL:

4       Q    And earlier I believe you said that

5    Alston & Byrd told you that you needed client

6    consent in the Lindsey settlement because of

7    Cherie Fuzzell's involvement, is that correct?

8       A    I had some issues with Rick Miller and

9    Cherie Fuzzell, in terms of what I thought was

10   wrongdoing out of the DaVita case, and I was

11   exploring that.

12          Obviously I think she had referred --

13   the Lindsey case came to me based on the --

14   based on Rick Miller's administrative assistant,

15   who I think was the sister of the gentleman that

16   died.  And then Rick wanted me to pay Cherie a

17   referral fee or a split of the fee.  And I was

18   discussing that with Joey and Chris; and they

19   said there has got to be client consent because

20   she is a third party.

21          And I said does that apply -- I

22   remember saying does that rule also apply to

23   Sandmann; and they said yeah, yeah, it does.  So

24   the idea of client consent for the ethical rule

25   was first raised with me in that context.



1      Q     And would it be fair to say that you

2    entered into the Settlement Statement on the

3    Lindsey case before hiring Alston & Byrd?

4      A     I think that is right.  I think that

5    Lindsey had settled before I hired them in terms

6    of the agreement of the amount, yeah.

7                    (Whereupon, Plaintiff's Exhibit

8                    Number 8 was marked for

9                    identification.)

10   BY MR. BEAL:

11     Q     Let me hand you what has been marked as

12   Exhibit 8.  You don't need to read the whole

13   thing.  I am only going to look at this very top

14   part up here.

15           Does this top part appear to be an

16   Email from you to Nikki Baker dated

17   February 22nd at 9:20 p.m.?

18     A     Yeah.  It looks like I was sending

19   Nikki the Email that I had sent to you on

20   February 22nd.

21     Q     Okay.

22     A     Wait, hold on a second.  I had

23   contemplated --

24           MR. BEAL:  Wait a second.  Let me

25     object.



1          THE WITNESS:  I sent it to Nikki
2     Baker because she was at the time
3     thought to be who I would use to help
4     me with the Sandmann cases going
5     forward, giving Nicole and Johnathan
6     and Taylor no involvement.
7          So yes, this is the Email I sent
8     to Nikki.  I don't know what letter of
9     Todd's I was referring to.
10  BY MR. BEAL:
11     Q    But you do say:  Todd's letter to
12  follow?
13     A    Yes, I said it.  I don't know what
14  letter I was talking about.  It may have been
15  the letter confirming that she was going to be
16  involved, I don't know.
17     Q    If we look back at Exhibit 7 it
18  wouldn't be the letter that you were urging Todd
19  to write to me saying that the Sandmann's would
20  only consent to quantum meruit?
21     A    I do not believe that is the letter I
22  was referring to.
23     Q    You just thought that it could be a
24  random letter from Todd?
25     A    No, I didn't ask -- no.  I had asked



1    Todd for them to consider it.  I don't think
2    they did it.  So there was no letter for me to
3    send to Nikki along those lines.
4            I imagine it was Todd's letter -- I am
5    guessing.  I don't want to guess.
6        Q    So it wasn't --
7        A    He would have to -- he would have had
8    to acknowledge the engagement of Nikki.
9        Q    So Todd's letter to follow in Exhibit 8
10   doesn't refer to the letter you asked him to
11   write the same day in Exhibit 7?
12       A    No, because I only said in Exhibit 7 I
13   would like to ask you to consider preparing a
14   letter.
15       Q    Okay.
16       A    And so no, I don't believe that would
17   have been the letter, because there is no such
18   letter existed.
19                (Whereupon, Plaintiff's Exhibit
20                Number 9 was marked for
21                identification.)
22   BY MR. BEAL:
23       Q    Let me hand you Exhibit 9 and ask you
24   if this is an Email from Todd McMurtry to me
25   dated essentially of the same day, just later



1     that day?

2         A     Yes, I mean it is an Email that Todd

3     sent you and copied me.  I did not review it.  I

4     didn't have any approval of what he said.  He

5     said what he said to you.

6              And I wrote back and said Todd's Email

7     to Beal is perfect because I think he was

8     correct in what he was saying.

9         Q     And in this Email to me from

10    Mr. McMurtry on Exhibit 9, he is stating that

11    only quantum meruit would be paid, which is

12    exactly what you asked him to say in Exhibit 7,

13    is that correct?

14        A     Apparently he and his clients discussed

15    it.  They apparently told him that they would

16    pay quantum meruit.  That was consistent at the

17    time with what I wanted them to do.  You have to

18    remember --

19        Q     So let's --

20        A     Hold on a second now.  I am going to

21    finish my answer.

22             You have to remember that this was

23    settled at a time when the settlement would have

24    been subject to a probate judge approving it on

25    behalf of Nicholas.  That may have obviated the



1    need for consent by Nicholas because the probate

2    judge could give approval to whatever he wanted

3    to do.

4           So that is the client's position.  It

5    was consistent with what I wanted them to say,

6    because that is what I at that point wanted

7    Nicole and Johnathan to get is quantum meruit.

8    That is all they were ever really entitled to.

9       Q    So the answer to my question was yes or

10   no.

11          The Email that he sends on Exhibit 9 to

12   me about quantum meruit is exactly the Email

13   that you requested that he write in Exhibit 7,

14   is that correct?

15      A    No.

16      Q    Okay.

17      A    I asked them to consider.  I had no

18   authority to direct them to do anything.  That

19   was between Todd McMurtry and the Sandmann's.

20   But remember this all predated.  These were

21   negotiations and positions being taken prior to

22   March the 17th, and those by the agreement of

23   March the 17th were not even admissible.

24          The prior discussions were integrated

25   into the written agreement of March the 17th.



1    So you are going through stuff that your clients

2    agree all would have been integrated into the

3    March 17th agreement.  There were different

4    positions taken before March the 17th.  The

5    final agreement was made on March the 17th.

6        Q    And nowhere in Exhibit 9 does

7    Mr. McMurtry refer to the decision of the

8    Sandmann's, is that correct?

9        A    Listen, it says what it says.

10       Q    Okay, on page 2 --

11       A    Hold on a second, let me look.

12            It says:  I advised the Sandmann's that

13   there may be a dispute between Lin and his

14   former colleagues.  They have authorized me to

15   take actions necessary to protect their son's

16   interest.  To that end I wish to advise you that

17   upon the Court's approval of the minor's

18   settlement I will deposit the CNN settlement

19   moneys into my firm's escrow account, distribute

20   moneys to Nicholas Sandmann, distribute fees to

21   my firm and pay L. Lin Wood, PC its costs and

22   expenses.  I however will not distribute moneys

23   to your client or Lin Wood for fees absent

24   agreement by the parties or an Order by an

25   Kentucky Court directing me to disburse the



1    moneys in a particular manner.  Further it is my
2    opinion that the Sandmann's control the fees to
3    be paid from CNN, and at best are obligated to
4    pay your clients in quantum meruit for their
5    services.
6              Absent an agreement we do not and shall
7    not agree that any fees due to L. Lin Wood, PC
8    be divided with any other lawyers except on a
9    quantum meruit basis.  We believe this position
10   is consistent with our agreement with L. Lin
11   Wood, P.C. and the law in general.
12             That is documenting discussions and
13   decisions that Todd made with his clients.  Todd
14   I don't believe would have been directed by me
15   to make decisions with his clients.  I wouldn't
16   have had that authority, and I don't believe he
17   would have ceded it to me.
18             So he is telling you about what his
19   discussions were; and it is clear that as of
20   this date there is at least a position taken by
21   the Sandmann's, whether you want to blame me for
22   it or whether you want to blame Todd for it,
23   that he gave them that advice and that is what
24   they intended to do.
25             So that is why I didn't understand when



1    it all came up why you did not in the agreement
2    put in a warranty of consent by me.  Then I
3    would have had to pay it whether he consented or
4    not.  But you didn't put it in there.  Now you
5    are complaining about it.
6              MR. BEAL:  Chris, we have to call
7         the Court.  I mean this is crazy.  We
8         are getting a 20-minute speech on
9         unrelated matters.
10              THE WITNESS:  It is not a
11         20-minute speech.
12              MR. BEAL:  I can't.
13              MR. HARRISON:  Keep going.  Ask
14         the questions.
15              MR. BEAL:  If it doesn't get
16         better we will have to Court, because
17         it is just a filibuster.
18              (Whereupon cross-talk occurs.)
19              MR. HARRISON:  Lin, just answer
20         his questions.
21              MR. BEAL:  We have either got to
22         get answers to questions or we have got
23         to get a little mini speech and that is
24         not fair.
25              MR. HARRISON:  Let us keep going



1           and see what we can do here.

2                   I understand.

3       BY MR. BEAL:

4           Q     The statement at the top of page 2 of

5       Exhibit 9 where Todd McMurtry promises to put

6       the money in escrow absent an agreement, that

7       didn't happen, did it?

8           A     That was Todd's decision, not mine.

9           Q     So what is the answer to my question?

10      To the best of your knowledge?

11          A     To the best of my knowledge he did not

12      do that.

13          Q     And in fact you got paid, is that

14      correct?

15          A     I received the L. Lin Wood, P.C. share

16      of the fees and the expenses.

17                   (Whereupon, Plaintiff's Exhibit

18                   Number 10 was marked for

19                   identification.)

20      BY MR. BEAL:

21          Q     Let me hand you Exhibit 10.

22          A     Okay.

23          Q     Okay.  So does Exhibit 10 reflect

24      another February 22nd Email from you to Todd

25      McMurtry regarding division of fees in the



1    Sandmann versus CNN case?

2        A    It is a true and correct copy of the

3    Email that I sent to Mr. McMurtry, and I think

4    it speaks for itself.

5        Q    So then in the fourth paragraph here

6    you state:  There was no oral or written

7    agreement between me and any of those lawyers

8    concerning my share of my firm's fee in the CNN

9    case.

10       A    That is true.

11       Q    Did you consider that to be a truthful

12   statement in light of your February 17th

13   agreement and Email confirming that agreement

14   with Taylor Wilson?

15       A    I believe it was absolutely consistent.

16   There was no oral or written agreement between

17   me and any of those lawyers concerning any share

18   of my firm's fee in the CNN case before the case

19   settled.

20            And then the issue arose after they had

21   themselves left any relationship with me on the

22   14th of February; and I told you that I did have

23   that conversation as it related to what I was

24   willing to say at the time on dividing the fees.

25   But there were other issues that connected into



1    payment of the fees, the main one being the

2    issue of their responsibility under the lease.

3        Q    All right.

4        A    So then I put it in the hands -- I

5    decided it is a mistake dealing with this

6    myself -- and then I put it in the hands of Joey

7    Burby and Chris Marquardt at Alston & Byrd.

8            At from that point on they dealt with

9    you.  You all negotiated the agreement.  I

10   intended to pay that money per the agreement,

11   and I even asked when the issue came up, Joey

12   Burby I believe is the one that drafted the -- I

13   don't know if Todd drafted it or not, because I

14   was told -- because I stayed out of it at that

15   point.  I was told --

16           MR. BEAL:  Let me object.

17           MR. HARRISON:  Why?  He is

18       answering the question.

19           MR. BEAL:  We are going into

20       completely unrelated --

21           THE WITNESS:  You asked about this

22       agreement.

23           MR. BEAL:  I said is it consistent

24       with what you said in February 17th.

25       He said yes.



1          THE WITNESS:  No, I did not say
2     that.
3          MR. HARRISON:  Hang on.
4          THE WITNESS:  That is the problem.
5     You are coming up with the answers.  I
6     am trying to give you my answer, and
7     you won't let me give it to you.
8          MR. BEAL:  He answered the
9     question.  He explained why he thought
10    it was consistent and not a
11    contradiction of the February 17th, and
12    why that had changed.
13         MR. HARRISON:  Right.
14         MR. BEAL:  And we are done.  But
15    now we are going on to another speech.
16         THE WITNESS:  It is not a speech.
17    I am sorry, I will try to be more
18    concise.  But I want to be thorough.  I
19    don't want my answers to be
20    misrepresented like they are being
21    misrepresented even here today.
22         The point I am making is, is that
23    I gave this to Alston & Byrd; and then
24    they negotiated the agreement, which
25    integrated every prior discussion or



1        agreement into the agreement, March the

2        17th, 2020.

3    BY MR. BEAL:

4        Q    So on February 22nd before you had

5    hired Alston & Byrd, five days after receiving

6    the Email from Lin, you stated that there had

7    never been an agreement -- excuse me -- with

8    Taylor Wilson, you stated there had never been

9    an agreement with any of those lawyers

10   concerning any share of my firm's fee in the CNN

11   case?

12            MR. HARRISON:  Object to the form.

13            Asked and answered.

14            Hang on.

15            You are complaining about the

16       length of his answers and you are

17       asking the question again.

18            So you have answered it.

19            THE WITNESS:  Let me try to make

20       it clear.

21            MR. BEAL:  I will move on.

22            THE WITNESS:  I have the right to

23       answer the question.

24            MR. HARRISON:  But you have

25       answered it.



1           THE WITNESS:  But he just made a
2      statement that is inaccurate.
3           The statement that I made, there
4      was no written or oral agreement
5      between me and any of those lawyers
6      concerning any share --
7           MR. BEAL:  I withdrew the
8      question.
9           THE WITNESS:  All right, the
10     question is withdrawn.
11  BY MR. BEAL:
12     Q    Let us look on page 2:  I have tried to
13  negotiate with Taylor, Johnathan and Nicole
14  about a fair percentage or payment for their
15  efforts in relation to the CNN case.  Those
16  efforts on my part have varied between offering
17  an hourly quantum meruit payment, to a demand by
18  them for 35 percent of my fee, to which I
19  confirmed to them I would pay them 50 percent of
20  my fee.  I agreed to the outrageous payment of
21  50 percent only in a last ditch effort to
22  peacefully resolve the differences between us
23  and maintain a semblance of dignity and order
24  with respect to the separation of my law
25  practice from their law practices, which would



1    minimize damage to me, my family, and my

2    clients.  I should not now be coerced into

3    paying that ransom.  These people should not

4    receive a dime above quantum meruit.

5          Did I read that right correctly?

6     A    Are you talking about wasting time?

7    You read it correctly.

8          Now may I explain?

9     Q    No, I am not asking --

10    A    So I don't have the right to explain my

11    answer?  You just get to make a statement.

12          I am going to explain it.  It is going

13    to be simple.  There were varying discussions

14    prior to March the 17th, all of which were

15    integrated into the March 17th agreement, where

16    I said in that agreement that I was going to pay

17    them 50 percent of the Sandmann case.  I don't

18    understand the problem.

19    Q    Let us look at the fourth paragraph.

20    The last sentence of the fourth paragraph in

21    which you stated --

22    A    Which?

23          MR. HARRISON:  On page 2?

24          MR. BEAL:  I am on page 2 and

25     right there, the fourth paragraph.



1          THE WITNESS:  I have sent you the
2     lease?
3   BY MR. BEAL:
4     Q    Yes, it is that paragraph, the third
5   line down.
6          MR. HARRISON:  Okay.
7   BY MR. BEAL:
8     Q    "I am not concerned about money.  I am
9   only concerned about clearing my slate in order
10  to pursue the Sandmann litigation and the
11  opportunities possibly presented by my scheduled
12  meeting in D.C."
13    A    Okay.
14    Q    My question to you is, if you are not
15  concerned about the money, but only clearing
16  your slate in order to pursue other litigation
17  and opportunities, why did you contest paying
18  the amount that you had agreed to in the
19  preceding paragraph?
20    A    Okay.  Number 1, I didn't contest it.
21  I entered into the agreement on March the 17th,
22  and it said 50 percent would go to Wade Grunberg
23  and Wilson's PC's.  So I didn't contest it.  I
24  lived up to ti.
25         When I say I am not concerned about



**COASTAL COURT REPORTING & VIDEO SERVICES**
                    800-791-1100      www.coastalcourt.com

1    money, what I mean by that is that I don't love

2    money.  The love of money is the root of all

3    evil.  I need money, but God will provide me

4    what I need.  So I don't fight over money.

5            But I wanted to get their foolishness

6    out of the way because it was jeopardizing not

7    only my family's relationship with me, but what

8    I had to do going forward in the Sandmann

9    litigation and the other cases; and the

10   opportunities that might possibly be presented

11   by meeting in Washington, D.C. at the Oval

12   Office requested by President Trump.  That is

13   what I was referring to.  I had a meeting on

14   March 11 in the Oval Office at his request.

15   Q    Would it be fair to say that the money

16   was important to you because you took all of the

17   funds?

18           MR. HARRISON:  Object to the form.

19           THE WITNESS:  No, I took the funds

20      subject to the payment pursuant to the

21      March 17th agreement.  If the issue of

22      consent had never come up, if it had

23      proceeded to the probate judge; and he

24      said here is where you are going to pay

25      and who you are going to pay, I was



1      going to pay it.  I even asked Nicholas

2      to agree to it.  I was actually

3      surprised, Drew, that he did not.

4  BY MR. BEAL:

5      Q    Okay.

6      A    I was surprised that Todd didn't say to

7  him if this is satisfactory to Lin, and he feels

8  like it is commensurate with what they did, go

9  ahead and agree to it.  It is not your money to

10 fight, but he didn't consent to it.  It was news

11 to me after they had the day where they were

12 going to settle it.

13          I thought he was going to consent.  I

14 was going to be paid the money.  I wanted to

15 make sure I was covered of what they owed on the

16 lease, and life goes on.  That is why some 40,

17 45 cases off of a line of credit.  I wanted

18 peace.

19          MR. BEAL:  Object.  We can't have

20      a speech on everyone of these.  Can we

21      just answer the question?

22          MR. HARRISON:  Just ask your

23      question.

24 BY MR. BEAL:

25     Q    Look at the next paragraph, on the



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

1    second sentence says:  While the lease -- I am

2    not sure that "wow" isn't a typo?

3        A    I think it meant to be "while".

4        Q    "While the lease is in the name of my

5    PC, all four of us agreed as the lease, as the

6    tenants, as partners with my PC, we are in fact

7    partners in an office sharing arrangement.

8            Do you believe both of those statements

9    to be true?

10       A    I think they are absolutely true.

11       Q    Okay.

12       A    But let me say this.  I did not -- when

13   I asked the building to take their keys, I did

14   not look at the lease.  I assumed that the lease

15   was in the name of L. Lin Wood, P.C., and I was

16   the one responsible.

17           MR. BEAL:  Let me object.  I don't

18       care about --

19           THE WITNESS:  You don't hear about

20       hearing the truth, that is fine.

21   BY MR. BEAL:

22       Q    The next paragraph says:  Because the

23   lease is in the name of my PC, the building

24   management followed my directions.  That action

25   was not justified under the actual execution of



1   the lease bar all four lawyers.

2           So of these pair of sentences here what

3   you were getting to when you barred them from

4   the lease, you barred them from the space, you

5   hadn't read the lease?

6       A   I think "bar" is a typo.  It should

7   have been "buy".

8           When I got the building to pull their

9   access cards and change the locks on the door,

10  as I thought here I thought that it was in my

11  name, under my control.  I did not go back and

12  look at the lease.  Then I did.  And I saw where

13  they were signers on the lease and responsible

14  themselves under the lease.  I called the

15  building.  I said let them back in.

16          I didn't have the right to bar them or

17  take their keys, nor did the building; and they

18  were in trouble because they should have known

19  what their lease said.  I tried to get them back

20  in right away.

21      Q   Let us look at the next paragraph:  I

22  need for you and Ted and Julie to state in

23  writing that Ted and Julie do not and shall not

24  agree that any fees due to my PC be divided with

25  any other lawyers except on a quantum meryl --



1    and I assume you mean quantum meruit basis?

2        A    That is fair.

3        Q    "I am confident they have the right to

4    control the fees.  I am confident that their

5    right to do so exceeds my right, if any, to be

6    coerced into paying these greedy lawyers

7    50 percent of my fee."

8        A    I think I am right.  I think what I

9    said to them is exactly right.  The client

10   controls it.

11       Q    So --

12       A    But the point is, please, this changed;

13   and we made a final agreement on March 17th.

14   And you are fussing about things that went back

15   and forth prior in time that are integrated into

16   the March 17th lease.  You wrote the March 17th

17   agreement to which you helped draft.

18            Why are you talking about this when the

19   issue is March 17th?

20            MR. BEAL:  Chris, can I get some

21       help here?

22            THE WITNESS:  I am not doing

23       anything that requires help.

24            Go ahead and ask your next

25       question.



1          MR. HARRISON:  Come on.

2   BY MR. BEAL:

3      Q    So by February 22, 2020 you believed

4   that client consent was essential, and you had

5   asked Todd to intercede on your behalf to insist

6   to have the clients insist on quantum meruit?

7      A    I said exactly what I said in this

8   letter.

9      Q    Okay.

10     A    And then the agreement was negotiated,

11  and it was finalized on March 17th.

12     Q    Okay.  And then the last paragraph, the

13  first sentence:  Will you help me?

14          And by that sentence you meant go to

15  the Sandmann's and persuade them?

16     A    I didn't mean that at all.

17          MR. HARRISON:  Object to the form.

18          THE WITNESS:  What I meant by it

19          was that I wanted them to consider

20          informing Jonathan, Taylor, and Nicole

21          of their positions, but it was up to

22          Todd to make that decision with his

23          clients.  I couldn't insist that they

24          do anything.  Todd was the lead lawyer

25          for them.



1           But nonetheless, whatever I was

2      trying to get done at that time was

3      integrated into the March 17th

4      agreement.

5           It was not on February 17th

6      agreement.

7           It was a March 17th agreement.

8                (Whereupon, Plaintiff's Exhibit

9                Number 11 was marked for

10               identification.)

11   BY MR. BEAL:

12      Q    Let me hand you what has been marked as

13   Exhibit 11.

14           And ask you if this is your March 3rd

15   Email to Todd McMurtry?

16      A    It is.  I was asking him to give me

17   your evaluation.

18      Q    So in the very first paragraph you

19   state:  I am prepared to offer WGWB's on a

20   quantum meruit basis only for Carbone and

21   Lindsey.  Their problem on those cases is that

22   they did not keep up with their hours and can

23   only reconstruct them after the fact of

24   settlement.

25      A    I said that and I later changed my mind



1   in the final agreement.  And you told everybody

2   they had plenty of documentation of their time

3   on Sandmann.  We just hadn't seen it yet.

4       Q    And then the very last sentence of this

5   Exhibit 11 you state:  A legitimate argument

6   could be made that a fair and respectful amount

7   I should offer these people who have been

8   practicing law for fame and fortune and

9   conniving against their office sharing agreement

10  partner since 2018 is quantum meruit only as to

11  all three cases, Carbone versus CNN, Lindsey,

12  and Sandmann versus CNN, which under the law and

13  agreed to by my clients will be worth zero,

14  since that cannot legitimately reconstruct their

15  hours in any of those cases.

16      A    So what is your question?

17      Q    My question is, you were aware

18  obviously at the time March 3, 2020 when you

19  wrote this that the Plaintiffs did not regularly

20  record their hours as a function of performing

21  services for clients, is that correct?

22      A    No.  They did record the time.  They

23  know they recorded to the minute in the Steve

24  Wynn cases where they were getting paid

25  80 percent of what they billed.  Do I believe



1    that they were doing it?  I had my doubts.  But

2    I didn't know.  They had their own PC's.  They

3    could do whatever they wanted to do.

4         Q    So when you say they did not keep up

5    with their hours and can only reconstruct them

6    after the fact of settlement, you didn't believe

7    that to be true when you wrote it?

8              MR. HARRISON:  Object to the form.

9              THE WITNESS:  As to Carbone and

10        Lindsey, their problem on those cases,

11        Carbone and Lindsey is that they did

12        not keep up with their hours and can

13        only reconstruct them after the fact of

14        the settlement.  That is what I

15        believed to be true.

16    BY MR. BEAL:

17         Q    And then in the last sentence you

18    reference:  Carbone, Lindsey, and Sandmann vs.

19    CNN which under the law and agreed to by my

20    clients will be worth zero since they cannot

21    legitimately reconstruct their hours in any of

22    those cases.

23              You said that --

24         A    I said that.

25         Q    -- Because you believed that they did



1    not regularly record their time?

2       A    I didn't believe that they did, but

3    they did keep it up in certain cases.

4            So I don't know for a fact whether they

5    did in those cases or not.  You have indicated

6    that they did reconstruct it in Sandmann, so I

7    was wrong on that.

8            But that was my belief at the time.

9    All of this predates my engagement -- this is

10   March the 3rd, and this is when I realized I

11   needed to get somebody to represent me.

12      Q    I am only asking about recording time?

13      A    And I have told you that I believed

14   they did not, but I knew that in other instances

15   they did.  So my belief is either right or

16   wrong.

17      Q    And you were saying here that they

18   didn't?

19      A    I didn't believe that they did.

20      Q    Okay.

21      A    But I didn't know it, and I found out

22   later that they did keep up with their time in

23   Sandmann when you said they had a wealth of

24   documentation of their time.

25      Q    Would it be fair to say that the three



1    Plaintiffs performed the majority of work on

2    creating Pleadings and correspondence and

3    responding to correspondence and Pleadings in

4    the CNN versus Sandmann case?

5        A    I don't know that I can quantitate it

6    that way.

7             Did they do what they had always done

8    for me in terms of drafting Pleadings, doing

9    legal research, preparing motions, they had also

10   looked into all of the body of what was said

11   about Nicholas, not just related to CNN; and

12   then Todd cut that off because he got a firm to

13   do it.

14            So they did what they did.  I

15   appreciated their efforts.  I acknowledged what

16   they did; and then we got into this dispute

17   which I settled with them on March 17th of 2020.

18       Q    Can you name any Pleadings that you

19   drafted completely on your own?

20       A    I wouldn't do that.  I didn't -- I have

21   been practicing law for how long.  I don't go

22   out and have not since they worked with me, I do

23   not generate the first iteration of a Brief or a

24   Pleading.  That is what they are getting paid to

25   do.



1          So they would bring it to me.  I would

2    give them input, advice.  I might as we say --

3    Nicole will tell you I would Wood-ize it.  I did

4    the preparation of it initially as an Associate

5    and a young lawyer.  I didn't do it after

6    40 years of practicing law.

7        Q    So then all of the Pleadings that were

8    created in the Sandmann versus CNN case were

9    initially drafted by the Plaintiffs in this

10   case?

11       A    I don't know that, because I don't know

12   if Todd did some of it.  But everything that was

13   drafted would have been under my direction and

14   my input, because I was the one that shaped the

15   issues for the case in how it was going to be

16   proceeding.  I had the expertise in defamation.

17   They did not.

18       Q    So all of the Pleadings that came out

19   of your office would have been drafted by them

20   at your direction and with your input, is that

21   correct?

22       A    No, I know one time we had a problem

23   that came up, and I had to basically to rewrite

24   the Brief.  So I can't say all of it.

25            But I am not trying to tell you they



1    did not do it.  They did.  That is why I had

2    them engaged.  If I wanted to do that, I

3    wouldn't have needed them.

4         Q    And was a large volume of work in CNN

5    versus Sandmann --

6         A    CNN and Sandmann settled quickly.  So

7    on the scale of things they could have been --

8    that litigation could have gone on for five

9    years.  So whether it is a large volume or not

10   is not really capable of saying it.  It is what

11   it is.  They did what they did.

12        Q    The --

13        A    And I was going to pay them for it.

14             (Whereupon, Plaintiff's Exhibit

15             Number 12 was marked for

16             identification.)

17   BY MR. BEAL:

18        Q    And is Exhibit 12 the March 17th

19   Settlement Agreement that you have referenced

20   earlier?

21        A    Yes.

22        Q    And does it refer to the same cases as

23   in the February 17th agreement, Carbone,

24   Lindsey, Sandmann, Grogan Cordoba and then add

25   in La Liberte?



1      A      The answer is no as you point out

2   because it also dealt with La Liberte versus

3   Reid.  We had not settled all of the issues in

4   the February 17th discussion.

5           But we did settle all the issues in the

6   March 17th final agreement that says this is the

7   agreement and prior discussions or agreements

8   are integrated into this agreement.

9      Q      So let us look back at Exhibit 6 and

10  ask you to look at page 2, and see if there

11  isn't in the middle of the page:  Additionally

12  as we discussed earlier with respect to La

13  Liberte and Reid we agreed to split 20 percent

14  to Lin Wood, PC and 80 percent to us.

15     A      I do see that now.

16     Q      So that was in the February

17  agreement --

18     A      Yes.

19     Q      -- As well?

20     A      Yes, because we had to agree that

21  Taylor was going to continue to be lead Counsel

22  because it was his case that he took in, and he

23  wanted to take the case.  I was not the lawyer

24  that said let's take the La Liberte case.  He

25  liked it.  He wanted to take it.  That is why I



1    was getting 20 percent to give input in overall

2    strategy.

3            But all that worked out when it worked

4    out after we made the agreement.  So I stand

5    corrected, there had been a discussion.  But it

6    doesn't change the reality that the agreement

7    was March 17th.  And all prior discussions,

8    agreements, et cetera were integrated into the

9    March 17th agreement that you helped draft and

10   they signed, and now you want to go back and

11   litigate pre-March 17th.

12           MR. BEAL:  Can I respond to his

13      speech, and tell him why I am doing it?

14      Or would that be another --

15           THE WITNESS:  I am here to answer

16      questions.  I don't need to listen to

17      his --

18           MR. HARRISON:  Just ask your

19      questions, please.

20           We had a conversation and I told

21      you what would happen if we had another

22      outburst.  We will walk out the door.

23           MR. BEAL:  Well, they are not

24      outbursts.

25           MR. HARRISON:  We will walk out



1      the door.

2            MR. BEAL:  Okay.  You can any time

3      you want to.

4            MR. HARRISON:  Yeah.

5            (Whereupon, Plaintiff's Exhibit

6             Number 13 was marked for

7             identification.)

8  BY MR. BEAL:

9      Q    I hand you what has been marked as

10     Exhibit 13.  Does this appear to be the

11     July 24th letter from Alston & Byrd to me

12     refusing to make payment under the March 17th

13     Settlement Agreement that we marked Exhibit 12?

14     A    I believe it is, yes.

15     Q    Okay.

16     A    I am sure I got a copy at the time.

17     That was the letter he wrote on his own to you.

18     Q    And in this letter Chris Marquardt is

19     stating that only quantum meruit will be paid

20     exactly as you had asked Todd McMurtry to assist

21     in reaching that agreement in Exhibits 7, 8 and

22     9, is that correct?

23           MR. HARRISON:  Object to the form.

24           THE WITNESS:  No.

25           MR. HARRISON:  But you can answer.



1              THE WITNESS:  No, because this was

2         his opinion, independent legal opinion

3         on what could be paid given the fact

4         that Nicholas did not consent, even

5         though I had asked him to do so.  So he

6         is telling you he didn't consent.

7              And now, this is what the law

8         says.  Chris Marquardt and Alston &

9         Byrd are not going to tell you what I

10        think the law says.  They are going to

11        tell you what Alston & Byrd has

12        determined the law says.

13             So I relied on them from the time

14        I engaged them.  I relied on them in

15        terms of the positions to be taken.  I

16        wanted to make sure that I complied

17        with the agreement and that I complied

18        with the Georgia ethical rule.

19   BY MR. BEAL:

20        Q    When you said earlier you urged

21   Nicholas Sandmann to agree to a percentage

22   distribution, that would be the exact opposite

23   of what you said in Exhibits 7, 8 and 9 in your

24   Email's to Todd McMurtry, right?

25        A    Yes, those predated the final



1   agreement.  And so Todd prepared -- and I don't
2   know if Todd prepared it or Joey Burby did, I
3   don't know, I didn't prepare it -- but when the
4   money could be distributed on his 18th birthday
5   they gave him a statement from me recommending
6   and asking him to agree to it.
7              I couldn't put it into his head and
8   tell him to do it.  I was surprised that he
9   didn't.
10             (Whereupon, Plaintiff's Exhibit
11             Number 14 was marked for
12             identification.)
13  BY MR. BEAL:
14     Q     Let me hand you Exhibit 14.
15             Does this appear to be the Complaint
16  that was filed?
17     A     If you don't mind, I know your time is
18  important to you, and it is to me too I guess;
19  but I will sit here as long as I need to.
20             But you want me to go through and tell
21  you what it is.  I would have to read the whole
22  thing.  What I can tell you quickly you have
23  represented it to me as such and it shows a case
24  filing number of March 17th of 2022, so I won't
25  quibble with it.  It is what it is.



1      Q    And this next group of exhibits are

2    going to be a little messy, because they are

3    Telegram messages that are many pages, but the

4    only relevant part is on a particular page, so

5    we are all just going to have to turn the pages.

6              MR. HARRISON:  No worries.

7              THE WITNESS:  Okay.

8    BY MR. BEAL:

9      Q    While we are waiting, it would be fair

10    to say that on Telegram you repeatedly stated

11    that the Plaintiffs were extortionists or had

12    extorted you?

13     A    I wouldn't agree with that at all.

14              The way you characterize it, it sounds

15    like all I did on Telegram was talk about them.

16              I made my statements I believe in May

17    of 2021, when at a time that I had been taken on

18    being Counsel to myself I was coming under

19    fierce attack in South Carolina with their

20    Complaint, which is exactly why I think they

21    filed it for.

22              So I made a decision to speak out as a

23    lawyer for myself for myself in the Court of

24    public opinion, and I did believe at the

25    beginning, I believed in the middle, and I



1   believed at the end that what was done in

2   reference to the filing of this Superior Court

3   lawsuit in September of 2020 was pure extortion.

4   My opinion has never changed.

5          Now I said what I said on Telegram and

6   after I said it I don't think I have gone back

7   and said it again.  I said enough.  I had to

8   defend myself from what was a very, very

9   salacious, inappropriate, irrelevant,

10  immaterial, personal attack on me that had no

11  relationship to the claims for breach of

12  contract and a fraud and inducement claim that

13  they had waived and agreed not to file.  They

14  waived all of it.  They released all their

15  claims.  There was a covenant not to sue.

16         And the next thing I know I get hit

17  with a breach of contract in a fraud case that

18  goes on ad nauseam to personally attack and

19  demean me.  I didn't say anything about it first

20  in a press release that Joey and Chris helped me

21  write.  The next time I said something about it

22  representing myself I had to speak out in the

23  Court of public opinion in May because I was

24  being brutally attacked for the false statements

25  contained in their Complaint.

