## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

Nicole Jennings Wade, Jonathan
D. Grunberg, and G. Taylor
Wilson,

               Plaintiffs,

                         Case No. 1:22-cv-1073-MLB

v.

L. Lin Wood,

               Defendant.

_____/

## OPINION & ORDER

Plaintiffs bring this defamation action against Defendant for falsely accusing them of criminal extortion.  Defendant now moves for summary judgment.  (Dkt. 69.)  Plaintiffs also move for partial summary judgment. (Dkt. 71.)  The Court grants Plaintiffs' motion and denies Defendant's.

## I.   Background

The parties are attorneys who previously worked together at Defendant's law firm.  (Dkt. 85-1 ¶ 17.)  In February 2020, after Plaintiffs left the firm, the parties agreed to split the firm's future contingency fees in (1) three cases that had not yet settled, and (2) three cases that had

settled but for which the firm had not yet received payment. (Dkts. 72-1 at 11–12, 30–31; 85-1 ¶ 18.) The agreement entitled Plaintiffs to 50–80% of the fees depending on the case. (Dkt. 72-1 at 11–12.)[1]

Just days after the parties reached this agreement, Defendant told Plaintiffs he would not comply with it—even though it was his idea—because he believed the parties had other issues that required resolution. (S*ee* Dkts. 1 ¶¶ 36–38; 72-1 at 11–12, 19–20; 85-1 ¶ 19.) This led to a second agreement in March 2020. (Dkt. 85-1 ¶ 20.) The March agreement—which Defendant proposed and drafted—(1) incorporated the fee-splitting arrangement from the February agreement; (2) required Plaintiffs to contribute $285,000 to the firm's lease obligation; (3) required the firm to pay Plaintiffs 10% of its future contingency fees

---

[1] The Court generally disregards any evidence or facts not included in the parties' statements of material facts in the required form. *See* LR 56.1, NDGa.; *Reese v. Herbert*, 527 F.3d 1253, 1268 (11th Cir. 2008) (compliance with Local Rule 56.1, which the Eleventh Circuit holds in "high esteem," is "the only permissible way . . . to establish a genuine issue of material fact"); *see also Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record."). The Court also declines to "distill every potential argument that could be made based upon the materials before it on summary judgment. . . . [T]he onus is upon the parties to formulate arguments." *Resolution Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).

in two additional cases that were still pending; (4) required the firm to pay Plaintiffs 80% of any fees it recovered from a client who owed the firm almost $200,000; and (5) prohibited Defendant from disparaging Plaintiffs. (Dkts. 71-4 ¶ 25; 72-1 at 30–36; 85-1 ¶¶ 20–21.) To effectuate some of these terms, the agreement required Defendant's firm to pay Plaintiffs a lump sum of $647,949.99 (Plaintiffs' total fees for the three settled cases minus Plaintiffs' $285,000 lease contribution) within 72 hours after the firm received fees in the largest settled case. (Dkts. 72-1 at 30–32; 85-1 ¶¶ 22–23.) The agreement also required Defendant's firm to pay Plaintiffs fees from the *un*settled cases within 72 hours after the firm received those fees. (Dkts. 72-1 at 31–32; 85-1 ¶ 23.)

In July 2020, Defendant's firm received fees that appeared to trigger its obligation to pay Plaintiffs the $647,949.99 lump sum plus 10% of the firm's recovery for a case that settled after the March agreement. (Dkt. 85-1 ¶¶ 24–25.) Plaintiffs repeatedly asked Defendant for those payments. (Dkt. 85-1 ¶¶ 26–29.) Defendant refused. (Dkt. 85-1 ¶¶ 26–29.)

On August 25, 2020, Plaintiffs told Defendant they would sue him for breach of contract and fraud if he did not pay what they demanded.

(Dkt. 85-1 ¶ 30.)  Defendant asked Plaintiffs to hold off on filing suit so they could discuss settlement.  (Dkt. 85-1 ¶ 31.)  To accommodate that request, and with the agreement of both sides, Plaintiffs sent Defendant a copy of their draft complaint and confirmed they would not file suit before August 27, 2020.  (Dkt. 85-1 ¶¶ 32–33.)

