NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                    6

```
1              MR. BEAL:  This will be the
2        deposition of Defendant Lin Wood taken
3        pursuant to Notice and agreement of
4        Counsel.  I would propose that all
5        objections save to the form of the
6        question or responsiveness of the
7        answer be reserved until first use of
8        the deposition, is that agreeable?
9              MR. HARRISON:  Agreed.
10                (Whereupon, Plaintiff's Exhibit
11                Number 1 was marked for
12                identification.)
13                DIRECT EXAMINATION
14   BY MR. BEAL:
15        Q    Mr. Wood, we met before.  My name is
16   Drew Beal, and I believe you are well versed in
17   the world of depositions, so I won't give you
18   any preamble.  Instead I will give you what has
19   been marked as Exhibit 1 to this deposition and
20   ask you if you have seen that before?
21        A    I did receive it in advance of it, yes.
22        Q    What did you do in preparation for this
23   deposition?
24        A    Nothing.  I prayed.
25        Q    Did you have any review of documents?
```



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                    11

1      Q      Let us unpack what you just said.
2             If they were no longer Associate's did
3      you refer to them in the Bar and the courts and
4      the clients as your partner?
5      A      I did and they were my partners.  They
6      were partners in a business relationship.
7      Q      And did they sign Pleadings as partners
8      of L. Lin Wood, P.C.?
9      A      I don't know if they had the word
10     partners, but they certainly signed Pleadings as
11     under the name L. Lin Wood, P.C.
12     Q      All right, thank you.
13            And when you would pay them a fee, a
14     portion of the fee recovered, did you pay that
15     to them individually or to one of their PC's or
16     LLC's?
17     A      I did not pay them individually.  So
18     the arrangement was Nicole had -- when she was
19     leaving Bryan Cave and I offered her a place to
20     work, instead of her going out and starting up
21     her own physical law firm, I thought it would be
22     helpful to her and helpful to me, because Nicole
23     is a very smart lawyer; and I envisioned that I
24     would be able to engage her to help me in
25     matters, and so all of the fees that were paid



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                               21

```
 1        Q    No, I mean the Settlement Statement?
 2        A    I would have to see it.  I think it
 3   showed how the breakdown of money.  In other
 4   words, my recollection is that it listed how
 5   much each of them got.
 6        Q    Okay.
 7              (Whereupon, Plaintiff's Exhibit
 8              Number 6 was marked for
 9              identification.)
10   BY MR. BEAL:
11        Q    Let me hand you what has been marked
12   Exhibit 6.
13              And we are going to be talking about
14   the first long Email from Taylor Wilson to you
15   dated February 17, 2020.
16        A    Okay, we are going to be talking about
17   the first part of it?  Not February 18th?
18        Q    Correct.  I don't know.  We just left
19   it on there for context, because it was part of
20   the chain.
21              Do you remember entering into an
22   agreement with the Plaintiffs here regarding the
23   fee splits that are reflected here on Taylor's
24   Email to you of February 17, 2020?
25        A    I do remember speaking with them on the
```

 **COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                           22

1      phone, and we reached an agreement as to how the

2      fee -- the fees themselves would be divided.  We

3      did not reach at that time an agreement on the

4      overall issues that were between us.

5           Q    Okay.

6           A    In fact, I remember it well because I

7      had to ask --

8                MR. BEAL:  Hold on for one second.

9                     (Whereupon, an off-the-record

10                    discussion was held.)

11     BY MR. BEAL:

12          Q    I am handing you back Exhibit 5.  We

13     needed to black out a total in the recovery in

14     Sandmann.

15          A    It might be a good idea to block off

16     Carbone and CNN on the second page, because that

17     agreement may have been confidential at CNN's

18     request.

19          Q    We can do that at the end of the

20     deposition.

21               So this agreement by -- this Email by

22     Taylor sets forth in writing the agreement you

23     had reached certainly by February 17th on

24     regarding fee splits in a variety of cases, is

25     that correct?



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                    23

```
 1        A    I think it reflects how we agreed to
 2   divide the fee, not the final agreement on how
 3   we were going to sever the relationship, because
 4   there were other issues.
 5        Q    Right.
 6        A    But it does, because I remember the
 7   phone call was on the 17th three days after they
 8   had left the office sharing agreement with
 9   myself and my PC; and I remember having a
10   conversation.  I was trying to be -- I was
11   trying to calm the waters at that time.
12        Q    I understand.
13        A    We were going through a very difficult
14   time period dealing with Johnathan and Taylor --
15   not so much Nicole -- starting in October of
16   2019, and there were a lot of things that were
17   done that created problems --
18        Q    But this Email --
19        A    Let me finish, and I was trying to calm
20   the waters.  And I remember that I said what do
21   you all think is fair?  And they said
22   35 percent.  I said I will give you 50, is that
23   fair?  Yeah, yeah, we will take 50.
24             And that that was a discussion that
25   occurred on February 17th and Taylor sent an
```



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

1    Email confirming it.

2        Q    Thank you.

3             And so if you turn over to the second

4    page of Exhibit 6 (b) is Carbone versus CNN, the

5    proposed -- you proposed to split the fee

6    40 percent to L. Lin Wood, P.C. and 60 percent

7    to us.

8             Did I read that correctly?

9        A    Yes, that is what it says.

10       Q    And the date of this is February 17th,

11   is that correct?

12       A    Yes.

13       Q    And then if we refer back to Exhibit 5,

14   the date of that fee disbursement is about a

15   week after?  It is February 25th, is that

16   correct?

17       A    It is because, and I tell you, I think

18   I am right I think, after I had had the

19   conversation with Johnathan Taylor and Nicole on

20   the 17th, things occurred that placed doubt in

21   my mind as to whether I was going to actually do

22   what I had said on the 17th in terms of the fee

23   division.

24       Q    Whether you were going to honor that

25   promise?



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          25

1        A     Well, it wasn't a done deal; and issues
2     arose about the lease, and I was not happy with
3     them.
4              And so at the time that I did the
5     Carbone Settlement Statement in my mind it was
6     unclear what was going to happen with Carbone.
7        Q     And so you didn't list them on
8     Exhibit 5 on the Carbone Settlement Statement
9     because you planned to keep all the fees
10    yourself?
11       A     That is not true.
12             MR. HARRISON:  Object to the form.
13    BY MR. BEAL:
14       Q     Well, you said --
15             THE WITNESS:  Hold on, that is not
16       true at all.
17    BY MR. BEAL:
18       Q     Okay.
19       A     In fact, I got to remember the date;
20    but somewhere after -- or shortly after or
21    before maybe, February 20th, I engaged Alston &
22    Byrd to represent me.
23       Q     Did you in fact share any of the
24    Carbone fees with the Plaintiffs in this case?
25       A     It would have been done pursuant to the



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100       www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          43

1    is that correct?

2        A     My residence was moved to South

3    Carolina in February of 2021.  I still have a

4    home in Atlanta on Green View and I have to -- I

5    am trying to maintain it, because when I go down

6    to deal with this litigation and the State Bar,

7    I don't want to go down and stay in a hotel

8    because I take my dog with me.

9              So the answer is Kimmy works remotely,

10   and then I will see her in person when I go to

11   Atlanta; and then she has made a couple of trips

12   to South Carolina.  Tat is right after when I

13   first bought the property here.

14       Q     And you have invested with Kimmy's

15   husband in another business, is that correct?

16       A     No.

17       Q     No?

18       A     No, I have no investments with Paul.

19       Q     Okay.  So for the most part your PC is

20   located in Atlanta, Georgia; but your permanent

21   residence and where you spend the majority of

22   your time is here in South Carolina, is that

23   correct?

24       A     I spend the majority of my time here.

25   The PC still has an address in Atlanta.  I have



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              44

1    left the corporation viable, although it is not

2    a viable entity any more financially; and I

3    don't have any cases that I am working on,

4    except my efforts to combat as Co-Counsel the

5    warfare that has been waged against me,

6    including this lawsuit.

