**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

1      represent Todd McMurtry and his law firm

2      Hemmer Wessels McMurtry.

3              THE VIDEOGRAPHER:  Thank you.  Would

4      the Court Reporter please swear in the

5      witness.

6                  TODD V. MCMURTRY,

7      having first been duly sworn, was deposed and

8      examined as follows:

9              MR. BEAL:  This will be the videotaped

10     deposition of Mr. Todd McMurtry taken for

11     preservation of evidence and use at trial,

12     for cross-examination and all purposes

13     provided under the Georgia Civil Practice

14     Act.

15                  EXAMINATION

16     BY MR. BEAL:

17         Q    Mr. McMurtry, good morning.

18         A    Good morning.

19         Q    Can you tell the jury your full name?

20         A    Todd Vandivere McMurtry.  My mother's

21     maiden name.

22         Q    Thank you.  You grew up in the area of

23     Kentucky where you practice law; is that correct?

24         A    Correct.

25         Q    All right.  And that's around the town of

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 11

1   Covington, not too far from Cincinnati, Ohio; is that

2   correct?

3        A    Correct.

4        Q    All right.  And I believe that you've

5   been practicing about 35 years.  Did I get that

6   correctly?

7        A    Yes.

8        Q    All right.  And you specialize mostly in

9   complex litigation; is that correct?

10       A    Yes.

11       Q    And you've had various leadership

12   positions with the Kentucky Bar Association and the

13   Northern Kentucky Bar Association?

14       A    Correct.

15       Q    And those are two different bar

16   associations, right?

17       A    Yes.

18       Q    All right.  And in Kentucky as in

19   Georgia, the Bar Association promulgates the rules

20   regarding ethics and the conduct of lawyers within

21   that state; is that correct?

22       A    They propose the rules.  They're

23   ultimately approved by the Supreme court.

24       Q    And they assist in enforcing those rules;

25   is that correct?

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 12

 1          A     Correct.

 2          Q     Thank you.  Let's talk about your

 3   relationship with Lin Wood and the plaintiffs in this

 4   case, Nicole Wade, Jonathan Grunberg and Taylor

 5   Wilson.  Would it be okay with you if we refer to the

 6   three of them as plaintiffs or WGW?

 7          A     Yes.

 8          Q     Okay.  It would save us some time.  You

 9   were first contacted by Lin Wood regarding -- how did

10   you first come to meet Lin Wood?

11          A     I called him on the phone.

12          Q     Because Todd -- because Nick Sandmann had

13   retained your services, is that -- or indicated that

14   he wished to retain your services; is that correct?

15          A     Correct.  Correct.  Sorry.

16          Q     And tell us who Nick Sandmann is and in

17   general terms what the claims were that he had when

18   he first contacted you.

19                MR. GILFILLAN:  And I'm going to

20          object based on attorney/client privilege

21          and the work product doctrine to the extent

22          that it -- you're asking him to talk about

23          claims or potential claims at that point

24          and communication with Nick Sandmann.

25          Subject to that go ahead.

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 13

1       A    So Nick Sandmann at the time that I met

2  him was a 16-year-old boy from I believe

3  Independence, Kentucky which is a suburb in northern

4  Kentucky.  And he was a student at Covington Catholic

5  High School.

6  BY MR. BEAL:

7       Q    And had he been the subject of various

8  news stories in Washington, D.C. regarding some type

9  of exchange or confrontation with a group of native

10  American demonstrators?

11       A    Basically, yes.  He was -- he was in

12  Washington, D.C., an incident occurred.  It went

13  viral and national and he was the subject of that.

14       Q    And so when did you first --

15            THE WITNESS:  I think we're good.

16       He's muted his phone.  (Technical issues.)

17            MR. BEAL:  Okay.  When were you --

18       when did you reach out to Lin Wood?

19       A    Within three or four days of being

20  retained on the case.  I would be -- the following

21  week, so the week in the 21st timeframe.

22  BY MR. BEAL:

23       Q    I'm sorry, I didn't ask --

24       A    January.

25       Q    All right.  What year?

NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.
Todd V. McMurtry on 03/27/2024

Page 14

1        A     2019.

2        Q     Okay.  So we're talking about January of

3   2019 and you reach out to Lin Wood.  Is that because

4   he was a well known defamation lawyer?

5        A     In part.  A friend of mine called me and

6   said that Lin was a well regarded defamation lawyer.

7        Q     And did you discuss with Lin a joint

8   representation of Nicholas Sandmann?

9        A     I did.

10             (Whereupon, Exhibit No. 16 was previously

11             marked for identification by the court

12             reporter.)

13        Q     All right.  Let's turn over to document

14   16 in your book there.

15        A     Got it.

16        Q     Does this appear to be Lin's -- one of

17   Lin's early communications to you on January 21st,

18   2019 where he's talking about scheduling an initial

19   meeting with the Sandmanns?

20        A     Yes.

21   BY MR. BEAL:

22        Q     And does he refer to Taylor Wilson and

23   Jonathan Grunberg as his partners in that

24   communication?

25        A     He does.

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 15

1       Q     And did you understand that Taylor,

2   Jonathan and Nicole -- I just did it again -- were

3   Lin's partners at that time?

4             MR. REYES:  Objection.

5       A     By virtue of this e-mail that's what he

6   told me.

7   BY MR. BEAL:

8       Q     But I mean did you -- when you met them

9   -- let's ask it this way.  So the meeting took place

10  the very next day, is that right, after --

11      A     Correct.

12      Q     -- this e-mail on Exhibit 16.  And did

13  Lin or the WGW folks introduce themselves or

14  represent that they were partners in the law firm?

15      A     I recall that Lin said that they were his

16  partners at the meeting.

17      Q     Thank you.  Throughout your

18  representation of Lin -- of Nick in 2019 and into the

19  beginning of 2020, did Lin routinely refer to the WGW

20  folks as his partners to clients, the court or other

21  attorneys?

22      A     I only recall that in the plead -- in

23  some of pleadings I believe they were referenced as

24  partners, some of the initial complaints that were

25  filed.  Maybe they were on that line.  That's my

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 16

```
 1   recollection.  He and I did not discuss that.  You

 2   know, he didn't -- when we spoke he didn't say my

 3   partners, my partners.  We just didn't discuss

 4   anything one way or the other about their status.

 5        Q    Other than that initial meeting?

 6        A    Correct.

 7        Q    And how about representation to the

 8   Court?  Do you recall anytime when Lin said one of my

 9   partners referring to either of the three plaintiffs

10   here?

11        A    I believe he did refer to Taylor Wilson

12   as his partner at a conference with the trial court

13   judge.

14             (Whereupon, Exhibit No. 18 was previously

15        marked for identification by the court

16        reporter.)

17   BY MR. BEAL:

18        Q    Thank you.  Let's turn over to Exhibit

19   18.  Does this appear to be one of the three motions

20   pro hoc vice that you filed on behalf of -- excuse

21   me, one of the four pro hoc vice applications that

22   you filed on behalf of Lin Wood, Taylor Wilson,

23   Jonathan Grunberg and Nicole Wade?

24        A    Yes.

25        Q    All right.  And if we look at page two
```

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 17

1   under memorandum, the first sentence of the second

2   paragraph, you state under local rule 83.2(a)(1) Mr.

