**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

```
1       represent Todd McMurtry and his law firm

2       Hemmer Wessels McMurtry.

3              THE VIDEOGRAPHER:  Thank you.  Would

4       the Court Reporter please swear in the

5       witness.

6                  TODD V. MCMURTRY,

7   having first been duly sworn, was deposed and

8   examined as follows:

9              MR. BEAL:  This will be the videotaped

10      deposition of Mr. Todd McMurtry taken for

11      preservation of evidence and use at trial,

12      for cross-examination and all purposes

13      provided under the Georgia Civil Practice

14      Act.

15                  EXAMINATION

16  BY MR. BEAL:

17      Q     Mr. McMurtry, good morning.

18      A     Good morning.

19      Q     Can you tell the jury your full name?

20      A     Todd Vandivere McMurtry.  My mother's

21  maiden name.

22      Q     Thank you.  You grew up in the area of

23  Kentucky where you practice law; is that correct?

24      A     Correct.

25      Q     All right.  And that's around the town of
```

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 11

1   Covington, not too far from Cincinnati, Ohio; is that

2   correct?

3        A    Correct.

4        Q    All right.  And I believe that you've

5   been practicing about 35 years.  Did I get that

6   correctly?

7        A    Yes.

8        Q    All right.  And you specialize mostly in

9   complex litigation; is that correct?

10       A    Yes.

11       Q    And you've had various leadership

12  positions with the Kentucky Bar Association and the

13  Northern Kentucky Bar Association?

14       A    Correct.

15       Q    And those are two different bar

16  associations, right?

17       A    Yes.

18       Q    All right.  And in Kentucky as in

19  Georgia, the Bar Association promulgates the rules

20  regarding ethics and the conduct of lawyers within

21  that state; is that correct?

22       A    They propose the rules.  They're

23  ultimately approved by the Supreme court.

24       Q    And they assist in enforcing those rules;

25  is that correct?

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 12

```
 1          A    Correct.
 2          Q    Thank you.  Let's talk about your
 3    relationship with Lin Wood and the plaintiffs in this
 4    case, Nicole Wade, Jonathan Grunberg and Taylor
 5    Wilson.  Would it be okay with you if we refer to the
 6    three of them as plaintiffs or WGW?
 7          A    Yes.
 8          Q    Okay.  It would save us some time.  You
 9    were first contacted by Lin Wood regarding -- how did
10    you first come to meet Lin Wood?
11          A    I called him on the phone.
12          Q    Because Todd -- because Nick Sandmann had
13    retained your services, is that -- or indicated that
14    he wished to retain your services; is that correct?
15          A    Correct.  Correct.  Sorry.
16          Q    And tell us who Nick Sandmann is and in
17    general terms what the claims were that he had when
18    he first contacted you.
19               MR. GILFILLAN:  And I'm going to
20          object based on attorney/client privilege
21          and the work product doctrine to the extent
22          that it -- you're asking him to talk about
23          claims or potential claims at that point
24          and communication with Nick Sandmann.
25          Subject to that go ahead.
```

NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.
Todd V. McMurtry on 03/27/2024

Page 13

1        A    So Nick Sandmann at the time that I met

2   him was a 16-year-old boy from I believe

3   Independence, Kentucky which is a suburb in northern

4   Kentucky.  And he was a student at Covington Catholic

5   High School.

6   BY MR. BEAL:

7        Q    And had he been the subject of various

8   news stories in Washington, D.C. regarding some type

9   of exchange or confrontation with a group of native

10  American demonstrators?

11       A    Basically, yes.  He was -- he was in

12  Washington, D.C., an incident occurred.  It went

13  viral and national and he was the subject of that.

14       Q    And so when did you first --

15            THE WITNESS:  I think we're good.

16       He's muted his phone.  (Technical issues.)

17            MR. BEAL:  Okay.  When were you --

18       when did you reach out to Lin Wood?

19       A    Within three or four days of being

20  retained on the case.  I would be -- the following

21  week, so the week in the 21st timeframe.

22  BY MR. BEAL:

23       Q    I'm sorry, I didn't ask --

24       A    January.

25       Q    All right.  What year?

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 14

1        A     2019.

2        Q     Okay.  So we're talking about January of

3    2019 and you reach out to Lin Wood.  Is that because

4    he was a well known defamation lawyer?

5        A     In part.  A friend of mine called me and

6    said that Lin was a well regarded defamation lawyer.

7        Q     And did you discuss with Lin a joint

8    representation of Nicholas Sandmann?

9        A     I did.

10             (Whereupon, Exhibit No. 16 was previously

11             marked for identification by the court

12             reporter.)

13        Q     All right.  Let's turn over to document

14    16 in your book there.

15        A     Got it.

16        Q     Does this appear to be Lin's -- one of

17    Lin's early communications to you on January 21st,

18    2019 where he's talking about scheduling an initial

19    meeting with the Sandmanns?

20        A     Yes.

21    BY MR. BEAL:

22        Q     And does he refer to Taylor Wilson and

23    Jonathan Grunberg as his partners in that

24    communication?

25        A     He does.

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 15

1      Q    And did you understand that Taylor,

2    Jonathan and Nicole -- I just did it again -- were

3    Lin's partners at that time?

4            MR. REYES:  Objection.

5      A    By virtue of this e-mail that's what he

6    told me.

7    BY MR. BEAL:

8      Q    But I mean did you -- when you met them

9    -- let's ask it this way.  So the meeting took place

10   the very next day, is that right, after --

11     A    Correct.

12     Q    -- this e-mail on Exhibit 16.  And did

13   Lin or the WGW folks introduce themselves or

14   represent that they were partners in the law firm?

15     A    I recall that Lin said that they were his

16   partners at the meeting.

17     Q    Thank you.  Throughout your

18   representation of Lin -- of Nick in 2019 and into the

19   beginning of 2020, did Lin routinely refer to the WGW

20   folks as his partners to clients, the court or other

21   attorneys?

22     A    I only recall that in the plead -- in

23   some of pleadings I believe they were referenced as

24   partners, some of the initial complaints that were

25   filed.  Maybe they were on that line.  That's my

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 16

1    recollection.  He and I did not discuss that.  You

2    know, he didn't -- when we spoke he didn't say my

3    partners, my partners.  We just didn't discuss

4    anything one way or the other about their status.

5          Q    Other than that initial meeting?

6          A    Correct.

7          Q    And how about representation to the

8    Court?  Do you recall anytime when Lin said one of my

9    partners referring to either of the three plaintiffs

10   here?

11         A    I believe he did refer to Taylor Wilson

12   as his partner at a conference with the trial court

13   judge.

14               (Whereupon, Exhibit No. 18 was previously

15         marked for identification by the court

16         reporter.)

17   BY MR. BEAL:

18         Q    Thank you.  Let's turn over to Exhibit

19   18.  Does this appear to be one of the three motions

20   pro hoc vice that you filed on behalf of -- excuse

21   me, one of the four pro hoc vice applications that

22   you filed on behalf of Lin Wood, Taylor Wilson,

23   Jonathan Grunberg and Nicole Wade?

24         A    Yes.

25         Q    All right.  And if we look at page two

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 17

1   under memorandum, the first sentence of the second

2   paragraph, you state under local rule 83.2(a)(1) Mr.

3   Grunberg is a partner with L. Lin Wood, PC?

4        A    I do state that, yes.

5        Q    And did you make a similar

6   representation -- I'll represent to you that the

7   other documents were produced -- regarding Taylor

8   Wilson and Nicole Wade?

9        A    That's my recollection, yes.

10            (Whereupon, Exhibit No. 21 was previously

11            marked for identification by the court

12            reporter.)

13   BY MR. BEAL:

14        Q    Thank you.  Let's look over at Exhibit

15   21.  Take a second and look at Lin's e-mail back to

16   you dated January 14th, 2020 at 5:58 p.m.