 **COASTAL COURT REPORTING & VIDEO SERVICES**
                    800-791-1100        www.coastalcourt.com

1      Q     Can you identify every act that you
2   contend constituted extortion or attempts at
3   extortion?
4      A     Honestly, I can take the time to
5   catalog every act, but the acts are pretty
6   simple.
7      Q     What are they?
8      A     Number one, remember the back drop.  I
9   believe there was a pattern of extortion with
10  respect to the March 17th agreement.  So they
11  had a pattern of extorting and making claims
12  that threatened me unrelated to the litigation
13  with my children, Richard Jewell, the
14  Sandmann's; and my efforts for Richard were very
15  important to me.
16          So I felt extorted into that agreement.
17  Candidly I wished I had never made it; but I did
18  what I did.  I was going to live up to it.
19          Then in September out of the blue,
20  nobody sued me when I said extortion in the
21  press release.  When they put in their own
22  Complaint in September and they said that I
23  told -- it is Dexter King that they were
24  extorting me, they put that in their Complaint.
25          Then they put in their Complaint that I



1    told a co-Counsel of mine on one of the class

2    action cases they were extorting me.  They

3    published my statements themselves in their

4    Complaint.

5            So then they come up with this new

6    lawsuit.  They sue me for breach of contract.  I

7    didn't breach the contract.  I asked the boy to

8    consent.  Then they sued me for fraud in the

9    inducement -- hang on, you want to know -- now

10   you don't want me to answer --

11           MR. BEAL:  Hang on.  I know, but I

12       am getting confused.  Can you list out

13       what acts constituted your sort of --

14           THE WITNESS:  I am.

15           MR. HARRISON:  We have been over

16       this.  You said that you don't want him

17       to give long answers, but you asked him

18       the specific acts that he said

19       constituted extortion in the context,

20       and he has answered those --

21           MR. BEAL:  I just got confused

22       about some of the last one's because he

23       was speaking about other people's

24       actions.  So let's go to the first

25       one --



1            THE WITNESS:  I haven't answered

2        the question.  This is not fair.  You

3        want to know what I believe to be the

4        extortion, I am telling you.

5    BY MR. BEAL:

6        Q    Yeah.

7        A    I believe part of what proves the

8    extortion in September of 2020 is the pattern of

9    extortion related to the March 17th agreement.

10           Then I am trying to tell you, and let

11   me go back and start again, I get a lawsuit

12   draft from you through Joey Burby that contains

13   pages of personal attacks, salacious,

14   irrelevant, immaterial, redundant that had

15   nothing to do with whether there was a breach of

16   contract based on consent.  That had nothing to

17   do with even your fraud in the inducement claim,

18   because in the agreement all of the other claims

19   were released.

20           And there was an agreement in the

21   March 17th agreement that they would not sue, a

22   covenant not to sue, except for breach of the

23   agreement.

24           So you got them filing this salacious

25   Complaint that personally smears me.  You got



1    them suing me for something they had released.

2    Suing me in direct derogation of the agreement

3    of March 17th covenant not to sue, and yet they

4    are sitting there relying on the agreement.  And

5    then they make a demand -- I am not done.

6           Then you make a demand that I pay in

7    effect $1.5 million, 1.25 plus another in effect

8    280, because now you want me to pay for their

9    share of the lease they already agreed they

10   owed.  And the claim for $1.5 million is part of

11   the extortion.  It was totally unjustified.  It

12   cannot be documented, and you made it in a way

13   that said agree to this and pay this, or we are

14   going to file this lawsuit in 24 hours.

15          And then thankfully Joey was able to

16   get you to agree to give us two or three days to

17   figure out what to do until a Monday.  Why would

18   you put that out there and say pay me in

19   24 hours or I am going to smear you like crazy

20   when I file this lawsuit.  That is extortion.

21          I sat there with Jonathan Burby and

22   them, and I said look, the only real dispute is

23   over consent.  Let us take it to an arbitrator

24   and get a ruling in final arbitration on the

25   issue is consent required or not.



1              No, we are not going to do that.  We
2      are going to file it.  You didn't want to
3      discuss a settlement by arbitration.  You wanted
4      to litigate it and file it publicly in my
5      opinion and I think the facts bear it out.
6              And then you file it, and I don't
7      have -- I make a response and the next thing I
8      know is I can't even respond.  My response is
9      under seal.  The craziest thing I ever heard.
10     There was no legal basis to seal the records.
11     The legal basis that the judge used to seal the
12     records were striking those types of allegations
13     from the Complaint.
14             So I believe that if you go back and
15     look at the correspondence between you and Joey
16     Burby and Chris Marquardt and the efforts you
17     have made to try to explain the unexplainable in
18     terms of how you came up with $1.5 million, pay
19     it in 24 hours or I am going to sue you, I think
20     that is extortion.  I thought so then, I feel so
21     now.
22             If I have left out a fact or two
23     because of documents I haven't reviewed recently
24     I will make it up at a later time, but I believe
25     it was extortion; and I haven't heard a real

1    explanation of how anybody says it is not.

2              MR. BEAL:  Can you look through

3       there and find me Exhibit 12?

4              MR. HARRISON:  Uh-huh.

5              MR. BEAL:  Thanks.

6    BY MR. BEAL:

7       Q    So going back to your statements, the

8    first act of extortion you believe was a pattern

9    of extortion surrounding the March 17th

10   Settlement Agreement which is marked as

11   Exhibit 12?

12      A    I wouldn't call that the first act of

13   extortion.  What I called it is what I called

14   it.

15            I thought that what they did leading up

16   to the March 17th agreement established a

17   pattern of extortion, because they were trying

18   to get money that they had not earned.  They

19   were trying to coerce me into giving them more

20   than they deserved under the threat of a

21   continued attack in my relationship with my

22   children, my efforts ongoing for Nicholas

23   Sandmann, and to jeopardize my efforts to try to

24   ask the President to give Richard Jewell the

25   presidential Medal of Freedom.



1          And just generally the idea of saying

2     these false things about my mental health, which

3     they documented were false in the March 17th

4     agreement, I thought that showed extortion; but

5     I paid it, I paid it.  I agreed to it.  I wish I

6     hadn't.  I should have stood on my principles

7     instead of my preference, I wanted peace.  I

8     should have stood on my principles.

9          And then all of a sudden I am hit with

10    your lawsuit to pay within a day 1.5 million or

11    we are going to file this thing and smear --

12    Q     I want to talk about March.  Let's

13    not --

14    A     Okay, well, I have covered March.

15    Q     Would it be fair to say that a

16    culmination of this pattern of extortion you

17    have identified, it culminated in the March 17th

18    Settlement Agreement?

19          MR. HARRISON:  Object to the form.

20          You can answer.

21          THE WITNESS:  What I said was that

22      when I looked at what you did in

23      September of 2020, I recognized then as

24      I had recognized earlier that they had

25      extorted me into the March 17th



1          agreement, but I went ahead and made it

2          and I felt extorted.  That was my

3          opinion then.  And then all of a sudden

4          I get extorted again.

5     BY MR. BEAL:

6          Q     So you were represented when you signed

7     the March 17th Settlement Agreement, right?

8          A     Absolutely, Joey Burby and you

9     negotiated it.

10         Q     And do you have a single writing that

11    you can point to where any of the Plaintiffs

12    threatened to take any action with regard to

13    your children or your mental health condition?

14         A     I have already pointed you to the

15    confirmatory text -- there is more, where it was

16    clear that Taylor Wilson was conspiring with my

17    son Matt Wood to have Dr. Phil McGraw conduct a

18    mental health intervention on me, but I caught

19    it.  I caught it in time because I knew what

20    they were up to, and I told Phil McGraw don't

21    come out to Atlanta, Georgia and mess with my

22    relationship with my children, because it won't

23    end well for you; and he did not.

24              He Emailed my son and said your father

25    is a genius, he is the finest lawyer I have ever



1    met.  He can get all the facts wrong and still

2    come up with the perfect resolution.  That Email

3    is now missing out of my system.

4            But nevertheless put yourself in my

5    position, I know it is hard for you to do, but

6    try I am trying my best to get Richard Jewell a

7    recognition that Richard Jewell deserved.  I am

8    trying my best to represent the Sandmann family.

9    I want to do the Sandmann cases and then retire;

10   and I am always trying to do my best to maintain

11   a good, healthy relationship with my children;

12   and these people are threatening all of that.

13   If I don't give them money that they really

14   under the law did not deserve, but I ended up

15   making the agreement in March 17th; and then I

16   lived up to it.  Did you see how many cases I

17   sent them?  You still haven't told me how much

18   money they made on it.

19       Q    Can I ask you if there was a

20   specific -- if you can point to any act or

21   threat by any of the Plaintiffs with regard to

22   Nicholas Sandmann or Nicholas Sandmann's claims

23   or cases?

24       A    I don't know how many Email's there

25   were at the time.  I haven't gone back and



1    looked, but the discussions leading up to
2    ultimately the March 17th agreement would be
3    part of what I believed to be acts of extortion
4    until I finally agreed to it.
5         The only thing that came up after that
6    in terms of extortion is when you tried to
7    extort me by telling me to pay them $1.5 million
8    or you are going to file this frivolous, heinous
9    complaint against me within 24 hours.  There is
10   your document.
11       Q    Was there any threat by any of the
12   Plaintiffs to interfere with your relationship
13   with Richard Jewell?
14       A    They knew that I was doing my best,
15   publicly advocate for Richard Jewell to receive
16   the Presidential Medal of Freedom, that was
17   well-known to them.
18        The idea that they were out talking to
19   people, and you don't know where it stops,
20   suggesting that Richard Jewell's lawyer was in
21   need of mental healthcare treatment, well I
22   don't think President Trump would have been so
23   fond of thinking about meeting with me to talk
24   about Richard; but yet despite the accusations
25   he met with me.



1      Q     But you don't have any evidence of any
2   conversations by the Plaintiffs with any parties
3   regarding mental health besides what you just
4   identified as a conversation with your son Matt
5   and --
6      A     Dr. Phil.
7      Q     -- And possibly a conversation with
8   Dr. Phil?
9      A     I think it is more than a conversation
10  with Dr. Phil.
11     Q     And Dr. Phil was -- had previously been
12  your client, is that correct?
13     A     He was.
14     Q     Okay.
15     A     He is not now.
16     Q     And --
17     A     Are you going to break for lunch?
18     Q     I kind of want to power through and be
19  done.
20     A     That is not fair to anybody.  I need at
21  least 15, 20 minutes to get a sandwich.
22           MR. HARRISON:  How long do you
23      think you have?
24           And let me offer this while you
25      are thinking about it.  Are you going



1        to go through each Telegram statement,

2        because you do it how you want it, but

3        they are in the Complaint, and they are

4        also a subject of a Request to Admit

5        them; and he said he already sent them.

6            MR. BEAL:  I am thinking of a way

7        to cut those out altogether.

8            MR. HARRISON:  I appreciate that.

9            MR. BEAL:  And these copies are

10       hard to follow, so I want to do that.

11           But we will take a break and we

12       will talk.

13           Just let me finish up with these

14       series of questions and take a break

15       and see exactly how long we have and

16       what we want to do.

17           MR. HARRISON:  Yeah, here is my

18       request, get to a good stopping point,

19       let's see how long it will be.

20           MR. BEAL:  Yes.

21           MR. HARRISON:  At least get

22       something really quick, if that is what

23       the witness wants to do.

24           Right.  So keep going.

25   BY MR. BEAL:



1       Q      So you have referenced in prior

2    testimony computer hacking.

3              Do you believe that the Plaintiffs have

4    hacked into your computers or your Email's?

5       A      I believed at the time that I learned

6    that my computer was hacked, and it was hacked.

7    The whole file system was out of whack.  I had

8    it investigated.  It was hacked.

9              I also believed that my phone system

10   had been hacked.  I think that was done through

11   my Wi-Fi system in my house, so I documented the

12   hacking.

13             I felt like that there might have been

14   an effort by Johnathan Taylor and/or Nicole,

15   because she is close with Rick Miller to go in

16   and perhaps remove certain documents that were

17   related to Rick Miller.

18             When I first went in I couldn't find

19   the documents to confirm the hack.  I filed a

20   complaint with the FBI.

21             Then we went back and I found the

22   documents that I thought might have been hacked

23   out, and I wrote them and apologized.

24             But the problem is I still think now

25   that I was wrong about what was being looked



1    for, but I was right about what was done; and I
2    think it related to Dr. Phil McGraw.
3        Q    So here is my question real
4    specifically, do you believe the Plaintiffs
5    hacked your computers or participated in the
6    hacking of your computers?
7        A    I have no way to know who hacked it,
8    but I thought that they had a motivation to hack
9    it, I still do, or to have someone hack it.
10            I know there was a day where I came in
11   and turned on my Email, I thought it was a
12   Sunday; and there was an Email being forwarded
13   to Taylor, not a complete Email address, and I
14   stopped it.  And then for that day it kept
15   trying to send it bouncing back, because when I
16   stopped it it hadn't gotten to a full Email
17   address.  That led me to believe that may be
18   effort for someone to mess with the Microsoft
19   360, Johnathan is familiar with it.
20            I don't know, but I know that my
21   computer was hacked.  I know my phone was
22   hacked, and I believe they had motivation to at
23   least know it or be involved in it.
24       Q    Did you believe --
25       A    But when I found out it was not Rick



**COASTAL COURT REPORTING & VIDEO SERVICES**
                800-791-1100        www.coastalcourt.com

1    Miller documents, I wrote them and said I am
2    sorry.  I jumped the gun.
3           But then I found out about confirmatory
4    evidence on Dr. Phil; and I am convinced beyond
5    any doubt in my mind that these lawyers to some
6    extent were involved in the Elon Musk case to
7    sabotage and rig the jury.
8    Q    Okay, I want to ask that before we take
9    a break.
10   A    Sure.
11   Q    So summing up on hacking, do you
12   believe the Plaintiffs were involved or not
13   involved as you sit here today?
14   A    My belief is just what I said.  They
15   had motivation to be involved.  The whole
16   Dr. Phil thing stinks.
17   Q    Do you believe that Dr. Phil was
18   involved in computer hacking?
19   A    I don't think Dr. Phil --- I don't know
20   if he knows how to hack a computer.  But I think
21   I know enough about Dr. Phil and what happened
22   with Tara Trask and Chris Chatham, that I have
23   serious concerns.  I know the jury was rigged
24   and I started to investigate it --
25   Q    Now --



1        A    And my son Matt went ballistic, because
2    he didn't want to give me any information.
3             MR. HARRISON:  Okay.
4    BY MR. BEAL:
5        Q    So we have transitioned from hacking to
6    jury tampering?
7        A    No.
8        Q    Or is this part of hacking?
9        A    I will tell you.
10       Q    All right.
11       A    You are asking me if I know who hacked
12   me, I do not; but I have certain suspicions.
13       Q    All right.  So --
14       A    When I said that about jury rigging, I
15   don't know who did what, when and where; but I
16   have certain suspicions based on facts that I am
17   aware of.
18   BY MR. BEAL:
19       Q    All right.  So and the jury tampering
20   issue, do you believe the Plaintiffs were
21   involved somehow in tampering with the jury or
22   hurting your efforts in the representation of
23   Unsworth versus Elon Musk?
24       A    You asked me two questions, let me
25   answer it this way.  There was a noticeable



1    change in Johnathan Grunberg and Taylor Wilson's
2    treatment of me starting with the incident in
3    October, and by November if I hadn't had them to
4    help me, I would have thrown them out of my
5    office on the 21st floor.  I had never seen
6    lawyers more rude, more abrasive, more
7    condescending, telling me I didn't know what I
8    was doing.  They like changed day and night.
9         Q    Okay.
10        A    And so do I have concerns that that
11   relates to perhaps them having gotten
12   compromised to participate in sabotaging some
13   part of the Elon Musk case?  I believe it does,
14   but I haven't taken any action yet.
15        Q    Do you believe that the Plaintiffs were
16   involved in somehow sabotaging or working
17   against your efforts in the Unsworth versus Elon
18   Musk case?
19        A    I know they were.  I know they were
20   because they were trying to direct me to take an
21   issue in the case that was minuscule compared to
22   the main allegation of pedophilia that I now
23   know that issue was interjected by the
24   Mockingbird Media, so that we would spend time
25   on that and not time on what the main case was



1    about; and they were adamant that I needed to go

2    there, and it very much affected my ability to

3    prepare the case in an orderly fashion in the

4    manner that I thought it should be done, being

5    the most experienced, being the lawyer in

6    charge.  And I have never let such opposition

7    and mistreatment from every one of them, not as

8    much Nicole.  In fact, I told Nicole one day

9    when Johnathan and Taylor were in my office and

10   I looked at them and said I ought to sue every

11   damn one of you about what you said about mental

12   health.

13          And Nicole said I never said it, and I

14   said you are too smart to say it.  And she sent

15   me a note later when she found out about my

16   children.  And she knew how much that would hurt

17   me.  And she said I love you no matter what

18   happens to our law firm.  I will always be there

19   for you, and I appreciate that and I believe she

20   meant it.

21   Q    So you believe the Plaintiffs were

22   deliberately taking steps to sabotage or hurt

23   your client in the Elon Musk litigation?

24   A    I said what I said.  I don't know it,

25   but I saw it --



1       Q     But you believe it?

2       A     Do you want me to answer or are you

3   going to answer it for me?

4       Q     No, I am just trying to --

5       A     Why don't you let me answer it.

6       Q     All right.

7       A     Because you don't know what you are

8   talking about.  Only I can answer that question

9   with all due respect.

10      Q     Okay.  Go ahead.

11      A     I have serious concerns based on the

12  totality of the circumstances that occurred and

13  the timing of those, I have serious concerns

14  that somehow my son, perhaps Johnathan and

15  Taylor perhaps were compromised and perhaps had

16  to do things that were not in the best interest

17  of Vernon Unsworth, although I have a lot of

18  thoughts on the Vernon Unworth's case, which we

19  don't need to go into today.  I don't know what

20  this has to do with extortion, but I am happy to

21  talk to you about it.

22      Q     Okay.

23      A     Because I don't know what happened in

24  the Thai cave rescue.  I know a lot more now

25  about child sex trafficking than I knew then.  I



1    know a lot more now about how caves are used in

2    Thailand.  I know a lot more now about

3    psychological operations.

4              MR. HARRISON:  What I will ask

5         both of you to do is stick to the

6         allegations of the Complaint.  This is

7         a defamation lawsuit, right, Drew?

8              MR. BEAL:  Right.

9    BY MR. BEAL:

10        Q    So when you said that you were lead

11   Counsel in the Vernon Unworth's case?

12        A    I was.

13        Q    Was there a time when you asked Taylor

14   to take over the lead Counsel role prior to

15   trial?

16        A    I don't remember it.  If I was going to

17   ask Taylor to take on lead Counsel, I wouldn't

18   have gone.  I was always lead Counsel.  We had a

19   meeting the weekend before Thanksgiving, where

20   we had, I guess you would call it a come to

21   Jesus meeting, because the acrimony between

22   those lawyers and me and their disrespect and

23   their acting like they knew everything, and I

24   was some sort of a dummy in my case, with my

25   experience.  I couldn't understand it.



1           We all got together at Lake Oconee at
2    my house in Reynolds that I owned then and we
3    had a sit down and I heard them all out; and
4    then I made the decision here is what is going
5    to be done.  If you don't want to do it my way,
6    then you will not need to go to Los Angeles.
7           They all said we will do it your way,
8    so I don't think there was ever any time where I
9    would have told Taylor Wilson to take on the
10   role of lead trial Counsel.  He hadn't had that
11   much experience, my goodness.
12           MR. BEAL:  All right.  Let us make
13      it a short break and talk about timing,
14      and then you and I get together and
15      make a decision.
16           MR. HARRISON:  Very good.
17           (Whereupon, a short break was
18           taken.)
19   BY MR. BEAL:
20      Q   Mr. Wood, real briefly, we talked about
21   the Carbone and Lindsey settlement, and we saw
22   that the Carbone settlement did not have a
23   separate breakout for the Plaintiffs' legal
24   fees.
25           Did you have an oral agreement with



1    David Carbone or Lindsey about the percentage of

2    the fee that would be received by the

3    Plaintiffs?

4       A    I did not have an agreement at that

5    time with either one of those.

6       Q    Did you ever have -- you stated

7    previously that you were surprised that there

8    was no warranty in the March 17th Settlement

9    Agreement about the Sandmann's consenting to a

10   fee.

11           Do you remember that testimony?

12      A    Yes.

13      Q    Were you surprised by that absence, if

14   you will, on March 17th when you signed the

15   document?

16      A    No, it was not an issue at that time.

17   From my perspective that agreement was

18   negotiated by you and Alston & Byrd, so I wasn't

19   questioning it.  I trusted my lawyers.

20           And when the consent issue came to the

21   forefront, given that you were aware from the

22   prior statements of Todd McMurtry there was

23   potentially a client out there saying quantum

24   meruit, I am surprised that you did not put in a

25   warranty of consent on my part; so that if he



1    did not consent I would still be liable for it.

2    So I was really surprised that you did not put

3    it in, given your knowledge that they had taken

4    positions apparently as you pointed out that

5    they only wanted to pay quantum meruit.

6        Q    So it is your understanding if they

7    hadn't consented, you would be responsible for

8    it from the PC?

9        A    If you had included a warranty on my

10   part to his consent, meaning if he doesn't

11   consent I have warranted his consent; and they

12   could sue and recover from my PC.

13       Q    I believe earlier you testified that

14   Alston & Byrd told you about client consent with

15   regard to the Lindsey settlement?

16       A    That is my best recollection.  It came

17   up when I was talking to them about Cherie

18   Fuzzell.

19       Q    Okay.  And --

20       A    And they told me to apply it to

21   Sandmann too.

22       Q    Okay.  And --

23       A    And I am surprised both of you all

24   didn't address the issue of consent more

25   clearly.



1       Q      And the Lindsey settlement occurred in
2    February of 2020.
3             So would it be fair to say that Alston
4    & Byrd brought that to your attention sometime
5    early on in their representation?
6       A      They brought to my attention they were
7    hired to help negotiate and reach an agreement
8    with Nicole, Johnathan, and Taylor.
9             I decided not to go back and
10   re-litigate the issue of the amounts that I had
11   said on the 17th I would pay.
12            As I recall in the first part of their
13   representation I had not reached that
14   conclusion.  But I did when it was finalized.  I
15   thought, you know, I said it, I will live up to
16   it.  Just give them the money, give them
17   percentages.
18      Q      So did they tell you about their
19   understanding of the requirements of client
20   consent around the time of the Lindsey
21   settlement?
22      A      They didn't represent me at that time,
23   I don't believe.
24      Q      Did Alston & Byrd ever tell you that
25   you did not owe the funds under the March 17th



**COASTAL COURT REPORTING & VIDEO SERVICES**
                    800-791-1100      www.coastalcourt.com

1    Settlement Agreement for Sandmann versus CNN

2    because of client consent?

3             MR. HARRISON:  Object to the form.

4             Answer.

5             THE WITNESS:  They told you what

6        their position was.  I wasn't an expert

7        on the ethics rules; they were in terms

8        of fee splits.  So I assumed that they

9        knew what they were talking about, and

10       I think they dd.

11            And so I relied on what they told

12       me, which is exactly what they told you

13       I think in the letter of July 24th, if

14       I am right, that you introduced

15       earlier.

16   BY MR. BEAL:

17       Q    Did Alston & Byrd ever tell you that

18   the Plaintiffs or their Counsel had committed

19   extortion?

20       A    I didn't ask that question to them, but

21   I had in my press statement the fact that I was

22   not going to allow them to extort me by

23   litigation.  That press statement was edited and

24   reviewed by Alston & Byrd.

25            If there was a red flag, I would have



1    expected them to tell me; but I felt strongly
2    then that it was extortion.  And I feel that way
3    now, that is my opinion.
4         Q     In earlier posts you have stated that
5    you felt Alston & Byrd committed malpractice in
6    their representation of you?
7         A     What post?
8         Q     Do you remember that?
9         A     Tell me what you are talking about.
10        Q     Have you ever made a statement that
11   Alston & Byrd committed malpractice in their
12   representation of you?
13        A     Where?  Are you talking about on
14   Telegram?
15        Q     I am saying in any public forum?
16        A     That is so broad I don't know.
17              I mean I have concerns that having been
18   hired to negotiate a settlement on a fee split
19   with an outside firm, that I was not informed
20   and that it was not -- the issue of consent was
21   not addressed at the time of agreement.
22              And I was concerned subsequently they
23   did not file a counter-claim, but the issue is
24   before the Court, so it is okay, that Johnathan,
25   Nicole, Taylor breached the contract themselves



1    when they sued me for fraud and inducement,

2    which is in breach of the agreement.

3        Q    Do you believe that as you sit here

4    today that Alston & Byrd committed

5    malpractice --

6            MR. HARRISON:  Objection.

7    BY MR. BEAL:

8        Q    -- In their representation of you?

9        A    I don't know what that has to do with

10   this liable case.  I have concerns in the two

11   areas that I have mentioned; I may have more.

12   But I have not acted on those.

13           But I do know that if it turns out that

14   L. Lin Wood, P.C., which is the only party that

15   is responsible for the fee, if L. Lin Wood, P.C.

16   is found liable, then I would look to Alston &

17   Byrd to indemnify me, because I relied on their

18   advice, which they told you themselves in the

19   July or the July 24th letter.

20           I don't want any more litigation.  I

21   have more than I can afford now, and you are all

22   going to be litigating for nothing pretty soon,

23   because I am having to pay attorneys' fees; and

24   I know they are not.

25       Q    And I believe you testified -- earlier



1    you testified that one act of extortion was the

2    demand that was made upon you in September of

3    2020 immediately prior to the filing of suit?

4        A    That was I thought consistent with

5    extortion, yes.

6        Q    And --

7        A    It made no sense.  Why would you not --

8        Q    I just need you to --

9        A    I am going to answer the question

10   fully.

11            That was an act of extortion, part of

12   the extortion because the position that you all

13   took made no sense.  You weren't looking to

14   resolve the matter.  You were looking to sue it.

15       Q    And it was the crime of extortion?

16            MR. HARRISON:  Object to the form.

17            THE WITNESS:  I call it extortion.

18       Whether you refer to it as a crime, it

19       is knowing.  So I guess it would fall

20       within the category of knowing,

21       criminal extortion.  I didn't act on it

22       in the sense of taking it to the

23       police.  Just like --

24   BY MR. BEAL:

25       Q    Okay.



1      A     I didn't -- I knew what had happened to

2     me.  I was going to move forward.  And then when

3     I got brutally attacked in South Carolina, I

4     made a decision as a lawyer for myself that I

5     needed to speak out publicly about it and so I

6     did.  And I told the truth.  I gave my honest

7     opinion.

8                  MR. BEAL:  I have to object.

9                  THE WITNESS:  I gave the truth and

10       gave my honest opinion.  I don't lie.

11    BY MR. BEAL:

12      Q     What is your understanding of the

13    elements of extortion?

14                  MR. HARRISON:  Object to the form.

15                  You can answer.

16                  THE WITNESS:  I am not sitting

17          here with a law book in front of me,

18          but I think when you take acts that are

19          beyond what you are entitled to, to try

20          to get someone else coerced into doing

21          what they are not obligated to do for

22          you, that is extortion.  It is in the

23          dictionary.  People use the term all

24          the time.

25                  A lot of people say the lawyer is



```
1       extorting you.  It is a commonly used
2       term, especially when you are talking
3       about lawyers making demands on you.
4              And this one was not just a demand
5       to pay.  If you had said here is the
6       breach of contract claim, we demand you
7       pay the 600-what-odd-thousand-dollars,
8       that would not be extortion.  But when
9       you add all that other stuff in there,
10      and you made a $1.5 million demand; and
11      you actually attacked my faith by
12      putting in your Complaint that I
13      thought I was all mighty God, what in
14      the world were you thinking?
15  BY MR. BEAL:
16      Q    So your definition of extortion is
17  urging someone to make a payment to you that you
18  are not required to make?
19              MR. HARRISON:  Object to the form.
20              THE WITNESS:  Extortion comes in
21      many forms.  But it is when somebody
22      inappropriately tries to exert leverage
23      or pressure on you for their own game,
24      that they are not entitled to.
25              So the extortion could be in the
```



1    form of the money demand, it was

2    outrageous.  It can't be justified.  It

3    can be part of the fact that you are

4    only gave me 24 hours initially to

5    respond.  What was the rush?

6         That you would refuse a reasonable

7    request that we arbitrated privately

8    with lawyers, binding arbitration.

9         And you added in so much stuff

10   that was intended clearly in my mind to

11   smear me and attack me for purposes

12   that had nothing to do with the dispute

13   on whether there was client consent

14   required.

15        And other things that were done,

16   if you say Lin, make this agreement or

17   we are going to continue to drive a

18   wedge between you and your children,

19   that is extortion.

20        Lin, make this agreement or we are

21   going to continue to talk about your

22   mental health that might hurt you in

23   your Sandmann litigation or hurt you in

24   your efforts with Richard Jewell with

25   President Trump, in my view that is



1      extortion.  That is my opinion.

2  BY MR. BEAL:

3      Q    So the September demand included

4  payment of fees on various cases?

5      A    It included a lot more than that.  In

6  fact, nobody -- you have to explain how they

7  came up with the fees.  But on top of that --

8      Q    Can you just answer the question yes or

9  no.  Did it include that or not?

10      A    I don't know.  Show it to me and I will

11  tell you what it included.

12      Q    What was the Washington Post

13  settlement?

14           MR. HARRISON:  You are asking him

15      the amount?

16           MR. BEAL:  Yes.

17           MR. HARRISON:  Is it confidential?

18           THE WITNESS:  It is confidential.

19  BY MR. BEAL:

20      Q    Well, everything else is sealed in this

21  proceeding.

22      A    Not in this case.

23      Q    But it is part of our demand so.

24      A    There is no seal order in this case.

25           MR. HARRISON:  Yeah, I am not



1   aware of anything under seal in this
2   case.
3        We have also asked for some
4   financial information and information
5   on referrals and fees earned so -- but
6   beside that I don't know if it is
7   confidential or not.
8        And you say it is then --
9        THE WITNESS:  Oh yeah, it is
10  confidential but I don't mind telling
11  you at some point, but I want to make
12  sure I don't violate the agreement.
13       MR. BEAL:  Why don't we go off the
14  record.
15       THE WITNESS:  That would require
16  that I get in touch with Todd McMurtry
17  to make sure he is okay with me telling
18  it.  I mean it is not -- I don't mind
19  you knowing, but it is not something I
20  am allowed to say without some
21  protection in terms of ensuring that I
22  don't breach the agreement with
23  Nicholas and Todd may.
24       MR. HARRISON:  I am happy to
25  discuss it with you to see if we find a



1        way to get it to you somehow; but I

2        don't know the answer other than what

3        he said.

4                  (Whereupon, Plaintiff's Exhibit

5                  Number 15 was marked for

6                  identification.)

7    BY MR. BEAL:

8        Q    Let me hand you what has been marked as

9    Exhibit 15.

10            Does this look like the first page, and

11   then it skips to the Ad Damnum clause of the

12   Sandmann lawsuit filed in the Eastern District

13   of Kentucky?

14            MR. HARRISON:  Just for the

15       record, it is page 1 of the Complaint,

16       and then it goes to page 57.

17            MR. BEAL:  Correct, and 58.

18            MR. HARRISON:  And 58, okay.

19            THE WITNESS:  What do you want me

20       to tell you?  It looks like it.  It is

21       marked filed.

22   BY MR. BEAL:

23       Q    Let us look over at page 57.

24       A    Okay.

25       Q    And in paragraph (a) and (b) of the



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

1      Sandmann Ad Damnum clause, did you make a demand

2      for $275 million?

3          A    That is what it says right here.

4          Q    Did you consider that to be extortion?

5               MR. HARRISON:  Object to the form.

6               THE WITNESS:  That is the way

7          lawyers file lawsuits.  The Ad Damnum

8          can be related to what you want to

9          recover.  It can be made to make a

10         point to the person that is looking at

11         the Complaint.

12              There is no connection between the

13         Ad Damnum and a legitimate lawsuit and

14         extortion.  Now, I can tell you CNN

15         might have looked at it and said that

16         is extortion.  Sandmann is trying to

17         extort me.  That would be their

18         opinion.  They may view it that way.  I

19         didn't view it as extortion, but CNN

20         very well could have.

21                   (Whereupon, Plaintiff's Exhibit

22                   Number 16 was marked for

23                   identification.)

24     BY MR. BEAL:

25         Q    Let me hand you the same three-page



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

1    Exhibit for the Washington Post Complaint

2    against Sandmann and direct your attention to

3    page 37 of that Complaint, and that is paragraph

4    (a) and paragraph (b) on page 38; and in that

5    Complaint did you assert a claim for $250

6    million?

7        A    I did not.  Nicholas Sandmann did.

8        Q    But you didn't consider that to be

9    extortion?

10       A    No.

11       Q    For the same reason?

12       A    Well, let me answer.  Once again, Ad

13   Damnum's in Complaints are done by lawyers in

14   connection with a case that is pending, to be

15   pending.

16            I did not put in something -- I have

17   never filed a lawsuit to extort someone.  I

18   filed a lawsuit when I thought it was

19   meritorious.  Then I make a decision on what I

20   believe is the proper Ad Damnum.  Again, the

21   Washington Post may think it is extortion.  Just

22   like President Trump recently said that he

23   settled the horse face Daniels case, but it was

24   extortion, extortion litigation; but he settled

25   it for a nominal amount on his advice of



1    Counsel.

2              People feel extorted in different ways.

3    I have told you why I felt extorted in the two

4    instances, one that showed the pattern; and two,

5    that I thought was extortion.

6              And nobody complained when I put

7    extortion in my public statement that I issued

8    right after the lawsuit was filed.  They put in

9    the public record that I had said extortion to

10   Dexter King and another lawyer.  They spread the

11   accusation or my opinion of extortion around the

12   world, and they complained that I made a comment

13   about it on Telegram, where you don't really

14   know how many people see it.

15             MR. BEAL:  Let me object.  I mean

16        it is a simple question of it wasn't

17        extortion for the same reason as what

18        he just described.

19             MR. HARRISON:  Okay.  Keep moving.

20   BY MR. BEAL:

21        Q    And it would be fair to say that when

22   making demands in cases that involve punitive

23   damages or presumed damages or exemplary damages

24   that demands are difficult to quantify, because

25   they are not tied to actual, specific damage



1    computation?