On August 26, 2020, Defendant contacted some of Plaintiffs' clients and co-counsel and said Plaintiffs were "extortionists" who were threatening to sue him in order to "extort" money from him.  (Dkts. 71-4 ¶ 37; 85-1 ¶ 35.)  Later that day, after the parties agreed to exchange settlement offers, Plaintiffs sent Defendant a written demand for $1.25 million.  (Dkt. 85-1 ¶¶ 36–37.)  Plaintiffs said this amount would "buy them out of" the March agreement and resolve Plaintiffs' claims for breach of contract, fraud, attorneys' fees, defamation, and breach of the non-disparagement clause in the March agreement.  (Dkts. 71-4 at 109; 85-1 ¶ 37.)  Plaintiffs initially gave Defendant one day to accept the offer. (Dkts. 71-4 at 109; 85-1 ¶ 42.)  But, at Defendant's request, Plaintiffs extended the deadline by four days.  (Dkts. 71-4 at 110–111; 85-1 ¶ 43.) Defendant ultimately rejected Plaintiffs' settlement offer, and Plaintiffs filed their complaint in state court.  (Dkt. 85-1 ¶¶ 45–46.)

During a five-week period the following year, Defendant repeatedly accused Plaintiffs of criminal extortion in a series of messages he posted on a social media platform called Telegram. (*See* Dkt. 85-1 ¶¶ 1–16.) Some of the messages accused Plaintiffs of extortion without much explanation. (*See* Dkt. 85-1 ¶¶ 2, 4, 8.) Some claimed Plaintiffs' $1.25 million settlement demand was extortion. (*See* Dkt. 85-1 ¶¶ 3, 9, 12–14, 16.) And some claimed Plaintiffs extorted Defendant into the March agreement—or otherwise sought to extort money from him—by making "false claims about [his] mental health," threatening to publicize those claims, "interfer[ing] with [his] relationship with [his] children," and "threatening [his] efforts to get President Trump to award Richard Jewell the Presidential Medal of Freedom." (Dkt. 85-1 ¶¶ 1, 13, 16.) Hundreds of thousands of people viewed Defendant's messages. (Dkt. 85-1 ¶ 58.)

In March 2022, Plaintiffs sued Defendant in this case for defamation based on his extortion accusations. (Dkt. 1.) The parties now move for summary judgment. (Dkts. 69; 71.)

## II.   Standard of Review

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

## III.   Discussion

Under Georgia law, which applies here, "a claim for defamation has four elements: (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of special harm." *Am. C.L. Union, Inc. v. Zeh*, 864 S.E.2d 422, 427 (Ga. 2021).  The parties cross-move for summary judgment on elements (1), (2), and (4).  Defendant also moves for summary judgment on element (3).  The Court sides with Plaintiffs on all four elements.

### A.   First Element: False and Defamatory Statement

The first element of a defamation claim requires a statement that was false, defamatory, and about the plaintiff.  *Id.*  It is undisputed that Defendant's extortion accusations were about Plaintiffs.  (*See* Dkt. 85-1 ¶¶ 1–16, 57.)  So the question is whether the accusations were false and

defamatory.  Plaintiffs say they were as a matter of law.  (Dkt. 71-1 at 12–18.)  The Court agrees.

### 1. False

Defendant's Telegram posts claimed Plaintiffs committed—or attempted to commit—criminal extortion when they threatened to sue him if he did not accept their $1.25 million settlement demand.  This claim was false because "demand letters" and "mere threats to sue" "cannot constitute criminal extortion."  *State v. Cohen*, 807 S.E.2d 861, 868 (Ga. 2017); *Buckley v. DIRECTV, Inc.*, 276 F. Supp. 2d 1271, 1276 (N.D. Ga. 2003).  Under a narrow exception, a threat to sue may involve extortion if it is "based on intentional falsehoods or on knowingly frivolous claims."  *Cohen*, 807 S.E.2d at 869 n. 9; *see Rogers v. Dupree*, 824 S.E.2d 823, 831 (Ga. Ct. App. 2019).  Defendant does not invoke that exception here, and the record does not support it.