7         Q    And when we look at the lawsuits listed

8    on Exhibit 6, Sandmann, Carbone, Lindsey,

9    Grogan -- let us leave Cordoba out for now -- in

10   each one there is an estimated fee recovery, and

11   is that because the majority of the work had

12   already been performed on those files?

13        A    No.  No.

14             Cordoba was as I recall the case that

15   Taylor Wilson brought in --

16        Q    I don't want to talk about Cordoba

17   right now.  I am asking A through E?

18        A    You asked me about D and E.

19        Q    No, I am asking you A through D.

20   Sandmann --

21        A    Grogan -- I don't know -- no, I don't

22   believe Grogan had all the work done on it at

23   all.  I thought it was relatively a new case.

24        Q    But we know that Carbone was done

25   because the payment came eight days later.



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          48

1    consummated.

2        Q    Correct.

3        A    I don't know if it had been documented,

4    because Todd McMurtry handled that part of the

5    case.  It had been envisioned at one point that

6    I was going to ask Taylor to work with Todd on

7    it and I don't think that worked out.  Either I

8    just changed my mind or things got to a point

9    where it didn't matter because we got it

10   settled.

11       Q    A minute ago you said these people were

12   extorting me.

13            Do you believe that there was in fact

14   extortion committed by the Plaintiffs?

15       A    I believe they extorted me into the

16   agreement of March 17th, because they were

17   interfering with my relationship with my

18   children.  That is documented.  You don't do

19   that to me.

20            They were threatening me with their

21   accusations, false about my mental health.  They

22   were threatening my efforts for Richard Jewell

23   to have President Trump award him posthumously

24   the Presidential Medal of Freedom.

25            And their baseless allegations also



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          49

1    threatened what I was doing in an ongoing effort
2    for Nicholas Sandmann and they knew it.
3             And I think they used that leverage and
4    it worked.  I gave in, but I felt extorted.
5    Then I believe clearly without any doubt in my
6    mind it is my opinion they extorted me or tried
7    to extort me with respect to the demand that you
8    made when you sent over that incredibly
9    scandalous, irrelevant, impertinent Complaint
10   that they were determined to file, so they could
11   smear my name and they did it.
12            They knew I would never agree to the
13   extortion terms that were presented to me when
14   you sent that over to Joey Burby.  They wanted
15   to smear me.  I think that why they involved
16   David Hancock.
17      Q    So it is your belief that the first act
18   of criminal extortion or the crime of extortion
19   occurred by the Plaintiffs in the March 17th
20   agreement, Settlement Agreement, is that
21   correct?
22            MR. HARRISON:  Objection to the
23        form.
24            You can answer.
25            THE WITNESS:  I believe that they



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          51

1   Alston & Byrd, because they prepared with me the
2   press release that was issued after the lawsuit
3   was filed; and they assisted me in editing it,
4   and it contained the fact that I said that they
5   were trying to extort me through litigation.  I
6   wasn't going to get extorted.
7          So the first accusation or description
8   or my opinion I would say about extortion was in
9   the press release that I issued back in
10  September of 2020.  They didn't say anything
11  about it.
12         And then they filed their lawsuit and
13  published to the world that I had said to Dexter
14  Cain that they were extorting.  That I had said
15  to one of the Co-Counsel in the class action
16  case that they were extorting me.  They put that
17  out for the world to read.  They published it
18  themselves.  I didn't.  But that is the way I
19  felt, because I think I am right.  I think my
20  opinion is solid.
21      Q    To whom -- to what Law Enforcement
22  agencies did you report this extortion or
23  attempted extortion?
24      A    I didn't -- I didn't -- I didn't have
25  the opinion it was extortion to have these



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100     www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              52

1    people put in jail for it.  But I described what
2    they had done, because I believed then, I
3    believe now that it was extortion; but I wasn't
4    here to put anybody in jail.
5         Q     But you believe it was the crime of
6    extortion, but you did not want to put them in
7    jail for it?
8         A     I believed that they extorted me and I
9    made finally a decision in I believe May of 2021
10   when I was then representing myself in this
11   case, when I had joined as Co-Counsel when Burby
12   had left, I felt like as a lawyer when I was
13   getting blasted up there in South Carolina, in
14   large part based on their lawsuit, that I had
15   not only a right, but under the law I had a duty
16   as my own lawyer to defend myself in the Court
17   of public opinion and that is when I posted on
18   Telegram.  And that is when I described what
19   they had done as extortion.  That is my opinion.
20   It was then.  It is now and it hasn't changed.
21        Q     Did you believe that you had a duty to
22   report the crime of extortion to any Bar
23   Association?
24        A     Well, it was on Telegram; and I think I
25   made some reference to it.  The Bar had



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                    58

1      Q     Okay.  In Exhibit 7 you wrote this on
2    February 22, 2020, is that correct?
3      A     2:40 a.m., yes.  It looks like I wrote
4    it that morning.
5      Q     So that is five days after you entered
6    into the February 17th agreement with Taylor
7    about fee splits, is that correct?
8      A     It was after I had -- we had come to --
9    extorted agreement -- you didn't hear what I
10   said, so let me make sure you understand.
11     Q     You are under cross-examination, so I
12   need a --
13     A     I am going to answer it.  If I am not
14   allowed to --
15     Q     Yes or no and then you can explain
16   whatever you would like to.  This Email was
17   written five days?
18     A     That is clearly yes, you can do the
19   math.
20     Q     Okay, good.
21     A     The answer is yes, but go back and
22   understand I was extorted when I gave them that
23   agreement on the 17th.
24           And I was kind of playing with them.
25   When I said well, tell me what you think is



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          59

1   fair.  35 percent, the same thing we got with

2   Ramsey.  I said I will tell you what, I will

3   give you 50 percent, do you think that is fair?

4            I was not actually of the mind to give

5   them a dime at that time.  I was playing with

6   them a little bit to see what they would do.

7   And they went oh, yeah, yeah, we will take the

8   50 because they are greedy.

9            And then when I got back and dealt with

10  Joey Burby and Chris Marquardt, I said just go

11  ahead and let us divide it the way I said on

12  February 17th, because I did say it even though

13  it was not done with the mind set that they

14  deserved it and I wanted to give it to them, I

15  would live up to my word and give them

16  50 percent; and that is what got into the final

17  agreement.

18      Q    Okay.  And so when you entered into the

19  agreement with Taylor on February 17th you were,

20  to use your words, sort of playing with them.

21  You didn't plan on giving those percentages.

22  You were thinking more in line of what you said

23  here five days later to Todd McMurtry on

24  February 22nd, Exhibit 7?

25      A    No.



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100       www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                    67

1        Q    When you say their foolishness, would
2    that be what you are describing here on
3    paragraph 2 on page 2 of Exhibit 7:  That alone
4    would cut off their ability to finance and
5    publicize their BS claims against me.
6        A    No.  That was a part of it.
7             The foolishness that I was being faced
8    with were their efforts in dealing with my
9    children claiming that I needed to agree to
10   undergo regular mental healthcare treatment.
11   They were interfering with my relationship with
12   my children and their discussions, whether they
13   were by text or Email or by phone were subject
14   to being discovered by the media, there is no
15   privacy.  And that threatened my efforts with
16   respect to the ongoing representation of
17   Nicholas Sandmann.  It threatened my efforts,
18   which they were well aware of that I had been
19   making to try to have President Trump to give
20   Richard Jewell the Presidential Medal of
21   freedom.  I am not sure when he asked me to meet
22   with him, but I met with him on March 11th, so
23   it may have been that I already had the meeting
24   date at the time when I was writing this.
25             I wanted this to stop.