3   Grunberg is a partner with L. Lin Wood, PC?

4        A    I do state that, yes.

5        Q    And did you make a similar

6   representation -- I'll represent to you that the

7   other documents were produced -- regarding Taylor

8   Wilson and Nicole Wade?

9        A    That's my recollection, yes.

10            (Whereupon, Exhibit No. 21 was previously

11       marked for identification by the court

12       reporter.)

13  BY MR. BEAL:

14       Q    Thank you.  Let's look over at Exhibit

15  21.  Take a second and look at Lin's e-mail back to

16  you dated January 14th, 2020 at 5:58 p.m.

17       A    You want me to look at the e-mail for --

18  I see it.

19       Q    Yeah, you're pointing at it.

20       A    I recall this e-mail.

21       Q    Thank you.  And in that e-mail does Lin

22  say Taylor speaks for me unless or until I can speak

23  for myself?

24       A    He does.

25       Q    And did you understand that Lin was

NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.
Todd V. McMurtry on 03/27/2024

Page 18

1    directing you to Taylor Wilson whenever you had

2    substantive questions about the Sandmann case and he

3    was not available?

4         A    That was my understanding based upon

5    reading that e-mail.

6              (Whereupon, Exhibit No. 38 was previously

7         marked for identification by the court

8         reporter.)

9    BY MR. BEAL:

10        Q    Let's look over at Exhibit 38.  And this

11   is an e-mail that you produced from Taylor to you and

12   Kyle and Will of your firm and copies to other

13   people.  Do you remember receiving that e-mail?

14        A    Yes.

15        Q    All right.  And so there Taylor's

16   signature line is Wood, Wilson, Grunberg & Wade.  And

17   that e-mail is dated February 12th, 2020.  Did you

18   understand that sometime in January and the first

19   half of February 2020, WGW had formed a partnership

20   with Lin Wood called Wood, Wilson, Grunberg & Wade?

21        A    I did understand that to be the fact.

22             (Whereupon, Exhibit No. 39 was previously

23        marked for identification by the court

24        reporter.)

25   BY MR. BEAL:

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 19

```
 1        Q    Thank you.  Let's look over at 39.  And

 2   is this a retraction demand dated February 13th

 3   authored by Taylor Wilson with a copy to you sent to

 4   Democracy Now Productions, Inc., with a new

 5   letterhead of Wood, Wilson, Grunberg & Wade trial

 6   lawyers?

 7        A    Yes.

 8        Q    And that confirmed your belief that they

 9   were in a firm at least at that point?

10             MR. REYES:  Objection, form.

11        A    Yes.

12   BY MR. BEAL:

13        Q    Thank you.  And by -- by February 13th

14   the Sandmann settlement had been agreed to and

15   executed by the lawyers for the various parties; is

16   that correct?

17        A    I think the initial settlement had been

18   with CNN.  I don't recall if the Washington Post

19   settlement had occurred at this time.

20        Q    I'm sorry, I should have been more

21   precise.  I meant the CNN settlement?

22        A    That's my recollection.

23             (Whereupon, Exhibit No. 17 was previously

24        marked for identification by the court

25        reporter.)
```

NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.
Todd V. McMurtry on 03/27/2024

Page 29

1          The rule you keep referring to is Georgia

2     Rule of Professional Conduct Rule 1.5; is that

3     correct?

4          A    That's my recollection.

5          Q    And that is a rule that talks about

6     division of fees of lawyers; is that correct?

7          A    Again, yes, that's my recollection.

8          Q    All right.  And early in the audio

9     recording Taylor states or refers to I believe an

10    earlier phone conversation which you had in which you

11    informed him that the -- that your clients, the

12    Sandmanns, had not requested time sheets at that

13    point; is that correct?

14         A    At what point?

15         Q    I believe Taylor says Lin's whole

16    position that Nick required time sheets is not true,

17    and in response you said right.

18         A    That is correct.

19         Q    Okay.  So when Lin asserted that the

20    Sandmanns -- early in the dispute that the Sandmanns

21    had demanded to see the time sheets, that was not

22    correct?

23         A    That's not correct.  You are correct.

24    What you said is correct.  The answer is yes.

25         Q    Thank you.  Got it.  And you understood

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 35

1    A    Correct.  I wanted WGW to be paid fairly.

2    And I wanted to take into account the various factors

3    that led to receipt of these settlements as a part of

4    that.

5    Q    And whether WGW got paid half the fee in

6    the Sandmann versus CNN litigation, half of Lin's

7    fee, would not impact in any way the total amount of

8    fees paid by Nicholas Sandmann; is that correct?

9    A    That is correct.

10    Q    And it wouldn't impact the amount of fees

11    that you received for your representation of Nicholas

12    Sandmann in the CNN case, right?

13    A    That is correct.

14    Q    And it wouldn't -- it wouldn't require

15    the defendants to actually increase their settlement

16    amount?

17    A    That is correct.

18    Q    The only person who would pay something

19    more would be Lin Wood and/or L. Lin Wood, PC?

20    A    Correct.

21        (Whereupon, Exhibit No. 48 was previously

22    marked for identification by the court

23    reporter.)

24    BY MR. BEAL:

25    Q    Thank you.  All right.  Now let's turn

NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.
Todd V. McMurtry on 03/27/2024

Page 45

1   is all these greedy will get [sic] despite my coerced

2   agreement to pay them 50 percent of a fee that at a

3   time when their mutiny and wrongdoing was unknown to

4   me.

5           So did you understand at that time that

6   Lin wanted WGW to only be paid in quantum meruit?

7       A   That's what he said.

8           (Whereupon, Exhibit No. 46 was previously

9       marked for identification by the court

10      reporter.)

11  BY MR. BEAL:

12      Q   Let's look over at Exhibit 46.  When you

13  spoke to Lin after he wrote these the next day either

14  on the phone or as you were flying down to Reynolds

15  that -- did Lin ever express a concern to you that

16  WGW might file suit against him to recover a portion

17  of the fees that he may or may not have agreed to in

18  writing?

19      A   I'm sorry.  Could you reread the

20  question?