17        A    You want me to look at the e-mail for --

18   I see it.

19        Q    Yeah, you're pointing at it.

20        A    I recall this e-mail.

21        Q    Thank you.  And in that e-mail does Lin

22   say Taylor speaks for me unless or until I can speak

23   for myself?

24        A    He does.

25        Q    And did you understand that Lin was

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 18

1  directing you to Taylor Wilson whenever you had

2  substantive questions about the Sandmann case and he

3  was not available?

4      A    That was my understanding based upon

5  reading that e-mail.

6            (Whereupon, Exhibit No. 38 was previously

7       marked for identification by the court

8       reporter.)

9  BY MR. BEAL:

10     Q    Let's look over at Exhibit 38.  And this

11  is an e-mail that you produced from Taylor to you and

12  Kyle and Will of your firm and copies to other

13  people.  Do you remember receiving that e-mail?

14     A    Yes.

15     Q    All right.  And so there Taylor's

16  signature line is Wood, Wilson, Grunberg & Wade.  And

17  that e-mail is dated February 12th, 2020.  Did you

18  understand that sometime in January and the first

19  half of February 2020, WGW had formed a partnership

20  with Lin Wood called Wood, Wilson, Grunberg & Wade?

21     A    I did understand that to be the fact.

22            (Whereupon, Exhibit No. 39 was previously

23       marked for identification by the court

24       reporter.)

25  BY MR. BEAL:

NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.
Todd V. McMurtry on 03/27/2024

Page 19

1        Q     Thank you.  Let's look over at 39.  And

2    is this a retraction demand dated February 13th

3    authored by Taylor Wilson with a copy to you sent to

4    Democracy Now Productions, Inc., with a new

5    letterhead of Wood, Wilson, Grunberg & Wade trial

6    lawyers?

7        A     Yes.

8        Q     And that confirmed your belief that they

9    were in a firm at least at that point?

10            MR. REYES:  Objection, form.

11       A     Yes.

12   BY MR. BEAL:

13       Q     Thank you.  And by -- by February 13th

14   the Sandmann settlement had been agreed to and

15   executed by the lawyers for the various parties; is

16   that correct?

17       A     I think the initial settlement had been

18   with CNN.  I don't recall if the Washington Post

19   settlement had occurred at this time.

20       Q     I'm sorry, I should have been more

21   precise.  I meant the CNN settlement?

22       A     That's my recollection.

23            (Whereupon, Exhibit No. 17 was previously

24       marked for identification by the court

25       reporter.)

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 23

 1       and trying to find stuff.

 2    BY MR. BEAL:

 3       Q    And there were a lot of Internet

 4    rebroadcast, republication discussion of this event;

 5    is that right?

 6       A    Yeah, many, many.

 7       Q    And the WGW folks were primarily

 8    responsible for drafting lengthy retraction demands

 9    to various media outlets; is that correct?

10       A    Yes.

11       Q    And why are retraction demands to media

12    outlets so important in a case like this?

13       A    Well, Kentucky had a retraction statute

14    that would have affected how potential damages might

15    be awarded.  If you don't send a retraction demand

16    under Kentucky law then you may lose your right to

17    seek punitive damages.

18       Q    And were these kind of long detailed

19    analysis of how the publication was false?

20       A    Yeah, the length of the -- of the letters

21    speak for themselves.  The volume of the letters sent

22    speaks for themselves or speaks for itself.  They

23    were lengthy letters.

24       Q    Thank you.  The WGW folks also drafted

25    the complaint in this case; is that correct?

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 24

 1          A     There were three complaints that they

 2    drafted, yes.

 3          Q     Okay.  And then on the motion to dismiss

 4    they drafted the response to the motion to dismiss

 5    and worked with you in preparation for oral argument

 6    which you conducted; is that correct?

 7          A     Correct.  I mean people in my office

 8    would have helped but not on the substantive legal

 9    arguments.  We would have proofread, we would have

10    compiled, we would have filed, all that stuff.

11          Q     And did you divide up the labor on that

12    motion to dismiss in large part because the WGW folks

13    had a lot of experience with large defamation cases?

14          A     That was my understanding that they did.

15    I can't speak today to the level of their experience,

16    but they represented to me that they were experienced

17    and that they understood the law.

18          Q     Thank you.  And then they ultimately did

19    a motion to amend the complaint and drafted an

20    amended complaint?

21          A     That is correct.

22          Q     Would it be fair to say that they were

23    involved in and contributing toward all the written

24    work product in this case?

25          A     They took the lead on the written work

NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.
Todd V. McMurtry on 03/27/2024

Page 25

1    product while they were involved in the case.

2         Q    Mr. McMurtry, I'd like to play for you an

3    audio of a phone conversation you had with the WGW

4    folks and ask you a few followup questions regarding

5    it.  I believe you've heard it before and they've

6    shared it with you, but I'd like to talk to you about

7    it.  Takes a minute to get started.  Pause that for a

8    second.

9              (Whereupon, Exhibit No. 52 was previously

10        marked for identification by the court

11        reporter.)

12   BY MR. BEAL:

13        Q    So while we're waiting for that

14   recording, let's look over at Exhibit 52.  And if you

15   look at page two of Exhibit 52, on the middle of the

16   page you'll see a February 24th e-mail that you sent

17   to Lin at 9:22 p.m. in which you said need your

18   insights on campaign issue.  Can we chat tomorrow.

19              And can you describe for us what that is

20   referring to?

21        A    Not specifically.  I can't recall

22   specifically that conversation.

23        Q    But I meant the campaign?

24        A    Oh, sorry.

25        Q    Sorry.

NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.
Todd V. McMurtry on 03/27/2024

Page 29

1          The rule you keep referring to is Georgia

2    Rule of Professional Conduct Rule 1.5; is that

3    correct?

4          A     That's my recollection.

5          Q     And that is a rule that talks about

6    division of fees of lawyers; is that correct?

7          A     Again, yes, that's my recollection.

8          Q     All right.  And early in the audio

9    recording Taylor states or refers to I believe an

10   earlier phone conversation which you had in which you

11   informed him that the -- that your clients, the

12   Sandmanns, had not requested time sheets at that

13   point; is that correct?

14         A     At what point?

15         Q     I believe Taylor says Lin's whole

16   position that Nick required time sheets is not true,

17   and in response you said right.

18         A     That is correct.

19         Q     Okay.  So when Lin asserted that the

20   Sandmanns -- early in the dispute that the Sandmanns

21   had demanded to see the time sheets, that was not

22   correct?

23         A     That's not correct.  You are correct.

24   What you said is correct.  The answer is yes.

25         Q     Thank you.  Got it.  And you understood

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 35

1        A     Correct.  I wanted WGW to be paid fairly.

2   And I wanted to take into account the various factors

3   that led to receipt of these settlements as a part of

4   that.

5        Q     And whether WGW got paid half the fee in

6   the Sandmann versus CNN litigation, half of Lin's

7   fee, would not impact in any way the total amount of

8   fees paid by Nicholas Sandmann; is that correct?

9        A     That is correct.

10        Q     And it wouldn't impact the amount of fees

11   that you received for your representation of Nicholas

12   Sandmann in the CNN case, right?

13        A     That is correct.

14        Q     And it wouldn't -- it wouldn't require

15   the defendants to actually increase their settlement

16   amount?

17        A     That is correct.

18        Q     The only person who would pay something

19   more would be Lin Wood and/or L. Lin Wood, PC?

20        A     Correct.

21             (Whereupon, Exhibit No. 48 was previously

22        marked for identification by the court

23        reporter.)

24   BY MR. BEAL:

25        Q     Thank you.  All right.  Now let's turn

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

1   by WGW.

2        Q    Thank you.  Let's turn over to the second

3   page.  First full paragraph starts with:  Would you

4   please be willing to call me in the morning and let

5   me give you the basic details of what is going on and

6   exactly what I would like you -- like for you to

7   consider doing for me and what I would like for Ted

8   and Julie to consider doing for me which I believe

9   will bring this foolishness to an abrupt and unhappy

10  ending for Taylor, Jonathan and Nicole.