2              MR. HARRISON:  Object to the form.

3              THE WITNESS:  There is no way I

4         can agree with that.  That is not what

5         you did here.  You are trying to say

6         that you were making a demand for a

7         lawsuit you intended to file.  That is

8         just one small part of what you did

9         with them.

10             MR. BEAL:  Let me object as

11        nonresponsive.

12             THE WITNESS:  If you don't want to

13        find out what I am going to say.  This

14        is the time to find out.

15   BY MR. BEAL:

16        Q    I am asking you about demands made in a

17   lawsuit.

18        A    I don't agree with you.  The way you

19   phrase that you are trying to say that any

20   demand in a lawsuit cannot be extortion.  That

21   is not true, because there was more to this than

22   just the demand.  You were asking for something

23   in the demand that you had already agreed that

24   you owed in the breach of contract portion; and

25   you were asking for undefined amounts for some



1   cases.  You were claiming you wanted to be paid

2   for defamation, which I guess was --

3           MR. BEAL:  What does this got to

4      do with this?

5           THE WITNESS:  I am trying to tell

6      you why --

7           MR. HARRISON:  He is trying to

8      answer the question.

9           MR. BEAL:  He is not answering the

10     question.

11          THE WITNESS:  I am not going to

12     sit here and be insulted by this man.

13              (Whereupon, a discussion was

14              held off the record.)

15          MR. BEAL:  The ruler is coming out

16     for both of us.

17          MR. HARRISON:  Yeah.

18          MR. BEAL:  And I simply asked

19     about computation of damages in other

20     lawsuits, and I got a right to get an

21     answer.  He has practiced law for a

22     long time.  He has made a lot of

23     demands.  I don't want to get into

24     this.  We will get into this on the

25     next set of questions.



1             But I am talking about demands

2       made in general on cases that involve

3       exemplary or punitive damages, and now

4       we are going into a bunch of specifics.

5             THE WITNESS:  Let me --

6             MR. HARRISON:  Hang on.

7             THE WITNESS:  That doesn't -- what

8       you are asking about does not describe

9       the facts of this case.  So I don't

10      agree with you, that the demand was a

11      part of extortion.

12            MR. HARRISON:  That is the answer

13      that he gave, and he is giving it

14      again.

15            Next question.

16  BY MR. BEAL:

17      Q    So in other cases when you made these

18  demands in Exhibits 15 and 16 they weren't

19  extortion, because the amount of damages is

20  based on punitive damages and injury to feelings

21  and they are difficult to quantify?

22      A    Who said that?

23      Q    Is that a fair statement?

24      A    No.

25      Q    Okay.  So you can --



1       A       I didn't extort anybody when I filed
2   this lawsuit.
3       Q       Because you can exactly compute the
4   $275 million?
5       A       That is not at all accurate.  Where are
6   you getting that from?  You are making up
7   something that is not part of what I am doing
8   here in terms of what happened to me.
9       Q       Why did you make the demand of
10  $275 million?
11      A       In what case?
12      Q       In the Sandmann case, Exhibit 15?
13              MR. HARRISON:   CNN.
14              THE WITNESS:  Because it was the
15          consensus of the clients and Todd
16          McMurtry and me that that was an
17          appropriate Ad Damnum.  It wasn't a
18          demand to pay us $275 million or we are
19          going to sue you.  And in the process
20          of making that demand for $275 million,
21          we are also going to slander you and
22          put in false allegations about you and
23          file claims that have already been
24          agreed to.
25              I mean it is a whole different set



1        of factors that go in.  But again, CNN
2        may look at it and go this is
3        extortion.  People say it all the time
4        when a lawyer sues them.  So you are
5        trying to compare apples and oranges,
6        Drew.
7    BY MR. BEAL:
8        Q    So the answer to my question is 15 and
9    16 were fair demands to go in the Complaint?
10        A    They were.
11        Q    They were fair demands for Nicholas'
12    case in these Complaints?
13        A    They were in the Ad Damnum clause.
14    They weren't demands pay us this or we are going
15    to smear you and do all --
16            MR. BEAL:  I am going to object.
17        It is completely nonresponsive.
18            MR. HARRISON:  It is not at all
19        true.  I disagree.
20            MR. BEAL:  I want an answer to the
21        question I asked.
22            MR. HARRISON:  He is trying to
23        answer your question.
24            MR. BEAL:  The demands made in
25        Exhibits 15 and 16 were in his



1    opinion -- in your opinion fair demands

2    to make in those lawsuits and that is

3    why you made them?

4         THE WITNESS:  One more time.  Todd

5    McMurtry and the clients, and I made

6    the decision on the amount of the Ad

7    Damnum clause in a Complaint.  That

8    wasn't a settlement demand.  And

9    then -- but even then CNN -- we thought

10   it was a reasonable amount to put in

11   the Ad Damnum clause.

12        MR. BEAL:  Okay.

13        THE WITNESS:  And then CNN could

14   turn around and go out public and say

15   we think that is extortion by the

16   Sandmann's.  They had the right to have

17   that opinion.  Whether they had it or

18   not, I don't know.  But a lot of people

19   feel extorted by lawsuits.

20        But my case is not a -- my

21   comments about Taylor, Jonathan, and

22   Nicole were much more than the actual

23   lawsuit that it was.  It came with the

24   timing of things you did, the things

25   you put in there.  There was a whole



```
1        host of things given the background of
2        the March 17th agreement that in my
3        opinion I believed was extortion.  I am
4        entitled to have that opinion.  It is
5        an honest opinion.  I haven't changed
6        it.  I am not going to change it.
7             MR. BEAL:  Object and move to
8        strike.
9             That is nonresponsive.
10            MR. HARRISON:  I don't agree with
11       you.  You have done this all day long
12       where you try to talk over him and stop
13       him.  He gave his answer.  He is
14       entitled to it.  You have asked the
15       same question over and over a couple of
16       times today.
17   BY MR. BEAL:
18       Q    Let me ask you this --
19            MR. HARRISON:  I am not finished.
20            MR. BEAL:  Please, this whole
21       thing has been a filibuster.
22            MR. HARRISON:  Now you are
23       interrupting me.  Ask you question, get
24       your answer and ask your next question.
25            MR. BEAL:  Please don't --
```



1           MR. HARRISON:  Quit interrupting
2      him and quit trying to lecture me.
3           MR. BEAL:  Please, there is no
4      answer to any of these questions.
5           MR. HARRISON:  Not true.
6           Ask a question.
7   BY MR. BEAL:
8      Q    If the Washington Post had not answered
9   this Complaint on time, they would have
10  hypothetically gone into default.  Assume that.
11  They went into default.              What
12  amount would they be responsible for if they
13  went into default in light of this Complaint?
14     A    They would have been responsible -- if
15  you default on the Complaint, then there has to
16  be a hearing for the Court to determine based on
17  evidence the amount to be paid.  It does not
18  default to the Ad Damnum.  If that were true I
19  would sue for $10 million and hope that the
20  person didn't answer and you get award for $10
21  million.
22          The point I am trying to make, which
23  you won't let me make, what you are trying to
24  say about an Ad Damnum in a Complaint is apples
25  and orange from what the facts are in this case

1    and what you and your clients attempted to do.

2        Q    Let us direct your attention back to

3    March 17th on what you contend was a pattern of

4    extortion; and I am just going to ask you to

5    identify specifically the facts that you

6    contend; and I believe you referenced in general

7    terms communications with your children and some

8    complaints about mental health.

9            But I am asking you to identify

10   specifically what actions the Plaintiffs took

11   leading up to the March 17th Settlement

12   Agreement, the specific acts which constituted

13   extortion?

14           MR. HARRISON:  So to be clear we

15      have covered this, but you are asking

16      him to answer it again?

17           MR. BEAL:  Yes, I am asking for

18      the specific acts.  I just need a list

19      of them.

20           MR. HARRISON:  And you are going

21      to let him give an answer?

22           MR. BEAL:  I am all set.

23           MR. HARRISON:  Okay.

24           THE WITNESS:  Well, number 1, I

25      have answered this question.

1    BY MR. BEAL:

2         Q      Right.

3         A      So I refer you and I would incorporate

4    the answer I previously gave you into what I say

5    now.

6         Q      Okay.

7         A      Which will be in addition potentially.

8                It is not a matter of acts.  It is not

9    you act to extort.  You can say something.  You

10   can take a position.  I know here that Johnathan

11   I believe was involved with Dr. Phil; certainly

12   Taylor Wilson was in trying to have Dr. Phil

13   come in and do a mental health intervention.

14               I remember Matt wrote him and said we

15   have got too much to lose without Dr. Phil, what

16   did they have to lose?  They never even dealt

17   with Dr. Phil.  I know what Dr. Phil was doing,

18   and they were involved in it, at least Taylor

19   was.  And Johnathan was going around telling me

20   and my children confirming that somehow I needed

21   to go into regular mental healthcare, monthly

22   treatment.  Johnathan even said you need to be

23   on Lithium.  I ain't getting on Lithium.  There

24   are people who need it.

25               And my son said the same thing a month



1    before, Lithium.  It was a concerted effort to
2    try to attack me on my mental health.  It is a
3    classic psychological operation.  The State Bar
4    was part of it later.  I am sorry my children
5    were involved.  I think I know how they got
6    involved.  Time will tell.
7            But that was one part of it.  You got a
8    guy that is in your law office, I don't know who
9    else he is saying it to; but he is questioning
10   my mental health, where I have got clients, I
11   have got Richard Jewell and I have got my family
12   involved.  What is he doing that for?
13           It was I said a pattern of extortion,
14   because I am sitting there going well, am I
15   going to shut this guy up by just getting rid of
16   him and paying him, or I am not going to let him
17   go our and continue doing this, have it get
18   worse, and have it impact my family more than it
19   already has, and my clients more than it already
20   has.  I got five by Nicholas Sandmann, and then
21   obviously hopefully down the road when things
22   get right in this country, and I believe they
23   will in due time.  Then I will be able to renew
24   my efforts with President Trump to get Richard
25   Jewell the Presidential Medal of Freedom.



1      Q     So the first category of actions that
2  you referred to efforts is Johnathan and Taylor
3  contacting Dr. Phil seeking an intervention or
4  discussion about your mental health?
5      A     I didn't say they contacted Dr. Phil
6  for that purpose.  I know now that it is
7  documented that they were talking to Dr. Phil.
8      Q     But at the time you didn't know --
9      A     It was enough that just running around
10 saying it, period.  They had no right to say it.
11 They had no medical training.  They had no
12 psychological training.  They were just making
13 it up and accusing me of something that was not
14 true, which they admitted in March 17th was not
15 true when they said I was mentally competent in
16 all respects.
17     Q     Who were they saying it to that you are
18 aware of?
19     A     I don't know.  I know they were saying
20 it to my children.  I know they were saying it
21 to each other.  I know they were saying it to
22 me.  I know that probably other people heard it.
23           I don't know who else they said it to.
24     Q     How did you know they were saying it to
25 your kids?



1      A     Because they told me.  Johnathan and

2    Taylor told me they talked to them.  There was

3    this big powwow where they were all concerned

4    about me.  It was nonsense.  They were making it

5    up out of whole cloth.

6            It is a typical psychological operation

7    to attack the target by attacking their mental

8    health.  Study psychological operations.

9            It just didn't work because my mental

10   health is fine.

11     Q     Okay.

12           Next, action, words, or series of

13   actions that constituted extortion by the

14   Plaintiffs leading up to this March 17th

15   agreement besides that whole category, is there

16   anything else?

17     A     I have told you everything in my first

18   time I answered it.  I think I have added some

19   more specifics in.

20           It is just this simple, they were

21   threatening my family with their comments.  They

22   were threatening my clients with their comments.

23   They were threatening Richard Jewell with their

24   comments; and their comments were fake.  It was

25   false.  They have admitted that themselves in



1    the March 17th Settlement Agreement.

2            And I think they were doing it to try

3    to pressure me into paying them more than they

4    deserved in a situation where they had made the

5    mistake of not getting an agreement on the fee

6    division before the Sandmann case settled.

7    Historically we always did.  So I think they

8    were doing it to extort me, to force me to pay

9    them more than they deserve.

10           I gave in.  I agreed to it in March

11   17th.

12       Q    Okay, all right.

13       A    And then Nicholas doesn't consent and

14   you saw the letter from --

15       Q    Okay.

16       A    From Chris Marquardt.  And then the

17   next thing I know you send me this Complaint.

18       Q    Now, we are getting onto something

19   else.

20       A    You send me this Complaint.  Shame on

21   you.

22       Q    We are talking about March 17.

23       A    Questioning my faith in my children.

24   It is extortion.

25       Q    And how do you know that the Plaintiffs



1    were speaking to your clients about mental

2    health issues?

3              MR. HARRISON:  Object to the form.

4       I don't think he said that.

5              MR. BEAL:  I thought you said

6       saying it to me, saying it to my

7       clients.

8              THE WITNESS:  They were saying it

9       to me.

10   BY MR. BEAL:

11        Q    Okay.

12        A    They were saying it to my children.

13        Q    Okay.

14        A    I don't know who else they were saying

15   it to.

16        Q    Okay.

17        A    But I have got concerns they may be

18   saying to it other people, or what they were

19   saying to the people they did say it to.  It

20   could be leaked out into the public discussion.

21   I mean there is no privacy.  Everything you say

22   on your phone, your Email's, and your texts is

23   captured in the air.  So you don't know who is

24   going to get it, and what they are going to do

25   with it.



1          So you don't make baseless accusations
2     about somebody, because you don't know who is
3     going to get it and how they may try to use it
4     to hurt you.  Study about cell phones and
5     Email's and texts, and how they are in the air
6     and they capture it, Palentir.
7          They shouldn't have been doing it, that
8     is my point.
9               (Whereupon, Plaintiff's Exhibit
10              Number 17 was marked for
11              identification.)
12    BY MR. BEAL:
13       Q    Let me hand you what I will purport to
14    you was the Answer that you filed in this case,
15    which is Exhibit 17.
16       A    I will accept your representation.  It
17    is marked.
18       Q    And can you grab the Complaint?
19            MR. HARRISON:  14?
20            MR. BEAL:  Which is 14.
21    BY MR. BEAL:
22       Q    And if you turn over to your Answer
23    number 36.
24            MR. HARRISON:  The Answer is 17,
25        is that right?

1                MR. BEAL:  Yes.

2                THE WITNESS:  So you want me to

3        look at paragraph 36.

4     BY MR. BEAL:

5        Q     Can you explain the basis for your

6     denial in paragraph 36.  And I will read to you

7     the averment in paragraph 36.

8        A     Hold on.  Let me have a chance to make

9     sure I understand it.

10               MR. HARRISON:  While he is reading

11        it to the extent that any decisions

12        about responses or denials were made by

13        Counsel.

14               THE WITNESS:  Well, I can tell you

15        they hadn't offered any concession on

16        the amounts previously agreed on

17        February 17th.  They had no agreement.

18        They had no leverage.  They didn't get

19        a written agreement.  They were

20        literally at my mercy.  I could have

21        said you are only going to get quantum

22        meruit, good luck.

23               But I made the deal in terms of

24        coming to an agreement as to the

25        amounts for all other things to be



1        resolved, which ultimately was done by

2        Birdie and Mark Watt and you, and that

3        was the March 17th agreement.

4   BY MR. BEAL:

5        Q    So the basis of the denial in paragraph

6   36 was you didn't believe that there had been an

7   agreement reached on February 17th regarding

8   splitting the fees?

9        A    That is not what I said at all.  You

10  are not listening.

11       Q    Okay.

12       A    I said that it looks like here that

13  during the conversation Plaintiffs offered

14  concessions on the amounts previously agreed.

15  Where was the previous agreement?  And what

16  concessions did they offer?  I know of none.

17  They had nothing to offer me.  They could either

18  get me to agree, and I think they extorted me

19  into it to pay them what they had not gotten an

20  agreement on, after the fact; or they could get

21  quantum meruit.  They had nothing to concede.

22            It is like they are claiming they had a

23  right to a fee that they did not have a right

24  to.  They had a right to quantum meruit, because

25  they did not get a written agreement on how to



1    split up a contingency; and then they wanted

2    35 percent.  35 percent.

3          Well, if I know what the case is

4    settled for, it is nice to be able to settle, I

5    will take 35 percent of that.  It might not have

6    been that much if we had reached it before.  It

7    was not their fault any more than it was mine

8    that the Sandmann case for some reason was an

9    exception to the rule that had always been in

10   place.  We always confirmed at the time they got

11   involved what their respective corporations

12   would receive on a contingency fee split.  That

13   didn't happen in Sandmann.

14         And then their demand came after the

15   case had settled, and it came after two or three

16   very trying months where these people treated me

17   horribly.

18         Q    Okay.

19         A    I was not happy with them.  But I would

20   have paid them quantum meruit.

21              MR. BEAL:  I am going to object.

22              THE WITNESS:  They just kept

23      trying to get more money.

24   BY MR. BEAL:

25         Q    Paragraph 37, can you explain the basis



1   for your denial there?

2        A    Well, I am telling you what I do.  I

3   can't speak for my lawyer.

4             MR. HARRISON:  The same statement

5        as before, Drew.  I don't know if you

6        want me to keep repeating it.

7             MR. BEAL:  You don't have to.

8             THE WITNESS:  You want me to read

9        38?

10  BY MR. BEAL:

11       Q    37.

12       A    To the extent that we had that

13  conversation, Taylor sent me an Email to

14  document it.  And I told you that I was also

15  trying to ferret out what these people were

16  really up to.  Were they really looking for

17  fairness, or were they looking to take advantage

18  of my largesse.  That is why I said what do you

19  think is fair?  35 percent.  I said I will give

20  you 50, is that fair?  Yeah, that is fair; which

21  shows that is what was fair to them was as much

22  as they could get.

23       Q    Okay.

24       A    So I said that I documented the

25  discussions we had, Taylor did it.  But the



1    agreement was not complete until March the 17th.

2    Yeah, March the 17th.  We had other issues to be

3    resolved; but I lived up to the percentages that

4    we discussed on the 17th in the March 17th

5    agreement.

6        Q    So let me direct your attention back to

7    paragraph 35 of the Complaint.

8        A    Okay.

9        Q    And so paragraph 35 says:  On

10   February 17th shortly following these threats

11   the parties reached an agreement for the

12   allocation of all fees earned, but not yet

13   collected by LLW, PC on those cases which had

14   already resolved.

15       A    Yes, they had resolved.

16       Q    And then on paragraph 36 says that the

17   parties reached an agreement, which you denied?

18       A    I did not.

19       Q    Paragraph 37 says:  The parties

20   subsequently documented their agreement via

21   Email.

22            And my question to you is why did you

23   deny that paragraph?  Didn't we --

24       A    Which one is it you want me to --

25       Q    37.



1        A     First it was 35.  Which one do you want

2    me to look at?  37?  The parties subsequently

3    documented their agreement via Email, the

4    February 17th agreement.  And that was denied.

5              Because that was not the agreement, and

6    if we just simply admit that then you will be

7    going the agreement was February 17th.  That is

8    not the agreement.  There were other issues that

9    had to be resolved, including the very

10   significant issue of their liability for 3/4th's

11   of the office space.

12             So you are trying to make that the

13   agreement.  The agreement was March 17th, and

14   the March 17th agreement had an integration

15   clause, that all prior agreements, all prior

16   discussions merged into the March 17th

17   agreement, which was the governing agreement,

18   which you don't want to be governed by.

19       Q     On paragraph 35 it defines what we are

20   talking about, which is an agreement for the

21   allocation of all fees earned, but not yet

22   collected by L. Lin Wood, P.C. on those cases,

23   which had already resolved --

24       A     I --

25       Q     Can I finish my question?



1      A     Yeah, but you are just beating the same

2    horse.  I thought you are in a hurry to get the

3    testimony.

4      Q     That paragraph does not refer to any

5    other agreements about rent or anything.  It

6    only talks about allocation of fees on a series

7    of cases; and you have denied that subsequently

8    saying no, that is not true.

9      A     I didn't say that.

10           Listen, I think you have been

11   practicing law long enough to know that your

12   lawyer makes a decision in admitting and denying

13   very carefully, because you don't want to over

14   admit; and if there is some concern about it,

15   you will deny and hold you to the proof.  Chris

16   prepared the Answer.  I went through it with

17   him.

18           The decision was his to make ultimately

19   on how to respond.  I have not denied that there

20   was an allocation agreement, although I was

21   getting really to let them litigate it with me;

22   but then I decided not to and put those amounts

23   in the agreement.  So the allocation that we

24   discussed, and Taylor confirmed in his Email of

25   February 17th, all of which was done after they



1    had left the office.  They were no longer my

2    office sharing partner.  It was in the

3    March 17th agreement.  What is the problem?

4        Q    Okay, look over at paragraph 41.

5        A    I see you want to go through the

6    Complaint.  Okay, paragraph 41.

7        Q    Paragraph 41 and explain --

8        A    It says just what I said.

9        Q    And March 17, 2020 after negotiations

10   by lawyers for each side the parties executed a

11   formal written Settlement Agreement, the

12   March 17th agreement, in which they agreed to

13   the exact same fee split set forth in the

14   February 17th agreement; but Plaintiffs agreed

15   to contribute $285,000 from the fees owed to

16   them to buy out a portion of LLW, PC's lease,

17   among other things.

18       A    I deny it.

19       Q    Right.  And --

20       A    They were not buying out a portion of

21   my lease.  They were paying their share of their

22   lease.  And you talked to the lawyer.  You know

23   the lawyer for the landlord, he said they owe

24   75 percent.

25       Q    And so that was the basis for your



1    denial?

2         A    The way you worded this, it was not --
3    and I am assuming Chris made the decision, but I
4    am sure I would have looked over and my reaction
5    to it looking here is it does not correctly
6    address the $285,000.

7         Q    Okay.  Can you --

8         A    They weren't buying out a portion of my
9    lease.  They were paying their share of the
10   lease.

11        Q    Can you look at paragraph 44.

12             Take a look at that paragraph and
13   explain your denial on that one.

14        A    I am not really sure I understand what
15   44 is saying.  In late July 2020 the initial
16   payments -- no, they weren't due then.  The
17   initial payments under the other cases, those
18   payments were due.  But they weren't due in
19   terms of actually paying them until I was able
20   to get the $285,000.

21             Their share of the Carbone case and the
22   Lindsey case did not -- did not total at -- it
23   was not the 285,000.  So they weren't going to
24   be due any payment until -- they were due the
25   payments from those people, but I was holding it



1    to pay their share of the lease.  So maybe that

2    is why it is denied.  I mean it is hard to come

3    back here today and tell you what is admitted or

4    denied, but it seems to be an exercise of waste

5    of time.

6              MR. HARRISON:  I can tell you why

7         it is denied, if you want me to, or I

8         won't.

9    BY MR. BEAL:

10        Q    Did you have an opportunity --

11             THE WITNESS:  Do you mind telling

12        him so I can hear it?  You prepared the

13        Answer.

14   BY MR. BEAL:

15        Q    Did you have a chance to look over this

16   document before you filed it?

17        A    Let's take a break.  I want to find out

18   what my lawyer wants to tell you that you don't

19   want to hear and then I will tell you.

20        Q    No, no, no.  There is a question on the

21   table.  You have to answer the question.

22             MR. HARRISON:  One question, did

23        you get a chance to review this before

24        we filed it?

25             THE WITNESS:  Absolutely.  I



1        looked at it with you, Chris.  He is a

2        good lawyer.

3    BY MR. BEAL:

4        Q    Good, so let's look at paragraph 46.

5        A    Now I want to take a break and confer

6    with my Counsel, so he can tell me what you

7    don't want to hear and I will tell it to myself.

8             MR. BEAL:  I will object to you

9        leaving the room under the

10       circumstances.

11            THE WITNESS:  You are not the

12       Judge.

13            MR. HARRISON:  Well, I am offering

14       to clarify the reason for the denial if

15       you want to in the Answer --

16            MR. BEAL:  Okay, well, you can

17       clarify it.  Go for it, please.

18            MR. HARRISON:  It says Defendant

19       Wood and LLW, PC, I don't think that is

20       correct.

21            THE WITNESS:  Thank you, that

22       refreshes me.

23            So if you don't mind, Chris.

24            MR. HARRISON:  Hang on a second.

25                (Whereupon, an off-the-record



1           discussion was held.)

2           MR. HARRISON:  Do you want to ask

3      a question or do you want to make a

4      statement?

5           MR. BEAL:  You can make your

6      statement.

7           MR. HARRISON:  I believe it was

8      denied because it says came due from

9      Defendant Wood and LLW, PC.  I don't

10      think that is correct as to who it was

11      coming due from --

12           MR. BEAL:  Only from the PC?

13           MR. HARRISON:  Yes.

14           MR. BEAL:  Got it.

15           MR. HARRISON:  Yes.

16           MR. BEAL:  Okay, thank you.

17           THE WITNESS:  Lin Wood

18      individually does not owe them a dime

19      on the fee.

20           MR. HARRISON:  Right, we got it.

21           THE WITNESS:  It is PC only.

22  BY MR. BEAL:

23      Q    Let us look at paragraph 46.  Let us

24   take a second to read that.

25      A    Okay, I have read it.



1      Q    And is it true that the statement there
2  in paragraph 46 that you have not disclosed the
3  amount of the recovery in the Sandmann versus
4  Washington Post?
5      A    I never received a demand or a request
6  for that amount.  And that would have been an
7  event that occurred after Joey Burby and Chris
8  Marquardt were involved and you were involved;
9  and I don't know whether Joey and Chris got a
10  demand or a request from you about that or not.
11  I don't think they did.
12      Q    Can we refer over to paragraph 49; and
13  there is a text embedded there in paragraph 49.
14           Can you tell us who that text was being
15  sent to?
16      A    It was not sent to -- it was not
17  intended to be sent to Johnathan.  And sitting
18  here today -- I mean what is the date of the
19  text?
20           I don't see a date.  So I don't know
21  who that I am intending to send it to.  It would
22  probably be better if I knew the time that I
23  sent it.  I was dealing with issues about my
24  computer being hacked.
25           MR. HARRISON:  Lin, I believe it



1      is supposed to be July 26, 2020, if you

2      look at 48.

3              THE WITNESS:  July the 26th, 2020?

4              MR. HARRISON:  Is that correct,

5      Drew?

6              MR. BEAL:  I think so.

7              THE WITNESS:  July the 6th?

8              MR. HARRISON:  26.

9              THE WITNESS:  July the 26th of

10     2020?

11             Well, it wouldn't have been

12     intended to be sent to Johnathan

13     because he had a lawyer.

14             So I could have been sending it to

15     my lawyer.  I could have been sending

16     it to somebody who I was working with.

17             I have no idea who I intended to

18     send it to.

19     BY MR. BEAL:

20     Q    Okay.  Let us look at paragraph 58 over

21     on page 16.

22             And can you explain your denial of

23     paragraph 58?

24     A    Yeah.  I didn't agree to pay him

25     anything.  The fee splits were L. Lin Wood, P.C.


**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

1    That was a very important distinction and Joey

2    and Chris knew it, you knew it.  The fee split

3    payments were from L. Lin Wood, P.C. only.  So

4    Wood individually didn't agree to pay him a dime

5    on the fee splits.

6        Q    Okay.  Can you refer over to paragraphs

7    79 and 80, and they are related so I am just

8    lumping them together.

9            If you can tell me the basis for your

10   denial there?

11       A    79 and 80?

12       Q    Yes.

13       A    I don't know.  I can't as I sit here

14   why the denial was done.  I know I did it in

15   discussions with Chris.

16       Q    Okay.

17       A    What I can tell you is that I don't

18   believe the numbers of subscribers on Telegram.

19   I think they are manufactured.  I don't think

20   you can trust it, just like you can't trust

21   receiving something from someone on Telegram

22   because you don't know whether it is artificial

23   intelligence or a bot or a shield or a

24   propagandist.

25           So I do know that I had the channel



1    "Lin Wood Speaks Truth".  I don't remember it
2    having the Number 660,000.  But at some point it
3    did.  I know it started off at 980.  And down
4    substantially from the number of subscribers he
5    had previously while defaming Plaintiffs, I
6    don't know if that is true or not; so I think we
7    took the safe option of denying it.
8        Q    Okay.
9        A    And then the second channel, that
10   channel was not mine.  The reply channel was in
11   the name of another individual who was going to
12   look at the replies to be able to edit them,
13   because people put pornography and obscene
14   things on there.  And if you don't have someone
15   monitoring it and get them off quickly, they
16   will use it as an excuse to close your channel.
17   I don't remember if she was doing the channel in
18   March of '22 or not.  I haven't gone back to
19   look.
20        But again I do know that the channel
21   says it is for Lin Wood followers to be able to
22   reply to him with words of support, love and
23   encouragement.  I can't tell you why.  It may
24   just be because of the numbers.  I can't tell
25   you why it was denied.  It wasn't denied in bad


**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

1    faith.

2        Q    Who was the person who monitored this

3    response channel?

4        A    I should have known you would ask me

5    that.  The first name is Margaret, and I can't

6    remember her last name.

7        Q    And who does she work for?

8        A    I don't think at the time that I knew

9    Margaret.  I don't know that she worked for

10   anybody.  She did -- she did voiceovers for ads,

11   and I met her at the church that I was

12   previously attending.

13       Q    Here in South Carolina?

14       A    Yes.

15       Q    And do you know what kind of computer

16   background or anything she had?

17       A    No.

18       Q    Did you ask her to monitor the channel,

19   or did she volunteer?  Or how did that come

20   about?

21       A    One of the two.  I think she

22   volunteered.  She was very kind at the time and

23   seemed to want to be helpful.  Ultimately I

24   found out it was not a good idea to have her do

25   it, and we switched to somebody else.  Now we



1    got some other people doing it.  It is not

2    rocket science.  You just go in and try to

3    delete spam, profanity, pornography, clear

4    propaganda.  What appears to be an artificial

5    intelligence bot.

6             So it doesn't take a computer

7    background to be able to monitor the Telegram

8    channel.  But it takes time, and the people give

9    it to me willingly; and I am incredibly thankful

10   for what they do.

11       Q    So the response channel posts come from

12   people -- from outsiders or from you?

13       A    So I post on my main channel.

14       Q    Right.

15       A    Elizabeth set up the reply channel.

16       Q    You mean Margaret?

17       A    Margaret -- no, Elizabeth.

18            MR. HARRISON:  The name you gave

19       earlier was Margaret.

20            THE WITNESS:  I messed that up.

21       It was Elizabeth.

22            MR. HARRISON:  No problem.

23            THE WITNESS:  When I put something

24       on my main channel, she would send it

25       to the reply channel that she had set



1       up.  When I stopped using her I just
2       started posting it and sending it to
3       the reply channel myself; and then the
4       monitors monitor what is posted on
5       there by the third parties or
6       artificial intelligence or bots or
7       whoever, a lot of spam.
8   BY MR. BEAL:
9       Q    Hold on one second.
10           Is there a reason why you didn't just
11   have the responses posted to the main channel?
12       A    Because then it would -- when I first
13   set up the main channel it was set up for
14   responses to be made there; and then I quickly
15   realized that Telegram, because they sent things
16   in, you have got pornography or something on
17   your channel, and either monitor it or get it
18   off or you are going to lose your channel.
19       Q    I got you.
20       A    I didn't buy into -- some people just
21   post and don't allow replies.
22       Q    I see.  That is what you were
23   explaining before?
24       A    I haven't done that.  And there are so
25   many people, legitimate people that follow me, a



1    lot of people all over the world, because I talk

2    about God a lot.

3            And so I wanted to keep their ability

4    to reply and to have a chat channel which I

5    added, so they could have conversations with

6    each other, and that is monitored now by a group

7    of very nice people.

8    Q      On paragraphs 103 and 4?

9    A      Okay.

10   Q      There were denials for both of those

11   paragraphs.

12           What was the basis of those denials?

13   A      I will do the best I can; but I think

14   it is unfair to continually ask me the basis

15   when the Answer was prepared in conjunction with

16   my lawyer who prepared the Answer.  So he may

17   have made a decision for reasons I don't really

18   know about.

19           So what were the numbers again.

20   Q      103 and 104?

21   A      I imagine in 103 would be denied

22   because I did not -- I stated my opinion.  I

23   really don't know.

24           I could confer with Counsel and try to

25   answer it, but then you will be getting my



1    attorney's advice.  I didn't prepare the Answer.
2    I did it in conjunction with Chris.
3              But I do know that I did make the
4    statement repeatedly and not that many times,
5    but I made it enough to put my position in a
6    Court of public opinion that in my belief they
7    had extorted me and attempted to extort me and
8    that I believed 100 percent that I am right.
9        Q    Thank you.
10       A    There is not a doubt in my mind.
11       Q    In paragraph 104 you did say that you
12   were considering whether to pursue criminal
13   action against the Plaintiffs?
14       A    I would have to look at the posts where
15   that came from.
16       Q    We can do that in just a minute.
17       A    I mean I thought about it, but I just
18   thought wait a minute, this foolishness has got
19   to end at some point in time.  So I just didn't
20   want to take another step further.  I would like
21   to get this -- I would like to have this
22   resolved in some way with these people, so they
23   can go about their lives, I can go about mine;
24   the same thing I tried to do in March 17 of
25   2020.



1      Q     But you believed that you have the
2   right to pursue criminal action against the
3   Plaintiffs?
4      A     I could go -- yeah, I believe under the
5   facts that I could go out and sign a warrant for
6   having them try to criminally extort me, but
7   what is that going to do?
8      Q     So in paragraph 105 on the next page
9   you refer to the filing a grievance against the
10   Plaintiffs with the State Bar of Georgia.
11         Did you in fact file a grievance or
12   complaint with the State Bar of Georgia against
13   any of the Plaintiffs regarding your belief --
14   regarding extortion?
15      A     I believe so.
16      Q     What was Nicole Wade doing during all
17   of this dispute where you believe leading up to
18   March 17th on Taylor and Johnathan were
19   contacting your children improperly --
20      A     I said they were talking with them.  I
21   don't know who initiated the contacts.
22      Q     But was Nicole a part of any of that in
23   your belief?
24      A     My recollection, and I have a very
25   vivid recollection of having Johnathan and



1   Taylor in my office standing; and Nicole was

2   sitting in the chair and this was after all this

3   bizarre change of treatment of me that started

4   late October and was full blown in November.

5   And I remember looking at them at some point and

6   I said I ought to sue every damn one of you for

7   defamation for running around and running your

8   mouth and making an accusation about my mental

9   health.  And Nicole quickly said I have never

10  said that.  And I said to her right, you are too

11  smart to have done that.  These two people are

12  not.