Defendant's posts also claimed Plaintiffs extorted him by making "false claims about [his] mental health," threatening to publicize those claims, "interfer[ing] with [his] relationship with [his] children," and "threatening [his] efforts to get President Trump to award Richard Jewell the Presidential Medal of Freedom."  (Dkt. 85-1 ¶¶ 1, 13.)  These

statements were also untrue.  In Georgia, a person commits extortion when he "unlawfully obtains [the] property" of another by "threatening" to take one of the actions listed in O.C.G.A. § 16-8-16(a).[2]  Making mental-health claims and interfering with family relationships does not constitute extortion under this language because it does not involve a "threat," much less a threat to take one of the specified actions set forth in the extortion statute.  *See Dial HD, Inc. v. Clearone Commc'ns, Inc.*, 2010 WL 3732115, at *16 (S.D. Ga. Sept. 7, 2010) (no extortion because

---

[2] Section 16-8-16(a) encompasses threats to:

> (1) Inflict bodily injury on anyone or commit any other criminal offense;
>
> (2) Accuse anyone of a criminal offense;
>
> (3) Disseminate any information tending to subject any person to hatred, contempt, or ridicule or to impair his credit or business repute;
>
> (4) Take or withhold action as a public official or cause an official to take or withhold action;
>
> (5) Bring about or continue a strike, boycott, or other collective unofficial action . . . ; or
>
> (6) Testify or provide information or withhold testimony or information with respect to another's legal claim or defense.

O.C.G.A. § 16-8-16(a).

defendant did not "threaten[] to take any of the actions set forth in § 16-8-16(a)"); *G-I Holdings, Inc. v. Baron & Budd*, 179 F. Supp. 2d 233, 256 (S.D.N.Y. 2001) ("The extortion paradigm is 'Give me X or else I *will* do Y.'" (emphasis added)).

Even assuming the extortion statute covered Plaintiffs' other alleged conduct—threatening to publicly question Defendant's mental health and interfere with his Medal-of-Freedom efforts—no reasonable jury could conclude Plaintiffs actually made those threats. Plaintiffs swear they did not. (*See* Dkts. 71-4 ¶¶ 49–50; 71-5 ¶¶ 3–4, 42–43; 71-6 ¶¶ 3, 7.) And Defendant's cited evidence—a few snippets from his own deposition testimony—is too generalized and conclusory to permit a reasonable inference to the contrary. (*See* Dkts. 80-1 ¶¶ 11–12; 85-1 ¶¶ 54–56); *see Leigh v. Warner Bros.*, 212 F.3d 1210, 1217 (11th Cir. 2000) ("conclusory allegations without specific supporting facts have no probative value" at summary judgment); *Jackson v. West*, 787 F.3d 1345, 1357 n.6 (11th Cir. 2015) (finding a declaration "too cursory and too vague to create a genuine issue of fact").

At most, the evidence suggests Plaintiffs discussed Defendant's mental health with one another and told Defendant and his children they

were concerned, Defendant was worried this "could be leaked out into the public," and Defendant was worried such a leak would damage his client work and his advocacy for Richard Jewell. (*See, e.g.*, Dkts. 74-1 at 67–68, 121, 157–164; 80-2 ¶¶ 26, 28–30.)  But, while Defendant's perception of these possibilities may have motivated him to enter into the March agreement or otherwise to pacify Plaintiffs, it does not mean Plaintiffs communicated any specific threat to him—much less a Section 16-8-16 threat—with the intent to "unlawfully obtain[] [his] property." O.C.G.A. § 16-8-16(a).  No reasonable jury could conclude otherwise.

Tellingly, Defendant does not even try to show his accusations were true.  Indeed, he admits Plaintiffs did *not* commit "the crime of extortion." (*See* Dkt. 78 at 6 ("Defendant still does not contend that the acts exhibited by the Plaintiffs during the timeline relevant to this matter constituted fulfillment of the specific elements of the crime of extortion.").)  But he insists his extortion accusations were still non-false because they contained "loose, figurative, or hyperbolic language" that no reasonable person could construe as a genuine accusation of criminal conduct. *Bryant v. Cox Enterprises, Inc.*, 715 S.E.2d 458, 469 (Ga. Ct. App. 2011); (*see* Dkt. 78 at 4–6; *see also* Dkt. 69-1 at 17–22).  The Court disagrees.