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                           68

1       Q     All right.

2       A     And I wanted it to stop because it was

3   hurting my relationship with my children.   It

4   was threatening my efforts for Richard.   It was

5   threatening my potential efforts going forward

6   for Nicholas Sandmann.

7             And so having seen they are only going

8   to pay quantum meruit, I said make it clear to

9   them and I thought that might bring them to

10  their senses; and also prevent them from

11  thinking they were going to stick me with

12  $285,000 of their lease, their liability on the

13  lease.

14      Q     So when you say cut off their ability

15  to finance and publicize their claims against

16  you, that was only one of the desires you had,

17  and the others were to have them stop

18  interfering or having some relationship with

19  your children and making statements about your

20  mental health, is that right?

21      A     No, those are your words.   I told you

22  my words.

23      Q     All right --

24      A     Hold on a second.   I documented that I

25  was right when I saw the text messages between



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                           69

1    my son Matt and Taylor Wilson with respect to

2    Dr. Phil McGraw.  I know what happened with

3    Dr. Phil McGraw.  I know how the jury got

4    rigged, and I know who was involved in it.

5         Q    So how would a lack of money prevent

6    the Plaintiffs from talking to your children?

7         A    That we come to an agreement.  If they

8    realized they weren't going to have their big

9    payday, which they did not earn.  I bet their

10   quantum meruit effort in the case was probably

11   not 150,000.  If they were not going to get the

12   847 or whatever the deal was where they could

13   pay what they owed on the lease, and then have a

14   bonanza from the fee they didn't earn based on

15   quantum meruit.  I thought it was something that

16   would make them realize the foolishness of their

17   ways.

18        Q    And that would make them not contact

19   your children or question your mental health?

20        A    Listen, I cannot -- my mental health

21   was fine then, and they knew it; and that is why

22   they admitted it in March.

23             I couldn't stop somebody from

24   contacting my children, but let me say this to

25   you, Drew, I am a nice guy.  I am not an angry



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          70

1    man; but if you mess with my children and my

2    relationship I am hot blooded.

3           If you mess with Richard Jewell, I am

4    hot blooded, just like I am if you mess with my

5    puppies I am hot blooded.

6           These people were engaged in subverting

7    my relationship with my children.  Read the

8    bible --

9           MR. BEAL:  Real quickly --

10          THE WITNESS:  Wait a minute.  This

11       was the threat they were making.  God's

12       commandment, honor thy father and thy

13       mother is the only commandment that

14       comes with a promise.  Honor thy father

15       and thy mother so that thy days can be

16       long on this earth.

17   BY MR. BEAL:

18       Q    All right --

19       A    God could take them out for not

20   honoring their mother and father.  If you know

21   God and you read the bible.  They were not only

22   threatening my relationship with my children,

23   but other God's commandment they were putting my

24   children at risk; so I was not happy with them.

25   I am not happy with them now for doing it; but I



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          71

1    forgive them.  I love them.  I want to move on

2    from all the nonsense with them even today.

3        Q    So while we are talking about the

4    commandments this also would have allowed you to

5    pocket their $843,000 too?

6        A    It wasn't theirs until there was an

7    agreement.

8             MR. HARRISON:  Object to the form.

9    BY MR. BEAL:

10       Q    So you would get all the money?

11       A    If we had not -- if I had not made the

12   deal in March -- if I had not made the deal in

13   March, they would have had to sue me for quantum

14   meruit, me, seeking their recovery because there

15   was no written division.

16            So they would have had to sue me for

17   quantum meruit.  My guess is is at best they

18   could have maybe come up with $150,000 in time;

19   and then they would have gotten the $150,000.

20       Q    So in this second paragraph you talk

21   about that the money might be put in an escrow

22   account pending final resolution of the disputes

23   between you and WGW.

24            That never happened, did it?

25       A    It didn't happen because that is not



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          84

1           and see what we can do here.

2                   I understand.

3      BY MR. BEAL:

4           Q    The statement at the top of page 2 of

5      Exhibit 9 where Todd McMurtry promises to put

6      the money in escrow absent an agreement, that

7      didn't happen, did it?

8           A    That was Todd's decision, not mine.

9           Q    So what is the answer to my question?

10     To the best of your knowledge?

11          A    To the best of my knowledge he did not

12     do that.

13          Q    And in fact you got paid, is that

14     correct?

15          A    I received the L. Lin Wood, P.C. share

16     of the fees and the expenses.

17                   (Whereupon, Plaintiff's Exhibit

18                   Number 10 was marked for

19                   identification.)

20     BY MR. BEAL:

21          Q    Let me hand you Exhibit 10.

22          A    Okay.

23          Q    Okay.  So does Exhibit 10 reflect

24     another February 22nd Email from you to Todd

25     McMurtry regarding division of fees in the



**COASTAL COURT REPORTING & VIDEO SERVICES**
          800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              85

1    Sandmann versus CNN case?

2        A    It is a true and correct copy of the

3    Email that I sent to Mr. McMurtry, and I think

4    it speaks for itself.

5        Q    So then in the fourth paragraph here

6    you state:  There was no oral or written

7    agreement between me and any of those lawyers

8    concerning my share of my firm's fee in the CNN

9    case.

10       A    That is true.

11       Q    Did you consider that to be a truthful

12   statement in light of your February 17th

13   agreement and Email confirming that agreement

14   with Taylor Wilson?

15       A    I believe it was absolutely consistent.

16   There was no oral or written agreement between

17   me and any of those lawyers concerning any share

18   of my firm's fee in the CNN case before the case

19   settled.

20            And then the issue arose after they had

21   themselves left any relationship with me on the

22   14th of February; and I told you that I did have

23   that conversation as it related to what I was

24   willing to say at the time on dividing the fees.

25   But there were other issues that connected into



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              91

```
1              THE WITNESS:  I have sent you the
2       lease?
3    BY MR. BEAL:
4       Q    Yes, it is that paragraph, the third
5     line down.
6              MR. HARRISON:  Okay.
7    BY MR. BEAL:
8       Q    "I am not concerned about money.  I am
9     only concerned about clearing my slate in order
10    to pursue the Sandmann litigation and the
11    opportunities possibly presented by my scheduled
12    meeting in D.C."
13      A    Okay.
14      Q    My question to you is, if you are not
15    concerned about the money, but only clearing
16    your slate in order to pursue other litigation
17    and opportunities, why did you contest paying
18    the amount that you had agreed to in the
19    preceding paragraph?
20      A    Okay.  Number 1, I didn't contest it.
21    I entered into the agreement on March the 17th,
22    and it said 50 percent would go to Wade Grunberg
23    and Wilson's PC's.  So I didn't contest it.  I
24    lived up to ti.
25              When I say I am not concerned about
```



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                    101

1    not regularly record their time?

2       A    I didn't believe that they did, but

3    they did keep it up in certain cases.

4            So I don't know for a fact whether they

5    did in those cases or not.  You have indicated

6    that they did reconstruct it in Sandmann, so I

7    was wrong on that.

8            But that was my belief at the time.

9    All of this predates my engagement -- this is

10   March the 3rd, and this is when I realized I

11   needed to get somebody to represent me.

12      Q    I am only asking about recording time?

13      A    And I have told you that I believed

14   they did not, but I knew that in other instances

15   they did.  So my belief is either right or

16   wrong.

17      Q    And you were saying here that they

18   didn't?

19      A    I didn't believe that they did.

20      Q    Okay.

21      A    But I didn't know it, and I found out

22   later that they did keep up with their time in

23   Sandmann when you said they had a wealth of

24   documentation of their time.

25      Q    Would it be fair to say that the three



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100       www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                           102

1    Plaintiffs performed the majority of work on

2    creating Pleadings and correspondence and

3    responding to correspondence and Pleadings in

4    the CNN versus Sandmann case?

5         A    I don't know that I can quantitate it

6    that way.