21      Q   You want me to just phrase it again?

22      A   Yeah, I --

23      Q   Did he ever say --

24      A   -- wandered a bit.  Sorry.

25      Q   Did he ever say he thought WGW might

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 46

1   resort to litigation over the CNN v. Sandmann fees?

2          A    I don't recall that specifically.  My

3   best recollection is that he would have said that.

4   He certainly implied that in his writings.  And

5   otherwise I would have expected that they would have

6   resorted to litigation were they not paid for their

7   work in the case.

8          Q    And did he ever express to you any

9   concerns that the WGW folks might sue over fees in

10  other cases?

11         A    That I don't think so.  I don't recall

12  that.  It may be in here but I don't recall it.

13         Q    Any other cases that you were working on

14  such as the other Sandmann cases?

15         A    At this time I think there were only

16  three cases filed and I knew that WGW had worked on

17  all three cases.  And I would have expected that they

18  would have sought fees there as well.  I don't know

19  that I quite answered your question but that was what

20  I was thinking.

21         Q    Thank you.  That's fine.  Let's look over

22  at Exhibit 46.  Is this the letter that you wrote me

23  about, let's see here, nine hours after receiving the

24  three e-mails from Lin?

25         A    Yes.

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 63

1        A    That is correct.

2             (Whereupon, Exhibit No. 64 was previously

3        marked for identification by the court

4        reporter.)

5    BY MR. BEAL:

6        Q    And so then Exhibit 64, does this appear

7    to be Lin's e-mail right back to you 30 -- 29, 30

8    minutes later?

9        A    Yes.

10       Q    Okay.  And he says:  I am excited, too.

11   The hearing will work out.  I have resolved dispute

12   with former business partners.  Today is a day for

13   prayer for our nation.  I love you.

14            Did Lin often times say I love you in his

15   e-mails?

16       A    Yes, he did.

17       Q    All right.

18       A    (Inaudible) that way.

19       Q    And -- and did you then contact him to

20   ask him what he meant by resolving his dispute with

21   his former business partners?

22       A    I don't believe that I did.  I don't

23   recall reaching out to him.  I just recall being

24   relieved that this was resolved and we could move on.

25       Q    And you believed that if there was an

NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.
Todd V. McMurtry on 03/27/2024

Page 64

1    agreement among the parties they could divide up the

2    fees however they wanted so long as it didn't affect

3    the Sandmann's fees or your fees and you could be

4    done with this?

5           A     Absolutely.

6           Q     And so you assumed that they had reached

7    one of those agreements that you talked about in your

8    letter to me where you said I will hold the money in

9    escrow absent an agreement?

10          A     Correct.

11                (Whereupon, Exhibit No. 69 was previously

12          marked for identification by the court

13          reporter.)

14   BY MR. BEAL:

15          Q     Thank you.  Let's turn over to Exhibit 69

16   and 3146 Bates number, so it's the second page.  In

17   the middle of the page does that appear to be your

18   e-mail to Lin on Tuesday, March 17th at 9:00 p.m. --

19   9:06 p.m.?

20          A     Yes.

21          Q     All right.  And you say:  Lin, I write to

22   bring you up to date on the status of the CNN

23   settlement.  We were set for a hearing on Monday in

24   Kenton District Court to appoint Julie Sandmann as

25   the conservator for Nick in the CNN settlement.

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 71

```
 1        A     Yeah.

 2        Q     I'm talking about 99.

 3        A     I don't see that there's a call scheduled
 4   on this.

 5        Q     Okay.  But you have several conversations
 6   with Alston & Bird during this time period; is that
 7   correct?

 8        A     I did.

 9        Q     And they were about Nicholas's consent to
10   a fee division; is that correct?

11        A     Yes.

12        Q     And did you understand from your
13   conversations with them -- well, you understood they
14   were representing Lin, right?

15        A     I knew that, yes.

16        Q     And did you understand from your
17   conversations that they did not want Nicholas's
18   consent to a division of the fees in any way other
19   than quantum meruit because that was Lin's desire?

20        A     They did not say that.

21        Q     Did you have that understanding in your
22   mind from your conversations with them?

23        A     Alston and -- when Alston & Bird spoke
24   with me they -- there were I believe two calls.  And
25   they told -- you know, they sent the settlement
```

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 72

 1   agreement and they told me that Nick would need to

 2   approve it and that -- and then they discussed -- oh,

 3   that Nick would need to approve it and that -- they

 4   said that Lin was in favor of Nick's approval of the

 5   settlement agreement.

 6            And then they also spelled out other --

 7   you know, what that looked like.  And I would say

 8   that my best recollection of what they said is, is

 9   that Nick had some discretion with regard to his

10   approval or non-approval of the settlement.  So that

11   information came from Alston & Bird.

**12        Q    And what did they say to you would form**

**13   the basis of that discretion?**

14        A    I don't quite understand your question.

15   Did --

**16        Q    On -- what would be some of the factors**

**17   that they indicated that Nick could consider?**

18        A    Well, I'll be honest.  When they started

19   to discuss that, I didn't want to be involved in the

20   process.  So I'm like I'll make my own decision.  You

21   guys -- I don't -- I don't want there to be you

22   suggesting anything in particular to me.

23            I did not want to be -- A, I didn't want

24   to be involved, B, I was pretty ticked off that this

25   was happening, and C, I didn't want them advising me

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 73

1   what I should do.  So that's the way I approached my

2   call with them -- calls plural.

3            Q    Thank you.  And you believed at that time

4   that the Sandmanns would control the allocation of

5   fees between Lin and WGW and that quantum meruit was

6   required; is that correct?

7            A    Well, I believe --

8                 MR. REYES:  Objection.

9                 THE WITNESS:  Is there an objection?

10           I -- I did not necessarily believe -- I

11           believed that Nick could have said yes, I

12           approve.  So I didn't think that he had to

13           engage in a quantum meruit discussion over

14           the fee.  So what Alston & Bird told me is

15           that Nick needed to make some decision

16           about approval or not of the settlement.

17   BY MR. BEAL:

18           Q    So we saw Exhibit 46 and 56, your first

19   letter to me in February of 2020 and your second

20   e-mail correspondence with me in March of 2020 in

21   which you said we can escrow the fees, the Sandmanns

22   control and quantum meruit is required.  Do you

23   remember those two --

24           A    I do.

25           Q    -- letters that you testified?

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

1        A     Yes.

2        Q     Thank you.  So are you saying that

3   between February of 2020 and July of 2020 your

4   position changed?

5        A     No, I don't think that my position

6   changed.  I think that I kind of stuck -- well, I see

7   what you're saying.  So whether -- whether it was

8   settled, that would eliminate any conversation about

9   the case.  My position changed after Alston & Bird

10  said Nick needs to approve this settlement.