11            So did you understand that Lin wanted you

12  to do something for him, do him a favor essentially?

13       A    Yes.  And I mean it also related to

14  managing the case.  This is part of the

15  representation of dealing with their breakup.

16       Q    Thank you.  Last sentence of that

17  paragraph, worst case scenario will be that I'll be

18  authorized by the clients to hold my PC's portion of

19  the CNN fee in my escrow account pending final

20  resolution of the disputes between me and WGW.  That

21  alone will cut off their ability to finance and

22  publicize their BS claims against me.

23            Did you understand that by that that --

24  that Lin wanted to make sure that the WGW folks did

25  not receive any money which might finance their

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 39

1    claims for recovery of their fees against him?

2         A    That's what it says.

3         Q    Thank you.  Next paragraph:  I will look

4    forward to hearing from you and I'm very much looking

5    forward to seeing you, Kyle and Will in Greensboro on

6    Sunday morning.

7              So you met with him shortly after this

8    e-mail?

9         A    We did go to Greensboro the following

10   Sunday.

11        Q    Thank yo.

12        A    And he was present.

13        Q    And is Greensboro his lakefront house?

14        A    I think it's on that Reynolds property.

15        Q    Reynolds Plantation?

16        A    Right.  Yeah, there is a dock access to

17   the lake in the back of his house.  It's on the lake.

18        Q    Thank you.  All right.  Let's turn over

19   to the next page which is Bates No. 2869.  And I'm

20   directing your attention to the middle of the page,

21   another February 22nd, 2020 e-mail sent approximately

22   12 minutes later at 2:58 a.m.  Subject line all in

23   bold, a good idea, exclamation point.

24             Do you remember receiving this e-mail?

25        A    Yes.

NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.
Todd V. McMurtry on 03/27/2024

Page 44

1   competent jurisdiction orders otherwise.  That alone

2   will screw these greedy lawyers to the wall.

3          You will be able to disburse your own

4   fees and expenses to my PC's -- and my PC's expenses

5   but you can hold my share of the fee until you are

6   ordered to disburse it or until there's an agreement

7   by the parties allowing for payment of L. Lin Wood,

8   PC fees.

9          Did you understand that Lin was insistent

10  upon having you agree to hold fees in escrow as part

11  of his request regarding the division of fees in this

12  CNN v. Sandmann case?

13      A    That's what he wrote, yes.

14      Q    And then the third paragraph states:  In

15  combination our efforts on Saturday will deliver a

16  knockout punch to Taylor, Jonathan and Nicole.

17      A    Is there a question?

18      Q    Did you understand that to be Lin's

19  desire to prevent receipt of any money by WGW that

20  would assist them in funding their claims or

21  litigation against him?

22      A    That's what I took when I read this.

23  That was my understanding.

24      Q    The next paragraph says game, set, match.

25  If you agree with me, I hope you do, quantum meruit

NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.
Todd V. McMurtry on 03/27/2024

Page 45

1    is all these greedy will get [sic] despite my coerced

2    agreement to pay them 50 percent of a fee that at a

3    time when their mutiny and wrongdoing was unknown to

4    me.

5           So did you understand at that time that

6    Lin wanted WGW to only be paid in quantum meruit?

7           A    That's what he said.

8               (Whereupon, Exhibit No. 46 was previously

9           marked for identification by the court

10          reporter.)

11   BY MR. BEAL:

12          Q    Let's look over at Exhibit 46.  When you

13   spoke to Lin after he wrote these the next day either

14   on the phone or as you were flying down to Reynolds

15   that -- did Lin ever express a concern to you that

16   WGW might file suit against him to recover a portion

17   of the fees that he may or may not have agreed to in

18   writing?

19          A    I'm sorry.  Could you reread the

20   question?

21          Q    You want me to just phrase it again?

22          A    Yeah, I --

23          Q    Did he ever say --

24          A    -- wandered a bit.  Sorry.

25          Q    Did he ever say he thought WGW might

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 46

1    resort to litigation over the CNN v. Sandmann fees?

2          A    I don't recall that specifically.  My

3    best recollection is that he would have said that.

4    He certainly implied that in his writings.  And

5    otherwise I would have expected that they would have

6    resorted to litigation were they not paid for their

7    work in the case.

8          Q    And did he ever express to you any

9    concerns that the WGW folks might sue over fees in

10   other cases?

11         A    That I don't think so.  I don't recall

12   that.  It may be in here but I don't recall it.

13         Q    Any other cases that you were working on

14   such as the other Sandmann cases?

15         A    At this time I think there were only

16   three cases filed and I knew that WGW had worked on

17   all three cases.  And I would have expected that they

18   would have sought fees there as well.  I don't know

19   that I quite answered your question but that was what

20   I was thinking.

21         Q    Thank you.  That's fine.  Let's look over

22   at Exhibit 46.  Is this the letter that you wrote me

23   about, let's see here, nine hours after receiving the

24   three e-mails from Lin?

25         A    Yes.

NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.
Todd V. McMurtry on 03/27/2024

Page 51

```
 1        the form of the question because I think
 2        you said it is the opinion of the Sandmanns
 3        and the letter e-mail says it is my
 4        opinion.
 5             MR. BEAL:  Oh, all right.  Let me
 6        rephrase the question because I'm not
 7        trying to trick you with it.  I just
 8        misstated.
 9             Further it is my opinion that the
10        Sandmanns control the fees to be paid from
11        the CNN settlement.
12             You would agree with me, would you
13        not, that that sentence is another -- or
14        that clause is another statement that Lin
15        Wood expressed to you in his late night
16        e-mails?
17        A    It is.  I think it's also correct, but it
18   is what he said, yes.
19   BY MR. BEAL:
20        Q    Thank you.  And then you go on to say:
21   And at best are obligated to pay your clients in
22   quantum meruit for their services.  Is that correct?
23        A    That's what I wrote, yes.
24        Q    And so the subject of at best pay quantum
25   meruit for their services is also something that Lin
```

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 52

1    stated repeatedly in his various e-mails?

2         A     It is.

3         Q     And -- and is that the statement about

4    quantum meruit that you talked about in the audio

5    recording when you said I'm the one that start --

6    that introduced the subject of quantum meruit way

7    back when when I wrote that e-mail as an attempt to

8    work out a dispute?

9         A     I can't recall exactly what I said on the

10   audio, but I agree in general that quantum meruit

11   was -- I mean it would only make sense that people

12   would be paid for their work in a fair manner.

13              MR. BEAL:  Can we go off for one

14        moment?

15              THE VIDEOGRAPHER:  Going off the

16        record, 11:36 a.m.

17              (Whereupon, the video camera was

18        turned off.)

19              (Whereupon, a discussion ensued off

20        the record.)

21              (Whereupon, the video camera was

22        turned on.)

23              THE VIDEOGRAPHER:  Going back on the

24        record, 11:37 a.m.  Please continue.

25   BY MR. BEAL:

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 56

1        Q      So somewhat common, not common but --

2        A      Yeah, I mean he was abusive.  He would

3    try to abuse people.  It didn't work on me, but he

4    would use these tactics.  And yeah, he called me and

5    I didn't return his call.

6        Q      Thank you.  He says as to the campaign

7    it's -- he was your best financial supporter.  Do you

8    believe that to be in general terms correct?

9        A      I think he -- as I recall he offered to

10   help with some fundraising by maybe holding a

11   fundraiser in Atlanta or something like that.  But at

12   this sheer point in time I didn't really take too

13   much -- too much of what he said seriously.

14       Q      All right.  And then at the top of the

15   page of Exhibit 55 is your e-mail saying hey, I've

16   been busy, I'll call you?

17       A      Correct.  That's -- whatever that says,

18   that's what I said.

19              (Whereupon, Exhibit No. 56 was previously

20       marked for identification by the court

21       reporter.)