13      Q    So --

14      A    I also remember, and I think I sent

15  it -- Nicole sent me and -- I think it -- I have

16  to go back and look, but I believe that it was

17  right around -- well, it was January for sure

18  and it could have been very early February, and

19  she said I just found out about the problems you

20  are having with your family.  I know -- because

21  she knows how much I love my children and they

22  love me -- I said I know that tears you apart.

23  It did.  It still does.

24           And then she said words to the effect,

25  that I still love you or I will always love you



**COASTAL COURT REPORTING & VIDEO SERVICES**
                    800-791-1100        www.coastalcourt.com

1    no matter what happens in terms of how we

2    practice law in the future; and I believed her.

3    And I said today I believe her now.  I think

4    Nicole Wade does love me.  Her love for me over

5    the years is legitimate as is mine for her.  I

6    think Johnathan loves me.  I think Taylor loves

7    me.  I love them.

8           But she was not in the middle of what

9    was going on in December.  I don't remember if

10   it was because she wasn't there.  I don't

11   recall.

12          But she was not one of the people who

13   was being so abusive to me and contradicting me

14   and acting like I did not know what I was doing

15   in preparation for the Musk trial.  So her

16   involvement in that was much different than

17   Johnathan and Taylor's.

18      Q    Okay.  So my question to you is about

19   Nicole Wade in this time period leading up to

20   the March 17th Settlement Agreement, do you

21   believe that she extorted you as well?  Or was

22   it just Johnathan and Taylor?

23      A    I think they all three did.  You were

24   asking me about the children.

25      Q    Yes.



1       A     They all three were trying to get money
2    they did not have the right to.  They did not
3    get an agreement.  That is as much their fault
4    as it would have been mine.
5              And then after the case settled and
6    they knew the amount, then they wanted to go
7    back and get the same amount that I had agreed
8    to give them in the Ramsey case, and after the
9    way they had treated me and looking at the work
10   done related to the result and how it came
11   about, the case didn't settle because of them,
12   it settled because of the argument that I made
13   to the Judge when he reversed himself and
14   reinstated part of the case.  I didn't feel like
15   looking at that that was at all fair for them to
16   get that much money, but I agreed to it.  I
17   wanted to move on.  March the 17th.
18             MR. BEAL:  Is this is a good place
19      for a break for five minutes?
20             MR. HARRISON:  Sure.
21             (Whereupon, a short break was
22                taken.)
23             MR. BEAL:  Did you have a
24      statement your client wanted to make?
25             THE WITNESS:  You asked me, Drew,



1     about paragraph 79 and 80 of the

2     Complaint and why I denied them.

3           MR. BEAL:  Okay.

4           THE WITNESS:  I was struggling to

5     figure out looking at it.  Now I know.

6     79 says that I had a certain amount of

7     followers while defaming Plaintiffs.  I

8     did not defame them.

9  BY MR. BEAL:

10     Q   Okay.

11     A   80 has the same problem, but it dropped

12  in number connected to 79, which suggested that

13  I was defaming them; and I don't believe I

14  defamed them.  I believe my statements were

15  protected and substantially true.

16           Thank you.

17           MR. HARRISON:  Thank you, Drew.

18           MR. BEAL:  Thank you.

19              (Whereupon, Plaintiff's Exhibit

20              Number 18 was marked for

21              identification.)

22              (Whereupon, Plaintiff's Exhibit

23              Number 19 was marked for

24              identification.)

25  BY MR. BEAL:



1      Q    Let me hand you what has been marked as

2    Exhibits 18 and 19, and unfortunately I only

3    have a copy of the 19.  18 is our

4    Interrogatories, First Set of Interrogatories,

5    and 19 is the Response.

6           And I direct your attention, and I will

7    read it into the record so you don't need it,

8    Chris.  Question number 9 on page 7,

9    Interrogatory Number 9 says:  Please identify

10   each and every act done by you or on your behalf

11   to investigate whether the Plaintiffs or any of

12   them had committed the crime of extortion,

13   attempted extortion or blackmail.

14          Now, directing your attention to 19 on

15   page 3, paragraph 9, you responded.

16          MR. HARRISON:  These are Amended

17      Responses, right?

18          MR. BEAL:  Yes.

19          MR. HARRISON:  Okay.

20          THE WITNESS:  Okay.

21   BY MR. BEAL:

22      Q    And you state that you had your

23   computer inspected by Tyler Jones in February of

24   2020, is that correct?

25      A    Yes.



1          Q     And does he work for Carmichael?

2          A     Yes.

3                (Whereupon, Plaintiff's Exhibit

4                Number 20 was marked for

5                identification.)

6     BY MR. BEAL:

7          Q     And let me hand you Exhibit 20, and is

8      that an invoice that he generated for his

9      computer search of your computer?  That didn't

10     come out right, but you know what I meant.

11               MR. HARRISON:  Is it three pages?

12               MR. BEAL:  Yes.

13               MR. HARRISON:  Let me look through

14        that.

15               THE WITNESS:  Okay.

16     BY MR. BEAL:

17         Q     And did Tyler Jones ever tell you that

18     he found on -- some Malware or some evidence of

19     computer hacking?

20         A     He didn't tell me Malware.  But he told

21     me that I had been hacked.  And the way the

22     question was asked me was whether I had done

23     anything to investigate whether they, the

24     Plaintiffs might have been involved.  And

25     because I was looking at who if I could find had



1   my computer been hacked, the answer was yes.  So

2   I was doing an investigation.  But I wanted to

3   make sure that that was part of it; and that

4   investigation may have revealed that they had

5   involvement.

6        Q    Well, did it in fact reveal that the

7   Plaintiffs were somehow involved in tampering

8   with your computer or computer systems?

9        A    I didn't reach that.  I didn't take

10  that next step.  Once I had documented that it

11  had been hacked, that is what I wanted to

12  document.

13       Q    So you never asked Mr. Jones to try to

14  determine where the hack came from?

15       A    I only asked him to determine whether

16  it had been hacked.  In the process of

17  determining that he was able to find out how and

18  who hacked it, great.  My goal was at that time

19  was to take what I had happen on the computer,

20  let him do his examination and he determined

21  that the computer had been hacked; and that was

22  on or around the time frame of February 17th.

23       Q    And it is your testimony that you hired

24  this Carmichael Company, Tyler Jones, to

25  investigate your computer network; and he



1    determined that you had in fact been hacked?

2        A    Yes.  And Tyler was our computer

3    expert, or he was doing our IT work for L. Lin

4    Wood, P.C.  He had done some things in terms of

5    Johnathan's computer earlier.

6        Q    I apologize if we are re-plowing some

7    ground we have been over, but this will save us

8    a lot of time rather than use any exhibits.

9             I believe you testified to this, but

10   let us just make it abundantly clear, in the

11   case of Carbone versus Lindsey you had no

12   agreement with them at any time that you can

13   remember about client consent to fee sharing

14   with all the Plaintiffs here?

15       A    I can't remember exactly what I told

16   you in response to what question; but I do

17   believe that there was no agreement that

18   referenced these, Nicole, Johnathan, and Taylor.

19       Q    Okay.

20       A    There may have been in those agreements

21   a statement that I could divide -- that they

22   agreed that I had the authority to divide the

23   fee any way I wanted to, and they would agree to

24   it.

25       Q    When you received the Sandmann --


**COASTAL COURT REPORTING & VIDEO SERVICES**
              800-791-1100      www.coastalcourt.com

1      A     But I would have to look at the
2  agreement, but I think that may have been it.  I
3  think it was in both of those.
4      Q     When you received the --
5      A     Sandmann?
6      Q     Well, we saw the Carbone agreement, and
7  there was no reference to them.
8      A     I don't have it.
9            You are talking about the Settlement
10  Statement.
11      Q     Yes.
12      A     I am talking about the engagement
13  agreement.
14      Q     Oh, okay, thank you.
15            When you received the Sandmann versus
16  CNN fees from Mr. McMurtry's escrow account, and
17  I assume that is how it got to you, was because
18  it went through his escrow account first and
19  came to you, is that correct?
20      A     Oh yeah, he closed it.
21      Q     Yes.
22      A     Once the probate judge's hearing was
23  postponed, I did not have any contact with Todd
24  until after the money was received and he
25  disbursed it, except for him to tell me that



1    they had, he and CNN had agreed to wait until
2    Nicholas turned 18.  So that Nicholas could then
3    sign without having to go through a probate, and
4    which would also have had to have been approved
5    by the federal judge I take it from what Todd
6    told me that CNN was willing to wait, so it
7    would lessen the chance of there being any
8    breach of the confidentiality.  But Todd handled
9    all of that.  I did not do anything at all.
10        Q    And when you received your portion of
11   those fees, where did you deposit that check?
12        A    I would have to go look.  Either in my
13   personal account or --
14                  (Whereupon, a short pause was
15                  taken.)
16   BY MR. BEAL:
17        Q    So my question was where did that money
18   from Todd McMurtry get deposited and you said?
19        A    I haven't looked at that, but it would
20   either have been into my escrow account or into
21   my operating account, PC's account; or the only
22   other option would be for it to be deposited
23   directly to my account personally.
24        Q    To your personal account.  So one of
25   those three accounts?

1        A      (Nods.)

2        Q      Would it be fair to say that there is

3    no money remaining in your escrow account from

4    this Sandmann versus CNN fees?

5        A      There is no money in either of my

6    accounts.  The law firm is defunct due to this

7    litigation and the State Bar.

8        Q      So all fees --

9        A      In other words, we are broke, I thought

10   about filing bankruptcy, but I hope I can avoid

11   it.

12       Q      So all fees in the CNN versus Sandmann

13   have been taken or paid to you individually

14   ultimately?

15       A      I have to go back and look and see how

16   it was paid out.

17       Q      Okay.

18       A      It may have been paid out of my PC for

19   other things that the PC -- I don't know.

20       Q      Okay.

21       A      So you got to keep in mind there is a

22   difference between my PC and me.  That is why it

23   is only my PC that agreed to split the fee, not

24   me.

25       Q      So some amount may have been paid over



1   to the PC to reimburse it for cost advances?

2       A    You are asking me to guess and I don't

3   know.

4       Q    But I believe you testified that you

5   know that no money remains in your escrow

6   account on these fees and that that account is

7   empty?

8       A    I think that is -- if there may be some

9   amount in there to keep it open, but I don't

10  think so.  I don't know.

11      Q    Okay.

12      A    There is no Sandmann money.  That

13  Sandmann money, whatever my share was that has

14  long been spent on attorneys' fees, litigating

15  all of these things that came out of this

16  lawsuit.

17           So I didn't make any money on the deal.

18      Q    Let us go back to the Complaint, which

19  I believe is Exhibit 14.

20      A    Okay.

21      Q    Exhibit 14, let us turn over to page

22  25, which is paragraph 88.

23      A    Okay.  Is there a page number?

24      Q    Yes.  Page 45, paragraph 88, the first

25  post.



1        A     Okay.

2        Q     And it is if you look at the sort of

3    faint markings on the bottom, it is May 19,

4    2021.

5        A     Correct.

6        Q     As of May 19, 2021, what was your

7    understanding of the elements of the crime of

8    extortion?

9        A     You have asked me that before, I have

10   told you.

11            MR. HARRISON:  Object to the form.

12            THE WITNESS:  It is as simple as

13       what is extortion.  You can look that

14       up.  You know what extortion is.  I

15       have given you my best explanation.

16       And I don't know that there are

17       elements of such.  It is just an

18       overall effort of someone to coerce

19       someone wrongfully into paying

20       something or doing something that they

21       are not obligated to pay or do.

22            And if you look at this, I didn't

23       mention their names.  I gave a

24       hypothetical and said does that sound

25       like criminal extortion to you?



1       Soliciting opinions.

2    BY MR. BEAL:

3       Q    Did you really think --

4       A    No, no --

5       Q    I am on my best behavior.

6       A    Listen, I was talking about Johnathan,

7    Taylor, and Nicole because I wanted to make sure

8    that the facts upon which my opinion was based

9    were stated.  That gives it complete protection

10   under Milkevich vs. Lorraine Jones.

11      Q    Let us turn over to page 27, sorry --

12   27, there is an insert of my Email to Chris

13   Marquardt and Joey Burby of Alston & Byrd; and I

14   am going to have my Melinda who has the best

15   eyes to read it into the record because it is --

16      A    Hold on.  I was just looking for the

17   date of the Email.

18           Okay, I see it, the 28th.

19           MS. BROWN:  I think it is the 26th

20      at 9:10 p.m.

21           THE WITNESS:  I think it is

22      legible to save you the time of reading

23      it.

24           MR. BEAL:  Okay.

25   BY MR. BEAL:



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

1       Q       So this is Plaintiff's Demand sent by
2    Email by me to Chris and Joey that you contend
3    is another act of extortion, is that correct?
4       A       Well, it is part of a scheme to extort.
5       Q       Okay.  And in that demand I have set
6    forth a demand of $1.25 million, is that
7    correct?
8       A       That was part of it.  In that
9    particular, yes, you also demanded I pay their
10   share of the office lease, which would have
11   taken the demand in excess of $1.5 million.
12      Q       And that involved a buyout of all of
13   the cases that are referenced in the March 17th
14   Settlement Agreement, is that correct?
15      A       No.  Those cases had been decided in
16   the March 17th agreement.  The amounts were set
17   forth.  This was sent to me on the 26th of
18   August.  And I was told here is our proposal.
19   And I was told on the 26th at 9:10 p.m. that if
20   I didn't agree with this that the offer only
21   remained open until the next afternoon at
22   5:00 o'clock p.m.
23      Q       Okay.  So my question is --
24      A       9:10 p.m., do it by 5:00 o'clock the
25   next day or we are going to sue you.  It is



1    extortion.

2         Q    The question is about the cases that

3    are included in the 1.25 million.  It is all

4    those cases that are referenced in the

5    March 17th Settlement Agreement, right?

6         A    I don't think so because as I recall

7    there is other documents where there was some 2

8    or $300,000, I don't remember the amount, to pay

9    for other cases.  There were no other cases.

10        Q    Well, I am going to get to that.

11        A    There was an NBC case, but I got fired.

12   So I didn't have anything to do with that.

13        Q    But it did include the payout of their

14   share of CNN -- Sandmann versus CNN, is that

15   correct?

16        A    Well, with all due respect, it is hard

17   to understand what you are asking for.

18             There was litigation pending on the

19   March 17th agreement.

20        Q    Yes.

21        A    And now you are making a demand within

22   less than literally 24 hours that I pay

23   1.25 million, plus the lease, another 285, to

24   buy out what was in litigation that was

25   liquidated at 648,000.  It made no sense.  It



1    was extortion in my opinion.

2        Q    So first of all, the litigation got

3    filed after this was sent, right?  So there

4    wasn't pending litigation?  There was a threat

5    of litigation?

6        A    There was pending litigation that --

7    there was not pending litigation.  There was the

8    March 17th agreement.

9        Q    Okay.

10       A    And what came along with this was this

11   obscene Complaint that was doing nothing but

12   talking about me personally on irrelevant issues

13   to smear me, to say I thought I was God, to say

14   that I had problems with my children.

15           MR. BEAL:  I will object.

16           THE WITNESS:  The whole thing was

17       extortion in my opinion.

18   BY MR. BEAL:

19       Q    My question to you is what cases are

20   covered in this Demand?  It references all the

21   cases in the March 17th agreement, as well as

22   other things.

23       A    I don't see that.

24           MR. BEAL:  Can you read that?

25           MS. BROWN:  Sure.  It says:  Your



1        client pays my clients 1.25 million
2        immediately in satisfaction of the
3        existing claims my clients intend to
4        file, in which you have reviewed, to
5        buy them out of the existing Settlement
6        Agreement, attorneys' fees for this
7        matter and claims for defamation and
8        breach of the non-disparagement based
9        upon today's events.
10              MR. BEAL:  That is good enough.
11              THE WITNESS:  I don't know what
12       cases.  I mean this was between you and
13       Chris and Joey.
14   BY MR. BEAL:
15       Q    Right, so --
16       A    I just saw the amount, plus the 285,
17   plus the inexplicable rush to say at
18   9:00 o'clock at night, agree to this by
19   5:00 o'clock tomorrow afternoon, or we are going
20   to file this slanderous, salacious, irrelevant,
21   redundant Complaint to smear you, Mr. Wood.
22   That was trying to force me to avoid the
23   smears --
24              MR. BEAL:  I object to this.
25              THE WITNESS:  You can object if



1      you want to.

2            MR. BEAL:  This answer has nothing

3      to do with the question.  The question

4      is --

5            THE WITNESS:  I can't understand

6      the question candidly.

7   BY MR. BEAL:

8      Q    Can we identify the cases that are

9   referenced in the Settlement Agreement in

10  Exhibit 12?

11     A    Here is the problem.  Whatever they are

12  you knew.  This is your Email.  I can't get into

13  your mind.  Don't want to.  So you decide what

14  cases you were talking about.

15           MR. BEAL:  Show him Exhibit 12.

16           THE WITNESS:  I don't know how the

17     cases go from $648,000, which I think

18     you admit --

19  BY MR. BEAL:

20     Q    I am going to tell you.

21     A    You are going to testify?

22           MR. BEAL:  So there won't be much

23     question.

24           THE WITNESS:  Are you going to

25     testify or ask me questions?



1   BY MR. BEAL:

2       Q    So the cases that are referenced under

3   number 1, fee split for legal work involved

4   Carbone versus CNN, Lindsey versus Clear Zone,

5   Sandmann versus CNN, Grogan versus Aarons,

6   Cordoba et al. versus Direct TV La Liberte

7   versus Reid, is that correct?

8       A    Those were the cases that were the

9   subject matter of the March 17th Settlement

10  Agreement.

11      Q    Okay.  Then we look at paragraph B,

12  because those were the one's that had resolved

13  or were in the process of resolving -- whoops,

14  sorry -- paragraph D with respect to the pending

15  Sandmann versus Washington Post and Sandmann

16  versus CNN --

17      A    No, NBC.

18           MR. HARRISON:  NBCUniversal.

19           MR. BEAL:  Sorry.

20           THE WITNESS:  There is no real

21      difference.

22  BY MR. BEAL:

23      Q    Versus NBCUniversal.  L. Lin Wood, PC

24  shall pay to WGW and its members 10 percent of

25  L. Lin Wood, P.C. contractual portion of any



1    contingency fee received by L. Lin Wood, PC in

2    connection with those cases.

3              So the demand related to all of these

4    cases, plus the Sandmann versus Washington Post

5    case?

6        A    How did you come up with the figure?

7    You didn't ask anybody what the Washington Post

8    settled for.

9        Q    Don't ask me questions.

10             It is a simple question?

11       A    Let me answer, and I have been patient

12   with you, Drew, this makes no sense to me, I

13   have told you that I don't know what you are

14   talking about.

15       Q    Okay.

16       A    Claims for defamation August of 2020.

17       Q    Okay.

18       A    That would have been I guess referring

19   to what I said to Dexter King and to co-Counsel

20   in the class action case, those were not viable

21   claims of defamation because they were made with

22   privilege.  And you published them in your own

23   lawsuit.

24             MR. BEAL:  I am going to object.

25   Now this is the same speech we have



**COASTAL COURT REPORTING & VIDEO SERVICES**
                    800-791-1100      www.coastalcourt.com

1       heard.  It is a simple question.

2             THE WITNESS:  I have been patient

3       with you and I don't understand you

4       getting to try to get me to figure out

5       what your Email means.

6    BY MR. BEAL:

7       Q     I am trying to get you to identify what

8    cases are referred to in the Settlement

9    Agreement?

10      A     I have told you that.  It is right here

11   in writing.  Why are we taking time to tell you

12   what is right in front of you.

13      Q     Okay.  So it is all of those fees.  It

14   does refer to claims as set forth in the

15   attached Complaint?

16      A     And I don't have that here, but there

17   claims -- there were no claims for defamation

18   made in that Complaint.

19      Q     That is correct.  Was there a claim for

20   fraud in that Complaint?

21      A     In that Complaint?

22      Q     Yes.

23      A     There was a claim for fraud in the

24   inducement which has been released.  It was a

25   frivolous claim.



1      Q      And then there was a claim for breach
2  of contract, is that right?
3      A      Absolutely because you didn't get the
4  client to consent.
5      Q      And then there was a claim for a breach
6  of the non-disparagement agreement, is that
7  correct?
8      A      I don't recall that being in there.
9             I am not saying it is not.
10     Q      I am not trying to trick you.  It was
11  the third count?
12     A      Was it based on the press release?  The
13  press release was done after the lawsuit was
14  filed.  I don't know what you are referring to
15  about breach of non-disparagement based upon
16  today's events.  I don't know what you are
17  talking about.  But I guess you are talking
18  about disparagement that occurred sometime
19  before August 26th of 2020 at 9:10 p.m.  I don't
20  know what you are talking about.
21             MR. BEAL:  Excuse me.
22             (Whereupon, an off-the-record
23             discussion was held.)
24             MR. BEAL:  Let us take five and
25          see if we can wrap up the rest of this.



```
1              MR. HARRISON:  Okay.
2              MR. BEAL:  And we may be able to
3        do that.
4                   (Whereupon, a short break was
5                   taken.)
6    BY MR. BEAL:
7         Q    Mr. Wood, a few follow-up questions and
8    we will be all done.
9         A    Is that a promise or a threat?
10        Q    That is a promise.  So looking at the
11   August 26th Demand there was no Ad Damnum in the
12   Fulton County lawsuit, is that correct?
13        A    I don't have the lawsuit.
14        Q    So you don't remember one way or the
15   other?
16        A    I don't remember what the Ad Damnum
17   was.  I am not even sure how closely I read it
18   when I got it, because when I saw it it was for
19   fraud inducement.
20        Q    Since this demand settled all claims
21   under the March 17th Settlement Agreement --
22        A    Which Demand?
23        Q    This Demand that we are looking at here
24   on page 28 of the Complaint sent on August 26th.
25        A    I am not sure I understand you.  All
```

1    the claim were settled on March 17th.

2        Q    So the Demand that was sent to you on

3    August 26th states that it will be a settlement

4    or a buyout of -- buy them out of the existing

5    Settlement Agreement.

6            So this Demand on August 26th settled

7    all the fee split of cases referenced in the

8    Settlement Agreement?

9        A    Did you ask me is that my

10   understanding?

11       Q    Yes, is that the what the first two

12   sentences state?

13       A    It makes no sense.  We settled

14   everything on March 17th, and now you are coming

15   back and giving me less than 24 hours to --

16           MR. BEAL:  I am going to object.

17       I need a yes or no answer.

18           THE WITNESS:  It is not capable of

19       a yes or no answer.

20           MR. HARRISON:  Drew, I --

21   BY MR. BEAL:

22       Q    Let me phrase it again.  This

23   Settlement Demand of August 26th references a

24   settlement of all of the fee splits that are

25   contained in the Settlement Agreement, as well



1    as other issues?

2        A    You said for the breach of the

3    Settlement Agreement --

4             MR. HARRISON:  Hang on.  It is not

5        a question.  You are making a

6        statement.

7    BY MR. BEAL:

8        Q    Is that true or false?

9             MR. HARRISON:  There you go.

10            THE WITNESS:  What is the

11       question?

12   BY MR. BEAL:

13       Q    The Demand sent from my office on

14   August 26, 2020 to your attorneys at Alston &

15   Byrd is among other things a settlement of all

16   of the fee splits contained in the March 17th

17   Settlement Agreement.

18       A    Are you telling me that?  Because I

19   don't know that.

20            Here is what I know, this Demand is

21   extortion.  You want me to pay you this money

22   and then you are suing me for breach of

23   contract.  And then you are suing me for breach

24   of contract.

25       Q    So can you can you say yes or no to the



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

1    question?

2         A    I am telling you it is not capable of a

3    yes or no answer.  But the bottom line is --

4              MR. BEAL:  Object to the form as

5         nonresponsive.

6              THE WITNESS:  Let me put it to you

7         quickly.

8              MR. BEAL:  Do you understand my

9         question?

10             THE WITNESS:  This letter was

11        extortion.  That is what I will tell

12        you.

13             MR. HARRISON:  Can I respond?

14             MR. BEAL:  Yeah.

15             MR. HARRISON:  You are not asking

16        a question.  You made a statement a

17        couple of times, and also you are still

18        not allowing him to finish.

19             I understand your position, but if

20        you are going to go object to the

21        responsiveness or you are going to move

22        to strike, the proper way to handle

23        that is to let the witness finish and

24        then to make your objection.  You

25        haven't done it all day long.  You have



1          done it over him.

2                So Lin, if you can answer it with

3          a yes or no, do so.

4                THE WITNESS:  I think I have the

5          right to explain it.

6                MR. HARRISON:  If you can answer

7          yes and no and then explain it, do so.

8                THE WITNESS:  That is fine to do.

9     BY MR. BEAL:

10         Q    As of August 28, 2020 in Nicholas

11    Sandmann versus Washington Post case had not

12    settled, is that correct?

13         A    Are you talking about the 26th or the

14    28th?

15                MR. BEAL:  Jus read back the

16         question, will you, please?

17                     (Whereupon, the record

18                     was read back as requested.)

19                MR. HARRISON:  Sorry, did you mean

20         August 26th because that is the date of

21         the Demand?

22                MR. BEAL:  (Nods).

23                MR. HARRISON:  Okay.

24                Lin, do you understand?

25                THE WITNESS:  I believe that it



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

1          had settled because I was always

2          mystified why you and Drew had never

3          asked anybody what it settled for.

4          Because your clients were entitled

5          under the March 17th agreement to

6          10 percent.

7              So how are you making a demand on

8          Washington Post without knowing what

9          your clients had agreed to and were

10         entitled to in the March 17th

11         agreement?  It makes no sense to me.

12         That is why I think this is just

13         another element of extortion.

14    BY MR. BEAL:

15     Q    And had you ever told your clients that

16    the Sandmann versus Washington Post case was as

17    good as or better than the Sandmann versus CNN

18    case?

19              MR. HARRISON:  Object to the form.

20              THE WITNESS:  You are talking

21         about the Sandmann's?  You want me to

22         tell you what I told the Sandmann's?

23              MR. BEAL:  Can you read the

24         question back.

25                   (Whereupon, the record



1              was read back as requested.)

2         THE WITNESS:  Number 1, I am not

3    going to tell you what I told my

4    clients, because that is

5    attorney-client privileged information.

6         But I will try to help you by

7    giving you my own analysis that was in

8    my mind at the time.  I viewed the

9    Nicholas Sandmann cases, seven cases I

10   believe, I viewed them as in effect one

11   whole.  So that I was looking more

12   towards what potentially he might get

13   from each case in terms of how that

14   total amount would compensate him for

15   the damage done, because it was

16   essentially the same defamation against

17   him in each case.

18        So it is not a new defamation, it

19   is just another pocket, when one of

20   them does the same thing another one

21   did.  So clearly the Washington Post

22   case had some serious problems, because

23   the Judge dismissed it, and that was

24   after CNN had settled.  He dismissed

25   the case and then I was able to



1    convince him to reverse himself and to

2    leave in for litigation one aspect of

3    the claim of defamation.

4          So I can only tell you that I was

5    looking at it as an entirety.  Not one

6    case is better than the other.  So I am

7    not going to tell you what I told my

8    clients, what I am going to tell you,

9    and I don't know what Todd told them,

10   and I could be wrong about when the

11   Washington Post case settled; but I

12   think it was before the 26th because I

13   remember that I was surprised as we got

14   to -- when I found out he didn't

15   consent that no one had ever asked

16   between March the 17th and that date

17   what happened to the Washington Post

18   case.  I don't know if you asked Joey

19   and them or not, because they were

20   representing them.

21   BY MR. BEAL:

22      Q    And did you ever tell the Plaintiffs

23   that you felt that the Washington Post case had

24   significant value, approximately equal to the

25   Sandmann versus CNN case?



1       A    I can't remember the specific statement
2   to that effect, but it wouldn't surprise me that
3   somewhere along the way when they were working
4   with me that I could have said we ought to maybe
5   do as well in Washington Post as we did in CNN;
6   but that is just an opinion and that changed.
7   It changed based on what the offer was and what
8   the clients were willing to take, and what Todd
9   wanted to do it with it.  I am not going to tell
10  you the amount, but I am going to tell you that
11  it was significantly less than CNN.
12  BY MR. BEAL:
13      Q    So the Plaintiffs' 10 percent of that
14  amount based on what you had told them earlier
15  in the case, that one fee amount could have
16  equaled over a million dollars?
17      A    No.
18      Q    Unlikely?
19      A    Unlikely.
20      Q    Okay.
21      A    I mean what you did was you pulled a
22  number out of the air, without asking what it
23  had settled for; and then you wanted to come
24  back and re-settle what had already been settled
25  and have me make demands to pay things that had



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

1   already been settled that were the obligation of

2   Johnathan and Nicole; or you were going to file

3   a heinously, slanderous smear Complaint against

4   me.  I look at that in the totality.  That in my

5   opinion is extortion.

6        Q    Let us turn over to page 29, and in the

7   post there on -- you said:  Yesterday I posted

8   the Email below and suggested that in my opinion

9   this Demand by Atlanta lawyer Andy Beal of

10  Buckley Beal and Atlanta lawyers Nicole Wade,

11  Johnathan Grunberg and Taylor Wilson of Wade,

12  Grunberg & Wilson, LLC constituted an attempt to

13  extort me.  I know some other lawyers who agree

14  with my opinion.

15        Who are those other lawyers?

16       A    I don't know who I talked to about it.

17  I know that the statement that I issued after

18  you all went out and filed this thing, couldn't

19  wait to file, and it went international.  You

20  took the statements I had made in private about

21  extortion and you blew it up around the world.

22  You created your own damage if you got damaged

23  at all; but I know that I had discussed it with

24  some lawyers.

25       Q    And do you remember who any of them



1    were?

2        A    You know, I don't.  It is kind of like

3    when we were taking Elon Musk's deposition, and

4    he called me a shake down lawyer.  That is a

5    phrase people use.  You are extorting me.  That

6    lawyer is trying to extort me.

7            So I know that I included in this press

8    release, which Alston & Byrd assisted in the

9    preparation of and edited, I specifically

10   included a statement that I was not going to be

11   extorted by this litigation.  Nobody sued me for

12   extortion.  In fact, I had every reason to

13   believe that you all had the good sense not to,

14   because it was protected opinion.  And then you

15   only did it whenever you filed the liable case

16   at the same time law 65 came out.

17           MR. BEAL:  Let me object.

18   BY MR. BEAL:

19       Q    The question was quite simply who were

20   the other lawyers?

21       A    65 Project, excuse me.  You know all

22   about it.

23       Q    The question was who are the other

24   lawyers, and you are saying you don't remember?

25       A    I would be trying to reconstruct who I

1    talked with at the time.

2         Q    Okay.

3         A    And I know that others, whether it was

4    one or two, I know I talked with them, but not

5    to retain them, the people I knew had law

6    degrees; and I told them what was happening to

7    me and there was a consensus yes, that is

8    extortion.

9              Extortion in the sense that if you go

10   to anybody and start talking about these kinds

11   of demands, it is always somebody saying I have

12   had lawyers that are trying to extort you.

13             MR. BEAL:  I am going to object as

14        nonresponsive.

15             THE WITNESS:  So the answer to

16        your the question I know what I did

17        with Chris and Joey, that is two

18        lawyers who helped me do that

19        statement.

20             I don't remember the names of any

21        others.  I didn't go out and seek an

22        official opinion, if that helps.

23   BY MR. BEAL:

24        Q    Okay, thank you.

25             And Chris and Joey never told you that



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

1    any of these acts constituted extortion, but

2    they reviewed a press release that you

3    published, that you drafted, which used the word

4    extortion and they did not edit it out, is that

5    a fair summary of your testimony?

6        A    You said I prepared it.  They helped

7    prepare it.

8        Q    Okay.

9        A    They edited it and reviewed it and made

10   suggestions.

11       Q    Did they come up with the word

12   "extortion" or did you?

13       A    I believe it was in mine, but I know

14   there are several red lines back and forth, and

15   if it was mine I felt like if they thought it

16   was a red flag they would have told me nobody

17   thought it was a red flag they would have told

18   me.  Nobody thought it was a red flag.

19            You didn't even think it was a red flag

20   until you decided to sue me a second time.

21       Q    Did Chris or Joey ever give you a

22   summary of the law of extortion?

23       A    No.

24       Q    Okay.  On --

25       A    Extortion is extortion.  You don't need



1    summaries of law.  If you have the opinion you

2    are being extorted and somebody trying to get

3    you to give you money or get you to do something

4    or you are threatening to hurt them with their

5    family or hurt them with their clients, or hurt

6    them in their dealings with the President of

7    United States, you don't need a memo about

8    extortion if you have any common sense.

9         Q    Okay.  So a memo summarizing the law in

10   this area wouldn't have helped you?

11             MR. HARRISON:  Object to the form.

12             THE WITNESS:  It wouldn't have

13        changed my bona fide, good-faith

14        opinion; and I have told you why a

15        zillion times today.  You know, I don't

16        want to distort it.

17             I have told you plenty of times

18        why I believed it was extortion, and I

19        think I am right.

20             MR. BEAL:  Off the record for one

21        minute.

22                  (Whereupon, an off-the-record

23                  discussion was held.)

24   BY MR. BEAL:

25        Q    A couple of follow-up questions, you


**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

1    were terminated in the Sandmann versus CNN -- in

2    the Sandmann representation months after you

3    entered into the Settlement Agreement, is that

4    correct?

5        A    Of March 17th?

6        Q    Yes.

7        A    Yes, I believe that it was in February

8    of 2021 when I was told that I was fired.

9        Q    Okay.

10       A    And I still at that time had five

11   pending cases; and I made clear it was an honor

12   and a privilege to represent him.

13            I said that I am sure Todd would do a

14   great job representing him.

15       Q    Okay.

16       A    And I wished him good luck.

17       Q    Thank you.

18            Did Alston & Byrd ever tell you that

19   client consent may not be required in the

20   Sandmann versus CNN fee sharing?

21       A    No.  They told me exactly what they

22   told you in their letter to you of July 24th, I

23   believe, 2020.