Defendant's posts included a slew of assertions that preclude any inference of non-literalness, including that Plaintiffs engaged in "criminal extortion," "committed the crime of attempted extortion," and were "guilty of the crime"; "[t]he law does not sanction lawyers' engaging in such conduct"; "other lawyers . . . agree"; Defendant was "considering whether to pursue criminal actions against Plaintiffs"; Plaintiffs were "extortionist lawyers who should be disbarred"; and "[t]he public should file bar complaints against them." (Dkt. 85-1 ¶¶ 1, 3–4, 8–9, 12, 14.) Defendant made some of these statements in a *discovery response* that he posted on Telegram, further bolstering the impression he meant them. (Dkt. 85-1 ¶¶ 10–12.)  He also told readers his discovery response was "correct and truthful" because, "[a]s a trial lawyer with 43 years experience," he knew it had to be.  (Dkt. 85-1 ¶¶ 10); *see Punturo v. Kern*, 2018 WL 5276142, at *8 (Mich. Ct. App. Oct. 16, 2018) (noting in the context of an attorney's extortion accusation that, "when [an attorney] uses a specific legal term to describe a person's behavior, a reasonable juror would be well-supported in understanding that term as an accusation of a specific crime, not rhetorical hyperbole").  Defendant even posted a link for "concerned citizens [to] file Bar complaints" against

Plaintiffs for engaging in the "criminal conduct" of "attempted extortion." (Dkt. 85-1 ¶ 8.)  Given the totality of these statements and the record more generally, and construing Defendant's posts together as he asks the Court to do, no reasonable jury could believe his extortion accusations were anything but literal and genuine.  (*See* Dkts. 69-1 at 24; 78 at 8.)[3]

Defendant also claims his accusations were not false because they were "mere opinions."  (Dkts. 69-1 at 22–25; 78 at 3–8.)  The Court again disagrees.  A statement is not an opinion if it is "capable of being proved false."  *Gettner v. Fitzgerald*, 677 S.E.2d 149, 154 (Ga. Ct. App. 2009); *see Empire S. Realty Advisors, LLC v. Younan*, 883 S.E.2d 397, 399 (Ga. Ct. App. 2023) ("[A] statement that reflects an opinion . . . cannot be proved false.").  "[T]he accusation that [a person] is guilty of a crime punishable by law is susceptible of being proved false."  *Eidson v. Berry*, 415 S.E.2d

---

[3] Even assuming Defendant *intended* his accusations to be rhetorical hyperbole, that would not change the outcome here because what matters is how "the average person would . . . have understood" them.  *Johnson v. Lindsay Pope Brayfield & Assocs., Inc.*, 875 S.E.2d 856, 862 (Ga. Ct. App. 2022); *see Lucas v. Cranshaw*, 659 S.E.2d 612, 615 (Ga. Ct. App. 2008) ("A publication claimed to be defamatory must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it.").  As explained above, the average person would have understood Defendant's posts as literal, genuine accusations of criminal conduct.

16, 17 (Ga. Ct. App. 1992); *see Andrews v. D'Souza*, 2023 WL 6456517, at *14 (N.D. Ga. Sept. 30, 2023) (accusations of "highly illegal" conduct and "organized crime" were "not statements of opinion" because they were "capable of being proved false"). So, too, is the more specific accusation that a person is guilty of criminal extortion. *See Friedman v. Bloomberg L.P.*, 884 F.3d 83, 97 (2d Cir. 2017) (the assertion that someone "actually committed the criminal act of extortion" is "capable of being proven false"); *Stavros v. Marrese*, 753 N.E.2d 1013, 1018 (Ill. App. Ct. 2001) ("We consider the assertion that plaintiff committed extortion to be objectively verifiable and therefore actionable [as defamation]."); *Kern*, 2018 WL 5276142, at *6–7 (extortion accusation was not an opinion because it was "provable as false"). Because a statement cannot constitute an opinion if it is verifiable and because Defendant's extortion accusations *were* verifiable, Defendant's accusations were not opinions.