7              Did they do what they had always done

8    for me in terms of drafting Pleadings, doing

9    legal research, preparing motions, they had also

10   looked into all of the body of what was said

11   about Nicholas, not just related to CNN; and

12   then Todd cut that off because he got a firm to

13   do it.

14             So they did what they did.  I

15   appreciated their efforts.  I acknowledged what

16   they did; and then we got into this dispute

17   which I settled with them on March 17th of 2020.

18        Q    Can you name any Pleadings that you

19   drafted completely on your own?

20        A    I wouldn't do that.  I didn't -- I have

21   been practicing law for how long.  I don't go

22   out and have not since they worked with me, I do

23   not generate the first iteration of a Brief or a

24   Pleading.  That is what they are getting paid to

25   do.



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                    103

1              So they would bring it to me.  I would
2     give them input, advice.  I might as we say --
3     Nicole will tell you I would Wood-ize it.  I did
4     the preparation of it initially as an Associate
5     and a young lawyer.  I didn't do it after
6     40 years of practicing law.
7          Q    So then all of the Pleadings that were
8     created in the Sandmann versus CNN case were
9     initially drafted by the Plaintiffs in this
10    case?
11         A    I don't know that, because I don't know
12    if Todd did some of it.  But everything that was
13    drafted would have been under my direction and
14    my input, because I was the one that shaped the
15    issues for the case in how it was going to be
16    proceeding.  I had the expertise in defamation.
17    They did not.
18         Q    So all of the Pleadings that came out
19    of your office would have been drafted by them
20    at your direction and with your input, is that
21    correct?
22         A    No, I know one time we had a problem
23    that came up, and I had to basically to rewrite
24    the Brief.  So I can't say all of it.
25              But I am not trying to tell you they



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                104

1    did not do it.  They did.  That is why I had
2    them engaged.  If I wanted to do that, I
3    wouldn't have needed them.
4         Q    And was a large volume of work in CNN
5    versus Sandmann --
6         A    CNN and Sandmann settled quickly.  So
7    on the scale of things they could have been --
8    that litigation could have gone on for five
9    years.  So whether it is a large volume or not
10   is not really capable of saying it.  It is what
11   it is.  They did what they did.
12        Q    The --
13        A    And I was going to pay them for it.
14             (Whereupon, Plaintiff's Exhibit
15             Number 12 was marked for
16             identification.)
17   BY MR. BEAL:
18        Q    And is Exhibit 12 the March 17th
19   Settlement Agreement that you have referenced
20   earlier?
21        A    Yes.
22        Q    And does it refer to the same cases as
23   in the February 17th agreement, Carbone,
24   Lindsey, Sandmann, Grogan Cordoba and then add
25   in La Liberte?



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                    112

1      Q     Can you identify every act that you
2   contend constituted extortion or attempts at
3   extortion?
4      A     Honestly, I can take the time to
5   catalog every act, but the acts are pretty
6   simple.
7      Q     What are they?
8      A     Number one, remember the back drop.  I
9   believe there was a pattern of extortion with
10  respect to the March 17th agreement.  So they
11  had a pattern of extorting and making claims
12  that threatened me unrelated to the litigation
13  with my children, Richard Jewell, the
14  Sandmann's; and my efforts for Richard were very
15  important to me.
16           So I felt extorted into that agreement.
17  Candidly I wished I had never made it; but I did
18  what I did.  I was going to live up to it.
19           Then in September out of the blue,
20  nobody sued me when I said extortion in the
21  press release.  When they put in their own
22  Complaint in September and they said that I
23  told -- it is Dexter King that they were
24  extorting me, they put that in their Complaint.
25           Then they put in their Complaint that I



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100       www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                    113

1    told a co-Counsel of mine on one of the class

2    action cases they were extorting me.  They

3    published my statements themselves in their

4    Complaint.

5              So then they come up with this new

6    lawsuit.  They sue me for breach of contract.  I

7    didn't breach the contract.  I asked the boy to

8    consent.  Then they sued me for fraud in the

9    inducement -- hang on, you want to know -- now

10   you don't want me to answer --

11             MR. BEAL:  Hang on.  I know, but I

12        am getting confused.  Can you list out

13        what acts constituted your sort of --

14             THE WITNESS:  I am.

15             MR. HARRISON:  We have been over

16        this.  You said that you don't want him

17        to give long answers, but you asked him

18        the specific acts that he said

19        constituted extortion in the context,

20        and he has answered those --

21             MR. BEAL:  I just got confused

22        about some of the last one's because he

23        was speaking about other people's

24        actions.  So let's go to the first

25        one --



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                117

1     explanation of how anybody says it is not.
2              MR. BEAL:  Can you look through
3        there and find me Exhibit 12?
4              MR. HARRISON:  Uh-huh.
5              MR. BEAL:  Thanks.
6     BY MR. BEAL:
7         Q    So going back to your statements, the
8     first act of extortion you believe was a pattern
9     of extortion surrounding the March 17th
10    Settlement Agreement which is marked as
11    Exhibit 12?
12        A    I wouldn't call that the first act of
13    extortion.  What I called it is what I called
14    it.
15             I thought that what they did leading up
16    to the March 17th agreement established a
17    pattern of extortion, because they were trying
18    to get money that they had not earned.  They
19    were trying to coerce me into giving them more
20    than they deserved under the threat of a
21    continued attack in my relationship with my
22    children, my efforts ongoing for Nicholas
23    Sandmann, and to jeopardize my efforts to try to
24    ask the President to give Richard Jewell the
25    presidential Medal of Freedom.



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                    118

1              And just generally the idea of saying
2    these false things about my mental health, which
3    they documented were false in the March 17th
4    agreement, I thought that showed extortion; but
5    I paid it, I paid it.  I agreed to it.  I wish I
6    hadn't.  I should have stood on my principles
7    instead of my preference, I wanted peace.  I
8    should have stood on my principles.
9              And then all of a sudden I am hit with
10   your lawsuit to pay within a day 1.5 million or
11   we are going to file this thing and smear --
12       Q    I want to talk about March.  Let's
13   not --
14       A    Okay, well, I have covered March.
15       Q    Would it be fair to say that a
16   culmination of this pattern of extortion you
17   have identified, it culminated in the March 17th
18   Settlement Agreement?
19              MR. HARRISON:  Object to the form.
20              You can answer.
21              THE WITNESS:  What I said was that
22        when I looked at what you did in
23        September of 2020, I recognized then as
24        I had recognized earlier that they had
25        extorted me into the March 17th



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                    119

1        agreement, but I went ahead and made it
2        and I felt extorted.  That was my
3        opinion then.  And then all of a sudden
4        I get extorted again.
5    BY MR. BEAL:
6        Q    So you were represented when you signed
7    the March 17th Settlement Agreement, right?
8        A    Absolutely, Joey Burby and you
9    negotiated it.
10       Q    And do you have a single writing that
11   you can point to where any of the Plaintiffs
12   threatened to take any action with regard to
13   your children or your mental health condition?
14       A    I have already pointed you to the
15   confirmatory text -- there is more, where it was
16   clear that Taylor Wilson was conspiring with my
17   son Matt Wood to have Dr. Phil McGraw conduct a
18   mental health intervention on me, but I caught
19   it.  I caught it in time because I knew what
20   they were up to, and I told Phil McGraw don't
21   come out to Atlanta, Georgia and mess with my
22   relationship with my children, because it won't
23   end well for you; and he did not.
24            He Emailed my son and said your father
25   is a genius, he is the finest lawyer I have ever