11             And so then I felt that we were, you

12  know, kind of walking a tightrope as to what do we do

13  here.  I didn't want to have that imposed upon Nick

14  and was not happy that that we were being put in this

15  position to have to deal with the situation.

16        Q     Did you ever tell Nick that he didn't

17  have to consent to anything, he could just receive

18  his money and not sign any kind of consent form and

19  not get involved in the issue of his consent?

20             MR. GILFILLAN:  Objection.  That

21        question calls for communications subject

22        to the attorney/client privilege and work

23        product doctrine and I'll instruct Todd not

24        to answer.

25             MR. BEAL:  You recognize that -- that

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 79

1      Q    Thank you.  Did you tell Nick that Lin

2  did not want him to consent to any fee division

3  between his firm and WGW?

4           MR. GILFILLAN:  I'm going to object to

5      the form of the question because it

6      purports to characterize privileged

7      communications.  But then second, I'm also

8      going to object based on the

9      attorney/client privilege and work product

10     doctrine and instruct Todd not to

11     communicate about the substance of his

12     communications with Nick Sandmann.

13          MR. BEAL:  All right.  But at this

14     time when you're disbursing this large

15     amount of money to Nick and talking to him

16     or communicating with him about consent,

17     did you believe that Lin was important to

18     getting the CNN versus Sandmann settlement

19     during that time period?

20     A    The case that had already been settled?

21  BY MR. BEAL:

22     Q    Yes.  Do you think that he was

23  instrumental in getting the settlement?

24     A    At this time I did, yes.

25     Q    Did you think that he was important in

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 80

1    the other cases as well?

2         A    At that time I did, yes.

3         Q    Do you believe that Nick thought that Lin

4    was important?

5              MR. GILFILLAN:  I'm going to --

6              MR. BEAL:  I'm not asking him what he

7         told him.

8              MR. GILFILLAN:  Yeah, but I'm going to

9         object because I think a lawyer's

10        understanding of what the client thinks is

11        subject to the client's attorney/client

12        privilege and also the work product

13        doctrine.  So I'm going to instruct him not

14        to answer.

15             MR. BEAL:  And do you believe that

16        Nick understood that Lin was acting as the

17        general in this case?

18             MR. GILFILLAN:  Same objection.  I'm

19        going to instruct him not to answer.

20             MR. BEAL:  Do you believe that Lin was

21        important to you for your campaign at that

22        time?

23        A    No, the campaign was over.

24   BY MR. BEAL:

25        Q    All right.  He had already made the

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 94

1          court reporter.)

2     BY MR. BEAL:

3          Q     Let's look over at Exhibit 175.   Does

4     that appear to be Nicholas Sandmann's affidavit?

5          A     Yes.

6          Q     Thank you.   Let's look at paragraph ten

7     on page three.   The first sentence says:   After

8     consulting with Mr. McMurtry and receiving his

9     independent advice.

10               Do you believe that that statement was

11    correct?

12         A     Yes.

13         Q     And so you provided your counsel to

14    Nicholas Sandmann regarding the issues he discusses

15    here in the affidavit?

16               MR. GILFILLAN:   I'm going to object to

17         the extent it calls for communications

18         subject to the attorney/client privilege

19         and work product doctrine with -- with

20         Nick.   I think the document speaks for

21         itself.

22               MR. BEAL:   Well, I'm not asking for

23         any independent communications.   You know,

24         he makes a statement here that he received

25         his independent advice and I'm asking did

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 95

1        you provide independent advice to him?

2              MR. GILFILLAN:  You can answer that.

3        A    I did.

4    BY MR. BEAL:

5        Q    Thank you.  Then we see over on paragraph

6    11, the second sentence:  I made the decision to

7    request documentation from them on my own after

8    consulting with Mr. McMurtry and receiving his

9    independent advice.

10             Did I read that correctly?

11       A    Yes.

12       Q    And do you believe that that was accurate

13   also?

14       A    Yes.

15       Q    Okay.  So do you believe that your advice

16   was independent at that time?

17             MR. GILFILLAN:  I'm going to object

18        again to the extent you're getting into

19        privileged communications with Nick.  He

20        just testified that the statement in the

21        affidavit he believes to be correct.

22             MR. BEAL:  Now I'm talking about his

23        state of mind, nothing to do with Nick.

24             Do you believe that you were

25        independent in your advice at that time?

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 96

1        A    I undertook my own investigation from the

2    February timeframe through till that date.  I thought

3    arguably that there was -- there was a legal argument

4    under Kentucky law that they be -- that they receive

5    no fee.  And there's a case involving the -- an

6    attorney named Barbara Bonar and Stan Chesley that

7    discusses this issue.

8             And so -- and I also received the

9    communications from Alston & Bird suggesting that

10    Nick did need to provide some consent to the

11    settlement agreement.  And although I was greatly

12    disappointed that Alston & Bird was telling me we

13    were being pulled back into this thing, I do believe

14    that my advice was independent.

15    BY MR. BEAL:

16        Q    And I believe you testified that you did

17    not review Rule 1.5(e)?

18        A    I did back in February.  I did not review

19    it again when Alston & Bird told me that Nick needed

20    to approve the settlement.  My assumption -- and I

21    don't know whether they told me this.  My assumption

22    is that they were -- had an interpretation of the

23    rule different than the one you had, and that's why

24    they were telling me this.

25        Q    And did you undertake your own

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 98

1      Q     And you believed at that time that the

2  WGW folks were all partners of Lin Wood in L. Lin

3  Wood, PC or their other firm, Wood, Wilson, Grunberg

4  & Wade?

5      A     That's what Jonathan told me back in that

6  time period.  So I accepted his representation that

7  that was their status.

8      Q     And do you know how being members of a

9  firm would impact the interpretation of Rule 1.5(e)?

10     A     I know that the rule discusses winding up

11  affairs and so forth.  You know, I think -- I think

12  that as I said before the case law in Kentucky is a

13  little different.  I was looking at it from a

14  Kentucky standpoint.

15     Q     And if we look back at Exhibit 92 in the

16  first binder?

17     A     I see it.

18     Q     Thank you.  And we look at page six --

19  excuse me, page seven, note eight, states that

20  paragraph E, meaning Rule 1.5(e), does not prohibit

21  or regulate the division of fees to be received in

22  the future for work done when lawyers were previously

23  associated in a law firm.

24          Did -- did you have an opportunity to

25  review note eight to Rule 1.0 -- Rule 1.5(e), sorry?

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 99

1        A     Not prior, not in the July 2024

2     timeframe.  I don't believe that the version of the

3     rules that I reviewed in February of 2020 yet

4     contained that provision.  I think the rules did.  I

5     think my book -- you know, the book that I referred

6     to for those things didn't have that rule, did not

7     have that number eight comment.