22   BY MR. BEAL:

23       Q      And then the very next exhibit, 56, is

24   the same day a couple of hours later.  You write this

25   e-mail, Exhibit 56, to me and to Lin; is that

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 63

```
 1        A    That is correct.
 2             (Whereupon, Exhibit No. 64 was previously
 3        marked for identification by the court
 4        reporter.)
 5   BY MR. BEAL:
 6        Q    And so then Exhibit 64, does this appear
 7   to be Lin's e-mail right back to you 30 -- 29, 30
 8   minutes later?
 9        A    Yes.
10        Q    Okay.  And he says:  I am excited, too.
11   The hearing will work out.  I have resolved dispute
12   with former business partners.  Today is a day for
13   prayer for our nation.  I love you.
14             Did Lin often times say I love you in his
15   e-mails?
16        A    Yes, he did.
17        Q    All right.
18        A    (Inaudible) that way.
19        Q    And -- and did you then contact him to
20   ask him what he meant by resolving his dispute with
21   his former business partners?
22        A    I don't believe that I did.  I don't
23   recall reaching out to him.  I just recall being
24   relieved that this was resolved and we could move on.
25        Q    And you believed that if there was an
```

NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.
Todd V. McMurtry on 03/27/2024

Page 64

1    agreement among the parties they could divide up the

2    fees however they wanted so long as it didn't affect

3    the Sandmann's fees or your fees and you could be

4    done with this?

5         A    Absolutely.

6         Q    And so you assumed that they had reached

7    one of those agreements that you talked about in your

8    letter to me where you said I will hold the money in

9    escrow absent an agreement?

10        A    Correct.

11             (Whereupon, Exhibit No. 69 was previously

12        marked for identification by the court

13        reporter.)

14   BY MR. BEAL:

15        Q    Thank you.  Let's turn over to Exhibit 69

16   and 3146 Bates number, so it's the second page.  In

17   the middle of the page does that appear to be your

18   e-mail to Lin on Tuesday, March 17th at 9:00 p.m. --

19   9:06 p.m.?

20        A    Yes.

21        Q    All right.  And you say:  Lin, I write to

22   bring you up to date on the status of the CNN

23   settlement.  We were set for a hearing on Monday in

24   Kenton District Court to appoint Julie Sandmann as

25   the conservator for Nick in the CNN settlement.

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 71

1     A     Yeah.

2     Q     I'm talking about 99.

3     A     I don't see that there's a call scheduled

4   on this.

5     Q     Okay.  But you have several conversations

6   with Alston & Bird during this time period; is that

7   correct?

8     A     I did.

9     Q     And they were about Nicholas's consent to

10  a fee division; is that correct?

11    A     Yes.

12    Q     And did you understand from your

13  conversations with them -- well, you understood they

14  were representing Lin, right?

15    A     I knew that, yes.

16    Q     And did you understand from your

17  conversations that they did not want Nicholas's

18  consent to a division of the fees in any way other

19  than quantum meruit because that was Lin's desire?

20    A     They did not say that.

21    Q     Did you have that understanding in your

22  mind from your conversations with them?

23    A     Alston and -- when Alston & Bird spoke

24  with me they -- there were I believe two calls.  And

25  they told -- you know, they sent the settlement

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 72

1   agreement and they told me that Nick would need to

2   approve it and that -- and then they discussed -- oh,

3   that Nick would need to approve it and that -- they

4   said that Lin was in favor of Nick's approval of the

5   settlement agreement.

6          And then they also spelled out other --

7   you know, what that looked like.  And I would say

8   that my best recollection of what they said is, is

9   that Nick had some discretion with regard to his

10  approval or non-approval of the settlement.  So that

11  information came from Alston & Bird.

12      **Q    And what did they say to you would form**

13  **the basis of that discretion?**

14      A    I don't quite understand your question.

15  Did --

16      **Q    On -- what would be some of the factors**

17  **that they indicated that Nick could consider?**

18      A    Well, I'll be honest.  When they started

19  to discuss that, I didn't want to be involved in the

20  process.  So I'm like I'll make my own decision.  You

21  guys -- I don't -- I don't want there to be you

22  suggesting anything in particular to me.

23          I did not want to be -- A, I didn't want

24  to be involved, B, I was pretty ticked off that this

25  was happening, and C, I didn't want them advising me

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 73

1   what I should do.  So that's the way I approached my

2   call with them -- calls plural.

3       Q    Thank you.  And you believed at that time

4   that the Sandmanns would control the allocation of

5   fees between Lin and WGW and that quantum meruit was

6   required; is that correct?

7       A    Well, I believe --

8            MR. REYES:  Objection.

9            THE WITNESS:  Is there an objection?

10       I -- I did not necessarily believe -- I

11       believed that Nick could have said yes, I

12       approve.  So I didn't think that he had to

13       engage in a quantum meruit discussion over

14       the fee.  So what Alston & Bird told me is

15       that Nick needed to make some decision

16       about approval or not of the settlement.

17   BY MR. BEAL:

18       Q    So we saw Exhibit 46 and 56, your first

19   letter to me in February of 2020 and your second

20   e-mail correspondence with me in March of 2020 in

21   which you said we can escrow the fees, the Sandmanns

22   control and quantum meruit is required.  Do you

23   remember those two --

24       A    I do.

25       Q    -- letters that you testified?

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

1        A    Yes.

2        Q    Thank you.  So are you saying that

3    between February of 2020 and July of 2020 your

4    position changed?

5        A    No, I don't think that my position

6    changed.  I think that I kind of stuck -- well, I see

7    what you're saying.  So whether -- whether it was

8    settled, that would eliminate any conversation about

9    the case.  My position changed after Alston & Bird

10   said Nick needs to approve this settlement.

11           And so then I felt that we were, you

12   know, kind of walking a tightrope as to what do we do

13   here.  I didn't want to have that imposed upon Nick

14   and was not happy that that we were being put in this

15   position to have to deal with the situation.

16       Q    Did you ever tell Nick that he didn't

17   have to consent to anything, he could just receive

18   his money and not sign any kind of consent form and

19   not get involved in the issue of his consent?

20           MR. GILFILLAN:  Objection.  That

21       question calls for communications subject

22       to the attorney/client privilege and work

23       product doctrine and I'll instruct Todd not

24       to answer.

25           MR. BEAL:  You recognize that -- that

NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.
Todd V. McMurtry on 03/27/2024

Page 79

1        Q       Thank you.  Did you tell Nick that Lin
2    did not want him to consent to any fee division
3    between his firm and WGW?
4               MR. GILFILLAN:  I'm going to object to
5          the form of the question because it
6          purports to characterize privileged
7          communications.  But then second, I'm also
8          going to object based on the
9          attorney/client privilege and work product
10         doctrine and instruct Todd not to
11         communicate about the substance of his
12         communications with Nick Sandmann.
13              MR. BEAL:  All right.  But at this
14         time when you're disbursing this large
15         amount of money to Nick and talking to him
16         or communicating with him about consent,
17         did you believe that Lin was important to
18         getting the CNN versus Sandmann settlement
19         during that time period?
20        A       The case that had already been settled?
21    BY MR. BEAL:
22        Q       Yes.  Do you think that he was
23    instrumental in getting the settlement?
24        A       At this time I did, yes.
25        Q       Did you think that he was important in

NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.
Todd V. McMurtry on 03/27/2024

Page 80

1    the other cases as well?

2          A    At that time I did, yes.

3          Q    Do you believe that Nick thought that Lin

4    was important?

5               MR. GILFILLAN:  I'm going to --

6               MR. BEAL:  I'm not asking him what he

7          told him.

8               MR. GILFILLAN:  Yeah, but I'm going to

9          object because I think a lawyer's

10         understanding of what the client thinks is

11         subject to the client's attorney/client

12         privilege and also the work product

13         doctrine.  So I'm going to instruct him not

14         to answer.

15              MR. BEAL:  And do you believe that

16         Nick understood that Lin was acting as the

17         general in this case?