24       Q    Did they ever --

25       A    I didn't have anything to do with it.



1    Did Todd handle the settlement?  I asked the boy
2    to consent to it, and he didn't.  He asked for
3    documentation and then they wrote you the
4    letter.
5         Q    Okay.  Did Alston & Byrd, this is a
6    very similar question, just yes or no, did
7    Alston & Byrd ever tell you that there were some
8    limitations on the application of Rule 1.5 E
9    regarding division of fees between firms?
10        A    They never told me -- they never sent
11   me any information, other than they gave me
12   their opinion based on all the information that
13   I provided them about the history of the law
14   firm and what had happened.  They told me that
15   client consent was necessary; and if I did pay
16   it without client consent I would be in
17   violation of the ethical rules and I have never
18   violated an ethical rule in my life.
19        Q    Have you ever made a claim against
20   Alston & Byrd for legal malpractice related to
21   their representation of you in this matter?
22        A    I don't know whether there was a formal
23   letter on it.  I don't think so.  But it has
24   been, and I am sure they are aware of it, and if
25   they gave me the wrong advice and I am liable



1    for this money, I acted on their advice and I

2    certainly would expect them to be responsible to

3    indemnify me.

4        Q    Did you ever have any of your attorneys

5    or you yourself write to anyone at Alston & Byrd

6    and set out those concerns or claims?

7        A    I don't recall that occurring.

8            Ibrahim Reyes has been involved, and I

9    know we brought to the attention of Judge Brown,

10   and I think that is the judge in this case --

11           MR. HARRISON:  Uh-huh.

12           THE WITNESS:  -- the potential for

13       there to be a lawsuit against Alston &

14       Byrd with Chris and Julie also being

15       witnesses in this case, and I think he

16       said something that you might even be a

17       witness.  I wasn't there, so I am just

18       hearing it secondhand.

19           So it is not a secret.  But my

20       view right now I don't have the money,

21       I don't have the time.  I don't want to

22       waste my energy any more on litigation

23       than I have to.  I have got more

24       important things to do related to my

25       eternity.



1    BY MR. BEAL:

2         Q    Okay.

3         A    So if it turns out that somebody says

4    that they were wrong and that client consent was

5    not necessary, then I would certainly expect

6    them to indemnify me, because I acted in

7    reliance on their advice; and they told you what

8    their advice was.  It was never Lin Wood.  It

9    was the lawyers telling Lin Wood if you pay it

10   without consent, you will violate the ethical

11   rules.

12             And I think you said send the

13   information, and I don't know whatever happened

14   to that.  I know there was some discussion and

15   Todd said he wasn't going to send it.  I don't

16   know why Todd would say that.  I haven't talked

17   to him in ages, except to wish him good luck.

18   BY MR. BEAL:

19        Q    So any claims that you made to Alston &

20   Byrd were made orally either by you or your

21   Counsel?

22        A    I don't think they were technically a

23   claim made on them.

24        Q    Okay.

25        A    But I think there were discussions, and



1      I think there was a discussion with Judge Brown.

2          Q    And do you believe that any claims you

3      might have against Alston & Byrd would be

4      controlled by a statute of limitations?

5          A    Indemnification, the statute starts --

6      if they end up being wrong, and I am stuck with

7      some type of a judgment, then I believe the

8      statute runs on indemnification.

9          Q    So the statute of limitations on legal

10     malpractice would be tolled until such time as

11     you were damaged?

12              MR. HARRISON:  Object to the form.

13              You can answer.

14              THE WITNESS:  You are asking me a

15         question, I didn't do legal

16         malpractice.  I think I did a couple

17         things peripherally.

18              I think the legal malpractice

19         statute is four years.  Four years from

20         2021 would be 2024.  Now whether that

21         is tolled when you are seeking

22         indemnification, I don't know.

23         Hopefully we will have this all

24         resolved before then.

25     BY MR. BEAL:



```
 1       Q     That is all I have got.  Thank you very
 2   much.  I appreciate it.
 3       A     God bless you.
 4             MR. HARRISON:  Okay.
 5             THE WITNESS:  I will read and
 6   sign.
 7             MS. BROWN:  We just need an
 8   electronic copy.
 9             MR. HARRISON:  I will get it
10   expedited.  I need it by Friday.
11             I will get a copy of the video.
12                 (RESERVED SIGNATURE.)
13                 (Whereupon, the videotaped
14                 deposition of L. Lin Wood
15                 was concluded at
16                 approximately 4:23 p.m.)
17
18
19
20
21
22
23
24
25
```



1                C E R T I F I C A T E

2

3    STATE OF SOUTH CAROLINA:

4    BEAUFORT COUNTY:

5

6            I, Ceil Weser, CSR and Notary

7    Public in and for the above county and state, do

8    hereby certify that the foregoing testimony was

9    taken before me at the time and place

10   herein before set forth; that the witness was by

11   me first duly sworn to testify to the truth, the

12   whole truth, and nothing but the truth, that

13   thereupon the foregoing testimony was later

14   reduced by computer transcription; and I certify

15   that this is a true and correct transcript of my

16   stenographic notes so taken.

17            I further certify that I am not of

18   counsel to either party, nor interested in the

19   event of this cause.

20

21                    _Ceil Weser_

22            ------------------------------

23                    Ceil Weser, CCR

24                    Notary Public

25                    Beaufort, South Carolina



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

```
 1                    ERRATA SHEET

 2

 3      CAPTION:  NICOLE JENNINGS WADE, et al.
                  vs. L. LIN WOOD
 4

 5

 6         DECLARATION UNDER PENALTY OF PERJURY

 7            I declare under penalty of perjury
           that I have read the entire transcript
 8         of my Deposition taken in the
           above-captioned matter or the same
 9         has been read to me and the same is
           true and accurate, save and except for
10         changes and/or corrections, if any, as
           indicated by me on the COASTAL COURT
11         REPORTING DEPOSITION ERRATA SHEET
           hereof, with the understanding that I
12         offer these changes as if still under
           oath. Signed on the _____ day of
13

14         _____, 2023.

15

16

17

           _____
18              L. LIN WOOD (Deponent)

19

20      SWORN TO and subscribed before me
        THIS _____ day of _____, 2023
21

22

23      NOTARY PUBLIC: _____

24
        My commission Expires: _____
25
```



1                     DEPOSITION ERRATA SHEET
      Reason for
2     change:_____
      Page No._____Line No._____Change to:_____
3     _____
      Reason for
4     change:_____
      Page No._____Line No._____Change to:_____
5     _____
      Reason for
6     change:_____
      Page No._____Line No._____Change to:_____
7     _____
      Reason for
8     change:_____
      Page No._____Line No._____Change to:_____
9     _____
      Reason for
10    change:_____
      Page No._____Line No._____Change to:_____
11    _____
      Reason for
12    change:_____
      Page No._____Line No._____Change to:_____
13    _____
      Reason for
14    change:_____
      Page No._____Line No._____Change to:_____
15    _____
      Reason for
16    change:_____
      Page No._____Line No._____Change to:_____
17    _____
      Reason for
18    change:_____
      Page No._____Line No._____Change to:_____
19    _____
      Reason for
20    change:_____
      Page No._____Line No._____Change to:_____
21    _____
      Reason for
22    change:_____
      Page No._____Line No._____Change to:_____
23    _____

24
      SIGNATURE:_____DATE:_____
25               L. LIN WOOD



**COASTAL COURT REPORTING & VIDEO SERVICES**
                800-791-1100        www.coastalcourt.com

1               DEPOSITION ERRATA SHEET
        Reason for
2       change:_____
        Page No._____ Line No._____ Change to:_____
3       _____
        Reason for
4       change:_____
        Page No._____ Line No._____ Change to:_____
5       _____
        Reason for
6       change:_____
        Page No._____ Line No._____ Change to:_____
7       _____
        Reason for
8       change:_____
        Page No._____ Line No._____ Change to:_____
9       _____
        Reason for
10      change:_____
        Page No._____ Line No._____ Change to:_____
11      _____
        Reason for
12      change:_____
        Page No._____ Line No._____ Change to:_____
13      _____
        Reason for
14      change:_____
        Page No._____ Line No._____ Change to:_____
15      _____
        Reason for
16      change:_____
        Page No._____ Line No._____ Change to:_____
17      _____
        Reason for
18      change:_____
        Page No._____ Line No._____ Change to:_____
19      _____
        Reason for
20      change:_____
        Page No._____ Line No._____ Change to:_____
21      _____
        Reason for
22      change:_____
        Page No._____ Line No._____ Change to:_____
23      _____

24
        SIGNATURE:_____ DATE:_____
25             L. LIN WOOD



**COASTAL COURT REPORTING & VIDEO SERVICES**
        **800-791-1100      www.coastalcourt.com**

### Exhibits

**PX-1** 4:3 6:10,11,19

**PX-2** 4:5 13:3,4,8

**PX-3** 4:7 14:7,8,12
15:18

**PX-4** 4:9 15:25 16:1,4

**PX-5** 4:10 17:15,16,20
22:12 24:13 25:8

**PX-6** 4:12 21:7,8,12
24:4 38:18 44:8 47:19,
21 105:9

**PX-7** 4:15 53:16,17 54:3
58:1 59:24 61:22 65:14
67:3 77:17 78:11,12
79:12 80:13

**PX-8** 4:17 76:7,8,12
78:9

**PX-9** 4:19 78:19,20,23
79:10 80:11 81:6 84:5

**PX-10** 4:21 84:17,18,
21,23

**PX-11** 4:23 98:8,9,13
99:5

**PX-12** 5:3 104:14,15,18
107:13 117:3,11
205:10,15

**PX-13** 5:5 107:5,6,10

**PX-14** 5:8 109:10,11,14
198:19,21

**PX-15** 5:10 145:4,5,9
152:12

**PX-16** 5:13 146:21,22

**PX-17** 5:15 164:9,10,15

**PX-18** 5:17 190:19,20

**PX-19** 5:20 190:22,23

**PX-20** 5:23 192:3,4,7

### $

**$1.25** 201:6

**$1.5** 115:7,10 116:18
121:7 141:10 201:11

**$10** 156:19,20

**$150,000** 71:18,19

**$250** 147:5

**$275** 146:2 152:4,10,18,
20

**$285,000** 26:11 27:9
28:25 68:12 172:15
173:6,20

**$300,000** 202:8

**$50,000** 27:4

**$648,000** 205:17

**$843,000** 71:5

**$850,000** 15:13

### (

**(a)** 145:25 147:4

**(b)** 24:4 145:25 147:4

### 0

**0** 14:18

### 1

**1** 6:11,19 14:18 91:20
145:15 157:24 206:3
216:2

**1.25** 115:7 202:3,23
204:1

**1.5** 118:10 225:8

**10** 84:18,21,23 206:24
215:6 218:13

**100** 42:16 185:8

**103** 184:8,20,21

**104** 184:20 185:11

**105** 186:8

**11** 92:14 98:9,13 99:5

**11th** 67:22

**12** 104:15,18 107:13
117:3,11 205:10,15

**120** 42:16

**120,000** 42:14

**13** 107:6,10

**14** 109:11,14 164:19,20
198:19,21

**14th** 18:2 33:21 39:14,
22 63:3 85:22

**15** 122:21 145:5,9
151:18 152:12 153:8,25

**150,000** 69:11

**16** 9:7 146:22 151:18
153:9,25 178:21

**17** 21:15,24 35:24
162:22 164:10,15,24
172:9 185:24

**17th** 22:23 23:7,25
24:10,20,22 26:1 27:19,
20,23 28:23 29:4,15
34:12 36:6 38:17 46:10
48:16 49:19 50:1,10
58:6,23 59:12,19 61:18
75:1 80:22,23,25 81:3,
4,5 85:12 86:24 87:11
88:2 90:14,15 91:21
92:21 96:13,16,19
97:11 98:3,5,7 102:17
104:18,23 105:4,6
106:7,9,11 107:12
109:24 112:10 114:9,21
115:3 117:9,16 118:3,
17,25 119:7 120:15
121:2 133:8,14 135:11,
25 155:2 157:3,11
160:14 161:14 162:1,11
165:17 166:3,7 169:1,2,
4,10 170:4,7,13,14,16
171:25 172:3,12,14
186:18 188:20 189:17
193:22 201:13,16
202:5,19 203:8,21
206:9 210:21 211:1,14
212:16 215:5,10 217:16
224:5

**18** 190:20 191:2,3 196:2

**18th** 21:17 109:4

**19** 9:6 190:23 191:2,3,5,
14 199:3,6

**1996** 8:12

**1997** 7:17

**1999** 14:23

### 2

**2** 13:4,8 38:25 61:22
67:3 81:10 84:4 89:12
90:23,24 105:10 202:7

**20** 7:14 40:13 105:13
106:1 122:21 192:4,7

**20-minute** 83:8,11

**200** 26:10

**2015** 9:1,6,11

**2016** 10:4,6

**2018** 99:10

**2019** 23:16

**2020** 17:24 18:2 21:15,
24 51:10 53:2 54:5 58:2
64:5 73:21 74:1 88:2
97:3 99:18 102:17
111:3 114:8 118:23
135:2 139:3 172:9
173:15 178:1,3,10
185:25 191:24 207:16
209:19 212:14 214:10
224:23

**2021** 43:3 52:9 110:17
199:4,6 224:8 228:20

**2022** 109:24

**2024** 228:20

**20th** 25:21 41:13

**21st** 128:5

**22** 58:2 97:3 180:18

**22nd** 59:24 65:14
76:17,20 84:24 88:4

**24** 115:14,19 116:19
121:9 142:4 202:22
211:15

**24th** 107:11 136:13
138:19 224:22



**25** 12:19,24 198:22

**25th** 17:23 24:15 28:11
29:5,15

**26** 178:1,8 212:14

**26th** 178:3,9 200:19
201:17,19 209:19
210:11,24 211:3,6,23
214:13,20 217:12

**27** 200:11,12

**27th** 54:4

**28** 210:24 214:10

**280** 115:8

**285** 202:23 204:16

**285,000** 173:23

**28th** 200:18 214:14

**29** 219:6

**2:30** 40:12

**2:40** 58:3

---

**3**

**3** 14:8,12 15:18 99:18
191:15

**3/4th's** 170:10

**35** 23:22 59:1 61:3
89:18 167:2,5 168:19
169:7,9 170:1,19

**36** 164:23 165:3,6,7
166:6 169:16

**360** 125:19

**37** 147:3 167:25 168:11
169:19,25 170:2

**38** 147:4 168:9

**3rd** 73:19 98:14 101:10

---

**4**

**4** 16:1,4 184:8

**40** 24:6 93:16 103:6

**41** 172:4,6,7

**44** 173:11,15

**45** 93:17 198:24

**46** 175:4 176:23 177:2

**48** 178:2

**49** 177:12,13

**4:23** 229:16

**4th** 74:15,17

---

**5**

**5** 17:16,20 22:12 24:13
25:8

**50** 23:22,23 27:6 59:3,8,
16 61:6 89:19,21 90:17
91:22 96:7 168:20

**57** 145:16,23

**58** 145:17,18 178:20,23

**5:00** 40:22 201:22,24
204:19

---

**6**

**6** 21:8,12 24:4 38:18
44:8 47:19,21 105:9

**60** 24:6

**600-what-odd-
thousand-dollars**
141:7

**648,000** 202:25

**65** 220:16,21

**660,000** 180:2

**6th** 178:7

---

**7**

**7** 53:17 54:3 58:1 59:24
61:22 65:14 67:3 77:17
78:11,12 79:12 80:13
107:21 108:23 191:8

**75** 27:14 172:24

**79** 179:7,11 190:1,6,12

---

**8**

**8** 76:8,12 78:9 107:21
108:23

**80** 99:25 105:14 179:7,
11 190:1,11

**800** 15:13

**847** 69:12

**88** 198:22,24

**8:00** 31:8

---

**9**

**9** 78:20,23 79:10 80:11
81:6 84:5 107:22
108:23 191:8,9,15

**980** 180:3

**9:00** 204:18

**9:10** 200:20 201:19,24
209:19

**9:20** 76:17

---

**A**

**a.m.** 58:3

**Aarons** 37:23 206:5

**ability** 62:7,15 67:4
68:14 129:2 184:3

**abrasive** 128:6

**abrupt** 62:4

**absence** 133:13

**absent** 81:23 82:6 84:6

**absolutely** 85:15 94:10
119:8 174:25 209:3

**abundantly** 60:12
66:22 194:10

**abusive** 188:13

**accept** 164:16

**access** 40:8 95:9

**account** 56:19 62:13
71:22 81:19 195:16,18

196:13,20,21,23,24
197:3 198:6

**accounts** 196:25 197:6

**accurate** 28:20,22
34:22 46:2,6,16 152:5

**accurately** 62:24

**accusation** 51:7
148:11 187:8

**accusations** 48:21
55:13 63:21 121:24
164:1

**accuse** 55:10

**accusing** 160:13

**acknowledge** 78:8

**acknowledged** 102:15

**acrimony** 131:21

**act** 40:11 49:17 112:1,5
117:8,12 120:20 139:1,
11,21 158:9 191:10
201:3

**acted** 138:12 226:1
227:6

**acting** 131:23 188:14

**action** 51:15 94:24
113:2 119:12 128:14
161:12 185:13 186:2
207:20

**actions** 81:15 113:24
157:10 160:1 161:13

**acts** 112:5 113:13,18
121:3 140:18 157:12,18
158:8 222:1

**actual** 45:20 94:25
148:25 154:22

**ad** 111:18 145:11 146:1,
7,13 147:12,20 152:17
153:13 154:6,11
156:18,24 210:11,16

**adamant** 129:1

**add** 104:24 141:9

**added** 142:9 161:18
184:5



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD
236Index: addition–artificial

**addition** 158:7

**Additionally** 105:11

**address** 43:25 125:13, 17 134:24 173:6

**addressed** 137:21

**administrative** 75:14

**admissible** 80:23

**admit** 123:4 170:6 171:14 205:18

**admitted** 61:17,19 69:22 160:14 161:25 174:3

**admitting** 171:12

**ads** 181:10

**advance** 6:21

**advances** 198:1

**advantage** 168:17

**advice** 35:16 36:3 82:23 103:2 138:18 147:25 185:1 225:25 226:1 227:7,8

**advise** 81:16

**advised** 81:12

**advocate** 121:15

**affected** 129:2

**afford** 138:21

**affordable** 64:19

**afternoon** 201:21 204:19

**agencies** 51:22

**ages** 227:17

**agree** 39:25 49:12 57:5 67:9 81:2 82:7 93:2,9 95:24 105:20 108:21 109:6 110:13 115:13,16 149:4,18 151:10 155:10 166:18 178:24 179:4 194:23 201:20 204:18 219:13

**agreeable** 6:8

**agreed** 6:9 14:3 23:1

27:8,10 28:3 39:1 46:15 50:14 89:20 91:18 94:5 99:13 100:19 105:13 111:13 115:9 118:5 121:4 149:23 152:24 162:10 165:16 166:14 172:12,14 189:7,16 194:22 196:1 197:23 215:9

**agreement** 6:3 10:22 14:19 15:7,20,24 16:5, 20 18:6,10,23 20:18 21:22 22:1,3,17,21,22 23:2,8 26:1,3,8,13 27:6, 18,24 28:17 30:6 34:10, 11,16 38:11,16,21 39:18 40:1 45:25 47:1, 7,23 48:16 49:20 50:2, 10 56:5 57:15 58:6,9,23 59:17,19 60:15,18 61:10,18 63:6 65:4,8 66:5,11 69:7 71:7 74:14,25 75:1 76:6 80:22,25 81:3,5,24 82:6,10 83:1 84:6 85:7, 13,16 86:9,10,22 87:24 88:1,7,9 89:4 90:15,16 91:21 92:21 96:13,17 97:10 98:4,6,7 99:1,9 104:19,23 105:6,7,8,17 106:4,6,9 107:13,21 108:17 109:1 112:10,16 114:9,18,20,21,23 115:2,4 117:10,16 118:4,18 119:1,7 120:15 121:2 132:25 133:4,9,17 135:7 136:1 137:21 138:2 142:16,20 144:12,22 155:2 157:12 161:15 162:1,5 165:17, 19,24 166:3,7,15,20,25 169:1,5,11,17,20 170:3, 4,5,7,8,13,14,17,20 171:20,23 172:3,11,12, 14 188:20 189:3 194:12,17 195:2,6,13 201:14,16 202:5,19 203:8,21 204:6 205:9 206:10 208:9 209:6 210:21 211:5,8,25 212:3,17 215:5,11 224:3

**agreements** 32:16

38:19,23 105:7 106:8 170:15 171:5 194:20

**ahead** 59:11 93:9 96:24 119:1 130:10

**air** 163:23 164:5 218:22

**Alec** 8:20

**allegation** 128:22

**allegations** 48:25 116:12 131:6 152:22

**allocation** 13:15 169:12 170:21 171:6, 20,23

**allowed** 27:6 58:14 71:4 144:20

**allowing** 213:18

**Alston** 25:21 26:2 29:17 31:2 32:11,22,23 34:18 35:12,24 37:1 51:1 73:15 75:5 76:3 86:7 87:23 88:5 107:11 108:8,11 133:18 134:14 135:3,24 136:17,24 137:5,11 138:4,16 200:13 212:14 220:8 224:18 225:5,7,20 226:5,13 227:19 228:3

**altogether** 123:7

**Amended** 191:16

**Amendment** 8:14 9:8

**amicable** 47:16

**amount** 27:16 45:25 46:7,15 63:9,24 76:6 91:18 99:6 143:15 147:25 151:19 154:6,10 156:12,17 177:3,6 189:6,7 190:6 197:25 198:9 202:8 204:16 216:14 218:10,14,15

**amounts** 135:10 149:25 165:16,25 166:14 171:22 201:16

**analysis** 216:7

**and/or** 124:14

**Andy** 219:9

**Angeles** 16:15 132:6

**angry** 69:25

**answering** 42:1 86:18 150:9

**answers** 31:20 33:3 83:22 87:5,19 88:16 113:17

**apologize** 194:6

**apologized** 124:23

**apparently** 53:1 79:14, 15 134:4

**appears** 182:4

**apples** 153:5 156:24

**application** 225:8

**applied** 35:22

**applies** 32:12

**apply** 36:11 75:21,22 134:20

**appreciated** 15:14 102:15

**approval** 79:4 80:2 81:17

**approved** 196:4

**approving** 79:24

**approximately** 217:24 229:16

**arbitrated** 142:7

**arbitration** 115:24 116:3 142:8

**arbitrator** 115:23

**area** 8:14 9:7 223:10

**areas** 9:5,20 138:11

**argument** 99:5 189:12

**arose** 25:2 85:20

**arrangement** 10:9,18 11:18 17:25 18:3,22 19:16,17,22 33:21 34:14 35:23 39:20 64:8, 12,13,16,20 65:1 94:7

**artificial** 179:22 182:4 183:6



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD
237Index: aspect–blackmail

**aspect** 217:2

**assert** 147:5

**assist** 107:20

**assistant** 40:25 41:19 75:14

**assisted** 51:3 220:8

**Associate** 10:10,13 103:4

**Associate's** 11:2

**Associates** 10:9,20

**association** 36:18 52:23

**assume** 96:1 156:10 195:17

**assumed** 94:14 136:8

**assuming** 173:3

**Atlanta** 42:11,24 43:4, 11,20,25 119:21 219:9, 10

**attached** 208:15

**attack** 55:6 110:19 111:10,18 117:21 142:11 159:2 161:7

**attacked** 111:24 140:3 141:11

**attacking** 55:18 161:7

**attacks** 114:13

**attempt** 219:12

**attempted** 50:15 51:23 56:6 157:1 185:7 191:13

**attempts** 112:2

**attending** 181:12

**attention** 34:24 35:21 135:4,6 147:2 157:2 169:6 191:6,14 226:9

**attorney's** 185:1

**attorney-client** 33:5 216:5

**attorneys** 212:14 226:4

**attorneys'** 9:23 17:1 138:23 198:14 204:6

**August** 201:18 207:16 209:19 210:11,24 211:3,6,23 212:14 214:10,20

**authority** 80:18 82:16 194:22

**authorized** 62:11 81:14

**averment** 165:7

**avoid** 197:10 204:22

**award** 48:23 156:20

**aware** 33:11,19 67:18 99:17 127:17 133:21 144:1 160:18 225:24

**B**

**back** 9:5,7 12:14 17:6 22:12 24:13 35:18 36:4 40:18 47:9 51:9 58:21 59:9 61:9 63:12 65:11 77:17 79:6 95:11,15,19 96:14 105:9 106:10 111:6 112:8 114:11 116:14 117:7 120:25 124:21 125:15 135:9 157:2 169:6 174:3 180:18 187:16 189:7 197:15 198:18 211:15 214:15,18 215:24 216:1 218:24 222:14

**background** 37:10 155:1 181:16 182:7

**bad** 180:25

**badly** 41:9

**Baker** 76:16 77:2

**ballistic** 127:1

**Bank** 8:21

**bankruptcy** 197:10

**bar** 11:3 42:20 43:6 52:22,25 53:9,14,15 95:1,6,16 159:3 186:10, 12 197:7

**barred** 95:3,4

**based** 8:22 9:14 35:22 52:14 69:14 75:13,14 114:16 127:16 130:11 151:20 156:16 200:8 204:8 209:12,15 218:7, 14 225:12

**baseless** 48:25 164:1

**basically** 18:21 103:23

**basis** 10:21 12:25 56:5 82:9 96:1 98:20 116:10, 11 165:5 166:5 167:25 172:25 179:9 184:12,14

**Beal** 6:1,14,16 13:6 14:10 16:3 17:18 21:10 22:8,11 25:13,17 26:17, 23 27:21 28:14 31:6,11, 15,22,25 32:21 34:20 36:1 40:17 50:3 53:19 55:20 56:1,2 57:22,25 60:5 61:11,21 62:19 65:19 70:9,17 71:9 73:2,6,14,22 74:5,18 75:3 76:10,24 77:10 78:22 79:7 83:6,12,15, 21 84:3,20 86:16,19,23 87:8,14 88:3,21 89:7,11 90:24 91:3,7 93:4,19,24 94:17,21 96:20 97:2 98:11 100:16 104:17 106:12,23 107:2,8 108:19 109:13 110:8 113:11,21 114:5 117:2, 5,6 119:5 123:6,9,20,25 127:4,18 131:8,9 132:12,19 136:16 138:7 139:24 140:8,11 141:15 143:2,16,19 144:13 145:7,17,22 146:24 148:15,20 149:10,15 150:3,9,15,18 151:16 153:7,16,20,24 154:12 155:7,17,20,25 156:3,7 157:17,22 158:1 163:5, 10 164:12,20,21 165:1, 4 166:4 167:21,24 168:7,10 174:9,14 175:3,8,16 176:5,12,14, 16,22 178:6,19 183:8 189:18,23 190:3,9,18, 25 191:18,21 192:6,12, 16 196:16 200:2,24,25 203:15,18,24 204:10, 14,24 205:2,7,15,19,22 206:1,19,22 207:24 208:6 209:21,24 210:2, 6 211:16,21 212:7,12 213:4,8,14 214:9,15,22 215:14,23 217:21 218:12 219:9,10 220:17,18 221:13,23 223:20,24 227:1,18 228:25

**bear** 116:5

**beating** 171:1

**began** 9:7

**beginning** 110:25

**behalf** 9:11 27:12 79:25 97:5 191:10

**behavior** 200:5

**belief** 49:17 101:8,15 126:14 185:6 186:13,23

**believed** 52:2,8 97:3 100:15,25 101:13 110:25 111:1 121:3 124:5,9 155:3 185:8 186:1 188:2 223:18

**benefit** 13:23 14:24 41:17 46:20

**benefited** 41:3

**benefits** 39:2

**Bennett** 39:8

**bet** 69:9

**bible** 70:8,21 72:13

**big** 69:8 161:3

**billed** 99:25

**binding** 142:8

**Birdie** 166:2

**birthday** 109:4

**bit** 19:1 59:6

**bizarre** 187:3

**black** 22:13

**blackmail** 191:13



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD
238Index: blame–cetera

**blame** 82:21,22

**blasphemy** 72:9,12

**blasted** 52:13

**bless** 229:3

**blew** 47:8 57:9 219:21

**block** 22:15

**blooded** 70:2,4,5

**blower** 9:10,22

**blowers** 8:24

**blown** 187:4

**blue** 112:19

**bodily** 53:24

**body** 102:10

**bona** 223:13

**bonanza** 69:14

**book** 140:17

**bot** 179:23 182:5

**bots** 183:6

**bottom** 199:3 213:3

**bought** 43:13

**bouncing** 125:15

**boy** 113:7 225:1

**breach** 111:11,17
113:6,7 114:15,22
138:2 141:6 144:22
149:24 196:8 204:8
209:1,5,15 212:2,22,23

**breached** 137:25

**break** 55:23 72:11,19
122:17 123:11,14 126:9
132:13,17 174:17 175:5
189:19,21 210:4

**breakdown** 12:17
17:13 20:1,4 21:3

**breakdowns** 12:6

**breakout** 18:14 132:23

**briefly** 7:5 132:20

**bring** 62:3 63:19 65:23
66:8 68:9 74:13 103:1

**broad** 137:16

**broke** 19:8 197:9

**broken** 17:8

**brought** 7:3 9:25 34:24
35:21 44:15 135:4,6
226:9

**Brown** 200:19 203:25
226:9 228:1 229:7

**brutal** 57:23

**brutally** 111:24 140:3

**Bryan** 7:20 8:2,17,22
11:19 18:20

**BS** 62:15 67:5

**Buckley** 54:25 55:8,14
219:10

**building** 94:13,23 95:8,
15,17

**bunch** 151:4

**Burby** 28:7 29:17 30:2
33:12 49:14 52:11
59:10 86:7,12 109:2
114:12 115:21 116:16
119:8 177:7 200:13

**Burke** 14:25

**Burr** 14:20,22

**business** 10:15,16
11:6 37:4 43:15 57:19
64:9,10,14

**buy** 95:7 172:16 183:20
202:24 204:5 211:4

**buying** 172:20 173:8

**buyout** 201:12 211:4

**Byrd** 25:22 26:2 29:17
31:3 32:12,22,23 34:18
35:12,25 37:1 51:1
73:16 75:5 76:3 86:7
87:23 88:5 107:11
108:9,11 133:18 134:14
135:4,24 136:17,24
137:5,11 138:4,17
200:13 212:15 220:8
224:18 225:5,7,20
226:5,14 227:20 228:3

---

**C**

**Cain** 51:14 55:1,4,7,18

**call** 7:9 17:21 23:7 61:1
83:6 117:12 131:20
139:17

**called** 41:24 42:2 54:10
56:21 95:14 117:13
220:4

**calm** 23:11,19

**candidly** 15:1 112:17
205:6

**capable** 104:10 211:18
213:2

**capacity** 36:22

**capture** 164:6

**captured** 163:23

**Carbone** 17:22 18:4,11
19:1 20:10 22:16 24:4
25:5,6,8,24 27:4,16
28:1,10,24 29:20 37:17
38:3,13 44:8,24 45:2
98:20 99:11 100:9,11,
18 104:23 132:21,22
133:1 173:21 194:11
195:6 206:4

**Carbone's** 45:14

**card's** 40:7

**Cardoba** 37:18

**cards** 95:9

**care** 94:18

**career** 8:9 30:15

**carefully** 171:13

**Carmichael** 192:1
193:24

**Carolina** 42:25 43:3,
12,22 52:13 110:19
140:3 181:13

**case** 8:19,20,24 9:2
10:2 13:10,14 14:1,20,
21 15:1,5,23 16:6,12,
13,15,17,21 17:22 18:4,
7 19:1 20:12,14 25:24

26:7 37:13 44:14,23
45:11,16 46:23 48:5
50:20 51:16 52:11
56:14 62:7 69:10 75:10,
13 76:3 85:1,9,18 88:11
89:15 90:17 102:4
103:8,10,15 105:22,23,
24 109:23 111:17 126:6
128:13,18,21,25 129:3
130:18 131:11,24
138:10 143:22,24 144:2
147:14,23 151:9
152:11,12 153:12
154:20 156:25 162:6
164:14 167:3,8,15
173:21,22 189:5,8,11,
14 194:11 202:11
207:5,20 214:11
215:16,18 216:13,17,
22,25 217:6,11,18,23,
25 218:15 220:15
226:10,15

**case-by-case** 10:21

**cases** 9:16,17,18,22
10:21,25 12:8 13:21
18:5,23 22:24 27:25
28:4 37:16 42:6 44:3
46:18,20 60:16 77:4
92:9 93:17 98:21 99:11,
15,24 100:10,22 101:3,
5 104:22 113:2 120:9,
16,23 143:4 148:22
150:1 151:2,17 169:13
170:22 171:7 173:17
201:13,15 202:2,4,9
203:19,21 204:12
205:8,14,17 206:2,8
207:2,4 208:8 211:7
216:9 224:11

**catalog** 112:5

**category** 139:20 160:1
161:15

**caught** 119:18,19

**cave** 7:20 8:2,17,22
11:19 18:20 130:24

**caves** 131:1

**ceded** 82:17

**cell** 164:4

**cetera** 33:14 39:7 106:8



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD
239Index: chain–concern

**chain** 21:20

**chair** 187:2

**chance** 165:8 174:15, 23 196:7

**change** 95:9 106:6 128:1 155:6 187:3

**changed** 38:20 40:12 48:8 52:20 53:1,4 57:13 87:12 96:12 98:25 111:4 128:8 155:5 218:6,7 223:13

**channel** 179:25 180:9, 10,16,17,20 181:3,18 182:8,11,13,15,24,25 183:3,11,13,17,18 184:4

**characterize** 110:14

**characterized** 64:25

**charge** 129:6

**chart** 16:24

**chat** 184:4

**Chatham** 126:22

**check** 45:8 196:11

**Cherie** 32:11 36:8,15 75:7,9,16 134:17

**child** 130:25

**children** 47:11 48:18 61:16 67:9,12 68:3,19 69:6,19,24 70:1,7,22,24 112:13 117:22 119:13, 22 120:11 129:16 142:18 157:7 158:20 159:4 160:20 162:23 163:12 186:19 187:21 188:24 203:14

**Chris** 7:5 30:2 33:13 57:14 59:10 75:18 83:6 86:7 96:20 107:18 108:8 111:20 116:16 126:22 162:16 171:15 173:3 175:1,23 177:7,9 179:2,15 185:2 191:8 200:12 201:2 204:13 221:17,25 222:21 226:14

**church** 181:11

**circumstances** 130:12 175:10

**claim** 53:23,24 111:12 114:17 115:10 141:6 147:5 208:19,23,25 209:1,5 211:1 217:3 225:19 227:23

**claiming** 67:9 150:1 166:22

**claims** 7:3 8:6 54:25 62:8,16 67:5 68:15 111:11,15 112:11 114:18 120:22 152:23 204:3,7 207:16,21 208:14,17 210:20 226:6 227:19 228:2