Even assuming the accusations did involve opinion, they would still be actionable because they "contain[ed] a provably false factual *connotation.*" *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990) (emphasis added); *see Eidson*, 415 S.E.2d at 17 ("expressions of opinion may often imply an assertion of objective fact" that is provably false). In *Eidson*, for

example, defendant publicly claimed a government attorney "act[ed] improperly" when he gave the news media an audio recording of a racist conversation between other government officials. *Eidson*, 415 S.E.2d at 17. The defendant said the attorney "should . . . be prosecuted" and "barred from practicing law because he knowingly violated federal law." *Id.* The trial court held these statements were not defamation because they were merely opinions. *Id.* The Court of Appeals reversed. The court said what mattered was not whether the statements were opinions but whether they "impl[ied] defamatory facts" that were "false." The court concluded defendant's statements were actionable under this principle because they could "easily be taken as an assertion that [the attorney was] guilty of a crime punishable by law," which was an assertion "susceptible of being proved false." *Id.*

So too here. Whether or not Defendant's Telegram posts contained opinion, they—like the statements in *Eidson*—claimed Plaintiffs should be disbarred and potentially prosecuted for committing a crime. This "impl[ied]" Plaintiffs were "guilty of a crime punishable by law," which—on the facts here—was both "susceptible of being proved false" and actually *was* false. Thus, as in *Eidson*, Defendant's posts are actionable

regardless of any opinion content. *See Milkovich*, 497 U.S. at 21 (alleged opinions were actionable because they contained "the connotation that petitioner committed perjury," which was "susceptible of being proved true or false"); *Kern*, 2018 WL 5276142, at *6 ("even if words suggesting personal opinions were used, they implied an assertion of objective fact"—namely, that plaintiff "committed extortion"—and thus were "actionable").

Finally, to the extent Defendant's accusations were opinions, they are still actionable because Defendant's public description of "the facts upon which he base[d]" those opinions was "incorrect or incomplete." *Milkovich*, 497 U.S. at 19; *see N. Atlanta Golf Operations, LLC v. Ward*, 870 S.E.2d 814, 819 (Ga. Ct. App. 2022) ("The explanation [for an opinion] must have been truthful to avoid potential liability for defamation.").[4] To be sure, one of Defendant's Telegram posts did include

---

[4] *See also Deeb v. Saati*, 778 F. App'x 683, 687–88 (11th Cir. 2019) ("A speaker cannot invoke a 'pure opinion' defense . . . if the facts underlying the opinion are false or inaccurately presented." (applying Florida law)); *Gast v. Brittain*, 589 S.E.2d 63, 64 n.6 (Ga. 2003) (an opinion is actionable if it is "so intertwined with false statements of fact that the false total stated constitutes defamation"). The Court recognizes *Deeb* is unpublished and not binding but cites it as instructive, nonetheless. *See Searcy v. R.J. Reynolds Tobacco Co.*, 902 F.3d 1342,

a copy of the $1.25 million settlement demand that animated some of his extortion accusations.  (Dkt. 85-1 ¶¶6–7.)  But the posts also included several misrepresentations, including that Plaintiffs were really seeking $1.5 million, Plaintiffs admitted they were only entitled to $647,000, and Plaintiffs were "threatening" to publicly question Defendant's mental health and interfere with his work for Richard Jewell.  (Dkt. 85-1 ¶¶ 1, 14, 16.)  The posts omitted other pertinent facts too, including that Defendant was the one who drafted and proposed the March agreement, several of its terms were his idea, he received fees that ostensibly triggered his obligation to pay Plaintiffs under the agreement, Plaintiffs sent him their draft complaint and settlement demand with the agreement of all parties, Plaintiffs granted his request for extra time to consider the demand, Plaintiffs baked into the demand their entitlement to future fees in several cases (not just the $647,949.99 for previously settled cases), at least two such cases involved high-value claims with the potential to generate substantial fees, and Defendant recently told key third parties that Plaintiffs were guilty of extortion, which arguably

---

1355 n.5 (11th Cir. 2018) ("Unpublished cases do not constitute binding authority and may be relied on only to the extent they are persuasive.").

entitled Plaintiffs to additional damages under the non-disparagement clause in the March agreement.  (*See* Dkts. 71-5 ¶¶ 35–38 (discussing the bases for Plaintiffs' $1.25 million demand); 85-1 ¶¶ 37–41 (same), 48 (state court issued an October 2020 injunction enjoining Defendant from breaching the non-disparagement clause).)  Taken together, these statements and omissions created a false and misleading picture of the facts underlying Defendant's accusations.  So the accusations are actionable even if they were opinions.