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                    120

```
 1   met.  He can get all the facts wrong and still
 2   come up with the perfect resolution.  That Email
 3   is now missing out of my system.
 4           But nevertheless put yourself in my
 5   position, I know it is hard for you to do, but
 6   try I am trying my best to get Richard Jewell a
 7   recognition that Richard Jewell deserved.  I am
 8   trying my best to represent the Sandmann family.
 9   I want to do the Sandmann cases and then retire;
10   and I am always trying to do my best to maintain
11   a good, healthy relationship with my children;
12   and these people are threatening all of that.
13   If I don't give them money that they really
14   under the law did not deserve, but I ended up
15   making the agreement in March 17th; and then I
16   lived up to it.  Did you see how many cases I
17   sent them?  You still haven't told me how much
18   money they made on it.
19      Q    Can I ask you if there was a
20   specific -- if you can point to any act or
21   threat by any of the Plaintiffs with regard to
22   Nicholas Sandmann or Nicholas Sandmann's claims
23   or cases?
24      A    I don't know how many Email's there
25   were at the time.  I haven't gone back and
```



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                    121

 1    looked, but the discussions leading up to
 2    ultimately the March 17th agreement would be
 3    part of what I believed to be acts of extortion
 4    until I finally agreed to it.
 5            The only thing that came up after that
 6    in terms of extortion is when you tried to
 7    extort me by telling me to pay them $1.5 million
 8    or you are going to file this frivolous, heinous
 9    complaint against me within 24 hours.  There is
10    your document.
11       Q    Was there any threat by any of the
12    Plaintiffs to interfere with your relationship
13    with Richard Jewell?
14       A    They knew that I was doing my best,
15    publicly advocate for Richard Jewell to receive
16    the Presidential Medal of Freedom, that was
17    well-known to them.
18            The idea that they were out talking to
19    people, and you don't know where it stops,
20    suggesting that Richard Jewell's lawyer was in
21    need of mental healthcare treatment, well I
22    don't think President Trump would have been so
23    fond of thinking about meeting with me to talk
24    about Richard; but yet despite the accusations
25    he met with me.



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                122

1        Q      But you don't have any evidence of any
2    conversations by the Plaintiffs with any parties
3    regarding mental health besides what you just
4    identified as a conversation with your son Matt
5    and --
6        A      Dr. Phil.
7        Q      -- And possibly a conversation with
8    Dr. Phil?
9        A      I think it is more than a conversation
10   with Dr. Phil.
11       Q      And Dr. Phil was -- had previously been
12   your client, is that correct?
13       A      He was.
14       Q      Okay.
15       A      He is not now.
16       Q      And --
17       A      Are you going to break for lunch?
18       Q      I kind of want to power through and be
19   done.
20       A      That is not fair to anybody.  I need at
21   least 15, 20 minutes to get a sandwich.
22              MR. HARRISON:  How long do you
23       think you have?
24              And let me offer this while you
25       are thinking about it.  Are you going



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                    124

1       Q     So you have referenced in prior

2    testimony computer hacking.

3             Do you believe that the Plaintiffs have

4    hacked into your computers or your Email's?

5       A     I believed at the time that I learned

6    that my computer was hacked, and it was hacked.

7    The whole file system was out of whack.  I had

8    it investigated.  It was hacked.

9             I also believed that my phone system

10   had been hacked.  I think that was done through

11   my Wi-Fi system in my house, so I documented the

12   hacking.

13            I felt like that there might have been

14   an effort by Johnathan Taylor and/or Nicole,

15   because she is close with Rick Miller to go in

16   and perhaps remove certain documents that were

17   related to Rick Miller.

18            When I first went in I couldn't find

19   the documents to confirm the hack.  I filed a

20   complaint with the FBI.

21            Then we went back and I found the

22   documents that I thought might have been hacked

23   out, and I wrote them and apologized.

24            But the problem is I still think now

25   that I was wrong about what was being looked



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                    125

1    for, but I was right about what was done; and I

2    think it related to Dr. Phil McGraw.

3        Q    So here is my question real

4    specifically, do you believe the Plaintiffs

5    hacked your computers or participated in the

6    hacking of your computers?

7        A    I have no way to know who hacked it,

8    but I thought that they had a motivation to hack

9    it, I still do, or to have someone hack it.

10            I know there was a day where I came in

11   and turned on my Email, I thought it was a

12   Sunday; and there was an Email being forwarded

13   to Taylor, not a complete Email address, and I

14   stopped it.  And then for that day it kept

15   trying to send it bouncing back, because when I

16   stopped it it hadn't gotten to a full Email

17   address.  That led me to believe that may be

18   effort for someone to mess with the Microsoft

19   360, Johnathan is familiar with it.

20            I don't know, but I know that my

21   computer was hacked.  I know my phone was

22   hacked, and I believe they had motivation to at

23   least know it or be involved in it.

24       Q    Did you believe --

25       A    But when I found out it was not Rick



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          126

1    Miller documents, I wrote them and said I am

2    sorry.  I jumped the gun.

3            But then I found out about confirmatory

4    evidence on Dr. Phil; and I am convinced beyond

5    any doubt in my mind that these lawyers to some

6    extent were involved in the Elon Musk case to

7    sabotage and rig the jury.

8        Q    Okay, I want to ask that before we take

9    a break.

10       A    Sure.

11       Q    So summing up on hacking, do you

12   believe the Plaintiffs were involved or not

13   involved as you sit here today?

14       A    My belief is just what I said.  They

15   had motivation to be involved.  The whole

16   Dr. Phil thing stinks.

17       Q    Do you believe that Dr. Phil was

18   involved in computer hacking?

19       A    I don't think Dr. Phil --- I don't know

20   if he knows how to hack a computer.  But I think

21   I know enough about Dr. Phil and what happened

22   with Tara Trask and Chris Chatham, that I have

23   serious concerns.  I know the jury was rigged

24   and I started to investigate it --

25       Q    Now --



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          127

```
 1        A     And my son Matt went ballistic, because
 2     he didn't want to give me any information.
 3              MR. HARRISON:  Okay.
 4    BY MR. BEAL:
 5        Q     So we have transitioned from hacking to
 6     jury tampering?
 7        A     No.
 8        Q     Or is this part of hacking?
 9        A     I will tell you.
10        Q     All right.
11        A     You are asking me if I know who hacked
12     me, I do not; but I have certain suspicions.
13        Q     All right.  So --
14        A     When I said that about jury rigging, I
15     don't know who did what, when and where; but I
16     have certain suspicions based on facts that I am
17     aware of.
18    BY MR. BEAL:
19        Q     All right.  So and the jury tampering
20     issue, do you believe the Plaintiffs were
21     involved somehow in tampering with the jury or
22     hurting your efforts in the representation of
23     Unsworth versus Elon Musk?
24        A     You asked me two questions, let me
25     answer it this way.  There was a noticeable
```



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              128

1    change in Johnathan Grunberg and Taylor Wilson's
2    treatment of me starting with the incident in
3    October, and by November if I hadn't had them to
4    help me, I would have thrown them out of my
5    office on the 21st floor.  I had never seen
6    lawyers more rude, more abrasive, more
7    condescending, telling me I didn't know what I
8    was doing.  They like changed day and night.
9        Q    Okay.
10       A    And so do I have concerns that that
11   relates to perhaps them having gotten
12   compromised to participate in sabotaging some
13   part of the Elon Musk case?  I believe it does,
14   but I haven't taken any action yet.
15       Q    Do you believe that the Plaintiffs were
16   involved in somehow sabotaging or working
17   against your efforts in the Unsworth versus Elon
18   Musk case?
19       A    I know they were.  I know they were
20   because they were trying to direct me to take an
21   issue in the case that was minuscule compared to
22   the main allegation of pedophilia that I now
23   know that issue was interjected by the
24   Mockingbird Media, so that we would spend time
25   on that and not time on what the main case was



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              129

1   about; and they were adamant that I needed to go

2   there, and it very much affected my ability to

3   prepare the case in an orderly fashion in the

4   manner that I thought it should be done, being

5   the most experienced, being the lawyer in

6   charge.  And I have never let such opposition

7   and mistreatment from every one of them, not as

8   much Nicole.  In fact, I told Nicole one day

9   when Johnathan and Taylor were in my office and

10  I looked at them and said I ought to sue every

11  damn one of you about what you said about mental

12  health.