8              With regard to heading into July 4th,

9     2020, no, I did not review that.  I did not see this

10    memo.  I did not review that.  I relied upon what

11    Alston & Bird told me was required under Georgia law.

12       Q     And you discussed Rule 1.5 with Lin in

13    February of 2020; is that right?

14       A     I believe that I did, yes.

15       Q     And then if we look over to page six of

16    that exhibit?

17       A     Which one?

18       Q     The 92, sorry.  And I'll just read it to

19    you.

20       A     Okay.

21       Q     Georgia Rule of Professional Conduct

22    1.5(e) provides a division of the fee between lawyers

23    who are not in the same firm may be made only if.

24              Not in the same firm.  And I believe you

25    testified that you believed that the WGW folks were

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 100

1    partners with Lin Wood in his firm or in the firm of

2    WWGW?

3         A    When they left the firm, yes, I would

4    have said that they were partners.

5         Q    Thank you.  And did you get a chance to

6    review Georgia Rule of Professional Conduct 1.0?

7         A    I didn't review any Georgia rules of

8    professional conduct.

9         Q    What steps did you undertake if any to

10   determine what constitutes a law firm -- associated

11   with a law firm or being members of a law firm?

12        A    I didn't do anything with regard to

13   Georgia law.  I'm not licensed or affiliated with any

14   firm down here, so I didn't make any review of

15   Georgia law.  I relied upon what Alston & Bird told

16   me.  And prior in the February timeframe I thought

17   Kentucky law applied.  And as I said I decided to use

18   a case involving Bonar and Chesley, which I think

19   would support my legal position at that time.

20        Q    Looking back at the -- I think you're on

21   the right one, the affidavit, did you ever ask to see

22   Lin Wood's records of his time spent in the Sandmann

23   versus CNN case?

24        A    No.

25        Q    When providing legal advice did you

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 101

1    discuss the issue of proportionality?

2             MR. GILFILLAN:  Object to form.

3         Object to that question.  It calls for

4         communications subject to the

5         attorney/client privilege and work product

6         doctrine.

7             MR. BEAL:  What steps, if any, did you

8         undertake to determine the proportionality

9         of any fee to WGW as opposed to Lin Wood?

10        A    The only steps that I would have taken or

11   that I did take were to consider the relative value

12   of what each group, Lin Wood and WGW, brought to the

13   settlement.  And in my view Lin Wood's -- my view at

14   the time, it's evolved, but at the time I would have

15   said that Lin procured the settlements based upon his

16   alleged national reputation and standing in the area

17   of defamation law and that WGW were his able

18   supporters in that effort.

19             But that none -- none of that group, WGW,

20   would have had any success obtaining those same

21   settlements as Lin was able to based upon in part

22   his -- you know, he personally knew the lawyers for

23   CNN.  He personally knew the lawyers for the

24   Washington Post, had dealt with them before and they

25   seemed to have a good rapport.  So I saw Lin as being

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 102

1    the -- you know, kind of using a realtor term, the

2    procuring cause of the settlements.

3    BY MR. BEAL:

4        Q    Would you agree that there would have

5    been no settlement had there not been a complaint and

6    a complaint or amended complaint that ultimately

7    survived a motion to dismiss?

8        A    Yeah, sure.  And I think that, you know,

9    in an alternate reality Lin had the capacity to have

10   drafted the complaint or directed me to draft that

11   complaint just as he helped train the WGW people in

12   this field of law.

13       Q    Did you ever have a discussion with Lin

14   about how often he ever typed any pleading or any non

15   e-mail correspondence?

16       A    I'm sure that he did practically nothing

17   other than talk to me on the phone from time to time.

18       Q    Thank you.  When WGW withdrew from these

19   cases, your firm undertook a lot of the written

20   product thereafter in representation of Nick

21   Sandmann; is that correct?

22       A    Yes.

23       Q    Would you say that your law firm then

24   after their departure effectively did all the written

25   work product on the Sandmann cases?

NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.
Todd V. McMurtry on 03/27/2024

Page 103

```
1        A    Yes.  I even had to -- had to hire
2   another attorney to help.
3        Q    All-consuming absorbing kind of work?
4        A    Yes.
5        Q    And you were aware at the time of the
6   execution of this affidavit and you were aware in
7   July of 2020 that Lin did not keep a record of his
8   time either?
9        A    I certainly would not have -- I didn't
10  know that as an independent fact.  My assumption was
11  that he did not.
12       Q    Okay.  And he had told you in multiple
13  e-mails that the WGW folks did not to his knowledge
14  either?
15       A    That's what he told me.
16            MR. GILFILLAN:  We've been going about
17       an hour and 20 minutes.
18            THE WITNESS:  I'm fine.  If you need a
19       short break, that's fine.
20            MR. BEAL:  You need a break?
21            MR. GILFILLAN:  Yeah.
22            THE VIDEOGRAPHER:  Going off the
23       record, 1:39 p.m.
24            (Whereupon, the video camera was
25       turned off.)
```

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 104

1              (Whereupon, a brief recess was taken.)

2              (Whereupon, the video camera was

3        turned on.)

4              THE VIDEOGRAPHER:  We're going back on

5        the record.  The time is 2:05 p.m.  Please

6        continue.

7   BY MR. BEAL:

8        Q    Mr. McMurtry, thank you.  Follow up on a

9   couple of questions.  Let's see if we can't bring

10  this to a close.

11             Earlier I believe you testified that you

12  and Lin had discussions in February 2020 about Rule

13  1.5?

14        A    Yes.

15        Q    All right.  Did Lin bring those up to

16  you?

17        A    I don't recall whether he mentioned it or

18  whether I looked at the rule myself.  I'm sorry, I

19  don't recall.  If it's in one of his e-mails

20  mentioning that rule then he would have initiated

21  that.  I just don't recall.

22        Q    Did -- in your conversations with Alston

23  & Bird in July did they ever tell you that WGW were

24  not lawyers of L. Lin Wood, PC?

25        A    I don't believe so.  I don't recall that.

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 105

```
 1   Don't recall them ever saying that.
 2        Q    Did they -- but they did tell you they
 3   were lawyers of a separate law firm?
 4        A    I believe that they did.
 5        Q    Thank you.  Did you come away with the
 6   belief that Lin wanted -- did you come away with a
 7   belief as to what Lin's desires were regarding fee
 8   splits in the Sandmann versus CNN case based on your
 9   conversations with Alston & Bird?
10             MR. REYES:  Objection, form.
11        A    I do not believe that anything that
12   Alston & Bird did gave me an indication as to what
13   Lin's desires were.
14   BY MR. BEAL:
15        Q    But you had a belief based on your
16   communications directly with Lin?
17        A    I did.
18        Q    And was that that he did not want to
19   share fees on that case with WGW except on a quantum
20   meruit basis?
21             MR. REYES:  Objection, form.
22        A    I don't know that he was as specific as
23   saying quantum meruit, but in that July 2020
24   timeframe based upon my conversations with Lin, I
25   took that he did not want -- he did not want Nick to
```

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 106

1   approve that settlement and he didn't want to share

2   fees with WGW.