18              MR. GILFILLAN:  Same objection.  I'm

19         going to instruct him not to answer.

20              MR. BEAL:  Do you believe that Lin was

21         important to you for your campaign at that

22         time?

23          A    No, the campaign was over.

24    BY MR. BEAL:

25          Q    All right.  He had already made the

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 94

1          court reporter.)

2     BY MR. BEAL:

3          Q     Let's look over at Exhibit 175.   Does

4     that appear to be Nicholas Sandmann's affidavit?

5          A     Yes.

6          Q     Thank you.   Let's look at paragraph ten

7     on page three.   The first sentence says:   After

8     consulting with Mr. McMurtry and receiving his

9     independent advice.

10               Do you believe that that statement was

11    correct?

12         A     Yes.

13         Q     And so you provided your counsel to

14    Nicholas Sandmann regarding the issues he discusses

15    here in the affidavit?

16               MR. GILFILLAN:   I'm going to object to

17          the extent it calls for communications

18          subject to the attorney/client privilege

19          and work product doctrine with -- with

20          Nick.   I think the document speaks for

21          itself.

22               MR. BEAL:   Well, I'm not asking for

23          any independent communications.   You know,

24          he makes a statement here that he received

25          his independent advice and I'm asking did

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 95

1       you provide independent advice to him?

2            MR. GILFILLAN:  You can answer that.

3       A    I did.

4    BY MR. BEAL:

5       Q    Thank you.  Then we see over on paragraph

6    11, the second sentence:  I made the decision to

7    request documentation from them on my own after

8    consulting with Mr. McMurtry and receiving his

9    independent advice.

10           Did I read that correctly?

11      A    Yes.

12      Q    And do you believe that that was accurate

13   also?

14      A    Yes.

15      Q    Okay.  So do you believe that your advice

16   was independent at that time?

17           MR. GILFILLAN:  I'm going to object

18      again to the extent you're getting into

19      privileged communications with Nick.  He

20      just testified that the statement in the

21      affidavit he believes to be correct.

22           MR. BEAL:  Now I'm talking about his

23      state of mind, nothing to do with Nick.

24           Do you believe that you were

25      independent in your advice at that time?

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

1      A    I undertook my own investigation from the

2  February timeframe through till that date.  I thought

3  arguably that there was -- there was a legal argument

4  under Kentucky law that they be -- that they receive

5  no fee.  And there's a case involving the -- an

6  attorney named Barbara Bonar and Stan Chesley that

7  discusses this issue.

8          And so -- and I also received the

9  communications from Alston & Bird suggesting that

10  Nick did need to provide some consent to the

11  settlement agreement.  And although I was greatly

12  disappointed that Alston & Bird was telling me we

13  were being pulled back into this thing, I do believe

14  that my advice was independent.

15  BY MR. BEAL:

16      **Q    And I believe you testified that you did**

17  **not review Rule 1.5(e)?**

18      A    I did back in February.  I did not review

19  it again when Alston & Bird told me that Nick needed

20  to approve the settlement.  My assumption -- and I

21  don't know whether they told me this.  My assumption

22  is that they were -- had an interpretation of the

23  rule different than the one you had, and that's why

24  they were telling me this.

25      **Q    And did you undertake your own**

NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.
Todd V. McMurtry on 03/27/2024

Page 98

1      Q    And you believed at that time that the

2   WGW folks were all partners of Lin Wood in L. Lin

3   Wood, PC or their other firm, Wood, Wilson, Grunberg

4   & Wade?

5      A    That's what Jonathan told me back in that

6   time period.  So I accepted his representation that

7   that was their status.

8      Q    And do you know how being members of a

9   firm would impact the interpretation of Rule 1.5(e)?

10     A    I know that the rule discusses winding up

11  affairs and so forth.  You know, I think -- I think

12  that as I said before the case law in Kentucky is a

13  little different.  I was looking at it from a

14  Kentucky standpoint.

15     Q    And if we look back at Exhibit 92 in the

16  first binder?

17     A    I see it.

18     Q    Thank you.  And we look at page six --

19  excuse me, page seven, note eight, states that

20  paragraph E, meaning Rule 1.5(e), does not prohibit

21  or regulate the division of fees to be received in

22  the future for work done when lawyers were previously

23  associated in a law firm.

24          Did -- did you have an opportunity to

25  review note eight to Rule 1.0 -- Rule 1.5(e), sorry?

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 99

1      A     Not prior, not in the July 2024

2   timeframe.  I don't believe that the version of the

3   rules that I reviewed in February of 2020 yet

4   contained that provision.  I think the rules did.  I

5   think my book -- you know, the book that I referred

6   to for those things didn't have that rule, did not

7   have that number eight comment.

8            With regard to heading into July 4th,

9   2020, no, I did not review that.  I did not see this

10  memo.  I did not review that.  I relied upon what

11  Alston & Bird told me was required under Georgia law.

12      Q     And you discussed Rule 1.5 with Lin in

13  February of 2020; is that right?

14      A     I believe that I did, yes.

15      Q     And then if we look over to page six of

16  that exhibit?

17      A     Which one?

18      Q     The 92, sorry.  And I'll just read it to

19  you.

20      A     Okay.

21      Q     Georgia Rule of Professional Conduct

22  1.5(e) provides a division of the fee between lawyers

23  who are not in the same firm may be made only if.

24            Not in the same firm.  And I believe you

25  testified that you believed that the WGW folks were

NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.
Todd V. McMurtry on 03/27/2024

Page 100

1  partners with Lin Wood in his firm or in the firm of

2  WWGW?

3      A    When they left the firm, yes, I would

4  have said that they were partners.

5      Q    Thank you.  And did you get a chance to

6  review Georgia Rule of Professional Conduct 1.0?

7      A    I didn't review any Georgia rules of

8  professional conduct.

9      Q    What steps did you undertake if any to

10  determine what constitutes a law firm -- associated

11  with a law firm or being members of a law firm?

12      A    I didn't do anything with regard to

13  Georgia law.  I'm not licensed or affiliated with any

14  firm down here, so I didn't make any review of

15  Georgia law.  I relied upon what Alston & Bird told

16  me.  And prior in the February timeframe I thought

17  Kentucky law applied.  And as I said I decided to use

18  a case involving Bonar and Chesley, which I think

19  would support my legal position at that time.

20      Q    Looking back at the -- I think you're on

21  the right one, the affidavit, did you ever ask to see

22  Lin Wood's records of his time spent in the Sandmann

23  versus CNN case?

24      A    No.

25      Q    When providing legal advice did you

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 101

```
 1    discuss the issue of proportionality?

 2            MR. GILFILLAN:  Object to form.

 3        Object to that question.  It calls for

 4        communications subject to the

 5        attorney/client privilege and work product

 6        doctrine.

 7            MR. BEAL:  What steps, if any, did you

 8        undertake to determine the proportionality

 9        of any fee to WGW as opposed to Lin Wood?

10        A    The only steps that I would have taken or

11    that I did take were to consider the relative value

12    of what each group, Lin Wood and WGW, brought to the

13    settlement.  And in my view Lin Wood's -- my view at

14    the time, it's evolved, but at the time I would have

15    said that Lin procured the settlements based upon his

16    alleged national reputation and standing in the area

17    of defamation law and that WGW were his able

18    supporters in that effort.

19            But that none -- none of that group, WGW,

20    would have had any success obtaining those same

21    settlements as Lin was able to based upon in part

22    his -- you know, he personally knew the lawyers for

23    CNN.  He personally knew the lawyers for the

24    Washington Post, had dealt with them before and they

25    seemed to have a good rapport.  So I saw Lin as being
```

NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.
Todd V. McMurtry on 03/27/2024

1  the -- you know, kind of using a realtor term, the

2  procuring cause of the settlements.

3  BY MR. BEAL:

4       Q    Would you agree that there would have

5  been no settlement had there not been a complaint and

6  a complaint or amended complaint that ultimately

7  survived a motion to dismiss?