**clarify** 175:14,17

**class** 51:15 113:1 207:20

**classic** 159:3

**clause** 145:11 146:1 153:13 154:7,11 170:15

**clear** 14:16 56:2 57:10 63:17 65:23 66:13,22 68:8 82:19 88:20 119:16 157:14 182:3 194:10 206:4 224:11

**clearing** 91:9,15

**client** 16:10,25 30:5 32:18 34:5,19 36:9 37:13 38:2 50:19 53:6 54:25 62:11 75:5,19,24 81:23 96:9 97:4 122:12 129:23 133:23 134:14 135:19 136:2 142:13 189:24 194:13 204:1 209:4 224:19 225:15,16 227:4

**client's** 80:4

**clients** 11:4 29:20 30:21 45:15 79:14 81:1 82:4,13,15 90:2 97:6,23 99:13,21 100:20 152:15 154:5 157:1 159:10,19 161:22 163:1,7 204:1,3 215:4,9,15 216:4 217:8 218:8 223:5

**close** 124:15 180:16

**closed** 27:5 195:20

**closely** 210:17

**cloth** 161:5

**CNN** 22:16 24:4 46:21, 23 47:20,22 62:7,9,12 81:18 82:3 85:1,8,18 88:10 89:15 99:11,12 100:19 102:4,11 103:8 104:4,6 136:1 146:14, 19 152:13 153:1 154:9, 13 195:16 196:1,6 197:4,12 202:14 206:4, 5,16 215:17 216:24 217:25 218:5,11 224:1, 20

**CNN's** 22:17

**co-counsel** 44:4 51:15 52:11 113:1 207:19

**coerce** 117:19 199:18

**coerced** 90:2 96:6 140:20

**colleagues** 81:14

**collected** 169:13 170:22

**combat** 44:4

**commandment** 70:12, 13,23

**commandments** 71:4

**commensurate** 93:8

**comment** 72:16 148:12

**comments** 154:21 161:21,22,24

**committed** 48:14 136:18 137:5,11 138:4 191:12

**committee** 14:17

**common** 223:8

**commonly** 141:1

**communications** 33:5 157:7

**Company** 193:24

**compare** 153:5

**compared** 128:21

**compensate** 216:14

**competent** 61:19 160:15

**complained** 148:6,12

**complaining** 83:5 88:15

**complaint** 49:9 50:17 53:2,6 109:15 110:20 111:25 112:22,24,25 113:4 114:25 116:13 121:9 123:3 124:20 131:6 141:12 145:15 146:11 147:1,3,5 153:9 154:7 156:9,13,15,24 162:17,20 164:18 169:7 172:6 186:12 190:2 198:18 203:11 204:21 208:15,18,20,21 210:24 219:3

**complaints** 147:13 153:12 157:8

**complete** 125:13 169:1 200:9

**completed** 46:14

**completely** 37:5 53:5 86:20 102:19 153:17

**complied** 108:16,17

**compromised** 128:12 130:15

**computation** 149:1 150:19

**compute** 152:3

**computer** 29:5 124:2,6 125:21 126:18,20 177:24 181:15 182:6 191:23 192:9,19 193:1, 8,19,21,25 194:2,5

**computers** 124:4 125:5,6

**concede** 166:21

**concentration** 46:21

**concern** 171:14



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD
240Index: concerned–crime

**concerned** 91:8,9,15, 25 137:22 161:3

**concerns** 126:23 128:10 130:11,13 137:17 138:10 163:17 226:6

**concerted** 159:1

**concession** 165:15

**concessions** 166:14, 16

**concise** 87:18

**concluded** 229:15

**conclusion** 37:12 135:14

**condescending** 128:7

**condition** 119:13

**conduct** 119:17

**conducting** 64:14

**confer** 175:5 184:24

**confident** 96:3,4

**confidential** 22:17 143:17,18 144:7,10

**confidentiality** 196:8

**confirm** 14:5 34:22 124:19

**confirmatory** 119:15 126:3

**confirmed** 14:5 15:21 89:19 167:10 171:24

**confirming** 14:11,19 24:1 61:7 77:15 85:13 158:20

**confused** 113:12,21

**conjunction** 184:15 185:2

**connected** 85:25 190:12

**connection** 50:10 146:12 147:14 207:2

**conniving** 99:9

**consensus** 152:15

221:7

**consent** 30:5 33:22 34:5,19 35:14 36:9 37:13 50:19 75:6,19,24 77:20 80:1 83:2 92:22 93:10,13 97:4 108:4,6 113:8 114:16 115:23,25 133:20,25 134:1,10,11, 14,24 135:20 136:2 137:20 142:13 162:13 194:13 209:4 217:15 224:19 225:2,15,16 227:4,10

**consented** 83:3 134:7

**consenting** 133:9

**conservative** 54:17

**consistent** 73:24 79:16 80:5 82:10 85:15 86:23 87:10 139:4

**conspiring** 119:16

**constituted** 112:2 113:13,19 157:12 161:13 219:12 222:1

**consummated** 48:1

**consummation** 30:8, 9,10

**contact** 53:21,22 69:18 195:23

**contacted** 160:5

**contacting** 69:24 160:3 186:19

**contacts** 186:21

**contained** 51:4 111:25 211:25 212:16

**contemplated** 76:23

**contend** 112:2 157:3,6 201:2

**contest** 91:17,20,23

**context** 21:19 75:25 113:19

**contingency** 9:14,19, 23 10:23 13:14 45:11 167:1,12 207:1

**continually** 184:14

**continue** 39:19 105:21 142:17,21 159:17

**continued** 117:21

**continuing** 35:6

**contract** 20:24,25 111:12,17 113:6,7 114:16 137:25 141:6 149:24 209:2 212:23,24

**contracts** 20:20

**contractual** 206:25

**contradicting** 188:13

**contradiction** 87:11

**contribute** 172:15

**control** 82:2 95:11 96:4

**controlled** 228:4

**controls** 96:10

**conversation** 23:10 24:19 85:23 106:20 122:4,7,9 166:13 168:13

**conversations** 45:19 122:2 184:5

**convince** 217:1

**convinced** 126:4

**copied** 54:19 79:3

**copies** 123:9

**copy** 54:21 85:2 107:16 191:3 229:8,11

**Cordoba** 37:21 44:9, 14,16 104:24 206:6

**corporation** 7:25 8:4 44:1

**corporations** 167:11

**correct** 7:11 8:3,6 9:12 10:5,6 14:12 17:5 21:18 22:25 24:11,16 28:1,2, 19 30:16,17 42:14,15 43:1,15,23 46:13 48:2 49:21 55:1 58:2,7 64:4 65:3,20 75:7 79:8,13 80:14 81:8 84:14 85:2

99:21 103:21 107:22 122:12 145:17 175:20 176:10 178:4 191:24 195:19 199:5 201:3,7, 14 202:15 206:7 208:19 209:7 210:12 214:12 224:4

**corrected** 106:5

**correctly** 24:8 55:23 56:9 62:20 90:5,7 173:5

**correspondence** 102:2,3 116:15

**cost** 198:1

**costs** 81:21

**counsel** 6:4 7:7 33:7 35:17 105:21 110:18 131:11,14,17,18 132:10 136:18 148:1 165:13 175:6 184:24 227:21

**count** 209:11

**counter-claim** 137:23

**country** 159:22

**County** 210:12

**couple** 43:11 155:15 213:17 223:25 228:16

**Court** 52:16 81:25 83:7, 16 110:23 111:2,23 137:24 156:16 185:6

**Court's** 81:17

**courts** 11:3

**covenant** 111:15 114:22 115:3

**covered** 93:15 118:14 157:15 203:20

**craziest** 116:9

**crazy** 83:7 115:19

**created** 23:17 103:8 219:22

**creating** 102:2

**credit** 57:19 93:17

**crime** 49:18 50:24 52:5, 22 139:15,18 191:12 199:7



**criminal** 49:18 139:21 185:12 186:2 199:25

**criminally** 186:6

**critical** 42:22

**cross-examination** 58:11

**cross-talk** 83:18

**culminated** 118:17

**culmination** 118:16

**cut** 31:25 32:4 62:14 67:4 68:14 102:12 123:7

**CVS** 14:21,25

---

**D**

**D.C.** 91:12 92:11

**damage** 90:1 148:25 216:15 219:22

**damaged** 219:22 228:11

**damages** 148:23 150:19 151:3,19,20

**damn** 129:11 187:6

**Damnum** 145:11 146:1,7,13 147:20 152:17 153:13 154:7,11 156:18,24 210:11,16

**Damnum's** 147:13

**Daniels** 147:23

**dare** 72:16

**date** 24:10,14 25:19 35:15 36:13 45:5 67:24 73:17,19,25 82:20 177:18,20 200:17 214:20 217:16

**dated** 17:23 21:15 76:16 78:25

**David** 17:22 45:4,14,18 49:16 133:1

**Davita** 75:10

**day** 7:18 39:15 73:1 74:6 78:11,25 79:1

93:11 118:10 125:10,14 128:8 129:8 155:11 201:25 213:25

**days** 23:7 28:9,12,13, 15 39:23 44:25 45:8 58:5,17 59:23 70:15 88:5 115:16

**dd** 136:10

**deal** 25:1 28:17 29:18 43:6 47:2 69:12 71:12 165:23 198:17

**dealing** 23:14 60:24 67:8 86:5 177:23

**dealings** 55:8 65:10 223:6

**dealt** 16:8 59:9 74:3,24 86:8 105:2 158:16

**December** 188:9

**decide** 205:13

**decided** 86:5 135:9 171:22 201:15 222:20

**decision** 16:9 18:3 52:9 81:7 84:8 97:22 110:22 132:4,15 140:4 147:19 154:6 171:12,18 173:3 184:17

**decisions** 14:13 82:13, 15 165:11

**defamation** 8:6,15,18 9:6,8,11,17,18,20 103:16 131:7 150:2 187:7 204:7 207:16,21 208:17 216:16,18 217:3

**defame** 190:8

**defamed** 190:14

**defaming** 180:5 190:7, 13

**default** 156:10,11,13, 15,18

**defend** 52:16 111:8

**Defendant** 6:2 175:18 176:9

**define** 29:14

**defines** 170:19

**definition** 141:16

**defunct** 197:6

**degree** 36:21

**degrees** 221:6

**delete** 182:3

**deliberately** 129:22

**demand** 49:7 56:18 89:17 115:5,6 139:2 141:4,6,10 142:1 143:3, 23 146:1 149:6,20,22, 23 151:10 152:9,18,20 154:8 167:14 177:5,10 201:1,5,6,11 202:21 203:20 207:3 210:11, 20,22,23 211:2,6,23 212:13,20 214:21 215:7 219:9

**demanded** 201:9

**demands** 141:3 148:22,24 149:16 150:23 151:1,18 153:9, 11,14,24 154:1 218:25 221:11

**demean** 111:19

**denial** 165:6 166:5 168:1 173:1,13 175:14 178:22 179:10,14

**denials** 165:12 184:10, 12

**denied** 169:17 170:4 171:7,19 174:2,4,7 176:8 180:25 184:21 190:2

**deny** 169:23 171:15 172:18

**denying** 171:12 180:7

**deposit** 81:18 196:11

**deposited** 196:18,22

**deposition** 6:2,8,19,23 22:20 220:3 229:14

**depositions** 6:17

**derogation** 115:2

**describe** 32:23 151:8

**describing** 39:4 67:2

**description** 51:7 63:25

**deserve** 120:14 162:9

**deserved** 59:14 117:20 120:7 162:4

**desires** 68:16

**destroy** 57:20

**determine** 156:16 193:14,15

**determined** 49:10 108:12 193:20 194:1

**determining** 193:17

**Dexter** 51:13 112:23 148:10 207:19

**dictionary** 140:23

**died** 75:16

**difference** 37:2 197:22 206:21

**differences** 89:22

**difficult** 23:13 39:23 148:24 151:21

**dignity** 89:23

**dime** 59:5 90:4 176:18 179:4

**direct** 6:13 80:18 115:2 128:20 147:2 157:2 169:6 191:6 206:6

**directed** 82:14

**directing** 81:25 191:14

**direction** 103:13,20

**directions** 94:24

**directive** 56:3

**directly** 26:12 196:23

**disagree** 153:19

**disburse** 81:25

**disbursed** 15:6,9 30:21,22,23 32:18 195:25



**COASTAL COURT REPORTING & VIDEO SERVICES**
**800-791-1100          www.coastalcourt.com**

**disbursement** 16:23 17:21 20:13 24:14

**disclosed** 177:2

**disclosure** 30:24

**disclosures** 32:15

**discovered** 67:14

**discuss** 7:2 17:2,3 116:3 144:25

**discussed** 79:14 105:12 169:4 171:24 219:23

**discussing** 13:14 75:18

**discussion** 13:13 22:10 23:24 31:3 32:10 36:7 41:12 47:4 73:13 87:25 105:4 106:5 150:13 160:4 163:20 176:1 209:23 223:23 227:14 228:1

**discussions** 67:12 80:24 82:12,19 90:13 105:7 106:7 121:1 168:25 170:16 179:15 227:25

**dismissed** 216:23,24

**disparagement** 209:18

**dispute** 54:24 55:2 81:13 102:16 115:22 142:12 186:17

**disputes** 62:13 71:22

**disrespect** 131:22

**disruption** 47:11

**distinction** 20:20 37:7, 8 179:1

**distort** 223:16

**distribute** 81:19,20,22

**distributed** 109:4

**distribution** 108:22

**District** 145:12

**ditch** 89:21

**divide** 15:22 18:23 23:2 30:4 59:11 194:21,22

**divided** 22:2 34:4 82:8 95:24

**dividing** 85:24

**division** 14:3 15:4,19 16:11,22 18:11 19:7 24:23 26:4 28:3 32:10 33:19 34:11 36:7 47:1 71:15 84:25 162:6 225:9

**divisions** 10:24 27:25

**document** 121:10 133:15 168:14 174:16 193:12

**documentation** 99:2 101:24 225:3

**documented** 48:3,18 68:24 73:18 74:22 115:12 118:3 124:11 160:7 168:24 169:20 170:3 193:10

**documenting** 82:12

**documents** 6:25 7:1 46:10 116:23 124:16, 19,22 126:1 202:7

**dog** 43:8

**dollar** 46:7

**dollars** 218:16

**door** 95:9 106:22 107:1

**doubt** 24:20 34:10 49:5 126:5 185:10

**doubts** 100:1

**draft** 56:24 96:17 106:9 114:12

**drafted** 86:12,13 102:19 103:9,13,19 222:3

**drafting** 102:8

**draw** 37:6,8

**Drew** 6:16 50:16 69:25 73:5 93:3 131:7 153:6 168:5 178:5 189:25 190:17 207:12 211:20

**215:**2

**drive** 142:17

**drop** 112:8

**dropped** 190:11

**due** 28:18,24 42:19 82:7 95:24 130:9 159:23 173:16,18,24 176:8,11 197:6 202:16

**dummy** 131:24

**duty** 52:15,21 63:5 64:4,7 65:2,7,9

### E

**earlier** 19:16 34:13 75:4 104:20 105:12 108:20 118:24 134:13 136:15 137:4 138:25 182:19 194:5 218:14

**early** 135:5 187:18

**earn** 69:9,14

**earned** 18:14,15 117:18 144:5 169:12 170:21

**earth** 70:16

**Eastern** 145:12

**Ed** 54:12,13,14,15,25 55:4,5,8,14

**edit** 180:12 222:4

**edited** 136:23 220:9 222:9

**editing** 51:3

**effect** 115:7 187:24 216:10 218:2

**effective** 18:1

**effort** 49:1 57:12 69:10 89:21 124:14 125:18 159:1 199:18

**efforts** 15:14 18:7 39:2 42:20 44:4 48:22 56:8 67:8,15,17 68:4,5 89:15,16 102:15 112:14 116:16 117:22,23 127:22 128:17 142:24

**159:24 160:2**

**electronic** 229:8

**element** 215:13

**elements** 140:13 199:7,17

**Elizabeth** 182:15,17,21

**Elon** 16:18 126:6 127:23 128:13,17 129:23 220:3

**Email** 13:8 14:5,11 15:17 21:14,24 22:21 23:18 24:1 27:23 54:3, 18 58:16 65:15 67:13 76:16,19 77:7 78:24 79:2,6,9 80:11,12 84:24 85:3,13 88:6 98:15 120:2 125:11,12,13,16 168:13 169:21 170:3 171:24 200:12,17 201:2 205:12 208:5 219:8

**Email's** 29:6 108:24 120:24 124:4 163:22 164:5

**Emailed** 119:24

**embedded** 177:13

**employee** 42:22

**empty** 198:7

**encouragement** 180:23

**end** 22:19 81:16 111:1 119:23 185:19 228:6

**ended** 18:2 74:25 120:14

**ending** 62:4

**energy** 226:22

**Enforcement** 51:21 53:21,23

**engage** 10:18,20 11:24

**engaged** 8:23 14:1 19:6 25:21 30:25 70:6 104:2 108:14

**engagement** 20:25 30:6 78:8 101:9 195:12



**ensuring** 144:21

**entered** 16:5,20 19:20 29:2 34:16 47:5,7 58:5 59:18 76:2 91:21 224:3

**entering** 21:21 28:16

**entire** 33:13,17 63:9

**entirety** 217:5

**entitled** 33:7,10 80:8 140:19 141:24 155:4,14 215:4,10

**entity** 44:2

**envisioned** 11:23 19:2 48:5

**equal** 217:24

**equaled** 218:16

**escrow** 56:19 62:12 71:21 72:6 81:19 84:6 195:16,18 196:20 197:3 198:5

**essential** 97:4

**essentially** 15:18 63:17 78:25 216:16

**established** 18:19 117:16

**estimate** 46:6

**estimated** 44:10 45:22

**et al** 206:6

**eternity** 72:15 226:25

**ethical** 30:12,18 31:1 32:14,20,24 33:24 34:1 75:24 108:18 225:17,18 227:10

**ethically** 53:6

**ethics** 53:8 136:7

**evaluation** 98:17

**Evans** 18:16,17,19 19:4,10,12

**event** 177:7

**events** 204:9 209:16

**evidence** 122:1 126:4 156:17 192:18

**evil** 92:3

**exact** 10:7 45:5 73:17, 24 108:22 172:13

**examination** 6:13 193:20

**exceed** 56:4

**exceeds** 96:5

**exception** 167:9

**excess** 201:11

**exclusively** 64:23

**excuse** 65:14 88:7 180:16 209:21 220:21

**executed** 172:10

**execution** 94:25

**executive** 14:17 40:25 41:19

**exemplary** 148:23 151:3

**exercise** 174:4

**exert** 141:22

**Exhibit** 6:10,19 13:3,8 14:7,12 15:18,25 16:4 17:15,20 21:7,12 22:12 24:4,13 25:8 38:18 44:8 47:19,21 53:16 54:3 58:1 59:24 61:22 65:14 67:3 76:7,12 77:17 78:9,11,12,19,23 79:10, 12 80:11,13 81:6 84:5, 17,21,23 98:8,13 99:5 104:14,18 105:9 107:5, 10,13 109:10,14 117:3, 11 145:4,9 146:21 147:1 152:12 164:9,15 190:19,22 192:3,7 198:19,21 205:10,15

**exhibits** 107:21 108:23 110:1 151:18 153:25 191:2 194:8

**existed** 78:18

**existing** 204:3,5 211:4

**expect** 226:2 227:5

**expected** 137:1

**expedited** 229:10

**expended** 19:11

**expense** 19:11

**expenses** 12:13 17:1 81:22 84:16

**experience** 131:25 132:11

**experienced** 129:5

**expert** 136:6 194:3

**expertise** 103:16

**explain** 55:24 58:15 90:8,10,12 116:17 143:6 165:5 167:25 172:7 173:13 178:22 214:5,7

**explained** 87:9

**explaining** 183:23

**explanation** 117:1 199:15

**exploring** 75:11

**express** 56:3

**extent** 126:6 165:11 168:12

**extort** 49:7 50:16 51:5 121:7 136:22 146:17 147:17 152:1 158:9 162:8 185:7 186:6 201:4 219:13 220:6 221:12

**extorted** 48:15 49:4,6 50:1,9 51:6 52:8 58:9, 22 110:12 112:16 118:25 119:2,4 148:2,3 154:19 166:18 185:7 188:21 220:11 223:2

**extorting** 47:6 48:12 51:14,16 55:12 112:11, 24 113:2 141:1 220:5

**extortion** 48:14 49:13, 18 50:21,23 51:8,22,23, 25 52:3,6,19,22 53:13 55:10 111:3 112:2,3,9, 20 113:19 114:4,8,9 115:11,20 116:20,25 117:8,9,13,17 118:4,16

**expedited** 229:10

**extortionists** 110:11

**eyes** 200:15

**F**

**face** 147:23

**faced** 67:7

**fact** 22:6 25:19,23 34:2, 9 41:23 48:13 51:4 84:13 94:6 98:23 100:6, 13 101:4 108:3 116:22 129:8 136:21 142:3 143:6 166:20 186:11 193:6 194:1 220:12

**factors** 153:1

**facts** 116:5 120:1 127:16 151:9 156:25 157:5 186:5 200:8

**factual** 37:10

**faint** 199:3

**fair** 15:4 23:21,23 37:15 56:11 59:1,3 60:12 65:13 76:1 83:24 89:14 92:15 96:2 99:6 101:25 110:9 114:2 118:15 122:20 135:3 148:21 151:23 153:9,11 154:1 168:19,20,21 189:15 197:2 222:5

**fairness** 168:17

**faith** 60:25 65:9 141:11 162:23 181:1

Note: the column of entries including **121:3,6 130:20 136:19 137:2 139:1,5,11,12,15, 17,21 140:13,22 141:8, 16,20,25 142:19 143:1 146:4,14,16,19 147:9, 21,24 148:5,7,9,11,17 149:20 151:11,19 153:3 154:15 155:3 157:4,13 159:13 161:13 162:24 186:14 191:12,13 199:8,13,14,25 201:3 202:1 203:1,17 212:21 213:11 215:13 219:5,21 220:12 221:8,9 222:1,4, 12,22,25 223:8,18**



**fake** 161:24

**fall** 139:19

**false** 48:21 111:24 118:2,3 152:22 161:25 212:8

**fame** 99:8

**familiar** 30:11 35:20 125:19

**family** 90:1 120:8 159:11,18 161:21 187:20 223:5

**family's** 92:7

**fashion** 129:3

**father** 70:12,14,20 119:24

**fault** 167:7 189:3

**FBI** 124:20

**February** 17:23 18:2 21:15,17,24 22:23 23:25 24:10,15 25:21 27:20,23 29:16 33:21 39:14,22 43:3 46:10 54:4 58:2,6 59:12,19,24 63:3 64:5 65:14 76:17, 20 84:24 85:12,22 86:24 87:11 88:4 97:3 98:5 104:23 105:4,16 135:2 165:17 166:7 169:10 170:4,7 171:25 172:14 187:18 191:23 193:22 224:7

**federal** 196:5

**fee** 9:14,19 10:22 11:13, 14 13:14 14:13 15:3,4, 13 16:23 17:4,21,25 20:13,20 21:23 22:2,24 23:2 24:5,14,22 26:5 27:24 28:3,23 29:20 30:4,12 32:10 33:14,20 34:4,10 44:10 45:11,22 46:5 47:1 56:13,18 58:7 62:12 65:17 69:14 75:17 85:8,18 88:10 89:18,20 96:7 133:2,10 136:8 137:18 138:15 162:5 166:23 167:12 172:13 176:19 178:25 179:2,5 194:13,23

197:23 206:3 207:1 211:7,24 212:16 218:15 224:20

**feel** 53:13 116:20 137:2 148:2 154:19 189:14

**feelings** 62:25 151:20

**feels** 93:7

**fees** 9:23 11:25 15:6,19 17:1 18:11,14,15 19:7,8 20:14,15,21,22 22:2 25:9,24 26:14,16 27:7, 13 28:9 30:21 47:2 56:3 62:9 81:20,23 82:2,7 84:16,25 85:24 86:1 95:24 96:4 132:24 138:23 143:4,7 144:5 166:8 169:12 170:21 171:6 172:15 195:16 196:11 197:4,8,12 198:6,14 204:6 208:13 225:9

**felt** 47:5 49:4 51:19 52:12 66:20 112:16 119:2 124:13 137:1,5 148:3 217:23 222:15

**ferret** 168:15

**fide** 223:13

**fiduciary** 63:5 64:4,6 65:2,6,7,9

**fierce** 110:19

**fight** 92:4 93:10

**figure** 115:17 190:5 207:6 208:4

**figured** 34:25 53:9

**file** 49:10 53:2 111:13 115:14,20 116:2,4,6 118:11 121:8 124:7 137:23 146:7 149:7 152:23 186:11 204:4,20 219:2,19

**filed** 50:17 51:3,12 53:6 109:16 110:21 124:19 145:12,21 147:17,18 148:8 152:1 164:14 174:16,24 203:3 209:14 219:18 220:15

**files** 44:12

**filibuster** 83:17 155:21

**filing** 109:24 111:2 114:24 139:3 186:9 197:10

**final** 14:13 23:2 27:18 29:18 38:16,20 59:16 61:10 62:13 71:22 81:5 96:13 99:1 105:6 108:25 115:24

**finalized** 97:11 135:14

**finalizing** 46:9

**finally** 40:14,19 52:9 121:4

**finance** 62:8,15 67:4 68:15

**financial** 144:4

**financially** 15:16 44:2

**find** 42:21 60:23 117:3 124:18 144:25 149:13, 14 174:17 192:25 193:17

**fine** 69:21 94:20 161:10 214:8

**finest** 119:25

**finish** 23:19 26:22 27:1 31:20 32:3 35:4,9 50:5 79:21 123:13 170:25 213:18,23

**finished** 155:19

**fired** 202:11 224:8

**firm** 7:14 11:21 14:18 16:9 18:19,20 29:17 30:4 34:15 36:17,19 37:5 50:25 81:21 102:12 129:18 137:19 197:6 225:14

**firm's** 12:2 81:19 85:8, 18 88:10

**firms** 12:11 32:25 33:1 225:9

**flag** 136:25 222:16,17, 18,19

**flaming** 54:10,12,13, 15,16,17

**floor** 128:5

**flux** 38:15,20

**focus** 8:10,25

**follow** 62:21 63:22 77:12 78:9 123:10 183:25

**follow-up** 210:7 223:25

**followers** 180:21 190:7

**fond** 121:23

**foolishness** 56:7 62:4 63:20 65:25 66:20,24 67:1,7 69:16 92:5 185:18

**force** 162:8 204:22

**forefront** 133:21

**forgive** 71:1

**form** 6:5 25:12 49:23 55:11 60:1 65:18 71:8 88:12 92:18 97:17 100:8 107:23 118:19 136:3 139:16 140:14 141:19 142:1 146:5 149:2 163:3 199:11 213:4 215:19 223:11 228:12

**formal** 172:11 225:22

**formalize** 66:4

**formed** 7:16

**forms** 141:21

**fortune** 99:8

**forum** 137:15

**forward** 47:16 57:17 68:5 77:5 92:8 140:2

**forwarded** 125:12

**found** 40:9 101:21 124:21 125:25 126:3 129:15 138:16 181:24 187:19 192:18 217:14

**fourth** 85:5 90:19,20,25

**frame** 193:22



**fraud** 8:24 9:2,4,16
111:12,17 113:8 114:17
138:1 208:20,23 210:19

**freedom** 48:24 67:21
117:25 121:16 159:25

**French** 18:15 19:7,9,
11,12,15 20:5

**Friday** 229:10

**friend** 72:14

**frivolous** 62:8 121:8
208:25

**front** 140:17 208:12

**fuel** 66:18

**full** 63:23 125:16 187:4

**fully** 42:2 139:10

**Fulton** 210:12

**fun** 61:14,16

**function** 41:18 99:20

**funds** 66:17 92:17,19
135:25

**fussing** 96:14

**future** 56:7 188:2

**Fuzzell** 32:11 36:8,14,
15 75:9 134:18

**Fuzzell's** 75:7

**G**

**game** 141:23

**gave** 13:20 15:3 16:10,
12 33:12,17,18 35:13
36:2 37:9 49:4 50:2,11
58:22 82:23 87:23
109:5 140:6,9,10 142:4
151:13 155:13 158:4
162:10 182:18 199:23
225:11,25

**general** 82:11 151:2
157:6

**generally** 9:18 12:24
30:20 118:1

**generate** 13:24 102:23

**generated** 192:8

**generous** 15:13 16:13
61:5

**generously** 60:12

**genius** 119:25

**gentleman** 75:15

**Georgia** 30:12 31:1
33:24 43:20 53:14,15
108:18 119:21 186:10,
12

**get all** 71:10 120:1

**Ginger** 55:5,6,18

**give** 6:17,18 23:22
26:25 59:3,4,14,15 60:7
61:5 67:19 80:2 87:6,7
98:16 103:2 106:1
113:17 115:16 117:24
120:13 127:2 135:16
157:21 168:19 182:8
189:8 222:21 223:3

**giving** 59:21 77:5
117:19 151:13 211:15
216:7

**glad** 15:15

**goal** 193:18

**God** 70:19,21 92:3
141:13 184:2 203:13
229:3

**God's** 70:11,23

**gold** 60:14

**Goldstein** 7:20,23 8:1,
16

**good** 15:15 22:15 50:8
58:20 60:13,25 65:9
120:11 123:18 132:16
165:22 175:2,4 181:24
189:18 204:10 215:17
220:13 224:16 227:17

**good-faith** 223:13

**goodness** 132:11

**governed** 170:18

**governing** 170:17

**Governor** 19:18

**grab** 164:18

**great** 193:18 224:14

**greedy** 59:8 96:6

**Green** 43:4

**grievance** 186:9,11

**Grogan** 37:17,23 44:9,
21,22 104:24 206:5

**gross** 16:25

**ground** 194:7

**group** 110:1 184:6

**Grunberg** 10:3 12:9
33:15 39:21 91:22
128:1 219:11,12

**Grunberg's** 12:7

**guess** 41:17 42:5 71:17
78:5 109:18 131:20
139:19 150:2 198:2
207:18 209:17

**guessing** 78:5

**gun** 126:2

**guy** 69:25 159:8,15

**H**

**hack** 124:19 125:8,9
126:20 193:14

**hacked** 29:6 124:4,6,8,
10,22 125:5,7,21,22
127:11 177:24 192:21
193:1,11,16,18,21
194:1

**hacking** 124:2,12
125:6 126:11,18 127:5,
8 192:19

**Halifax** 9:2

**Hancock** 49:16

**hand** 13:7 16:4 17:19
21:11 53:20 76:11
78:23 84:21 98:12
107:9 109:14 145:8
146:25 164:13 191:1
192:7

**handing** 22:12 54:2

**handle** 213:22 225:1

**handled** 26:2 48:4
196:8

**handling** 8:19

**hands** 86:4,6

**hang** 31:12,14 35:3
87:3 88:14 113:9,11
151:6 175:24 212:4

**happen** 25:6 71:25
73:4,10 84:7 106:21
167:13 193:19

**happened** 36:12 38:5
69:2 71:24 72:1 126:21
130:23 140:1 152:8
217:17 225:14 227:13

**happening** 221:6

**happy** 25:2 70:24,25
130:20 144:24 167:19

**hard** 35:13 120:5
123:10 174:2 202:16

**harm** 53:24

**harming** 56:7

**HARRISON** 6:9 25:12
26:22 28:13 31:10,14,
19,24 32:4 33:2,9 35:3
49:22 55:11 60:1,9
62:17 65:18 71:8 72:10,
18,22 73:3,8,21 74:16
83:13,19,25 86:17 87:3,
13 88:12,24 90:23 91:6
92:18 93:22 97:1,17
100:8 106:18,25 107:4,
23,25 110:6 113:15
117:4 118:19 122:22
123:8,17,21 127:3
131:4 132:16 136:3
138:6 139:16 140:14
141:19 143:14,17,25
144:24 145:14,18 146:5
148:19 149:2 150:7,17
151:6,12 152:13
153:18,22 155:10,19,22
156:1,5 157:14,20,23
163:3 164:19,24 165:10
168:4 174:6,22 175:13,
18,24 176:2,7,13,15,20
177:25 178:4,8 182:18,
22 189:20 190:17



**COASTAL COURT REPORTING & VIDEO SERVICES**
**800-791-1100          www.coastalcourt.com**

191:16,19 192:11,13
199:11 206:18 210:1
211:20 212:4,9 213:13,
15 214:6,19,23 215:19
223:11 226:11 228:12
229:4,9

**Hart** 39:8

**head** 109:7

**health** 48:21 61:15
68:20 69:19,20 118:2
119:13,18 122:3 129:12
142:22 157:8 158:13
159:2,10 160:4 161:8,
10 163:2 187:9

**healthcare** 67:10
121:21 158:21

**healthy** 120:11

**hear** 53:10 58:9 94:19
174:12,19 175:7

**heard** 116:9,25 132:3
160:22 208:1

**hearing** 94:20 156:16
195:22 226:18

**heavy** 46:4

**heinous** 121:8

**heinously** 219:3

**held** 22:10 73:13
150:14 176:1 209:23
223:23

**hell** 72:15

**helped** 96:17 106:9
111:20 221:18 222:6
223:10

**helpful** 11:22 181:23

**helps** 221:22

**Herman** 55:1,4,6,18

**Hernacki** 18:19

**high** 16:15

**higher** 12:22

**Hipp** 8:20

**hire** 73:15

**hired** 74:22 76:5 88:5

135:7 137:18 193:23

**hiring** 76:3

**Historically** 162:7

**history** 30:19 33:13,17,
18 34:3 37:10 225:13

**hit** 111:16 118:9

**hold** 15:12 22:8 25:15
29:3 39:18 40:15 47:6
62:11 68:24 76:22
79:20 81:11 165:8
171:15 183:9 200:16

**holding** 173:25

**home** 43:4

**honest** 65:9 140:6,10
155:5

**Honestly** 112:4

**honor** 24:24 70:12,14
224:11

**honoring** 70:20

**hope** 156:19 197:10

**horribly** 167:17

**horse** 147:23 171:2

**Hospital** 9:2

**host** 155:1

**hot** 70:2,4,5

**hotel** 43:7

**hourly** 9:21 10:24
89:17

**hours** 98:22 99:15,20
100:5,12,21 115:14,19
116:19 121:9 142:4
202:22 211:15

**house** 40:10 124:11
132:2

**humor** 14:16

**hurry** 171:2

**hurt** 41:9 129:16,22
142:22,23 164:4 223:4,
5

**hurting** 68:3 127:22

**husband** 42:10 43:15

**hypothetical** 199:24

**hypothetically** 27:4
156:10

———

**I**

**Ibrahim** 226:8

**idea** 22:15 57:20 75:24
118:1 121:18 178:17
181:24

**identification** 6:12
13:5 14:9 16:2 17:17
21:9 53:18 76:9 78:21
84:19 98:10 104:16
107:7 109:12 145:6
146:23 164:11 190:21,
24 192:5