### 2. Defamatory

To ground a claim for defamation, a false statement must also be defamatory.  A statement is "per se defamatory if it [asserts] one is guilty of a crime." *Harris v. Pierce Cnty., Ga.*, 2014 WL 3974668, at *17 (S.D. Ga. Aug. 14, 2014); *see* O.C.G.A. § 51-5-4(a)(1) ("[i]mputing to another a crime punishable by law" is per se defamatory).  As explained above, that is exactly what Defendant's extortion accusations did here, regardless of whether Defendant subjectively intended them to do so.  *See StopLoss Specialists, LLC v. VeriClaim, Inc.*, 340 F. Supp. 3d 1334, 1351 (N.D. Ga. 2018) (whether a statement "imput[es] a crime to plaintiff" depends on how "the average reader" would construe it); *Hoffman-Pugh v. Ramsey*,

193 F. Supp. 2d 1295, 1299 (N.D. Ga. 2002) ("[W]hat the Plaintiff understood or the Defendants intended is irrelevant.").  No reasonable jury could reach a different conclusion.  So the statements are defamatory.  *See Hoffman-Pugh v. Ramsey*, 312 F.3d 1222, 1225 (11th Cir. 2002) ("the question of whether a published statement is defamatory . . . is one of law for the court" if "the statement is not ambiguous and can reasonably have but one interpretation").

### 3. Conclusion

Given the totality of the record, including the parties' factual submissions and legal arguments, a reasonable jury could only conclude Defendant's extortion accusations were false and defamatory.  Plaintiffs are thus entitled to summary judgment on the first element of their defamation claim.  Plaintiffs are also entitled to summary judgment on the fifth and sixth defenses in Defendant's answer, namely, that Defendant's statements "were true or substantially true" (fifth defense) and "constitute protected opinion" (sixth defense).  (Dkt. 21 at 2–3.)

### B.    Second Element: Unprivileged Publication

The second element of a defamation claim "requires both that the statement is not privileged and that it is published to a third party."

*StopLoss*, 340 F. Supp. 3d at 1347.  It is undisputed that Defendant published his extortion accusations to third parties when he posted them on Telegram.  (*See* Dkts. 74-1 at 185; 80-1 ¶ 18; 85-1 ¶ 58.)  So the only question is whether those accusations were privileged.  Defendant says they were because they fell within O.C.G.A. § 51-5-7(9), which protects "[c]omments upon the acts of public men or public women in their public capacity."  (Dkts. 69-1 at 9–16; 78 at 8–10.)  Defendant cites no authority for the proposition that this language includes persons other than public *officials*.  Nor does he claim Plaintiffs were public persons *generally* (which they clearly weren't).  But he insists Section 51-5-7(9) still applies because Plaintiffs were "*limited-purpose* public figures" under a First Amendment doctrine that governs the level of fault required for an entirely different element (the third element) of Plaintiffs' claim.  (Dkts. 69-1 at 9–16; 78 at 8–10.)  The Court rejects this argument.  Even assuming Section 51-5-7(9) includes public figures as well as public officials, even assuming it includes limited-purpose as well as general public figures, and even assuming it incorporates the First Amendment standard for limited-purpose public figures, Defendant's argument would still fail because Plaintiffs do not qualify as limited-purpose public

19

figures under that standard.  *See Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016) ("Determining whether an individual is a public figure . . . is a question of law for the court to decide.").

A plaintiff is a limited-purpose public figure if he or she "voluntarily injects himself [or herself] or is drawn into a particular *public controversy*" with respect to which he or she is allegedly defamed.  *Little v. Breland*, 93 F.3d 755, 57 (11th Cir. 1996) (emphasis added).  A public controversy is an issue that (1) is "debated publicly" and (2) has "foreseeable and substantial ramifications for nonparticipants."  *Id.*; *see Grlpwr, LLC v. Rodriguez*, 2023 WL 5666203, at *6 n.6 (N.D. Fla. Aug. 25, 2023).  With respect to (1), the public debate must involve actual discussion of a "specific question," not just "general concern or interest." *Waldbaum v. Fairchild Publications, Inc.*, 627 F.2d 1287, 1297 (D.C. Cir. 1980).[5]  With respect to (2), the issue must "affect[] the general public or some segment of it in an appreciable way."  *Id.* at 1296.  "The public controversy must [also] have preexisted the alleged defamation."  *Little*, 93 F.3d at 757.  And plaintiff must have knowingly assumed "a special