13          And Nicole said I never said it, and I

14  said you are too smart to say it.  And she sent

15  me a note later when she found out about my

16  children.  And she knew how much that would hurt

17  me.  And she said I love you no matter what

18  happens to our law firm.  I will always be there

19  for you, and I appreciate that and I believe she

20  meant it.

21      Q    So you believe the Plaintiffs were

22  deliberately taking steps to sabotage or hurt

23  your client in the Elon Musk litigation?

24      A    I said what I said.  I don't know it,

25  but I saw it --



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                     130

1       Q     But you believe it?

2       A     Do you want me to answer or are you

3   going to answer it for me?

4       Q     No, I am just trying to --

5       A     Why don't you let me answer it.

6       Q     All right.

7       A     Because you don't know what you are

8   talking about.  Only I can answer that question

9   with all due respect.

10      Q     Okay.  Go ahead.

11      A     I have serious concerns based on the

12  totality of the circumstances that occurred and

13  the timing of those, I have serious concerns

14  that somehow my son, perhaps Johnathan and

15  Taylor perhaps were compromised and perhaps had

16  to do things that were not in the best interest

17  of Vernon Unsworth, although I have a lot of

18  thoughts on the Vernon Unworth's case, which we

19  don't need to go into today.  I don't know what

20  this has to do with extortion, but I am happy to

21  talk to you about it.

22      Q     Okay.

23      A     Because I don't know what happened in

24  the Thai cave rescue.  I know a lot more now

25  about child sex trafficking than I knew then.  I



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                         131

1    know a lot more now about how caves are used in
2    Thailand.  I know a lot more now about
3    psychological operations.
4              MR. HARRISON:  What I will ask
5         both of you to do is stick to the
6         allegations of the Complaint.  This is
7         a defamation lawsuit, right, Drew?
8              MR. BEAL:  Right.
9    BY MR. BEAL:
10        Q    So when you said that you were lead
11   Counsel in the Vernon Unworth's case?
12        A    I was.
13        Q    Was there a time when you asked Taylor
14   to take over the lead Counsel role prior to
15   trial?
16        A    I don't remember it.  If I was going to
17   ask Taylor to take on lead Counsel, I wouldn't
18   have gone.  I was always lead Counsel.  We had a
19   meeting the weekend before Thanksgiving, where
20   we had, I guess you would call it a come to
21   Jesus meeting, because the acrimony between
22   those lawyers and me and their disrespect and
23   their acting like they knew everything, and I
24   was some sort of a dummy in my case, with my
25   experience.  I couldn't understand it.

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                         138

1    when they sued me for fraud and inducement,

2    which is in breach of the agreement.

3         Q    Do you believe that as you sit here

4    today that Alston & Byrd committed

5    malpractice --

6              MR. HARRISON:  Objection.

7    BY MR. BEAL:

8         Q    -- In their representation of you?

9         A    I don't know what that has to do with

10   this liable case.  I have concerns in the two

11   areas that I have mentioned; I may have more.

12   But I have not acted on those.

13             But I do know that if it turns out that

14   L. Lin Wood, P.C., which is the only party that

15   is responsible for the fee, if L. Lin Wood, P.C.

16   is found liable, then I would look to Alston &

17   Byrd to indemnify me, because I relied on their

18   advice, which they told you themselves in the

19   July or the July 24th letter.

20             I don't want any more litigation.  I

21   have more than I can afford now, and you are all

22   going to be litigating for nothing pretty soon,

23   because I am having to pay attorneys' fees; and

24   I know they are not.

25         Q    And I believe you testified -- earlier



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100       www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                     139

1     you testified that one act of extortion was the
2     demand that was made upon you in September of
3     2020 immediately prior to the filing of suit?
4         A     That was I thought consistent with
5     extortion, yes.
6         Q     And --
7         A     It made no sense.  Why would you not --
8         Q     I just need you to --
9         A     I am going to answer the question
10    fully.
11               That was an act of extortion, part of
12    the extortion because the position that you all
13    took made no sense.  You weren't looking to
14    resolve the matter.  You were looking to sue it.
15        Q     And it was the crime of extortion?
16               MR. HARRISON:  Object to the form.
17               THE WITNESS:  I call it extortion.
18         Whether you refer to it as a crime, it
19         is knowing.  So I guess it would fall
20         within the category of knowing,
21         criminal extortion.  I didn't act on it
22         in the sense of taking it to the
23         police.  Just like --
24    BY MR. BEAL:
25        Q     Okay.



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                    140

1        A    I didn't -- I knew what had happened to

2    me.  I was going to move forward.  And then when

3    I got brutally attacked in South Carolina, I

4    made a decision as a lawyer for myself that I

5    needed to speak out publicly about it and so I

6    did.  And I told the truth.  I gave my honest

7    opinion.

8                 MR. BEAL:  I have to object.

9                 THE WITNESS:  I gave the truth and

10         gave my honest opinion.  I don't lie.

11    BY MR. BEAL:

12        Q    What is your understanding of the

13    elements of extortion?

14                 MR. HARRISON:  Object to the form.

15                 You can answer.

16                 THE WITNESS:  I am not sitting

17         here with a law book in front of me,

18         but I think when you take acts that are

19         beyond what you are entitled to, to try

20         to get someone else coerced into doing

21         what they are not obligated to do for

22         you, that is extortion.  It is in the

23         dictionary.  People use the term all

24         the time.

25                 A lot of people say the lawyer is



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                    141

1        extorting you.  It is a commonly used

2        term, especially when you are talking

3        about lawyers making demands on you.

4             And this one was not just a demand

5        to pay.  If you had said here is the

6        breach of contract claim, we demand you

7        pay the 600-what-odd-thousand-dollars,

8        that would not be extortion.  But when

9        you add all that other stuff in there,

10       and you made a $1.5 million demand; and

11       you actually attacked my faith by

12       putting in your Complaint that I

13       thought I was all mighty God, what in

14       the world were you thinking?

15   BY MR. BEAL:

16       Q    So your definition of extortion is

17   urging someone to make a payment to you that you

18   are not required to make?

19            MR. HARRISON:  Object to the form.

20            THE WITNESS:  Extortion comes in

21       many forms.  But it is when somebody

22       inappropriately tries to exert leverage

23       or pressure on you for their own game,

24       that they are not entitled to.

25            So the extortion could be in the



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                     142

1   form of the money demand, it was
2   outrageous.  It can't be justified.  It
3   can be part of the fact that you are
4   only gave me 24 hours initially to
5   respond.  What was the rush?
6           That you would refuse a reasonable
7   request that we arbitrated privately
8   with lawyers, binding arbitration.
9           And you added in so much stuff
10  that was intended clearly in my mind to
11  smear me and attack me for purposes
12  that had nothing to do with the dispute
13  on whether there was client consent
14  required.
15          And other things that were done,
16  if you say Lin, make this agreement or
17  we are going to continue to drive a
18  wedge between you and your children,
19  that is extortion.
20          Lin, make this agreement or we are
21  going to continue to talk about your
22  mental health that might hurt you in
23  your Sandmann litigation or hurt you in
24  your efforts with Richard Jewell with
25  President Trump, in my view that is



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                        143

1        extortion.  That is my opinion.

2    BY MR. BEAL:

3        Q    So the September demand included

4    payment of fees on various cases?

5        A    It included a lot more than that.  In

6    fact, nobody -- you have to explain how they

7    came up with the fees.  But on top of that --

8        Q    Can you just answer the question yes or

9    no.  Did it include that or not?

10       A    I don't know.  Show it to me and I will

11   tell you what it included.

12       Q    What was the Washington Post

13   settlement?