3   BY MR. BEAL:

4        Q    Thank you.  You had no discussions with

5   Lin between that -- the March 17th time period and

6   these July 2020 conversations about the WGW fee

7   split.  Is that fair?

8        A    The first I would have learned of this

9   new WGW fee split issue would have been when Lin

10  called me and said my lawyers from Alston & Bird are

11  going to call you.  And then they called me and they

12  raised this issue of needing Nick to approve the

13  settlement between Lin Wood and WGW.

14            So that would have occurred in July 2020

15  I believe based upon my review of the e-mails and

16  documents.  So between that March e-mail where Lin

17  said we're settled and that July call where Lin said

18  Alston & Bird will be calling you, I didn't even

19  think about this.  I thought it was over.

20       Q    Thank you.  So nothing changed in your

21  perception of what Lin wanted between your

22  February/March conversations with Lin and your July

23  conversations with Lin; is that right?

24       A    The only thing that would have indicated

25  a change is that e-mail in March where he said we're

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 107

1    settled.  But other than that, he never spoke to me

2    and said my -- my feelings on settlement have

3    changed, you know, up until the July timeframe.

4         Q    And he never said disregard prior

5    communications or anything?

6         A    No.

7         Q    I believe you testified about a trip that

8    you guys took down to Reynolds plantation to meet

9    with him?

10        A    I could never forget that trip, but go

11   ahead.

12        Q    And on -- did Lin send a private jet for

13   you guys?

14        A    He did.

15        Q    All right.  And in that trip he also

16   expressed his views about fee splits and a variety of

17   other issues?

18        A    I don't recall exactly.  It was a -- it

19   was a very strange event.  He expressed a lot of

20   views in the day that we were there.  And I'm sure

21   that there would have been -- based upon everything

22   that is happening that there would have been some

23   complaints about WGW.

24        Q    Okay.  Now, there was another trip down

25   to his plantation in South Carolina, the Tomotley

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 121

1    we would like to see some evidence of their work, you

2    know, show me their work.

3        Q    **And you were keenly aware of the amount**

4    **of written product they did because you were working**

5    **with them on every phase of this case?**

6        A    In my opinion --

7        Q    **Is that correct?**

8        A    In my opinion as an attorney separated

9    from my role as a lawyer I thought that their fee

10   would have been fine.  I mean you could make an

11   argument one way or the other and say 800,000 is too

12   much or it's not enough.  I think the point of the

13   July 24th thing is that this was thrust upon me

14   without anybody asking me, and I didn't want to be --

15   I really didn't want to be a part of it.

16           I didn't want to say yes.  I didn't want

17   to say no.  I really wanted to thread the needle and

18   get out of the -- get out of the whole situation.

19   That's what I was trying to do.

20       Q    **Did you ever tell Lin that you felt like**

21   **he had brought you into this situation unfairly or**

22   **improperly?**

23       A    I probably said I'm really pissed off

24   that I'm involved in this situation, yes.  I was not

25   happy about it and I didn't want to be involved in

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 123

```
 1        we ought to -- let's focus on the language
 2        that's actually on that recorded call.
 3               THE WITNESS:  So in response do you
 4        want to ask a different question or do you
 5        want me to --
 6   BY MR. BEAL:
 7        Q    No.  Go ahead and answer that one.
 8        A    Okay.  So as I understand your question,
 9   did I tell Alston & Bird that Nick -- did I tell
10   Alston & Bird that I wanted to see something for WGW
11   to prove its work.  And that's just the gist of what
12   I said, show us your work, then yes, I did tell that
13   to Alston & Bird.
14        Q    Right.  That's paragraph 31.  Paragraph
15   32 where you're referencing Nick and his demand for
16   documents, I believe what you meant is it's your
17   demand for documents; is that right?
18               MR. GILFILLAN:  I'll object to the
19        form to the extent it mischaracterizes what
20        he meant.
21        A    What I communicated to Alston & Bird was
22   that we would like WGW to show its work.
23   BY MR. BEAL:
24        Q    Okay.  But I believe you said on the
25   recorded call that the disputed client did not demand
```

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 124

```
 1    time records to substantiate fees?

 2        A    Correct.  I think something akin to your

 3    letter that you sent before, if you had sent that on,

 4    you know, August 3rd or something, had you chosen to

 5    do that then I would have been able to proceed.  And

 6    again, I didn't want to be approving or not approving

 7    the fee, but that would have been the next step in

 8    getting your people paid.

 9        Q    But not getting into your attorney/client

10    communications, you were capable of telling Nick all

11    the facts regarding proportionality of the fee

12    because you lived it, you worked it and you worked

13    with the WGW folks every day throughout 2019 and the

14    beginning of 2020, correct?

15             MR. GILFILLAN:  I'm going to object

16        and instruct him not to answer to the

17        extent that it calls for what -- he what he

18        said and communicated --

19             MR. BEAL:  Nope.

20             MR. GILFILLAN:  -- about with the

21        Sandmanns.

22             MR. BEAL:  Doesn't ask that at all.

23             THE WITNESS:  May I proceed?

24             MR. GILFILLAN:  Yes.

25        A    So if you had called me as an expert
```

NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.
Todd V. McMurtry on 03/27/2024

Page 125

1    witness to review the work done on the case, I would

2    have found that their fee request was reasonable.

3                  MR. BEAL:  Thanks.  Let's take a quick

4        break and see if we have any mop up

5        questions.

6                  THE VIDEOGRAPHER:  Going off the

7        record, 2:34 p.m.

8                  (Whereupon, the video camera was

9        turned off.)

10                 (Whereupon, a brief recess was taken.)

11                 (Whereupon, the video camera was

12       turned on.)

13                 THE VIDEOGRAPHER:  We're going back on

14       the record.  The time is 2:41 p.m.  Please

15       continue.

16                 (Whereupon, Exhibit No. 199 was

17        previously marked for identification by the

18        court reporter.)

19   BY MR. BEAL:

20       Q    Can you turn over to Exhibit 199, Mr.

21   McMurtry?  We received this extraction report from

22   Cellebrite from your team.  Can you describe for us

23   who Cellebrite is?

24       A    Is this my phone?

25       Q    Yeah, I think.

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 129

1    to the -- whether we would go through the process of

2    probate or whether we'd wait until Nick turned 18 and

3    what that meant.  So there were some additional

4    negotiations.  But I can't say exactly when.  I think

5    around this time.