8       A    Yeah, sure.  And I think that, you know,

9  in an alternate reality Lin had the capacity to have

10  drafted the complaint or directed me to draft that

11  complaint just as he helped train the WGW people in

12  this field of law.

13      Q    Did you ever have a discussion with Lin

14  about how often he ever typed any pleading or any non

15  e-mail correspondence?

16      A    I'm sure that he did practically nothing

17  other than talk to me on the phone from time to time.

18      Q    Thank you.  When WGW withdrew from these

19  cases, your firm undertook a lot of the written

20  product thereafter in representation of Nick

21  Sandmann; is that correct?

22      A    Yes.

23      Q    Would you say that your law firm then

24  after their departure effectively did all the written

25  work product on the Sandmann cases?

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 103

1       A    Yes.  I even had to -- had to hire

2    another attorney to help.

3       Q    All-consuming absorbing kind of work?

4       A    Yes.

5       Q    And you were aware at the time of the

6    execution of this affidavit and you were aware in

7    July of 2020 that Lin did not keep a record of his

8    time either?

9       A    I certainly would not have -- I didn't

10   know that as an independent fact.  My assumption was

11   that he did not.

12      Q    Okay.  And he had told you in multiple

13   e-mails that the WGW folks did not to his knowledge

14   either?

15      A    That's what he told me.

16           MR. GILFILLAN:  We've been going about

17       an hour and 20 minutes.

18           THE WITNESS:  I'm fine.  If you need a

19       short break, that's fine.

20           MR. BEAL:  You need a break?

21           MR. GILFILLAN:  Yeah.

22           THE VIDEOGRAPHER:  Going off the

23       record, 1:39 p.m.

24           (Whereupon, the video camera was

25       turned off.)

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 104

```
1              (Whereupon, a brief recess was taken.)

2              (Whereupon, the video camera was

3         turned on.)

4              THE VIDEOGRAPHER:  We're going back on

5         the record.  The time is 2:05 p.m.  Please

6         continue.

7    BY MR. BEAL:

8         Q    Mr. McMurtry, thank you.  Follow up on a

9    couple of questions.  Let's see if we can't bring

10   this to a close.

11              Earlier I believe you testified that you

12   and Lin had discussions in February 2020 about Rule

13   1.5?

14        A    Yes.

15        Q    All right.  Did Lin bring those up to

16   you?

17        A    I don't recall whether he mentioned it or

18   whether I looked at the rule myself.  I'm sorry, I

19   don't recall.  If it's in one of his e-mails

20   mentioning that rule then he would have initiated

21   that.  I just don't recall.

22        Q    Did -- in your conversations with Alston

23   & Bird in July did they ever tell you that WGW were

24   not lawyers of L. Lin Wood, PC?

25        A    I don't believe so.  I don't recall that.
```

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

1    Don't recall them ever saying that.

2         Q    Did they -- but they did tell you they

3    were lawyers of a separate law firm?

4         A    I believe that they did.

5         Q    Thank you.  Did you come away with the

6    belief that Lin wanted -- did you come away with a

7    belief as to what Lin's desires were regarding fee

8    splits in the Sandmann versus CNN case based on your

9    conversations with Alston & Bird?

10             MR. REYES:  Objection, form.

11        A    I do not believe that anything that

12   Alston & Bird did gave me an indication as to what

13   Lin's desires were.

14   BY MR. BEAL:

15        Q    But you had a belief based on your

16   communications directly with Lin?

17        A    I did.

18        Q    And was that that he did not want to

19   share fees on that case with WGW except on a quantum

20   meruit basis?

21             MR. REYES:  Objection, form.

22        A    I don't know that he was as specific as

23   saying quantum meruit, but in that July 2020

24   timeframe based upon my conversations with Lin, I

25   took that he did not want -- he did not want Nick to

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 106

1  approve that settlement and he didn't want to share

2  fees with WGW.

3  BY MR. BEAL:

4      Q    Thank you.  You had no discussions with

5  Lin between that -- the March 17th time period and

6  these July 2020 conversations about the WGW fee

7  split.  Is that fair?

8      A    The first I would have learned of this

9  new WGW fee split issue would have been when Lin

10  called me and said my lawyers from Alston & Bird are

11  going to call you.  And then they called me and they

12  raised this issue of needing Nick to approve the

13  settlement between Lin Wood and WGW.

14          So that would have occurred in July 2020

15  I believe based upon my review of the e-mails and

16  documents.  So between that March e-mail where Lin

17  said we're settled and that July call where Lin said

18  Alston & Bird will be calling you, I didn't even

19  think about this.  I thought it was over.

20      Q    Thank you.  So nothing changed in your

21  perception of what Lin wanted between your

22  February/March conversations with Lin and your July

23  conversations with Lin; is that right?

24      A    The only thing that would have indicated

25  a change is that e-mail in March where he said we're

NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.
Todd V. McMurtry on 03/27/2024

Page 107

1    settled.  But other than that, he never spoke to me

2    and said my -- my feelings on settlement have

3    changed, you know, up until the July timeframe.

4        Q    And he never said disregard prior

5    communications or anything?

6        A    No.

7        Q    I believe you testified about a trip that

8    you guys took down to Reynolds plantation to meet

9    with him?

10        A    I could never forget that trip, but go

11    ahead.

12        Q    And on -- did Lin send a private jet for

13    you guys?

14        A    He did.

15        Q    All right.  And in that trip he also

16    expressed his views about fee splits and a variety of

17    other issues?

18        A    I don't recall exactly.  It was a -- it

19    was a very strange event.  He expressed a lot of

20    views in the day that we were there.  And I'm sure

21    that there would have been -- based upon everything

22    that is happening that there would have been some

23    complaints about WGW.

24        Q    Okay.  Now, there was another trip down

25    to his plantation in South Carolina, the Tomotley

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 121

1   we would like to see some evidence of their work, you

2   know, show me their work.

3          **Q     And you were keenly aware of the amount**

4   **of written product they did because you were working**

5   **with them on every phase of this case?**

6          A     In my opinion --

7          **Q     Is that correct?**

8          A     In my opinion as an attorney separated

9   from my role as a lawyer I thought that their fee

10  would have been fine.  I mean you could make an

11  argument one way or the other and say 800,000 is too

12  much or it's not enough.  I think the point of the

13  July 24th thing is that this was thrust upon me

14  without anybody asking me, and I didn't want to be --

15  I really didn't want to be a part of it.

16          I didn't want to say yes.  I didn't want

17  to say no.  I really wanted to thread the needle and

18  get out of the -- get out of the whole situation.

19  That's what I was trying to do.

20          **Q     Did you ever tell Lin that you felt like**

21  **he had brought you into this situation unfairly or**

22  **improperly?**

23          A     I probably said I'm really pissed off

24  that I'm involved in this situation, yes.  I was not

25  happy about it and I didn't want to be involved in

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 123

1          we ought to -- let's focus on the language

2          that's actually on that recorded call.

3                  THE WITNESS:  So in response do you

4          want to ask a different question or do you

5          want me to --

6      BY MR. BEAL:

7          Q    No.  Go ahead and answer that one.

8          A    Okay.  So as I understand your question,

9      did I tell Alston & Bird that Nick -- did I tell

10     Alston & Bird that I wanted to see something for WGW

11     to prove its work.  And that's just the gist of what

12     I said, show us your work, then yes, I did tell that

13     to Alston & Bird.

14         Q    Right.  That's paragraph 31.  Paragraph

15     32 where you're referencing Nick and his demand for

16     documents, I believe what you meant is it's your

17     demand for documents; is that right?

18                 MR. GILFILLAN:  I'll object to the

19         form to the extent it mischaracterizes what

20         he meant.

21         A    What I communicated to Alston & Bird was

22     that we would like WGW to show its work.

23     BY MR. BEAL:

24         Q    Okay.  But I believe you said on the

25     recorded call that the disputed client did not demand

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 124

1    time records to substantiate fees?