**identified** 118:17 122:4

**identify** 112:1 157:5,9
191:9 205:8 208:7

**imagine** 78:4 184:21

**immaterial** 111:10
114:14

**immediately** 139:3
204:2

**impact** 159:18

**impertinent** 49:9

**important** 39:10 40:15
42:12 92:16 109:18
112:15 179:1 226:24

**improperly** 186:19

**inaccurate** 89:2

**inappropriate** 111:9

**inappropriately**
141:22

**incident** 128:2

**include** 143:9 202:13

**included** 27:24 134:9
143:3,5,11 202:3 220:7,
10

**including** 27:25 39:3
44:6 170:9

**income** 13:25

**incomplete** 63:1

**incorporate** 158:3

**incredibly** 49:8 182:9

**indemnification**
228:5,8,22

**indemnify** 138:17
226:3 227:6

**independent** 19:10
108:2

**individual** 12:10
180:11

**individually** 11:15,17
176:18 179:4 197:13

**inducement** 111:12
113:9 114:17 138:1
208:24 210:19

**inexplicable** 204:17

**inflame** 72:25

**influence** 39:2

**inform** 56:23

**information** 37:9
127:2 144:4 216:5
225:11,12 227:13

**informed** 31:2 137:19

**informing** 97:20

**initial** 30:6 173:15,17

**initially** 19:2 103:4,9
142:4

**initiated** 186:21

**injury** 151:20

**input** 103:2,14,20 106:1

**insert** 200:12

**inside** 32:25

**insist** 56:13 65:16 97:5,
6,23

**inspected** 191:23

**instances** 13:25
101:14 148:4

**instruct** 56:13



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD
247Index: insulted–large

**insulted** 150:12

**integrated** 80:24 81:2
87:25 90:15 96:15 98:3
105:8 106:8

**integration** 170:14

**intelligence** 179:23
182:5 183:6

**intend** 204:3

**intended** 82:24 86:10
142:10 149:7 177:17
178:12,17

**intending** 177:21

**intent** 47:17

**intentional** 57:24 73:7

**intentionally** 62:22
72:24

**intentions** 62:25

**intercede** 97:5

**interest** 81:16 130:16

**interfere** 121:12

**interfering** 48:17 67:11
68:18

**interjected** 128:23

**international** 219:19

**Interrogatories** 191:4

**Interrogatory** 191:9

**interrupting** 155:23
156:1

**intervention** 119:18
158:13 160:3

**intimately** 30:11

**introduced** 136:14

**invested** 43:14

**investigate** 126:24
191:11 192:23 193:25

**investigated** 124:8

**investigation** 53:8
193:2,4

**investments** 43:18

**invoice** 192:8

**involve** 148:22 151:2

**involved** 13:19 16:14
19:3 20:8 28:7 29:9,17
37:21,24 46:17 49:15
50:16 55:15 69:4 74:2,3
77:16 125:23 126:6,12,
13,15,18 127:21 128:16
158:11,18 159:5,6,12
167:11 177:8 192:24
193:7 201:12 206:3
226:8

**involvement** 75:7 77:6
188:16 193:5

**irrelevant** 49:9 111:9
114:14 203:12 204:20

**issue** 30:3 35:13,22
50:18 85:20 86:2,11
92:21 96:19 115:25
127:20 128:21,23
133:16,20 134:24
135:10 137:20,23
170:10

**issued** 51:2,9 148:7
219:17

**issues** 22:4 23:4 25:1
28:18 38:24 39:7 75:8
85:25 103:15 105:3,5
163:2 169:2 170:8
177:23 203:12 212:1

**item** 38:9

**iteration** 102:23

**J**

**jail** 52:1,4,7

**January** 187:17

**jeopardize** 117:23

**jeopardizing** 92:6

**Jesus** 72:7 131:21

**Jewell** 8:13 47:11
48:22 67:20 70:3
112:13 117:24 120:6,7
121:13,15 142:24
159:11,25 161:23

**Jewell's** 121:20

**job** 39:13 41:8 224:14

**Joey** 28:7 29:16 30:2
33:12 47:14 49:14
57:14 59:10 75:18 86:6,
11 109:2 111:20 114:12
115:15 116:15 119:8
177:7,9 179:1 200:13
201:2 204:13 217:18
221:17,25 222:21

**John** 14:23

**Johnathan** 10:3,9,19
12:7,8,16 15:10 19:2
20:8 23:14 24:19 29:8
40:12 41:7 56:4,20 62:5
77:5 80:7 89:13 124:14
125:19 128:1 129:9
130:14 135:8 137:24
158:10,19,22 160:2
161:1 177:17 178:12
186:18,25 188:6,17,22
194:18 200:6 219:2,11

**Johnathan's** 194:5

**joined** 8:16 10:4 52:11

**Jonathan** 40:14,19
97:20 115:21 154:21

**Jones** 191:23 192:17
193:13,24 200:10

**judge** 79:24 80:2 92:23
116:11 175:12 189:13
196:5 216:23 226:9,10
228:1

**judge's** 195:22

**judgment** 228:7

**Julie** 56:2 62:2 66:3,9
95:22,23 226:14

**July** 107:11 136:13
138:19 173:15 178:1,3,
7,9 224:22

**jumped** 32:9 126:2

**jury** 16:19 69:3 126:7,
23 127:6,14,19,21

**Jus** 214:15

**justified** 94:25 142:2

**K**

**keeping** 41:4

**Kentucky** 56:23 81:25
145:13

**Kentucky's** 34:1

**keys** 40:7 94:13 95:17

**kidding** 54:13

**kids** 160:25

**Kimmy** 39:1,8,11
40:18,24 41:6,8,10,14,
21 42:13,16 43:9

**Kimmy's** 43:14

**kind** 8:13 13:12 54:7
58:24 122:18 181:15,22
220:2

**kinds** 221:10

**King** 112:23 148:10
207:19

**knew** 34:2,3 49:2,12
57:7 69:21 74:2 101:14
119:19 121:14 129:16
130:25 131:23 136:9
140:1 177:22 179:2
181:8 189:6 205:12
221:5

**knowing** 50:24 66:21
139:19,20 144:19 215:8

**knowledge** 14:24
42:18 84:10,11 134:3

**knowledgeable** 41:20

**L**

**La** 104:25 105:2,12,24
206:6

**lack** 69:5

**Lake** 132:1

**land** 60:19

**landlord** 26:12 27:10,
12 172:23

**large** 52:14 104:4,9



**larger** 13:13

**largesse** 168:18

**late** 173:15 187:4

**law** 8:2,9 11:21 12:1 13:22 16:9 18:16 19:10, 12 33:1 36:16,19,20 37:3,5 41:11 42:18,19 51:21 52:15 53:21,22 54:24 56:23 64:17,18, 22 82:11 89:24,25 99:8, 12 100:19 102:21 103:6 108:7,10,12 120:14 129:18 140:17 150:21 159:8 171:11 188:2 197:6 220:16 221:5 222:22 223:1,9 225:13

**lawsuit** 42:19 44:6 51:2,12 52:14 111:3 113:6 114:11 115:14,20 118:10 131:7 145:12 146:13 147:17,18 148:8 149:7,17,20 152:2 154:23 198:16 207:23 209:13 210:12,13 226:13

**lawsuits** 8:6 44:7 146:7 150:20 154:2,19

**lawyer** 11:23 52:12,16 53:3 97:24 103:5 105:23 110:23 119:25 121:20 129:5 140:4,25 148:10 153:4 168:3 171:12 172:22,23 174:18 175:2 178:13,15 184:16 219:9 220:4,6

**lawyers** 10:1,2 33:20 34:25 47:2 60:11 82:8 85:7,17 88:9 89:5 95:1, 25 96:6 126:5 128:6 131:22 133:19 141:3 142:8 146:7 147:13 172:10 219:10,13,15,24 220:20,24 221:12,18 227:9

**lead** 97:24 105:21 131:10,14,17,18 132:10

**leading** 117:15 121:1 157:11 161:14 186:17 188:19

**leaked** 163:20

**learned** 29:5 30:2 32:13 41:23 42:2 124:5

**lease** 19:13 25:2 26:11 27:15 29:1 34:13 40:5,6 62:9 63:9,24 65:8,12 68:12,13 69:13 86:2 91:2 93:16 94:1,4,5,14, 23 95:1,4,5,12,13,14,19 96:16 115:9 172:16,21, 22 173:9,10 174:1 201:10 202:23

**leave** 37:16 40:5 44:9 63:3,23 72:6 217:2

**leaving** 11:19 175:9

**lecture** 156:2

**led** 8:13 29:16 125:17

**left** 8:1,22 17:25 18:20 21:18 23:8 33:20 44:1 52:12 60:18 85:21 116:22 172:1

**legal** 34:17,21 35:11 45:20 46:4,14 102:9 108:2 116:10,11 132:23 206:3 225:20 228:9,15, 18

**legible** 200:22

**legitimate** 99:5 146:13 183:25 188:5

**legitimately** 99:14 100:21

**length** 88:16

**lessen** 196:7

**letter** 56:1,25 57:2,3,6 63:12 65:14 66:13 77:8, 11,14,15,18,21,24 78:2, 4,9,10,14,17,18 97:8 107:11,17,18 136:13 138:19 162:14 213:10 224:22 225:4,23

**leverage** 49:3 141:22 165:18

**liability** 62:10 68:12 170:10

**liable** 134:1 138:10,16

220:15 225:25

**liberal** 54:10,12,14,15, 16

**Liberte** 104:25 105:2, 13,24 206:6

**lie** 57:24 61:17 140:10

**life** 47:10 93:16 225:18

**lifting** 46:4

**light** 85:12 156:13

**light-hearted** 16:8

**limitation** 39:4

**limitations** 225:8 228:4,9

**Lin** 6:2 7:11,16,21 8:3 11:8,11 12:14,15 15:9 17:3,12 18:1,14 19:14 20:1,5,15,21 24:6 31:21 32:6 36:23 39:16 40:6 42:3 57:8 64:22 72:18 73:2 74:8 81:13,21,23 82:7,10 83:19 84:15 88:6 93:7 94:15 105:14 138:14,15 142:16,20 170:22 176:17 177:25 178:25 179:3 180:1,21 194:3 206:23,25 207:1 214:2,24 227:8,9 229:14

**Lindsey** 20:12,14 37:17 38:1,6,8 44:8 75:6,13 76:3,5 98:21 99:11 100:10,11,18 104:24 132:21 133:1 134:15 135:1,20 173:22 194:11 206:4

**lines** 12:23 78:3 222:14

**liquidated** 202:25

**list** 25:7 50:6 113:12 157:18

**listed** 21:4 29:21 44:7

**listen** 69:20 81:9 106:16 171:10 200:6

**listening** 166:10

**literally** 14:24 165:20 202:22

**Lithium** 158:23 159:1

**litigate** 106:11 116:4 171:21

**litigating** 138:22 198:14

**litigation** 43:6 51:5 66:18 91:10,16 92:9 104:8 112:12 129:23 136:23 138:20 142:23 147:24 197:7 202:18,24 203:2,4,5,6,7 217:2 220:11 226:22

**live** 42:9,25 59:15 112:18 135:15

**lived** 91:24 120:16 169:3

**lives** 42:10 185:23

**living** 42:21

**LLC** 12:2,9 219:12

**LLC's** 11:16 13:16 20:2,16,22 38:10

**LLP** 18:16 20:5

**LLW** 169:13 172:16 175:19 176:9

**located** 43:20

**location** 37:6

**locks** 95:9

**long** 19:19 21:14 54:7 61:20 70:16 72:15 102:21 109:19 113:17 122:22 123:15,19 150:22 155:11 171:11 198:14 213:25

**longer** 10:19 11:2 172:1

**looked** 36:9 41:7 102:10 118:22 121:1 124:25 129:10 146:15 173:4 175:1 196:19

**Lord** 72:17

**Lorraine** 200:10

**Los** 16:15 132:6

**lose** 41:8 158:15,16



183:18

**lost** 42:19

**lot** 15:5 20:7 23:16
31:12 46:11,18 50:14
130:17,24 131:1,2
140:25 143:5 150:22
154:18 183:7 184:1,2
194:8

**love** 71:1 92:1,2 129:17
180:22 187:21,22,25
188:4,7

**loves** 188:6

**luck** 165:22 224:16
227:17

**lumping** 179:8

**lunch** 122:17

**M**

**made** 14:16,19 15:5,11,
12 18:20 28:16 43:11
49:8 52:9,25 53:25
56:6,17 60:3 63:4 64:19
66:12 71:11,12 81:5
82:13 89:1,3 96:13 99:6
106:4 110:16,22 112:17
115:12 116:17 119:1
120:18 132:4 137:10
139:2,7,13 140:4
141:10 146:9 148:12
149:16 150:22 151:2,17
153:24 154:3,5 162:4
165:12,23 173:3 183:14
184:17 185:5 189:12
202:25 207:21 208:18
213:16 219:20 222:9
224:11 225:19 227:19,
20,23

**main** 66:16 86:1
128:22,25 182:13,24
183:11,13

**maintain** 7:24 19:13
41:11 43:5 56:18 89:23
120:10

**maintained** 7:10,17

**majority** 43:21,24
44:11 46:8,13 102:1

**make** 13:21 15:2 27:12
33:2,11 42:4,21 55:13
56:6 57:10 58:10 60:17
61:9 63:17 65:22 68:8
69:16,18 72:16 82:15
88:19 90:11 93:15
97:22 107:12 108:16
115:5,6 116:7,24
132:12,15 141:17,18
142:16,20 144:11,17
146:1,9 147:19 152:9
154:2 156:22,23 164:1
165:8 170:12 171:18
176:3,5 185:3 189:24
193:3 194:10 198:17
200:7 213:24 218:25

**makes** 63:13 171:12
207:12 211:13 215:11

**making** 41:18 55:5
56:2 67:19 68:19 70:11
87:22 112:11 120:15
141:3 148:22 149:6
152:6,20 160:12 161:4
187:8 202:21 212:5
215:7

**malpractice** 8:10
137:5,11 138:5 225:20
228:10,16,18

**Malware** 192:18,20

**man** 70:1 150:12

**management** 94:24

**manner** 82:1 129:4

**manufactured** 179:19

**March** 26:1 27:19 28:23
34:12,17 35:24 36:6
38:17 48:16 49:19 50:1,
10 61:9,18 67:22 69:22
71:12,13 73:19 74:15,
17 75:1 80:22,23,25
81:3,4,5 88:1 90:14,15
91:21 92:14,21 96:13,
16,19 97:11 98:3,7,14
99:18 101:10 102:17
104:18 105:6 106:7,9
107:12 109:24 112:10
114:9,21 115:3 117:9,
16 118:3,12,14,17,25
119:7 120:15 121:2
133:8,14 135:25 155:2
157:3,11 160:14 161:14

162:1,10,22 166:3
169:1,2,4 170:13,14,16
172:3,9,12 180:18
185:24 186:18 188:20
189:17 201:13,16
202:5,19 203:8,21
206:9 210:21 211:1,14
212:16 215:5,10 217:16
224:5

**Margaret** 181:5,9
182:16,17,19

**Mark** 166:2

**marked** 6:11,19 13:4,7
14:8 15:17 16:1 17:16,
19 21:8,11 53:17 54:2
76:8,11 78:20 84:18
98:9,12 104:15 107:6,9,
13 109:11 117:10
145:5,8,21 146:22
164:10,17 190:20,23
191:1 192:4

**markings** 199:3

**Marquardt** 30:3 33:13
59:10 86:7 107:18
108:8 116:16 162:16
177:8 200:13

**mass** 14:24

**math** 58:19

**Matt** 69:1 119:17 122:4
127:1 158:14

**matter** 7:2 16:19 26:9
30:24 32:17 47:14 48:9
74:13 129:17 139:14
158:8 188:1 204:7
206:9 225:21

**matters** 7:22 11:25
26:15 31:5 83:9

**Mcgraw** 69:2,3 119:17,
20 125:2

**Mcmurtry** 33:25 48:4
54:4 59:23 78:24 79:10
80:19 81:7 84:5,25 85:3
98:15 107:20 108:24
133:22 144:16 152:16
154:5 196:18

**Mcmurtry's** 195:16

**meaning** 134:10

**means** 208:5

**meant** 60:22 66:4 94:3
97:14,18 129:20 192:10

**Medal** 48:24 67:20
117:25 121:16 159:25

**media** 55:6,17 67:14
128:24

**medical** 8:10 160:11

**Medicare** 8:24 9:2,16

**meet** 39:16 67:21

**meeting** 39:22 40:3,10,
24 41:6 67:23 91:12
92:11,13 121:23
131:19,21

**Melinda** 200:14

**members** 206:24

**memo** 35:2 223:7,9

**mental** 48:21 61:15
67:10 68:20 69:19,20
118:2 119:13,18 121:21
122:3 129:11 142:22
157:8 158:13,21 159:2,
10 160:4 161:7,9 163:1
187:8

**mentally** 61:19 160:15

**mention** 199:23

**mentioned** 138:11

**mercy** 165:20

**merged** 170:16

**meritorious** 147:19

**meruit** 50:13 56:5,13
57:5 65:17,22 66:17
68:8 69:10,15 71:14,17
77:20 79:11,16 80:7,12
82:4,9 89:17 90:4 96:1
97:6 98:20 99:10
107:19 133:24 134:5
165:22 166:21,24
167:20

**meryl** 95:25

**mess** 70:1,3,4 119:21
125:18



**messages** 68:25 110:3

**messed** 182:20

**messy** 110:2

**met** 6:15 67:22 120:1 121:25 181:11

**Microsoft** 125:18

**middle** 61:25 105:11 110:25 188:8

**mighty** 141:13

**Milkevich** 200:10

**Miller** 29:13 75:8 124:15,17 126:1

**Miller's** 36:15 75:14

**million** 115:7,10 116:18 118:10 121:7 141:10 146:2 147:6 152:4,10, 18,20 156:19,21 201:6, 11 202:3,23 204:1 218:16

**mind** 15:19 24:21 25:5 48:8 49:6 57:13 59:4,13 98:25 109:17 126:5 142:10 144:10,18 174:11 175:23 185:10 197:21 205:13 216:8

**mine** 84:8 113:1 167:7 180:10 185:23 188:5 189:4 222:13,15

**mini** 83:23

**minimize** 90:1

**minor's** 81:17

**minuscule** 128:21

**minute** 48:11 70:10 99:23 185:16,18 223:21

**minutes** 40:13,21 122:21 189:19

**mirror** 47:8,15

**misread** 62:22

**misrepresented** 87:20,21

**missing** 120:3

**Misstates** 60:2

**mistake** 86:5 162:5

**mistreatment** 129:7

**misunderstanding** 57:11

**Mockingbird** 128:24

**Monday** 115:17

**money** 13:21 15:5 19:11 21:3 69:5 71:10, 21 72:8 84:6 86:10 91:8,15 92:1,2,3,4,15 93:9,14 109:4 117:18 120:13,18 135:16 142:1 167:23 189:1,16 195:24 196:17 197:3,5 198:5, 12,13,17 212:21 223:3 226:1,20

**moneys** 30:22 81:19, 20,22 82:1

**monitor** 181:18 182:7 183:4,17

**monitored** 181:2 184:6

**monitoring** 180:15

**monitors** 183:4

**month** 12:17 34:12 158:25

**monthly** 158:21

**months** 167:16 224:2

**morning** 58:4

**mother** 70:13,15,20

**motions** 102:9

**motivation** 125:8,22 126:15

**mouth** 187:8

**move** 47:10 63:7 66:25 71:1 88:21 140:2 155:7 189:17 213:21

**moved** 15:24 43:2

**moving** 148:19

**Musk** 16:6,11,18 126:6 127:23 128:13,18 129:23 188:15

**Musk's** 220:3

**mystified** 215:2

---

**N**

**names** 199:23 221:20

**nauseam** 111:18

**NBC** 202:11 206:17

**NBCUNIVERSAL** 206:18,23

**necessarily** 17:2

**needed** 22:13 67:9 75:5 101:11 104:3 129:1 140:5 158:20

**negotiate** 29:18 57:14 89:13 135:7 137:18

**negotiated** 26:1 74:25 86:9 87:24 97:10 119:9 133:18

**negotiating** 45:13

**negotiations** 80:21 172:9

**network** 193:25

**news** 93:10

**nice** 69:25 167:4 184:7

**Nicholas** 33:23 49:2 56:8 67:17 68:6 79:25 80:1 81:20 93:1 102:11 108:4,21 117:22 120:22 144:23 147:7 159:20 162:13 196:2 214:10 216:9

**Nicholas'** 153:11

**Nicole** 8:19 10:2 11:18, 22 12:1,17 15:10 19:3 20:9 23:15 24:19 29:8 56:4,20 62:5 77:5 80:7 89:13 97:20 103:3 124:14 129:8,13 135:8 137:25 154:22 186:16, 22 187:1,9,15 188:4,19 194:18 200:7 219:2,10

**Nicole's** 40:10

**night** 31:9 128:8 204:18

**Nikki** 76:16,19 77:1,8

78:3,8

**Nods** 62:21 197:1 214:22

**nominal** 147:25

**non-disparagement** 204:8 209:6,15

**nonetheless** 15:1 98:1

**nonresponsive** 149:11 153:17 155:9 213:5 221:14

**nonsense** 65:25 71:2 161:4

**note** 53:22 129:15

**noted** 57:2

**Notice** 6:3

**noticeable** 127:25

**November** 128:3 187:4

**number** 6:11 13:4 14:8 16:1 17:16 21:8 38:25 53:17 76:8 78:20 84:18 91:20 98:9 104:15 107:6 109:11,24 112:8 145:5 146:22 157:24 164:10,23 180:2,4 190:12,20,23 191:8,9 192:4 198:23 206:3 216:2 218:22

**numbers** 179:18 180:24 184:19

---

**O**

**object** 25:12 55:11 57:22 60:1 65:18 71:8 76:25 86:16 88:12 92:18 93:19 94:17 97:17 100:8 107:23 118:19 136:3 139:16 140:8,14 141:19 146:5 148:15 149:2,10 153:16 155:7 163:3 167:21 175:8 199:11 203:15 204:24,25 207:24 211:16 213:4,20 215:19 220:17 221:13 223:11 228:12



**objection** 49:22 60:9
138:6 213:24

**objections** 6:5

**obligated** 82:3 140:21
199:21

**obligation** 30:19 219:1

**obscene** 50:17 180:13
203:11

**obviated** 79:25

**occurred** 23:25 24:20
45:19 49:19 130:12
135:1 177:7 209:18

**occurring** 226:7

**occurs** 83:18

**Oconee** 132:1

**October** 23:15 39:23
128:3 187:4

**off-the-record** 22:9
73:12 175:25 209:22
223:22

**offer** 98:19 99:7 122:24
166:16,17 201:20 218:7

**offered** 11:19 42:13
57:19 165:15 166:13

**offering** 89:16 175:13

**office** 10:8,17 18:22
19:17,21 23:8 32:25
33:18 34:8,9,14 36:23
39:19,25 40:22 62:9
63:5,8,24 64:8,11,13,
16,20 65:1 92:12,14
94:7 99:9 103:19 128:5
129:9 159:8 170:11
172:1,2 187:1 201:10
212:13

**offices** 39:16

**official** 221:22

**oftentimes** 12:12

**on-board** 10:4

**one's** 113:22 206:12

**ongoing** 47:12 49:1
67:16 117:22

**open** 198:9 201:21

**operating** 12:13
196:21

**operation** 159:3 161:6

**operations** 131:3
161:8

**opinion** 49:6 50:25
51:8,20,25 52:17,19
82:2 108:2 110:24
111:4,23 116:5 119:3
137:3 140:7,10 143:1
146:18 148:11 154:1,17
155:3,4,5 184:22 185:6
200:8 203:1,17 218:6
219:5,8,14 220:14
221:22 223:1,14 225:12

**opinions** 200:1

**opportunities** 91:11,
17 92:10

**opportunity** 13:20
15:2 16:14 174:10

**opposite** 108:22

**opposition** 129:6

**option** 180:7 196:22

**oral** 85:6,16 89:4
132:25

**orally** 227:20

**orange** 156:25

**oranges** 153:5

**order** 81:24 89:23 91:9,
16 143:24

**orderly** 129:3

**outburst** 106:22

**outbursts** 106:24

**outrageous** 89:20
142:2

**outsiders** 182:12

**Oval** 92:11,14

**overhead** 12:13,18,22,
25 41:4

**owe** 135:25 172:23
176:18

**owed** 26:10,11 27:3,14
28:25 64:4,6,7 65:1,2,8
69:13 93:15 115:10
149:24 172:15

**owned** 132:2

---

## P

**P.C.** 7:16,21 8:3 11:8,11
12:14,15 15:9 17:4,12
18:1,15 19:14 20:2,5,
15,21 24:6 36:23 39:16
64:22 82:11 84:15
94:15 138:14,15 170:22
178:25 179:3 194:4
206:25

**P.c.'s** 40:6

**p.m.** 76:17 200:20
201:19,22,24 209:19
229:16

**pages** 110:3,5 114:13
192:11

**paid** 11:25 12:1,6,8,10,
12,25 26:6,9 27:14
28:25 41:1,5 56:3 79:11
82:3 84:13 93:14 99:24
102:24 107:19 108:3
118:5 150:1 156:17
167:20 197:13,16,18,25

**pair** 95:2

**Palentir** 164:6

**paragraph** 54:23 55:21
57:3 67:3 71:20 85:5
90:19,20,25 91:4,19
93:25 94:22 95:21
97:12 98:18 145:25
147:3,4 165:3,6,7 166:5
167:25 169:7,9,16,19,
23 170:19 171:4 172:4,
6,7 173:11,12 175:4
176:23 177:2,12,13
178:20,23 185:11 186:8
190:1 191:15 198:22,24
206:11,14

**paragraphs** 179:6
184:8,11

**parents** 57:4

**parking** 12:23

**part** 7:2 9:6,15 18:7
21:17,19 43:19 48:4
52:14 63:5 66:1 67:6
76:14,15 89:16 110:4
114:7 115:10 121:3
127:8 128:13 133:25
134:10 135:12 139:11
142:3 143:23 149:8
151:11 152:7 159:4,7
186:22 189:14 193:3
201:4,8

**participate** 128:12

**participated** 125:5

**parties** 7:4 30:13 46:21
81:24 122:2 169:11,17,
19 170:2 172:10 183:5

**partner** 7:20 10:14 11:4
18:18 54:24 64:22
65:11 99:10 172:2

**partners** 11:5,6,7,10
37:4 64:7,10,11,25
94:6,7

**partnership** 64:23

**party** 9:24 34:15 75:20
138:14

**patient** 207:11 208:2

**Patsy** 14:23

**pattern** 112:9,11 114:8
117:8,17 118:16 148:4
157:3 159:13

**Paul** 43:18

**pause** 196:14

**pay** 11:13,14,17 12:18
16:18 26:14 27:5,8,10,
11 50:14 65:22 68:8
69:13 75:16 79:16
81:21 82:4 83:3 86:10
89:19 90:16 92:24,25
93:1 104:13 115:6,8,13,
18 116:18 118:10 121:7
134:5 135:11 138:23
141:5,7 152:18 153:14
162:8 166:19 174:1
178:24 179:4 199:21
201:9 202:8,22 206:24
212:21 218:25 225:15



227:9

**payable** 28:24

**payday** 69:9

**paying** 29:19 35:12 41:4 42:16 90:3 91:17 96:6 159:16 162:3 172:21 173:9,19 199:19

**payment** 28:15,23 44:25 86:1 89:14,17,20 92:20 107:12 141:17 143:4 173:24

**payments** 28:18 173:16,17,18,25 179:3

**payout** 202:13

**pays** 204:1

**PC** 7:11,18 12:2,6,7,10 23:9 43:19,25 64:24 81:21 82:7 94:5,6,23 95:24 105:14 134:8,12 169:13 175:19 176:9, 12,21 197:18,19,22,23 198:1 206:23 207:1

**PC's** 11:15 12:10,12 13:1,15 15:10 18:21 20:2,16,22 33:15,16 37:11 38:10 41:1 62:12 91:23 100:2 172:16 196:21

**peace** 42:4 93:18 118:7

**peacefully** 89:22

**pedophilia** 128:22

**pending** 38:15,20 62:13 71:22 147:14,15 202:18 203:4,6,7 206:14 224:11

**people** 47:6 48:11 52:1 53:8,10,25 57:18 60:24 61:8 63:18 65:24 70:6 90:3 99:7 120:12 121:19 140:23,25 148:2,14 153:3 154:18 158:24 160:22 163:18, 19 167:16 168:15 173:25 180:13 182:1,8, 12 183:20,25 184:1,7 185:22 187:11 188:12 220:5 221:5

**people's** 113:23

**percent** 12:19,24 23:22 24:6 27:14 59:1,3,16 61:3,6 89:18,19,21 90:17 91:22 96:7 99:25 105:13,14 106:1 167:2, 5 168:19 172:24 185:8 206:24 215:6 218:13

**percentage** 17:3,12 37:19 38:9 89:14 108:21 133:1

**percentages** 17:2 59:21 135:17 169:3

**perfect** 79:7 120:2

**performed** 44:12 45:8, 21 102:1

**performing** 99:20

**period** 7:19,22 9:3 23:14 29:4 39:24 160:10 188:19

**peripheral** 55:15

**peripherally** 228:17

**permanent** 43:20

**person** 19:5 42:17 43:10 146:10 156:20 181:2

**personal** 111:10 114:13 196:13,24

**personally** 111:18 114:25 196:23 203:12

**perspective** 133:17

**persuade** 39:11 65:16 97:15

**Phil** 29:11 69:2,3 119:17,20 122:6,8,10, 11 125:2 126:4,16,17, 19,21 158:11,12,15,17 160:3,5,7

**phone** 22:1 23:7 40:13 55:16,24 61:1 67:13 124:9 125:21 163:22

**phones** 164:4

**phrase** 149:19 211:22 220:5

**physical** 11:21

**place** 11:19 167:10 189:18

**Plaintiff** 8:10 9:12

**Plaintiff's** 6:10 8:11 13:3 14:7 15:25 17:15 20:16 21:7 53:16 76:7 78:19 84:17 98:8 104:14 107:5 109:10 145:4 146:21 164:9 190:19,22 192:3 201:1

**Plaintiffs** 7:3 10:2 20:2, 23 21:22 25:24 30:15 37:3,19 38:9 39:11 48:14 49:19 54:19 56:14 64:3 65:17 69:6 99:19 102:1 103:9 110:11 119:11 120:21 121:12 122:2 124:3 125:4 126:12 127:20 128:15 129:21 133:3 136:18 157:10 161:14 162:25 166:13 172:14 180:5 185:13 186:3,10, 13 190:7 191:11 192:24 193:7 194:14 217:22

**Plaintiffs'** 132:23 218:13

**plan** 59:21 63:2,4,22

**planned** 25:9 28:16

**planning** 29:19

**play** 61:13

**playing** 58:24 59:5,20 60:6,21 61:13

**Pleading** 102:24

**Pleadings** 11:7,10 102:2,3,8,18 103:7,18

**plenty** 99:2 223:17

**plotting** 63:7

**pocket** 71:5 216:19

**point** 20:8 28:2 30:16 46:1 48:5,8 80:6 86:8, 15 87:22 96:12 105:1 119:11 120:20 123:18 144:11 146:10 156:22 164:8 180:2 185:19

187:5

**pointed** 119:14 134:4

**police** 139:23

**policies** 53:1

**pornography** 180:13 182:3 183:16

**portion** 11:14 16:13 62:12 149:24 172:16,20 173:8 196:10 206:25

**portions** 15:11

**posed** 47:12

**position** 57:8,11 66:12 80:4 82:9,20 120:5 136:6 139:12 158:10 185:5 213:19

**positions** 80:21 81:4 97:21 108:15 134:4

**possibly** 91:11 92:10 122:7

**post** 46:22 137:7 143:12 147:1,21 156:8 177:4 182:13 183:21 198:25 206:15 207:4,7 214:11 215:8,16 216:21 217:11,17,23 218:5 219:7