---

[5] The Eleventh Circuit has endorsed *Waldbaum's* "standards for determining whether plaintiffs are limited public figures."  *Silvester v. Am. Broad. Companies, Inc.*, 839 F.2d 1491, 1494 (11th Cir. 1988).

prominence" in it. *Waldbaum*, 627 F.2d at 1297; *see Silvester*, 839 F.2d at 1496–97.

Defendant repeatedly claims Plaintiffs were central figures in "the controversy that arose from the conclusion of the business relationship between the Parties." (Dkt. 69-1 at 12; *see* Dkts. 78 at 9; 83 at 2, 8.) But he never defines this controversy with any specificity, which makes it impossible to evaluate. *See Little*, 93 F.3d at 757 (the first step in the public-figure analysis is to "isolate the public controversy"). And, looking through the record, the Court sees no defamation-related issue in which Plaintiffs were "intimately involved" that would even come close to a public controversy (not before Defendant's accusations, anyway). *Id.* at 758.

The parties were essentially involved in a run-of-the-mill fee dispute, which led to settlement discussions, a couple of agreements, and a lawsuit. Nothing suggests any of those things were particularly "newsworthy" at the time, much less "the subject of extensive public debate" with "foreseeable and substantial ramifications for nonparticipants." *Id.* at 757. No one cites any "official state investigations," "television news stories," "documentar[ies]," "newspaper

articles," "coverage in the local media," or the like. *Id.* at 757–58; *Berisha v. Lawson*, 973 F.3d 1304, 1310 (11th Cir. 2020). And a dispute over attorneys' fees is hardly the kind of "legitimate public concern" that promises to "affect[] the general public or some segment of it in an appreciable way." *Silvester*, 839 F.2d at 1495; *Waldbaum*, 627 F.2d at 1296; *see Foretich v. Cap. Cities/ABC, Inc.*, 37 F.3d 1541, 1554 (4th Cir. 1994) ("[T]he mere facts that a dispute was litigated and that the litigation garnered some news coverage do not, by themselves, render the dispute a public controversy.").

The Eleventh Circuit has also noted public figures "usually have greater access to the media" and "voluntarily expose themselves" to a heightened risk of defamation by "invit[ing] attention and comment." *Silvester*, 839 F.2d at 1494. Neither of these things holds true for Plaintiffs, whose pre-defamation "activities and public profile[s]"—as best we can tell—were "much like those of countless members of [their] profession." *Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979); (*see* Dkt. 80-3 ¶¶ 23–25). That Plaintiffs lacked these "fundamental" characteristics of a public figure is another reason to conclude they were not public figures at all. *Berisha*, 973 F.3d at 1310.

Plaintiffs were not limited-purpose public figures under the First Amendment because Defendant has not identified a relevant public controversy in which they assumed a role of special prominence. This kills Defendant's privilege argument under Section 51-5-7(9). No reasonable jury could conclude Defendant's accusations were privileged. So Plaintiffs are entitled to summary judgment on the second element of their defamation claim.[6]

## C.   Third Element: Fault

The third element of a defamation claim requires "fault by the defendant amounting at least to negligence." *Zeh*, 864 S.E.2d at 427. Only Defendant moves for summary judgment on this element. His sole argument is that, because Plaintiffs are limited-purpose public figures under the First Amendment, they must show he published his

---

[6] Several courts have said that, to establish a privilege under O.C.G.A. § 51-5-7, a defamation defendant must show "good faith, an interest to be upheld, a statement properly limited in its scope, a proper occasion, and publication to proper persons." *Zeh*, 864 S.E.2d at 435 n.16; *see Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994); *StopLoss*, 340 F. Supp. 3d at 1348; *RCO Legal, P.S., Inc. v. Johnson*, 820 S.E.2d 491, 501 (Ga. Ct. App. 2018); *Richardson v. King*, 316 S.E.2d 582, 583 (Ga. Ct. App. 1984). Defendant does not explicitly address these elements or respond to Plaintiffs' argument that he is required to do so. (*See* Dkts. 80 at 16; 83 at 2.) This further supports the Court's conclusion that summary judgment is proper here.