14            MR. HARRISON:  You are asking him

15       the amount?

16            MR. BEAL:  Yes.

17            MR. HARRISON:  Is it confidential?

18            THE WITNESS:  It is confidential.

19   BY MR. BEAL:

20       Q    Well, everything else is sealed in this

21   proceeding.

22       A    Not in this case.

23       Q    But it is part of our demand so.

24       A    There is no seal order in this case.

25            MR. HARRISON:  Yeah, I am not



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              144

1    aware of anything under seal in this

2    case.

3          We have also asked for some

4    financial information and information

5    on referrals and fees earned so -- but

6    beside that I don't know if it is

7    confidential or not.

8          And you say it is then --

9          THE WITNESS:  Oh yeah, it is

10   confidential but I don't mind telling

11   you at some point, but I want to make

12   sure I don't violate the agreement.

13         MR. BEAL:  Why don't we go off the

14   record.

15         THE WITNESS:  That would require

16   that I get in touch with Todd McMurtry

17   to make sure he is okay with me telling

18   it.  I mean it is not -- I don't mind

19   you knowing, but it is not something I

20   am allowed to say without some

21   protection in terms of ensuring that I

22   don't breach the agreement with

23   Nicholas and Todd may.

24         MR. HARRISON:  I am happy to

25   discuss it with you to see if we find a



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                    157

1    and what you and your clients attempted to do.

2         Q    Let us direct your attention back to

3    March 17th on what you contend was a pattern of

4    extortion; and I am just going to ask you to

5    identify specifically the facts that you

6    contend; and I believe you referenced in general

7    terms communications with your children and some

8    complaints about mental health.

9              But I am asking you to identify

10   specifically what actions the Plaintiffs took

11   leading up to the March 17th Settlement

12   Agreement, the specific acts which constituted

13   extortion?

14              MR. HARRISON:  So to be clear we

15        have covered this, but you are asking

16        him to answer it again?

17              MR. BEAL:  Yes, I am asking for

18        the specific acts.  I just need a list

19        of them.

20              MR. HARRISON:  And you are going

21        to let him give an answer?

22              MR. BEAL:  I am all set.

23              MR. HARRISON:  Okay.

24              THE WITNESS:  Well, number 1, I

25        have answered this question.



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              158

```
 1    BY MR. BEAL:
 2         Q     Right.
 3         A     So I refer you and I would incorporate
 4    the answer I previously gave you into what I say
 5    now.
 6         Q     Okay.
 7         A     Which will be in addition potentially.
 8               It is not a matter of acts.  It is not
 9    you act to extort.  You can say something.  You
10    can take a position.  I know here that Johnathan
11    I believe was involved with Dr. Phil; certainly
12    Taylor Wilson was in trying to have Dr. Phil
13    come in and do a mental health intervention.
14               I remember Matt wrote him and said we
15    have got too much to lose without Dr. Phil, what
16    did they have to lose?  They never even dealt
17    with Dr. Phil.  I know what Dr. Phil was doing,
18    and they were involved in it, at least Taylor
19    was.  And Johnathan was going around telling me
20    and my children confirming that somehow I needed
21    to go into regular mental healthcare, monthly
22    treatment.  Johnathan even said you need to be
23    on Lithium.  I ain't getting on Lithium.  There
24    are people who need it.
25               And my son said the same thing a month
```



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100      www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                    159

1    before, Lithium.  It was a concerted effort to
2    try to attack me on my mental health.  It is a
3    classic psychological operation.  The State Bar
4    was part of it later.  I am sorry my children
5    were involved.  I think I know how they got
6    involved.  Time will tell.
7              But that was one part of it.  You got a
8    guy that is in your law office, I don't know who
9    else he is saying it to; but he is questioning
10   my mental health, where I have got clients, I
11   have got Richard Jewell and I have got my family
12   involved.  What is he doing that for?
13             It was I said a pattern of extortion,
14   because I am sitting there going well, am I
15   going to shut this guy up by just getting rid of
16   him and paying him, or I am not going to let him
17   go our and continue doing this, have it get
18   worse, and have it impact my family more than it
19   already has, and my clients more than it already
20   has.  I got five by Nicholas Sandmann, and then
21   obviously hopefully down the road when things
22   get right in this country, and I believe they
23   will in due time.  Then I will be able to renew
24   my efforts with President Trump to get Richard
25   Jewell the Presidential Medal of Freedom.



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          160

1        Q      So the first category of actions that
2    you referred to efforts is Johnathan and Taylor
3    contacting Dr. Phil seeking an intervention or
4    discussion about your mental health?
5        A      I didn't say they contacted Dr. Phil
6    for that purpose.  I know now that it is
7    documented that they were talking to Dr. Phil.
8        Q      But at the time you didn't know --
9        A      It was enough that just running around
10   saying it, period.  They had no right to say it.
11   They had no medical training.  They had no
12   psychological training.  They were just making
13   it up and accusing me of something that was not
14   true, which they admitted in March 17th was not
15   true when they said I was mentally competent in
16   all respects.
17       Q      Who were they saying it to that you are
18   aware of?
19       A      I don't know.  I know they were saying
20   it to my children.  I know they were saying it
21   to each other.  I know they were saying it to
22   me.  I know that probably other people heard it.
23              I don't know who else they said it to.
24       Q      How did you know they were saying it to
25   your kids?



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                    161

1        A     Because they told me.  Johnathan and

2    Taylor told me they talked to them.  There was

3    this big powwow where they were all concerned

4    about me.  It was nonsense.  They were making it

5    up out of whole cloth.

6              It is a typical psychological operation

7    to attack the target by attacking their mental

8    health.  Study psychological operations.

9              It just didn't work because my mental

10   health is fine.

11       Q     Okay.

12             Next, action, words, or series of

13   actions that constituted extortion by the

14   Plaintiffs leading up to this March 17th

15   agreement besides that whole category, is there

16   anything else?

17       A     I have told you everything in my first

18   time I answered it.  I think I have added some

19   more specifics in.

20             It is just this simple, they were

21   threatening my family with their comments.  They

22   were threatening my clients with their comments.

23   They were threatening Richard Jewell with their

24   comments; and their comments were fake.  It was

25   false.  They have admitted that themselves in



**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                     162

1     the March 17th Settlement Agreement.
2              And I think they were doing it to try
3     to pressure me into paying them more than they
4     deserved in a situation where they had made the
5     mistake of not getting an agreement on the fee
6     division before the Sandmann case settled.
7     Historically we always did.  So I think they
8     were doing it to extort me, to force me to pay
9     them more than they deserve.
10             I gave in.  I agreed to it in March
11    17th.
12        Q    Okay, all right.
13        A    And then Nicholas doesn't consent and
14    you saw the letter from --
15        Q    Okay.
16        A    From Chris Marquardt.  And then the
17    next thing I know you send me this Complaint.
18        Q    Now, we are getting onto something
19    else.
20        A    You send me this Complaint.  Shame on
21    you.
22        Q    We are talking about March 17.
23        A    Questioning my faith in my children.
24    It is extortion.
25        Q    And how do you know that the Plaintiffs



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                        163

1    were speaking to your clients about mental
2    health issues?
3              MR. HARRISON:  Object to the form.
4        I don't think he said that.
5              MR. BEAL:  I thought you said
6        saying it to me, saying it to my
7        clients.
8              THE WITNESS:  They were saying it
9        to me.
10   BY MR. BEAL:
11        Q    Okay.
12        A    They were saying it to my children.
13        Q    Okay.
14        A    I don't know who else they were saying
15   it to.
16        Q    Okay.
17        A    But I have got concerns they may be
18   saying to it other people, or what they were
19   saying to the people they did say it to.  It
20   could be leaked out into the public discussion.
21   I mean there is no privacy.  Everything you say
22   on your phone, your Email's, and your texts is
23   captured in the air.  So you don't know who is
24   going to get it, and what they are going to do
25   with it.



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                         164

1              So you don't make baseless accusations
2      about somebody, because you don't know who is
3      going to get it and how they may try to use it
4      to hurt you.  Study about cell phones and
5      Email's and texts, and how they are in the air
6      and they capture it, Palentir.
7              They shouldn't have been doing it, that
8      is my point.
9                   (Whereupon, Plaintiff's Exhibit
10                  Number 17 was marked for
11                  identification.)
12     BY MR. BEAL:
13        Q    Let me hand you what I will purport to
14     you was the Answer that you filed in this case,
15     which is Exhibit 17.
16        A    I will accept your representation.  It
17     is marked.
18        Q    And can you grab the Complaint?
19             MR. HARRISON:  14?
20             MR. BEAL:  Which is 14.
21     BY MR. BEAL:
22        Q    And if you turn over to your Answer
23     number 36.
24             MR. HARRISON:  The Answer is 17,
25        is that right?



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              177

1        Q     And is it true that the statement there
2   in paragraph 46 that you have not disclosed the
3   amount of the recovery in the Sandmann versus
4   Washington Post?
5        A     I never received a demand or a request
6   for that amount.  And that would have been an
7   event that occurred after Joey Burby and Chris
8   Marquardt were involved and you were involved;
9   and I don't know whether Joey and Chris got a
10  demand or a request from you about that or not.
11  I don't think they did.
12       Q     Can we refer over to paragraph 49; and
13  there is a text embedded there in paragraph 49.
14             Can you tell us who that text was being
15  sent to?
16       A     It was not sent to -- it was not
17  intended to be sent to Johnathan.  And sitting
18  here today -- I mean what is the date of the
19  text?
20             I don't see a date.  So I don't know
21  who that I am intending to send it to.  It would
22  probably be better if I knew the time that I
23  sent it.  I was dealing with issues about my
24  computer being hacked.
25             MR. HARRISON:  Lin, I believe it


**COASTAL COURT REPORTING & VIDEO SERVICES**
800-791-1100        www.coastalcourt.com

NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                    186

1        Q      But you believed that you have the
2   right to pursue criminal action against the
3   Plaintiffs?
4        A      I could go -- yeah, I believe under the
5   facts that I could go out and sign a warrant for
6   having them try to criminally extort me, but
7   what is that going to do?
8        Q      So in paragraph 105 on the next page
9   you refer to the filing a grievance against the
10  Plaintiffs with the State Bar of Georgia.
11            Did you in fact file a grievance or
12  complaint with the State Bar of Georgia against
13  any of the Plaintiffs regarding your belief --
14  regarding extortion?
15       A      I believe so.
16       Q      What was Nicole Wade doing during all
17  of this dispute where you believe leading up to
18  March 17th on Taylor and Johnathan were
19  contacting your children improperly --
20       A      I said they were talking with them.  I
21  don't know who initiated the contacts.
22       Q      But was Nicole a part of any of that in
23  your belief?
24       A      My recollection, and I have a very
25  vivid recollection of having Johnathan and



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          187

1   Taylor in my office standing; and Nicole was
2   sitting in the chair and this was after all this
3   bizarre change of treatment of me that started
4   late October and was full blown in November.
5   And I remember looking at them at some point and
6   I said I ought to sue every damn one of you for
7   defamation for running around and running your
8   mouth and making an accusation about my mental
9   health.  And Nicole quickly said I have never
10  said that.  And I said to her right, you are too
11  smart to have done that.  These two people are
12  not.
13       Q    So --
14       A    I also remember, and I think I sent
15  it -- Nicole sent me and -- I think it -- I have
16  to go back and look, but I believe that it was
17  right around -- well, it was January for sure
18  and it could have been very early February, and
19  she said I just found out about the problems you
20  are having with your family.  I know -- because
21  she knows how much I love my children and they
22  love me -- I said I know that tears you apart.
23  It did.  It still does.
24            And then she said words to the effect,
25  that I still love you or I will always love you



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                    188

1    no matter what happens in terms of how we
2    practice law in the future; and I believed her.
3    And I said today I believe her now.  I think
4    Nicole Wade does love me.  Her love for me over
5    the years is legitimate as is mine for her.  I
6    think Johnathan loves me.  I think Taylor loves
7    me.  I love them.
8            But she was not in the middle of what
9    was going on in December.  I don't remember if
10   it was because she wasn't there.  I don't
11   recall.
12           But she was not one of the people who
13   was being so abusive to me and contradicting me
14   and acting like I did not know what I was doing
15   in preparation for the Musk trial.  So her
16   involvement in that was much different than
17   Johnathan and Taylor's.
18       Q    Okay.  So my question to you is about
19   Nicole Wade in this time period leading up to
20   the March 17th Settlement Agreement, do you
21   believe that she extorted you as well?  Or was
22   it just Johnathan and Taylor?
23       A    I think they all three did.  You were
24   asking me about the children.
25       Q    Yes.



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                          189

1       A      They all three were trying to get money

2    they did not have the right to.   They did not

3    get an agreement.   That is as much their fault

4    as it would have been mine.

5              And then after the case settled and

6    they knew the amount, then they wanted to go

7    back and get the same amount that I had agreed

8    to give them in the Ramsey case, and after the

9    way they had treated me and looking at the work

10   done related to the result and how it came

11   about, the case didn't settle because of them,

12   it settled because of the argument that I made

13   to the Judge when he reversed himself and

14   reinstated part of the case.  I didn't feel like

15   looking at that that was at all fair for them to

16   get that much money, but I agreed to it.   I

17   wanted to move on.  March the 17th.

18              MR. BEAL:  Is this is a good place

19        for a break for five minutes?

20              MR. HARRISON:  Sure.

21              (Whereupon, a short break was

22              taken.)

23              MR. BEAL:  Did you have a

24        statement your client wanted to make?

25              THE WITNESS:  You asked me, Drew,



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                              217

1            convince him to reverse himself and to
2            leave in for litigation one aspect of
3            the claim of defamation.
4                 So I can only tell you that I was
5            looking at it as an entirety.  Not one
6            case is better than the other.  So I am
7            not going to tell you what I told my
8            clients, what I am going to tell you,
9            and I don't know what Todd told them,
10           and I could be wrong about when the
11           Washington Post case settled; but I
12           think it was before the 26th because I
13           remember that I was surprised as we got
14           to -- when I found out he didn't
15           consent that no one had ever asked
16           between March the 17th and that date
17           what happened to the Washington Post
18           case.  I don't know if you asked Joey
19           and them or not, because they were
20           representing them.
21    BY MR. BEAL:
22           Q    And did you ever tell the Plaintiffs
23       that you felt that the Washington Post case had
24       significant value, approximately equal to the
25       Sandmann versus CNN case?



NICOLE JENNINGS WADE, et al. vs L. LIN WOOD
1:22-CV-01073 - L. LIN WOOD                                          218

1         A    I can't remember the specific statement
2     to that effect, but it wouldn't surprise me that
3     somewhere along the way when they were working
4     with me that I could have said we ought to maybe
5     do as well in Washington Post as we did in CNN;
6     but that is just an opinion and that changed.
7     It changed based on what the offer was and what
8     the clients were willing to take, and what Todd
9     wanted to do it with it.  I am not going to tell
10    you the amount, but I am going to tell you that
11    it was significantly less than CNN.
12    BY MR. BEAL:
13        Q    So the Plaintiffs' 10 percent of that
14    amount based on what you had told them earlier
15    in the case, that one fee amount could have
16    equaled over a million dollars?
17        A    No.
18        Q    Unlikely?
19        A    Unlikely.
20        Q    Okay.
21        A    I mean what you did was you pulled a
22    number out of the air, without asking what it
23    had settled for; and then you wanted to come
24    back and re-settle what had already been settled
25    and have me make demands to pay things that had