6          Q    And did -- did Lin ever indicate to you

7    that he wanted to wait till Nick turned 18 because it

8    would be easier for him to convince Nick not to

9    consent to any fee agreement with the WGW people?

10         A    No.

11         Q    Was it for increased confidentiality of

12   the settlement?

13         A    What happened is, is we ended up going to

14   a judge, Douglas Grothaus, to try to have the

15   agreement.  I graduated from law school with Judge

16   Grothaus.  I called him up, I said we've got this

17   confidential settlement agreement.  Can it remain

18   confidential through this process?  And he said no, I

19   have to look at it and somebody else might look at

20   it.

21              So we considered that just due to the

22   high profile nature of things at that time that it

23   would be better -- I think we told this -- I'm pretty

24   sure I told this to opposing counsel that I did -- I

25   was doing all this.  I told this to opposing counsel

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 130

1   and said there's a problem, it may -- it may not

2   remain confidential, it may be leaked out of the

3   clerk's office.  And so they said let's wait until he

4   18.  And then we negotiated points over what that

5   meant since we'd have to wait all this time to get

6   paid.

7       Q    Were you aware that Lin ever communicated

8   any of that to WGW?

9       A    No.

10      Q    And so I believe you testified earlier

11  that the settlement in the CNN Sandmann case was in

12  January of 2020?

13      A    Yes.

14      Q    Is that right?  And these e-mails are in

15  March of 2020; is that correct?

16      A    Yes.

17      Q    All right.  What did Lin say to you in

18  July of 2020 that made you think he still did not

19  want Nick to consent to a fee division with WGW?

20      A    So from the time of the call with Alston

21  & Bird up until July 24th I probably had three or

22  four phone calls from Lin where he was basically

23  unhinged and screaming, I'm being screwed, I'm being

24  screwed, WGW is screwing me, you know.  And he was

25  really -- as Mr. Wilson knows, you know, off the

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 131

1   reservation, you know, crazy.

2           And so we had to deal with that and

3   that's what he told me.  So I knew that he was

4   looking for a deficient solution.  He was trying to

5   blow things up.  So that's what he told me.

6           Q    Thank you.  Did you ever receive any

7   interest on the CNN settlement?

8           A    There -- yes, there was interest paid on

9   the CNN settlement.

10          Q    And do you know approximately how much

11  that was?

12               MR. GILFILLAN:  I'm going to object

13          based on confidentiality grounds.  We don't

14          unfortunately have a protective order in

15          this case in place, and I think the amount

16          of that would be -- would be confidential.

17               MR. BEAL:  Okay.  And however much it

18          was, did you and Lin share some portion of

19          that interest by your contingency fee?

20          A    Yes, we did.  It was just, you know, some

21  simple type interest on the gross amount that was

22  tacked onto the settlement by July 20.

23               MR. BEAL:  Thank you very much.

24               THE WITNESS:  Okay.

25               MR. BEAL:  I appreciate it.

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 133

1          Q     If I may, let's go to Exhibit No. 5.

2          A     (Witness complies with request of

3     counsel.)

4          Q     And it's my understanding that at some

5     point in time counsel for Mr. Wood at Alston & Bird,

6     Joey Burby and Chris Marquardt, asked you to confirm

7     that Nicholas Sandmann had seen the entire affidavit

8     that he had signed.  Is that so?

9          A     Is it so that Nicholas Sandmann saw the

10    entire affidavit that he signed?  I missed your

11    question.  I'm sorry.

12         Q     Yes.  That's question one.

13         A     Nicholas Sandmann did see the entire

14    affidavit.

15               (Whereupon, Defendants' Exhibit No. 6 was

16          previously marked for identification by the

17          court reporter.)

18    BY MR. REYES:

19         Q     And that's what you confirmed to the

20    lawyers on Exhibit No. 6; is that correct?

21         A     Without reading the entire affidavit I

22    believe that that is correct.

23         Q     Okay.  Was Mr. Wood involved in those

24    conversations with you at the time that Nicholas

25    Sandmann was asked to provide an affidavit?

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 134

1      A     Mr. Wood was not involved in any way in

2    the affidavit.

3            (Whereupon, Defendants' Exhibit No. 3 was

4        previously marked for identification by the

5        court reporter.)

6    BY MR. REYES:

7      Q     Okay.  If I may direct your attention to

8    Exhibit No. 3.

9      A     (Witness complies with request of

10   counsel.)  I see it.

11     Q     Did you present that settlement agreement

12   to the Sandmanns for consideration?

13     A     The fact is that I did.

14     Q     Okay.  Who communicated -- who spoke with

15   you on behalf of Mr. Wood regarding the need for

16   consent from Nicholas Sandmann in order for the fee

17   split to occur?

18     A     Alston & Bird, Joey Burby and Chris

19   Marquardt, however you pronounce it.  Marquardt.

20     Q     Not Lin Wood?

21     A     Lin Wood did not tell me that Nicholas

22   Sandmann had to consent to the settlement agreement.

23     Q     Okay.  And I believe that you testified

24   earlier today that Joey Burby told you that Lin had

25   said that Nick should consent; is that right?

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 135

 1        A      That is what Joey Burby and/or Chris

 2    Marquardt told me.

 3        Q      So it's fair to say that Lin Wood never

 4    told you ask Nick Sandmann not to consent?

 5        A      Lin Wood never told me or asked me to

 6    have Nick Sandmann not consent.

 7        Q      Has Mr. Beal's office contacted you

 8    regarding coordinating depositions for Nick Sandmann

 9    or Julie Sandmann or Ted Sandmann?

10        A      No.

11        Q      At some point in time the complaint that

12    the WGW plaintiffs filed against Mr. Wood made it to

13    the New York Times before it had been filed.  Did the

14    New York Times ever contact you to comment?

15        A      No.

16        Q      Did you know that -- about that, that the

17    complaint draft had been sent to the New York Times

18    before it was filed?

19            MR. BEAL:  I'm going to object to the

20        form of the question on the grounds that it

21        calls -- object to the form of the question

22        on the grounds that it assumes facts not in

23        evidence that anyone provided a copy of

24        anything in this case to the New York Times

25        and they didn't retrieve it on their own

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 141

1        Q     Were you still dealing with the CNN

2    settlement when the WGW plaintiffs were no longer

3    associated with L. Lin Wood?

4              MR. BEAL:  Object to the form of the

5         question on vagueness grounds.  What do you

6         mean by dealing with.

7        A     So around --

8    BY MR. REYES:

9        Q     Do you understand the question, Mr.

10   McMurtry?

11       A     I can answer the question.  Around that

12   time period we had settled with CNN.  I don't know

13   the exact date that the settlement agreement was

14   signed.  We then moved to try to have it approved

15   because Nick Sandmann had not yet achieved the age of

16   18, so we needed court approval.  And I was taking

17   the lead on all of that.  After Taylor Wilson was no

18   longer involved I took over what he was doing.

19       Q     So it's fair to say that Wilson, Wade and

20   Grunberg were no longer involved in the case at that

21   time?

22       A     During the period of working to have the

23   settlement agreement approved, I believe that they

24   had left the firm.

25       Q     And they were not involved --

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 142

1        A      Approved -- approved by the -- approved

2    by the Court.  I think that it was signed and

3    finalized, but I don't think we had Court approval to

4    distribute the monies to a minor at that point.

5        Q      And the case was still active.  It had

6    not been dismissed, correct?

7        A      I don't believe so.

8        Q      You believe it was active?

9        A      We were trying to figure out how to

10   properly dismiss the case.  We were trying to figure

11   out if we needed the federal court to also approve

12   the settlement.  Once the settlement had been

13   approved then certainly it would have required a

14   dismissal of the case, but we had not made it that

15   far I do not believe in that March timeframe.  But

16   there will be something of record as to the exact

17   date we submitted the settlement.  It probably came

18   later in July when they paid us.

19       Q      Okay.

20       A      Dismissed the case.  If I misspoke there,

21   I think we probably dismissed the case after they

22   paid the monies in July of 2020.

23       Q      Very well.  Did Lin Wood have anything to

24   do with the postponement of the -- of the

25   conservatorship hearing?

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 143

 1       A     No.   The conservatorship hearing was

 2    postponed after I spoke with Doug -- Judge -- well,

 3    let me -- there were -- there was a hearing.  We

 4    showed up.  It was cancelled at the last minute.   I

 5    think we actually showed up.  And then we were going

 6    to move to a different judge to petition to have a

 7    guardian appointed.  And in that process I spoke with

 8    the judge to whom we were going to present the

 9    guardianship materials.  And he said that he could

10    not guarantee us that the settlement would remain

11    confidential.

12             So then we contacted the defendants and

13    they agreed that they would rather delay and pay us

14    later than risk the settlement becoming public.  And

15    Lin had nothing to do with any of that process.

16             (Whereupon, Defendants' Exhibit No. 4 was

17        previously marked for identification by the

18        court reporter.)

19    BY MR. REYES:

20        Q     Thank you.  I'll direct your attention

21    now to Exhibit 4.  And is this an e-mail from you to

22    Chris Marquardt on August 10, 2020 at 10:25 a.m. in

23    which you say:  Chris, I think Drew Beal committed

24    malpractice by not including the Sandmanns.

25             What do you mean by that?

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

1    BY MR. REYES:

2         Q    Mr. McMurtry, the plaintiffs in this case

3    allege in their complaint at paragraph five that you

4    and the Wood defendants preplanned that the client in

5    the disputed case, Nicholas Sandmann, would refuse to

6    consent to plaintiff's compensation with your knowing

7    aid.  Is that true?

8         A    No.

9         Q    At paragraph six the plaintiffs allege

10   that through discovery it has become apparent that

11   the McMurtry defendants conspired with the Wood

12   defendants to defraud the plaintiffs knowing and

13   understanding the overall objective was to avoid

14   compensating plaintiffs for the disputed case in the

15   manner agreed to by the Wood defendants and took

16   multiple steps before and after the settlement

17   agreement was executed to accomplish this fraudulent

18   aim.  Is that true?

19        A    I did not do what's alleged in the

20   paragraph.  I -- that's their argument in the

21   complaint, so -- and I didn't take any action as

22   described.

23        Q    At paragraph seven the plaintiffs allege

24   that at the Wood defendants' request the McMurtry

25   defendants first ensured just prior to the execution

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

1    of the settlement agreement that the client in the

2    disputed case would not consent to the payment of

3    future fees to plaintiffs as the Wood defendants

4    promised.  And then it goes on.

5              The McMurtry defendants carried out the

6    fraudulent plan when performance later came due by

7    instructing the client in the disputed case not to

8    consent to the agreed payment on the purported basis

9    that the law required quantum meruit only.

10             Is that true?

11        A    I'm sorry, I would need to see the

12   complaint.  Do we have it?  That's a lot for me to

13   remember and then answer.

14        Q    Okay.  I can -- I can repeat the

15   question.  It's paragraph seven of the complaint

16   filed against the Wood defendants and the McMurtry

17   defendants.  It says at the Wood defendants request

18   the McMurtry defendants first ensured just prior to

19   the execution of the settlement agreement that the

20   client in the disputed case would not consent to the

21   payment of future fees to plaintiffs as the Wood

22   defendants promised.

23        A    That's not true.

24        Q    That's not true, correct?

25        A    It is not true.

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 147

1      Q      The second paragraph in that allegation

2   is that the McMurtry defendants carried out the

3   fraudulent plan when performance later came due by

4   instructing the client in that disputed case not to

5   consent to the agreed payment on the purported basis

6   that the law required quantum meruit only.

7               Did that happen?

8      A      That is not true.

9      Q      That did not happen, correct?

10     A      It's not true what you read.

11     Q      Isn't it true that the plaintiffs allege

12   that the Wood defendants and the McMurtry defendants

13   defrauded them?

14     A      I think that's the gist of what they

15   allege in their complaint.

16     Q      And they allege that you defrauded them

17   by hiding the ball from them that at some point in

18   time they would be told you're not entitled to what's

19   in the settlement agreement, you're only entitled to

20   quantum meruit, right?

21               MR. BEAL:  Object to the form.

22     A      I don't quite understand the question.

23   I'm sorry.

24   BY MR. REYES:

25     Q      One of reasons why they allege that you,

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 148

1    the McMurtry defendants and the Wood defendants

2    defrauded the plaintiffs is that you hid the ball

3    from them and all along you were going to say Nick

4    Sandmann can only agree to the quantum meruit?

5              MR. BEAL:  Same objection.

6       A    I did not conspire with Lin to say that

7    Nick Sandmann would only agree to quantum meruit.

8    BY MR. REYES:

9       Q    Did you ask Nick Sandmann to consent?

10             MR. GILFILLAN:  I'm going to -- yeah,

11       I'm going to object and instruct him not to

12       answer.  I think that question calls for

13       communications that are subject to the

14       attorney/client privilege and information

15       subject to the work product doctrine.

16             MR. REYES:  Understood.

17             Would you explain briefly what's your

18       understanding of that Kentucky case that

19       you referred to earlier regarding the

20       applicability of the Rule 1.5(e) under

21       Kentucky law?

22       A    Yeah.  I mean the Kentucky Supreme Court

23   said in this case, and I think it was about 2012,

24   that if in a contingency fee situation if a lawyer

25   abandons the case without cause then that lawyer is