2        A    Correct.  I think something akin to your

3    letter that you sent before, if you had sent that on,

4    you know, August 3rd or something, had you chosen to

5    do that then I would have been able to proceed.  And

6    again, I didn't want to be approving or not approving

7    the fee, but that would have been the next step in

8    getting your people paid.

9        Q    But not getting into your attorney/client

10   communications, you were capable of telling Nick all

11   the facts regarding proportionality of the fee

12   because you lived it, you worked it and you worked

13   with the WGW folks every day throughout 2019 and the

14   beginning of 2020, correct?

15            MR. GILFILLAN:  I'm going to object

16       and instruct him not to answer to the

17       extent that it calls for what -- he what he

18       said and communicated --

19            MR. BEAL:  Nope.

20            MR. GILFILLAN:  -- about with the

21       Sandmanns.

22            MR. BEAL:  Doesn't ask that at all.

23            THE WITNESS:  May I proceed?

24            MR. GILFILLAN:  Yes.

25       A    So if you had called me as an expert

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 125

1    witness to review the work done on the case, I would

2    have found that their fee request was reasonable.

3                    MR. BEAL:   Thanks.   Let's take a quick

4          break and see if we have any mop up

5          questions.

6                    THE VIDEOGRAPHER:   Going off the

7          record, 2:34 p.m.

8                    (Whereupon, the video camera was

9          turned off.)

10                   (Whereupon, a brief recess was taken.)

11                   (Whereupon, the video camera was

12         turned on.)

13                   THE VIDEOGRAPHER:   We're going back on

14         the record.   The time is 2:41 p.m.   Please

15         continue.

16                   (Whereupon, Exhibit No. 199 was

17          previously marked for identification by the

18          court reporter.)

19   BY MR. BEAL:

20         Q    Can you turn over to Exhibit 199, Mr.

21   McMurtry?   We received this extraction report from

22   Cellebrite from your team.   Can you describe for us

23   who Cellebrite is?

24         A    Is this my phone?

25         Q    Yeah, I think.

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

1  to the -- whether we would go through the process of

2  probate or whether we'd wait until Nick turned 18 and

3  what that meant.  So there were some additional

4  negotiations.  But I can't say exactly when.  I think

5  around this time.

6       Q    And did -- did Lin ever indicate to you

7  that he wanted to wait till Nick turned 18 because it

8  would be easier for him to convince Nick not to

9  consent to any fee agreement with the WGW people?

10      A    No.

11      Q    Was it for increased confidentiality of

12  the settlement?

13      A    What happened is, is we ended up going to

14  a judge, Douglas Grothaus, to try to have the

15  agreement.  I graduated from law school with Judge

16  Grothaus.  I called him up, I said we've got this

17  confidential settlement agreement.  Can it remain

18  confidential through this process?  And he said no, I

19  have to look at it and somebody else might look at

20  it.

21           So we considered that just due to the

22  high profile nature of things at that time that it

23  would be better -- I think we told this -- I'm pretty

24  sure I told this to opposing counsel that I did -- I

25  was doing all this.  I told this to opposing counsel

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 130

1    and said there's a problem, it may -- it may not

2    remain confidential, it may be leaked out of the

3    clerk's office.  And so they said let's wait until he

4    18.  And then we negotiated points over what that

5    meant since we'd have to wait all this time to get

6    paid.

7         Q    Were you aware that Lin ever communicated

8    any of that to WGW?

9         A    No.

10         Q    And so I believe you testified earlier

11   that the settlement in the CNN Sandmann case was in

12   January of 2020?

13         A    Yes.

14         Q    Is that right?  And these e-mails are in

15   March of 2020; is that correct?

16         A    Yes.

17         Q    All right.  What did Lin say to you in

18   July of 2020 that made you think he still did not

19   want Nick to consent to a fee division with WGW?

20         A    So from the time of the call with Alston

21   & Bird up until July 24th I probably had three or

22   four phone calls from Lin where he was basically

23   unhinged and screaming, I'm being screwed, I'm being

24   screwed, WGW is screwing me, you know.  And he was

25   really -- as Mr. Wilson knows, you know, off the

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 131

1    reservation, you know, crazy.

2           And so we had to deal with that and

3    that's what he told me.  So I knew that he was

4    looking for a deficient solution.  He was trying to

5    blow things up.  So that's what he told me.

6           Q     Thank you.  Did you ever receive any

7    interest on the CNN settlement?

8           A     There -- yes, there was interest paid on

9    the CNN settlement.

10          Q     And do you know approximately how much

11   that was?

12               MR. GILFILLAN:  I'm going to object

13          based on confidentiality grounds.  We don't

14          unfortunately have a protective order in

15          this case in place, and I think the amount

16          of that would be -- would be confidential.

17               MR. BEAL:  Okay.  And however much it

18          was, did you and Lin share some portion of

19          that interest by your contingency fee?

20          A     Yes, we did.  It was just, you know, some

21   simple type interest on the gross amount that was

22   tacked onto the settlement by July 20.

23               MR. BEAL:  Thank you very much.

24               THE WITNESS:  Okay.

25               MR. BEAL:  I appreciate it.

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 133

1        Q      If I may, let's go to Exhibit No. 5.

2        A      (Witness complies with request of

3    counsel.)

4        Q      And it's my understanding that at some

5    point in time counsel for Mr. Wood at Alston & Bird,

6    Joey Burby and Chris Marquardt, asked you to confirm

7    that Nicholas Sandmann had seen the entire affidavit

8    that he had signed.  Is that so?

9        A      Is it so that Nicholas Sandmann saw the

10   entire affidavit that he signed?  I missed your

11   question.  I'm sorry.

12       Q      Yes.  That's question one.

13       A      Nicholas Sandmann did see the entire

14   affidavit.

15              (Whereupon, Defendants' Exhibit No. 6 was

16       previously marked for identification by the

17       court reporter.)

18   BY MR. REYES:

19       Q      And that's what you confirmed to the

20   lawyers on Exhibit No. 6; is that correct?

21       A      Without reading the entire affidavit I

22   believe that that is correct.

23       Q      Okay.  Was Mr. Wood involved in those

24   conversations with you at the time that Nicholas

25   Sandmann was asked to provide an affidavit?

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 134

1      A     Mr. Wood was not involved in any way in

2   the affidavit.

3             (Whereupon, Defendants' Exhibit No. 3 was

4        previously marked for identification by the

5        court reporter.)

6   BY MR. REYES:

7      Q     Okay.  If I may direct your attention to

8   Exhibit No. 3.

9      A     (Witness complies with request of

10  counsel.)  I see it.

11     Q     Did you present that settlement agreement

12  to the Sandmanns for consideration?

13     A     The fact is that I did.

14     Q     Okay.  Who communicated -- who spoke with

15  you on behalf of Mr. Wood regarding the need for

16  consent from Nicholas Sandmann in order for the fee

17  split to occur?

18     A     Alston & Bird, Joey Burby and Chris

19  Marquardt, however you pronounce it.  Marquardt.

20     Q     Not Lin Wood?

21     A     Lin Wood did not tell me that Nicholas

22  Sandmann had to consent to the settlement agreement.

23     Q     Okay.  And I believe that you testified

24  earlier today that Joey Burby told you that Lin had

25  said that Nick should consent; is that right?

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 135

1       A     That is what Joey Burby and/or Chris

2   Marquardt told me.

3       Q     So it's fair to say that Lin Wood never

4   told you ask Nick Sandmann not to consent?

5       A     Lin Wood never told me or asked me to

6   have Nick Sandmann not consent.

7       Q     Has Mr. Beal's office contacted you

8   regarding coordinating depositions for Nick Sandmann

9   or Julie Sandmann or Ted Sandmann?

10      A     No.

11      Q     At some point in time the complaint that

12  the WGW plaintiffs filed against Mr. Wood made it to

13  the New York Times before it had been filed.  Did the

14  New York Times ever contact you to comment?

15      A     No.

16      Q     Did you know that -- about that, that the

17  complaint draft had been sent to the New York Times

18  before it was filed?

19           MR. BEAL:  I'm going to object to the

20      form of the question on the grounds that it

21      calls -- object to the form of the question

22      on the grounds that it assumes facts not in

23      evidence that anyone provided a copy of

24      anything in this case to the New York Times

25      and they didn't retrieve it on their own

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 141

1        Q        Were you still dealing with the CNN

2    settlement when the WGW plaintiffs were no longer

3    associated with L. Lin Wood?

4                 MR. BEAL:   Object to the form of the

5             question on vagueness grounds.   What do you

6             mean by dealing with.

7        A    So around --

8    BY MR. REYES:

9        Q        Do you understand the question, Mr.

10   McMurtry?

11       A    I can answer the question.   Around that

12   time period we had settled with CNN.   I don't know

13   the exact date that the settlement agreement was

14   signed.   We then moved to try to have it approved

15   because Nick Sandmann had not yet achieved the age of

16   18, so we needed court approval.   And I was taking

17   the lead on all of that.   After Taylor Wilson was no

18   longer involved I took over what he was doing.

19       Q    So it's fair to say that Wilson, Wade and

20   Grunberg were no longer involved in the case at that

21   time?

22       A    During the period of working to have the

23   settlement agreement approved, I believe that they

24   had left the firm.

25       Q        And they were not involved --

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 142

1        A    Approved -- approved by the -- approved

2    by the Court.  I think that it was signed and

3    finalized, but I don't think we had Court approval to

4    distribute the monies to a minor at that point.

5        Q    And the case was still active.  It had

6    not been dismissed, correct?

7        A    I don't believe so.

8        Q    You believe it was active?

9        A    We were trying to figure out how to

10   properly dismiss the case.  We were trying to figure

11   out if we needed the federal court to also approve

12   the settlement.  Once the settlement had been

13   approved then certainly it would have required a

14   dismissal of the case, but we had not made it that

15   far I do not believe in that March timeframe.  But

16   there will be something of record as to the exact

17   date we submitted the settlement.  It probably came

18   later in July when they paid us.

19       Q    Okay.

20       A    Dismissed the case.  If I misspoke there,

21   I think we probably dismissed the case after they

22   paid the monies in July of 2020.

23       Q    Very well.  Did Lin Wood have anything to

24   do with the postponement of the -- of the

25   conservatorship hearing?

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 143

```
 1        A    No.  The conservatorship hearing was
 2   postponed after I spoke with Doug -- Judge -- well,
 3   let me -- there were -- there was a hearing.  We
 4   showed up.  It was cancelled at the last minute.  I
 5   think we actually showed up.  And then we were going
 6   to move to a different judge to petition to have a
 7   guardian appointed.  And in that process I spoke with
 8   the judge to whom we were going to present the
 9   guardianship materials.  And he said that he could
10   not guarantee us that the settlement would remain
11   confidential.
12              So then we contacted the defendants and
13   they agreed that they would rather delay and pay us
14   later than risk the settlement becoming public.  And
15   Lin had nothing to do with any of that process.
16              (Whereupon, Defendants' Exhibit No. 4 was
17         previously marked for identification by the
18         court reporter.)
19   BY MR. REYES:
20        Q    Thank you.  I'll direct your attention
21   now to Exhibit 4.  And is this an e-mail from you to
22   Chris Marquardt on August 10, 2020 at 10:25 a.m. in
23   which you say:  Chris, I think Drew Beal committed
24   malpractice by not including the Sandmanns.
25              What do you mean by that?
```

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 145

1    BY MR. REYES:

2        Q    Mr. McMurtry, the plaintiffs in this case

3    allege in their complaint at paragraph five that you

4    and the Wood defendants preplanned that the client in

5    the disputed case, Nicholas Sandmann, would refuse to

6    consent to plaintiff's compensation with your knowing

7    aid.  Is that true?

8        A    No.

9        Q    At paragraph six the plaintiffs allege

10   that through discovery it has become apparent that

11   the McMurtry defendants conspired with the Wood

12   defendants to defraud the plaintiffs knowing and

13   understanding the overall objective was to avoid

14   compensating plaintiffs for the disputed case in the

15   manner agreed to by the Wood defendants and took

16   multiple steps before and after the settlement

17   agreement was executed to accomplish this fraudulent

18   aim.  Is that true?

19       A    I did not do what's alleged in the

20   paragraph.  I -- that's their argument in the

21   complaint, so -- and I didn't take any action as

22   described.

23       Q    At paragraph seven the plaintiffs allege

24   that at the Wood defendants' request the McMurtry

25   defendants first ensured just prior to the execution

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

Page 146

1    of the settlement agreement that the client in the

2    disputed case would not consent to the payment of

3    future fees to plaintiffs as the Wood defendants

4    promised.  And then it goes on.

5              The McMurtry defendants carried out the

6    fraudulent plan when performance later came due by

7    instructing the client in the disputed case not to

8    consent to the agreed payment on the purported basis

9    that the law required quantum meruit only.

10             Is that true?

11       A    I'm sorry, I would need to see the

12   complaint.  Do we have it?  That's a lot for me to

13   remember and then answer.

14       Q    Okay.  I can -- I can repeat the

15   question.  It's paragraph seven of the complaint

16   filed against the Wood defendants and the McMurtry

17   defendants.  It says at the Wood defendants request

18   the McMurtry defendants first ensured just prior to

19   the execution of the settlement agreement that the

20   client in the disputed case would not consent to the

21   payment of future fees to plaintiffs as the Wood

22   defendants promised.

23       A    That's not true.

24       Q    That's not true, correct?

25       A    It is not true.

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
Todd V. McMurtry on 03/27/2024

Page 147

1      Q      The second paragraph in that allegation

2    is that the McMurtry defendants carried out the

3    fraudulent plan when performance later came due by

4    instructing the client in that disputed case not to

5    consent to the agreed payment on the purported basis

6    that the law required quantum meruit only.

7              Did that happen?

8      A      That is not true.

9      Q      That did not happen, correct?

10     A      It's not true what you read.

11     Q      Isn't it true that the plaintiffs allege

12   that the Wood defendants and the McMurtry defendants

13   defrauded them?

14     A      I think that's the gist of what they

15   allege in their complaint.

16     Q      And they allege that you defrauded them

17   by hiding the ball from them that at some point in

18   time they would be told you're not entitled to what's

19   in the settlement agreement, you're only entitled to

20   quantum meruit, right?

21            MR. BEAL:  Object to the form.

22     A      I don't quite understand the question.

23   I'm sorry.

24   BY MR. REYES:

25     Q      One of reasons why they allege that you,

**NICOLE WADE, ET AL. vs L. LIN WOOD, ET AL.**
**Todd V. McMurtry on 03/27/2024**

1    the McMurtry defendants and the Wood defendants

2    defrauded the plaintiffs is that you hid the ball

3    from them and all along you were going to say Nick

4    Sandmann can only agree to the quantum meruit?

5              MR. BEAL:  Same objection.

6         A    I did not conspire with Lin to say that

7    Nick Sandmann would only agree to quantum meruit.

8    BY MR. REYES:

9         Q    Did you ask Nick Sandmann to consent?

10             MR. GILFILLAN:  I'm going to -- yeah,

11        I'm going to object and instruct him not to

12        answer.  I think that question calls for

13        communications that are subject to the

14        attorney/client privilege and information

15        subject to the work product doctrine.

16             MR. REYES:  Understood.

17             Would you explain briefly what's your

18        understanding of that Kentucky case that

19        you referred to earlier regarding the

20        applicability of the Rule 1.5(e) under

21        Kentucky law?

22        A    Yeah.  I mean the Kentucky Supreme Court

23    said in this case, and I think it was about 2012,

24    that if in a contingency fee situation if a lawyer

25    abandons the case without cause then that lawyer is