**posted** 52:17 183:4,11 219:7

**posthumously** 48:23

**posting** 183:2

**postponed** 195:23

**posts** 137:4 182:11 185:14

**potential** 7:4 16:16 68:5 226:12

**potentially** 15:2 33:4 133:23 158:7 216:12

**Powell** 7:20,23 8:1,16

**power** 122:18

**powwow** 161:3

**practical** 26:9

**practice** 8:14 13:23



19:13 41:11 42:18,19
64:17,18 89:25 188:2

**practiced** 8:2 36:20,21,
22 37:3,5 150:21

**practices** 89:25

**practicing** 33:1 99:8
102:21 103:6 171:11

**prayed** 6:24

**pre-march** 106:11

**preamble** 6:18

**preceding** 91:19

**predated** 7:22 80:20
108:25

**predates** 101:9

**predating** 35:23

**preferably** 30:6

**preference** 118:7

**preliminary** 27:19

**preparation** 6:22
103:4 188:15 220:9

**prepare** 35:2,10 38:1
109:3 129:3 185:1
222:7

**prepared** 51:1 98:19
109:1,2 171:16 174:12
184:15,16 222:6

**preparing** 55:25 78:13
102:9

**present** 16:24

**presented** 49:13 91:11
92:10

**President** 48:23 67:19
92:12 117:24 121:22
142:25 147:22 159:24
223:6

**presidential** 48:24
67:20 117:25 121:16
159:25

**press** 51:2,9 111:20
112:21 136:21,23
209:12,13 220:7 222:2

**pressure** 141:23 162:3

**presumed** 148:23

**pretty** 17:11 112:5
138:22

**prevailing** 9:24

**prevent** 56:7 68:10
69:5

**previous** 166:15

**previously** 122:11
133:7 158:4 165:16
166:14 180:5 181:12

**primarily** 8:5

**principles** 118:6,8

**prior** 29:4 80:21,24
87:25 90:14 96:15
105:7 106:7 124:1
131:14 133:22 139:3
170:15

**privacy** 67:15 163:21

**private** 219:20

**privately** 142:7

**privilege** 207:22
224:12

**privileged** 216:5

**probate** 79:24 80:1
92:23 195:22 196:3

**problem** 29:13,14 87:4
90:18 98:21 100:10
103:22 124:24 172:3
182:22 190:11 205:11

**problems** 23:17
187:19 203:14 216:22

**proceeded** 92:23

**proceeding** 103:16
143:21

**proceeds** 30:23 32:18

**process** 152:19 193:16
206:13

**profanity** 182:3

**professional** 7:24

**profile** 16:15

**Project** 220:21

**promise** 24:25 70:14
210:9,10

**promises** 84:5

**proof** 171:15

**propaganda** 182:4

**propagandist** 179:24

**proper** 147:20 213:22

**property** 43:13

**proposal** 201:18

**propose** 6:4

**proposed** 24:5

**prosper** 57:18

**protect** 81:15

**protected** 190:15
220:14

**protection** 144:21
200:9

**proves** 114:7

**provide** 92:3

**provided** 225:13

**psychological** 131:3
159:3 160:12 161:6,8

**public** 52:17 110:24
111:23 137:15 148:7,9
154:14 163:20 185:6

**publicize** 62:15 67:5
68:15

**publicly** 116:4 121:15
140:5

**published** 51:13,17
113:3 207:22 222:3

**pull** 95:8

**pulled** 218:21

**punitive** 148:22 151:3,
20

**puppies** 70:5

**pure** 111:3

**purport** 164:13

**purpose** 160:6

**purposes** 142:11

**pursuant** 6:3 15:6
25:25 26:3 33:23 34:1
92:20

**pursue** 91:10,16
185:12 186:2

**put** 15:15 28:6,7 38:22
39:13 51:16 52:1,4,6
53:11 57:6,12 71:21
83:2,4 84:5 86:4,6
109:7 112:21,24,25
115:18 120:4 133:24
134:2 147:16 148:6,8
152:22 154:10,25
171:22 180:13 182:23
185:5 213:6

**putting** 53:12 70:23
141:12

**Q**

**quantify** 148:24 151:21

**quantitate** 102:5

**quantum** 50:13 56:5,13
57:5 65:17,22 66:17
68:8 69:10,15 71:13,17
77:20 79:11,16 80:7,12
82:4,9 89:17 90:4 95:25
96:1 97:6 98:20 99:10
107:19 133:23 134:5
165:21 166:21,24
167:20

**question** 6:6 26:24
27:22 31:15,21 32:7
36:10 38:7 46:11 62:18
69:19 80:9 84:9 86:18
87:9 88:17,23 89:8,10
91:14 93:21,23 96:25
99:16,17 114:2 125:3
130:8 136:20 139:9
143:8 148:16 150:8,10
151:15 153:8,21,23
155:15,23,24 156:6
157:25 169:22 170:25
174:20,21,22 176:3
188:18 191:8 192:22
194:16 196:17 201:23
202:2 203:19 205:3,6,
23 207:10 208:1 212:5,
11 213:1,9,16 214:16



215:24 220:19,23
221:16 225:6 228:15

**questioning** 133:19
159:9 162:23

**questions** 83:14,20,22
106:16,19 123:14
127:24 150:25 156:4
205:25 207:9 210:7
223:25

**quibble** 109:25

**quick** 123:22

**quickly** 15:24 70:9
104:6 109:22 180:15
183:14 187:9 213:7

**quit** 156:1,2

———————

**R**

———————

**raised** 41:13 75:25

**Ramsey** 13:10 14:14,
20,23,25 15:5 20:20
59:2 61:4 189:8

**ran** 19:18

**random** 77:24

**ransom** 90:3

**re-answered** 31:16

**re-litigate** 135:10

**re-plowing** 194:6

**re-settle** 218:24

**reach** 15:20 22:3 74:7
135:7 193:9

**reached** 18:10 22:1,23
38:16 47:24 74:9,10,18,
23 135:13 166:7 167:6
169:11,17

**reaching** 107:21

**reaction** 173:4

**read** 24:8 34:23 40:11
51:17 55:22 56:9 62:20,
25 70:7,21 76:12 90:5,7
95:5 109:21 165:6
168:8 176:24,25 191:7
200:15 203:24 210:17
214:15,18 215:23 216:1

229:5

**reading** 165:10 200:22

**real** 70:9 115:22 116:25
125:3 132:20 206:20

**reality** 63:20 106:6

**realize** 62:5 69:16

**realized** 16:17 29:24
63:2 69:8 101:10
183:15

**rear-view** 47:8,15

**reason** 29:7 54:21
66:15 147:11 148:17
167:8 175:14 183:10
220:12

**reasonable** 142:6
154:10

**reasoning** 34:18

**reasons** 66:16 184:17

**rebuke** 72:21

**recall** 26:8 33:24 44:14
53:12 135:12 188:11
202:6 209:8 226:7

**receive** 6:21 12:16 26:5
38:10 62:6 90:4 121:15
167:12

**received** 17:13 28:9
57:3 84:15 133:2 177:5
194:25 195:4,15,24
196:10 207:1

**receiving** 17:8 37:20
88:5 179:21

**recently** 116:23 147:22

**recognition** 120:7

**recognized** 118:23,24

**recollection** 18:25
19:25 20:13,19 21:4
36:5 73:20 74:20
134:16 186:24,25

**recommending** 109:5

**reconstruct** 98:23
99:14 100:5,13,21
101:6 220:25

**record** 60:11 72:23
73:4 99:20,22 101:1
144:14 145:15 148:9
150:14 191:7 200:15
214:17 215:25 223:20

**recorded** 99:23

**recording** 101:12

**records** 116:10,12

**recover** 134:12 146:9

**recovered** 11:14

**recovery** 9:23 16:16,25
22:13 44:10 57:5 71:14
177:3

**red** 136:25 222:14,16,
17,18,19

**redundant** 114:14
204:21

**refer** 11:3 24:13 78:10
81:7 104:22 139:18
158:3 171:4 177:12
179:6 186:9 208:14

**reference** 38:21 52:25
63:13 100:18 111:2
195:7

**referenced** 104:19
124:1 157:6 194:18
201:13 202:4 205:9
206:2 211:7

**references** 203:20
211:23

**referral** 75:17

**referrals** 144:5

**referred** 10:13,14
75:12 160:2 208:8

**referring** 77:9,22 92:13
207:18 209:14

**reflect** 20:14 30:20
84:23

**reflected** 21:23 37:19

**reflects** 18:13 23:1

**refresh** 19:25 73:19
74:19

**refreshed** 20:7

**refreshes** 18:25
175:22

**refuse** 142:6

**refusing** 107:12

**regard** 119:12 120:21
134:15

**regular** 67:10 158:21

**regularly** 99:19 101:1

**regulations** 32:24

**Reid** 105:3,13 206:7

**reimburse** 198:1

**reinstated** 189:14

**related** 29:11,12 65:8
85:23 102:11 114:9
124:17 125:2 146:8
179:7 189:10 207:3
225:20 226:24

**relates** 65:11 128:11

**relation** 89:15

**relationship** 11:6 23:3
37:11 47:16 48:17
67:11 68:3,18 70:2,7,22
85:21 92:7 111:11
117:21 119:22 120:11
121:12

**release** 51:2,9 111:20
112:21 209:12,13 220:8
222:2

**released** 111:14
114:19 115:1 208:24

**relevant** 35:6 110:4

**reliance** 227:7

**relied** 33:6 34:2 35:24
108:13,14 136:11
138:17

**relying** 115:4

**remained** 201:21

**remaining** 62:9 197:3

**remains** 198:5

**remarkably** 46:6

**remember** 10:7 15:7,8
16:10 21:21,25 22:6



23:6,9,20 25:19 35:15
36:5 45:3,5 56:21 75:22
79:18,22 80:20 112:8
131:16 133:11 137:8
158:14 180:1,17 181:6
187:5,14 188:9 194:13,
15 202:8 210:14,16
217:13 218:1 219:25
220:24 221:20

**remotely** 43:9

**remove** 124:16

**removed** 40:7,8

**renew** 159:23

**rent** 171:5

**repeatedly** 110:10
185:4

**repeating** 168:6

**replies** 180:12 183:21

**reply** 180:10,22 182:15,
25 183:3 184:4

**report** 51:22 52:22
53:14,15

**represent** 8:23 25:22
74:8 101:11 120:8
135:22 224:12

**representation** 8:12
47:13 67:16 127:22
135:5,13 137:6,12
138:8 164:16 224:2
225:21

**represented** 53:3,4
55:4,5,19 109:23 119:6

**representing** 14:22
52:10 111:22 217:20
224:14

**request** 22:18 41:3
92:14 123:4,18 142:7
177:5,10

**requested** 80:13 92:12
214:18 216:1

**require** 34:5 144:15

**required** 7:24 33:22,25
34:19 35:14 37:14
50:19 115:25 141:18
142:14 224:19

**requirement** 31:1

**requirements** 135:19

**requires** 96:23

**rescue** 130:24

**research** 34:21 35:1,2,
11,19 102:9

**reserved** 6:7 229:12

**residence** 43:2,21

**resolution** 62:13 71:22
120:2

**resolve** 18:7 35:12
89:22 139:14

**resolved** 26:7 34:6
38:24 50:18 65:25
66:25 72:5 166:1 169:3,
14,15 170:9,23 185:22
206:12 228:24

**resolving** 39:7 206:13

**respect** 49:7 67:16
69:1 89:24 105:12
112:10 130:9 202:16
206:14

**respectful** 99:6

**respective** 12:19 15:11
167:11

**respects** 160:16

**respond** 106:12 116:8
142:5 171:19 213:13

**responded** 191:15

**responding** 102:3

**response** 116:7,8
181:3 182:11 191:5
194:16

**responses** 165:12
183:11,14 191:17

**responsibility** 86:2

**responsible** 94:16
95:13 134:7 138:15
156:12,14 226:2

**responsiveness** 6:6
213:21

**rest** 209:25

**result** 189:10

**retain** 221:5

**retained** 74:8,11

**retire** 120:9

**returning** 39:3

**reveal** 193:6

**revealed** 193:4

**reverse** 217:1

**reversed** 189:13

**review** 6:25 7:1 79:3
174:23

**reviewed** 116:23
136:24 204:4 222:2,9

**rewrite** 103:23

**Reyes** 226:8

**Reynolds** 45:3 132:2

**Richard** 8:13 47:11
48:22 67:20 68:4 70:3
112:13,14 117:24
120:6,7 121:13,15,20,
24 142:24 159:11,24
161:23

**Rick** 29:13 36:15 75:8,
14,16 124:15,17 125:25

**rid** 56:6 159:15

**rig** 126:7

**rigged** 69:4 126:23

**rigging** 127:14

**riot** 40:11

**ripped** 40:13

**risk** 39:13 70:24

**road** 159:21

**rocket** 182:2

**role** 131:14 132:10

**room** 175:9

**root** 92:2

**rude** 26:18 128:6

**rule** 32:14,20 34:23
35:20 75:22,24 108:18

167:9 225:8,18

**ruler** 150:15

**rules** 30:12 31:2 33:24
34:1 53:5 136:7 225:17
227:11

**ruling** 115:24

**running** 160:9 187:7

**runs** 42:18,20 228:8

**rush** 142:5 204:17

---

**S**

**sabotage** 126:7 129:22

**sabotaging** 128:12,16

**safe** 180:7

**salacious** 111:9
114:13,24 204:20

**salary** 42:13

**Sandmann** 22:14 26:7,
15 30:3 32:12 33:23
36:11 37:13,16,17 38:5
44:8,20 46:4,9,14,17
47:13,18,19,22 49:2
50:19 56:12,18 57:4,8
60:16 61:3 65:16 67:17
68:6 75:23 77:4 81:20
85:1 90:17 91:10 92:8
99:3,12 100:18 101:6,
23 102:4 103:8 104:5,6,
24 108:21 117:23
120:8,9,22 134:21
136:1 142:23 145:12
146:1,16 147:2,7
152:12 159:20 162:6
167:8,13 177:3 194:25
195:5,15 197:4,12
198:12,13 202:14
206:5,15 207:4 214:11
215:16,17 216:9 217:25
224:1,2,20

**Sandmann's** 63:14
77:19 80:19 81:8,12
82:2,21 97:15 112:14
120:22 133:9 154:16
215:21,22

**sandwich** 122:21



sat 115:21

satisfaction 204:2

satisfactory 93:7

satisfied 27:9

satisfy 72:4

save 6:5 32:1 194:7 200:22

Savior 72:17

scale 104:7

scandalous 49:9

scenario 62:10

schedule 16:24 17:22 20:13

scheduled 91:11

scheme 201:4

science 182:2

seal 116:9,10,11 143:24 144:1

sealed 143:20

search 192:9

second-guess 35:18

secondhand 226:18

secret 226:19

seek 221:21

seeking 71:14 160:3 228:21

semblance 89:23

send 12:16 14:4 56:25 78:3 125:15 162:17,20 177:21 178:18 182:24 227:12,15

sending 76:18 178:14, 15 183:2

sends 80:11

sense 14:16 139:7,13, 22 202:25 207:12 211:13 215:11 220:13 221:9 223:8

sensed 40:2,4

senses 65:24 68:10

sentence 61:25 90:20 94:1 97:13,14 99:4 100:17

sentences 95:2 211:12

separate 12:11 28:17 38:8 132:23

separately 20:15 54:20

separation 89:24

September 7:17 51:10 111:3 112:19,22 114:8 118:23 139:2 143:3

series 123:14 161:12 171:6

services 82:5 99:21

set 26:6,13 59:13 150:25 152:25 157:22 172:13 182:15,25 183:13 191:4 201:5,16 208:14 226:6

sets 22:22

settle 93:12 105:5 167:4 189:11

settled 9:1 15:9 45:18 46:23,25 47:14 48:10 76:5 79:23 85:19 102:17 104:6 105:3 147:23,24 162:6 167:4, 15 189:5,12 207:8 210:20 211:1,6,13 214:12 215:1,3 216:24 217:11 218:23,24 219:1

settlement 17:7,20 18:13 21:1 25:5,8 29:21 30:9,22 37:18 38:13 45:12,25 46:9,15 47:23 49:20 61:18 75:6 76:2 79:23 81:18 98:24 100:6,14 104:19 107:13 116:3 117:10 118:18 119:7 132:21,22 133:8 134:15 135:1,21 136:1 137:18 143:13 154:8 157:11 162:1 172:11 188:20 195:9 201:14 202:5 204:5 205:9 206:9 208:8 210:21 211:3,5,8,23,24,25

212:3,15,17 224:3 225:1

setup 40:2

sever 23:3

sex 130:25

SG 18:16 19:10,12

shake 220:4

Shame 72:20 162:20

shape 15:15

shaped 103:14

share 13:9 25:23 26:11 28:25 41:5 46:6 56:19 72:6 84:15 85:8,17 88:10 89:6 115:9 172:21 173:9,21 174:1 198:13 201:10 202:14

shared 12:17,25

shares 12:13

sharing 10:8,17 14:14 18:22 19:15,17,21 23:8 33:19,20 34:14 39:19, 25 63:6 64:8,11,13,16, 20 65:1 94:7 99:9 172:2 194:13 224:20

shield 179:23

shift 8:13

shifted 9:5

short 132:13,17 189:21 196:14 210:4

shortly 25:20 169:10

show 20:15,17 50:22 143:10 205:15

showed 17:8 20:20 21:3 30:20 118:4 148:4

shows 109:23 168:21

shut 159:15

side 172:10

sign 11:7 186:5 196:3 229:6

SIGNATURE 229:12

signed 11:10 34:11,12

56:1 106:10 119:6 133:14

signers 95:13

significant 13:25 15:3 16:16 170:10 217:24

significantly 218:11

similar 16:5 225:6

similarly 12:3

simple 26:23 90:13 112:6 148:16 161:20 199:12 207:10 208:1

simpler 14:2

simply 14:3 150:18 170:6 220:19

single 119:10

sister 75:15

sit 39:24 72:25 109:19 126:13 132:3 138:3 150:12 179:13

sitting 115:4 140:16 159:14 177:17 187:2

situation 162:4

skill 42:17

skilled 41:20

skips 145:11

slander 152:21

slanderous 204:20 219:3

slate 91:9,16

small 149:8

smart 11:23 129:14 187:11

smear 49:11,15 115:19 118:11 142:11 153:15 203:13 204:21 219:3

smears 114:25 204:23

smiling 72:23

smirking 72:23

Soliciting 200:1

solid 51:20



**son** 69:1 119:17,24 122:4 127:1 130:14 158:25

**son's** 81:15

**sort** 59:20 113:13 131:24 199:2

**sound** 199:24

**sounds** 110:14

**South** 42:25 43:2,12,22 52:13 110:19 140:3 181:13

**space** 19:13 95:4 170:11

**spam** 182:3 183:7

**speak** 7:6 39:1 110:22 111:22 140:5 168:3

**speaking** 21:25 113:23 163:1

**speaks** 85:4 180:1

**specialized** 8:5

**specific** 36:13 113:18 120:20 148:25 157:12, 18 218:1

**specifically** 12:5 125:4 157:5,10 220:9

**specifics** 151:4 161:19

**speech** 83:8,11,23 87:15,16 93:20 106:13 207:25

**spend** 43:21,24 45:17 72:14 128:24

**spent** 198:14

**split** 19:9 24:5 75:17 105:13 137:18 167:1,12 172:13 179:2 197:23 206:3 211:7

**splits** 21:23 22:24 30:12 33:14 58:7 136:8 178:25 179:5 211:24 212:16

**splitting** 166:8

**spoke** 7:5 45:4

**spread** 148:10

**Stacey** 18:17 19:4,16

**stand** 106:4

**standing** 187:1

**start** 61:24 114:11 221:10

**started** 8:7,9,19 55:5 126:24 180:3 183:2 187:3

**starting** 11:20 23:15 39:23 128:2

**starts** 228:5

**state** 42:20 43:6 85:6 95:22 98:19 99:5 159:3 186:10,12 191:22 197:7 211:12

**stated** 88:6,8 90:21 110:10 133:6 137:4 184:22 200:9

**statement** 17:21 18:13 21:1 25:5,8 29:22 35:14 38:2,13 66:12 76:2 84:4 85:12 89:2,3 90:11 109:5 123:1 136:21,23 137:10 148:7 151:23 168:4 176:4,6 177:1 185:4 189:24 194:21 195:10 212:6 213:16 218:1 219:17 220:10 221:19

**statements** 17:7 37:18 68:19 94:8 110:16 111:24 113:3 117:7 133:22 190:14 219:20

**states** 211:3 223:7

**stating** 79:10 107:19

**status** 7:23

**statute** 228:4,5,8,9,19

**stay** 41:14,21,24 42:3,7 43:7 73:3

**stayed** 86:14

**step** 15:18 185:20 193:10

**steps** 129:22

**Steve** 9:19 99:23

**stick** 40:5 63:8 68:11 131:5

**stigma** 10:12

**stinks** 126:16

**stood** 118:6,8

**stop** 31:21 63:20,21 66:1,20,23 67:25 68:2, 17 69:23 155:12

**stopped** 125:14,16 183:1

**stopping** 123:18

**stops** 121:19

**strategy** 106:2

**strictly** 41:2

**strike** 155:8 213:22

**striking** 116:12

**strongly** 137:1

**struggling** 190:4

**stuck** 63:23 228:6

**Study** 161:8 164:4

**stuff** 31:23 40:23 81:1 141:9 142:9

**subject** 20:6 31:18 66:8 67:13 79:24 92:20 123:4 206:9

**subjected** 53:7

**subscribers** 179:18 180:4

**subsequently** 137:22 169:20 170:2 171:7

**substantially** 45:7 180:4 190:15

**subverting** 70:6

**sudden** 118:9 119:3

**sue** 50:13 71:13,16 111:15 113:6 114:21,22 115:3 116:19 129:10 134:12 139:14 152:19 156:19 187:6 201:25 222:20

**sued** 112:20 113:8 138:1 220:11

**sues** 153:4

**suggested** 190:12 219:8

**suggesting** 34:7 121:20

**suggestions** 222:10

**suing** 115:1,2 212:22, 23

**suit** 139:3

**sum** 62:6

**summaries** 223:1

**summarize** 62:24

**summarizing** 27:24 223:9

**summary** 222:5,22

**summing** 126:11

**Sunday** 125:12

**Suntrust** 8:21

**Superior** 111:2

**support** 180:22

**supposed** 39:15 178:1

**surprise** 218:2

**surprised** 63:15 93:3,6 109:8 133:7,13,24 134:2,23 217:13

**surrounding** 117:9

**suspect** 38:12

**suspicions** 127:12,16

**switched** 181:25

**system** 120:3 124:7,9, 11

**systems** 193:8

---

**T**

**table** 174:21

**takes** 182:8



**taking** 17:4 72:11 129:22 139:22 208:11 220:3

**talk** 14:13 35:7 39:11 44:16 54:23 71:20 73:7, 11 110:15 118:12 121:23 123:12 130:21 132:13 142:21 155:12 184:1

**talked** 55:16 132:20 161:2 172:22 219:16 221:1,4 227:16

**talking** 13:9 21:13,16 26:19 32:24 47:18,19, 21 69:6 71:3 77:14 90:6 96:18 121:18 130:8 134:17 136:9 137:9,13 141:2 151:1 160:7 162:22 170:20 186:20 195:9,12 200:6 203:12 205:14 207:14 209:17, 20 214:13 215:20 221:10

**talks** 171:6

**tampering** 127:6,19,21 193:7

**Tara** 126:22

**target** 161:7

**Tat** 43:12

**Taylor** 10:3,7,10,19 12:6,9,16 15:10 19:2 20:10 21:14 22:22 23:14,25 24:19 27:23 29:8 38:22 41:23 42:2 44:15 48:6 56:4,20 58:6 59:19 61:1 62:5 69:1 77:6 85:14 88:8 89:13 97:20 105:21 119:16 124:14 125:13 128:1 129:9 130:15 131:13,17 132:9 135:8 137:25 154:21 158:12,18 160:2 161:2 168:13,25 171:24 186:18 187:1 188:6,22 194:18 200:7 219:11

**Taylor's** 21:23 188:17

**tears** 187:22

**technically** 227:22

**Ted** 56:2 62:2 66:3,8 95:22,23

**Telegram** 52:18,24 53:11,13,25 110:3,10, 15 111:5 123:1 137:14 148:13 179:18,21 182:7 183:15

**telling** 82:18 108:6 114:4 121:7 128:7 144:10,17 158:19 168:2 174:11 212:18 213:2 227:9

**tenants** 94:6

**tentative** 45:24

**term** 140:23 141:2

**terminated** 34:13 39:14 224:1

**terms** 24:22 34:7 42:17 49:13 56:19 60:19 64:7 75:9 76:5 102:8 108:15 116:18 121:6 136:7 144:21 152:8 157:7 165:23 173:19 188:1 194:4 216:13

**testified** 134:13 138:25 139:1 194:9 198:4

**testify** 205:21,25

**testimony** 124:2 133:11 171:3 193:23 222:5

**text** 67:13 68:25 119:15 177:13,14,19

**texts** 163:22 164:5

**Thai** 130:24

**Thailand** 131:2

**thankful** 182:9

**thankfully** 115:15

**Thanksgiving** 131:19

**thing** 18:22 59:1 61:3 66:24 76:13 109:22 111:16 116:7,9 118:11 121:5 126:16 155:21 158:25 162:17 185:24 203:16 216:20 219:18

**things** 23:16 24:20 31:19 48:8 65:10 96:14 104:7 118:2 130:16 142:15 154:24 155:1 159:21 165:25 172:17 180:14 183:15 194:4 197:19 198:15 203:22 212:15 218:25 226:24 228:17

**thinking** 59:22 68:11 72:4 121:23 122:25 123:6 141:14

**thinks** 54:17

**thought** 11:21 15:4 29:12 30:18 32:19 40:6 42:5 44:23 47:14 64:6 68:9 69:15 75:9 77:3,23 87:9 93:13 95:10 116:20 117:15 118:4 124:22 125:8,11 129:4 135:15 139:4 141:13 147:18 148:5 154:9 163:5 171:2 185:17,18 197:9 203:13 222:15, 17,18

**thoughts** 130:18

**threat** 70:11 117:20 120:21 121:11 203:4 210:9

**threatened** 49:1 67:15, 17 112:12 119:12

**threatening** 48:20,22 68:4,5 70:22 120:12 161:21,22,23 223:4

**threats** 47:12 53:24 63:21 169:10

**three-page** 146:25

**thrown** 128:4

**thy** 70:12,14,15

**ti** 91:24

**tie** 40:18

**tied** 27:18 148:25

**time** 7:19,21 9:3 10:7 18:8,9 20:6 22:3 23:11, 14 25:4 28:3 29:4,7,12, 24 30:7,8 31:7,17 32:2

34:16 36:21 37:12 39:24 40:12 41:11 42:4, 16,25 43:22,24 45:17 46:10,25 59:5 60:17 61:20 62:25 63:4 64:5 67:24 71:18 72:15 77:2 79:17,23 85:24 90:6 96:15 98:2 99:2,18,22 101:1,8,12,22,24 103:22 107:2,16 108:13 109:17 110:17 111:21 112:4 116:24 119:19 120:25 124:5 128:24,25 131:13 132:8 133:5,16 135:20,22 137:21 140:24 149:14 150:22 153:3 154:4 156:9 159:6,23 160:8 161:18 167:10 174:5 177:22 181:8,22 182:8 185:19 188:19 193:18,22 194:8,12 200:22 208:11 216:8 220:16 221:1 222:20 224:10 226:21 228:10

**times** 9:25 55:17 61:20 155:16 185:4 213:17 223:15,17

**timing** 130:13 132:13 154:24

**today** 71:2 87:21 126:13 130:19 138:4 155:16 174:3 177:18 188:3 223:15

**today's** 204:9 209:16

**Todd** 33:25 48:4,6 54:4, 18 56:12,18 59:23 63:11 65:15 66:8 77:18, 24 78:1,24 79:2 80:19 82:13,22 84:5,24 86:13 93:6 97:5,22,24 98:15 102:12 103:12 107:20 108:24 109:1,2 133:22 144:16,23 152:15 154:4 195:23 196:5,8,18 217:9 218:8 224:13 225:1 227:15,16

**Todd's** 66:13 77:9,11 78:4,9 79:6 84:8

**told** 30:7 33:22 40:23 41:7 68:21 75:5 79:15



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD
259Index: tolled–warfare

85:22 86:14,15 99:1
101:13 106:20 112:23
113:1 119:20 120:17
129:8 132:9 134:14,20
136:5,11,12 138:18
140:6 148:3 161:1,2,17
168:14 192:20 194:15
196:6 199:10 201:18,19
207:13 208:10 215:15,
22 216:3 217:7,9
218:14 221:6,25
222:16,17 223:14,17
224:8,21,22 225:10,14
227:7

**tolled** 228:10,21

**tomorrow** 55:24
204:19

**ton** 31:7

**tonight** 39:7

**top** 76:13,15 84:4 143:7

**total** 17:4 22:13 173:22
216:14

**totality** 130:12 219:4

**totally** 115:11

**touch** 144:16

**tough** 45:15

**tour** 55:6,17

**trafficking** 130:25

**training** 160:11,12

**transitioned** 127:5

**transparency** 32:17

**Trask** 126:22

**treated** 167:16 189:9

**treatment** 67:10
121:21 128:2 158:22
187:3

**trial** 16:14 131:15
132:10 188:15

**trick** 209:10

**trips** 43:11

**trouble** 95:18

**true** 25:11,16 46:3 54:1

85:2,10 94:9,10 100:7,
15 149:21 153:19
156:5,18 160:14,15
171:8 177:1 180:6
190:15 212:8

**Trump** 48:23 67:19
92:12 121:22 142:25
147:22 159:24

**trust** 179:20

**trusted** 133:19

**truth** 94:20 140:6,9
180:1

**truthful** 85:11

**turn** 24:3 110:5 154:14
164:22 198:21 200:11
219:6

**turned** 125:11 196:2

**turns** 138:13 227:3

**TV** 206:6

**Tyler** 191:23 192:17
193:24 194:2

**type** 64:22 228:7

**types** 8:11 116:12

**typical** 13:12,18 161:6

**typo** 94:2 95:6

**U**

**Uh-huh** 117:4 226:11

**ultimately** 27:17 28:22
29:16 41:21 42:7 121:2
166:1 171:18 181:23
197:14

**unanimous** 14:17

**unclear** 25:6

**undefined** 149:25

**undergo** 67:10

**underlying** 14:25

**understand** 23:12
31:10 35:5 58:10,22
82:25 84:2 90:18
131:25 165:9 173:14
202:17 205:5 208:3

210:25 213:8,19 214:24

**understanding** 134:6
135:19 140:12 199:7
211:10

**unexplainable** 116:17

**unfair** 184:14

**unhappy** 62:4

**United** 223:7

**unjustified** 115:11

**unpack** 11:1 64:1

**unrelated** 83:9 86:20
112:12

**Unsworth** 16:6,11
127:23 128:17 130:17

**Unworth's** 130:18
131:11

**urge** 41:14

**urged** 108:20

**urging** 65:15 77:18
141:17

**V**

**validated** 50:25

**valuable** 42:17

**varied** 14:4 89:16

**variety** 22:24 27:25

**varying** 90:13

**Vernon** 130:17,18
131:11

**versed** 6:16

**versus** 8:21 10:13 12:7
14:21,25 16:6,11 24:4
32:25 37:4,23 47:20,22
85:1 99:11,12 102:4
103:8 104:5 105:2
127:23 128:17 136:1
177:3 194:11 195:15
197:4,12 202:14 206:4,
5,6,7,15,16,23 207:4
214:11 215:16,17
217:25 224:1,20

**viable** 7:18 44:1,2
207:20

**vicious** 57:24

**video** 73:9 229:11

**view** 43:4 45:15,16
142:25 146:18,19
226:20

**viewed** 216:8,10

**Vigilante** 45:4,14,18

**violate** 144:12 227:10

**violated** 225:18

**violation** 63:6 225:17

**vivid** 186:25

**voiceovers** 181:10

**volume** 104:4,9

**volunteer** 181:19

**volunteered** 181:22

**vote** 14:18

**W**

**Wade** 10:3 12:1 33:15
39:21 91:22 186:16
188:4,19 219:10,11

**waged** 44:5

**wait** 70:10 76:22,24
185:18 196:1,6 219:19

**waiting** 110:9

**waived** 111:13,14

**walk** 106:22,25

**wanted** 10:15 33:10
42:6 49:14 57:9,17
59:14 60:23 66:16,20
67:25 68:2 75:16 79:17
80:2,5,6 92:5 93:14,17
97:19 100:3 104:2
105:23,25 108:16 116:3
118:7 134:5 150:1
167:1 184:3 189:6,17,
24 193:2,11 194:23
200:7 218:9,23

**warfare** 44:5



**Wargo** 18:15 19:6,9,11, 12,15 20:5

**warrant** 186:5

**warranted** 134:11

**warranty** 83:2 133:8,25 134:9

**Washington** 46:22 92:11 143:12 147:1,21 156:8 177:4 206:15 207:4,7 214:11 215:8, 16 216:21 217:11,17,23 218:5

**waste** 174:4 226:22

**wasting** 31:6 90:6

**waters** 23:11,20

**Watt** 166:2

**ways** 69:17 148:2

**wealth** 101:23

**wedge** 142:18

**week** 7:9 24:15

**weekend** 131:19

**well-known** 121:17

**WGW** 62:14 71:23 206:24

**WGWB's** 98:19

**whack** 124:7

**whistle** 8:23 9:10,22

**White** 55:5,6,18

**whoops** 206:13

**Wi-fi** 124:11

**wife** 36:15

**willingly** 182:9

**willingness** 39:5

**Wilson** 10:3 12:9 20:11 21:14 39:20 44:15 69:1 85:14 88:8 119:16 132:9 158:12 219:11,12

**Wilson's** 12:6 91:23 128:1

**wished** 112:17 224:16

**withdrawn** 89:10

**withdrew** 89:7

**witnesses** 7:4 226:15

**Wood** 6:2,15 7:10,11, 16,21 8:3 11:8,11 12:14,15 15:9 17:4,12 18:1,14,18 19:14 20:1, 5,15,21 24:6 36:23 39:16,20 40:6 64:22 73:15 74:8 81:21,23 82:7,11 84:15 94:15 105:14 119:17 132:20 138:14,15 170:22 175:19 176:9,17 178:25 179:3,4 180:1,21 194:4 204:21 206:23,25 207:1 210:7 227:8,9 229:14

**Wood's** 57:8

**Wood-ize** 103:3

**word** 11:9 40:20 59:15 222:3,11

**worded** 173:2

**words** 21:4 59:20 68:21,22 161:12 180:22 187:24 197:9

**work** 8:11 9:4,9,10,11, 19 10:1 11:20 13:20 19:4 20:9,10 39:3,5,6, 12,19 40:1 44:11,22 45:7,10,21 46:4,8,14, 17,19,22 48:6 102:1 104:4 161:9 181:7 189:9 192:1 194:3 206:3

**worked** 16:21 27:17 41:1,2 48:7 49:4 102:22 106:3 181:9

**working** 7:19 13:23 44:3 128:16 178:16 218:3

**works** 42:8,24 43:9

**world** 6:17 51:13,17 141:14 148:12 184:1 219:21

**worries** 110:6

**worse** 159:18

**worst-case** 62:10

**worth** 99:13 100:20

**wow** 94:2

**wrap** 209:25

**write** 57:1 77:19 78:11 80:13 111:21 226:5

**writing** 14:6,12 15:21 16:22 22:22 28:6,8 67:24 95:23 119:10 208:11

**written** 58:17 71:15 80:25 85:6,16 89:4 165:19 166:25 172:11

**wrong** 18:11 101:7,16 120:1 124:25 217:10 225:25 227:4 228:6

**wrongdoing** 75:10

**wrongfully** 199:19

**wrote** 27:23 54:4 58:1,3 79:6 96:16 99:19 100:7 107:17 124:23 126:1 158:14 225:3

**Wynn** 9:20 10:25 99:24

---

**Y**

**yah** 60:19

**year** 42:14

**years** 7:10,13 8:25 9:5 103:6 104:9 188:5 228:19

**Yesterday** 219:7

**young** 103:5

---

**Z**

**zillion** 223:15

**Zone** 206:4