accusations with "actual malice," which they cannot do. (*See* Dkt. 69-1 at 9–16.) This argument fails because the Court has already concluded Plaintiffs are *not* limited-purpose public figures. Defendant offers no other argument on the third element of Plaintiffs' claim. So Defendant's motion for summary judgment on that element is denied.[7]

### D.    Fourth Element: Harm

The final element of a defamation claim requires either "special damages" or "a statement [that] is defamatory per se." *StopLoss*, 340 F. Supp. 3d at 1349–50. The Court has already concluded Defendant's extortion accusations were defamatory per se because they "[i]mput[ed] to another a crime punishable by law." O.C.G.A. § 51-5-4(a)(1). This means "damage is inferred," no showing of special damages is required, and Plaintiffs are entitled to summary judgment on the fourth element of their claim. *Id.*; *see StopLoss*, 340 F. Supp. 3d at 1349–50.

---

[7] Even if Plaintiffs were limited-purpose public figures, summary judgment would still be inappropriate because, as explained in Plaintiffs' brief, a jury could conclude Defendant acted maliciously. (*See* Dkt. 80 at 16–23.) That also precludes summary judgment on Plaintiffs' request for punitive damages. (*See* Dkt. 69-1 at 13.)

## IV.   Conclusion

The Court **GRANTS** Plaintiffs' Motion for Partial Summary Judgment (Dkt. 71) and **DENIES** Defendant's Second Motion for Summary Judgment (Dkt. 69).  The Court **DENIES** Defendant's Motions for Oral Argument (Dkts. 70; 84) because Defendant has not shown oral argument is necessary.

The Court also **DENIES** Defendant's First Motion for Summary Judgment (Dkt. 68)—a borderline frivolous filing—for the reasons stated in Plaintiffs' response brief (Dkt. 79).  This motion claimed the Court lacks personal jurisdiction over him because he is a nonresident.  But, as Plaintiffs explained in their brief, the Court "has jurisdiction over Defendant Wood because he was personally served in Georgia, he waived any such objection by failing to raise it in his first responsive pleading, and he waived any such objection by actively participating in this litigation for nearly a year."  (Dkt. 79 at 17.)

Finally, the Court **DENIES WITHOUT PREJUDICE** the parties' Motions to Seal (Dkts. 73; 75) because they are overbroad, generalized, insufficiently justified by reference to authority, and presented in a way that makes it needlessly onerous for the Court to identify the specific

portions of the record for which protection is sought (and the basis for such protection).  For example, neither side cites any caselaw or fleshes out any legal arguments, in violation of the Local Rules.  *See* LR 7.1(A)(1), NDGa.  Plaintiffs move to seal Defendant's deposition transcript even though it is already public. (*Compare* Dkt. 74-1 *with* Dkt. 72.)  Defendant also seeks to redact public information.  (*Compare* Dkt. 71-3 at 48–50 *with* Dkt. 74-2 at 1–3, and Dkt. 71-3 at 55–56 *with* Dkt. 74-3.)  And the parties have filed under provisional seal hundreds of pages of discrete documents—cumbersomely bunched together in only three filings—without clearly pinpointing the specific content that supposedly requires protection.  (*See* Dkts. 69-1; 72; 72-1.)

If the parties want to renew their sealing requests, they may do so in a single joint motion **no later than thirty days after the entry date of this Order**.  Any such motion must identify the specific portions of the record sought to be sealed (by page and line number where appropriate), explain with specificity why each such portion requires sealing, include a robust discussion and application of relevant authority, and make it as simple as possible for the Court to understand, evaluate, and effectuate each sealing request.  The parties also must attach a

proposed order containing everything necessary to effectuate the sealing they seek (and everything necessary to ensure the docket otherwise remains clean, orderly, and accessible to the public). Documents 69-1, 72, and 72-1 shall remain provisionally sealed until the Court orders otherwise.

**SO ORDERED** this 12th day of March, 2024.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE